## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAQUIA BUIE,

        *Plaintiff*,

    v.

DISTRICT OF COLUMBIA, *et al.*,

        *Defendants*.

Civil Action No. 1:16-cv-01920-CKK

## DEFENDANT DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT

Defendant District of Columbia (the District) moves under Fed. R. Civ. P. 56(c) for judgment on all claims asserted by Plaintiff Jacquia Buie. Plaintiff's 42 U.S.C. § 1983 municipal liability claims fail because Plaintiff cannot establish deliberate indifference or causation. Additionally, the District is entitled to judgment on Plaintiff's common law claims because (1) the District is not vicariously liable for Best's assault; (2) Plaintiff's claims fail on the merits; (3) the statute of limitations bars Plaintiff's negligent and intentional infliction of emotional distress claims, and (4) the public duty doctrine bars any claim that the District breached a "duty to protect" Plaintiff. Finally, even if Plaintiff could proceed on any of her claims, the Court should grant judgment to the District on Plaintiff's prayer for injunctive relief.

A statement of material facts as to which there is no genuine issue, a memorandum of points and authorities supporting this motion, and a proposed order are attached for the Court's consideration.

Date: October 20, 2020

Respectfully submitted

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Alicia M. Cullen*
ALICIA M. CULLEN [1015227]
Chief, Civil Litigation Division, Section III

*/s/ Philip A. Medley*
DAVID A. JACKSON [471535]
PHILIP A. MEDLEY [1010307]
MATHEW BLECHER [1012957]
Assistant Attorneys General
400 6th Street, NW
Washington, D.C. 20001
Phone:  (202) 724-6618; (202) 724-6626
Fax:  (202) 741-8999; (202) 741-5920
Email:  davida.jackson@dc.gov;
philip.medley@dc.gov;
matthew.blecher@dc.gov

*Counsel for Defendant District of Columbia*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAQUIA BUIE,<br><br>                    *Plaintiff*,<br><br>          v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>                    *Defendants*. | Civil Action No. 1:16-cv-01920-CKK |

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Under Fed. R. Civ. P. 56(c) and LCvR 7(h)(1), Defendant District of Columbia (the District) hereby submits the following statement of material facts as to which there is no genuine issue.

1.      In December 2012, Defendant Darrell Best (Best) founded the God of Second Chance Ministries ("the church"), located at 4410 Southern Avenue, SE, Washington, DC.  Ex. 1, Best Decl. at ¶ 7.

2.      Plaintiff Jaquia Buie started attending the church in the fall of 2013.  Ex. 2, Pl. Dep. Tr. at 84:17-19; Ex. 1, Best Decl. at ¶ 14.

3.      Plaintiff did not know Best before attending the church, and she had no previous contact with him in his capacity as a police officer.  Ex. 2, Pl. Dep. Tr. at 90:19-91:2, 99:2-7.

4.      From the moment she joined the church until November 2014, Plaintiff never spoke to Best about her life, her career goals, or any other topic.  *Id.* at 122:6-22.

5.      On Thanksgiving Day 2014, Plaintiff had a one-on-one conversation with Best for the first time since joining the church.  *Id.* at 145:9-21, 149:11-17, 150:2-9.  Best mentioned that

1

Plaintiff's mother, Shenita Buie (Ms. Buie), told him that Plaintiff was interested in being a police officer. *Id*. at 145:9-21, 147:22-148:3. Plaintiff responded that she was interested and that her mother had arranged for her to attend a police cadet meeting in early 2015. *Id*. at 148:4-16. Best indicated that he may be able to help her, but he did not say how and Plaintiff did not ask. *Id*. at 148:17-149:10. The conversation ended with Best asking Plaintiff what she wanted for her graduation (Plaintiff had graduated high school five months earlier, *Id*. at 34:19-35:1), and Plaintiff responded that she did not want anything. *Id*. at 150:10-20.

6.     Shortly thereafter, Best had another conversation with Plaintiff at the church in which he asked for her phone number and inquired whether she had come up with an idea for a graduation gift. *Id*. at 163:7-19. Plaintiff said no, and Best responded that he would take Plaintiff and her mother out to dinner to discuss Plaintiff's interest in becoming a police officer. *Id*. Plaintiff told Best that there was "nothing . . . really to talk about[,]" that "it was not that serious[,]" and that she "would just take a gift card[.]" *Id.* at 165:6-16.

7.     Plaintiff eventually agreed to go to dinner with Best and chose Georgia Brown's as the location for the dinner. *Id*. at 171:9-22.

8.     At approximately 4:00 p.m. on the day of the dinner (December 4, 2014), Ms. Buie decided not to attend. *Id*. at 170:8-17.

9.     On the day of the dinner, Best sent a text message to Plaintiff confirming their plans to have dinner at Georgia Brown's. *Id*. at 170:18-171:8. Plaintiff agreed to meet him at the Mount Vernon metro station. *Id*. at 172:1-15.

10.     Best picked Plaintiff up from the metro in an unmarked police car. *Id*. at 173:16 - 174:4. Best did not tell Plaintiff why he was driving an unmarked police cruiser; nor did Plaintiff inquire. *See id*. at 176:5-10.

11.     Best was dressed in his full police uniform with his service weapon.  *Id*. at 176:11-17.

12.     As Best drove Plaintiff to Georgia Brown's, he asked if she had any questions about the police force, and Plaintiff stated she did not.  *Id*. at 177:3-9, 178:3-16.

13.     Plaintiff and Best arrived at Georgia Brown's around 6:00 p.m.  *Id*. at 223:2-4.

14.     Upon arriving at the restaurant, Best briefly spoke about the police academy.  *Id*. at 179:21-180:11.  It was a one-sided conversation that lasted only five minutes, and Plaintiff did not ask Best any questions.  *Id*. at 180:12-22.

15.     Throughout dinner, Best asked Plaintiff a series of inappropriate and harassing questions, such as:  if she had a boyfriend, *id*. at 181:8-13; if she liked having oral sex performed on her, *id*. at 181:8-13; and what "position" she liked, *id*. at 183:4-13.

16.     Plaintiff started to put her coat on but Best, in an aggressive manner, demanded that she take it off.  *Id*. at 201:7-202:6.

17.     Plaintiff told Best that she would pay for her own dinner because she considered the dinner was "no longer a gift."  *Id.*

18.     Plaintiff told Best that she was leaving, and she planned to take the metro home.  *Id*. at 204:3-20.

19.     Plaintiff and Best were at the restaurant for about one hour.  *Id*. at 202:22-203:6.

20.     Best paid for the meal over Plaintiff's objection.  *Id.* at 205:4-15.

21.     After dinner, Best's demeanor changed—he became "aggressive," "stern," and was "talking as if he was [Plaintiff's] parent," *id*. at 201:7-202:6—ultimately causing Plaintiff to fear him, *id*. at 202:7-9.

22.     When Plaintiff left the restaurant, Best followed her and, as she crossed to the other side of the street, Best, "talking between his teeth[,]" said "come here."  *Id*. at 205:12-206:22.

23.     Plaintiff walked back to Best who asked "what would it look like if I didn't take you home?"  *Id*.  Plaintiff got into the car.  *Id*. at 211:2-20.

24.     Best drove Plaintiff to MPD headquarters, stating that he had work to finish but that he would not be long.  *Id*. at 212:5-11.

25.     Best then drove into the parking garage at MPD Headquarters and used his badge to gain access.  *Id*. at 212:12-14, 213:2-17.

26.     Plaintiff asked to wait in the car but Best told her that she could not because "Chief Lanier's in here."  *Id*. at 213:2-17.

27.     As Plaintiff and Best walked to the elevators, the only person Plaintiff saw was a cleaning person.  *Id*. at 213:21-214:10.

28.     Best used his badge to operate the elevators.  *Id.* at 243:20-244:2.

29.     The two proceeded to the Corporate Support Bureau (CSB)—where Best was detailed at the time, *see* Ex. 3, Teletype—which is located on the fifth floor.  Ex. 2, Pl. Dep. Tr. at 214:11-17.

30.     Once they arrived on the fifth floor, Plaintiff did not see any police officers.  *Id*. at 214:21-215:11.  Plaintiff saw that Chief Lanier's office door was open but she did not hear any voices.  *Id*. at 215:21-216:9.

31.     Plaintiff proceeded with Best to the CSB suite, which was comprised of Assistant Chief Kimberly Chisley-Missouri's private office, an open workspace for staff, a smaller office,

and a file room.  Ex. 4, Chisley-Missouri Dep. Tr. at 51:10-54:2.  Best's desk was located in the open workspace.  *Id*. at 62:4-8.

32.     When Plaintiff and Best entered the CSB suite on the night of the incident, Best sat at his desk while Plaintiff sat on a couch away from the desk.  Ex. 2, Pl. Dep. Tr. at 216:20-217:6.  Eventually, Best "made his way to [Plaintiff]."  *Id*. at 227:17-20.

33.     Best then sexually assaulted Plaintiff.  *Id*. at 228:10-229:11, 230:2-17, 230:20-231:2, 231:6-232:12, 232:20-233:20, 237:3-12, 237:15-21, 238:5-15.

34.     After the assault, Plaintiff and Best left the CSB suite.  Plaintiff could hear voices coming from Chief Lanier's office but she did not see anyone.  *Id*. at 243:11-19.

35.     Best drove Plaintiff away from MPD headquarters and dropped her off two blocks from her house.  *Id*. at 248:21-249:6.

36.     In January 2015, A.T.[1], Best's fiancé's 16-year-old niece, confided in Plaintiff that Best raped her.  *Id*. at 259:7-261:21.

37.     Plaintiff and A.T. were in the church choir together, and A.T. revealed Best's criminal conduct to Plaintiff after the choir had performed at another church.  *Id.*

38.     On March 14, 2015, A.T.'s older sister reported Best's crimes to her cousin, Officer Zunobia Hakir.  Ex. 5, Incident Summary Report.  The ensuing investigation revealed that Best raped and otherwise sexually assaulted A.T. on three separate occasions.  Ex. 6, Arrest Warrant.  The incidents occurred on December 23, 2014, January 15 or 17, 2015, and February 14, 2015 (Valentine's Day).  *Id*.  All three incidents occurred in Best's private office inside the church.  *Id*.

---

[1]     A.T. was a minor (age 16) at the time Best raped her.  Thus, to protect her privacy, only her initials are used throughout this brief and her name is redacted from the exhibits.

39.     On March 14, 2015, agents from MPD's Internal Affairs Division served Best with a Form PD 77 (Revocation of Police Powers). Ex. 7, Internal Affairs Final Report.  MPD then placed Best on administrative leave.  *Id.*  On March 15, 2015, a warrant was issued for Best's arrest for raping and sexually assaulting A.T.  *Id.*  Best was arrested on March 16, 2015, and charged with First Degree Sexual Abuse of Minor.  *Id.*

40.     On August 4, 2015, Best resigned from MPD.  Ex. 1, Best Decl. at ¶ 3.

41.     On August 18, 2015, the Internal Affairs Division (IAD) sustained the allegations against Best.  Ex. 7, Internal Affairs Final Report.  However, MPD could not take any disciplinary action against Best because he had resigned from his position.  Ex. 8, Gottert Dep. Tr. at 50:20-51:15.

42.     On or about March 10, 2016, Best pled guilty to Production of Child Pornography, First Degree Sexual Abuse of a Minor, and Second Degree Sexual Abuse of a Minor.  Ex. 9, Judgment in a Criminal Case.  Best was sentenced to 18 years in prison.  *Id.*

43.     Best was originally hired as a police officer with the Metropolitan Police Department (MPD) on February 2, 1987.  Ex. 1, Best Decl. at ¶ 3.  In November 1998, he was promoted from patrol officer to master patrol officer with the Fifth District.  Ex. 10, Personnel Action, Promotion to Master Patrol Officer.  Several months later, he was promoted to sergeant and assigned to the Seventh District.  Ex. 11, Personnel Action, Promotion to Sergeant.

44.     In January 2009, MPD's Diversity and Equal Employment Opportunity Compliance Unit (EEO) completed an investigation into allegations by a female police cadet with the Youth Investigation Branch Cadet Program that Best had sexually harassed and sexually assaulted her over a period of time.  Ex. 12, Investigation Report (Jones matter).

The complainant alleged that Best repeatedly requested oral and vaginal sex, fondled her buttocks and breast, and kissed her neck. *Id*.

45. The investigation of the Jones matter found that there were insufficient facts to support the allegations, specifically noting that the people identified by the complainant as having information supporting the allegations denied having any knowledge of Best's alleged misconduct. *Id*. The United States Attorney for the District of Columbia declined to prosecute Best for sexual abuse related to these allegations. Ex. 13, Declination Letter (Jones matter).

46. In the winter and spring of 2009, MPD's EEO investigated allegations made by a civilian employee that Best touched her buttocks and asked that she allow him to give her a message for $35 at a hotel. Ex. 14, Investigation Report (Lee matter).

47. The Lee matter investigation substantiated the allegations and recommended sustaining a charge of "conduct unbecoming an officer" against Best. *Id.* Best appealed the charge and, in September 2009, Chief of Police Cathy Lanier denied Best's appeal. Ex. 15, Lanier Letter (Lee matter).

48. As punishment, Best was demoted from sergeant to officer. *Id*. A few weeks later, Best was issued a Notice of Direction (Notice), requiring him to report to the training academy for training and recertification. Ex. 16, Notice of Direction. The Notice also specified that Best was reassigned to the Patrol Service and School Security Bureau at the Fourth District. *Id*. The United States Attorney declined to prosecute Best in connection with the allegations. Ex. 17, Declination Letter (Lee matter).

49. Best was with the Fourth District until November 21, 2014, when Chief Lanier issued a teletype detailing Best to the CSB for the period of November 23, 2014, to February 21,

2015.  Ex. 3, Teletype.  Best was an administrative officer with CSB.  Ex. 4, Chisley-Missouri

Dep. Tr. at 61:12-17.

50.     At CSB, Best's work hours were Monday through Friday, 9:00 a.m. to 5:00 p.m.,

and Best could only work overtime if it was approved by Chief Chisley-Missouri.  Ex. 1, Best

Decl. at ¶ 5.

51.     On the night that Best assaulted Plaintiff, he was not authorized to work overtime.

*Id.* at ¶ 20.

52.     The unmarked police car that Best used to take Plaintiff to dinner in December

2014, was assigned to CSB for official MPD business and the keys to the vehicle were kept in

the CSB office.  *Id.* at ¶ 6.

53.     Best was not authorized by any MPD official to use the vehicle to take Plaintiff to

dinner.  *Id*. at ¶ 22.

54.     No one at MPD was aware of Best's dinner plans with Plaintiff.  *Id.* at ¶¶ 22, 23.

55.     Best independently decided to use the CSB car to avoid rush hour and parking

problems.  *Id.* at ¶ 22.

56.     Best's duties as a police officer were completely unrelated to his association and

work with the God of Second Chance Ministries.  *Id*. at ¶ 8.

57.     Best did not seek approval or authorization from MPD to establish or preach at

the church.  *Id*. at ¶ 9.

58.     MPD did not assign Best to perform any police-related duties at or for the church.

*Id*. at ¶ 10.

59.     There was no official or unofficial association or connection between MPD and

the church.  *Id*. at ¶ 11.

60.     All MPD recruits are trained on sexual misconduct topics in the context of learning the offenses of the D.C. Criminal Code, as well as in the context of EEO training. Ex. 18, Davis Dep. Tr. at 6:9-19, 32:22-33:7.

61.     MPD recruits are also trained "to act ethically, act with morals, act with standards[.]" *Id*. at 7:10-19.

62.     MPD officers receive ongoing, quarterly sexual harassment training throughout their time on the force.  Ex. 19, Lee Dep. Tr. at 30:7-20.

Date:  October 20, 2020                    Respectfully submitted

                                           KARL A. RACINE
                                           Attorney General for the District of Columbia

                                           CHAD COPELAND
                                           Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Alicia M. Cullen*
                                           ALICIA M. CULLEN [1015227]
                                           Chief, Civil Litigation Division, Section III

                                           */s/ Philip A. Medley*
                                           DAVID A. JACKSON [471535]
                                           PHILIP A. MEDLEY [1010307]
                                           MATTHEW BLECHER [1012957]
                                           Assistant Attorneys General
                                           Civil Litigation Division
                                           400 6th Street, NW
                                           Washington, D.C. 20001
                                           Phone:  (202) 724-6618; (202) 724-6626
                                           Fax:  (202) 741-8999; (202) 741-5920
                                           Email:  davida.jackson@dc.gov;
                                           philip.medley@dc.gov;
                                           matthew.blecher@dc.gov

                                           *Counsel for Defendant District of Columbia*

## <u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND ........................................................................................ 1

   I.   God of Second Chance Ministries ............................................................. 1

   II.   The Buie Family Joins the Church. ........................................................... 2

   III.   Plaintiff and Best .......................................................................................... 3

   IV.   Plaintiff Meets Best for Dinner. ................................................................ 5

   V.   Best Harasses Plaintiff at Dinner .............................................................. 6

   VI.   Best Assaults Plaintiff. ................................................................................ 7

   VII.   Best's Illegal Conduct is Uncovered. ...................................................... 9

   VIII.   Best's Pre-Incident Employment History with MPD ........................... 10

PROCEDURAL HISTORY ...................................................................................... 13

LEGAL STANDARD ................................................................................................ 14

ARGUMENT ............................................................................................................... 15

   I.   The District is Entitled to Judgment on Plaintiff's Section 1983 Municipal Liability Claims (Counts I and II). ............................................................... 16

      A.   There is No Record Evidence of Deliberate Indifference. ........................ 16

         i.   Failure to Terminate Best .............................................................. 18

         ii.   Failure to Sanction/Train/Supervise Best .................................. 21

         iii.   Failure to "prevent officer Best from unlawfully detaining [Plaintiff] against her will and then sexually abusing her inside MPD headquarters" ........................... 24

      B.   Plaintiff Cannot Establish Causation. ...................................................... 25

   II.   The District is Entitled to Judgment As a Matter of Law on Plaintiff's Common Law Claims. ................................................................................................... 28

      A.   Plaintiff Cannot Establish Vicarious Liability Under Either Restatement Section 219(2)(b) or Section 219(2)(d). ................................................................ 29

         i.   Section 219(2)(b)—Employer Negligence or Recklessness ...... 29

         ii.   Section 219(2)(d)—Employer Instrumentalities ........................ 30

      B.   Even If Plaintiff Could Establish Vicarious Liability, She Cannot Prevail On the Merits of Her Common Law Claims ................................................................ 37

         i.   Plaintiff Cannot Establish a Claim of Negligent Supervision (Count IV) or Retention (Count VI). ...................................................................... 37

         ii.   Plaintiff Cannot Establish a Claim for Negligent Entrustment (Count V). .... 39

         iii.   Plaintiff Cannot Establish a Claim of Negligent Infliction of Emotion Distress (Count VII). ............................................................................................ 40

**iv.    Plaintiff Cannot Establish a Claim of Intentional Infliction of Emotional Distress (Count VIII).** ................................................................. **41**

**C.  The Statute of Limitations Bars Plaintiff's NIED and IIED Claims.** ..................... **41**

**D.  The Public Duty Doctrine Bars Plaintiff's Negligence-Based Claims.** ................... **42**

**III.  The District is Entitled to Judgment on Plaintiff's Claim for Injunctive Relief (Count III).** ................................................................................................. **44**

**CONCLUSION** ................................................................................................. **45**

## TABLE OF AUTHORITIES

**Cases**

*Allison Gas Turbine v. District of Columbia*, 642 A.2d 841 (D.C. 1994) .............................. 42, 43
*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) ................................................. 21
*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003) ............................................ 16, 17
*Bankers Standard Ins. Co. v. Anand*, 2020 WL 4698363 (D.D.C. Aug. 13, 2020) ..................... 39
*Barnes v. Costle*, 561 F.2d 983 (D.C. Cir. 1977) ......................................................... 31, 32, 36
*Base One Techs., Inc. v. Ali*, 78 F. Supp. 3d 186 (D.D.C. 2015) ................................................. 44
*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397 (1997) ............................................ 21
*Bias v. Advance Int'l, Inc.*, 905 F.2d 1558 (D.C. Cir. 1990) ...................................................... 15
*Blue v. District of Columbia*, 811 F.3d 14 (D.C. Cir. 2015) ...................................................... 18
*Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103 (3d Cir. 1994) .................................................... 32
*Boykin v. District of Columbia*, 484 A.2d 560 (D.C. 1984) ...................................................... 36
*Burton v. United States*, 668 F. Supp. 2d 86 (D.D.C. 2009) ..................................................... 26
*Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ................................................ 20
*Carter v. District of Columbia*, 795 F.2d 116 (D.C. Cir. 1986) ................................................ 17
*Cawood v. Rainbow Rehab. Ctr.*, 711 N.W.2d 754 (Mich. Ct. App. 2005) .......................... 32, 33
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 15, 29
*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) ..................................................... passim
*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ................................................................... 45
*Clark v. District of Columbia,* 708 A.2d 632 (D.C. 1997) ....................................................... 38
*Connick v. Thompson*, 563 U.S. 51 (2011) .................................................................... 17, 21
*Cooper v. First Gov't Mortg. & Inv'rs Corp.*, 238 F. Supp. 2d 50 (D.D.C. 2002) ..................... 29
*Davis v. District of Columbia*, 800 F. Supp. 2d 28 (D.D.C. 2011) ............................................ 17
*District of Columbia v. Arnold & Porter*, 756 A.2d 427 (D.C. 2000) ....................................... 38
*District of Columbia v. Carmichael*, 577 A.2d 312 (D.C. 1990) ......................................... 37, 39
*District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003) ....................................................... 41
*District of Columbia v. Hampton*, 666 A.2d 30 (D.C. 1995) .................................................... 38
*District of Columbia v. Peters,* 527 A.2d 1269 (D.C. 1987) ..................................................... 38
*District of Columbia v. White*, 442 A.2d 159 (D.C. 1982) ....................................................... 38
*Doe v. Forrest*, 176 Vt. 476, 853 A.2d 48 (2004) .................................................................. 30
*Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993) ...................................................................... 15
*Doe v. Sipper*, 821 F. Supp. 2d 384 (D.D.C. 2011) ...................................................... 30, 31, 32
*Dorman v. District of Columbia*, 888 F.2d 159 (D.C. Cir. 1989) ............................................. 22
*Feirson v. District of Columbia*, 506 F.3d 1063 (D.C. Cir. 2007) ............................................ 16
*Fleming v. Bronfin*, 80 A.2d 915 (D.C. 1951) ................................................................... 29, 30
*Gary v. Long*, 59 F.3d 1391 (D.C. Cir. 1995) ................................................................. passim
*Giles v. Shell Oil Corp.*, 487 A.2d 610 (D.C. 1985) ............................................................... 37
*Groob v. KeyBank*, 843 N.E.2d 1170 (Ohio 2006) ................................................................. 30
*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ................................................................. 45
*Harris v. Gov't of D.C.*, 2019 WL 3605877 (D.D.C. 2019) ..................................................... 17
*Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907 (D.C. Cir. 2015) .................................. 40
*Harvey v. District of Columbia*, 798 F.3d 1042 (D.C. Cir. 2015) ....................................... 22, 25
*Henriksen v. City of Rialto*, 25 Cal. Rptr. 2d 308 (Cal. App. 4th 1993) .................................... 36
*Hines v. District of Columbia*, 580 A.2d 133 (D.C. 1990) ...................................................... 42

ii

*Holder v. District of Columbia,* 700 A.2d 738 (D.C. 1997) ................................ 38

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984) ............................................ 41

*Johnson v. District of Columbia*, 2006 WL 2521241 (D.D.C. Aug. 30, 2006) ............ 43

*Jones v. Horne,* 634 F.3d 588 (D.C. Cir. 2011) .............................................. 17

*Klahr v. District of Columbia*, 576 A.2d 718 (D.C. 1990) .............................. 43, 44

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 (1986) ...................... 15

*McGaughey v. District of Columbia*, 734 F. Supp. 2d 14 (D.D.C. 2010) .................. 43

*McKethean v. WMATA*, 588 A.2d 708 (D.C. 1991) ........................................ 26

*Messina v. District of Columbia,* 663 A.2d 535 (D.C. 1995) .............................. 38

*Miller v. District of Columbia*, 841 A.2d 1244 (D.C. 2004) ............................... 43

*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978) ..................... 25

*Morgan v. District of Columbia*, 468 A.2d 1306 (D.C. 1983) .......................... 43, 44

*Muhammad v. District of Columbia*, 584 F. Supp. 2d 134 (D.D.C. 2008) ................. 19

*Nat'l Sec. Counselors v. C.I.A.*, 931 F. Supp. 2d 77 (D.D.C. 2013) ...................... 45

*Oklahoma City v. Tuttle*, 471 U.S. 808  (1985) ............................................. 21

*Parker v. District of Columbia*, 850 F.2d 708 (D.C. Cir. 1988) ........................... 25

*Phelan v. City of Mount Rainier*, 805 A.2d 930 (D.C. 2002) ........................... 37, 39

*Phillips v. District of Columbia*, 714 A.2d 768 (D.C. 1998) ............................... 39

*Platt v. District of Columbia*, 467 A.2d 149 (D.C. 1983) .................................. 42

*Pollard v. District of Columbia*, 698 Fed. App'x 616 (D.C. Cir. 2017) ................... 22

*Powell v. District of Columbia*, 602 A.2d 1123 (D.C. 1992) .............................. 43

*Rice v. District of Columbia*, 774 F.Supp.2d 25 (D.D.C. 2011) ........................... 40

*Ridgell v. HP Enter. Servs. LLC*, 209 F. Supp. 3d 1 (D.D.C. 2016) ........... 33, 36, 37, 40

*Robinson v. Pezzat*, 818 F.3d 1 (D.C. Cir. 2016) ........................................... 22

*Rogala v. District of Columbia*, 161 F.3d 44 (D.C. Cir. 1998) ............................ 23

*Rogers v. Johnson-Norman*, 466 F. Supp. 2d 162 (D.D.C. 2006) ......................... 42

*Saunders v. Nemati*, 580 A.2d 660 (D.C. 1990) ............................................ 42

*Singh v. District of Columbia*, 881 F. Supp. 2d 76 (D.D.C. 2012) ........................ 19

*Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005) .......................... 25, 26

*Smith v. Hope Village, Inc.*, 481 F. Supp. 2d 172 (D.D.C. 2007) ......................... 26

*Taylor v. District of Columbia*, 776 A.2d 1208 (D.C. 2001) .............................. 43

*Toy v. District of Columbia*, 549 A.2d 1 (D.C. 1988) ...................................... 37

*Travers v. District of Columbia*, 672 A.2d 566 (D.C. 1996) .............................. 38

*Turner v. District of Columbia*, 532 A.2d 662 (D.C. 1987) ............................... 44

*Turpin v. Mailet*, 619 F.2d 196 (2d Cir. 1980) ............................................. 28

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) ..................... 16, 17, 25

*Warren v. District of Columbia*, 444 A.2d 1 (D.C. 1981) .............................. 42, 43

*White v. United States,* 780 F.2d 97 (D.C. Cir. 1986) ..................................... 26

*Woods v. District of Columbia*, 63 A.3d 551 (D.C. 2013) ................................. 43

*Young v. District of Columbia,* 752 A.2d 138 (D.C. 2000) ................................ 38

*Young v. U-Haul Co. of D.C.,* 11 A.3d 247 (D.C. 2011) ................................... 39

*Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220 (Mich. 2006) ................................ 30

**Statutes**

D.C. Code § 11-723 (2012 Repl.) ............................................................ 31

D.C. Code § 12-301 (2012 Repl.) .......................................................... 41, 42

D.C. Code § 50-204 (2012 Repl.) ............................................................ 35

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................... 14

**Treatises**

Restatement (Second) of Agency § 219 (1958).................................................... passim
Restatement (Second) of Torts § 390 (1965)............................................................ 39

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAQUIA BUIE,

        *Plaintiff*,

    v.

DISTRICT OF COLUMBIA, *et al*.,

        *Defendants*.

Civil Action No. 1:16-cv-01920-CKK

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT

On the evening of December 4, 2014, Plaintiff Jacquia Buie went to dinner with her pastor, Defendant Darrell Best (Best), at Georgia Brown's.  Under the auspices of treating Plaintiff to a high school graduation gift, Best instead used the dinner to sexually harass Plaintiff before taking her to his vacant office at the Metropolitan Police Department (MPD) headquarters, where he sexually assaulted her.  Now, Plaintiff seeks to hold Best's then-employer, the District of Columbia (the District), liable for Best's criminal acts.  For the reasons stated below, the Court should grant judgment as a matter of law in favor of the District on all claims asserted by Plaintiff Jaquia Buie.

### FACTUAL BACKGROUND

**I.**    **God of Second Chance Ministries**

In December 2012, Defendant Darrell Best (Best) founded the God of Second Chance Ministries (the church), located at 4410 Southern Avenue, SE, Washington, D.C.  Ex. 1, Best Decl. at ¶ 7.  Approximately 60-80 parishioners congregated at the church and Best, who was an ordained minister, preached to them.  *Id*.  Church services included bible studies, counseling, a

1

dance ministry, and a choir.  Ex. 2, Pl. Dep. Tr. at 119:19-21; Ex. 20, Shenita Buie Dep. Tr. at 70:14-20, 73:8-17.  Best was the director of the choir but he only participated if the choir was practicing new songs.  Ex. 21, A.T. Dep. Tr. at 102:20-103:17.

## II.    The Buie Family Joins the Church.

Plaintiff is the oldest of three girls born to Shenita Buie (Ms. Buie) and Charles Buie (Mr. Buie).  Ex. 20, Shenita Buie Dep. Tr. at 16:3-12.  Mrs. and Mr. Buie divorced in 2003, but maintained an on-again, off-again relationship until 2013.  *Id*. at 13:1-14:3.

The Buie family started attending God of Second Chance Ministries in the fall of 2013.[2] Ex. 2, Pl. Dep. Tr. at 84:17-19; Ex. 1, Best Decl. at ¶ 14.  Ms. Buie testified that, following the death of her mother, she was looking for a church to attend when she met a man who invited her to attend Best's church.  Ex. 20, Shenita Buie Dep. Tr. at 67:4-21.  She brought her daughters to church with her on either the first or second Sunday service that she attended.  *Id*. at 69:8-11. Mr. Buie eventually attended the church for a short period of time.  *Id*. at 69:12-22.  According to Ms. Buie, she and Mr. Buie went to Best for counseling in an attempt to rekindle their strained relationship.  *Id*. at 70:3-11.  After the first counseling session, Mr. Buie stopped attending the church because he "did not believe in [Best]."  *Id*. at 69:12-22.

Ms. Buie and her daughters were deeply involved in the church.  Ms. Buie was a trustee and a member of church leadership who participated in meetings with Best and the assistant pastor.  *Id*. at 77:19-78:10.  She had a key to the church and she and her daughters would clean the church every week and cook for the church every other week.  *Id*. at 73:8-74:3.  They also participated in various activities at the church—Plaintiff was in the choir; her younger sister

---

[2]    Ms. Buie testified that the family started attending the church in September 2011, which is impossible because the church was founded in December 2012.

participated in dance ministry; and her youngest sister was in the children's choir.  *Id*. at 73:8-

74:3.  Ms. Buie testified that the church was like a family; they went on trips and to dinner "as a

church family."  *Id*. at 78:11-20.

Prior to the incident at issue in this case, Ms. Buie's view of Best was positive.  *Id*. at

71:14-16.  According to Ms. Buie, Best represented God and was doing "good in the

neighborhood."  *Id*. at 75:8-76:2.  Best was always professional in church.  *Id*. at 77:10-18.  Ms.

Buie testified that she built a rapport with Best and trusted him.  *Id*. at 75:8-76:2.

### III.   <u>Plaintiff and Best</u>

Plaintiff did not know Best before attending God of Second Chance Ministries, and she

had no contact with him in his capacity as a police officer.  Ex. 2, Pl. Dep. Tr. at 90:19-91:2,

99:2-7.  Plaintiff testified that Best was a "fine pastor" who "did not come off in a bad manner

like some others" and that she "didn't see nothing bad."  *Id*. at 120:20-121:9.  At first, Best never

made Plaintiff feel uncomfortable.  *Id*. at 123:1-3.  From the moment she joined the church until

November 2014, Plaintiff never spoke to Best about her life, her career goals, or any other topic.

*Id*. at 122:6-22.

Eventually, Plaintiff and her mother began Bible studies with ten other church members.

*Id*. at 117:8-118:7, 120:12-19.  At least three of the studies were held at Best's house.  *Id*.

Plaintiff also became familiar with members of the dance ministry and testified that no one in

that group expressed concerns to her about Best.  *Id*. at 123:14-17.

On Thanksgiving Day 2014, Plaintiff had a one-on-one conversation with Best for the

first time since joining the church.  *Id*. at 145:9-21, 149:11-17, 150:2-9.  Best mentioned that Ms.

Buie told him that Plaintiff was interested in being a police officer.[3]  *Id*. at 145:9-21, 147:22-148:3.  Plaintiff responded that she was interested and that her mother had arranged for her to attend a police cadet meeting in early 2015.  *Id*. at 148:4-16.  Best indicated he may be able to help her, but did not say how and Plaintiff did not ask.  *Id*. at 148:17-149:10.  The conversation ended with Best asking Plaintiff what she wanted for her graduation (Plaintiff had graduated high school five months earlier, *Id*. at 34:19-35:1), and Plaintiff responded that she did not want anything.  *Id*. at 150:10-20.  Plaintiff never told her mother about this conversation with Best.  *Id*. at 152:17-153:6.

Three days after Thanksgiving, Plaintiff and her mother had a conversation at the church with Best and his fiance, Keisha, about potential honeymoon destinations.  *Id*. at 154:13-156:1.  Ms. Buie suggested that they go to Jamaica because she had taken Plaintiff there as a high school graduation present.  *Id*. at 154:13-156:1.  Keisha asked to see photos from their trip and Plaintiff stated she would have to find them.  *Id*. at 156: 2-22.  Plaintiff later created a separate folder in her cell phone with certain pictures from Jamaica but excluding any pictures of herself.  *Id*. at 156:2-22.  Sometime later, Plaintiff showed the pictures to Best and Keisha at the church, and Best asked Plaintiff some questions about the trip.  *Id*. at 156:2-22, 162:2-10.  Later that same day, Best had another conversation with Plaintiff wherein he asked for her phone number and inquired whether she had come up with an idea for a graduation gift.  *Id*. at 163:7-19.  Plaintiff said no and Best responded that he would take Plaintiff and her mother to dinner to discuss

---

[3]      Ms. Buie testified that she had several conversations with Best over three or four months about Plaintiff's plans after high school and that Best initiated these conversations.  Ex. 20, Shenita Buie Dep. Tr. 65:3-9, 94:13-95:12.  Ms. Buie wanted Best to talk to Plaintiff about "career options in general" and not just about being a police officer.  *Id*. at 93:13-21.  Ms. Buie thought that Best would be able to provide necessary guidance to Plaintiff because he was a "man of god," "a positive role model," and people listen to him.  *Id*. at 92:1-93:5.

4

Plaintiff's interest in becoming a police officer. *Id*. Plaintiff told Best that there was "nothing [ ] really to talk about[,]" that "it was not that serious[,]" and that she "would just take a gift card[.]" Ex. 2, Pl. Dep. Tr. at 165:6-16. Plaintiff testified that she told her mother about Best's offer and her mother agreed to go to dinner with them.[4] *Id*. at 166:10-18, 168:2-12. Plaintiff chose Georgia Brown's as the location of the dinner. *Id*. at 171:9-22.

## IV.  **Plaintiff Meets Best for Dinner.**

Plaintiff testified that at approximately 4:00 p.m. on the day of the dinner, Ms. Buie decided not to attend. *Id*. at 170:8-17. According to Plaintiff, Ms. Buie was concerned that, if she went, Plaintiff would rely on her to retain whatever advice or information Best offered. *Id*. at 168:13-169:7. Best sent a text message to Plaintiff confirming their plans for dinner at Georgia Brown's. *Id*. at 170:18-171:8. Plaintiff agreed to meet him at the Mount Vernon metro station. *Id*. at 172:1-15. Plaintiff was dressed in pants, a jean shirt, and a bubble coat. *Id*. at 173:3-6.

Shortly before 6:00 p.m., Best arrived at the metro station in an unmarked police car. *Id*. at 173:16 - 174:4. Plaintiff was familiar with the type of car, because she had seen similar unmarked police cars in her neighborhood. *Id*. Best did not tell Plaintiff why he was driving an unmarked police cruiser; nor did Plaintiff inquire. *See id*. at 176:5-10. Best was dressed in his full police uniform with his service weapon. *Id*. at 176:11-17. As Best drove to Georgia Brown's, he asked Plaintiff if she had any questions about the police force and Plaintiff stated she did not. *Id*. at 177:3-9, 178:3-16.

---

[4]        According to Ms. Buie, the dinner plans never included her. Ex. 20, Shenita Buie Dep. Tr. at 96:19-21. She testified that Best told her he would take Plaintiff to lunch or brunch to talk to her, adding "but you know how everyone else is in church. You can't really say anything. You know what I mean?" *Id*. at 94:13-95:12.

V.   **Best Harasses Plaintiff at Dinner.**

Plaintiff and Best arrived at Georgia Brown's around 6:00 p.m. *Id.* at 223:2-4. Upon arrival, Best briefly spoke about the police academy. *Id.* at 179:21-180:11. According to Plaintiff, it was a one-sided conversation that lasted only five minutes. *Id.* at 180:12-22. Plaintiff did not ask Best any questions. *Id.*

The conversation suddenly shifted to inappropriate territory as Best asked Plaintiff if she had a boyfriend. *Id.* at 181:8-13. When Plaintiff questioned why he was asking, Best then luridly asked if she liked having oral sex performed on her. *Id.* at 181:8-13. Plaintiff told Best that his question was out of line; Best apologized and promised not to say it again. *Id.* at 182:21-183:4.

Best again harassed Plaintiff by asking her what "position" she liked. *Id.* at 183:4-13. Plaintiff started to put her coat on but Best, in an aggressive manner, demanded that she to take it off. *Id.* at 201:7 - 202:6. According to Plaintiff, she did not take her jacket off because she became afraid of Best and decided that her "next move was to get out of the restaurant." *Id.* at 202:7-16. Plaintiff told Best that she would pay for her own dinner because she considered the dinner was "no longer a gift." *Id.* Plaintiff told Best that she was leaving and she planned to take the metro home. *Id.* at 204:3-20. Plaintiff estimates that she and Best were at the restaurant for about one hour. *Id.* at 202:22-203:6. Best paid for the meal over Plaintiff's objection. *Id.* at 205:4-15.

After dinner, according to Plaintiff, Best's demeanor changed—he became "aggressive," "stern," and was "talking as if he was [Plaintiff's] parent," *id.* at 201:7-202:6—ultimately causing Plaintiff to fear him, *id.* at 202:7-9. When Plaintiff left the restaurant, Best followed her and, as she crossed to the other side of the street, Best, "talking between his teeth[,]" said "come

here." *Id*. at 205:12-206:22.  When Plaintiff walked back to Best, he asked "what would it look

like if I didn't take you home?" *Id*. at 210:5-13.  Thereafter, Plaintiff got into the car.  *Id*. at

211:2-20.

**VI.    Best Assaults Plaintiff.**

Best then drove Plaintiff to MPD headquarters, stating that he had work to finish but

would not be long.  *Id*. at 212:5-11.  Best drove into the parking garage at MPD headquarters and

used his badge to gain access.  *Id*. at 212:12-14, 213:2-17.  Plaintiff asked to wait in the car but

Best told her that she could not because "Chief Lanier's in here."  *Id*. at 213:2-17.  As Plaintiff

and Best walked to the elevators, the only person Plaintiff saw was a cleaning person.  *Id*. at

213:21-214:10.  Best used his badge to operate the elevators.  *Id.* at 243:20-244:2.  The two

proceeded to the Corporate Support Bureau (CSB)—where Best was detailed at the time, *see* Ex.

3, Teletype—which is located on the fifth floor.[5]  Ex. 2, Pl. Dep. Tr. at 214:11-17.

Once they arrived on the fifth floor, Plaintiff did not see any police officers.  *Id*. at

214:21-215:11.  Plaintiff saw that Chief Lanier's office door was open but Plaintiff did not hear

any voices.  *Id*. at 215:21-216:9.  They proceeded to the CSB suite comprised of Assistant Chief

Kimberly Chisley-Missouri's private office, an open workspace for staff, a smaller office, and a

file room.  Ex. 4, Chisley-Missouri Dep. Tr. at 51:10-54:2.  Best's desk was located in the open

workspace.  *Id*. at 62:4-8.  When Plaintiff and Best entered the CSB suite on the night of the

incident, Best sat at his desk and Plaintiff sat on a couch away from the desk.  Ex. 2, Pl. Dep. Tr.

at 216:20-217:6.  According to Plaintiff, Best worked for a short period of time and called his

fiancé to let her know that he would be home later.  *Id*. at 225:10-226:6.  Best spoke to Keisha

---

[5]      Plaintiff testified that she did not specifically remember what floor Best took her to, but
when she later did a "walkthrough" with the detectives investigating Best's crimes, they took her
to the fifth floor.  Ex. 2, Pl. Dep. Tr. at 214:11-17.

over the speaker phone.  *Id*.  After the call, Best worked for "a little while longer" but then

"made his way to [Plaintiff]."  *Id*. at 227:17-20.

Plaintiff testified that Best sat next to her on the couch and tried to unbutton her shirt.  *Id*.

at 228:10-229:11.  Against her will, Best unbuttoned Plaintiff's shirt down to her cleavage area

and "smashed his head into [her] breasts."  *Id*. at 228:10-229:11.  Best then pulled on her bra

which caused one of her breasts to be exposed.  *Id*. at 230:2-12.  Plaintiff was unable to pull

away as Best continued to put his head between her breasts.  *Id*. at 230:13-17.  Plaintiff told Best

to "please stop," but he responded by asking why she was acting like a little girl.  *Id*. at 230:20-

231:2.

Plaintiff was able to move from the couch to a chair as she fixed her bra and rebuttoned

her shirt.  *Id*. at 231:6-21, 232:7-12.  Best then turned off the lights, walked over to her, and

began to touch her shoulders.  *Id*. at 231:22-232:6.  Plaintiff then moved back to the couch and

sat on the edge.  *Id*. at 232:20-233:10.  Best then sat next to her and exposed his penis.  *Id*. at

233:11-20.  According to Plaintiff, Best then placed his gun on a coffee table in front of the

couch.  *Id*. at 233:11-20; 237:15-21.  Best asked Plaintiff to touch his penis, and she said no.  *Id*.

at 237:3-12.  According to Plaintiff, Best then unzipped her pants, got on top of her, and

attempted to force his penis into her pants.  *Id*. at 238:5-11.  Plaintiff struggled with Best but was

ultimately able to prevent him from removing her pants.  *Id*. at 238:12-15.  At that point, Plaintiff

told Best, "We're leaving.  Come on, I'm ready to go."  *Id*. at 240:7-11.  Plaintiff told Best to

take her home and he responded by telling her that no one better find out about what had

happened.  *Id*. at 242:14-19.  According to Plaintiff, Best looked at his gun when he made that

statement.  *Id*. at 242:20-243:10.

As Plaintiff and Best left the office, Plaintiff testified that could hear voices coming from Chief Lanier's office but she did not see anyone. *Id*. at 243:11-19.  Best drove Plaintiff away from MPD headquarters and dropped her off two blocks from her house.  *Id*. at 248:21-249:6.

**VII.  <u>Best's Illegal Conduct is Uncovered.</u>**

In January 2015, A.T., Best's fiancé's 16-year-old niece, confided in Plaintiff that Best had raped her.  *Id*. at 259:7-261:21.  Plaintiff and A.T. were in the church choir together and A.T. revealed Best's criminal conduct to Plaintiff after the choir had performed at another church.  *Id.*

One evening in March 2015, A.T. told her mother what Best did to her and, at 7:00 a.m. the next morning, A.T. and her mother went to Plaintiff's house. Ex. 21, A.T. Dep. Tr. at 79:3-12.  On that morning, Plaintiff, for the first time, told her mother about what Best said and did to her at Georgia Brown's and MPD headquarters. Ex. 20, Shenita Buie Dep. Tr. at 100:18-101:17.

On March 14, 2015, A.T.'s older sister reported Best's crimes to her cousin, MPD Officer Zunobia Hakir. Ex. 5, Incident Summary Report.  That same day, MPD Lieutenant Felicia Lucas went to Ms. Buie's house to interview both families.  *Id*.  The ensuing investigation revealed that Best raped and otherwise sexually assaulted A.T. on three separate occasions. Ex. 6, Arrest Warrant.  The incidents occurred on December 23, 2014, January 15 or 17, 2015, and February 14, 2015 (Valentine's Day).  *Id*.  All three incidents occurred in Best's private office inside the church.  *Id*.  According to A.T., the first incident occurred after her mother took her to Best for counseling at the church. Ex. 21, A.T. Dep. Tr. at 38:17-39:17, 41:9-42:20.  The second and third incidents occurred during choir practice.  *Id*. at 55:7-15, 56:19-57:1, 58:9-13, 101:18-102:7.  During each incident, Best was not wearing his police uniform,[6]

---

[6]      According to A.T., he was wearing a belt and service weapon. Ex. 21, A.T. Dep. Tr. at 57:12-20.

although A.T. testified that he was wearing a police "t-shirt" during the first incident.  *Id*. at 45:2-11, 57:2-8.

On March 14, 2015, agents from MPD's Internal Affairs Division served Best with a Form PD 77 (Revocation of Police Powers).  Ex. 7, Internal Affairs Final Report.  MPD then placed Best on administrative leave.  *Id.*  On March 15, 2015, a warrant was issued for Best's arrest for raping and sexual assaulting A.T.  *Id*.  Best was arrested on March 16, 2015, and charged with First Degree Sexual Abuse of a Minor.  *Id*.  On August 4, 2015, Best resigned from MPD.  Ex. 1, Best Decl. at ¶ 3.  On August 18, 2015, the Internal Affairs Division (IAD) sustained the allegations against Best.  Ex. 7, Internal Affairs Final Report.  However, MPD could not take any disciplinary action against Best because he had resigned from his position.  Ex. 8, Gottert Dep. Tr. at 50:20-51:15.  On or about March 10, 2016, Best pled guilty to Production of Child Pornography, First Degree Sexual Abuse of a Minor, and Second Degree Sexual Abuse of a Minor.  Ex. 9, Judgment in a Criminal Case.  Best was sentenced to 18 years in prison.  *Id*.

## VIII.   **Best's Pre-Incident Employment History with MPD**

Best was hired as a police officer with MPD on February 2, 1987.  Ex. 1, Best Decl. at ¶ 3.  In November 1998, he was promoted from patrol officer to master patrol officer with the Fifth District.  Ex. 10, Personnel Action, Promotion to Master Patrol Officer.  Several months later, he was promoted to sergeant and assigned to the Seventh District.  Ex. 11, Personnel Action, Promotion to Sergeant.

In January 2009, MPD's Diversity and Equal Employment Opportunity Compliance Unit (EEO) completed an investigation into allegations by a female police cadet assigned to the Youth Investigation Branch Cadet Program claiming Best had sexually harassed and sexually

assaulted her over a period of time.  Ex. 12, Investigation Report (Jones matter).  The complainant alleged that Best repeatedly requested oral and vaginal sex, fondled her buttocks and breast, and kissed her neck.  *Id*.  The investigation found that there were insufficient facts to support the allegations, specifically noting that the people identified by the complainant as having information supporting the allegations denied having any knowledge of Best's alleged misconduct.  *Id*.  The United States Attorney for the District of Columbia declined to prosecute Best for sexual abuse regarding these allegations.  Ex. 13, Declination Letter (Jones matter).

In the winter and spring of 2009, MPD's EEO investigated allegations made by a civilian employee that Best touched her buttocks and asked that she allow him to give her a message for $35 at a hotel.  Ex. 14, Investigation Report (Lee matter).  The investigation ultimately substantiated the allegations and recommended sustaining a charge of "conduct unbecoming an officer" against Best.  *Id.*  Best appealed the charge and, in September 2009, Chief Lanier denied Best's appeal.  Ex. 15, Lanier Letter (Lee matter).  Consequently, Best was demoted from sergeant to officer.  *Id*.  A few weeks later, Best was issued a Notice of Direction (Notice), requiring him to report to the training academy for training and recertification.  Ex. 16, Notice of Direction.  The Notice also specified that Best was reassigned to the Patrol Service and School Security Bureau at the Fourth District.  *Id*.  The United States Attorney declined to prosecute Best in connection with the allegations.  Ex. 17, Declination Letter (Lee matter).

Through his time at MPD, Best was the subject of other substantiated investigations that were not based on allegations of sexual harassment or sexual misconduct.  In November 2006, Best was issued a corrective action for neglect of duty when he failed to notify IAD that he served an officer with a temporary protective order in a domestic violence case involving two

other MPD officers.  Ex. 22, Investigation Report (Dodds matter).  On April 5, 2007, MPD found

that Best had worked outside employment without authorization and covered up his work by

submitting fraudulent time and attendance reports.  Ex. 23, Final Notice of Adverse Action

(Outside employment matter).  Best was suspended for 30 days without pay.  Ex. 24, Lanier

Letter (Outside employment matter).

Best was at the Fourth District until November 21, 2014, when Chief Lanier issued a

teletype detailing Best to the CSB for the period of November 23, 2014 to February 21, 2015.

Ex. 3, Teletype.  The catalyst for the move was Kimberly Chisley-Missouri who, in November

2014, was promoted from Commander of the Fourth District to Assistant Chief of the CSB.  Ex.

4, Chisley-Missouri Dep. Tr. at 57:10-13, 58:3-5, 7:14-14; 8:5-10; Ex. 1, Best Decl. at ¶ 4.

Assistant Chief Chisley-Missouri brought Best and his supervisor, Sergeant Christopher

DePasquale, with her to CSB.  Ex. 4, Chisley-Missouri Dep. at Tr. 59:4-13; Ex. 1, Best Decl. at ¶

4; Ex. 3, Teletype.  Chief Chisley-Missouri brought Best to CSB because, in his time at the

Fourth District, she had "no issue with his work" and he had demonstrated the ability to

adequately handle assignments.  Ex. 4, Chisley-Missouri Dep. Tr. at 59:22-60:10.  Best's role at

CSB was limited to an administrative officer.  *Id.* at 61:12-17.

At CSB, Best's work hours were Monday through Friday, 9:00 a.m. to 5:00 p.m.  Ex. 1,

Best Decl. at ¶ 5.  Best could only work overtime if it was approved by Assistant Chief Chisley-

Missouri.  *Id.*  On the night that Best assaulted Plaintiff, he was not authorized to work overtime.

*Id.* at ¶ 20.  The unmarked police car that Best used to take Plaintiff to dinner in December 2014,

was assigned to CSB for official MPD business and the keys to the vehicle were kept in the CSB

office.  *Id.* at ¶ 6.  Best was not authorized by Assistant Chief Chisley-Missouri, Sergeant

DePasquale, or any other MPD official to use the vehicle to take Plaintiff to dinner.  *Id*. at ¶ 22.

In fact, no one at MPD was aware of Best's dinner plans with Plaintiff.  *Id.* at ¶¶ 22, 23.

Nonetheless, Best decided to use the CSB car to avoid rush hour and parking problems, despite

being unauthorized to do so.  *Id.* at ¶ 22.

Throughout his time at MPD, Best's duties as a police officer were completely unrelated

to his association with the God of Second Chance Ministries.  *Id*. at ¶ 8.  Best did not seek

approval or authorization to establish or preach at the church.  *Id*. at ¶ 9.  MPD did not assign

Best to perform any police-related duties at or for the church.  *Id*. at ¶ 10.  Indeed, there was no

official or unofficial association or connection between MPD and the church.  *Id*. at ¶ 11.

## PROCEDURAL HISTORY

On September 28, 2016, Plaintiff filed her Complaint against the District, Mayor Muriel

E. Bowser, and Darrell Best.  Plaintiff asserted a total of ten counts:

- Count I:  42 U.S.C. § 1983 claim for "Deprivation of Liberty and Right to Bodily Integrity" in violation of the Fifth Amendment;

- Count II:  42 U.S.C. § 1983 claim for "Unlawful Seizure by a Police Officer" in violation of the Fourth Amendment;

- Count III:  Injunctive relief (against the District of Columbia);

- Count IV:  Negligence;

- Count V:  Negligent entrustment (against the District of Columbia);

- Count VI:  Negligent retention (against the District of Columbia);

- Count VII:  Negligent infliction of emotional distress;

- Count VIII:  Intentional infliction of emotional distress;

- Count IX:  Sexual abuse of a minor;

- Count X:  Breach of fiduciary duty.

13

Counts I, II, III, V, and VI appear to be asserted solely against the District, while Counts IV, VII, and VIII are asserted against "Defendants," generally.  Counts IX and X are asserted only against Best.

In December 2016, Defendants Mayor Bowser and the District filed a motion for partial dismissal, seeking dismissal of (1) the Mayor as a defendant, and (2) Counts IV through VIII as to the District, arguing the District is not liable for Best's actions outside of the scope of his employment.  *See generally* Defs.' Mot. for Part. Dismissal [10].  In her opposition, Plaintiff did not respond to the Mayor's argument, and she conceded that Best was acting outside of the scope of his employment when he assaulted her.  *See generally* Pl.'s Opp'n [13].  However, Plaintiff proposed two alternate theories of vicarious liability under Section 219(2) of the Restatement (Second) of Agency (1958):  (1) the District itself acted negligently or recklessly, as provided in Section 219(2)(b); and (2) Best accomplished his tortious acts utilizing "instrumentalities" of his employment, as envisioned by Section 219(2)(d).  *See id.* [13] at 5-6.[7]  The Court partially granted Defendants' motion, dismissed the Mayor as a party, and denied all other relief sought.  *See generally* Mem. Op. & Or. [19].

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving

---

[7]     More specifically, Plaintiff asserted that her "negligence-driven" claims—Counts IV through VII—are based in the negligence/recklessness exception in Section 219(2)(b), and only her IIED claim (Count VIII) proceeds on an "instrumentality" theory.  *See* Pl.'s Opp'n [13] at 5-6, 7.  The Court, however, accepted the latter theory as plausibly establishing—on the facts alleged in the Complaint—a basis for vicarious liability for all five common law counts.  *See* Mem. Op. & Or. [19] at 3-4.

party in a motion for summary judgment bears the initial burden of identifying evidence that shows that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once a movant has made this initial showing, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). In other words, "once the movant has supported a summary judgment motion by evidence of particular events, the court may properly look to the nonmovant for rebuttal evidence either 'from persons familiar with the events,'" or require "the nonmovant to 'otherwise cast more than metaphysical doubt on the credibility of the testimony.'" *Doe v. Gates*, 981 F.2d 1316, 1323 (D.C. Cir. 1993) (quoting *Bias v. Advance Int'l, Inc.*, 905 F.2d 1558, 1561 (D.C. Cir. 1990)). A trial court should enter summary judgment against a nonmoving party who fails to make a showing sufficient to establish the existence of an element essential to his case, and on which the party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

## ARGUMENT

The District is entitled to judgment as a matter of law on all of Plaintiff's claims. Plaintiff's Section 1983 municipal liability claims fail because Plaintiff cannot establish deliberate indifference or causation. Moreover, Plaintiff's common law claims fail because (1) the District is not vicariously liable for Best's assault, (2) Plaintiff's claims fail on the merits, (3) Plaintiff's NIED and IIED claims are barred by the statute of limitations, and (4) the public duty doctrine bars any claim that the District breached a "duty to protect" Plaintiff. Finally, even if Plaintiff could proceed on any of her claims, the Court should grant judgment to the District on Plaintiff's prayer for injunctive relief.

I.      **The District is Entitled to Judgment on Plaintiff's Section 1983 Municipal Liability Claims (Counts I and II).**

Plaintiff asserts claims for municipal liability under 42 U.S.C. § 1983 against the District. To establish a claim, Plaintiff must adequately allege "that a policy or custom of the District of Columbia caused the constitutional violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003); *see Feirson v. District of Columbia*, 506 F.3d 1063, 1066 (D.C. Cir. 2007) ("To impose liability on the District under 42 U.S.C. § 1983, [the plaintiff] must show not only a violation of his rights under the Constitution or federal law, but also that the [District's] custom or policy caused the violation." (internal quotation marks omitted)).

A municipality's policy or custom can be the cause of an injury if (1) "the municipality or one of its policymakers explicitly adopt[s] the policy that was the moving force of the constitutional violation"; (2) a policymaker knowingly ignores an unconstitutional practice consistently enough that it becomes a custom; or, (3) the municipality fails to respond "to a need in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations."  *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (internal citations and quotation marks omitted).

Plaintiff premises her municipal liability claims on a theory of "deliberate indifference." Compl. [1] at ¶¶ 42, 52, 62, 64, 72.  The Court should grant judgment to the District on these claims because (1) there is no evidence that the District was deliberately indifferent, and (2) even if there was evidence of deliberate indifference, no reasonable jury could find that such indifference caused Plaintiff's injury.

A.      **There is No Record Evidence of Deliberate Indifference.**

"Deliberate indifference 'is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations,' but did not act."  *Jones v. Horne*, 634

16

F.3d 588, 601 (D.C. Cir. 2011) (quoting *Baker*, 326 F.3d at 1306). "This standard is 'stringent,'
and mere negligence is insufficient." *Harris v. Gov't of D.C.,* 2019 WL 3605877, at \*4 (D.D.C.
2019) (internal citations omitted). Deliberate indifference "does *not* require the [municipal
actor] to take reasonable care to discover and prevent constitutional violations. It simply means
that, faced with actual or constructive knowledge that its agents will probably violate
constitutional rights, the [municipal actor] may not adopt a policy of inaction." *Warren,* 353
F.3d at 39 (emphasis in original).

Showing a pervasive pattern of similar constitutional violations is the most common and
accepted way to satisfy the deliberate indifference standard. *See Connick v. Thompson*, 563 U.S.
51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is
'ordinarily necessary' to demonstrate deliberate difference" in failure-to-act cases); *Carter v.
District of Columbia*, 795 F.2d 116, 123-26 (D.C. Cir. 1986); *Davis v. District of Columbia*, 800
F. Supp. 2d 28, 34 (D.D.C. 2011). This applies to situations where policymakers knew of and
tacitly authorized a pattern of similar constitutional violations by non-policymaking employees.
*City of Canton*, *Ohio v. Harris*, 489 U.S. 378, 397 (1989) (O'Connor, J., concurring in part and
dissenting in part). And even in circumstances where the need to act became apparent only over
time, a pervasive pattern of similar constitutional violations permits the inference that a
municipality had constructive notice that its non-policymaking employees regularly confront
particular situations where they often engage in unconstitutional conduct. *Id.*

Plaintiff claims that the District's deliberate indifference to her constitutional rights
manifested in (1) the "fail[ure] to terminate officer Best after it knew that he had sexually
assaulted at least two female officers[;]" (2) the "failure . . . to provide adequate sanctions,
training, and supervision of MPD police officers in general, including those who it knows, or

17

should have known, have committed sexual misconduct[;]" (3) the failure to supervise and sanction officers regarding the misuse of uniforms and equipment;[8] and (4) the "fail[ure] to prevent officer Best from unlawfully detaining Plaintiff against her will and then sexually abusing her inside MPD headquarters." Compl. [1] at ¶¶ 48, 49, 51, 53, 72. There is no evidence in the record to support any of Plaintiff's theories of deliberate indifference.

### 1.   Failure to Terminate Best

Plaintiff claims that MPD "fail[ed] to terminate officer Best after it knew that he had sexually assaulted at least two female officers[,]" *id.* at ¶ 48, but this theory is not supported by the record. Plaintiff is presumably referring to the Jones and Lee investigations, which occurred in late 2008 and 2009, respectively. Statement of Material Facts As To Which There Is No Genuine Issue (SMF) at ¶¶ 44, 46. But the Jones investigation concluded that there were insufficient facts to substantiate the complainant's allegations. SMF at ¶ 45. Thus, there was no basis for MPD to take any disciplinary action against Best. *Cf. Blue v. District of Columbia*, 811 F.3d 14, 19 (D.C. Cir. 2015) (complainant could not maintain a municipal liability claim against the District for failure to terminate a teacher who was accused of having an inappropriate sexual relationship with complainant when the District's investigation concluded that the teacher never had a sexual relationship with the student).

---

[8]      Based on the reports of Plaintiff's police practices expert, Lou Reiter, it appears that Plaintiff abandoned any claim of municipal liability premised on the failure to supervise or sanction Best for misusing his uniform or equipment. *See generally* Ex. 25, Reiter Preliminary Expert Report; Ex. 26, Reiter First Supplemental Report; Ex. 27, Reiter Second Supplemental Report. Therefore, the District's argument will focus on Plaintiff's "failure to terminate," "failure to sanction/train/supervise," and "failure to prevent the unlawful detention" theories, which appear to be the only theories that Plaintiff is pursuing. Should Plaintiff seek to revive the "failure to supervise or sanction the misuse of uniforms and equipment" theory in her opposition to the present motion, the District notes that there is no evidence in the record supporting the notion that MPD was deliberately indifferent to its officers' misuse of uniforms or equipment, and Plaintiff has failed to provide any expert testimony to support this claim.

Since the Jones matter is irrelevant, Plaintiff's claim rests entirely on the notion that MPD should have terminated Best following the Lee matter.  But the investigator substantiated Lee's allegations against Best and, as a result, MPD punished Best by demoting him from sergeant to officer.  SMF at ¶¶ 47, 48.  Thus, Plaintiff's theory is not that MPD failed to discipline Best; it is that MPD made a conscious decision to impose a punishment more lenient than termination.  Viewed in this light, Plaintiff's claim sounds in deliberate *conduct* by the municipality, not deliberate *indifference*.  The crux of a deliberate indifference claim is a municipality's *inaction* in the face of an obvious risk of constitutional violations; the District is aware of no authority recognizing a failure to issue a harsher form of discipline as a valid theory of municipal liability.  *Cf. Singh v. District of Columbia*, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (allegations that MPD *took no action* after complainant reported on five separate occasions that he had been harassed by a particular group of officers were sufficient to state a claim for deliberate indifference); *Muhammad v. District of Columbia*, 584 F. Supp. 2d 134, 139 (D.D.C. 2008) (allegations that MPD *failed to discipline or train* an officer who had been the subject of 14 citizens' complaints were sufficient to state a claim for deliberate indifference).

But even if there was authority supporting Plaintiff's theory, there is no evidentiary basis in this case to conclude that MPD *should have* terminated Best.  MPD's General Order governing Disciplinary Procedures and Processes prescribed that the penalty for a second[9] sustained charge of "conduct unbecoming an officer" ranged from a five-day suspension to

---

[9]     MPD sustained a charge of "conduct unbecoming an officer" against Best for the first time in the spring of 2007, after an investigation that Best had performed unauthorized outside employment and submitted fraudulent time and attendance reports.  Ex. 23, Final Notice of Adverse Action (Outside employment matter).  Best was suspended for 30 days without pay as a result.  Ex. 24, Lanier Letter (Outside employment matter).

removal. Ex. 28, MPD GO 120.21. More importantly, Plaintiff's own police practices expert

refused to opine that MPD should have terminated Best:

> Q:     Do you have an opinion as to whether or not the
> Metropolitan Police Department should have terminated Best prior
> to the incident with Ms. Buie?
>
> A:     You know, I don't have enough information to give you an
> opinion on that. I'm saying -- mainly because I don't -- when you
> get into termination, you have to know the person themselves. It's
> more than what's on paper, so I really don't have an opinion.
>
> . . .
>
> Q:     I understand that they could have terminated him. My
> question is: Based on your expert opinion, on your experience, do
> you have an opinion as to whether that they should have terminated
> Officer Best prior to the incident involving Ms. Buie?
>
> A:     No. I can't answer that, because I don't know Officer Best.
> When you get into a personnel decision like that, you have to have
> intimate knowledge of the employee. So I have no opinion on that.

Ex. 29, Reiter First Dep. Tr. at 95:16-96:3; 96:15-97:3.[10]  Police procedures are beyond the ken

of the average layperson. *See Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir.

2001). And because Plaintiff's own police practices expert does not opine that MPD should have

terminated Best before it did, there is no basis for the jury to reach that conclusion. Thus, there

is no record evidence to support Plaintiff's deliberate indifference theory on a failure to terminate

Best.

---

[10]     More than a year after this testimony, Plaintiff produced a second supplemental report
from Mr. Reiter in which he claimed that testimony from a Rule 30(B)(6) designee "fully
supports [his] original opinion that had the prior administrative investigations and disciplinary
decisions regarding former Sgt. Best had [*sic*] not been so lacking in impartiality, had not been
so egregious in departures with generally accepted police practices and the MPD policies, Sgt.
Best would more likely than not been [*sic*] separated from the MPD[.]" Ex. 27, Reiter Second
Supplemental Report at ¶ 11. However, at his second deposition, Reiter clarified that the Second
Supplemental Report did not in any way change the opinions he rendered in his previous reports
or his first deposition. Ex. 30, Reiter Second Dep. Tr. at 6:21-7:10.

2.      **Failure to Sanction/Train/Supervise Best**

Plaintiff claims that MPD "failed . . . to provide adequate sanctions, training, and supervision of MPD police officers in general, including those who it knows, or should have known, have committed sexual misconduct."  Compl. [1] at ¶ 51.  It is unclear what, if anything, differentiates Plaintiff's "failure to sanction" and "failure to terminate" theories, but for the same reasons set forth in Section I.A.1. *supra*, Plaintiff cannot establish a claim for municipal liability based on MPD's alleged failure to sanction Best (or its officers in general).

Plaintiff fares no better with her theory that MPD failed to adequately train or supervise Best in the area of sexual misconduct.  The Supreme Court has cautioned that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick*, 563 U.S. at 61 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985)).  "*Proving* a [§ 1983] failure-to-train claim is no easy task."  *Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996) (emphasis in original).  Only if such a failure amounts to "deliberate indifference to the rights of [the municipality's] inhabitants," such that it can "be properly thought of as a city policy or custom," is it "actionable under § 1983."  *City of Canton*, 489 U.S. at 389 (quotations omitted).  Deliberate indifference in this context is an objective but "stringent standard of fault," *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997), requiring that city policymakers both:  (1) had "actual or constructive notice that a particular omission . . . causes city employees to violate citizens' constitutional rights," *Connick*, 563 U.S. at 61; and (2) made a "deliberate choice" not to act, *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) (Brennan, J., plurality opinion) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials"); *accord Harvey v. District of Columbia*, 798 F.3d

21

1042, 1053 (D.C. Cir. 2015) ("objective standard . . . determined by analyzing whether the municipality knew or should have known . . . but did not act").  It is settled that "pointing to [a plaintiff's] individual experience does not by itself evidence either a recurring problem or any gaps in District training [or policy]." *Pollard v. District of Columbia*, 698 Fed. App'x 616, 621 (D.C. Cir. 2017).  "In the case of police officers, it will not 'suffice to prove that an injury or accident *could* have been avoided if an officer had had better or more training[.]" *Robinson v. Pezzat*, 818 F.3d 1, 12 (D.C. Cir. 2016) (quoting *City of Canton*, 489 U.S. at 391) (emphasis added); *see also Dorman v. District of Columbia*, 888 F.2d 159, 165 (D.C. Cir. 1989) (reversing jury verdict for plaintiff because evidence failed to show that inadequate police training rose to the level of deliberate indifference necessary to establish Section 1983 liability, and recognizing that there must be a causal connection between an "identified deficiency in a city's training program" and the ultimate injury).

The record evidence shows that the MPD has adequate training on issues involving sexual misconduct.  Lieutenant Arthur Davis, Director of Recruit Training at MPD, testified that all MPD recruits are trained on sexual misconduct topics in the context of learning the offenses of the D.C. Criminal Code, as well as in the context of EEO training.  Ex. 18, Davis Dep. Tr. at 6:9-19, 32:22-33:7.  The recruits are also trained "to act ethically, act with morals, act with standards[.]"  *Id*. at 7:10-19.  The EEO recruit training about sexual harassment is a two-hour program.  Ex. 31, EEO Sexual Harassment Syllabus.  Alphonso Lee, Director of the EEO Investigations Division, testified that not only are MPD recruits trained on sexual harassment, MPD officers receive ongoing, quarterly sexual harassment training throughout their time on the force.  Ex. 19, Lee Dep. Tr. at 30:7-20; *see also* 20:17-22:8 and 76:22-77:10 (testifying that the training defined sexual misconduct to include unwanted

touching).  Lieutenant Nicole Webster, who spent 12 years working in the Internal Affairs Bureau, testified that MPD has posters in all of its offices "explaining sexual misconduct[.]" Ex. 32, Webster Dep. Tr. at 59:19-60:5.  This evidence demonstrates that MPD made "deliberate" and "conscious" choices to continually train MPD officers on topics of sexual harassment and sexual misconduct, not that MPD engaged in a pattern of inaction in the face of obvious risks.  *See City of Canton*, 489 U.S. at 389.

Plaintiff offers no specifics when it comes to her "failure to supervise" theory, nor does the record evidence support such a theory.  Her expert's report and testimony suggest that this theory is indistinguishable from her "failure to sanction" and "failure to train" theories.  *See* Ex. 25, Reiter Preliminary Expert Report at ¶ 22 (citing "supervisory oversight failures *including Best retention*" (emphasis added)); *and see* Ex. 29, Reiter First Dep. Tr. at 75:14-76:14 (stating that "the deficiencies in the District's systems and investigative practices and lack of a specific written policy and lack of specific training and lack of specific supervisory monitoring can create the culture where some officers may believe they could engage in sexual misconduct and not be held accountable for it."). Plaintiff's expert fails to point to any aspect of MPD's supervision of its officers that proves deliberate indifference.

Even if Plaintiff could somehow show that MPD's training or supervision were inadequate to the point of inaction, Plaintiff still must show an obvious need for more or different training or supervision.  *See Rogala v. District of Columbia*, 161 F.3d 44, 56 (D.C. Cir. 1998) (stating that deliberate indifference requires a showing that "the need for more or different training or supervision was so obvious and the inadequacy so likely to result in the violation of constitutional rights that the policymakers can be said to have been deliberately

indifferent to the need." (citing *City of Canton*, 489 U.S. 378)).  In his original report, Mr. Reiter opined that MPD "lack[ed] . . . training specific to sexual and domestic misconduct[.]"  Ex. 25, Reiter Preliminary Expert Report at ¶ 22.  In his deposition, however, Reiter admitted that he had not reviewed the MPD's lesson plans about either the training on sexual offenses in the criminal code or the EEO training.  Ex. 29, Reiter First Dep. Tr. at 58:16-21, 61:3-62:3.  Reiter explained his complaints about the "lack of specificity" in MPD's training in the following way:

> Q:     Okay.  So if I understand you, your opinion is that the Metropolitan Police Department should tell police officers that you cannot have sex with a child.  Is that correct?
>
> A:     Yes.
>
> Q:     And they should tell police officers, you cannot rape a person.  Correct?
>
> A:     Yes.
>
> Q:     And they should tell police officers, you cannot touch the private parts of another person.  Is that what you're saying?
>
> A:     Yes.

*Id*. at 55:18-56:7.  Reiter could not point to a single police department that had adopted the training philosophy he espouses.  *Id*. at 62:9-63:4.  As for any separate "failure to supervise" theory, Reiter offers no alternative supervisory structure that would alleviate any alleged deficiency.  Thus, Plaintiff's deliberate indifference claim based on a failure to sanction, train, or supervise Best also fails as a matter of law.

### 3.     Failure to "prevent officer Best from unlawfully detaining [Plaintiff] against her will and then sexually abusing her inside MPD headquarters"

Plaintiff claims that municipal liability should attach because MPD "fail[ed] to prevent officer Best from unlawfully detaining her against her will and then sexually abusing her inside

MPD headquarters." Compl. [1] at ¶ 72. This theory merits little attention. Plaintiff cannot

point to *any* record evidence that MPD had "actual or constructive knowledge" that Best—or any

of its officers—would commit constitutional violations by unlawfully detaining an individual

and sexually assaulting them. *See Warren*, 353 F.3d at 39 (the deliberate indifference standard

"does *not* require the city to take reasonable care to discover and prevent constitutional

violations." (emphasis in original)). Under this theory, Plaintiff is essentially proceeding on a

premise of *respondeat superior* liability, something the Supreme Court long ago vanquished

from Section 1983 jurisprudence. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658,

691 (1978).

Because there is no evidence in the record establishing deliberate indifference—on any of

these theories—the Court should grant judgment in favor of the District on Plaintiff's Section

1983 municipal liability claims (Counts I and II).

**B.      Plaintiff Cannot Establish Causation.**

Even if Plaintiff could show deliberate indifference, Plaintiff's claims still fail for lack of

causation. *Both* wrongdoing and causation are elements of a Section 1983 claim. *Harvey*, 798

F.3d at 1050 (holding that, to prevail under *Monell*, the plaintiff had to show both that the

District was deliberately indifferent to the medical needs of group home residents and that the

custom or policy caused his injury). Plaintiff cannot show that any of the alleged municipal

failures discussed above—either individually or in concert—*caused* her injury. "A deliberately

indifferent policy or custom is 'deemed to be the moving force of a constitutional injury if the

conduct is a substantial factor in bringing about the harm.'" *Smith v. District of Columbia*, 413

F.3d 86, 102 (D.C. Cir. 2005) (internal quotation marks omitted) (quoting *Parker v. District of

Columbia*, 850 F.2d 708, 714 (D.C. Cir. 1988)). This requirement is similar to proximate cause

in that it requires both factual causation (that the particular violation at issue would not have occurred but for the alleged policy) and foreseeability (that the violation was a foreseeable result of the policy). *See id.* at 102-03; *Burton v. United States*, 668 F. Supp. 2d 86, 108 (D.D.C. 2009) ("Proximate cause has been defined as that cause which, in natural and continual sequence, *unbroken by any efficient intervening cause,* produces the injury[.]" (quoting *McKethean v. WMATA*, 588 A.2d 708, 716 (D.C. 1991)) (emphasis in original)). To put it succinctly, "[w]ould the injury have been avoided" had the municipality undertaken "a program that was not deficient[?]" *City of Canton*, 489 U.S. at 391. Here, the answer is no.

The proximate cause of Plaintiff's injury was Best's criminal conduct. When intervening criminal acts cause injury, the defendant is only liable "if the acts are those 'the defendant might reasonably anticipate, and against which the defendant would be required to take precautions.'" *Smith v. Hope Village, Inc.*, 481 F. Supp. 2d 172, 203 (D.D.C. 2007) (quoting *White v. United States,* 780 F.2d 97, 107 n. 33 (D.C. Cir. 1986)). There is no evidence establishing that MPD should have anticipated that Best would sexually assault Plaintiff at headquarters or that MPD could have taken a specific precaution that would have prevented the assault. If MPD had terminated—instead of demoted—Best in 2009, would that have prevented Best from assaulting Plaintiff on December 4, 2014? No, as evidenced by (1) the fact that Best's sexual harassment of Plaintiff began at Georgia Brown's, not MPD headquarters, SMF at ¶ 15, and (2) Best's subsequent sexual assaults of A.T., which occurred in his private office at the church, SMF at ¶ 38. Would even more training—such as Plaintiff's expert's recommendation that MPD specifically train officers not to sexually assault minor children—have prevented Best's assault of Plaintiff? The very question represents such a cartoonish caricature of a municipal liability claim that the answer is self-evident—no.

26

Plaintiff's own police practices expert could *not* say that his recommended changes in

MPD policy and training would have prevented Best's assault of Plaintiff:

> Q:      And is it your opinion that if the MPD did everything that you have identified that was deficient, that somehow Ms. Buie would not have been assaulted?
>
> A:      You know, I've answered that numerous times.  I've said I can't get into Officer Best's mind.  I don't know what was going on there.  I can say that if the culture represented by my readings of the materials in this and the administrative investigations, if the culture had been what I'm recommending it should have been, more likely than not, it may not have occurred.  But that's the best I can do, to answer your question.
>
> . . .
>
> Q:      Is there—in your opinion, is there anything that the Metropolitan Police Department could have done to prevent . . . former Officer Best from assaulting Ms. Buie?
>
> . . .
>
> A:      You know, like I've said, in my opinion, from the materials I've reviewed, the agency has created a culture that has not adequately defined in written format, trained with specific, realistic examples, both at basic and in-service, monitored and then created administrative investigations and filing, and the whole issue of being able to look at an overview of what their officers are doing that are getting them in trouble and making corrective moves there, and there's no indication that there's any ongoing monitoring of what the officers are engaged in on a realistic way.
>
> I mean, just the number of instances that have come from the 7th District that I've seen—and I've only scratched the surface on this documentation—any reasonable manager would say, what the hell's going on down there; is this some sort of frat house that we've got in the 7th District.
>
> And now, would all of those things have stopped the sexual assault against Ms. Buie?  I'm saying, more likely than not.  That's why we do this.  Could it have occurred?  Possibly, yes.  But it's the idea that if they had done all those things, I wouldn't be here doing this deposition now.

Ex. 29, Reiter First Dep. Tr. at 87:2-15, 88:11-89:22.  Mr. Reiter's ultimate opinion is precisely

the kind of "lesser standard[]" that the Supreme Court warned against in *City of Canton*:

> In virtually every instance where a person has had his or her
> constitutional rights violated by a city employee, a § 1983 plaintiff
> will be able to point to something the city 'could have done' to
> prevent the unfortunate incident[, and] [t]hus, permitting cases
> against [municipalities] for their 'failure to train' employees to go
> forward under § 1983 on a lesser standard of fault would result in *de
> facto respondeat superior* liability on municipalities[.]

489 U.S. at 391-92 (internal citations omitted); *and see Turpin v. Mailet*, 619 F.2d 196, 204 (2d

Cir. 1980) (explaining that evidence of the municipality's failure to discipline an officer for an

earlier incident of alleged excessive force was "simply too attenuated to support municipal

liability under § 1983" for a later incident).

Because there is no evidence in the record establishing causation, the Court should grant

judgment in favor of the District on Plaintiff's Section 1983 municipal liability claims (Counts I

and II).

## II.    The District is Entitled to Judgment as a Matter of Law on Plaintiff's Common Law Claims.

With constitutional claims addressed above, Plaintiff asserts common law tort claims of

negligence (Count IV); negligent entrustment (Count V); negligent retention (Count VI);

negligent infliction of emotional distress (Count VII); and intentional infliction of emotional

distress (Count VIII) against the District.  Generally, the District is not subject to liability for the

tortious acts of employees acting outside the scope of their employment, except under the narrow

circumstances outlined in Section 219(2) of the Restatement (Second) of Agency (1958)

(Restatement).  *Gary v. Long*, 59 F.3d 1391, 1397 (D.C. Cir. 1995).  Plaintiff proposes two

theories of vicarious liability under Section 219(2) of the Restatement:  (1) the District itself

acted negligently or recklessly, as provided in Section 219(2)(b); and (2) Best accomplished his

tortious acts utilizing "instrumentalities" of his employment, as envisioned by Section 219(2)(d). *See* Pl.'s Opp'n [13] at 5-6.  But Plaintiff cannot establish vicarious liability under either Section 219(2)(b) or Section 219(2)(d).  And even if she could, each of her common law claims fail on their merits, are barred by the statute of limitations, or are barred by the public duty doctrine.

### A.    Plaintiff Cannot Establish Vicarious Liability Under Either Restatement Section 219(2)(b) or Section 219(2)(d).

### 1.    Section 219(2)(b)—Employer Negligence or Recklessness

Under Restatement Section 219(2)(b), an employer can be liable at common law for tortious acts intentionally committed by an employee acting outside the scope of employment if the employer was "negligent or reckless," and the negligence or recklessness resulted in the injury alleged.  Relying on *Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951), Plaintiff previously characterized her Section 219(2)(b) theory of vicarious liability as resting on the District's alleged negligence in either selecting Best for MPD employment or retaining him, despite later learning that he was "unfit" to serve as a police officer.  *See* Pl.'s Opp'n [13] at 6. Plaintiff does not contend—likely because she could not plausibly—that Defendant Best was incompetent or unfit for the work associated with MPD policing *when he was hired* in 1987.  *See id.*  Plaintiff received Best's complete personnel file in discovery but did not question a single District witness about Best's qualifications at the time he applied for MPD employment or the rationale for the decision to hire him; nor did Plaintiff's police practices expert, Lou Reiter, express an opinion concerning any of these matters.  And it is axiomatic that "by pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment."  *Cooper v. First Gov't Mortg. & Inv'rs Corp.*, 238 F. Supp. 2d 50, 53 (D.D.C. 2002) (citing *Celotex*, 477 U.S. at 322).  Thus, Plaintiff cannot hold the District vicariously liable on a negligent hiring theory.

Otherwise, Plaintiff's theory of vicarious liability under Section 219(2)(b) depends on the premise that MPD *retained* Best, despite knowing that he was apparently "unfit" for duty.  Pl.'s Opp'n [13] at 6 (quoting *Fleming, supra*).  In this regard, Plaintiff's vicarious liability argument merges in all relevant respects with her negligent supervision and retention claim (Count VI and, arguably, Count IV) and should be rejected for the reasons that this claim fails as a matter of law, as outlined below in Section II.B.i.

### 2.    Section 219(2)(d)—Employer Instrumentalities

Plaintiff's instrumentalities theory under Section 219(2)(d) fares no better.  The D.C. Court of Appeals has not resolved whether the exception in Section 219(2)(d) applies in the District as a basis for vicarious liability at common law.  *See Doe v. Sipper*, 821 F. Supp. 2d 384, 391 (D.D.C. 2011).  The Court need not resolve this issue of local law because Plaintiff's claim fails on the facts, as explained below.  If the Court does reach the legal issue, it should reject the exception in Section 219(2)(d), just as the Supreme Court of Michigan did in a case involving a hospital employee who sexually assaulted a patient in the hospital emergency room.  *Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220 (Mich. 2006).  The court there explained that the 219(2)(d) "exception to employer nonliability applies primarily to cases involving misrepresentation and deceit, for example when a store manager is able to cheat store customers because of his or her position as store manager for the owner."  *Id.* at 222.  The court rejected Section 219(2)(d) "because the exception swallows the rule and amounts to an imposition of strict liability upon employers."  *Id.* at 226; *see also Groob v. KeyBank*, 843 N.E.2d 1170, 1179 (Ohio 2006) (declining to adopt Section 219(2)(d) because employer cannot be found liable for the acts of its employee committed outside the scope of employment); *but cf. Doe v. Forrest*, 176 Vt. 476, 853 A.2d 48, 57 (2004) (expressly adopting § 219(2)(d)).  Ultimately, if the issue is dispositive here,

the D.C. Circuit should certify this issue of local law to the D.C. Court of Appeals.  D.C. Code §
11-723 (2012 Repl.).

Nonetheless, Plaintiff cannot establish this theory of vicarious liability.  Section
219(2)(d) of the Restatement provides for vicarious employer liability where either "the
[employee] purported to act [ ] on behalf of the [employer] and there was reliance upon apparent
authority, *or* [the employee] was aided in accomplishing a tort by the existence of the
[employment] relation[ship]."  Restatement § 219(2)(d) (emphasis added).  "The exception is
stated in the disjunctive," *Barnes v. Costle*, 561 F.2d 983, 996 (D.C. Cir. 1977) (MacKinnon, J.,
concurring), and Plaintiff cannot seriously argue that the first part applies here:  She has never
contended that Defendant Best "purported to act [ ] on behalf of [MPD]" when he sexually
assaulted her, and she could not have reasonably believed that Best's actions were somehow
condoned by the District.  *See Sipper*, 821 F. Supp. 2d at 391 ("[employee] could not have
'purported to act or speak on half of' [employer] while assaulting [the injured party]").  Nor has
Plaintiff ever made any assertion—in her pleadings, prior briefing, or deposition testimony—that
would tend to show reasonable reliance on any such apparent authority.  *See Barnes, supra.*

Concerning the second part of Section 219(2)(d), as the Court has already acknowledged,
the D.C. Circuit has espoused a "narrow reading" of the exception, one that requires not only that
the employee-tortfeasor be aided in some way by his position—an "instrumentality or conduct
associated with the [employment]," *Gary*, 59 F.3d at 1397—but also that the injured party could
have *reasonably* believed, on the factual circumstances presented, that the employee was acting
within the permissible scope of the authority granted by the employer.  *See* Mem. Op. & Or. [19]
at 3 (quoting *Gary*, *supra*) (internal quotations omitted).  This reasonable belief inquiry must
account for *all* the information available to the injured party, including publicly available laws,

orders, policies, and other measures that govern the use of the employer's instrumentalities. *See Gary,* 59 F.3d at 1397.[11] Were it otherwise, the exception proscribed by Section 219(2)(d) would swallow the rule because, as the Circuit has observed, "[i]n *every* case where vicarious liability is at issue, the agent will have been aided in some way in committing the tort by the position he holds." *Cf. Barnes*, 561 F.2d at 996; *Sipper*, 821 F. Supp. 2d at 392 ("The D.C. Circuit [in *Gary*, 59 F. 3d at 1397] has acknowledged the superficial expansiveness of the standard").

Applying these principles to the undisputed facts in this case, Plaintiff could not have *reasonably* believed that Defendant Best's sexual assault of her at MPD headquarters, while he was off duty, was within the authority conferred or otherwise condoned by MPD. Best was no doubt equipped with traditional police instrumentalities immediately prior to and during the encounter: He was in MPD uniform; carrying a department-issued service weapon; driving an unmarked police cruiser; and had access to a secure suite at the headquarters building. But the record is devoid of any evidence that Best affirmatively used any of these instrumentalities (or his police powers, generally) to gain access to, control, or eventually assault Plaintiff. The Court should follow the reasoning of *Cawood v. Rainbow Rehab. Ctr.*, 711 N.W.2d 754 (Mich. Ct. App. 2005), where the court rejected the application of the Section 219(2)(d) exception in a case involving sexual assault by a nurse of a patient in a rehabilitation center. The panel reasoned that

---

[11]     In developing this rule, the D.C. Circuit in *Gary* quoted Restatement Section 166 cmt. a., for the "general principal of agency law" that, "[i]f a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal . . . he cannot subject the principal to liability." *Gary*, 59 F.3d at 1398 (internal quotations omitted). The *Gary* Court also quoted with approval the Third Circuit's opinion in *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103 (3d Cir. 1994), to the extent it observed that "[the Third Circuit's] agency precedent requires the belief in the agent's apparent authority to be reasonable before the principal will be bound." *Id.* (internal quotations omitted).

"an employee is not aided in accomplishing the tort by the existence of the agency relation, under the Restatement exception, just because of the mere fact that an employee's employment situation may offer an opportunity for tortious activity." *Id.* at 756 (internal quotation marks omitted); *see Ridgell v. HP Enter. Servs. LLC*, 209 F. Supp. 3d 1, 49 (D.D.C. 2016) (rejecting vicarious liability under Section 219(2)(d); explaining, "[employee's] criminal conduct (mass shooting) cannot be associated in any way with his status as a computer technician [for employer]"). Defendant Best did not, for example, gain access to Plaintiff by virtue of his affiliation with MPD, but as an outgrowth of Plaintiff's (and her family's) membership to Best's church. SMF at ¶¶ 2-6. Best offered to take Plaintiff and her mother to dinner as a gift for Plaintiff's high school graduation following a Sunday church service and, although Best expressed an interest in discussing Plaintiff's curiosity about becoming a police officer, Plaintiff made clear that she had no "serious" intentions to pursue a career in policing and that there was "nothing . . . really to talk about." SMF at ¶ 6. In fact, Plaintiff never actually asked Best about anything concerning the MPD or policing; despite Best explicitly asking her if she had any questions on the drive Georgia Brown's, before speaking *at* her about the police academy for approximately five minutes at dinner. SMF at ¶¶ 12, 14; Ex. 2, Pl. Dep. Tr. 177:3-9; *accord id.* at 178:11-16 ("I did not have any questions right then and there [about the police force]"), 180:16-22 ("this was my reason why I didn't … want to come out to eat for a graduation gift because I didn't have anything to talk about"). Furthermore, Best did not tell Plaintiff why he was driving an unmarked police cruiser; nor did Plaintiff inquire. SMF at ¶ 10.

After dinner, as Plaintiff recounts, Best's demeanor changed—he became "aggressive," "stern," and was "talking as if he was [Plaintiff's] parent," Ex. 2, Pl. Dep. Tr. at 201:7-202:6— ultimately causing Plaintiff to fear him, *id.* at 202:7-9. But Best did not instruct Plaintiff to get in

the car *because he was a police officer* or by threatening any consequences associated with refusing a police order.  To the contrary, on *Plaintiff's* account, Best's instruction (which she ultimately heeded) was, "what would it look like if I didn't take you home?"  SMF at ¶ 23.  And Best did not coax Plaintiff into police headquarters or the secure CSB suite by feigning an arrest, restricting her movement, or otherwise invoking his police powers in any way.  Ex. 2, Pl.'s Dep. Tr. 213:2, *et seq.*  In short, if Plaintiff feared Best during the encounter because of his status as a police officer or the presence of his firearm, it was not due to any *actual* assertion of MPD authority by Best.

Perhaps more importantly, any unilateral perception by Plaintiff that Best was acting within the permissible scope of his authority at the time he assaulted her could not be objectively reasonable as a matter of law considering the myriad statutes, regulations, and readily-accessible MPD orders flatly prohibiting the use of MPD instrumentalities in the manner Best employed them.  *See supra* at fn. 12 (discussing *Gary*, 59 F.3d at 1398).  For example, publicly available[12] MPD policy squarely restricts the use of official government vehicles to "the performance of a member's official duties and in furtherance of District government business."  EO-17-027 at 2, Sec. III.B.1; *see also id.* at 2, Sec. III.B.2 ("Members **shall not** use government vehicles for personal activities . . ."); *accord* GO-OPS-301.05 at 2, Sec. IV.C. ("Only authorized members . . ").  The same general order also provides that "[o]nly personnel assigned to [a police] vehicle are authorized to ride in it, except . . . [c]ivilians may ride:  (a) When authorized by general order; (b) [i]n case of an emergency; or (c) [i]f they are on official police business."  GO-OPS-301.01 at 1-2, Sec. I.A.1; *see also* EO-17-027 at 2, Sec. III.B.3 ("Members **shall not** use

---

[12]      MPD general, special, and executive orders are available to the public on the department's website at https://mpdc.dc.gov/page/written-directives-general-orders.

government vehicles to transport non-District government employees unless: (a) Members are transporting non-District government employees as part of their official duties (*e.g.*, transporting an arrestee or witness, conducting an approved ride-along); or (b) [t]he transportation is authorized by the Chief of Police or his or her designee"). Even then, MPD policy is clear that "[m]embers driving government vehicles [are required to] [c]omport themselves with integrity at all such times." *Id.* at 3, Sec. III.D.1.a. At the time Plaintiff rode in the MPD cruiser with Best, she was not authorized to do so by any general order or the Chief, there was no emergency, and she and Best were at a private dinner, not on any official police business.[13]

Regarding the off-duty carrying of standard-issue service weapons, SO 04-07—also available on MPD's website—provides discretion, in most cases, for officers to decide whether the presence of a firearm may be ill-advised at particular off-duty activities. *Id.* at 1, 3. The SO specifically advises that "situations where carrying a weapon may prove unnecessary or imprudent . . . include attendance at religious services . . . or attending social functions where officers may consume alcohol and their weapons cannot be secured in accordance with department policy." *Id.* at 1. Additionally, MPD officers are required to complete bi-annual firearms training. *See* Ex. 32, Webster Dep. Tr. at 37:20-38:6, 41:13-42:5. Best would have attended these trainings as a condition of his active duty status and would have, in any event, known that any use of his service weapon to threaten or harm Plaintiff was clearly and flatly

---

[13]     D.C. Code § 50-204 requires that "no officer or employee of the District may be provided with an official vehicle . . . [except] in the performance of the officer's or employee's official duties." D.C. Code § 50-204(a). Pursuant D.C. Code § 50-204, MPD has implemented a Motor Vehicle Take Home Program, under which sworn members below the rank of lieutenant (or otherwise as determined by the Chief, on a case-by-case basis) to be assigned MPD patrol vehicles as "Take-Home" vehicles. GO-OPS-301.04. As administrative personnel, not assigned to a patrol district, Best was ineligible for participation in the program. *See id.* at 2, Sec. III.B.

forbidden.  *Accord Henriksen v. City of Rialto*, 25 Cal. Rptr. 2d 308, 311-13 (Cal. App. 4th 1993).

And Best's sexual assault of Plaintiff was in clear violation of local criminal law, which Plaintiff knew or should have known.  *Gary*, 59 F.3d at 1398 ("[employer] policies and [ ] measures" that the injured party "knew or should have known").  This, of course, makes any belief that MPD conferred on Best the authority to carry out the assault even less reasonable.  *See Barnes*, 561 F.2d at 996 (citing Restatement § 231 for the proposition that, "under the general law of agency and tort, there is even less basis for vicarious liability if the [employee's] action were characterizable under the criminal law").  And, the allegation "that [MPD] provided [Best] with access to the [headquarters building or CSB suite] . . . is insufficient" to establish vicarious employer liability under Restatement Section 219(2)(d) because "[t]he fact that an employee's work 'afforded him an opportunity to' commit [a] crime is 'insufficient to make [the employer] vicariously liable[.]'"  *Ridgell*, 209 F. Supp. 3d at 49 (quoting *Boykin v. District of Columbia*, 484 A.2d 560, 563-64 (D.C. 1984)).  Further, Best's reference to Chief Lanier—while parking at MPD headquarters, in response to Plaintiff's request to "sit in the car" instead of accompanying Best to the CSB suite, SMF at ¶ 26—is yet further information that would have signaled to any reasonable person that Best was violating MPD orders by bringing her there.  According to Plaintiff, Best responded, "No.  Chief Lanier's in here.  You can't sit down here."  SMF at ¶ 26. Ultimately, the information known to or reasonably knowable by Plaintiff during and immediately preceding Best's assault of her could not have led any reasonable person to conclude that Best's conduct was within the authority conferred by MPD or otherwise condoned by the District.

**B.**     **Even If Plaintiff Could Establish Vicarious Liability, She Cannot Prevail on the Merits of Her Common Law Claims.**

**1.**     **Plaintiff Cannot Establish a Claim of Negligent Supervision (Count IV) or Retention (Count VI).**

Plaintiff asserts a count for negligence (Count IV), but the allegations in the Complaint associated with this count suggest that Plaintiff is in fact asserting a count of negligent supervision. *See* Compl. [1] at ¶¶ 85, 87. Plaintiff separately asserts a count for negligent retention (Count VI). *Id.* at ¶¶ 96-102. These claims are duplicative and, therefore, at a minimum, the Court should dismiss one of them. *See Ridgell*, 209 F. Supp. 3d at 37-38 (dismissing certain negligence claims as duplicative of others where they "stem[med] from identical allegations and rel[ied] on the same underlying theory of liability"). But regardless of their duplicative nature, Plaintiff cannot establish a claim for negligent supervision or retention.

Negligent supervision or retention is not a theory of vicarious liability; rather, it is a theory of direct liability against the employer. *See Phelan v. City of Mount Rainier*, 805 A.2d 930, 937 (D.C. 2002). Establishing negligent supervision requires that a party "show that an employer knew or should have known its *employee* behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (emphasis in original).

As is true in any negligence case, Plaintiff here must establish by competent evidence a standard of care; that the District violated that standard; and that such violation proximately caused injury to the plaintiff. *See District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C. 1990). The failure to prove a standard of care is fatal to a plaintiff's case, because, in order to recover damages for negligence, plaintiff must prove that the defendant deviated from the

applicable standard of care. *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988). If the standard itself is not proven, then a deviation from that standard is incapable of proof and a plaintiff's negligence claim should not be submitted to the jury. *District of Columbia v. Hampton*, 666 A.2d 30, 37 (D.C. 1995).

A party must offer an expert to testify as to the standard of care "where it concerns a subject so related to some profession or occupation as to be beyond the realm of knowledge of an average lay person." *Young v. District of Columbia,* 752 A.2d 138, 145 (D.C. 2000) (citing *Hampton*, 666 A.2d at 35). The purpose of expert testimony is to avoid jury findings based on mere conjecture or speculation. *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996).

Expert testimony regarding the standard of care is required in cases alleging negligent police operations, supervision, or training. *E.g., District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C. 1987) (requiring expert testimony for training of police regarding confrontations with people under the influence of narcotics); *District of Columbia v. White*, 442 A.2d 159, 164-65 (D.C. 1982) (requiring expert testimony concerning adequacy of the MPD's weapons safety training); *Holder v. District of Columbia,* 700 A.2d 738, 741-42 (D.C. 1997) (stating that police use of force is an issue beyond the ken of the average juror).

When required, expert testimony "is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances. Nor is it enough for the expert simply to declare that the [defendant] violated the national standard of care." *Clark v. District of Columbia,* 708 A.2d 632, 635 (D.C. 1997) (quoting *Messina v. District of Columbia,* 663 A.2d 535, 537 (D.C. 1995)). An expert must either relate the standard of care to the practices generally followed by other comparable jurisdictions or relate the standard of care to "some standard nationally recognized by such units." *Clark*, 708 A.2d at 635; *see also District*

*of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000).  Under either approach, the standard of care must be "specific, articulable (and articulated)," and directly relate to the defendant's alleged misconduct.  *Carmichael*, 577 A.2d at 315; *see also Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C. 1998).

Plaintiff designated Mr. Reiter as her police practices expert but, as demonstrated in Sections I.A.1 and I.A.2 *supra*, Reiter does not opine that MPD breached any standard of care in their supervision or retention of Best.  But even if Plaintiff could establish that MPD breached a standard of care, Plaintiff cannot establish that such a breach *caused* the terrible acts that Best committed against her in December 2014.  *See* Section I.B *supra*.

Because there is no evidence in the record supporting Plaintiff's negligent supervision or retention claims, the Court should grant judgment in favor of the District on those claims (Counts IV and VI).

### 2.    Plaintiff's Negligent Entrustment Claim (Count V) Fails.

Plaintiff asserts a claim for negligent entrustment (Count V), alleging that MPD "negligently entrusted Best with a police uniform, weapon, police car, and security passes to MPD headquarters[.]"  Compl. [1] at ¶ 90.  To establish a claim of negligent entrustment, a plaintiff must show:  "(1) [t]he making available to another a chattel which the supplier (2) knows or should have known the user is likely to use in a manner involving risk of physical harm to others (3) [whom] the supplier should expect to be endangered by its use."  *Young v. U-Haul Co. of D.C.,* 11 A.3d 247, 249 (D.C. 2011) (quoting *Phelan,* 805 A.2d at 941).  "[T]he second element refers to a person who is likely to use the chattel in an unsafe manner due to 'youth, inexperience, or otherwise.'"  *Bankers Standard Ins. Co. v. Anand,* 2020 WL 4698363, at *5 (D.D.C. Aug. 13, 2020) (quoting Restatement (Second) of Torts § 390 (1965)).

The first and most prominent problem with Plaintiff's claim is that Best did not use his uniform, his weapon, the CSB squad car, or his security pass to sexually assault Plaintiff.  What Best "used" to sexually assault Plaintiff was his position as her pastor, as well as the false sense of trust he had built with the Buie family through his church.  But even if this Court finds that Best "used" MPD equipment to commit the assault, there is no evidence in the record showing that MPD had any reason to foresee that Best would use these items to commit such a crime.  *See id.* ("The doctrine of negligent entrustment . . . does not require a defendant to be clairvoyant.").

Because there is no evidence in the record supporting Plaintiff's negligent entrustment claim, the Court should grant judgment in favor of the District on that claim (Count V).

### 3.    Plaintiff Cannot Establish a Claim of Negligent Infliction of Emotional Distress (Count VII).

Plaintiff asserts a claim for negligent infliction of emotional distress (NIED) (Count VII). Compl. [1] at ¶¶ 103-109.  It appears that Plaintiff premises this claim on MPD's alleged failure to supervise Best and thus the Court should dismiss the claim as duplicative of Plaintiff's negligent supervision and retention claims.  *Ridgell*, 209 F. Supp. 3d at 37-38.  Regardless, Plaintiff cannot establish a claim for NIED.  To prevail on such a claim, "a plaintiff must show that '(1) the plaintiff was in the zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for his own safety, and (4) the emotional distress so caused was serious and verifiable.'"  *Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 915 (D.C. Cir. 2015) (quoting *Rice v. District of Columbia*, 774 F.Supp.2d 25, 33 (D.D.C. 2011)).

There is no evidence in the record supporting Plaintiff's claim.  As detailed in Section I.A.2 *supra*, Plaintiff cannot show that MPD was negligent in its supervision of Best or that such

alleged negligence "created" the zone of physical danger that Plaintiff was in when Best assaulted her in December 2014.

Because there is no evidence in the record supporting Plaintiff's NIED claim, the Court should grant judgment in favor of the District on that claim (Count VII).

4.    **Plaintiff Cannot Establish a Claim of Intentional Infliction of Emotional Distress (Count VIII).**

In addition to NIED, Plaintiff asserts a claim for intentional infliction of emotional distress (IIED).  Compl. ¶¶ 110-115 [1 at 23-24].  To establish IIED, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984).  Here, Plaintiff explicitly references MPD's "fail[ure] to supervise" Best as the basis for her IIED claim.  Compl. ¶ 111 [1 at 23].  Because Plaintiff has failed to identify intentional conduct separate and apart from her allegations of negligent conduct, her IIED claim fails.  *See District of Columbia v. Chinn*, 839 A.2d 701, 708 (D.C. 2003) ("[O]ne incident may give rise to both negligence and intentional tort claims but . . . plaintiffs must set forth theories meeting the individual requirements of each claim.").

Because there is no evidence in the record supporting Plaintiff's IIED claim, the Court should grant judgment in favor of the District on that claim (Count VIII).

C.    **The Statute of Limitations Bars Plaintiff's NIED and IIED Claims.**

To the extent that Plaintiff's claims for emotional distress are premised on Best's assault upon her, the statute of limitations bars her NIED and IIED claims.  The D.C. Code does not specifically mention either intentional or negligent infliction of emotional distress.  *See* D.C. Code § 12-301 (2012 Repl.).  Although causes of action not specifically mentioned in Sec. 12-301 are prescribed a three-year limitation period, NIED and IIED claims that are intertwined

with a tort specifically mentioned by Sec. 12-301 borrow the identified tort's limitation period, as the emotional distress aspect of the claim is essentially an outgrowth of the other tort. *Saunders v. Nemati*, 580 A.2d 660, 662-63 (D.C. 1990).

Because Plaintiff's NIED and IIED claims are based on Best's sexual assault of her on December 4, 2014, these claims are intertwined with the torts of assault and battery. *See e.g. Rogers v. Johnson-Norman*, 466 F. Supp. 2d 162, 173 (D.D.C. 2006). Under such a theory of liability, Plaintiff's emotional distress claims are subject to a one-year limitations period, *see* D.C. Code § 12-301(4), meaning she had to assert these claims by December 4, 2015. Plaintiff filed her Complaint in September 2016, and therefore, her NIED and IIED claims are time-barred.

**D.**     **The Public Duty Doctrine Bars Plaintiff's Negligence-Based Claims.**

Throughout her Complaint, Plaintiff makes reference to MPD's supposed breach of a "duty to protect" Plaintiff. Compl. [1] at ¶¶ 58, 72, 85, 92, 99, 100, 106. To the extent Plaintiff is asserting a negligence claim based on this alleged duty, such a claim is barred by the public duty doctrine. "Under the public duty doctrine, the District of Columbia has no duty to provide public services to any particular citizen." *Allison Gas Turbine v. District of Columbia*, 642 A.2d 841, 843 (D.C. 1994). Instead, "the duty to provide public services is owed to the public at large, and absent a special relationship between the [government agency] and an individual, no specific legal duty exists." *Id.* (quoting *Warren v. District of Columbia*, 444 A.2d 1, 3 (D.C. 1981) (en banc)). "The doctrine operates to shield the District and its employees from liability arising out of their actions in the course of providing public services." *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C. 1990); *see Platt v. District of Columbia*, 467 A.2d 149, 151 (D.C. 1983).

42

Without this "limitation on liability, the District would be potentially liable for every oversight, omission, or blunder made by a police, ambulance or building inspection official." *Powell v. District of Columbia*, 602 A.2d 1123, 1128 at n. 5 (D.C. 1992) (citation and internal brackets omitted).  This limitation is vitally important to the function of the government, as it "protect[s] municipalities against what would be an overwhelming tide of liability if local governments were liable for mishaps which occur during the provision of public services." *Johnson v. District of Columbia*, 2006 WL 2521241, at *8 (D.D.C. Aug. 30, 2006) (citation omitted).  The local Court of Appeals has recognized on numerous occasions that the public duty doctrine applies to claims against the District and its agents concerning police protection.  *See Miller v. District of Columbia*, 841 A.2d 1244 (D.C. 2004); *Taylor v. District of Columbia*, 776 A.2d 1208 (D.C. 2001); *Allison Gas Turbine*, *supra*; *Morgan v. District of Columbia*, 468 A.2d 1306 (D.C. 1983) (en banc); *Warren*, *supra*.  The public duty doctrine "covers instances where the plaintiff contends that a defendant police officer 'failed to do what reasonably prudent police employees would have done in similar circumstances.'" *McGaughey v. District of Columbia*, 734 F. Supp. 2d 14, 18 (D.D.C. 2010) (quoting *Warren*, 444 A.2d at 7-8).

However, the public duty doctrine is not absolute, and a plaintiff may overcome the doctrine by showing that the District "owed the injured party a special duty [that was] greater than or different from any duty owed to the general public." *Woods v. District of Columbia*, 63 A.3d 551, 553 (D.C. 2013) (quoting *Klahr v. District of Columbia*, 576 A.2d 718, 719 (D.C. 1990)).  There are two ways in which a plaintiff may establish such a special duty or special relationship.  One way is by establishing that the District violated a "statute that prescribes mandatory acts clearly for the protection of a particular class of persons [of which the plaintiff is a member] *rather than the public as a whole*." *Turner v. District of Columbia*, 532 A.2d 662, 672

(D.C. 1987) (emphasis added, citations omitted). Alternatively, plaintiff may defeat the public

duty doctrine by establishing "(1) a direct or continuing contact between the injured party and a

governmental agency or official, and (2) a justifiable reliance on the part of the injured party."

*Klahr*, 576 A.2d at 720; *see also Morgan*, 468 A.2d at 1314 (plaintiff may show a "special

relationship" by showing "(1) a specific undertaking to protect a particular individual, and (2)

justifiable reliance by the plaintiff.").

      The alleged "duty to protect" Plaintiff from Best is precisely the type of generalized duty

that the public duty doctrine is designed to estop. There is no evidence in the record that

Plaintiff had a special relationship with MPD or that MPD owed her a special duty. Plaintiff's

relationship with Best came about exclusively through her membership at the church.

      Because Plaintiff's negligence-based claims are barred by the public duty doctrine, the

Court should grant judgment in favor of the District on all of Plaintiff's common law claims.

## III.   The District is Entitled to Judgment on Plaintiff's Claim for Injunctive Relief (Count III).

      In her Complaint, Plaintiff asserts—as a separate cause of action—a claim for injunctive

relief. Compl. [1] at ¶¶ 76-81. The Court should dismiss this claim because injunctive relief is a

remedy, not an independent cause of action. *See Base One Techs., Inc. v. Ali,* 78 F. Supp. 3d

186, 199 (D.D.C. 2015) ("Injunctive relief . . . is not a freestanding cause of action, but rather—

as its moniker makes clear—a form of relief to redress the other claims asserted by Plaintiff.").

      However, even if the Court allows Plaintiff to proceed against the District on any of the

claims in the Complaint, the Court should nonetheless rule that Plaintiff is not entitled to the

injunctive relief she seeks. "When a plaintiff seeks injunctive or declaratory relief specifically

for the purpose of challenging an alleged policy or practice of a government agency, it must also

demonstrate that it is 'realistically threatened by a repetition of [its] experience.'" *Nat'l Sec.*

*Counselors v. C.I.A.*, 931 F. Supp. 2d 77, 91 (D.D.C. 2013) (quoting *Haase v. Sessions*, 835 F.2d

902, 910-11 (D.C. Cir. 1987)). "This threat must be 'real and immediate,' or, alternatively,

'realistic[]' in nature." *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

Plaintiff has not shown that any realistic threat exists here. Plaintiff asks the Court to

enjoin the District "from failing to train, supervise and discipline its MPD police officers in an

adequate manner." Compl. [1] at ¶ 79. For the reasons stated in Sections I.A.1 and I.A.2 *supra,*

there is no evidence in the record showing that MPD failed to adequately train, supervise, or

discipline its officers. But even if there were evidence, Plaintiff is not "realistically threatened"

with the prospect of being sexually assaulted by another police officer. In *Lyons*, the Supreme

Court reversed an injunction against the police's use of chokeholds—even though the plaintiff

had cited to 15 chokehold-related deaths—because there was no realistic likelihood that the

plaintiff would again be put in a chokehold. 461 U.S. at 100. Here, Plaintiff seeks injunctive

relief based on a single incident of sexual assault by a former police officer, and a single incident

cannot form the basis of such a broad, ambiguous injunction. *Cf. Haase,* 835 F.2d at 910 (noting

that the chance of repetition based on "but one incident" was "altogether too phantasmal" to

justify injunctive relief).

Because injunctive relief is not a freestanding cause of action and because Plaintiff

cannot meet the standard for such relief, the Court should grant judgment in favor of the District

on that claim (Count III).

## CONCLUSION

For the foregoing reasons, the District respectfully requests that the Court enter judgment

in its favor.

Date:  October 20, 2020

Respectfully submitted

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

/s/ Alicia M. Cullen
ALICIA M. CULLEN [1015227]
Chief, Civil Litigation Division, Section III

/s/ Philip A. Medley
DAVID A. JACKSON [471535]
PHILIP A. MEDLEY [1010307]
MATHEW BLECHER [1012957]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone:  (202) 724-6618; (202) 724-6626
Fax:  (202) 741-8999; (202) 741-5920
Email:  davida.jackson@dc.gov;
philip.medley@dc.gov;
matthew.blecher@dc.gov

*Counsel for Defendant District of Columbia*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JAQUIA BUIE,<br><br>        *Plaintiff*,<br><br>    v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>        *Defendants*. |

Civil Action No. 1:16-cv-01920-CKK

## ORDER

Upon considering Defendant District of Columbia's (the District) Motion for Summary Judgment, any Opposition and Reply thereto, and the entire record herein, it is this _____ day of _____ 2020, hereby

**ORDERED** that the District's Motion is GRANTED; and it is further

**ORDERED** that judgment is entered in favor of the District of Columbia on all claims in Plaintiff's Complaint.

_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE