UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| JAQUIA BUIE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:16-cv-01920 (CKK) |
| | ) | Judge Colleen Kollar-Kotelly |
| DISTRICT OF COLUMBIA, *et. al.* | ) | |
| Defendants | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR  SUMMARY JUDGEMENT

Plantiff submits herein responses to Defendant's Statement of Facts and, in addition, provides its own Issues of Material Fact, and Memorandum of Points and Authorities in Support of its opposition.  Plaintiff has failed to meet its burden, and its motion should be denied.[1]

---

[1]      Plaintiff withdraws Count Ten: Breach of Fiduciary Duty.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| JAQUIA BUIE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:16-cv-01920 (CKK) |
| | ) | Judge Colleen Kollar-Kotelly |
| DISTRICT OF COLUMBIA, *et. al.* | ) | |
| Defendants | ) | |
| | ) | |

**PLAINTIFF'S ISSUES OF MATERIAL FACT**

**1.      Officer Darrell Best attempted to rape Jaquia Buie at MPD headquarters on the evening of December 3, 2014.**

In full police uniform and armed with his service weapon—came over to her, and despite her resistance, unbuttoned Jaquia's shirt, pulled up her bra, and exposed her breasts.  Ex. 1, Jaquia Buie ("J. Buie") Tr. at 228:18-230:12.  He pressed his head into her bosom as she resisted and tried to re-button her shirt, but he was too strong. *Id.* at 230:13-17. He asked her why she was acting "like a little girl." "But I am a little girl," she responded. *Id.* at 231:1-7.  He turned out the lights and told her that he wasn't going to play.  *Id.* at 232:1-3, 232:20-233:3.  She repeatedly tried to get away from him. Id. at 231:7-18, 232:3-6, 232:21-22.  Officer Best then unzipped his pants and pulled out his penis.  *Id.* at 233:11-12.  He removed his sidearm from its holster, and placed it in conspicuous proximity to her. *Id.* at 233:16-20, 237:8-12.  Then he told her to touch his penis, but she refused. Id. at 237:10-12.  He told her to stop acting scared and unfastened her pants and tried to press his penis into her vagina. *Id.* at 238:6-15.  She struggled vigorously to keep her pants on while

he tried to pull them down. *Id.* Best relented, but warned Jaquia "no one better find out about this;" she saw him looking at his gun when he said it; and she responded, "Okay." *Id.* at 242:17-243:4.

2.      **On the evening of Dec 3, 2014, Darrell Best seized Jaquia Buie in violation of the 4th Amendment of the Constitution of the United States of America.**

Officer Best met Jaquia at the metro station, as he had arranged. He arrived in an unmarked police cruiser around 6 p.m. on December 3, 2014, in full police uniform, wearing his service weapon on his hip. *Id.* at 176:11-13, 223:2-4. After being seated at Georgia Brown's for dinner, a conversation ensued about Jaquia's interest in becoming a police officer. Abruptly, Officer Best turned to vile sexual inquiry about young Jaquia, asking her, among other outrageous questions, if she liked "getting her pussy ate." *Id.* at 181:9-13. She spit out her tea. *Id.* at 182:4-6. She asked him to stop. *Id.* at 201:8-13. When he persisted, she got up and headed toward the Metro to go home. *Id.* at 205:6-19. Officer Best followed her out the restaurant and called her name several times. "Come here," he said in a hushed but commanding tone. "Come here." *Id.* at 205:6-206:12, 207:1-12. She was scared: he was "police." *Id.* at 204:19-22. She turned and went back to the police cruiser where he was standing. *Id.* at 210:2-6. He ordered her to get into the cruiser, so she did, with the understanding that he was driving her home. *Id.* at 210:14-16, 211:10-14, 240:14-17. Jaquia realized that Officer Best was not taking her home when he turned right at the Third Street Tunnel. Id. at 211:15-20. "I have to go home. I have to get home," she protested. *Id.* at 212:5-11. But he said that he had "work to finish up." *Id.* at 212:5-11.

3.      On the evening of December 3, 2014, Officer Best violated Jaquia Buie's right to bodily integrity in violation of the 5th Amendment of the Constitution of the United States of America.

See same record facts in support of Issue number "1."

4.      Officer Best misused power that he possessed by virtue of state law and made possible only because he was clothed with authority of state law.

Officer Best met Jaquia at the metro station.  He arrived in an unmarked police cruiser around 6 p.m. on December 3, 2014, in full police uniform, wearing his service weapon on his hip.  *Id.* at 176:11-13, 223:2-4. After inducing her to get into his police cruiser on the premise he would take Ms. Buie home.  *Id.* at 210:14-16, 240:15-17.  He proceeded to the entry gate of an underground garage, where the person overseeing the gate acquiesced to his badge and granted access.  *Id.* at 213:2-17.  Jaquia asked Officer Best if she could wait in the car. *Id.*  He said, "no" and pointed to a car that he said belonged to Chief of Police, Cathy Lanier, telling her that "Chief Lanier's in here.  You can't sit down here."  *Id.*  Best made Jaquia believe that she had to leave the garage and go into MPD headquarters. *Id.* at 213:18-214:2. He took Jaquia to Elevator 12, the special, secure elevator for high-ranking police officials, which allowed them to bypass security they would otherwise encounter at the fifth floor when using a standard elevator.  Ex. 9, Elevator log; Ex. 10, Elevator photos; Ex. 5, Inspector Dickerson Tr. at 167:14-168:9.  Officer Best also used a credential/fob that MPD issued him to give him access to Elevator 12.  Ex. 1, J. Buie Tr. at 214:11-20.  Jaquia looked around for a security camera; she wanted to make sure that a security camera got a picture of her face if anything happened to her, because she was really scared.  Ex. 11, Mrs. Shenita Buie ("S. Buie") Tr. at 102:12-15.

5.      **The MPD provides statement of its policies and interpretation of policy through written directives called General Orders.**

Plaintiff asks this Court to take judicial notice of the section on General Orders posted on the MPD official website at  https://mpdc.dc.gov/node/423092

6.      **General Order 120.21, Disciplinary Procedures and Processes ("General Order 120.21"), exist "to establish policies rules and procedures for handling discipline relating to the alleged misconduct of sworn members . . ."  It contains a Table of Offenses and Penalties, which "serves as the basis for an Official Reprimand or Adverse Action" at MPD.  But there is no mention of the subject police sexual misconduct or even a single type of police sexual misconduct.**

Ex. 12, General Order 120.21, at 1, and "Table of Offenses and Penalties," at 1-3.

7.      **General Order 120.23, Serious Misconduct Investigations, among other things, defines what the MPD considers as "Serious Misconduct."  But there is no mention of the subject of police sexual misconduct or even a single type of police sexual misconduct.**

Ex. 13, General Order 120.23, at 2-3.

8.      **The MPD has no written police sexual misconduct policy.**

If there was one, it would have been provided in discovery, and that did not happen.

Ex. 14, Lou Reiter Tr. 42:15-22; 43:1-11; Ex. 5, Inspector Dickerson Tr. at 180:10-182:1; Ex. 15, Alphonso Lee Tr. at 12:11-13-20.

9.      **The MPD is affiliated with International Association of Chiefs of Police ("IACP").**

Ex. 5, Inspector Dickerson Tr. at 170:4-172:2

**10.     In 2005, the U.S. Department of Justice, Office on Violence Against Women, awarded a grant to the IACP for it "to examine the problem of sexual offenses and conduct [committed by law enforcement] and to develop resources to assist law leaders in investigating and preventing incidents."**

Ex.7, *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide,* International Association of Chiefs of Police, 2011, at 2; Defendant's Ex. 25, Reiter Preliminary Expert Report, at 8, 12-13; Defendant's Ex. 27, Reiter Second Supplemental Report, at 2.

**11.     In June of 2011, the IACP published, *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide*.  ("*IACP Guide*") The guide provides clear instructions, derived from broad deliberation involving a wide range of input from law enforcement leaders and personnel, as well as scholarly research on how to institute and establish a police sexual misconduct policy.**

*Ex. 7, Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide,* at 5-6, 12-13.

**12.     Relying on general offenses, such as Conduct Unbecoming an Officer and/or MPD's EEO policy, which, among nineteen (19) other EEO topics, addresses sexual harassment, the District falsely contends that it has a written police sexual misconduct policy.**

Defendant Exhibit 25 at 9 (Mr. Lou Reiter, plaintiff's police practices and procedures expert noted that the *IACP Guide* advised, "that police agencies not rely on vague administrative charges and should develop specific policies to address [police sexual]

misconduct.  Specifically, the report presented model language that should be used or adopted in police department policies."  Ex. 5, Inspector Dickerson Tr. at 180:10-182:1; Ex. 16, General Order 201.09, Equal Employment Opportunity, at 2-5; Ex. 15 Alphonso Lee Tr. at 12:16-13-20, 29:1-14.

**13.** **The IACP National Working Group on Sexual Offenses by Police Officers, which produced,** ***Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide***, **involved police representatives from Delaware, Maryland, Virginia, Pennsylvania, and other states.  But there was no one from the MPD.  The MPD has—by all indications—ignored the contents of the guide.**

*Id*. at Table of Contents. Inspector referred to the IACP non-exhaustive list of the types of police sexual misconduct in the *IACP Guide* as an example of the things the District "potentially would say as an agency that relate to sexual misconduct. She cannot explain why it hasn't already been done, but she "think[s] it's needed, absolutely."  Ex. 5, Inspector Dickerson Tr. at 171:6-172:2; 180:10-182:1.

**14.** **It is the custom, pattern, and practice, i.e., the policy, of the District of Columbia not to have a written police sexual misconduct policy.**

Ex. 14, Reiter Tr. 42:15-22; 43:1-11.  Mr. Lou Reiter, Plaintiff's police practices and procedures expert, found "systemic deficiencies" of the customs, pattern, and practice of the MPD with respect to police sexual misconduct, which "created an environment where a reasonable officer could believe that there would be little, if any, employment sanctions for engaging in sexual and domestic misconduct."  Defendant's Ex. 25, Reiter Preliminary Expert Report, at ¶ 23.   In his opinion, MPD made a "conscious choice to avoid enacting specific written policies and procedures" regarding police sexual

misconduct. *Id*. at ¶ 24.  Mr. Reiter noted MPD's lack of training specific to police sexual misconduct; supervisory oversight failures, including the retention of Officer Best after two charges of misconduct were sustained against him, and administrative investigatory inadequacies. *Id*. at ¶ 22.  It is his opinion that the harm suffered by Jaquia Buie "was the result of the environment created by the MPD's customs, practices and policies" pertaining to police "sexual and domestic misconduct by MPD employees." *Id.*

Mr. Reiter examined the investigative files of other MPD officers accused of police sexual misconduct in his Supplemental Expert Report. *See* Defendant's Ex. 26, at 7-15. While reviewing these files, Mr. Reiter found what appeared to be "persistent and widespread custom of MPD officers abusing the most vulnerable female victims in the community." *Id*. at 11. *See also,* Defendant's Ex. 25, Reiter Preliminary Expert Report, at ¶ 25.  He pointed to the *IACP Guide* as a widely recognized standard on police sexual misconduct policies and quoted a passage from the Guide explaining why police departments resist implementing specific police sexual misconduct policy that is particularly apt in this case:

 "Two reasons are commonly offered by executives as to why they would resist instituting a sexual misconduct policy or program.  First, they report that there is no sexual misconduct problem in their agency. This may be an indicator of an undetected or denied problem.  Leaders must be aware of the potential and willing to implement policy and procedures for monitoring and intervening proactively.   Second, because policies are typically "incident driven," they admit they are unlikely to develop a policy until one is absolutely necessary.  To merely address issues and behaviors after they arise is an

ineffective operating model and a lapse in critical oversight that can create significant liability while risking the public's trust and confidence."

*Id*. at ¶11, at p. 10-11, quoting IACP Guide, at 6.

> **15.    This custom, pattern or practice, was the moving force behind the constitutional violations against Jaquia Buie.**

The police practices and procedures expert concluded that the lack of a specific police sexual misconduct policy "causes these serious acts of officer misconduct to occur" when there is no "reasonable investigation or imposition of sanctions" when an officer engages in police sexual misconduct. *Id*. at 2.

> **16.    The absence of a written police sexual misconduct policy at the MPD precludes the prospect of adequate training or supervision of its members about police sexual misconduct, because MPD has consciously chosen not to identify, define, or craft into a written policy a proactive set of standards to enable it adequately to train or supervise its members with respect to police sexual misconduct.**

> The results of the two computer generated searches using the term "sex" that the District produced in discovery reveal not only inadequacies in how MPD investigates and disciplines police sexual misconduct, but also how poorly the District keeps track of them. Ex. __ "IAD 2006 thru 2018" ("IAD Sex Search") and Ex. 18 "DRD 2006 thru 2018" ("DRD Sex Search")

> **17.    The District presents 1 of the 20 sections of its EEO policy, the sexual harassment section of its EEO policy as the core of its purported police sexual**

**misconduct policy.  But sexual harassment is only one (1) of, at minimum, ten (10) types of police sexual misconduct.**

Ex. 15 Alphonso Lee Tr. 29: 1-14. Ex. 7, *Addressing Sexual Offenses and Misconduct by Law Enforcement,* at 5-6: ("While strong policies prohibiting sexual harassment are necessary, relying on existing sexual harassment policies to cover matters of sexual misconduct involving members of the public is completely inadequate.")

**18.    In 2009 Internal Affairs specifically warned the District about Best's proclivity for police sexual misconduct and telegraphed concern about the prospect of serious legal action in connection with his behavior.**

On April 15, 2009, Internal Affairs issued its final report in the second sexual harassment case against Best (the Lee matter.)  The final report referred to the Raynette Jones case, ("IS#08003668") and contained a warning:  ". . .it appears that Sergeant Best continues to engage in behavior that may leave the Department open for serious legal action. Essentially, Sergeant Best has been involved in two reported sexual harassment allegations, and although the first complaint has a finding of Insufficient Facts, there are a number of factor that are similar.  It can be suggested that he used his position of authority to try to intimidate the women.  Additionally, the alleged inappropriate touching touch place in which Sergeant Best made sure there would not be any witnesses.  Both Women were allegedly touched on the buttocks." due to the "disturbing similarity of Sergeant Best's most recent complaint . . . it appears that Sergeant Best continues to engage in behavior that may leave the Department open for serious legal action…" Defendant Exhibit 14, at 6.

19.     **The District inadequately investigates and disciplines police sexual misconduct.**

Mr. Reiter's opinion after review of the produced administrative investigations, supported his initial opinion that the "practice of the MPD for investigating and adjudicating allegations of sexual misconduct are seriously egregious, contrary to reasonable and generally accepted police practices, and in many cases simply a perfunctory reaction to an allegation that often only stays within the four-corners of the complaint." Importantly, he said that these investigations simply corroborated his opinion that the Officer Best investigations were "not an anomaly and represent a conscious choice by the MPD and are consistent with its operational practices both before and after the 2014 incident involving Officer Best and the Plaintiff in this case."   Defendant's Ex. 26, Reiter Supplemental Report, at 5-6.

Former Sgt. Best's first sexual harassment incident arose approximately two months after met Raynette Jones in July 2007.  She was 20 years old and was interested in getting into MPD's police cadet program.  Best offered to help her.  She came Best's office at the police academy, and he helped her fill out her application. Ex. 3, Jones Investigation, at DC 001553-54.  Ms. Jones was hired by the MPD Cadet Program on July 27, 2007 and assigned to the police academy in September 2007.  *Id.* at DC 001552-53.  On April 28, 2008, Cadet Jones was interviewed and told the investigator that Sgt. Best five called her on her cell phone summoning her to his office at the police academy and locked the door, groped her, including her breasts and genital area.  *Id.* at DC 001553, 001558-001561. She said had Best repeatedly solicited oral and genital sex between five and ten times from September when she was assigned to the police academy until December of 2007.

*Id*. at DC 001561. Best was reassigned to the police academy in May 2008 pending the investigation.  *Id*. at DC 001473.

The Internal Affairs Division assigned the investigation to an agent who had known Best since they were as cadets at the police academy and had maintained a friendship with him for 28 years.  Ex. 19 Webster Tr. 28:2-19.   The District's Rule 30(b)(6) witness testified that assignment of the case to an investigator with a twenty-plus friendship with the target was "a conflict." Ex. 5, Inspector Dickerson Tr. 37:4-17.

Cadet Jones gave the investigator the name of a male cadet that she had told of Best's conduct, the only person she had told.  Id. at DC 001559.  She told the investigator that Best called on her cell phone three to five times.  Id. at DC 001560.  There is no evidence in the investigative file that the male cadet was interviewed or that cell phone records were subpoenaed, despite the agent's written note in the file of the five "Things to Do" and Number 3 was "Interview Haywood" (the name of the male cadet) and Number 5 was "Subpoena phone records (Best and Jones'). *Id*. at DC 001547. Inspector Dickerson confirmed there was no evidence of the interview or phone records in the file.  Ex. 5 Inspector Dickerson, Tr. at 152:9-153:6.  She testified that the Jones investigation was not "comprehensive." Id. at 153:15-154:1.

Also, missing from the file were two 2007 cases against Best: an Adverse Action and a domestic violence case (Ex. 4, Fraud/Time Attendance; Ex.18, Domestic Violence) from Best's "Officer History Summary" list*.*  Ex. 3, Jones Investigation, at DC 001529.

The offense, "Second Degree Sexual Abuse of a Ward," did not fit the facts of the case because Jones was not a ward. Ex. 3, Jones Investigation, at DC 001484-001489.  See D.C. Code, Title 22, §22-3014.   The case was not sent to the United States Attorney

Office for review until sometime after June 19, 2008. Ex. 3, Jones Investigation, at DC 001509. No surprise that on August 1, 2008, the USAO declined to prosecute Best for Second Degree Sexual Abuse of a Ward because the case did not meet the criminal elements of that offense. *Id*. at DC 001508.   Inspector Dickerson later testified that she the criminal charge of Second Degree Sexual Abuse of a Ward did not fit the facts of the case. Ex. 5 Inspector Dickerson, Tr. at 163:11-166:1.

A lieutenant at the police academy notified then Assistant Chief Peter Newsham on April 22, 2008 that her team would draw an IS number for the case that morning.  However, the investigator did not create the IS number (IS#08-3668) until August 6, 2008. Ex. 3, Jones Investigation, at DC 001473.  The period between the date MPD was notified (April 21, 2008) and the date of the final Jones report was inexplicitly in excess of the 90-day limit for administrative investigations to be completed, according to Inspector Dickerson.   Ex. 5, Inspector Dickerson Tr. 123:1-124:11.

More, Best's 2007 Adverse Action for time and attendance fraud and willfully and knowingly making an untruthful statement would have been relevant for assessing Best's credibility in the Cadet Jones matter, according to Inspector Dickerson. I*d*. at 90:20-91:2. On October 22, 2008, a newly hired civilian employee in the Fifth District filed a complaint against Best, alleging that Best touched her buttocks, suggested that she get a hotel room, and offered to give her a massage.  Defendant's Ex. 14, at 2.  The MPD assigned the same investigator to handle the second criminal sexual assault investigation against Best. *Id.,* at 1.  Chief Lanier placed Best on administrative leave on October 31, 2008, and his police powers remained revoked until October 2009.  Ex. 2, Best Personnel History, DC 000980; Defendant's Ex. 16.

Notably, there is a 2010 memo from then Assistant Chief Michael Anzallo asking whether a Seventh District sergeant's police powers should be revoked pending completion of the criminal investigation. The disciplinary wing of the MPD responded that it does not revoke an officer's police powers until the second sexual assault case is filed against him, specifically citing "i.e. Daryl Best case." Exhibit 21, Anzallo memo.

20.     **Sergeant Best's first police misconduct investigation, which the District in its summary judgment motion describes as irrelevant and which MPD officially declared had insufficient facts was seriously inadequate and should have, according to the District's own 30(b)(6) designee, former Director of Internal Affairs Division, Inspector Kimberly Dickerson, been sustained.**

Ex. 5 Inspector Dickerson Tr. at 37:4-15, 210:21-213:11; Ex. 13, General Order 120.23, Section IV, Regulations, subsection H, at 5.

21.     **The District has a custom, pattern or practice, of ignoring vital EEOC-promulgated standards for assessing credibility in sexual harassment cases.**

Ex. 5: Inspector Dickerson Tr. at 65:22-66:6. The District gives lip service to these standards.  "Since sexually harassing conduct is often displayed behind closed doors with no eyewitnesses, the EEOC permits the use of circumstantial evidence to raise an inference of discrimination . . . [and] in the absence of evidence or eyewitness testimony, an investigator may rely on a subjective assessment of the credibility of the complainant and the target."  Defendant's Ex. 14 (the Lee matter Final Report), at DC 001001-02. Interestingly, the same investigator chose to remove this language from the Final Report in the Jones investigation.  Ex. 5, Jones Investigation, at DC 001481.

13

**22.      By 2009, the District was on notice that Officer Best was a lying, undutiful, miscreant, with a penchant for police sexual misconduct, about which Internal Affairs had specifically admonished MPD in writing.**

On May 21, 2007, Chief Lanier suspended Best for thirty (30) days for fraud for working 52 hours of outside employment in conjunction with his official on-duty hours for which he was compensated by the MPD, and for altering his time card with "Wite-out" to represent that he had not worked outside employment when in fact he did. Ex. 4, Fraud/Time Attendance.

Nine days later, Best's wife filed a domestic violence case and got a Temporary Protection Order against him The MPD did not investigate.  Ex. 20, Domestic Violence.

On December 12, 2011, a man called Internal Affairs and alleged that Best was having an intimate relationship with his wife and wore his service weapon in the pulpit of his church. Ex. 22, Affair. The investigator, his captain, was instructed by Internal Affairs to interview the wife. The investigator did not do so. The investigation closed with a finding of 'Insufficient facts.'  Commander Kimberly Chisley-Missouri initialed the final report. The District's 30(b)(6) witness was aware that the woman Best later married the woman he denied having an affair with him. Dickerson Tr. at 209:13-210:11.

**23.      There is no record in Best files that he ever received targeted particularized monitoring as a result of sexual misconduct investigations or Internal Affairs sober admonition about him.**

Best never received any training as a recruit in the police academy or in in-service training on police sexual misconduct or sexual harassment throughout his career with the

MPD, even after his demotion.  Ex. 23, Best's Training Records.; Ex. 24 General Order (PPMS) and (SSP), Attachment A. "SSP Indicator Chart."

**24.     The District was deliberately indifferent to the risk that not addressing the implications of Best's history of investigations and disciplinary actions—particularly police sexual misconduct—would result in constitutional violations.**

Officer Best worked in the Fourth District under Commander Chisley-Missouri for approximately three years before the chief of police detailed him to the CSB.  In 2014, Best was one of two MPD personnel that Chisley-Missouri chose to go with her to CSB. Although Chisley-Missouri knew that Best had been demoted, but she made no inquiry as to what he was demoted for.  She did not review his personnel file.  She testified that she never knew, until the date of her deposition, what Best had been demoted for.  Missouri Tr. at 82:21-22; 83:1-14.  A mere nine (9) days after his arrival at CSB, Best brought Jaquia Buie into CSB offices and attempted to rape her:

He turned out the lights. *J.Buie Tr.* at 232:1-6

She repeatedly tried to get away from him.

 He told her that he wasn't going to play.  *Id.* at 232:1-6, 232:20-233:3.

Officer Best then pulled out his penis.  *Id.* at 233:11-12.

He removed his sidearm from its holster, and placed it in conspicuous proximity to her. *Id.* at 233:16-20, 237:3-21.

 He unfastened her pants and tried to press his penis into her vagina.  *Id.* at 238:6-15.

She struggled vigorously to keep her pants on while he tried to pull them down.

*Id.*

Best relented, but warned Jaquia "no one better find out about this;" she saw him looking at his gun when he said it; and she responded, "Okay." *Id.* at 242:17-243:4.

**25.    There is a direct causal link between the custom, pattern or practice at issue in this case and the constitutional violations alleged herein.**

Ex.14, Reiter Tr. at 43:17- 44:17.

**26.    At the request of former Deputy Chief of Police Kimberly Chisley Missouri, Chief Cathy Lanier, aware of his problematic history, authorized Officer Best to be detailed to the Corporate Support Bureau ("CSB").**

Then Chief of Police Cathy L. Lanier detailed Officer Best to the Corporate Support Bureau ("CSB"), effective November 23, 2014 at the request of former Assistant Chief Kimberly Chisley-Missouri, when Chisley-Missouri was promoted from Commander of the Fourth District to Assistant Chief of the CSB.  Officer Best was one of two MPD personnel chosen by Chisley-Missouri to accompany her to CSB from the Fourth District.  Officer Best's detail was supposed to last from 11/23/2014-Feb. 21, 2015. Ex. 25, Deputy Chief Chisley-Missouri Tr. at 58:22-59:3; Defendant Districts Ex. 3.  On December 1, 2014, Officer Best signed a police car out of the MPD motor pool.  The vehicle had not been returned by December 14, 2014. Ex. 6, Motorpool, at 1.

**27.     Chief Lanier had final policymaking authority to detail Darrell Best MPD employment issues, and specifically to detail Officer Best to the CSB.**

The Chief of Police is the final policymaking authority with respect to the discipline and training of MPD personnel.  The Chief's final decision-making authority includes the power to make final decisions on detailing, transfers, officers' appeals of adverse actions, and whether to punish officers.  Ex. General Order 120.21. and Ex. General Order 120.21. Under DC Code § 5-127.01, the Mayor is empowered by the City Council of the District of Columbia to enforce the rules for proper governance of the MPD.  The Mayor delegated personal authority to the chief of police by Mayor's Orders 97-88, 2008-81, 2012-28, and 2015-167.  The authority to supervise, discipline, train, detail, and transfer MPD personnel was delegated to the chief of police by these Orders. See D.C. Code   §5-1114(a)

**28.     Deputy Chief Chisley Missouri did not consider it sufficiently important, before she requested that Best be detailed to CSB, to find out why he had been demoted.**

Officer Best worked in the Fourth District under Commander Chisley-Missouri for approximately three years before the chief of police detailed him to the CSB.  Best was one of two MPD personnel that Chisley-Missouri chose to go with her to CSB.  Although Chisley-Missouri knew that Best had been demoted, but she made no inquiry as to what he was demoted for.  She did not review his personnel file.  She testified that she did not know, until the date of her deposition, why Best had been demoted. Ex. 25, Asst. Chief Chisley-Missouri Tr. at 80:11-81:1.

29.     **The District supplied the chattel that Best employed to inflict the harm he did upon Jaquia Buie**.

By detailing Officer Best to CSB, the chief of police gave him access to the police garage underneath police headquarters, a key or code to Elevator 12 that went from the garage to the fifth floor and bypassed security, and a key to the CSB office.  Officer Best used Elevator 12 to take Jaquia directly to the fifth floor and bypass security.  Ex 9, Elevator 12 Access.  He unlocked the door to CSB with the key that MPD had given him. Ex. 1, J. Buie Tr., at 176:11-13, 213:2-17, 214:11-20,

The CSB is located on the Fifth Floor, the location of the Department's top Leaders, the Joint Strategic & Tactical Analysis Command Center (i.e. control central), and other of the most sensitive centers of MPD decision and policy-making, including the Chief of Police's office. Id. at 215:1-4. The floor is staffed with security that you must pass through, unless you have access to Elevator 12. Ex. 5, Inspector Dickerson Tr. at 167:14-168:9.

30.     **The District knew or should have known that Officer Best was likely to use the chattel in a manner involving risk of harm to young women subject to his authority**

The District knew, among others, the following aspects of Best's foreboding disciplinary:

(1)     the 30-day suspension after the 2007 allegations of lying and stealing were sustained following an Internal Affairs investigation; Ex. 4, Fraud/Time Attendance.

(2)     successive Internal Affairs investigations for allegations of police sexual misconduct (the first of which Inspector Dickerson testified should have and could have been sustained if it had been investigated properly (see

18

Dickerson Tr. at 211-213), and the second of which was sustained resulting in Best being demoted from Sergeant to officer, where Internal Affairs admonished the District about Best and his penchant for police sexual misconduct); Ex. 3, Jones investigation.

(3)     the official written Internal Affairs admonition about Best's penchant for police sexual misconduct, warning that "Sergeant Best continues to engage in behavior that may leave the Department open for serious legal action." (Defendant's Exhibit 14 at DC 001002) contained in the final report of the second police sexual misconduct investigation;

(4)     the 2012 domestic violence Temporary Protection Order Best's then-wife filed against him; Ex. 20, Domestic Violence; and

(5)     the 2011 investigation of allegations from a citizen that Best was having an affair with his wife, a member of Best's church congregation (who, despite denying the affair, he later went on to marry) and that he regularly wore his police service revolver in the pulpit. Ex. 22, Affair.

**31.     Jaquia Buie was a vulnerable young girl, subject to Officer Best's police authority, the sort of person the District should expect to be endangered by Best's use of the chattel.**

Id. at 231:1-7.

**32.     The District had a duty to use reasonable care in the supervision and/or retention of Officer Best.**

The District knew, among others, the following aspects of Best's foreboding disciplinary:

19

(1)     the 30-day suspension after the 2007 allegations of lying and stealing were sustained following an Internal Affairs investigation; Ex. 4, Fraud/Time Attendance.

(2)     successive Internal Affairs investigations for allegations of police sexual misconduct (the first of which Inspector Dickerson testified should have and could have been sustained if it had been investigated properly (see Dickerson Tr. at 211-213), and the second of which was sustained resulting in Best being demoted from Sergeant to officer, where Internal Affairs admonished the District about Best and his penchant for police sexual misconduct); Ex. 3, Jones investigation.

(3)     the official written Internal Affairs admonition about Best's penchant for police sexual misconduct, warning that "Sergeant Best continues to engage in behavior that may leave the Department open for serious legal action." (Defendant's Exhibit 14 at DC 001002) contained in the final report of the second police sexual misconduct investigation;

(4)     the 2012 domestic violence Temporary Protection Order Best's then-wife filed against him; Ex. 20, Domestic Violence; and

(5)     the 2011 investigation of allegations from a citizen that Best was having an affair with his wife, a member of Best's church congregation (who, despite denying the affair, he later went on to marry) and that he regularly wore his police service revolver in the pulpit. Ex.22, Affair.

33.     **The District of Columbia failed to exercise such reasonable care and breached its duty.**

The District assigned both of Best's successive investigations to a person who testified that she was his friend of 28 years (Webster Tr., at 96:2-19), and the District's 30(b)(6) witness for Internal Affairs described assignment of even one case to Webster as a "conflict."  Ex. 5, Inspector Dickerson Tr. at 37: 4-15; see also Ex.13, General Order 120.23 "Serious Misconduct" at 5(H.) ("Any member who has a potential conflict of interest related to a pending misconduct investigation shall not be allowed to participate in any way in the conduct or review of that investigation." (Italics added); The District conducted a shoddy investigation into his first police sexual misconduct allegation and the District's 30(b)(6) witness for Internal Affairs testified that, if done properly, the allegations in that matter should have and could have been sustained.  Inspector Dickerson Tr. at 211-213.  The second investigation, which was based on allegations that occurred while the first was underway (Ex. 19, Sgt. Nicole Webster Tr. at 105:8-20), was sustained.  But the District retained Best, and his demotion did absolutely nothing to protect the myriad young civilian girls and women of the women from a known sexually predator MPD Officer.  After retaining him, the District did nothing proactive to monitor or hold Best accountable regarding police sexual misconduct; indeed, by detailing him to the CSB in November of 2014, they outfitted him with additional resources and further enabled him to act upon his known proclivity for sexual misconduct.

34.     **The District's breach of that reasonable duty of care caused harm to Jaquia Buie.**

Ex. 1, J. Buie Tr., at 265:6-285:22.

**35.    Officer Best's attempted rape of Jaquia Buie inside MPD was the outgrowth of a job-related encounter.**

Young Ms. Buie had an interest in becoming a police officer. *Id.,* at 148:20-149:4. Officer Best offered to take her and her mother out to dinner to discuss her interest in becoming a police officer." *Id.* at 165:6-16.  Officer Best met Jaquia at the metro station in an unmarked police cruiser around on December 3, 2014, in full police uniform, wearing his service weapon on his hip. *Id.* at 176:11-13, 223:2-4. At the restaurant, Best spoke about the police academy. *Id.* at 179:21-180:11.   Officer Best unilaterally took Jaquia Buie to police headquarters, where he said he work to finish up, against her will.  While there in his office—the place where he was only moments before doing job-related things and the place where he had reported to work for the previous eight (8) days—he attempted to rape her.

**36.    The District is directly negligent, not vicariously, for the harm inflicted upon her through Darrell Best.**

The District knew of the following foreboding aspects of Best's history at the MPD:

(1)    the 30-day suspension after the 2007 allegations of lying and stealing were sustained following an Internal Affairs investigation; Ex. 4.

(2)    successive Internal Affairs investigations for allegations of police sexual misconduct (the first of which Inspector Dickerson testified should have and could have been sustained if it had been investigated properly (see Dickerson Tr. at 211-213), and the second of which was sustained resulting in Best being demoted from Sergeant to officer, where Internal Affairs admonished the District about Best and his penchant for police sexual misconduct; (Ex. 3, Jones investigation);

(3)     the official written Internal Affairs admonition about Best's penchant for police sexual misconduct, warning that "Sergeant Best continues to engage in behavior that may leave the Department open for serious legal action." (Defendant's Exhibit 14 at DC 001002) contained in the final report of the second police sexual misconduct investigation;

(4)     the 2012 domestic violence Temporary Protection Order Best's then-wife filed against him; Ex. 20, Domestic Violence; and

(5)     the 2011 investigation of allegations from a citizen that Best was having an affair with his wife, a member of Best's church congregation (who, despite denying the affair, he later went on to marry) and that he regularly wore his police service revolver in the pulpit. Ex. 22, Affair.

This is a history of documented dishonest and sordid conduct.  The District's conscious choices made it possible for someone like Best to continue to be an "officer of the law."  The Districts tolerance, provision, permission, and enablement of Best are *sine qua non* and cause of the harm that Best inflicted upon Jaquia Buie.  The District not only retained Best, but it failed to require him to undergo any particularized remedial training to be subject to specific monitoring or accountability, particularly related to his history of police sexual misconduct.  Then, as if that wasn't enough, the District detailed Best to CSB.  The District both enabled and positioned to do to a vulnerable civilian what he had similarly done to members before.  This was the District's own negligence.

Officer Best picked Jaquia up in an unmarked police cruiser around on December 3, 2014, in full police uniform, wearing his service weapon on his hip.  Ex. 1, J. Buie Tr. at 176:11-13, 223:2-4.  At a meeting that Best had arranged to talk about her career, a conversation

ensued about Jaquia's interest in becoming a police officer. *Id.* at 148:2-7.   Officer Best followed her out the restaurant and said in a hushed but commanding tone.   "Come here." *Id.* at 205:6-206:12, 207:1-12.   She was scared: he was "police." *Id.* at 204:19-22, 208:7-12.   She turned and went back to the police cruiser where he was standing. *Id.* at 210:2-211:14.   He told her that he would take her home and ordered her to get into the cruiser, so she did.   *Id.* at 210:2-211:14, 240:14-17.

But he did not take her home.  Id. at 211:15-20.  "I have to go home. I have to get home," she protested. *Id.* at 212:5-11.  But he said that he had "work to finish up." *Id.* at 212:5-11. He proceeded to the entry gate of an underground garage, where the person overseeing the gate acquiesced to his badge and granted access.   *Id.* at 213:2-17.   Jaquia asked Officer Best if she could wait in the car. *Id.*  He said, "no" and pointed to a car that he said belonged to Chief of Police, Cathy Lanier, telling her that "Chief Lanier's in here.   You can't sit down here."   *Id.*   Best made Jaquia believe that she had to leave the garage and go into MPD headquarters. *Id.* at 213:18-214:4. Officer Best also used a code/fob that MPD issued him to give him access to Elevator 12.   *Id.* at 214:11-20.

Officer Best took her up to the fifth floor to the office of CSB and unlocked the door it with a key issued to him by the MPD.   *Id.* at 216:11-19.   Best never received any training as a recruit in the police academy or in in-service training on police sexual misconduct or sexual harassment throughout his career with the MPD, even after his demotion.   Ex. 23, Best's Training Records.

37. **Alone in an unmonitored office at MPD headquarters against her will, with Officer Best, Jaquia Buie was in a zone of physical danger.**

Officer Best took her up to the fifth floor and down a hall past a lighted office with a door ajar, which he said was the chief of police's office. He told Jaquia to be quiet as they walked by. Ex. 1, Jaquia Buie Dep. Tr. at 214:21-215:4. Officer Best brought her to the door of CSB and unlocked it with a key. *Id.* at 216:11-19.

38. **The District's negligence created the zone of danger into which Ms. Buie was taken against her will.**

See "26," supra. He took Jaquia to Elevator 12, the special, secure elevator for high-ranking police officials, which allowed them to bypass security they would otherwise encounter at the fifth floor when using a standard elevator. Ex. 9, Elevator 12 Access; Ex. 9, Elevator 12 photos; Ex. 5, Rule 30(b)(6) witness Dickerson Dep. Tr. at 167:14-168:9. Officer Best also used a code/fob that MPD issued him to give him access to Elevator 12. Ex. 1, Jaquia Buie Dep. Tr. at 214:11-20.

39. **Jaquia Buie feared for her safety while in the zone of danger.**

Jaquia looked around for a security camera; she wanted to make sure that a security camera got a picture of her face if anything happened to her because she was really scared. Ex. 11, S. Buie Dep. Tr. at 102:12-15. Surrounded by portraits of Chiefs of Police hanging on the wall, Jaquia sat afraid on a couch as far away from Best as possible under the circumstances. *Id.* at 220:16-217:1. Ex. 26, Photo of Police Chiefs.

**40.     The emotional distress that resulted from the life-changing experience was truly serious and verifiable.**

Dr. Carole Guinta, Ph.D., opined that Jaquia suffers from post-traumatic stress disorder after her ordeal, that this "violation has affected [her] beliefs on very fundamental level" and that Jaquia "feels that she cannot trust others to keep her safe."  Dr. Guinta reported that Jaquia was in "dire need of psychotherapy." She added: "…it is noteworthy that Ms. Buie was a relatively unsophisticated, under age black female from a low income background at the time that she was sexually assaulted. All of these factors make her more vulnerable to exploitation by an older, more savvy man whom society had accorded respect and stature due to his status as a member of the law enforcement and clerical communities.  These imbalances in power and privilege constitute an additional level of meaning to the victimization and insult which Ms. Buie must unravel in her therapy." Ex. 27, Dr. Guinta Report, at 7-9.

**41.     The following three factors work confluently to make the District's conduct in this case extreme and outrageous: (1) not having a written police sexual misconduct policy by 2014 when Best attempted to rape Jaquia Buie; (2) retaining Officer Best after 2009, and (3) detailing him to CSB and further enabling him to do the unsavory things that his history shows come natural to him, namely dishonesty and police sexual misconduct.** Not having a written police sexual misconduct policy contributed to a culture of indifference toward police sexual misconduct at the MPD.  (Defendant's Ex. 25, Expert Report of Lou Reiter at 17-18,) and—in light of various noteworthy incidents of police sexual misconduct incidents at MPD— and the publication of the *IACP Guide* in 2011, evinces a conscious disregard of

a risk of harm to its citizenry.  Retaining (particularly without special monitoring or a tailored regimen of proactive accountability through training and supervision) officer Best after several investigations for serious misconduct, including successive police sexual misconduct investigations (including a specific admonition about the threat of "serious legal action," which Best's penchant for police sexual misconduct posed) also evinces a conscious disregarded of a risk of harm to its citizenry.  Detailing Best to the CSB (Defendant's Ex._3) is the pinnacle of this triad of conscious disregard, as it positioned, permitted, and enabled Best to inflict the type of harm

> 42.     **The District's conduct expresses recklessness in each of the three (3) strands articulated above.**

Not having a written police sexual misconduct policy contributed to a culture of indifference toward police sexual misconduct at the MPD (Defendant's Ex. 25, Expert Report of Lou Reiter at 17-18,) and—in light of various noteworthy incidents of police sexual misconduct incidents at MPD — and the publication of the *IACP Guide* in 2011, evinces a conscious disregard of a risk of harm to its citizenry.  Retaining (particularly without special monitoring or a tailored regimen of proactive accountability through training and supervision) officer Best after several investigations for serious misconduct, including successive police sexual misconduct investigations (including a specific admonition about the threat of "serious legal action," which Best's penchant for police sexual misconduct posed) also evinces a conscious disregarded of a risk of harm to its citizenry.  Detailing Best to the CSB (Defendant's Ex. 3) is the pinnacle of this triad of conscious disregard, as it positioned, permitted, and enabled Best to inflict the type of harm he was known to deliver, but this time: on civilian citizen, a female minor.

27

**43.     The District's recklessness caused Jaquia severe emotional distress.**

Ex. 1, J. Buie Tr., at 265:6-285:22.

Dr. Carole Guinta, Ph.D., opined that Jaquia suffers from post-traumatic stress disorder after her ordeal, that this "violation has affected [her] beliefs on very fundamental level" and that Jaquia "feels that she cannot trust others to keep her safe."  Dr. Guinta reported that Jaquia was in "dire need of psychotherapy." She added: "…it is noteworthy that Ms. Buie was a relatively unsophisticated, under age black female from a low income background at the time that she was sexually assaulted. All of these factors make her more vulnerable to exploitation by an older, more savvy man whom society had accorded respect and stature due to his status as a member of the law enforcement and clerical communities.  These imbalances in power and privilege constitute an additional level of meaning to the victimization and insult which Ms. Buie must unravel in her therapy." Ex. 27, Guinta Report, at 7-9.

**44.     Darrell Best is a documented known liar whose Declaration is untrustworthy.**

Darrell Best was first accused of Fraud and Time Attendance by the MPD in March 2004. Ex. 3, Jones Investigation at DC001529. In 2007, he was charged again with Fraud and Time Attendance, but this time it was sustained.  Shortly thereafter a cadet at the police academy claimed that he had sexually abused her from September to December of 2007 while he was an instructor of the Code of Ethics at the police academy. Id. at DC 001084. He denied it, and the MPD officially declared it had insufficient facts was seriously inadequate and should have, according to the District's own 30(b)(6) designee, former

Director of Internal Affairs Division, Inspector Kimberly Dickerson, been sustained. Ex. 5, Inspector Dickerson Tr. at 37:4-15, 210:21-213:11.  Then in 2008, another charge of sexual harassment was brought against him, and this time was sustained over his denials of any wrongdoing. Defendant's Ex. 14, at DC 000996.

# Table of Contents

I.    BACKGROUND ................................................................................. 2

II.   STANDARD OF REVIEW ................................................................ 3

III.  ARGUMENT ..................................................................................... 4

IV.   MUNICIPAL LIABILITY, COUNT I & II ...................................... 7

A.    Custom, Pattern, or Practice ......................................................... 8

1.    The District does not have a written police sexual misconduct policy ............ 9

2.    The District does not adequately train or supervise its members against police sexual misconduct. ................................................................. 16

3.    The District inadequately investigates and disciplines police sexual misconduct. ................................................................................... 20

4.    The District ignores vital EEOC-promulgated standards for assessing credibility in sexual harassment cases ........................................... 27

B.    Deliberate Indifference ............................................................... 29

C.    Single Act by Final Policymaking Authority ............................. 32

Negligent Supervision and Retention, Counts IV & VI ........................ 37

Negligent Infliction of Emotional Distress, Count VII ......................... 41

Intentional Infliction of Emotional Distress ........................................ 43

i

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))* .......................................................................................................... 3

*Barnes v. District of Columbia*, 793 F. Supp.2d 260, 278 (D.D.C. 2011) ..................... 7

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 398, 117 S. Ct. 1382, 1385, 137 L. Ed. 2d 626 (1997)................................................................................ 31

*Brooks v. District of Columbia*, 297 F.Supp.2d 136, 139 (D.D.C. 2003) ...................... 7

*City of Canton v. Harris*, 489 U.S. 378, 388–89 & n. 7, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ................................................................................................................ 8

*District of Columbia v. Cassidy*, 465 A.2d 395, 398 (D.C. 1983) ................................ 40

*Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n. 10 (D.C. 1994).......................................... 43

*Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951) ...................................................... 37

*Florida v. Bostwick*, 501 U.S. 429, 439 (1991)............................................................ 6

*Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)........................................................ 43

*Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) ............................................... 43

*Hunter v. District of Columbia*, 824 F. Supp.2d 125, 139 (2011)................................. 41

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 2724, 105 L. Ed. 2d 598 (1989) ............................................................................................................... 33

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 102 S. Ct. 2744, 2747, 73 L. Ed. 2d 482 (1982) ............................................................................................................... 4

*Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 67–68 (D.D.C. 2007, citing *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250 (1988) ......................................................... 5

Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)...................................................................... 8

*Monell v.Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.16 (1978).......................................................................................... 7

*Murphy v. Army Distaff Foundation Inc.,* 458 A.2d 61, 62 (1983)................................. 3

*Murphy v. Army Distaff Foundation, Inc.*, 458 A.d 61, 64 and n. 4 (D.C. 1983) ......... 40

*Paratt v. Taylor* 451 U.S. 527, 535, ___ S. Ct. ____ (1981)......................................... 5

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S. Ct. 1292, 1298, 89 L. Ed. 2d 452 (1986) ............................................................................................................... 32

*Pembaur v. City. of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L. Ed. 452 (1986) ...................................................................................................................... 7

Penhollow v. Bd of Com'rs for Civil County, at 695 A.2d 1265, 1284, 116 Md. App. 265, 277 ................................................................................................................... 37

*Phelan v. City of Mount Ranier*, 805 A.2d 930, 937 (2002) ......................................... 38

*Rogala v. District of Columbia*, 161 F.3d 44, 56 (D.C.Cir.1998) ................................. 8

*Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982)............................... 43

*Towles v United States,* 115 A.3d 1222, 1228 (D.C. 2015) ........................................... 6

*Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C.Cir.1997)......................... 8

*United Sates v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed.1368 (1941).......... 5

*Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) ................................. 7
Woodward & Lothrop, 598 A.2d 1142, 1145 (1991) ...................................................... 5

**Statutes**
18 U.S.C § 2251(a) .......................................................................................................... 2
22 D.C. Code § 3009 ...................................................................................................... 2
22 D.C. Code § 3009.2 .................................................................................................... 2
42 U.S.C. § 1983 .............................................................................................................. 4
Restatement (Second) of Torts, §390 ............................................................................ 37

**Other Authorities**
Alphonso Lee Tr. at 12-13; 16-11 ................................................................................. 18
Alphonso Lee Tr. at 29; 1-14 ........................................................................................ 17
Buie Tr. at 102:12-15 ..................................................................................................... 42
Dickerson P. 89-90:12-10 .............................................................................................. 28
Dickerson Tr. at 181-182 ................................................................................................ 13
Dickerson Tr. at 211-213 ................................................................................................ 25
Dickerson Tr. at 212:21-213:11 ..................................................................................... 26
Dickerson Tr. at 37 ......................................................................................................... 26
J. Buie Tr. at 210: 14-16; 211: 10-14 ............................................................................. 5
Jaquia Tr. at 238:6 .......................................................................................................... 42
Kimberly Dickerson Tr. at 180-182 ............................................................................... 12
Missouri Tr. P. 82-83, L. 21-14 ..................................................................................... 34
Webster Tr. at 23; 4-19 ................................................................................................... 9
Webster Tr. pgs 27-28, lns. 22-14 ................................................................................. 21

**Rules**
Fed. R. Civ. P. 56 ............................................................................................................ 3
Fed. R. Civ. P. 56(a) ....................................................................................................... 3

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
Civil Division

JAQUIA BUIE       )
      )
      Plaintiff,       )
      )
vs.       )     Civil Action No. 1:16-cv-01920 (CKK)
      )     Judge Colleen Kollar-Kotelly
DISTRICT OF COLUMBIA, *et. al.*       )
      Defendants       )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO THE DISTRICT'S
<u>MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS</u>**

## <u>INTRODUCTION</u>

At this juncture the focus of this action is on the District of Columbia (the "District") and its own agency and responsibility in this conscience-shocking matter, not former Sergeant Darrell Best.  He has been held accountable, at least, for his criminal acts.[1]  The District, however, has fought to shield itself from the primary and direct responsibility it should bear for the harm inflicted on Jaquia Buie.  Justice William Brennan, rendering the opinion in *Pembaur v. City of Cincinatti*[2] succinctly stated that, "Monell is a case about responsibility."  Well, this case is about irresponsibility, deliberate indifference, and negligence—the District of Columbia's.

---

[1]     Officer Best defaulted on all counts applicable to him in this action.

[2]     *Pembauer v. City of Cincinatti*, 475 U.S. 469, 478; 106  S.Ct 1292, 1297 (1986)

Plaintiff wants to see the District held accountable for what it did to her and for what it is not doing for the rest of its citizens: holding members of the Metropolitan Police Department accountable for police sexual misconduct and taking there civil rights seriously.[3]

## I.   BACKGROUND

At a sentencing hearing before the Honorable Senior Judge Reggie B. Walton, on October 22, 2015, former Sergeant Darrell L. Best, a 28-year veteran of the Metropolitan Police Department ("MPD"), entered a plea of guilty to a criminal information consisting of three separate felony counts.  Two of the counts, production of child pornography (in violation of 18 U.S.C § 2251(a)) and first-degree sexual abuse of a minor (in violation of 22 D.C. Code § 3009), were against a minor female victim, not a party in the matter *sub judice*, and did not occur inside the heart and soul of MPD headquarters.  But the third count, second-degree sexual abuse of a minor (in violation of 22 D.C. Code § 3009.2), was the criminal offense that Officer Best's attorney was able to negotiate for him in connection with his attempted rape of Jaquia Buie on the evening of December 3, 2014, inside the offices of the Corporate Support Bureau ("CSB") on the fifth floor of MPD headquarters.[4]

---

[3]     It is premature to rule on the issue of Injunction in this matter, as one of the requirements of injunction is that the party seeking it prevail.  A decision on that should be deferred.

[4]     At Officer Best's sentencing hearing on February 26, 2016, Judge Walton said, "[t]here are certain crimes that people commit that they should be put away for the rest of their lives and this is one of them."  He asked the Assistant United States Attorney ("AUSA") to explain why it had agreed to a plea deal of only eighteen (18) years for Officer Best. The AUSA explained that while Best's offenses were "serious," the Office of the United States Attorney

## II. <u>STANDARD OF REVIEW</u>

   "Summary judgment is an extreme remedy, entitling the moving party to judgment as a matter of law only when no genuine issue of material fact is present. . ." *Murphy v. Army Distaff Foundation Inc.,* 458 A.2d 61, 62 (D.C. 1983). Under the standard set forth in Fed. R. Civ. P. 56, a court may grant a motion for summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248; 106 S.Ct 2505, 2510 (1986) When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in h[er] favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an

---

wanted to ensure that the girls would not have to testify against him in a criminal trial because neither of them wanted to be further exposed, humiliated or embarrassed.  Sentencing Tr. 4:5-13; 20:21-25.

  The principal reason he would go along with the plea deal, Judge Walton said, was out of consideration for the girls' wishes.  He imposed restrictions on Best's future employment, highlighting that "one of [Best's] offenses related to his involvement as a police officer since one of the assaults took place right across the street in the police department . . . ." *Id*. 33:20-34:6.

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*.  In responding to a motion for summary judgment, the non-moving party "must set forth specific facts showing that there [are] genuine issue[s] for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.  "The mere existence of a scintilla of evidence in support [is] insufficient"; rather, "there must be [some] evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. 2505.

### III.  ARGUMENT

42 U.S.C. § 1983

"Title 42 U.S.C. § 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . '" *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 924, 102 S. Ct. 2744, 2747, 73 L. Ed. 2d 482 (1982)[5]  "[I]n any §1983 action the initial inquiry must focus on whether the two essential elements to a 1983 action are present[:] (1) . . . conduct complained of was committed by a person acting under color of state law; and (2) . . . this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws

---

[5]   In relevant part, 42 U.S.C. § 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

of the United States." *Paratt v. Taylor* 451 U.S. 527, 535, _101 S. Ct. 1908, 68 L.Ed.2d 420 (1981).

The concepts of "state action" and acting "under color of state law" are identical. *Lugar v Edmondson,* 457 U.S. 922, 928; 102 S.Ct. 2744, 2749 (1982). "In cases under §1983 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." Id. "To constitute state action, 'the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible,' and 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 67–68 (D.D.C. 2007), citing *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250 (1988). "Misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law is action taken 'under color of' state law.'" *United Sates v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed.1368 (1941); Woodward & Lothrop, 598 A.2d 1142, 1145 (1991). Officer Best misused his police power[6] and employed an array of State-furnished instrumentalities, powers, and privileges to accomplish his wrongdoing. He used an unmarked police cruiser, his police uniform, attendant accoutrement (including his gun and badge), police credentials, an exclusive secure police parking facility, police

---

[6]     Officer Best induced Jaquia Buie to believe that he would drive her straight home. She justifiably relied on his statement. J. Buie Tr. at 210: 14-16; 211: 10-14. Instead of driving her home, he took her to MPD headquarters, because he had "work to finish up." Id. at 211:15-22; 212:1-11.

headquarters, elevator fob, restricted secure elevator, and an official office key. Best took Jaquia Buie, a 17-year old girl, into the nerve center of police headquarters—the Fifth Floor: the location of the Department's top Leaders, the Joint Strategic & Tactical Analysis Command Center (i.e. control central), and other of the most sensitive centers of MPD decision and policy-making—and there, with the authority and power of the state on full blast, his bona fide connection to it on intentional, vivid display, Officer Best attempted to rape Jaquia Buie.

Officer Best deprived her of her rights under the Fourth and Fifth Amendments of the Constitution of the United States of America. The Fourth Amendment deprivation of her right to be free from unreasonable seizures occurred when Best took Jaquia Buie to MPD headquarters against her will. "In determining whether a seizure occurred, the court analyzes the totality of the circumstances to determine whether 'the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' request or otherwise terminate the encounter" *Florida v. Bostwick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389  (1991).  "An encounter may begin consensually and, through either 'the officer's show of authority or some other indication that the individual is not free to leave, become a nonconsensual seizure' that requires reasonable, articulable suspicion." *Towles v United States,* 115 A.3d 1222, 1228 (D.C. 2015).  The encounter between Officer Best and Jaquia began consensually when they met at Georgia Brown's.  It became nonconsensual after Jaquia tried to end the encounter, and Best ordered her into his police cruiser, assuring her he would bring her home directly, then taking her to police headquarters against her will instead.   The Fifth

Amendment egregious deprivation of her right to bodily integrity occurred when Officer

Best attempted to rape her.

## IV.    MUNICIPAL LIABILITY, COUNT I & II

The Supreme Court decided in *Monell v. New York City Dept. of Social*

*Services*, in *Monell v .Department of Social Services of the City of New York,* 436 U.S.

658, 98 S.Ct. 2018, 56 L.Ed.16 (1978), that a municipality can be liable under §1983 only

where its policies are the "moving force" behind the constitutional violation. *Monell*, 436

U.S. at 694. "The deprivation must be caused by the exercise of some right or privilege

created by the State or by a rule of conduct imposed by a person for whom the State is

responsible." There are four theories of municipal action, which have been judicially

determined to establish municipal liability: (1) express municipal policy; (2) single act by

final policymaking authority; (3) custom, pattern or practice; and (4) deliberate

indifference.[7] *Pembaur v. City. of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.

Ed. 452 (1986), *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) *Barnes*

*v. District of Columbia*, 793 F. Supp.2d 260, 278 (D.D.C. 2011); *Brooks v. District of*

*Columbia*, 297 F.Supp.2d 136, 139 (D.D.C. 2003). With respect to police sexual

misconduct, one presumes that there will never be an actual situation where there is an

express policy promoting police sexual misconduct, so category (1) is perforce

inapplicable under the facts of this case. But the remaining three—custom, pattern, or

---

[7]       "There are four basic categories of municipal action Plaintiff may rely on to establish municipal liability: (1) express municipal policy; (2) adoption by municipal policymakers; (3) custom or usage; and (4) deliberate indifference." *Maniaci, supra*, 510 F. Supp. 2d 67-68, quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018.

practice, single act by policymaking authority, and deliberate indifference—remain in play and at issue.  Each will be addressed in the following pages.

### A.   Custom, Pattern, or Practice

The Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit have held that a city's inaction, including its failure to train or supervise its employees adequately, constitutes a policy or custom under *Monell* when it can be said that the failure amounts to deliberate indifference toward the constitutional rights of persons in its domain.  *City of Canton v. Harris*, 489 U.S. 378, 388–89 & n. 7, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (recognizing municipal liability under § 1983 for failure to train adequately).  *See Rogala v. District of Columbia*, 161 F.3d 44, 56 (D.C.Cir.1998) (recognizing liability for failure to train or supervise; *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C.Cir.1997) (noting that "inaction giving rise to or endorsing a custom" can be basis of § 1983 liability).  "[L]ocal governments, like every other §1983 'person' may be sued for constitutional deprivations visited pursuant to government 'custom' even though such custom has not received formal approval through the government's official decision-making channels."  Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  It is the policy—the custom, pattern and practice—of the MPD (1) not to have a written police sexual misconduct policy, (2) not adequately to train and supervise its members regarding police sexual misconduct, (3) not adequately to investigate and discipline police sexual misconduct, and, finally, (4) to ignore EEOC-promulgated standards for assessing credibility in sexual harassment cases.

1.      **The District does not have a written police sexual misconduct policy.**

The purpose of General Order 120.21, *Disciplinary Procedures and Processes*, "is to establish policies, rules, and procedures for handling discipline relating to the alleged misconduct of [MPD] members . . ."  General Order 120.21 has a specific list of types of prohibited conduct, The Table of Offenses and Penalties, which "serves as the basis for an Official Reprimand or Adverse Action" at the MPD.  See Exhibit 12 at , General Order 120.21, *Disciplinary Procedures and Processes*.  It contains twenty-five (25) different offenses.  But police sexual misconduct is not one of them.  That police sexual misconduct is not listed among The Table of Offenses under General Order 120.21 is dispositive evidence that the MPD does not have a written police sexual misconduct policy.  There cannot be a written policy about an offense that MPD has not even identified and defined. [8]  Moreover, there are four (4) categories of investigation in the Internal Affairs Bureau at MPD: (1) Misconduct, (2) Use of Force, (3) EEO, and (4) Citizen's Police Complaints.  Nicole Webster Tr. at 23; 4-19.  Each of these has intricately written policies behind them.  Police sexual misconduct has no written policy.

This is not a mistake.  It is the custom and practice of the MPD not to have a written police sexual misconduct policy.  MPD keeps the subject undefined, and in the shadows, because accounting for it through a written policy would inevitably expose MPD's pervasive deficiencies in this regard, shake up the Department, and subject it to

---

[8]      The MPD General Order for Serious Misconduct Investigation does not include police sexual misconduct either.  See Exhibit [Cite Go-Per 120.23]

intensely deserved scrutiny and compelled reform.  Although unwritten, this custom has been consistently, persistently, and defiantly practiced for far too long, despite various countervailing practical, professional, and societal pressures for the institution of a written police sexual misconduct policy.

MPD has literally hundreds of written policies on a wide range of topics, from the predictable to the obscure, many of which are considerably less important than police sexual misconduct.[9]  If there was, in fact, a written police sexual misconduct policy it would be in the form of a General Order.[10]  But year after year MPD has consistently declined to craft and institute a written policy on police sexual misconduct.

For purposes of contesting this litigation, however, it appears the District has haphazardly attempted to cobble together a narrative composed of unspecific, catch-all offenses, such as Conduct Unbecoming an Officer, and MPD's EEO policy, which, among various other EEO topics, addresses sexual harassment[11]—to advance the false notion that MPD does have a written sexual misconduct policy.  The following exchange with Inspector Kimberly Dickerson ("Inspector Dickerson"), formerly Director of the MPD Internal Affairs Division from September 2016 through March 2019, and now

---

[9]     The Metropolitan Police Department official website posts only a subset of MPD General Orders, written policies on a wide range of subjects.  Nonetheless, one can view more than two hundred (200) there.  This does not include the also available hundreds of executive orders, standard operating procedures, Special Orders, and Bureau and Divisions orders—all written policies of the MPD.

[10]     See, for example, MPD General Order 201.09:  Equal Employment Opportunity.

[11]     Sexual harassment is, indeed, a type of sexual misconduct.  But a proscription against it does not constitute a police sexual misconduct policy any more than one swallow doth a summer make.

Director of Risk Management Division, a subdivision of the Office of Internal Affairs,

was the District's 30(b) (6) designee with respect to the Internal Affairs, is telling:

> Q.      Do you have a sense of what the
> percentage of females are at the MPD?
>
> A.      Possibly 18 to 20 percent.
>
> Q.      18 to 20?
>
> A.      Maybe.
>
> Q.      I bet you it's slightly higher than
> that, but the point is that in modern policing,
> don't you believe [a] sexual misconduct policy
> ought to exist in the police department?
>
> A.      I do.
>
> Q.      Do you wonder why it's not at MPD?
>
> Objection.      Misstates
>                 the policies and procedures effective at MPD.
>
> A.      Do I wonder why?
>
> Q.      That there is not [a] police sexual
> misconduct policy at the MPD --
>
> Objection.
> .
> Q.      besides the one strand of EEO
> harassment?
>
> A.      I wouldn't say that I wonder why, but
> I do believe that it needs to be more clearly
> defined.
>
> Q.      So, is it your view that there already
> is a policy?
>
> A.      We have policies that govern our

11

behavior.  However, it's not clearly defined.

Q.      As police sexual misconduct?

A.      As police sexual misconduct and as,
        for example, what we have here, clearly
        delineated for all to see, these are the things
        that we're saying or potentially would say as
        an agency that relate to sexual misconduct. [12]

Q.      Okay, why do you think that is the
        case; is it left intentionally ambiguous in
        your view?

A.      I don't believe so. I don't think
        it's intentionally ambiguous.  Why it's not
        done, I don't really know.  Do I think it's
        needed, absolutely.

Inspector Kimberly Dickerson Tr. at 180-182.  Inspector Dickerson struggled to avoid

asserting on the record the fact that MPD does not have a written police sexual

misconduct policy.  Asked point blank, "[s]o, is it your view that there is already a

policy?"  She responded, "[w]e have policies that govern our behavior," but she didn't

say "yes."  That is one of many evasive stratagems she employed in the exchange to avoid

uttering the plain truth: no, there is not a written police sexual misconduct policy at MPD

and there never has been.

---

[12]      When Inspector Dickerson referred to "for example, what we have here" she was
referring to deposition Exhibit 12, *Addressing Sexual Offenses and Misconduct by Law
Enforcement: Executive Guide,* specifically a list of ten (10) non-exhaustive types of police
sexual misconduct set forth in the Guide.  Furthermore, she testified that she believed the
District participates in the International Association of Chiefs of Police (IACP), and that the
chief of police has attended IACP conferences.  Additionally, she testified that the IACP
"creates policies or guidelines for law enforcement from varying subjects such as [police sexual
misconduct] to everyday interactions with citizens and anything, of course, that can adversely
effect the profession."

Police sexual misconduct is a much broader category than sexual harassment.  Police sexual misconduct includes, but is not limited to, the following: "(1) sexual contact by force (e.g., sexual assault, rape); (2) sexual shakedown (e.g., extorting sexual favors in exchange for not ticketing or arresting a citizen); (3) gratuitous physical contact with suspects (e.g. inappropriate or unnecessary searches, frisks or pat-downs); (4) officer-initiated sexual contacts while on duty; (5) sexual harassment of colleagues/co-workers; (6) engaging in citizen-initiated sexual contact while on duty; (7) sexual behavior while on duty (e.g. masturbation, viewing and/or distributing pornographic images, sexting); (8) voyeuristic actions that are sexually motivated (e.g. looking in windows of residences for sexually motivated reasons); (9) unnecessary contacts/actions taken by officers for personally and/or sexually motivated reasons (e.g. unwarranted call backs to crime victims, making a traffic stop to get a closer look at the driver for non-professional reasons); and (10) inappropriate and unauthorized use of department resources and/or information systems for other than legitimate law enforcement purposes." Ex. 7, *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide* at 3-4.  Inspector Kimberly Dickerson of MPD stated that these are the things the District "potentially would say as an agency that relate to sexual misconduct."  She cannot explain why it hasn't already been done, but she "think[s] it's needed, absolutely."  Dickerson Tr. at 181-182

In 2005, the U.S. Department of Justice, Office on Violence Against Women, awarded a grant to the International Association of Chiefs of Police (IACP)[13] for it "to examine the problem of sexual offenses and conduct [committed by law enforcement] and to develop resources to assist law enforcement leaders in investigating and preventing incidents." [Citation.]  It is referenced in Defendant District's Exhibit 25, Preliminary Expert Report of Lou Reiter, plaintiff's police practices and procedures expert.  Mr. Reiter noted that the IACP publication on police sexual misconduct advised, "that police agencies not rely on vague administrative charges and should develop specific policies to address [police sexual] misconduct. Specifically, the report presented model language that should be used or adopted in police department policies." Defendant's Exhibit 25 at 9.

In June of 2011, the IACP published, *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide*. The guide provides clear instructions, derived from broad deliberation involving a wide range of input from law enforcement leaders and personnel, as well as scholarly research on how to institute and establish a

---

[13]     "Recurring accusations of sexual offenses implicating law enforcement officers were noted with concern by the Office on Violence Against Women of the U.S. Department of Justice. . . . IACP's work in the 1990's to address domestic violence committed by law enforcement officers uniquely situated the Association to explore this serious problem and issue recommendations to the field.  In 2007, the IACP hosted a roundtable discussion during the Association's 114th Annual Conference in New Orleans to learn from department leaders about situations they confronted and the resulting problems.  Over seventy executives chose to attend this moderated discussion that was closed to the media.  The range of concerns and incidents many had faced in their own agencies made it clear that sexual offenses and sexual misconduct committed while officers were on or off duty necessitated focused attention and a proactive response." *Addressing Sexual Offenses and Misconduct by Law Enforcement, Executive Guide* at 2.

police sexual misconduct policy.  The monograph is thorough and well considered, with detailed findings and practical, substantive recommendations.   Ultimately, the monograph/guide concluded the following:

> Members of law enforcement are in a unique and visible position in the communities they serve.  They are entrusted with the authority to enforce laws and protect citizens' civil rights.   Central to the executive's responsibility to the community is the proactive enforcement of ethical standards of conduct and officer accountability.  Leaders must establish zero-tolerance policies to address and prevent [police] sexual misconduct and reinforce the expectation of integrity through meaningful training and effective supervision.

Ex. 7, *Addressing Sexual Offenses and Misconduct by Law Enforcement, Executive Guide* at 15.  Plaintiff's police practices expert-witness [INSERT accreditation of him] relies, in relevant part, on the contents of the IACP monograph on police sexual misconduct.  Yet, more than nine (9) years after the publication of *Addressing Sexual Offenses and Misconduct by Law Enforcement*: *Executive Guide,* the Metropolitan Police Department, in 2020, still does not have a written police sexual misconduct policy. Exhibits: depo quotations and the email to Anzallo DC 012156]  This fact is evidence of the deliberate indifference to the rights of persons with whom the police come into contact and an expression of the moving force that drove the harm inflicted on Jaquia Buie at MPD headquarters on December 3, 2014.  The District's persistent and deliberate custom and practice of failing to institute a written police sexual misconduct policy[14] could lead a

---

[14]      "The problem of sexual misconduct by officers warrants the full attention of law enforcement leadership.  It represents a grave abuse of authority and a violation of the civil rights of those victimized.  Law enforcement agencies and executives have a duty to prevent sexual victimization, to ensure it is not perpetrated by their officers, and to take every step possible to ensure the safety and dignity of everyone in the community.  When an incident of

jury reasonably to conclude that the District conducted itself in a manner that was deliberately indifferent to a known and documented threat to the constitutional rights of its citizens.

> **2.      The District does not adequately train or supervise its members against police sexual misconduct.**[15]

The absence of a written police sexual misconduct policy at the MPD precludes the prospect of adequate training or supervision of its members about police sexual misconduct, because MPD has consciously chosen not to identify, define, or craft into a written policy a set of standards to enable it adequately to train or supervise its members with respect to police sexual misconduct.  Albeit, as this Court is keenly aware,

---

sexual misconduct involving a law enforcement officer is reported, it presents one of the most difficult challenges a law enforcement executive can face.  Therefore, it is imperative that executives prepare through agency mission, policy, and training to proactively address and prevent incidents.  Leaders must demonstrate to their officers and their community a consistent, focused effort to identify and eliminate misconduct through the institutionalization of a zero tolerance position.  Sexual misconduct within an agency may be indicative of a need for systemic and cultural changes.  Creating and implementing a policy are key steps to ensure an agency is prepared to respond to allegations, reinforce officer accountability, and ultimately prevent abuses of power."
*Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide* at 1.

[15]      In City of Canton, Ohio v. Harris the Supreme Court held that "the inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton, Ohio v. Harris, *supra*, 489 U.S.at 379, 388.  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an actionable city 'policy.'"  Id. at 389.  "It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id*. at 390.

discovery in this case went on for a number of years, there is simply no evidence (and it would certainly be in the interests of the District to have produced such evidence) that, at the times relevant to this lawsuit, there was anyone in District of Columbia leadership (in or outside MPD) who was sufficiently concerned with or knowledgeable about police sexual misconduct to be qualified to craft and articulate a set of standards to inform training or supervision of MPD members on the subject.[16]  The only training that MPD sworn members received related to police sexual misconduct is regarding a single issue: sexual harassment, and that training was itself inadequate.17  Indeed, in the course of this

---

[16]     The IACP National Working Group on Sexual Offenses by Police Officers, which produced, *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide*, involved police representatives from Delaware, Maryland, Virginia, Pennsylvania, and other states.  But there was no one from the MPD.  Moreover, the MPD has—by all indications— ignored the contents of the guide.  See *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide*  at Table of Contents page.

[17]

        A.     There is an annual training for
Metropolitan Police Department employees in relation
to EEO and sexual harassment.

        Q.     And it's an hour each year?

        A.     Yes, sir.

        Q.     And when you say "EEO and sexual
harassment," it's not an hour dedicated to the
broader topic of sexual misconduct/sexual
harassment? Let's do it that way. It's in that hour they cover the range of EEO topics, racial discrimination, age discrimination, national origin discrimination? All those types of EEO-related topics are covered in that hour?

        A.     That is correct.

Alphonso Lee Tr. at 29; 1-14.

litigation, the District has presented a single section, a mere component of its much

broader EEO policy, as the core of its purported police sexual misconduct "policy":

Q.      Are you equating sexual misconduct with
        sexual harassment?

A.      No, I'm not.

Q.      So where in here does this policy mention
         sexual misconduct?

A.      In the note section under 19, section 19,
        page 5, there's a note that says, "Sexual harassment
        may include, but is not limited to, verbal
        harassment or abuse, subtle pressure for sexual
        activity, patting or pinching, brushing against
        another person's body, and demands for sexual
        favors."

        My interpretation of that is to include
        sexual misconduct.

Q.       You're talking about the note on 19?

A.      Yeah, number 19, the –

Q.      There is a note, right?

A.      Yes, sir.

Q.      And the language "sexual harassment may
        include, but is not limited to, verbal harassment or
        abuse, subtle pressure for sexual activity, patting
        or pinching, brushing against another person's body,
        and demands for sexual favors." So this passage is
        where this policy document of the Equal Employment
        Opportunity Division of MPD comments on sexual
        misconduct, according to your interpretation?

A.      Yes, sir.

Alphonso Lee Tr. at 12-13; 16-11

18

Police sexual misconduct, as a general topic, is mentioned nowhere in the language that Director Lee cites. "While strong policies prohibiting sexual harassment are necessary, relying on existing sexual harassment policies to cover matters of sexual misconduct involving members of the public is completely inadequate." *Addressing Sexual Offenses and Misconduct by Law Enforcement* at 5-6. Because the District has deliberately and consistently chosen, at best, to rely upon an existing sexual harassment provision of a broader EEO policy—before and after—(1) Darrell Best's first and second Internal Affairs Bureau investigations for police sexual misconduct in 2008, (2) publication of *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide* in 2011, (3) the arrest, conviction, and sentencing of Darrell Best in 2015 for attempting to rape Jaquia Buie inside MPD headquarters in 2014, and (4) the occurrence of numerous other noteworthy events of police sexual misconduct at MPD during the period 2009 to 2017, a jury could reasonably find that the District did not (and does not) adequately train or supervise its officers about police sexual misconduct. More specifically, a jury could reasonably conclude that the District's refusal (to this very day) to identify, articulate, and systematically address in a General Order the numerous types of police sexual misconduct, even though the District was involved with the IACP, precluded the possibility of either adequately training or supervising its members about the subject of police sexual misconduct and evinces profound deliberate indifference for the civil rights of its citizens.

3.      **The District inadequately investigates and disciplines police sexual misconduct.** [18]

It is the District's pattern and custom to conduct shoddy investigations into allegations of police sexual misconduct and to tolerate it by not instituting zero-tolerance, although the agent who conducted the Internal Affairs Bureau investigations into both Darrell Best's police sexual misconduct matters testified under oath that MPD had a zero-tolerance policy regarding police sexual misconduct.[19]   Plaintiff's police practices and

---

[18]      Mr. Lou Reiter, plaintiff's police practices and procedures expert, stated the following: "My review of the produced administrative investigations, in my opinion, supports my initial opinion that the practice of the MPD for investigating and adjudicating allegations of sexual misconduct are seriously egregious, contrary to reasonable and generally accepted police practices, and in many cases simply a perfunctory reaction to an allegation that often only stays within the four-corners of the complaint.  These investigations, in my opinion, simply corroborate that the Officer Best investigations were not an anomaly and represent a conscious choice by the MPD and are consistent with its operational practices both before and after the 2014 incident involving Officer Best and the Plaintiff in this case."  Id. at 5-6.

[19] Q.    Now, what is the Metropolitan Police
          Department's position on sexual misconduct?

          Objection.

A.    That we don't tolerate
      it.

Q.    When you say you don't tolerate it,
      explain to me what you mean?

A.    We don't tolerate it, knowingly.  So
      if the facts are provided and it's found to be
      sustained, then the member is disciplined.

Q.    But you have a zero tolerance policy
      towards sexual misconduct?

A.    Yes, sir. When it's proven, it's zero
      tolerance.

procedures expert, Lou Reiter, in his Supplemental Expert Report of February 13, 2019, describes a series of egregious police sexual misconduct cases involving other MPD officers whose investigative files he reviewed.

Plaintiff invites this Court to consider the following synoptic examples.

> The MPD received an anonymous letter that a sergeant, a 17-year veteran and director of the cadet program at the Police Academy, was having sex with cadets at the Academy; was organizing group sex parties with cadets on a website called Gloryholeparties.com; and was taking nude photos at the parties of females on his MPD-issued cell phone. Several charges were sustained, including a charge for lying to investigators, but there is no evidence that he was disciplined. [20] There is also no evidence that the MPD tried to identify other officers who participated in the sex parties.

> In 2013, a Seventh District officer was arrested for taking semi-nude photographs of a 14-year-old girl in a follow-up visit to her home after a missing person report. Hundreds of photos of semi-nude women, some girls, dating back to 2011 were found on his camera after his arrest. There were fifteen (15) prior complaints against him between 2009 and 2013. The most recent was for alleged stalking.[21]

> In 2011, an anonymous caller told the MPD that a Seventh District officer assigned to the Narcotic and Special Investigations Division was operating a prostitution ring out of his apartment and smoking marijuana. The MPD waited nearly a year to send an agent to the apartment building and closed

---

Nicole Webster Tr. pgs 27-28, lns. 22-14

[20]     Mr. Reiter described these cases as two "singularly egregious examples of the tolerance for police sexual misconduct nurtured in the MPD." Id. at 6-7. Neither case against him appears on the computer printouts for Internal Affairs Division ("IAD") (2006-2018) and Disciplinary Review Division ("DRD") Sex Cases (2006-2018). Ex. 17 and 18.

[21]     A friend in the Seventh District, a police dispatcher, tipped the offending officer off on the Seventh District TAC channel and the offending officer was caught in the act of deleting photos from his camera. Internal Affairs did not interview the dispatcher until a year later. He said that other officers let the offending officer come to crime scenes and take photos of women and girls although he was not crime scene-search certified. The dispatcher was not disciplined. DC 020092-020229, 020266 and 020270

the case after a cursory investigation with finding of "Insufficient Facts." Then in 2013, the MPD stumbled on this officer-run prostitution ring after someone reported a missing juvenile female, and the girl's cell phone was traced to his apartment.   There were more than ten (10) prior complaints against him.[22]

In 2010, a female told the MPD that an officer had sexually assaulted her. Three other females told similar stories about the same officer.  A year later, based on MPD's investigation, the officer was charged merely with second and fourth degree sexual abuse while armed of three women between 2006-2010.  A city councilman wondered what took so long to bring an indictment against him.  Worse, in 2014, a judge said that the officer could not be found guilty as charged because he had confessed to acts of prostitution, not sexual abuse, and acquitted him of all criminal charges.

The lead detective in a criminal sexual assault case, a 19-year veteran MPD, sent the victim a photo of his penis.  She complained and Someone informed him.  He then exchanged text messages with her.  Text messages between the detective and the sexual assault victim say that victim was told that the detective would just be removed from the case.   Charges against him were sustained, but there is no record that he was disciplined.[23]

In 2015, Ward 8 Community contacted the MPD to advise the District that they had received more than 20 phone calls from residents complaining that MPD officers in their community were "messing with young girls, sexually," and that the problem went back to 2011 and had not stopped. The investigation consisted of merely two interviews and was closed out as 'Unfounded.'[24]

---

[22]     Reiter Supplemental Report at 8-9. The 2011 case is not listed in the "IAD Sex Cases computer printout, Ex. 17.

[23]     According to Mr. Reiter, "Disclosed documents from the District in the printouts of IAD and DRD fail to identify this case . . . as sexual and there is no documentation that DRD made any disposition.· DC 002652 IAD Sex Cases shows only 'Closed.'  DC 002640 DRD Sex Cases 2006-2018 void of this case.   This case is just one of many that show the MPD's inability to produce trustworthy lists of officer's sexual misconduct cases.  This is in my opinion a conscious choice by MPD to shield and obfuscate discovery of such cases in the event of litigation and limits any usefulness of its identification and intervention programs."  Reiter Supplemental Report at 11.

[24]     "The allegation from Ward 8 persons in 2015 should have alerted the MPD to the possibility that there was more misconduct occurring, specifically with District 7 officers…

In 2010, a female officer from the Seventh District alleged that a sergeant, her first-line supervisor, had been touching her inappropriately and sent her a photo of his erect penis. The men's bathroom floor of the Seventh District was recognizable in the background. There were two (2) prior sexual harassment complaints against him, both closed with 'Insufficient Facts.' This case, too, was closed with insufficient facts. [25]

> In 2011, Prince Georges County law enforcement contacted the MPD about 22-year MPD veteran accused of sexual abuse of a minor. There were two prior investigations of this officer, who was finally arrested in 2013 and convicted of repeated sexual abuse of a 10-year-old girl. He was not terminated until 2015.
>
> In 2011, a 22-year veteran of the MPD force solicited a prostitute, got in an altercation with her pimp, pursued them in his car, had a traffic accident, then fired five (5) rounds into their car, injuring them both. The officer was extremely intoxicated. Several charges were sustained against him in 2014, yet the case does not appear in either computer-run printouts of IAD or DRD sex cases the years 2006-2018.
>
> Best was interviewed in an investigation involving several Seventh District officers when he was a sergeant in the Seventh District Domestic Violence Unit. The investigation sprang from the arrest of a Seventh District officer who was convicted of having sex with a victim of domestic violence. The officer alleged, presumably as part of his plea deal, that other Seventh District officers had also returned to the scene of domestic violence calls and solicited sex from the victims. The investigation of two named officers was classified as 'Unfounded' and 'Insufficient Facts.' [26]

---

[MPD] made a superficial inquiry into the community leaders' concerns, showing in my opinion a callous and deliberate indifference to the risk that [if] it did not address this concern that prompted 25 calls." Reiter Supplemental Report at 9.

[25]     Notably, there is a memo in the investigative file from then Assistant Chief Michael Anzallo asking whether the sergeant's police powers should be revoked pending completion of the criminal investigation. The disciplinary wing of the MPD responded that it does not revoke an officer's police powers until the second sexual assault case is filed against him, "i.e. Daryl Best case." Exhibit 21.  (DC 012156)

[26]     Reiter Supplemental Report at 12.

Indeed, Sergeant Best's first police sexual misconduct investigation, which the District in its summary judgment motion describes as "irrelevant" (see SJM at 19) and which MPD officially declared had "insufficient facts" was seriously inadequate and should have, according to the District's own 30(b)(6) designee, former Director of Internal Affairs Division, Inspector Kimberly Dickerson, been sustained.

> Q.    Okay. Fair enough. I think we're
> done. Oh, one more question that I didn't ask.
> Going back to the Raynette Jones investigation,
> if the sustained allegations associated with
> lying and stealing from the District had been
> applied in the Raynette Jones investigation,
> had been taken into account so that she is
> saying she, the 20 year-old whose got nothing
> to gain and everything to lose by accusing this
> man, stepped forward, levies her allegations,
> he has a great deal to lose and everything to
> gain by lying and so we've got -- because no
> [phone] records were obtained and her only witness
> that offered any level of corroboration – and
> she didn't say, "He's going to tell you, I told
> him everything." She said, "I told him certain
> things," but it would have been some level, was
> not pursued, so it was turned into an
> artificial he said-she said because of a
> failure to pursue evidence, shouldn't that --
> in that situation, given that the pre-existing
> adverse action have [sic] operated against the
> credibility of Daryl Best to turn the tide in
> that situation to a sustained?

> A.    I think that it should have, but I
> also testified earlier that, that investigation
> was not comprehensive, so had there been a
> comprehensive investigation coupled with the
> allegations and the findings of the other
> investigation, lending to the, as you said, the

24

> 20 year-old who has everything to lose in this
> situation by coming forward and the history and
> the disciplinary or investigative history of
> Best, I do believe we could have reached a
> preponderance of evidence in the Jones case,
> but again, I stress had there been a comprehensive investigation.

Inspector Kimberly Dickerson Tr. at 211-213.

Cadet Jones filed a complaint on April 21, 2008 alleging that Sgt. Best, at least ten (10) times over a period of months in 2007, rang her cell phone, summoned her to his office at the police academy (where he taught Ethics), locked the door, and groped her buttocks, breasts and genital area while kissing on her neck. He repeatedly solicited oral and genital sex, informing her that he could outperform her lesbian lover in various sexual acts. First, the Internal Affairs Agent assigned to investigate the matter testified under oath at her deposition in this case that she had been a cadet with Officer Best at the police academy, that she had known him for 28 years, and that they'd been friends for the entire period.[27] Second, the investigation did not follow the EEO guidelines the MPD

---

[27]
Q.      If you were going to assign you know, an IS number gets triggered. A complaint comes in, IS number gets triggered, and you're going to make a decision who you are going to assign as the investigator, right?

A.      Yes.

Q.      And you know, you have knowledge that the person you are going to [as]sign as an investigator has had a 20-plus year friendship with the person who is the target of the investigation. Is that a potential conflict?

A.      It is a conflict.

professes to follow in cases characterized as instances of "he said/she said."  In fact, the

District's Rule 30(b)(6) witness who was designated to testify about the practices of MPD

Internal Affairs, Inspector Kimberly Dickerson, confirmed that it is the practice of MPD

to regard "he said/she said" matters as a case of 'Insufficient Facts' without regard to

credibility if there is no physical evidence or third-party corroboration.  Ex. 5, Inspector

Dickerson Tr. at 212:21-213:11.  The investigator neither obtained critical cell phone

records (Cadet Jones told the investigator that Officer Best had called her on her cell

phone several times)[28] nor interviewed the only witness who Cadet Jones offered to

corroborate her allegations, a male cadet she named specifically for that purpose.  Ex. 3,

Tr. Interview of Cadet Jones, 4/28/08.   The testimony of Cadet Jones and the female

sergeant, who originally reported the allegations, was given little weight.   When the

investigator asked her if she believed Cadet Jones, the sergeant responded, "she has. .

.nothing to gain by making it up. . ."

       Relevant prior disciplinary history of Sergeant Best before the Jones

matter was improperly excluded from consideration.   A 2007 Adverse Action against

Best for lying and stealing, followed by a domestic violence case a few weeks later were

notably missing from the "Officer History Summary" of Best's incident history in relation

---

Dickerson Tr. at 37.

[28]     The investigator wrote a note in the file to subpoena phone records and interview the
corroborating witness, but, by her own admission, never did either.

to the Jones matter. (The last entry in his Officer History Summary was a Fraud/Time & Attendance matter that occurred in 2004.)

>    **4.    The District ignores vital EEOC-promulgated standards for assessing credibility in sexual harassment cases.**

Exhibit 14 of the District's Motion for Summary Judgment, contains the following language:

> The EEOC has recognized that sexual harassment complaints may present evidentiary problems. Since sexually harassing conduct is often displayed behind closed doors with no eyewitnesses, the EEOC permits the use of circumstantial evidence to raise an inference of discrimination. The EEOC's Workplace Harassment Issues: An Essential Guide states that, in the absence of physical evidence or eyewitness testimony, an investigator may rely on subjective assessment of the credibility of the complainant and the target. In instances of "he said/she said" allegations, the credibility of the complainant assessment is crucial.

Among other things, Inspector Dickerson testified thus regarding "he said/she said" customs at the MPD:

> Q.    Right, I should mark this. So anyway, Exhibit 4. Remember, you recall the discussion we had about he said-she said, right?
>
> A.    I do.
>
> Q.    And you recall that we had gotten into the language in the document about credibility in situations of he said-she said?
>
> A.    I recall.

Q.      Now, once again, imagine that Officer Norman, Norman Jones is

out of the picture.  He's not involved.  And so you have [the complainant]

with her story of X and Daryl Best of [sic] his story with not X, right?

A.      Yes.

Q.      And you say it is the practice of MPD to treat those as insufficient

facts when that's what the situation is, without some extraneous witness

or recording or corroborating data, right?

A.      Correct.

Tr. Inspector Dickerson P. 89-90:12-10.   This testimony confirms that MPD has a

custom/practice of actively ignoring the EEO Division standard articulated in language

on its own documents and apathetically treating all he said/she said internal investigations

involving sexual-harassment as having Insufficient Facts.   This practice/custom

prejudices he said/she said scenarios, which most virtually all sexual harassment cases

tend to be, in favor of the accused and against complainants/victims.[29]   Indeed, this

practice played a large part in driving the finding of "Insufficient Facts" in Officer Best's

first police sexual misconduct Internal Affairs investigation.   Because this single practice

operates  prejudicially  to  frustrate  the  prospect  of  sustaining  sexual  harassment

investigations at MPD, the sliver of police sexual misconduct that receives some attention

at MPD, a jury could reasonably find that this practice evinces MPD's deliberate

indifference towards the constitutional rights of citizens.

_____

[29]

28

**B.**   **Deliberate Indifference**

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action . . . has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was not simply negligent, but was taken with "deliberate indifference" as to its known or obvious consequences." Id., at 388, 109 S.Ct., at 1204.  "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480. "[D]eliberate indifference on the part of individual officers towards a plaintiff . . .  may establish the predicate constitutional violation, but the plaintiff must also show the District itself was deliberately indifferent to the risk that not addressing a certain issue will result in constitutional violations." See *Baker*, 326 F.3d at 1306–07.  The District was—and continues to be—deliberately indifferent to the fact that police sexual misconduct will result in constitutional violations in the absence of a written police sexual misconduct policy at the MPD.

The "first inquiry in any case alleging municipal liability under §1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  City of Canton v. Harris, 489 US 378, *supra*, at 388, 109 S.Ct., at 1204.   There is a causal link between the District's conduct and the constitutional violations that plaintiff alleged in the matter before this Court.  Officer Best

had generated a trail of police misconduct well before the evening of December 3, 2014, including two official Internal Affairs investigations initiated on successive, separate 2008 complaints, allegations of police sexual misconduct based on events of 2007 and 2008, respectively.[30]  In addition, earlier in 2007 (the same year of his alleged first sexual misconduct incident), Sergeant Best had intentionally presented false work hours and falsified time cards to cover the original deception and theft.[31]  Indeed, in 2009, in the final investigative submission to the Disciplinary Review Division in connection with Best's second police sexual misconduct investigation, Internal Affairs explicitly warned the District:

> [I]t appears that Sergeant Best continues to engage in behavior that may leave the Department open for serious legal action. . . . Sergeant Best has been in two reported sexual harassment allegations, and although the first has a finding of Insufficient Facts, there are a number of factors that are similar.  The facts in both complaints suggest that both complainants are new employees: Sergeant Best served as a supervisor for both women, and in fact, it can be suggested he used his position of authority to try to intimidate the women.

---

[30]     The investigations, both handled by the investigator who had been a friend of Best for 28 years, overlapped one another and for a period of time were under way at the same time.

[31]     Sergeant Best pilfered $1997.32 before someone detected his dishonesty.  MPD imposed a mere 30-day suspension for his treachery.  Despite his manifest moral turpitude, MPD chose to retain him as an active member of what the District should be aspiring to make a fraternity of exemplary men and women, who diligently express and earnestly believe in the principals and values that would qualify them to wield remarkable authority in a free society and be trusted as worthy to serve and protect the people of the District of Columbia. Inspector Gottert, of the Disciplinary Review Division (DRD), testified that typically if a member has been found to have lied and been penalized for it, "the penalty for lying is generally recommendation for termination."  Gottert Tr. at 52:1-8.  Defendant Ex. 8 at 7.

Defendant Ex. 14.  Here Internal Affairs is alerting MPD, i.e. the District of Columbia, to a serious issue—one considered worthy of formal and explicit documentation— announcing that evidence indicates that Sergeant Best poses a grave threat to vulnerable, young females who are subject to his authority and, further (and quite remarkably), that there is concern about him exposing the District to "serious legal action"—exactly what has occurred.  Nonetheless, in a display of conscious disregard and truly shocking deliberate indifference to the obvious and foreseeable harm Officer Best had been specifically flagged as posing to the civil rights of the vulnerable, young women of the District of Columbia, MPD—again—chose to retain Officer Best within its fraternity and under its banner as a member of its police force.

Moreover, there is no record in the entirety of Best's files produced in discovery that he ever received any targeted training or particularized monitoring as a result of Internal Affair's sober admonition about him. Ex. Best's training records Based upon these facts, a jury could reasonably conclude that the District was the moving force that enabled Best to attempt to rape Jaquia Buie inside MPD headquarters.  The District retained him after he lied and stole from the MPD and after successive investigations for police sexual misconduct.  Then the District detailed Best to police headquarters, where within nine (9) days of being there, he brought a young female into police headquarters and attempted to rape her, exactly the kind of behavior that the District had been officially warned of in writing in 2009.[32]

---

[32]     In *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 398, 117 S. Ct. 1382, 1385, 137 L. Ed. 2d 626 (1997), the Supreme Court ruled that the plaintiff was required to

### C.      Single Act by Final Policymaking Authority

"Municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 1298, 89 L. Ed. 2d 452 (1986) "[A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations.  If that decision to adopt that particular course of action is properly made by that government's authorized decision makers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where the action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is taken only once or to be taken repeatedly." *Id*. at 481.

"Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command

_____

produce evidence from which a jury could find that, had the hiring Sheriff adequately screened the deputy's background, the Sheriff "should have concluded that Burns's use of excessive force would be a plainly obvious consequence of the hiring decision."  The Court found that plaintiff's evidence of the Sheriff 's scrutiny of the deputy's record did not enable the jury to make such a finding.  In the case *sub judice*, there is evidence from which a jury could reasonably find that, had Chief Lanier, who knew of Best's prior incidents of lying and stealing and police sexual misconduct, adequately considered Darrell Best's disciplinary record in 2009, particularly in light of the written Internal Affairs warning included in Best's second investigation for police sexual misconduct, Chief Lanier should have concluded that further manifestation of Best's proclivity for police sexual misconduct would be a plainly obvious consequence of a decision to retain him.  Furthermore, the District's 30(b)(6) designee regarding Internal Affairs testified that the Jones matter was not investigated comprehensively and should have been sustained.

that it occur, see *Monell*, *supra,* 436 U.S., at 661, n. 2, 98 S.Ct., at 2020, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 2724, 105 L. Ed. 2d 598 (1989)I

In 2014, former Deputy Chief of Police, Kimberly Chisley-Missouri submitted a formal request to Chief of Police, Cathy Lanier, seeking authorization for Officer Best to be detailed to police headquarters where Deputy Chief Missouri had been promoted to lead the Corporate Support Bureau.  Chief Lanier possessed final policymaking authority with respect to MPD members' employment issues.  Although she was aware that he had been demoted, Assistant Chief Missouri admitted in her deposition testimony that she requested officer Best be detailed to police headquarters.[33].  But she said she didn't know why he was demoted.  She obviously did not consider it sufficiently important to find out:

> Q.  "So I'm asking you, is it a minor thing or a
> significant thing for a sergeant to be demoted?"
>
> Same objection.
>
> A.  Between minor and
> significant, definitely more significant, yes.
>
> Q.  But you had -- you didn't look in -- before
> you brought him into police headquarters and gave
> him the privileges of accessing the office of the
> Corporate Support Bureau, you didn't investigate why
> he had been demoted?
>
> A.  No.

---

[33]     [Provide the language from her transcript where she says this.]

> Q.      Okay.  Is today when I handed you this
>         document the first time you learned why he was
>         demoted?
>
> A.      Yes.

Missouri Tr. P. 82-83, L. 21-14.  This is egregious indifference.  But what is more is that

Police Chief Cathy Lanier—fully aware of his 2007, 30-day suspension for lying and

stealing and of both sexual misconduct Internal Affairs investigations (moreover,

knowing specifically why she'd authorized his demotion), nonetheless decided to

authorize Best to be detailed to the Corporate Support Bureau on the fifth floor of police

headquarters.  Chief Lanier's final policymaking decision to authorize Officer Best to be

detailed to police headquarters occurred on November 21, 2014.  Officer Best's detail

commenced on November 24, 2014.  A mere nine (9) days later[34]—little more than a

week—on December 3, Officer Best used his police authority and assorted other

resources of the MPD, to bring Jaquia Buie into the very nerve center of the department

and attempt to rape her.  These facts make it possible for a jury to reasonably conclude

that the District was the moving force behind a constitutional deprivation, caused by

Chief Lanier's participation in a longstanding practice or custom which constitutes the

"standard operating procedure" of the MPD/the District of Columbia: a pattern of

deliberate indifference toward police sexual misconduct.

---

[34]     After being detailed to the Fifth District following commencement of Best's first
Internal Affairs investigation regarding sordid allegations of police sexual misconduct at the
police academy, it took only a few months before he committed new acts of police sexual
misconduct, which resulted in his subsequent demotion in connection with the second police
sexual misconduct Internal Affairs investigation.

<u>Negligent Entrustment, Count V</u>[35]

Defendant bewilderingly contends that "there is no evidence in the record supporting Plaintiff's negligent entrustment claim," and speciously asserts that "'the doctrine of negligent entrustment . . . does not require a defendant to be clairvoyant.'" *Id.*, at 40   Plaintiff agrees that the doctrine does not require a defendant to be clairvoyant, but urges this Court to recognize that the doctrine does require the defendant to have a memory.  As defendant states in its motion, "to establish a claim of negligent entrustment, a plaintiff must show: (1) [t]he making available to another chattel which the supplier (2) knows or should have known the user is likely to use in a manner involving risk of physical harm to others (3) whom the supplier should expect to be endangered by its use." *Id.*, at 39 . Defendant's evasive contention that "[w]hat Best used to sexually assault[36] Plaintiff was his position as pastor . . . ," *Id.*, 40, is

---

[35]     Defendant attempts to apply the Public Duty Doctrine to this case are unpersuasive. "[A]bsent a special relationship between the [District] and an individual, no specific legal duty exists," and a suit against the District based on a claim of simple negligence will "fail[ ] as a matter of law." *Warren v. District of Columbia,* 444 A.2d 1, 3, 4 (D.C.1981) (en banc). *Accord, e.g., Klahr v. District of Columbia,* 576 A.2d 718, 719 (D.C.1990) ("Underthe public duty doctrine, a person seeking to hold the District of Columbia liable for negligence must allege and prove that the District owed a special duty to the injured party, greater than or different from any duty which it owed to the general public.") When a police officer presses a citizen, particularly a young female, to let him take her home and induces her to get into his police cruiser, he creates a special relationship with the District, not him as an individual.  Even if not at that specific point, then certainly after the Officer unilaterally brings her via exclusive police garage and restricted elevator into police headquarters while he does police work.  See Wanzer v. District of Columbia, 580 A.2d 127, 132 (1990) ("[T]o give rise to a special relationship the [MPD's] response to the private party must in some way exceed the response generally made to the members of the public.")

[36]     Although, in a general sense, it is accurate to characterize what Officer Best did to Jaquia Buie as a "sexual assault," the charge that Count IX of the Complaint alleges is "Sexual Abuse of a Minor."  The pertinent section of 12 D.C. Code Subsec.  301(11) "Limitation of time

ridiculous.[37]  The District should remember that the only possible chattel at issue are the various articles supplied to Best by it: the car,[38] uniform (and associated accoutrements), key, fob, and firearm.  The District supplied these items to officer Best as a sworn member of MPD and, more recently, as someone newly detailed to the CSB. The District should also remember the host of reasons—including Best's documented disciplinary record involving, among other things, rank dishonesty (lying and stealing), domestic violence, and a keenly relevant history of police sexual misconduct reflected in two Internal Affairs investigations, in the course of the second of which IAD specifically admonished the District thus:

> Due to the nature of this allegation and the disturbing similarity of
> Sergeant Best's most recent complaint . . . it appears that Sergeant Best
> continues to engage in behavior that may leave the Department open for
> serious legal action. . . . Sergeant Best has been in two reported sexual
> harassment allegations, and although the first has a finding of
> Insufficient Facts, there are a number of factors that are similar.  The

---

for bringing actions," in effect on the date that Plaintiff initiated this action in September 2016, provided that actions "for the recovery of damages arising out of sexual abuse that occurred while the victim was a minor [is] 7 years from the date that the victim attains the age of 18, or 3 years from when the victim knew, or reasonably should have known, of any act constituting sexual abuse, whichever is later."  In the District of Columbia, a minor is a person under the age of 18 years.  Jaquia Buie was 17 at the time of Best's attempted rape.  Accordingly, she had a right to bring this count until 2021, seven years after she turned 18.  She filed this Complaint in September 2016.

[37]    But for the fact that Best was a police officer, it is highly improbable that Jaquia Buie would have ever been meeting with Best in the first instance.  She was certainly not at Georgia Brown's to confer about an interest in becoming a pastor.  Furthermore, it is not speculative to posit that any trust or respect related to his status as a pastor, which Jaquia had for Best prior to meeting him at the restaurant that evening, evaporated immediately and completely when he started asking her lascivious, disconcerting, and wildly inappropriate questions at dinner.

[38]    To the extent the District argues that Best was not authorized to have the MPD cruiser he was driving on December 3, 2014, it simply reinforces Plaintiff's contention about inadequate supervision at MPD, particularly of Best himself.

> facts in both complaints suggest that both complainants are new
> employees: Sergeant Best served as a supervisor for both women, and in
> fact, it can be suggested he used his position of authority to try to
> intimidate the women

(Defendant Ex. 14)—a jury could reasonably find that the District of Columbia knew or

should have known that Best was likely to use in a manner involving physical harm to

vulnerable young females subject to his position of police authority.  Finally, based on

Best's history of police sexual misconduct against vulnerable young females, a jury

could reasonably find that Jaquia Buie was definitely the sort to be endangered by

Best's use of the chattel.[39]

### Negligent Supervision and Retention, Counts IV & VI[40]

"An action for negligent supervision or retention requires proof that the

employer breached a duty to plaintiff to use reasonable care in the supervision or retention

of an employee which proximately caused harm to plaintiff. *Fleming v. Bronfin*, 80 A.2d

915, 917 (D.C. 1951).  "There are circumstances under which an employer can be held

---

[39]     In its argument against Plaintiff's claim of negligent entrustment, the District alludes to
Restatement (Second) of Torts, §390.  Among the illustrations provided to illuminate the
section is the following:

> A permits B, his chauffer, who to his knowledge is in the habit of driving at an
> excessive speed, to use his car to take B's family to the seashore.  While
> driving the car for this purpose, B drives at an excessive rate of speed and
> harms C.  A is subject to liability to C.

[40]     Contrary to Defendant's hyperbolic claims about the need for plaintiff's expert to
opine on the ultimate issue of causation, "[q]uestions of causation are ordinarily issues of fact
for the jury," and there is no reason for things to be otherwise in this case.  *Reese v.
Washington Metro Area Transit Authority*,  135 A.2d 1326, 1329 (1991); *Tolu v Ayed*, 945 A.2d
596, 604 n.6 (D.C. 2008)

liable for intentional acts committed by an employee who causes harm although acting outside the scope of his or her employment.   That liability is predicated upon the employer's direct negligence rather than under a theory of vicarious liability based on the employee's negligence."   *Phelan v. City of Mount Ranier*, 805 A.2d 930, 937 (2002).[41] The case *sub judice* is a case involving such circumstances.

The District failed to show reasonable care with respect to supervision and retention of Best at MPD after a series of important events:

(1)    the 30-day suspension after the 2007 allegations of lying and stealing were sustained following an Internal Affairs investigation;

(2)    successive Internal Affairs investigations for allegations of police sexual misconduct (the first of which Inspector Dickerson testified should have and could have been sustained if it had been investigated properly, and the second of which was sustained resulting in Best being demoted from Sergeant to officer);

(3)    the official written Internal Affairs admonition about Best, warning that "Sergeant Best continues to engage in behavior that may leave the Department open for serious legal action." (see Defendant's Exhibit 14 at

---

[41]    An off-duty, police officer in plain clothes and outside of his jurisdiction (the City of Mount Ranier, Maryland) gets involved in the personal squabble of a friend in the District of Columbia and ends up shooting a man dead in the process.  The decedent's wife commenced an action against the officer, the City of Mount Ranier, and its Police Chief for violation of his civil rights under 42 U.S.C. § 1983 various other claims, sounding in negligence, etc..

DC 001002) contained in the final report of the  second police sexual misconduct investigation;

(4)    the 2012 domestic violence Temporary Restraining Order Best's then-wife filed against him; and

(5)    the 2011 investigation of allegations from a citizen that Best was having an affair with his wife, a member of Best's church congregation (who, despite denying the affair, he later went on to marry) and that he regularly wore his police service revolver in the pulpit.

A jury could reasonably conclude that after all this documented dishonest and sordid conduct, allowing Best to continue to be entrusted with the authority, the official credibility, the powers and privileges, and the access to the wide range of resources and accoutrements of MPD, was not reasonable care with respect to the supervision or retention of officer Best or his fellow members.  Not only was Best retained, he was not required to undergo any particularized remedial training or subjected to any bespoke oversight or monitoring to hold him accountable in the wake of his demonstrated proclivity for police sexual misconduct.  Beyond this even, Former Chief of Police, Cathy Lanier, officially ordered—despite her knowledge of Best's history of sexual misconduct in the department and demotion from sergeant to officer—that he be detailed to the Corporate Support Bureau, which allowed officer Best privileged and unmonitored access to exclusive areas of police headquarters and various other departmental resources.

The *Phelan* Court reasoned that "[n]egligently retaining and supervising Thompson as a police officer in Mount Rainier had little or no connection with his off-

duty shooting in a jurisdiction where he had [no] . . . authority to act as police officer . . . ." *Phelan* at 940.  Unlike the shooting in Phelan, however, the attempted rape of Jaquia Buie was the outgrowth of a job-related encounter.  *Murphy v. Army Distaff Foundation, Inc.*, 458 A.d 61, 64 and n. 4 (D.C. 1983).  In full uniform, a police officer, driving a police cruiser, met a recent high school graduate within his jurisdiction to discuss the prospect of her joining the local police force for which he worked: [42] that's easy to conceive of as a job-related encounter.  Or, a police officer orders a minor into a police cruiser and promises that he will take her home, then, after the patrol car is in motion, unilaterally declares he has "work to finish up," takes her inside MPD headquarters, starts working in his office on his computer, and eventually attempts to rape her: that's hard not to conceive of as being a job-related situation.

It was clear in 2009 that Best was a person who was dishonest, untrustworthy, and would transgress sexually against female MPD members, particularly those subject to him.  Moreover, his exploitative sexual predation was known and documented.  It was plainly foreseeable that, if the District retained him, Best would someday use the powers and accoutrements of his position to prey on the even more vulnerable: the civilian female population of the District.  See generally *District of Columbia v. Cassidy*, 465 A.2d 395, 398 (D.C. 1983) (liability may be imposed for reasonably foreseeable results of acts or omissions, including intervening acts of third party when foreseeable).  But, irresponsibly, the MPD disregarded the threat to the

---

[42]    In *Phelan*, the officer was not in uniform, not within the jurisdiction of his police powers, and he was not identifiable as a police officer prior to the shooting.  Phelan at 940.

welfare of the women of the District of Columbia.  This was a substantial factor in best

preying on Jaquia Buie, and provides the "nexus between the  . . . misuse of the

professional relationship by the employee, the alleged negligent acts of the employer, and

the resultant injury to the [victim]," which the court in *Phelan* described.  *Phelan* at 939.

A jury could reasonably, based on these facts—all of which are substantiated by the

record—find that this was not the reasonable care required under the law and that breach

of this standard of reasonable care proximately caused the harm inflicted upon Jaquia

Buie.  Ultimately, as Plaintiff is "the nonmoving party, she is entitled to all favorable

inferences which may be drawn from" the evidence.  Consequently, summary judgment

is simply inappropriate here.

<u>Negligent Infliction of Emotional Distress, Count VII</u>

Defendant's contention that there is "no evidence in the record

supporting Plaintiff's NIED claim," (*see SMJ*., at 40) is irresponsible and false.  Under

the law of the District of Columbia, to prove a claim of negligent infliction of emotion

distress one must establish the following: (1) plaintiff was in the zone of physical

danger; (2) the zone was created by the defendant's negligence; (3) plaintiff feared for

her own safety; and (4) the resulting emotional distress was serious and verifiable.

*Hunter v. District of Columbia*, 824 F. Supp.2d 125, 139 (D.D.C. 2011).  Based on the

evidence in the record a jury could reasonably find that each of the elements above is

satisfied.  Relying on the fact that officer Best seized her against her will, took her into

police headquarters to an unmonitored office, alone with him, a jury could reasonably

conclude that Jaquia Buie was "in the zone of physical danger."  Indeed, based on the

fact officer Best indisputably attempted to rape her—and sits in prison at this exact moment because of a criminal conviction derived from that fact—no one could reasonably dispute that Jaquia Buie was in the zone of physical danger.  Then, predicated on the fact the District failed to adhere to its own disciplinary and supervisory policies and, in addition, inexplicably detailed Officer Best to CSB, recklessly granting him enhanced opportunity to act on his known proclivities to commit police sexual misconduct, a jury could also reasonably find that the "zone of physical danger" was, in fact, created by the District's negligence.  Simple reliance on plaintiff's own deposition testimony that she was scared at the time would allow the same jury to find that plaintiff, indeed, feared for her safety.[43]  That the "resulting emotional distress was serious and verifiable" could easily be shown through plaintiff's psychological expert, Dr. Carol T. Giunta, PhD, who states in her expert report the following:

> Because [Ms. Buie] continues to re[-]experience the sexual assault on a regular basis and has not yet been able to integrate this event into the larger narrative of her life, Ms. Buie copes with its aftermath in largely unhealthy ways. She keeps others at a distance, forgoing support in favor of isolation.  She has relied on substances to distance herself from the experience and facilitate sleep.  Her fuse is ignited quickly, resulting in displays of anger and aggression in an attempt to ward off the feared experience of further victimization.  In short, Ms.Buie is relying on any and all strategies she can muster to cope with what continues to be an overwhelming array of feelings and experiences which tie back directly to the sexual assault or represent attempts to manage its fallout.

---

[43]      As he molested her, Officer Best told her to stop acting scared.  Ex. 1, Jaquia Tr. at 238:6.  Jaquia was really scared and looked for a security camera in headquarters to make sure there was a picture of her face if something happened to her. Ex. 11, Mrs. Buie Tr. at 102:12-15.

However, these coping strategies create more problems for her and put
her at risk for a negative life trajectory.

Carol T. Giunta Expert Report at p. 8.  Defendant's.  A jury could reasonably find in

favor of Plaintiff with respect to the count of negligent infliction of emotional distress.

<u>Intentional Infliction of Emotional Distress</u>

To establish a prima facie case of intentional infliction of emotional

distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the

defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe

emotional distress.  *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (quoting *Sere*

*v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982)).  The conduct must be "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (quoting *Drejza v.*

*Vaccaro*, 650 A.2d 1308, 1312 n. 10 (D.C. 1994)).  Plaintiff contends that it was extreme

and outrageous conduct of the District of Columbia, the capitol city of the United States

of America, not to have a written police sexual misconduct policy in December 2014, and

to have retained and detailed Darrell Best to the CSB in light of his disciplinary record

and the specific admonition about him that Internal Affairs advanced in 2009.  She

maintains that those factors, together, constituted reckless conduct by the District of

Columbia—not Officer Best, who himself in determinative part was a product, result, and

expression of the District's conscious disregard over time—and that they operated

43

confluently to cause the emotional distress imposed upon her through Best.  Plaintiff stresses that it was the District's failure to take responsibility to lead, manage, supervise, and train its members—including Best—regarding police sexual misconduct that made possible the convergence of all the elements that produced what the Defendant described in its motion as "the terrible acts Best committed against her in December 2014" (see MSJ at 39).  A jury could reasonably find in favor of Plaintiff on this count based on this record.

Respectfully submitted,

SMITH MUSTILLE, LLC


By:   /s/Mark A. Smith_____
Mark A. Smith           Bar # 439116
2200 Pennsylvania Avenue, NW
Fourth Floor East Washington, D.C. 20037
(202) 776-0022
877-854-1631 – fax
masmith@smithmustille.com


By:   /s/ Judith A. Mustille_____
Judith A. Mustille         Bar # 455076
2200 Pennsylvania Avenue, NW
Fourth Floor East Washington, D.C. 20037
(202) 776-0022
877-854-1631 – fax
jamustille@smithmustille.com

December 21, 2020

*Attorneys for Plaintiff*

44

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
Civil Division

JAQUIA BUIE              )
                         )
       Plaintiff,       )
                         )
vs.                  )     Civil Action No. 1:16-cv-01920 (CKK)
                         )     Judge Colleen Kollar-Kotelly
DISTRICT OF COLUMBIA, *et. al.*  )
      Defendants.   )
_____)

## PROPOSED ORDER

Upon consideration of Plaintiff's Responses to Defendant's Statement of Facts, Issues of Material Fact, and Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Opposition to the District's Motion for Summary Judgment On All Counts, and the record herein, it is this ___ day of December, 2020 hereby,

**ORDERED** that Plaintiff's Responses to Defendant's Statement of Facts, Issues of Material Fact, and Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Opposition to the District's Motion for Summary Judgment On All Counts is **GRANTED**.

_____
Judge Colleen Kollar-Kotelly
U.S. District Court for the
District of Columbia

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

```
_____
                            :
IN THE MATTER OF:           :
                            :
JAQUIA BUIE,                :
                            :
            Plaintiff,      :
                            :
    v.                      : C.A. No.
                            : 16-CV-1920 (CKK)
DISTRICT OF COLUMBIA,       :
et al.,                     :
                            :
            Defendants.:
                            :
_____:
```

Tuesday,
April 3, 2018

Washington, D.C.


DEPOSITION OF:

JAQUIA BUIE

called for examination by Counsel for the

Defendant, pursuant to Notice of Deposition, in

the D.C. Office of the Attorney General, located

at 441 4th Street, NW, Suite 630 South,

Washington, D.C., when were present on behalf of

the respective parties:

APPEARANCES:


On Behalf of the Plaintiff, Jaquia Buie:

MARK A. SMITH, ESQ.
JUDITH MUSTILLE, ESQ.
Smith Mustille, LLC
2200 Pennsylvania Avenue, NW
4th Floor East
Washington, D.C. 20037
202-776-0022
masmith@smithmustille.com




On Behalf of Defendant, District of Columbia:

DAVID JACKSON, ESQ.
PATRICIA DONKOR, ESQ.
Office of the Attorney General
For The District of Columbia
One Judiciary Square
441 4th Street, NW
Suite 630 South
Washington, D.C. 20001
202-724-6618
davida.jackson@dc.gov

1        A       Sunday.

2        Q       All right.  And you said that it was

3   pleasant.  Tell me about going to the church, and

4   walking through the door, and what, what was the

5   experience that day?

6        A       It was a fun experience.  I didn't

7   have any problems.  I didn't, I mean, we didn't

8   go in their judging.  It was a very small church,

9   not a lot of people, so that was fine with me.

10            And the people, the people that were

11   there, they were kind to me that day.  So.

12        Q       Okay, and so did, at some point during

13   that day, did Best come over and introduce

14   himself to your mother and the family?

15        A       He just introduced himself in the

16   pulpit.

17        Q       And what did he say?

18        A       My name is Darrell Best, and he's the

19   pastor of the church, and he's also a police

20   officer - because he did carry gun on his hip in

21   church.

22        Q       What, okay.  But I asked you what, did

1      tell you?

2           A     No.

3           Q     Do you know what your mother told him?

4           A     I'm not sure what my mother told him,

5      but she did tell him I wanted to be a police

6      officer.

7           Q     So do, have you since found out what

8      your mother told him?

9           A     No.

10          Q     Have you ever asked your mother what

11     she told him?

12          A     I don't like bringing up Darrell Best.

13     So I'd rather not bring incidents up, and ask her

14     something, a question of what she might have, she

15     don't even like talking about Darrell Best.  So I

16     don't talk about what she told him, what he told

17     her.  We don't talk about this situation.

18          Q     Okay.  So you have not asked your

19     mother about what she might have told Darrell

20     Best about ---

21          MR. SMITH: Objection.  Asked and

22     answered.

1    say to you?

2        A    Your mother told me that she wanted to

3    be a police officer.

4        Q    And what did you say to him?

5        A    I said yes, I would like to be a

6    police officer.  But it was a closed-ended

7    question.

8        Q    And did he respond to that?

9        A    Yes, he did.

10        Q    What did he say?

11        A    He said what are you doing to become

12    a police officer?  And I said nothing now, but I

13    am going to the cadet meeting that my mother did

14    sign me up for.

15        Q    When was that cadet meeting?

16        A    In early 2015.

17        Q    Okay.  And what, did he say anything

18    in response to that?

19        A    No.

20        Q    How long did the conversation last?

21        A    It was not, it wasn't a conversation.

22    He just asked, you know, would I like to be a

1    police officer, because of what my mother had

2    talked about?  I told him yes.  And he said he

3    may, he may can help me with that.  And I said

4    okay. And that was the, that was the end of it.

5         Q    And did you ask him how he could help

6    you with it?

7         A    No, I did not.

8         Q    Did he tell you how he could help you

9    with it?

10        A    No, he did not.

11        Q    And was this conversation on a Sunday?

12        A    This conversation was on Thanksgiving.

13   I don't know if Thanksgiving was on a Sunday, but

14   I know it was on Thanksgiving.

15        Q    So you went to church on, for

16   Thanksgiving?

17        A    Correct.

18        Q    And was this conversation, were there

19   other people around ---

20        A    Yes.

21        Q    --- when he, when you had this

22   conversation with, with him?

1          Q      Other than Pastor Best telling you

2     that your mother told him that you were

3     interested, or maybe interested in being a police

4     officer, and him saying to you that he may be

5     able to help you.

6          A      Mmhmm.

7          Q      Did he say anything else about what

8     kind of assistance he could help you with, in

9     terms of becoming a police officer?

10         A      That, later, before we did, in the

11    church, he did ask for my number.  And the

12    graduation gift was brought up again.  And he

13    said, did you find, did you, did you come up with

14    anything for your graduation gift?

15                And I told him no.  I told you, I told

16    him, I told you nothing.

17                And he said, well, we'll just have,

18    we'll go out to dinner to talk about your plans

19    as a police officer, and your mother was invited.

20         Q      Okay, so was this on November 30?

21         A      Correct.

22         Q      Okay.  And now, was your mother there?

1      Q     Did you know if Pastor Best had her

2    cell phone number?

3      A     She did have Darrell Best's number,

4    because my mother was the coordinator.  She did

5    clean the church.  So she did have his number.

6    But I don't know when she gave this number, I

7    don't, when she gave her number to him, I'm not

8    sure.

9      Q     Okay.  So did the two of you, did

10    Pastor Best tell you when he wanted to take you

11    to dinner?

12      A     He did ask me for my number.

13      Q     Right.

14      A     And Darrell Best did ask me for my

15    number, and he told me to find a place where we

16    all can go, and sit down and have this dinner.

17    And he will, he will get in touch with me, but I

18    thought that would be, you know --- I, I never

19    thought going out for my graduation dinner would,

20    that would ever happen.

21      Q     And so, what, three days, four days

22    later you went to dinner with him?

1          A      Correct.

2          Q      Okay.  So when you told her mother

3    that she, that Pastor Best had invited you to

4    dinner and her to dinner, what did she say?

5          A      She said okay.

6          Q      And so was it her intention, do you

7    know, to go along with the, the two of you?  To

8    go to dinner?

9          A      Was it her intention?

10         Q      Yeah.  Was she planning on going to

11   dinner?

12         A      Yes, she was.

13         Q      And so, but it as it turned out, only

14   you and Pastor Best went to dinner, right?

15         A      Correct.

16         Q      Why was that?

17         A      Because my mother felt as though I was

18   not going to retain the information that he would

19   have told me if she was sitting in the presence

20   of the both of us, because I always relied,

21   because my mother was so big on my career, I

22   always relied on my mother to sit in on things so

1      problem of retaining information?

2           A      I don't have a problem with retaining

3      information, I just did not think, I just

4      graduated.  So I did want to become a police

5      officer, but I was not, I was not attacking the

6      situation like my mother wanted me to.  I was not

7      on top of everything how she would want me to be.

8           Q      So, and when did she decide that she

9      was not going to go to dinner?

10          A      The day of.

11          Q      Okay.  And when during that day?

12          A      When I was getting ready, she said

13     well, I'm not going to go.

14          Q      What time was that?

15          A      That time was about 4:00.

16          Q      Okay.  And you were at home?

17          A      Mmhmm.

18          Q      And Pastor Best called you?

19          A      He did.

20          Q      Okay.  And what did he say?

21          A      I didn't answer the phone.

22          Q      Who answered the phone?

1          Q      Did the, did you make plans to, to

2   meet up somewhere?

3          A      He did ask me where was I coming from,

4   because he didn't know where me and my mother

5   stayed.  We did give that when we joined the

6   church, but they did not, he didn't know where we

7   stayed at.  And I told him I would meet him at

8   Mount Vernon.

9          Q      Okay, and where you were staying at,

10   was that on Shippen Street?

11          A      Correct.  Shippen Lane.

12          Q      Shippen Lane.  Why did you decide to

13   meet him at Mount Vernon?

14          A      Because he said he was, you know,

15   close, downtown.

16          Q      How far -- Mount Vernon is the metro

17   station?

18          A      Correct.

19          Q      How far is that from where you live?

20          A      Mount Vernon, it was the same -- It

21   was the Green Line -- the Green Line, so there

22   was about seven stops.

1      Q      Okay.  And did he tell you why he was

2   in a -- and this was an unmarked police car,

3   correct?

4      A      Correct.

5      Q      Did he tell you why he was in an

6   unmarked police car?

7      A      No, he did not tell me why he was in

8   an unmarked police car.

9      Q      And you didn't ask him?

10     A      No, I didn't.

11     Q      How was he dressed?

12     A      He was in full police uniform with his

13  gun, with a jacket.

14     Q      Did the jacket say -- have any writing

15  on it?

16     A      No, but you could see his badge.  His

17  jacket was open.  You could see his police hat.

18     Q      And his police hat was in the vehicle

19  as opposed to on his head?

20     A      It was in the vehicle but when he got

21  out, he had it on his head.

22     Q      And how far was the drive from Mount

1            Q     So when you got to Georgia Brown, did

2       you text or call your mother to let her know that

3       you had arrived at the restaurant safely?

4            A     No.  I just let her know that I was at

5       --

6            Q     Mount Vernon.

7            A     Mount Vernon.

8            Q     Okay.

9            A     And he stopped talking about the

10      police force and asked me did I have a boyfriend.

11      And I asked him why.  And that question

12      immediately turned into, "Do you like getting

13      your pussy ate?"

14           Q     Did you have a boyfriend at that time?

15           A     I'm not sure if I had a boyfriend at

16      that time.

17           Q     What do you mean?

18           A     I don't remember 2014.  I didn't have

19      a boyfriend.  I had friends.  I was not allowed

20      to say I had a boyfriend.

21           Q     In your mind, did you have a

22      boyfriend?

1        A     No, I didn't have a boyfriend.  I

2   talked to people but I didn't have a boyfriend.

3        Q     Okay.

4        A     And I spit my drink out.  And I said,

5   "What?"  Because I couldn't believe this was

6   coming from his mouth.

7        Q     So let me stop you there.  What were

8   you drinking?

9        A     I was drinking a peach tea.

10       Q     Okay.  And when you say you spit it

11   out, was it all over the table or just --

12       A     No, it was in my section of the table.

13   It was in my section of the table.  And he could

14   see that I was uncomfortable.

15       Q     Were the two of you sitting at an open

16   table or in like a booth?

17       A     We were sitting at an open table.

18       Q     Okay.  And there were other patrons in

19   the restaurant?

20       A     Yes, there was.

21       Q     Okay.  So you spit out what you were

22   drinking and what happened?

1          A      And he apologized.  And I did tell him

2     -- I told him you were out of line for saying

3     that.  And he said I won't bring it up again.

4               And the food had arrived.  And he

5     complimented the food but at that time, I was

6     just -- I was over eating.  I didn't touch

7     anything.  And he started grinning and smiling.

8     And he started asking me what positions do you

9     like?  So I said, you said you wasn't going to

10    bring this back up.  And he said, well I know.

11    And he started mentioning that I was a big girl.

12    And I'm grown and things of that sort.  And I'm

13    like, well no.  I'm not grown.

14         Q      Okay.  So when he mentioned you were

15    a big girl, was he talking about your age or was

16    he talking about your body size, your physique?

17         A      I don't -- I'm not sure what he was

18    talking about but he did say I was grown.  And I

19    said No, we shouldn't be having this

20    conversation.

21               MR. JACKSON:  Okay.  Let me show you

22    a picture just -- and I'm going to ask you to

1     again, he said it again.  He said something

2     inappropriate again.  And when he started the

3     mess in his food after he asked me what position

4     --

5          Q     I'm sorry, when he started what?

6          A     He started to eat his food.

7          Q     Okay.

8          A     And then once he was finished with

9     that bite of food, he went on and said, "What

10    positions do you like?"  And I said, "Are you

11    serious?  I told you to stop."  And then I

12    preceded to put my coat on.  And that's when he

13    started being aggressive.

14         Q     Explain how he was being aggressive.

15         A     He told me to take my coat off and

16    started talking as if he was my parent.  And that

17    frightened me because I had never seen this side

18    of Darrell ever.  I've never seen him get upset

19    or -- he was just -- he was a pastor, so I didn't

20    see him raise his voice and I was confused.  And

21    I was -- you know, I was thrown back why he was

22    yelling me at like that.

1    there.  It was a need to call my mother but I did

2    not know how to tell my mother this happened.

3              Q      Okay.  Did you tell Pastor Best that

4    you were going -- you wanted to leave the

5    restaurant?

6              A      I said, I'm leaving.

7              Q      Okay.  And did you tell him that you

8    would be able to get home on your own?

9              A      I did tell him that.

10             Q      Were you able to get home on your own?

11             A      Yes, I was.

12             Q      How would you have gotten home?

13             A      I did have a metro card.

14             Q      And where was the closest metro stop

15   from where the restaurant is?

16             A      I'm not sure.

17             Q      How would you get to the metro?

18             A      Walk.

19             Q      Were you in fear of your safety?

20             A      I was in fear of my safety.

21             Q      Did you think of calling the police?

22             A      He was the police.

1          Q     My question is did you think of

2     calling the police?

3          A     No.

4          Q     Did you think of seeking help from

5     somebody in the restaurant?

6          A     No.  The reason I did not seek help

7     from the restaurant, because he was still in my

8     presence.  And when I -- when he paid for the

9     meal, after I told him I would pay for myself.  I

10    insisted on paying for myself, so he did not feel

11    like he did anything for me.  He got up and put

12    his coat on and followed me.  When he seen me

13    walking, he said, "Come here" and he started

14    talking through his teeth like this.  Now that's

15    what put me in fear for my life.

16         Q     Okay.  So at that point, were you

17    outside the restaurant?

18         A     I was outside the restaurant at that

19    time.

20         Q     Did you make an attempt at all to call

21    your mother?

22         A     No.  I was trying to get to where I

1    was going.  I was trying to get as far away as

2    Darrell Best as I possibly could.

3        Q    Okay.  And so were you walking fast,

4    slow?

5        A    I was walking across the street but he

6    kept calling my name.  And being as though he was

7    a police officer, I didn't want anybody thinking

8    okay well, let me stop her.  I thought of so many

9    scenarios.  And I did turn around and said,

10   "What?"  Because I know he could have followed

11   me.  He is a police officer.  He's capable of

12   anything.  He has access to everything.

13       Q    What time of the evening was this?

14       A    I'm not sure of the exact time.  I

15   don't want to give you a time that I'm -- I don't

16   remember but it was in the evening.

17       Q    And so had you started to cross the

18   street?

19       A    Yes, I did.

20       Q    Were you -- had you reached the other

21   side of the street?

22       A    Yes, I did.

1    Q    And where was Pastor Best when you

2    reached the other side of the street?

3    A    He was on the passenger side of the

4    car and he said, "Come here now."

5    Q    Did you try to call your mother at

6    that point?

7    A    No, I was trying to get away from

8    Darrell Best.

9    Q    I understand, but did you try to call

10    your mother?

11    A    I was trying to get away from Darrell

12    Best.

13         MR. SMITH:  I'm going to object.

14    She's asked and answered that many times now.

15    You've asked the same question.

16         MR. JACKSON:  Many times?

17         MR. SMITH:  Yes, many times.  We can

18    play it back for the record if you doubt it.

19         MR. JACKSON:  I understand that you

20    were trying to get away from Pastor Best.  My

21    question is did you try to call your mother?

22         MR. SMITH:  Objection, asked and

1    answered.

2                    MR. JACKSON:  That's fine.  You can

3    answer.

4                    MS. BUIE:  I was trying to get away

5    from Darrell Best at that present time.

6                    BY MR. JACKSON:

7        Q       Were you thinking about calling your

8    mother?

9        A       At that time, I was in disbelief and

10    I was shocked.  I was scared.  Calling my mother

11    was the last thing on my mind.  I was trying to

12    get away from this guy.

13        Q       Okay.  So when he told you to come

14    here, did you have to cross back over to the side

15    of the street where he was?

16        A       No, I did not.

17        Q       Were you on the opposite side of the

18    street where the restaurant was?

19        A       Yes, I was.

20        Q       And was his car parked on the side of

21    the street where the restaurant was?

22        A       It was on the opposite side of the

1   walk back towards him?

2          MS. BUIE:  No, he told me to come

3   here.

4          BY MR. JACKSON:

5      Q      And did you come here?

6      A      Yes, I did.

7      Q      Okay.  And tell me about the

8   conversation once you came back to the car.

9      A      He told me to stop playing with him.

10  And he told me how would that look if I didn't

11  bring you back home?  And I didn't answer.  I

12  didn't open my mouth one time until we got to the

13  parking garage.

14     Q      Okay.  So did he tell you to get in

15  the car?

16     A      Yes, he did.

17     Q      And so if he -- was it your

18  understanding when he said to you, "What would it

19  look like if I didn't bring you back home?"  Was

20  it your understanding that he was going to drive

21  you home at that point?

22     A      To -- from when we left the

1    restaurant?  I'm confused.

2         Q    Well, when he said -- I thought you

3    said that he said, "Come here."

4         A    Yes, he did say that.

5         Q    And you walked back towards the car.

6         A    Yes, I did.

7         Q    And he said to you, "How would it look

8    if I did not drive you home?"  Right?

9         A    Yes.

10        Q    At that point, was it your

11   understanding that he was going to drive you

12   home?

13        A    Yes, it was my understanding he was

14   going to drive me home.

15        Q    Okay.  So once you got in the car and

16   he started to drive, at what point did you

17   realize that he was not driving towards your

18   home?

19        A    When we made the right turn from the

20   Third Street Tunnel.

21        Q    Okay.  And that left turn put you

22   where?

1        A    It put me right there by the

2  courthouse.

3        Q    Okay.

4        A    On the side of the courthouse.

5        Q    And at that point, did you say

6  anything to Pastor Best?

7        A    Yes, I did.

8        Q    What did you say?

9        A    I said I have to go home.  I have to

10  get home.  And he said I have work to finish up.

11  I won't take long.

12        Q    And he drove you -- the police

13  headquarters is right here, correct?

14        A    Correct.

15        Q    Okay.  And you know that there's the

16  metro station right in front of this building,

17  correct?

18        A    At that time, I didn't know that.

19        Q    You didn't know that?

20        A    No, I did not.

21        Q    You weren't familiar with this area?

22        A    No, I was not.  To this day, I'm still

1    not familiar with this area.

2         Q    So then what happened, after he comes

3    out of the Third Street Tunnel?  Tell me about

4    that.

5         A    We make a right turn and he stopped

6    for a minute.  And I was curious as to why he

7    stopped.  And he to pull out his badge to gain

8    access to go down into the police garage.  And a

9    black gentleman -- he was a security guard, gave

10   him access to let him down.  And while we were

11   driving down in the police garage, he pointed out

12   Chief Lanier's car.  And I noticed now, this just

13   has turned wrong.  Because now I'm not even where

14   civilians are supposed to go.  When we get into

15   the garage.  I asked him to sit in the car.  And

16   he tells me, "No.  Chief Lanier's in here.  You

17   can't sit down here."

18        Q    Okay.  And so you have get out and go

19   into the building.

20        A    Yes, we did.

21        Q    Okay.  And you -- when you get out of

22   the car, you have to walk to an elevator?

214

1          A      We had to walk inside the building.

2          Q      Right.

3          A      After walking inside the two metal

4     doors, there was an elevator right there.

5          Q      Okay.  During that walk, did you see

6     any other police officers?

7          A      No.  I did see housekeeping -- a

8     Hispanic housekeeper.

9          Q      But no police officers?

10         A      No police officer.

11         Q      And so then you went up what floor, do

12    you remember?

13         A      No, I do not remember.  But when I --

14    I didn't remember that day but when the

15    detectives had took me to do the walkthrough to

16    ask where I was at, it was the fifth floor that

17    he took me to.

18         Q      Okay.

19         A      And he had to gain access to even get

20    on the elevator.

21         Q      And when you got to the fifth floor,

22    did you see any police officers there?

1        A    No police officers but I did pass

2    Chief Lanier's office where the door was ajar and

3    he told me to keep it down because I started to

4    ask questions, where am I?

5        Q    Did you see any police officers on the

6    fifth floor?

7        A    No.

8        Q    Did you hear any police officers --

9        A    No.

10       Q    -- anybody on the fifth floor?

11       A    No.

12            MS. BUIE:  Can I go to the restroom?

13            MR. JACKSON:  Sure.  We'll take a five

14   minute break.

15            (Whereupon, the foregoing matter went

16   off the record at 3:29 p.m. and went back on the

17   record at 3:38 p.m.)

18            MR. JACKSON:  Are we ready?

19            MS. BUIE:  Yes.

20            BY MR. JACKSON:

21       Q    Okay.  Back on the record.  So when

22   you got to the fifth floor, you passed Chief

1       Lanier's office.  Is that correct?

2           A       Correct.

3           Q       And you did not see the chief or any

4       other police officer?

5           A       No, but it was -- the lights were on

6       and the door was open.

7           Q       Right.  But you didn't hear any voices

8       coming from that office?

9           A       No.

10          Q       Okay.  Tell me what happened next.

11          A       We walked to his office and he had

12      opened the door.

13          Q       Did he need a key to open the door or

14      was it just open if you recall?

15          A       No, it was not just opened.  He did

16      need it to open the door.  And he opened it with

17      a key.  And --

18          Q       Who walked in first, you or him?

19          A       He walked in first.

20          Q       Okay.  And tell me to the best that

21      you can recall, what happened next?

22          A       He went directly to his desk.  And I

1          Q      -- if he sat down?

2          A      Yes.

3          Q      I see.

4          A      That side by the door.  It was -- that

5    was the door.  That was the Xerox machine and

6    this was the desk.

7          Q      Okay.

8          A      And there was not a chair there.

9          Q      There was not a chair where?

10         A      Right beside the desk.

11         Q      Do you see that couch there?

12         A      That couch was there.

13         Q      Was that -- is that the position where

14   the couch was?

15         A      Yes, it was.

16         Q      Okay.  And there's several pictures on

17   the wall.  Do you see that?

18         A      Yes.

19         Q      Do you recall those pictures being

20   there?

21         A      Yes.

22         Q      If you would turn to the second

1      A      What --

2      Q      In terms -- when you arrived at

3  Georgia Brown?

4      A      Somewhere around 6:00.

5      Q      Okay, later then.  At 6:00 and you

6  were there for about an hour?

7      A      Correct.

8      Q      And so you left there somewhere around

9  7:00.  Is that correct?

10      A      Correct.

11      Q      Okay.  And then the drive from Georgia

12  Brown to police headquarters.  By the time you

13  walked out of Georgia Brown, how much time was

14  that?  About 15 minutes elapsed?

15      A      When?

16      Q      By the time you walked out of Georgia

17  Brown's until the time you actually reached

18  police headquarters.

19      A      Correct.

20      Q      About 15 minutes?

21      A      (inaudible response)

22      Q      Okay.  So you would have arrived in

1    anything like how did dinner go or you know, or

2    how were you doing?  Did she say anything that

3    would indicate that she knew that he had dinner

4    with you that night?

5        A    No, she didn't.  And Keisha actually

6    started acting strange.

7        Q    That night?

8        A    No, I didn't speak to her that night.

9    The next time I saw her.

10        Q    Right, okay.  Well let's -- we'll get

11    to that later.  I just want to stick to this

12    particular night and the phone call.  So other

13    than him telling her that he was working and she

14    said okay, that was the extent of the

15    conversation?

16        A    Yes.

17        Q    What happened after that?

18        A    He hung up the phone and he stayed at

19    the desk for just a little while longer.  And he

20    had made his way to me.

21        Q    He had made his --

22        A    Way -- He had walked from the desk to

1    me.

2         Q    Okay.

3         A    And -- Can you give me a minute?  I'm

4    sorry.

5         Q    Well let me ask you this and let me

6    try to make it a little bit easier.  He never

7    forced you to remove your clothes, is that

8    correct?

9         A    He touched my clothes.

10        Q    Right but my question is, he never

11   forced you to remove your clothes.  Is that

12   correct?

13        A    Correct.

14        Q    Okay.  And he touched you through your

15   clothes.

16        A    No, he opened my shirt.  He came to me

17   and opened my shirt.

18        Q    Okay.  Did he -- what kind of a shirt

19   were you wearing?

20        A    I had a button-up jean shirt on.

21        Q    A button-up jean shirt, okay.  And

22   when it was buttoned, was it buttoned from the

1    neck down or from the second button down?

2          A     From the second button down.

3          Q     Okay.  How many buttons did he open?

4          A     He opened the cleavage part of my

5    shirt.

6          Q     And can you describe to me what you're

7    doing as he is doing this?

8          A     I'm closing my shirt back up while

9    he's trying to unbutton it.  But his grip is so

10   strong that he just smashed his head into my

11   breasts.

12         Q     How tall are you?

13         A     I'm 5'8".

14         Q     All right.  How tall is Best?

15         A     I don't know.

16         Q     Is he shorter than you?

17         A     He's about the same height as me.

18         Q     Is that the first thing that he did

19   was unbutton your blouse?

20         A     Yes.

21         Q     And he got it to the button that would

22   show your cleavage.

1          A       Right.

2          Q       What happened next?

3          A       He pulled my bra.

4          Q       He pulled it up?

5          A       No, he just pulled my bra.

6          Q       Oh, he just pulled it?

7          A       Yes.

8          Q       And did that cause you breasts to be

9     exposed?

10         A       Yes.

11         Q       What happened -- one or both?

12         A       One.

13         Q       Okay.  And what happened next?

14         A       He stuck his head inside my breasts.

15    And I was pushing his head but he had his head

16    snug in my chest so that the force of his head

17    wouldn't let up.

18         Q       And how long did this last?

19         A       For about a minute.

20         Q       And what happened -- did you say

21    anything to him?

22         A       Stop.  Please stop.

231

1          Q     Did he say anything to you?

2          A     Why are you acting like a little girl?

3          Q     Let me know when you're ready to

4     continue.

5          A     I am.

6          Q     And so what happened next?

7          A     I told him I am a little girl.  And I

8     had got up.  I had got up from the couch I was

9     sitting on and I had went to the chair.  And it

10    was like we were playing couch -- like we were

11    getting back up and going to the couch from the

12    chair because he would follow me.  And --

13         Q     Okay.  So just so I'm clear, so when

14    he unbuttoned your blouse, you were sitting on

15    the couch.

16         A     Correct.

17         Q     And then he came and sat next to you.

18         A     Correct.

19         Q     Okay.  And then you got up and you

20    moved to the chair?

21         A     The chair near that door.

22         Q     And what did he do?

1          A     He went to go turn off the lights.

2     And he came and turned off -- he went to turn off

3     the lights.  Then he came back to the chair I was

4     sitting in.  And he started to touch my -- he

5     started to touch my shoulder and I moved from

6     that chair back to the couch.

7          Q     So at this time, had you rebuttoned

8     your blouse?

9          A     Yes.

10          Q     Okay.  And you had straightened your

11     bra.

12          A     Yes, I did.

13          Q     And so was he in front of you or

14     behind you when he started to touch your

15     shoulder?

16          A     He was on the side of me.

17          Q     On the side of you.  Left side or

18     right side?

19          A     I don't remember which side it was.

20          Q     What happened next?

21          A     I had got up and I went to the couch

22     again and he had followed me.  And told me he

1  wasn't going to play.  Stop playing and stop

2  acting like a little girl.  He kept repeating

3  that.

4      Q    When you went to the couch, did you

5  sit down on the couch again or you just walked

6  towards the couch?

7      A    No, I sat down on the edge of the

8  couch.  And he had told me he loved me and he was

9  making comments -- just the little girl comments

10  again.  And I told him, I'm not grown.

11      Q    And then what happened?

12      A    He had pulled out his penis.

13      Q    Was he standing in front of you or was

14  he sitting on the couch?

15      A    No, he was sitting on the couch.

16      Q    How far away was he from you?

17      A    He was not far from me.  He was just

18  sitting next to me.  And as he -- as he took out

19  his penis, he had took his gun out of his holster

20  and placed it on the table.

21      Q    Had you ever saw Pastor Best without

22  his uniform on?

1   I know that he was in -- I got your question.  I

2   told you that he had left out the church directly

3   after service in full police uniform.

4         Q    Right, okay.  So my question is when

5   he was in the church, before he left that church,

6   do you know if he was supposed to be acting as a

7   police officer?  Do you know if he was on -- do

8   you understand when I asked if he was on duty?

9   Not how he was dressed.  Was he preaching at a

10  time that he should have been working?

11        A    Yes.  And he did mention that to my

12  mother one time that he was doing -- his overtime

13  was patrolling at the church.  That was his

14  overtime.

15        Q    Other than the time that you said that

16  he left the church right after service in his

17  full uniform, did you ever see him on other

18  occasions in his full uniform?

19        A    During bible study.

20        Q    In his house?

21        A    And when he came to the church.

22        Q    Okay.  How often did that happen?

1           A      It was every Tuesday we had bible

2     study.

3           Q      Okay.  So getting back to what was

4     going on at police headquarters, I think we

5     stopped at the part where he has exposed himself

6     to you.

7           A      Correct.

8           Q      What happened next?

9           A      He had exposed himself.  Placed his

10    gun on the table near me, in front of me.  And he

11    has asked me to touch it -- to touch his penis.

12    And I told him no.

13          Q      How far away from you was he?

14          A      He was directly next to me.

15          Q      Okay.  So did he have to get up from

16    the couch to put his gun on the desk and then he

17    walked back towards you?

18          A      It was the coffee table in front of

19    us.

20          Q      Oh, so he put it on the coffee table.

21          A      Correct.

22          Q      So did he ever stand up from the couch

1    at that point?

2            A       No, he leaned up.

3            Q       And you told him no.

4            A       Correct.

5            Q       And what happened next?

6            A       He told me to stop acting scared.   And

7    he wanted some.   Darrell Best got on top of me

8    and Darrell Best was humping me so hard trying to

9    -- he was trying to force his penis into my

10   pants.   But I would not -- my pants wouldn't go

11   down.

12           Q       Were your pants opened?

13           A       My pants -- he did unfasten my pants

14   but I was pulling them up so he could not get my

15   pants down.

16           Q       Okay.   And so your pants fastened how?

17           A       They were up here.

18           Q       Okay.

19           A       They were high-waisted -- they were

20   American Apparel pants so they were riding pants.

21           Q       So there's buttons and a zipper?

22           A       Yes.

1      Q      And did he unbutton that button?

2      A      Yes.

3      Q      And he zipped his pants down?

4      A      Yes.

5      Q      And then did he lower his pants?

6      A      No, he did not.

7      Q      Okay.  And then what happened?

8      A      And I made it from under him because

9   his force was on top of me.  I put my pants on

10   and I told him, we're leaving.  Come on.  I'm

11   ready to go now.

12      Q      Okay.  And is there a reason why you

13   didn't say that to him earlier?

14      A      It was not -- I didn't say that to him

15   earlier because I told him I was ready to go.  I

16   told him I had intentions that he was taking me

17   straight home, not to police headquarters.

18      Q      Okay.  So let me rephrase.  I

19   understand that.  But when he came over and he

20   started to unbutton your blouse, is there a

21   reason why you didn't say to him at that point,

22   take me home now?

1        A      I was shoving his head away.  And the

2    reason I said take me home now was because I was

3    going to be loud.  I didn't know why, but he told

4    me to keep my voice down.  And he could hear it

5    in my voice that I was ready to go.  And he said,

6    come on.  He did tell me to button up my shirt

7    more than it was buttoned because he didn't want

8    anybody thinking anything.

9        Q      At that point in your life, had you

10   been sexually active?

11       A      Yes, I was sexually active.

12       Q      And that would have been with your

13   boyfriend.

14       A      He wasn't my boyfriend.

15       Q      Your male friend.

16       A      Correct.

17       Q      Okay.  And for how many years had you

18   been sexually active?

19       A      I had, had sex, to make that clear.

20   I wasn't sexually active.  I had, had sex.

21       Q      Okay.  Had you only had -- Let me

22   rephrase it.  How many sexual partners had you

1       had at that point in your life?

2               A       One.

3               Q       Are you still friends with that

4       individual?

5               A       The guy that I had sex with?

6               Q       Yes.

7               A       Yes.

8               Q       Are the two -- did the two of you

9       date?

10              A       No.

11              Q       Still friends?  Best friends?

12              A       We're mutual.  If I see him, it's not

13      a bad -- it's not nothing bad.

14              Q       So you said to Darrell Best, "Take me

15      home now."

16              A       Yes.

17              Q       And what did he say?

18              A       He said, "Okay."  And he told me that

19      no one better find out about this.

20              Q       Other than saying that, did he say or

21      do anything else about telling you or indicating

22      that nobody else better find out about this?

1          A     I seen him look at his gun when he
2     said it.
3          Q     And did you respond to him?
4          A     I said, "Okay."
5          Q     So after you said to him, "I'm ready
6     to go now," what happened next?
7          A     I said, "Come on" and he said what he
8     told me.  "Nobody better find out about this,"
9     while looking at his gun.  And I told him,
10    "Okay."
11         Q     And after that, did you leave the
12    office?
13         A     We did leave the office.
14         Q     As you left the office, did you see
15    any police officers around?
16         A     No, I did not.
17         Q     Did you hear any voices?
18         A     I did hear voices coming from Chief
19    Lanier's office.
20         Q     At that point?
21         A     At that point when we was leaving.
22    Then we got on the elevator and he used the card

1          Q     Okay.  Did you ask him where he was

2     going?

3          A     No.

4          Q     Did you ask him if he was working?

5          A     No.

6          Q     Okay.

7          A     That's like me saying a police officer

8     in full uniform exiting -- leaving out of a

9     store, asking are you going to work?  I would

10    think they're at work.

11         Q     You indicated that Pastor Best told

12    you that his overtime work was to patrol the

13    church.  Let me make sure I have this right.  You

14    indicated that Pastor Best told your mother that

15    his overtime work included patrolling the church,

16    correct?

17         A     Correct.

18         Q     Okay.  Did you ever have a

19    conversation with Pastor Best about his overtime

20    work?

21         A     No, I did not.

22         Q     So when you would see him in his full

1      Q     Or did somebody choose that for you?

2      A     That was given to me.  That was given

3  to my mom, actually, and she told me about it.

4      Q     By the court?

5      A     Correct.

6      Q     Had you ever heard of The Wendt Center

7  prior to you going there?

8      A     I heard of The Wendt Center.  I didn't

9  know what The Wendt Center was, but I did know it

10  was funded through the Government.

11      Q     Did you know what kind of counseling

12  they did?

13      A     No.

14      Q     Did you ever know anybody that went to

15  The Wendt Center?

16      A     No.

17      Q     So, you were telling me that your

18  sleep habits changed.

19      A     Correct.

20      Q     What else changed?

21      A     I gained a lot of weight.  And I

22  gained the weight because I didn't want to look

269

1      like that old me.

2           Q      Okay.  So how much did you weigh prior

3      to the incident?

4           A      I weighed 160 pounds.

5           Q      How much do you weigh now?

6           A      I weigh 230 pounds.

7           Q      And that additional weight, you're

8      attributing to what happened?

9           A      Correct.

10          Q      So can you explain how it is that you

11     gained the weight?

12          A      By just eating.

13          Q      And -- just eating?

14          A      Eating every day, all day.  The reason

15     I gained weight was because he had a certain

16     type.  He --

17          Q      And when you say he, just for the

18     record --

19          A      Darrell Best.

20          Q      Okay.

21          A      Officer Best, yes.  He liked smaller

22     girls.  And I did not want to look small anymore.

1    I did not want to look -- I didn't want to fit

2    what he liked. I wanted to gain weight, so that

3    he would not be interested in what I looked like,

4    because he did convey to me that Terry was a

5    member of the church, and her kids was fat.

6        Q    Who's Terry?

7        A    She was a member of the church, and

8    she had two kids that went there. But they were

9    overweight.

10        Q    When did he tell you this?

11        A    He told me that -- I don't know what

12    time it was, but he did tell me, that was the day

13    of the third, he did tell me that he would never

14    talk to Terry's kids.

15        Q    How old were Terry's kids?

16        A    Terry's kids were fat.

17        Q    How old were they?

18        A    Oh, they were younger than me. They

19    were about 15.

20        Q    Were they female or male?

21        A    Female.

22        Q    Okay. So, he told you this the day of

1    the incident?

2         A    He did tell me this.

3         Q    Where were you when he told you this?

4         A    This was on the ride back.  I was not

5    talking, but he told me -- he was making jokes

6    about Terry's kids.

7         Q    And you're saying, on the ride back

8    from police headquarters?

9         A    Correct.

10        Q    Okay.  And so what did he tell you

11   about the weight of the people that he liked?

12        A    He would never look at they fat ass.

13   And now that I knew that he disliked fat girls, I

14   tried to turn into a fat girl.

15        Q    So what would you eat?

16        A    Everything that was not healthy.

17   Everything.

18        Q    Like what?

19        A    Cookies, ice cream, soda.  I would eat

20   more times a day.  I would eat huge proportions

21   of food.  I would sit in my room and eat.  I

22   would do everything.  I sat in my room.

1       Q    So, help me understand, when you said

2  you would just eat everything.  So, let's take a

3  meal, for example.  The family sits down.  Does

4  your family generally sit down together to eat?

5       A    No.  No.

6       Q    No?  Your mother cooked regularly?

7       A    She did not cook regularly, but we did

8  have snacks in the home.

9       Q    Okay.

10      A    I did know how to cook.

11      Q    So, if you cooked yourself dinner,

12  what would you cook?

13      A    I wasn't cooking dinner.

14      Q    Okay.  So tell me the fattening foods

15  that you'd eat.

16      A    I ate out mostly every day.

17      Q    Okay.  What did you eat, when you ate

18  out?

19      A    Chipotle, Syracuse, Chick-Fil-A,

20  McDonald's, Burger King, Chick Checkers.  We went

21  out to eat, Outback, Friday's, Pizza Hut,

22  Dominos, everything.

1      Q     And who were these people that you'd

2  be going out to eat with?

3      A     My mother.  But sometimes my mother

4  would bring us food back, if it was the fast food

5  places.

6      Q     Okay.  And the snacks that you were

7  eating, these snacks that were in the house?

8      A     Correct.

9      Q     And what snacks were those?

10      A     Deli Cakes, Chips Ahoy, cereal, eggs

11  and bacon at night.  My eating habits were off.

12      Q     Okay.  And did this start right after

13  the incident?

14      A     It did.

15      Q     Did you mother ever ask you why you

16  were eating so much?

17      A     Yes, she did.

18      Q     And what did you tell her?

19      A     Because I wanted to.

20      Q     Did she ever express to you concerns

21  that she saw this change in your behavior?

22      A     She did.

1    Q    And what would she say?

2    A    Why are you eating so much?  And,

3   you're gaining a lot of weight.  And you're not

4   going to be that size forever.  And you need to

5   slow down eating.

6            I didn't care.  I didn't care.

7    Q    And you would go in your room and eat?

8    A    Yes, I did.

9    Q    Other than eating, how else did your

10  life change?

11   A    My family.

12   Q    In what way?

13   A    My dad was no longer in the house.

14   Q    So, can you tell me why your dad left

15  the house?

16   A    Because him and my mother -- I don't

17  know exactly why, but -- I don't know every day

18  what the argument was, but it stemmed from this

19  event, December 3rd.  Yes, it did.

20   Q    But your family didn't find out until

21  sometime in March, correct?

22   A    Correct.  That's when I came out.

1      Q     So, before the disclosure was made in

2    March, did you father ever ask you why you were

3    eating so much?

4      A     No.

5      Q     So, when this incident comes out, your

6    father and mother, then have a breakdown in their

7    relationship?

8      A     Yes, they did.  It caused my family to

9    split up.  My sisters, my sister, acting out, my

10   sisters acting out.  We no longer had a father

11   figure.

12     Q     And when you say, are you talking

13   mainly about your older sister?

14     A     My younger and my older.

15     Q     Okay.  So, can you just give me a

16   sense, let's talk about the disclosure that was

17   made about what happened to you.  Can you just

18   tell me what's going on in your household?  Are

19   your parents arguing?

20     A     That day that the news came out?

21     Q     Yes.  What's the substance of the

22   argument?  The reason why I'm asking is because

1    I'm trying to understand why your father would

2    have left the home.

3         A     It was a lot of yelling.  At this

4    point, my father felt betrayed.  He felt

5    betrayed.

6         Q     By who?

7         A     Darrell Best, my mother, because he

8    didn't have any other -- he didn't know that this

9    was happening.  And it was a lot of blaming.  It

10   was a lot of blaming going on.

11              My father blamed my mother a lot, and

12   I just felt as though my mother couldn't deal

13   with that.  It was, arguing every day.  They

14   argued every day.

15        Q     And were these loud arguments?

16        A     Yes, they were loud arguments.

17        Q     And did they go on for a while?

18        A     They did go on for a while.

19        Q     And did your mother ask your father to

20   leave the house?

21        A     Yes, she did.

22        Q     And so when your father found out

1    about what had happened.

2         Q    Has the family ever been recommended

3    for family counseling?

4         A    No.

5         Q    No?  So, how are you sleeping now?

6         A    It's still not regular.  I don't have

7    normal sleeping hours.

8         Q    Is it getting better?

9         A    It's not -- I don't -- I don't see it

10   getting better.  I don't see it has gotten

11   better.

12        Q    Okay.  So what time would you normally

13   go to bed?

14        A    I used to go to bed around 10:00 or

15   11:00.

16        Q    And what time do you go to bed now?

17        A    Maybe 3:00 or 4:00.

18        Q    What time do you go to work?

19        A    This is ending -- I work overnight,

20   and that's just on Sundays, Tuesdays, Thursdays,

21   and Fridays.

22        Q    And so what are your working hours?

1         A      12:00 to 8:00.

2         Q      12:00 midnight to 8:00 in the morning?

3         A      Correct.  But when I'm off on that

4    Tuesday night, I don't sleep.  I don't sleep.

5         Q      Now that you're going to have a full-

6    time and a part-time job, how are you going to --

7    what are going to be your sleeping hours?

8         A      My sleeping hours, I don't know if

9    tomorrow, when I take the job, I don't know what

10   the possibility may be.  I can't tell you my

11   sleeping hours, because I don't know what my work

12   hours would be.  I haven't made that up yet.

13        Q      So how else has this incident affected

14   you?

15        A      My anger is -- I've never been -- I've

16   never been like this, ever.

17        Q      Okay.  Tell me about your anger.

18        A      I'm very defensive.  I'm very, very

19   rude.  I used to be social.  I used to like

20   talking to people.  Now, I'm really -- I get

21   irritable a lot.

22        Q      Okay.  So when you say rude, who are

1  you rude to?

2      A     To whoever.

3      Q     To your mother?

4      A     Yes.

5      Q     In what way?  What do you call being

6  rude?  I just want to understand what you mean by

7  rude.

8      A     Talking back.  Saying what I want to

9  say.  Having no regard for no one's feelings.  I

10  was never like that.  I was never like that.  The

11  defensiveness.  Just being arrested.  I've never

12  been arrested in my life.  I've never been

13  arrested in my life.  And that was very life-

14  changing for me.

15           Me and my sister would get -- we would

16  argue, but I've never fought my sister.

17      Q     And now that you've had some time to

18  think about it, do you recall what the argument

19  was with your sister?

20      A     No, I don't.  I still don't know.

21      Q     Other than the fight that you had with

22  your sister, have you had fights with other

1    people --

2          A    Yes.

3          Q    -- physically?

4          A    No, not physically, but words that

5    could have turned physically, driving.  I do seem

6    to get upset a lot, and pull over, and get out of

7    my car, and say, well, you know what -- just

8    things I know I would have never done.

9          Q    Do you drive?

10         A    I do drive.

11         Q    You have a driver's license?

12         A    Yes, I do.

13         Q    Okay.  And so you -- would you

14    describe the anger you get while you're driving

15    as road rage?

16         A    I would say that.

17         Q    You would say that?

18         A    Yes.

19         Q    So describe to me what you would be

20    like, or what you would do, when you're angry

21    about somebody when you're driving.

22         A    If, for example, because it just

1    happened, someone tried to cut in front of me,

2    and it was so much traffic, and I had to get to

3    where I was going, and the lady put her hand out

4    the window, and that wasn't okay with me.

5        Q    What do you mean, put her hand out of

6    the window?

7        A    She tried to wave like, oh, I'm sorry

8    that I was getting over.  And to me, it's like,

9    I've got to prove that, you know what, you're not

10   putting this one over on me.  So I drove around,

11   around her car, and I got back in front of her,

12   and she was talking out of her car, and you know,

13   I told her, she could get out of her car.

14           I'm just very aggressive.  And I've

15   never been like this.

16       Q    So do you -- if you know the source of

17   it, is there a reason why you can't control it?

18       A    I don't even understand what you're

19   asking me.

20       Q    Well, if you know that the reason why

21   you get angry is because of what happened to you,

22   some people just don't know what makes them

1   angry.  You seem to know what makes you angry.

2          My question is, if you know what makes

3   you angry, is there a reason why you can't

4   control it?

5          MR. SMITH:  Objection.  No

6   psychologist in the room.

7          BY MR. JACKSON:

8   Q     I'm sorry, what was your answer?  He

9   makes the objection for the record, but you can

10  still answer.

11  A     What was your question?  I forgot.

12  Q     My question was, if you know the

13  source of where your anger comes from, is there a

14  reason why you can't control it?

15         Is that a no, or a --

16  A     Because I don't understand the

17  question, I'm sorry.

18  Q     Okay.  Let's talk about the use of

19  alcohol.  Prior to the incident, were you

20  drinking?

21  A     No, I was not.

22  Q     Not at all?

# EXHIBIT 2

P.D. 77 Rev. 08/88

Metropolitan Police Department • Washington, D.C.

| Revocation/Restoration of Police Powers and Notice of Duty and Pay Status | Type of Report<br>☐ Original<br>☒ Supplemental | Complaint No. (if applicable)<br>DRD 526-08 |
|---|---|---|

| TO: | Member's Full Name<br>Best, Darrell | Member's Rank<br>Officer | Element<br>4D | Date of Appointment<br>2-2-87 |
|---|---|---|---|---|

| Previous ◇<br>Military Service | A. Beginning Date | B.Ending Date | Branch of Service | Selective Service No. |
|---|---|---|---|---|

## PART I   Notice of Revocation

| 1. Date Revoked ◇ 10-31-08<br>2. Time Revoked ◇ 1745 | You are hereby notified that, as of the date and time indicated, your police powers are revoked. You have no authority to perform duties requiring the exercise of such powers, nor do you have the authority to carry a service weapon (any department-issued firearm, authorized off-duty revolver, aerosol chemical dispenser, baton, blackjack, and teargas in any form, that is carried or kept readily available) subject to rules and regulations of the department. |
|---|---|

**3. Duty Status** The affected member shall be placed in the duty and pay status indicated below. The member shall date and initial the appropriate blocks opposite the duty and pay status. (See instructions and definitions on reverse side)

| ☒ | Status | Date | Init. | ☒ | Status | Date | Init. | ☒ | Status | Date | Init. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Administrative Leave With Pay | | | | Non-Contact Office Duty | | | | Explain the status entered above. Use reverse side if necessary.<br><br>IS# 09-004561<br>DRD#232-09 | | |
| | Suspension Without Pay | | | | Limited Duty | | | | | | |
| | Sick Leave (Exceeding thirty [30] consecutive days. | | | | LWOP (Exceeding [30] consecutive days requires approval by Adm. Serv. Officer.) | | | | | | |

**4. Member's Acknowledgement**

I understand that, because of this revocation of my police powers, I have no duty or authority to make an arrest or perform duties requiring the exercise of police powers and that my authority to carry a service weapon (as defined in Part I above) is revoked.

I understand that, if I am placed on Administrative Leave With Pay or Extended Sick Leave, I am required to remain at my residence of record between business hours (0800 to 1600), Monday through Friday, excluding holidays. Before leaving my residence for any period of time during the above hours, I am required to contact an official of my organizational element and provide him/her with an address of the location(s) to which I am going, the telephone number, and any other information that would allow communication with me. Furthermore, I understand that, I may not leave the Washington Metropolitan Area (defined in this notice as any point extending a 25-mile radius from the U.S. Capitol Building) while on Administrative Leave or Extended Sick Leave unless I submit a PD Form 358 and am granted permission by the Administrative Services Officer.

I understand that, if I am placed in a non-pay status and there are any cases pending before the courts as a result of my performance of duty, I have a responsibility as a witness until such cases are adjudicated.

I also understand that, effective this date, my privilege to engage in outside employment is revoked.

Finally, I understand that, I am subject to all other rules and regulations of the department.

| | Member's Signature ◇ |
|---|---|

| Signature of Official Serving Notice | Date Served | Witness' Signature | Member's Unit Notified (Official's Name/Date) |
|---|---|---|---|

**5. Equipment To Be Surrendered by Member.**   NOTE: If your police powers are revoked for a period exceeding 30 days, report to Headquarters, Room 3130, between the hours of 0900 and 1400, (Mon. thru Thur.) to obtain a temporary identification card.

| ITEM | SERIAL/ITEM NO. | DATE SURRENDERED | SIGNATURE Official Receiving Item | SIGNATURE OF MEMBER | SIGNATURE OF WITNESS |
|---|---|---|---|---|---|
| ☐ Service Revolver | | | | | |
| ☐ __ Cap Plate(s) | | | | | |
| ☐ Badge | | | | | |
| ☐ ID Folder | | | | | |

## PART II   Notice of Restoration and Member's Acknowledgement

| You are hereby notified that, as of the date and time indicated, your police powers are restored. You now have the authority to perform dut es requiring the exercise of such powers and you have authority to carry a service weapon as required by existing rules and regulations of the department | Date Restored ◇ 10-1-09<br>Time Restored ◇ 1420 |
|---|---|

| Signature of Official Serving Notice Date Served Witness' Signature | Member's Unit Notified (Official's Name/Date) |
|---|---|

I understand that, because of the restoration of my police powers, I have the duty and authority to make an arrest or perform duties requiring the exercise of police powers and that my authority to carry a service weapon as required by existing rules and regulations of the department has been restored.    ◇ Member's Signature

**6. Equipment Returned to Member**
If your identification folder is returned to you when you are restored, turn in the temporary ID card to the Property Division.

| ITEM | SERIAL/ITEM NO. | DATE SURRENDERED | SIGNATURE Official Receiving Item | SIGNATURE OF MEMBER | SIGNATURE OF WITNESS |
|---|---|---|---|---|---|
| ☐ Service Revolver | | | | | |
| ☐ __ Cap Plate(s) | | | | | |
| ☐ Badge | | | | | |
| ☐ ID Folder | | | | | |

DISTRIBUTION: Original - Member's Unit Personnel Folder; Copy 1 - to Member; Copy 2 - Attach to Required Report; Copy 3 - Personnel Liaison Officer; Copy 4 - Labor Relations Division

DC 000980

P.D. 360 Rev. 9/85 METROPOLITAN POLICE DEPARTMENT - Washington, D.C. - REQUEST FOR TELETYPE MESSAGE

| 1. REQUEST FOR | 2. TYPE | 3. COMPLAINT NUMBER | 6. DATE OF REQUEST |
| --- | --- | --- | --- |
| ☐ LOCAL LOOKOUT<br>☐ INTERSTATE TT<br>☐ ADMINISTRATIVE TT<br>☐ DETAIL (See Reverse) | ☐ ORIGINAL<br>☐ EXPEDITE<br>☐ ADDITIONAL<br>☐ CANCEL<br>☐ CORRECTION<br>☐ REPEAT<br>☐ REPLY | | October 2, 2009 |

| 4. UNIT NUMBER | 7. REQUESTING ELEMENT |
| --- | --- |
| 727-4218 | EOCOP |

| 5. | 8. |
| --- | --- |
| ☐    NOT FOR THE PRESS | ☐    FLASH TT REQUESTED |

| 9. TO | |
| --- | --- |
| THE FORCE | |

| 10. NAME OF WANTED PERSON | 11. WANTED BY | 12. CHARGE |
| --- | --- | --- |
| | | |

| 13. COMPLAINANT=S NAME | 14. COMPLAINANT=S ADDRESS |
| --- | --- |
| | |

## 15. DESCRIPTION OF WANTED PERSON OR MESSAGE

**Effective Sunday, October 4, 2009,** the below personnel actions shall occur:

**Transfer**

**Officer Darrell Best,** transferred from Professional Development Bureau, Metropolitan Police Academy to Patrol Services and School Security Bureau, Fourth District
**Officer Tira Gibson,** transferred from Investigative Services Bureau, Forensic Science Services Division to Patrol Services and School Security Bureau, Fifth District

**Detail End**

**Officer Thomas Green III,** detail ends from Investigative Services Bureau, Youth Investigative Services Division  return to Patrol Services and School Security Bureau, Fourth District

**Please ensure that the affected members are appropriately notified and that their personnel folders are updated to reflect these changes.**

All managers are reminded to adhere to TT # 01-093-08, dated January 24, 2008, "Annual Performance Ratings for Sworn Members in the Performance Management System (PMS) for the Rank/Position of Civil Service Sergeant, Investigative Personnel and Officers" and are to submit their detailed or transferred member's special rating evaluations within 10 days of their change of assignment. Managers are also reminded to adhere to TT # 04-047-09, dated April 9, 2009, "SiTEL Procedures for Members Who are reassigned to a New Unit."

Page 1 of 1

| SENDER-BADGE-ORG. ELM. | AUTHORIZED BY-BADGE-ORG.ELM. | BUREAU HEAD APPROVAL |
| --- | --- | --- |
| | | Cathy L. Lanier<br>Chief of Police |

| COMMUNICATIONS DIVISION USE ONLY | |
| --- | --- |
| REMARKS | DATE AND TIME |
| | FILE |
| | TELETYPE NUMBER TT 10-004-09 |

| Distribution: | 1- Communications Division | 2- Element File Copy |
| --- | --- | --- |

DC 000561

Standard Form 50
Rev 3/06
District of Columbia Government

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Best,Darrell L | | | 05-21-2007 |

| **FIRST ACTION** | | | **SECOND ACTION** | | |
|---|---|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | NTE: | 6-A. Code | 6-B. Nature of Action | |
| 940 | Suspension Temporary SUS TEMP | | | | |
| 5-C. Code | 5-D. Legal Authority | | 6-C. Code | 6-D. Legal Authority | |
| 072 | Sec1603.2 Pt I DCPerRg Suspension | | | | |
| 5-E. Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| SERGEANT PD: 007992    Position:   00018592 | SERGEANT PD: 007992    Position:   00018592 |

| 8.Pay Plan | 9.Occ. CD | 10.Grd/Lvl | 11.Step/Rate | 12.Tot. Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. CD | 18.Grd/Lvl | 19.Step/Rate | 20.Tot. Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PS | 0000 | 04 | 5 | $79,807.00 | PA | PS | 0000 | 04 | 5 | $79,807.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $79,807.00 | $0 | $79,807.00 | $0 | $79,807.00 | $0 | $79,807.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| Metropolitan Police Department Operational Services Group ROC East Seventh Distict Seventh Distict 13021700 Washington DC USA | Metropolitan Police Department Operational Services Group ROC East Seventh Distict Seventh Distict 13021700 Washington DC USA |

**EMPLOYEE DATA**

| 23. Veterans Preference | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|
| 1 | 1-None    3-10 Point/Disability    5-10 Point/Other 2-5 Point    4-10 Point/Compensable    6-10 Point/Compensable/30% | | 1 | 0-None    2-Conditional 1-Permanent    3-Indefinite | | YES   X   NO |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
|---|---|---|---|---|
| C0 | Basic + Option C (4x) | 9 | Not Applicable | 0   Regular Rate |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|
| 5 | MPD Retirement 7% - With Med | 02-02-1987 | F   Full Time | |

**POSITION DATA**

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Union Code / Barg Unit |
|---|---|---|---|---|
| 1 | 1-Competitive Service 3-SES General 2-Excepted Service    4-SES Career Reserved | N   E-Exempt N-Nonexempt | | KAA / C3 |

| 38. Employee Class | 39. Other Benefits |
|---|---|
| Continuing - CA SOAR | FED : KAIFDH,CBUPLN |

| 40. EMPLID/RCD | 41.DRBCD | 42.DEPT ID | 43.Location ID | 44. Date Processed |
|---|---|---|---|---|
| 00018735  /   0 | | FA20000221 | LOCDC00162 | 05-31-2007 |

Address:

45. Remarks
- ACTION TAKEN IN ACCORDANCE WITH MEMO DATED 05-08-07, APPROVED BY THE CHIEF OF POLICE. THIRTY (30) WORKING DAY SUSPENSION NOT TO EXCEED 06-29-07. DDRO #636, IS #06-003803

| 46. Employing Department or Agency District Of Columbia Govt Metropolitan Police Department | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
| DCGFA | FA01 | 6/1/07 |

1 -    Employee Copy

CONFIDENTIAL

DC 000551

Standard Form 52
3/06
District of Columbia Government

# REQUEST FOR PERSONNEL ACTION

## PART A - Requesting Office   (Also complete Part B, Items 1,7-22,32,33,36 and 39)

| | 2. Request Number |
|---|---|
| Actions Requested<br>Return from Suspension/Furlough | |
| For Additional Information Call   (Name and Telephone Number) | 4. Proposed Eff. Date<br>06-30-2007 |

| Action Requested By   (Typed Name, Title, Signature, and Request Date) | 6. Action Authorized By   (Typed Name, Title, Signature, and Date) |
|---|---|
| Green,Diane D S      05-31-2007<br>HUMAN RESOURCES SPEC | |

## PART B - For Preparation of SF 50   (Use only codes in The Guide to Personnel Data Standards.  Show all dates in month-day-year order.)

| Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| West,Darrell L | | | 06-30-2007 |

| FIRST ACTION | | | SECOND ACTION | |
|---|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action         NTE: | | 6-A. Code | 6-B. Nature of Action |
| 292 | RTD | | | |
| 5-C. Code | 5-D. Legal Authority<br>Sec827 Pt I  DC Per Reg | | 6-C. Code | 6-D. Legal Authority |
| 069 | RTD/Return to Pay Status | | | |
| 5-E. Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority |

| FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | SERGEANT<br>PD: 007992              Position:    00018592 |

| Pay Plan | 9.Occ. CD | 10.Grd/Lvl | 11.Step/Rate | 12.Tot. Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. CD | 18.Grd/Lvl | 19.Step/Rate | 20.Tot. Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | PS | 0000 | 04 | 5 | $79,807.00 | PA |
| 2A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | | |
| | | | | | | $79,807.00 | $0 | $79,807.00 | $0 | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | Metropolitan Police Department<br>Operational Services Group<br>ROC East<br>Seventh District<br>Seventh District 13021700<br>Washington DC USA |

## EMPLOYEE DATA

| 23. Veterans Preference | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|
| 1-None     3-10 Point/Disability     5-10 Point/Other<br>2-5 Point     4-10 Point/Compensable     6-10 Point/Compensable/30% | | | 0-None     2-Conditional<br>1-Permanent     3-Indefinite | | | YES  X  NO |
| 1 | | | 28. Annuitant Indicator | | | 29. Pay Rate Determinant |
| 27. FEGLI | | | 9      Not Applicable | | | 0    Regular Rate |
| C0     Basic + Option C (4x) | | | | | | |
| 30. Retirement Plan | 31. Service Comp. Date (Leave) | | 32. Work Schedule | | | 33. Part-Time Hours Per Biweekly<br>Pay Period |
| 5   MPD Retirement 7%<br>-With Med | 02-02-1987 | | F     Full Time | | | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Union Code / Barg Unit |
|---|---|---|---|
| 1-Competitive Service 3-SES General<br>2-Excepted Service   4-SES Career Reserved | E-Exempt<br>N   N-Nonexempt | | KAA / C3 |
| 1 | | | |
| 38. Employee Class | 39. Other Benefits | | |
| Continuing - CA SOAR | FED : KAIFDH,CBUPLN | | |

| 40. EMPLID/RCD | 41.DRBCD | 42.DEPT ID | 43.Location ID | 44. Date Processed |
|---|---|---|---|---|
| 00018735  /  0 | | FA20000221 | LOCDC00162 | |
| 45. Edu. Lvl. | 46. Yr. Degr. Attd | 47. Acad. Discipl. | 48. Func. Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
| | | | 00 | N    1-USA 8-Other | I    Not Indic. | 8  Other |

## PART C - Reviews and Approvals         (Not to be used by requesting office.)

| Office/Function | Initials/Signature | Date | | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|---|
| | | | D. | | | |
| | | | E. | | | |
| | | | F. | | | |

| Approval: I certify that the information entered on this form is accurate and<br>the proposed action is in compliance with statutory and regulatory requirements. | Signature | Approval Date |
|---|---|---|

CONTINUED ON REVERSE SIDE                          OVER

CONFIDENTIAL

Name: Best,Darrell L          PAR Number:

## PART D - Remarks by Requesting Office

(Note to Supervisors: Do you know of additional or conflicting reasons for the employee's resignation/retirement?
If ""YES"", please state these facts on a separate sheet and attach to SF52).

☐ YES   ☐ NO

Recall from Suspension/Layoff

## PART E - Employee Resignation/Retirement

### Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.
This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code. Sections 301 abd 3301 authorize OPM and agencies to issue

regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.
The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have: (2) pay or other compensation due you; (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits.
   Please be specific and avoid generalizations.
   Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address | (Number, Street, City, State, ZIP Code) |
|---|---|---|---|---|
| | | | | |

## PART F - Remarks for SF 50

- RETURN TO DUTY FROM THIRTY (30) WORKING DAY SUSPENSION.

CONFIDENTIAL      DC 000522

Standard Form 50
Rev 3/06
District of Columbia Government

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle)  Best,Darrell L | 2. Social Security Number | 3. Date of Birth | 4. Effective Date  06-30-2007 |
|---|---|---|---|

| FIRST ACTION | | | SECOND ACTION | | |
|---|---|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action   NTE: | | 6-A. Code | 6-B. Nature of Action | |
| 292 | RTD | | | | |
| 5-C. Code  069 | 5-D. Legal Authority  Sec827 Pt I  DC Per Reg  RTD/Return to Pay Status | | 6-C. Code | 6-D. Legal Authority | |
| 5-E. Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number  SERGEANT  PD: 007992                    Position:   00018592 |
|---|---|

| 8.Pay Plan | 9.Occ. CD | 10.Grd/Lvl | 11.Step/Rate | 12.Tot. Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. CD | 18.Grd/Lvl | 19.Step/Rate | 20.Tot. Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | PS | 0000 | 04 | 5 | $79,807.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | $79,807.00 | $0 | $79,807.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization  Metropolitan Police Department  Operational Services Group  ROC East  Seventh District  Seventh District 13021700  Washington DC USA |
|---|---|

## EMPLOYEE DATA

| 23. Veterans Preference  1  1-None  3-10 Point/Disability  5-10 Point/Other  2-5 Point  4-10 Point/Compensable  6-10 Point/Compensable/30% | 24. Tenure  0-None  2-Conditional  1  1-Permanent  3-Indefinite | 25. Agency Use | 26. Veterans Preference for RIF  YES  X  NO |
|---|---|---|---|

| 27. FEGLI  C0   Basic + Option C (4x) | 28. Annuitant Indicator  9   Not Applicable | 29. Pay Rate Determinant  0   Regular Rate |
|---|---|---|

| 30. Retirement Plan  5   MPD Retirement 7%  -With Med | 31. Service Comp. Date (Leave)  02-02-1987 | 32. Work Schedule  F   Full Time | 33. Part-Time Hours Per Biweekly  Pay Period |
|---|---|---|---|

## POSITION DATA

| 34. Position Occupied  1-Competitive Service 3-SES General  1  2-Excepted Service  4-SES Career Reserved | 35. FLSA Category  E-Exempt  N  N-Nonexempt | 36. Appropriation Code | 37. Union Code / Barg Unit  KAA / C3 |
|---|---|---|---|

| 38. Employee Class  Continuing - CA SOAR | 39. Other Benefits  FED : KAIFDH,CBUPLN |
|---|---|

| 40. EMPLID/RCD  00018735  /  0 | 41.DRBCD | 42.DEPT ID  FA20000221 | 43.Location ID  LOCDC00162 | 44. Date Processed  05-31-2007 |
|---|---|---|---|---|

Address:

45. Remarks
- RETURN TO DUTY FROM THIRTY (30) WORKING DAY SUSPENSION.

| 46. Employing Department or Agency  District Of Columbia Govt  Metropolitan Police Department | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date  6/1/07 | |
| DCGFA | FA01 | | |

CONFIDENTIAL                    - 1 -          Employee Copy                    DC 000549

Standard Form 50
Rev 3/06

## NOTIFICATION OF PERSONNEL ACTION

District of Columbia Government

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Best, Darrell L | | | 03-16-2008 |

| **FIRST ACTION** | | | **SECOND ACTION** | | |
|---|---|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | NTE: | 6-A. Code | 6-B. Nature of Action | |
| 721 | Reassignment | | | | |
| 5-C. Code | 5-D. Legal Authority | | 6-C. Code | 6-D. Legal Authority | |
| 001 | Sec 1-608.01(a)(5)DC Code Probational or Perm Appt | | | | |
| 5-E. Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority | |

| 7. FROM: Position Title and Number | | | | 15. TO: Position Title and Number | | | |
|---|---|---|---|---|---|---|---|
| SERGEANT PD: 007952 | | Position: | 00018592 | SERGEANT PD: 007992 | | Position: | 00018592 |

| 8.Pay Plan | 9.Occ. CD | 10.Grd/Lvl | 11.Step/Rate | 12.Tot. Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. CD | 18.Grd/Lvl | 19.Step/Rate | 20.Tot. Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PS | 0000 | 04 | 5 | $83,797.00 | PA | PS | 0000 | 04 | 5 | $83,797.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $83,797.00 | $0 | $83,797.00 | $0 | $83,797.00 * | $0 | $83,797.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| Metropolitan Police Department Operational Services Group ROC East Seventh District Seventh District 13021700 Washington DC USA | Metropolitan Police Department Chief of Police Human Services Institute of Police Science Instit of Police Sci 13048500 Washington DC USA |

**EMPLOYEE DATA**

| 23. Veterans Preference | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF | |
|---|---|---|---|---|---|---|---|
| 1-None 3-10 Point/Disability 5-10 Point/Other | | | 0-None 2-Conditional | | | YES X | NO |
| 1 | 2-5 Point 4-10 Point/Compensable 6-10 Point/Compensable/30% | | 1-Permanent 3-Indefinite | | | | |
| 27. FEGLI | | | 28. Annuitant Indicator | | | 29. Pay Rate Determinant | |
| 9 | Ineligible for Life Ins Covg | | 9 | Not Applicable | | 0 | Regular Rate |
| 30. Retirement Plan | 31. Service Comp. Date (Leave) | | 32. Work Schedule | | | 33. Part-Time Hours Per Biweekly Pay Period | |
| 5 | MPD Retirement 7% -With Med | 02-02-1987 | F | Full Time | | | |

**POSITION DATA**

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Union Code / Barg Unit |
|---|---|---|---|---|
| 1-Competitive Service 3-SES General | | E-Exempt | | |
| 1 | 2-Excepted Service 4-SES Career Reserved | N N-Nonexempt | | KAA / C3 |

| 38. Employee Class | 39. Other Benefits | | |
|---|---|---|---|
| Continuing - CA SOAR | FED : KAIFDH | | |

| 40. EMPLID/RCD | 41.DRBCD | 42. DEPT ID | 43. Location ID | 44. Date Processed |
|---|---|---|---|---|
| 00018735 / 0 | | FA30000261 | LOCDC00015 | 04-28-2008 |

Address:

45. Remarks
- Action taken in accordance with sworn vacancy announcement number 08-22.

| 45a. Schedule Pay | 45b. Base Rate Diff Pay | 45c. Tech/Haz Pay | 45d. Basic Pay | 45e. Longevity Pay | 45f. Total Pay |
|---|---|---|---|---|---|
| $83,797.00 | $0 | $0 | $83,797.00 * | $3,447.00 | $87,244.00 |

45g. Public Safety Date
09-03-1989

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| District Of Columbia Govt Metropolitan Police Department | |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| DCGFA | | 5-5-08 |

- 1 -          Employee Copy

CONFIDENTIAL

DC 000547

 

Standard Form 50
Rev 3/06

## NOTIFICATION OF PERSONNEL ACTION

District of Columbia Government

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Best, Darrell L | | | 09-27-2009 |

### FIRST ACTION

| 5-A. Code | 5-B. Nature of Action | NTE: |
|---|---|---|
| 713 | Chg to Lower Grade 1)Em Req 2)RIF 3)classif | |
| 5-C. Code | 5-D. Legal Authority | |
| 075 | Sec.836 Pt I  DC PerReg Change to lower grade | |
| 5-E. Code | 5-F. Legal Authority | |

### SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| 6-C. Code | 6-D. Legal Authority |
| 6-E. Code | 6-F. Legal Authority |

| 14. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| SERGEANT PD: 007992          Position:   00018592 | OFFICER PD: 002964          Position:   00018592 |

| 8.Pay Plan | 9.Occ. CD | 10.Grd/Lvl | 11.Step/Rate | 12.Tot. Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. CD | 18.Grd/Lvl | 19.Step/Rate | 20.Tot. Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PS | 0000 | 04 | 6 | $92,387.00 | PA | PS | 0000 | 01 | 9 | $78,743.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $92,387.00 | $0 | $92,387.00 | $0 | $78,743.00 | $0 | $78,743.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| Metropolitan Police Department Chief of Police Human Services Institute of Police Science Instit of Police Sci 13048500 Washington DC USA | Metropolitan Police Department Chief of Police Human Services Institute of Police Science Instit of Police Sci 13048500 Washington DC USA |

### EMPLOYEE DATA

| 23. Veterans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1-None   3-10 Point/Disability   5-10 Point/Other 2-5 Point   4-10 Point/Compensable   6-10 Point/Compensable/30% | | 1 | 0-None   2-Conditional 1-Permanent   3-Indefinite | | YES  X  NO |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
|---|---|---|---|---|
| 9 | Ineligible for Life Ins Covg | 9 | Not Applicable | 0   Regular Rate |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 5 | MPD Retirement 7% - With Med | 02-02-1987 | F   Full Time | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Union Code / Barg Unit |
|---|---|---|---|
| 1 | Competitive | N | E-Exempt N-Nonexempt | | KAA / C3 |

| 38. Employee Class | 39. Other Benefits |
|---|---|
| Continuing - CA SOAR | FED : KAIFDH |

| 40. EMPLID/RCD | 41.DRBCD | 42.DEPT ID | 43.Location ID | 44. Date Processed |
|---|---|---|---|---|
| 00018735  /  0 | | FA30000261 | LOCDC00015 | |

Address:

45. Remarks
Approved demotion per COP memo dated 09/11/2009, DRD 232-09; IS 09-004561

| $74,994.00 | $3,749.00 | $0 | $78,743.00 * | $5,330.00 | $84,073.00 |
|---|---|---|---|---|---|

09-03-1989

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| District Of Columbia Govt Metropolitan Police Department | |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| DCGFA | LM | 10/27/09 |

**Employee Copy**

CONFIDENTIAL

DC 000545

# EXHIBIT 3

UN-938 Rev. 5/07

# METROPOLITAN POLICE DEPARTMENT

## Incident Summary Sheet



**IS Number:** *08003668*

**IAD Case Number:**

| | | |
|---|---|---|
| **Location of Incident:** *4665 Blue Plains Dr Washington District of Columbia 20032* | | |

| | | |
|---|---|---|
| **Type of Incident:** *EEO* | **Date of Incident:** 11/01/2007 | **Time of Incident:** 12:00:00 PM |
| **OPR Member Notified of Incident:** *3360 - Webster, Nicole D Sergeant* | **Date Notified:** 04/21/2008 | **Time Notified:** 12:00:00 PM |
| **Unit Official Notifying OPR:** *5924 - Cowan, Tiffani D Sergeant* | **Element:** Other/Outside Jurisdiction | **Phone Number:** |
| **MPD Member First Receiving Incident:** *5924 - Cowan, Tiffani D Sergeant* | **Date MPD was Made Aware of Incident:** 04/21/2008 | **Time MPD was Made Aware of Incident:** 10:00:00 AM |

| **Allegation(s):** *Sexual Harassment* | **FIT Member Notified About Use of Force?** | **Member(s) Arrested?** *No* | **Charge(s):** |
|---|---|---|---|

**SYNOPSIS:** *C-1 alleges that Sergeant Darrell Best touched her in an inappropriate manner.*

## Member: 5062 - Best, Darrell L

| **Rank:** *Sergeant* | **Element:** | **Unit:** *Metropolitan Police Academy* | **Badge Number:** *S0682* |
|---|---|---|---|
| **Race:** *Black/African American* | **Ethnicity:** *Unknown* | **Sex:** *Male* | |
| **Assignment:** *IPS Subordinate* | **Supervisor:** *4726 - Hutchinson, David F* | **Partner at Time of Incident:** | **Revoked?** *No* |

| **Allegation(s):** *Sexual Harassment* | **Member Arrested?** *No* **Charge(s):** | **Complainant(s):** *Confidential* |
|---|---|---|
| **UFIR Required:** | **Did Member Decline to Complete UFIR?** *No* | **Reverse-Garrity Issued?** |

## Complainant: *Confidential*

| | | |
|---|---|---|
| **Address:** *4665 Blue Plains Dr Washington District of Columbia 20032* | | |

| **Race:** *Black/African American* | **Ethnicity:** | **Sex:** *Female* | **Email Address:** |
|---|---|---|---|
| **Work:** *202 645-0055* | **Home:** | **Other:** | **Fax:** |

**Complainant Arrested?** *No*
**Charge(s):**

*INSTRUCTIONS:* On ALL Use of Force Incidents, direct the member to complete a Use of Force Incident Report (UFIR). Have the member FAX a copy of the UFIR to FIT **202-576-7514** prior to being relieved from duty. If the member does not want to fill out a UFIR, direct the notifying official to immediately contact a FIT official, who will approve or deny the issuance of Reverse-Garrity.

| **IS Created By:** *3360 - Webster, Nicole D* | **IS Created By Rank:** *Sgt* | **Date:** *08/06/2008* |
|---|---|---|

DC 001473

## METROPOLITAN POLICE DEPARTMENT
Internal Affairs Bureau
*Equal Employment Opportunity Compliance Branch*

## MEMORANDUM

TO:            Assistant Chief of Police
               Internal Affairs Bureau

THRU:          Diversity Manager
               Diversity and Equal Employment Opportunity Compliance Branch

THRU:          Lieutenant
               Internal Investigations Team III

DATE:          January 6, 2009

SUBJECT:       Final Report Concerning Sergeant Darrell Best, Police Academy
               (IS #08003668)

## CHRONOLOGICAL NARRATIVE SECTION

On Monday, April 28, 2008, Cadet Raynette Jones, Youth Investigations Branch, Cadet Program, filed a complaint with the Diversity and Equal Employment Opportunity Compliance Unit (EEO Office). Cadet Jones alleged that she had been sexually harassed and sexually assaulted, over a period of time, by Sergeant Darrell Best of the Police Academy. **(Attachment No. 1)**

Specifically, Cadet Jones described incidents of sexual harassment and sexual assaults that she was subjected to when Sergeant Best repeatedly requested oral and vaginal sex from her. Additionally, Cadet Jones indicated that Sergeant Best fondled her buttocks and breast, and kissed her neck on numerous occasions. As a remedy, Cadet Jones suggested that Sergeant Best be suspended and have no contact with her. **(Attachment No. 2)**

EEO Investigator Nicole Webster was assigned to investigate the allegations presented by Cadet Jones.

## MEMBER INVOLVED

**Sergeant Darrell Best**                    **Badge # S-0682**

Duty & Uniform Status:                       Full Duty/Uniform
Personal:                                    Black Male

DC 001475

Assignment:                              Police Academy
Appointed to MPD:          02/02/1987      21 year member
Current Duty Status:        Full Duty
Impairment:                     Unknown

## COMPLAINANT INVOLVED

**Cadet Raynette Jones**           **Badge # CA 8518**

Duty & Uniform Status:      Full Duty/Uniform
Personal:                      Black Female
Assignment:                   Youth Investigations Branch
Appointed to MPD:         07/23/2007     1 year member
Impairment:                     None

## COMPLAINANTS' STATEMENT

### Cadet Raynette Jones

On Monday, April 28, 2008, Cadet Raynette Jones, Youth Investigations Branch, was interviewed by Agent Nicole Webster, Diversity and Equal Employment Opportunity Compliance Branch. During the interview, Cadet Jones reported the following: **(Attachment No. 3)**

In July 2007, Cadet Jones along with her girlfriend, Ms. ███ W███, met Sergeant Best at the Police Academy to complete a cadet package for employment. Sergeant Best assisted with filling out the paperwork and asked if they were interested in swimming at the academy. Whenever Ms. W███ would turn her head away from Sergeant Best, he would blow kisses and wink his eye at Cadet Jones. Cadet Jones was referred to Sergeant Best by her mother, Ms. ███ J███, who met Sergeant Best when he was assigned to the Seventh District, where she lives.

In September 2007, Cadet Jones was hired and assigned to the Police Academy. Immediately, Sergeant Best began making flirtatious remarks toward Cadet Jones, along with calling her, via cellular phone, to his office. Once Cadet Jones was inside his office, Sergeant Best would lock his office door, feel her buttocks and breast, and kiss her on the neck, while humping on her. Sergeant Best would say to her, "When are you going to have sex with me? We can do it in the parking lot at residential."

Sergeant Best got Cadet Jones' cellular phone number from her contact information on file at the academy.

In October 2007, Cadet Jones was working a detail at an "old folks home" in Southeast, District of Columbia, off of Martin Luther King Avenue Southeast. Sergeant Best directed her to hang her coat in the coat room. Once inside the coat room, Sergeant Best shut the door and blocked it with his body. He began physically touching her again. He

2

DC 001476

grabbed her buttocks and began humping on her, while kissing on her neck. Cadet Jones pushed him off and tried leaving the room.

Cadet Jones never told anyone about the aforementioned assaults because she had no proof.

In November 2007, during a female meeting with Commander Lillian Overton, several cadets mentioned to the commander that Sergeant Best was a pervert. A few cadets complained about what Sergeant Best said concerning swimming at the academy. Sergeant Best said they must purchase black two piece bikinis in order to swim at the academy. Commander Overton did not address the issue.

After speaking with the commander, the cadets told Lieutenant Michael Jamieson about the swimsuit issue. Lieutenant Jamieson advised them that they did not have to purchase swimsuits in order to swim at the academy.

Recently, Sergeant Best pulled Cadet Jones to the side and said, "I'm the one who got you this job and you're treating me like this!" Cadet Jones responded "You have a wife."

Cadet Jones mentioned that Sergeant Best knows she has a female lover and would say to her, "She can't do the things I can do! What she doesn't know won't hurt her." And, "I will eat you out better than your girlfriend can!"

Cadet Jones is assigned to the academy on Monday, Wednesday, and Friday. Sometimes after physical training (P.T.), Sergeant Best would call Cadet Jones on her cellular phone and ask her to come to his office. Once inside his office, he would talk about the events of the day, ask if she needed help with homework, ask about her girlfriend, and then lock his office door. Then, Sergeant Best would begin touching her on her breast, buttocks, kissing on her neck, while humping on her.

Cadet Jones stated that this happened on approximately ten (10) occasions, and there are no witnesses to these events.

On Tuesday, April 22, 2008, Cadet Jones asked Sergeant Tiffani Cowen to please stay in the room when Sergeant Best is around because Cadet Jones is not comfortable around him. At that time, Cadet Jones described the aforementioned events to Sergeant Cowen.

Sergeant Cowen immediately notified Lieutenant Jamieson, Lieutenant Jamieson notified Captain Martin Davis, and then Captain Davis notified Commander Overton.

As a remedy, Cadet Jones suggested that Sergeant Best be suspended and have no contact with her.

DC 001477

## POLICE WITNESS STATEMENT

### Sergeant Tiffani Cowan

On Tuesday April 29, 2008, Sergeant Tiffani Cowan, Youth Investigations Branch, was interviewed by Agent Nicole Webster, Diversity and Equal Employment Opportunity Compliance Branch. During the interview, Sergeant Cowan reported the following: **(Attachment No. 4)**

On Monday, April 21, 2008, Cadet Raynette Jones stated to Sergeant Cowan that during the last rotation at the Academy, Cadet Jones was in Sergeant Best's office, when he kissed her on her neck and touched her on her breast and buttocks.   She did not tell anyone because she didn't think anyone would believe her. This all occurred sometime between September 2007 and December 2007.

Sergeant Cowan indicated that this is the first allegation of this nature that has been brought to her attention.  She believes that Cadet Jones has no reason to create this type of story because she has nothing on the line to lose; Sergeant Best is not grading her or giving her any levels of instructions.

Sergeant Cowan further stated that Sergeant Best has never come to her to pull any cadets out of class.  His only interaction with the cadets is teaching report writing and Property; however, Sergeant Cowan is normally in the classroom during those times.

Sergeant Cowan described Cadet Jones as a quiet person who keeps to herself. Cadet Jones does interact with other cadets whom she feels comfortable around.

### Cadet Ebony Norris

On Thursday, May 1, 2008, Cadet Ebony Norris, Youth Investigations Branch, was interviewed by Agent Nicole Webster, Diversity and Equal Employment Opportunity Compliance Branch and Detective Wallace Carmichael, Sex Assault Unit. During the interview, Cadet Norris reported the following: **(Attachment No. 5)**

Cadet Norris stated that she did not witness anything involving Cadet Raynette Jones and Sergeant Best.  She further stated that Sergeant Best has never said anything to her inappropriately.

### Cadet Tierra Mimms

On Thursday, May 1, 2008, Cadet Mimms, Youth Investigations Branch, was interviewed by Agent Nicole Webster, Diversity and Equal Employment Opportunity Compliance Branch and Detective Wallace Carmichael, Sex Assault Unit. During the interview, Cadet Mims reported the following: **(Attachment No. 6)**

DC 001478

Cadet Mimms stated that she did not witness anything involving Cadet Raynette Jones and Sergeant Best. She further stated that Sergeant Best has never said anything to her inappropriately.

### Cadet Tracee Chamberland

On Wednesday May 7, 2008, Cadet Chamberland, Youth Investigations Branch, was interviewed by Agent Nicole Webster, Diversity and Equal Employment Opportunity Compliance Branch and Detective Wallace Carmichael, Sex Assault Unit. During the interview, Cadet Chamberland reported the following: **(Attachment No. 7)**

Cadet Chamberland stated that she did not witness anything involving Cadet Raynette Jones and Sergeant Best. She further stated that Sergeant Best has never said anything to her inappropriately.

## INVOLVED OFFICER STATEMENT

### Sergeant Darrell Best

On Thursday, August 21, 2008, Sergeant Best, Police Academy, was interviewed by Agent Nicole Webster and Ms. Lisa Tapp, Diversity and Equal Employment Opportunity Compliance Branch. During the interview, Sergeant Best reported the following: **(Attachment No. 8)**

Sergeant Best met Cadet Raynette Jones through her mother, Ms. G█████████, when he was assigned to the Seventh District. He stated that her mother inquired about getting a job for her daughter, Raynette. He met Raynette at his office and assisted her with completing the application for the cadet program on the computer. After completing the application, Sergeant Best hand carried the application to recruiting. Subsequently, Raynette Jones was hired by the Metropolitan Police Department, Cadet Program.

Sergeant Best stated that Cadet Jones telephoned him and stated that she was having problems filling out the employment application on the computer. Sergeant Best indicated that Cadet Jones along with a female companion came to his office and he assisted her with her application. Sergeant Best stated that Cadet Jones got his telephone number from her mother.

Sergeant Best indicated that at no time did he wink at Cadet Jones when she and her companion were in his office. Cadet Jones' companion was sitting close to Sergeant Best making it impossible to wink at Cadet Jones without her companion seeing him.

Sergeant Best was assigned by Commander Cheryl Pendergast to assist as the liaison between the Police Academy and Youth Investigations Branch. Sergeant Best instructed the Cadet's with Code of Ethics, Report Writing, and Property. Whenever Sergeant Best

DC 001479

was with the Cadets, Lieutenant Michael Jamieson and the Officer assigned would also be present.

Sergeant Best stated that the door to his office had to be locked with a key; therefore, he never shut or locked the door to his office in the presence of Cadet Jones.

Sergeant Best declared that he never kissed Cadet Jones on her neck, touched her breast or buttocks.

Sergeant Best recalled discussing the Cadet Handbook, with the class as a whole, concerning fraternization with staff members at the Academy.  He explained that it is against policy to date a staff member at the Academy.

Sergeant Best described the events that took place in December 2008, at the Senior Citizens Christmas Party.  He stated that at no time was he alone in the coat room with Cadet Jones.

Sergeant Best believes that Cadet Jones is making these allegations because he questioned her about her whereabouts.  He asked her why does she leave early everyday, and she responded that she goes to counseling for drinking.  Sergeant Best believes that this allegation is a scapegoat for her drinking habit and that she may be afraid that she will be fired for underage drinking.

Sergeant Best stated that he never said to Cadet Jones "I got you this job, why are you treating me like this?"  Additionally, he could not recall calling her on her cellular phone.

## UNITED STATES ATTORNEY'S OFFICE REVIEW/REVERSE GARRITY

On Friday, August 1, 2008, this case was reviewed by Assistant United States Attorney Kelly Higashi, Chief of the Sex Branch Unit.  Attorney Higashi signed a Declination indicating that the case did not have the criminal elements necessary for the charge of Second Degree Sexual Abuse of a Ward. **(Attachment No. 9)**

## SUMMARY AND CONCLUSION

Cadet Raynette Jones alleged that she had been sexually harassed and sexually assaulted, over a period of time, by Sergeant Darrell Best.  Specifically, she described incidents when Sergeant Best repeatedly requested oral and vaginal sex from her.  She indicated that Sergeant Best fondled her buttocks and breast, and kissed her neck on numerous occasions.

During an interview with Sergeant Best he denied all allegations concerning sexually assaulting and sexually harassing Cadet Jones.

6

DC 001480

Sergeant Best affirmed that he met with Cadet Jones in his office and helped her complete the application for hire process on his computer.  He further affirmed that he hand carried her application to the Recruiting Office.

Cadet Jones stated that after rejecting Sergeant Best's advances, he would often say, "I'm the one who got you this job and you're treating me like this!"

As a remedy, Cadet Jones suggested that Sergeant Best have no contact with her.

## FINDINGS

The Equal Employment Opportunity Commission (EEOC) has issued guidelines that define sexual harassment as a form of sex discrimination under Title VII.  According to EEOC guideline section 1604.11 provides in part, "Unwelcome sexual advances, request for favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment...or such conduct has the purpose or effect of unreasonable interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."  Moreover, Title VII and EEOC regulations do not prohibit all verbal or physical harassment in the workplace.  A critical issue is whether the words or actions have a negative impact on the employee's terms, conditions or privileges of employment.

This investigation did not disclose sufficient evidence to sustain Cadet Jones' allegation that Sergeant Best inappropriately touched her or made inappropriate comments toward her.  Sergeant Best denies all allegations and there is no corroborating evidence to support them. Therefore, without any corroboration, such as a non-involved witness, to support Cadet Jones' allegations, there is insufficient evidence to sustain the allegations against Sergeant Best.

As a result, it is recommended that the allegation of misconduct on the part of Sergeant Darrell Best be classified as **Insufficient Facts**.

## RECOMMENDATIONS

In view of the facts and circumstances outlined in this report, it is recommended that no further action be taken in this matter.

DC 001481

## **MISCELLANEOUS**

A pre-write up conference was held with Ms. Sharon Vaughan-Roach and Ms. Lisa Tapp, Diversity and Equal Employment Opportunity Compliance Branch, prior to the completion of this report.

Nicole Webster
Agent/Sergeant
Internal Affairs Division

8

DC 001482

# Metropolitan Police Department
*WACIIS Investigative Supplement Report*

Supplement Number **SX08-138/1**

Report Date **04/28/2008**

## Supplement Report Information

| | |
|---|---|
| Number | SX08-138/1 |
| Date | 4/28/2008 |
| Type Of Report | SEX SUMMARY |
| Description | SECOND DEGREE SEXUAL ABUSE OF A WARD |
| Occurence Date | 9/1/2007 |
| Source | COMPLAINANT |
| Detective | CARMICHAEL, WALLACE L (D1-73) |
| Backup Officer | HARKINS, INGRID M (D1-39) |

## Narrative

METROPOLITAN POLICE DEPARTMENT
   WASHINGTON, D.C.
   SEX OFFENSE SUPPLEMENT REPORT SUMMARY


COMPLAINANT/VICTIM:
JONES, RAYNETTE S B/F/20 YRS. DOB: ███████████

COMPLAINANT'S ADDRESS:
███████████████████████

COMPLAINANT'S PHONE #:
████████████

EMPLOYER/SCHOOL ATTENDED:
METROPOLITAN POLICE DEPARTMENT POLICE CADET

PARENT/GUARDIAN:

PARENT/GUARDIAN ADDRESS:

PARENT/GUARDIAN PHONE #:

DATE/TIME OF OCCURRENCE:
SEPTEMBER 2007-OCTOBER 2007

OFFENSE:
SECOND DEGREE SEXUAL ABUSE OF A WARD

CCN #:

SEX BRANCH CASE/SUPPLEMENT #:
SX08-138

LOCATION OF OFFENSE:
4665 BLUE PLAINS DR. SW
POLICE ACADEMY


MOBILE CRIME LAB NO:

-----------------------------------------------------------------
*Continued On Next Page*

This report is the property of the Metropolitan Police Department. Neither it or its contents may be disseminated to unauthorized personel

WLCARMIC 07/23/2008 5:17 AM

Page  1  of  6

DC 001484

## Carmichael, Wallace (MPD)

**From:** Carmichael, Wallace (MPD)
**Sent:** Monday, August 04, 2008 11:12 PM
**To:** Webster, Nicole (MPD)
**Subject:** Sgt. D. Best

Sgt. Webster,

On August 1, 2008, the case regarding Sgt. Best was reviewed by AUSA Kelly Higashi, Chief of the Sex Branch Unit. Mrs. Higashi signed a Declination and forwarded same to the Assistant Chief of Police (Peter Newsham). The case did not have the Criminal elements necessary for the charge of Second Degree Sexual Abuse of a Ward. It was decided that the Case should be handled by the Metropolitan Police Department at the appropriate level.  Please call me if you have any questions concern this matter.

Det: Wallace L. Carmichael.

8/4/2008

DC 001508

**Carmichael, Wallace (MPD)**

**From:** Carmichael, Wallace (MPD)
**Sent:** Thursday, June 19, 2008 8:24 AM
**To:** Webster, Nicole (MPD); Webster, Nicole (MPD)

Hi Sgt. Webster,

Pertaining to the information that I requested, can you follow-up with me as soon as you can. I would like to present this case to the AUSA office.

Thank you,

Det. Wallace Carmichael
Sex Branch

DC 001509

**Webster, Nicole (MPD)**

| | |
|---|---|
| **From:** | Vaughan-Roach, Sharon R. (MPD) |
| **Sent:** | Wednesday, April 23, 2008 9:43 AM |
| **To:** | Webster, Nicole (MPD) |
| **Subject:** | FW: Cadet complaint |



Nicole:

Please call her this morning.

Thanks

Sharon

---

**From:** Newsham, Peter (MPD)
**Sent:** Tuesday, April 22, 2008 8:19 AM
**To:** Overton, Lillian (MPD)
**Cc:** Vaughan-Roach, Sharon R. (MPD)
**Subject:** RE: Cadet complaint

Thank you.  Sharon Vaughn-Roach, our EEO director will likely be in contact for details.

A/C PN

---

**From:** Overton, Lillian (MPD)
**Sent:** Tuesday, April 22, 2008 7:29 AM
**To:** Newsham, Peter (MPD)
**Subject:** Cadet complaint

Chief, I just wanted to give you a heads up that one of the female cadet's has alleged that Sergeant Daryl Best, assigned to the academy, made inappropriate advances toward her, touched her bottom, breast and tried to kiss her neck.  This apparently happened during the last rotation to the academy (September through December) and was not reported until this rotation.  My team will draw IS #'s this morning.

4/28/2008

DC 001521

# METROPOLITAN POLICE DEPARTMENT

## Internal Affairs Division

_4/28/08_
**(Date)**

_PEO_
**(IAD Case Number)**

**You are being interviewed in connection with a confidential investigation. Therefore, you are hereby ordered not to discuss the contents of this interview with anyone other than the persons present in this interview. The only exception to this order allows you to discuss this matter with an attorney, if you choose to do so. Further, you are hereby ordered <u>NOT</u> to divulge, to anyone other than the persons present in this interview (with the exception of your attorney) the contents of any material (written, tape recorded, or otherwise) provided to you in connection with this confidential investigation. You are hereby further advised that violations of this order may result in disciplinary action against you.**

**If you are entitled to FOP representation in this interview and you waive your right to that representation, you retain the right to consult with an FOP representative at a later date. However, if an FOP representative was not present in the interview and you desire to consult a representative after the interview, you must notify the Internal Affairs Division agent in your case of the name of the FOP representative you intend to discuss this matter with PRIOR to discussing the case with any FOP representative. The IAD agent to be notified is** _Webster_ **on 727-** _0066_ **.**

**These orders will remain in effect until you have been notified that this investigation has been concluded.**

_N Webal_
**(Serving Agent)**

_Raynette S Jones_
**(Signature of Member Served)**

_12:02 pm 4-28-08_
**(Date & Time)**

DC 001525

# METROPOLITAN POLICE DEPARTMENT

## Internal Affairs Division

_4/29/08_
**(Date)**

_____
**(IAD Case Number)**

**You are being interviewed in connection with a confidential investigation. Therefore, you are hereby ordered not to discuss the contents of this interview with anyone other than the persons present in this interview.  The only exception to this order allows you to discuss this matter with an attorney, if you choose to do so.  Further, you are hereby ordered <u>NOT</u> to divulge, to anyone other than the persons present in this interview (with the exception of your attorney) the contents of any material (written, tape recorded, or otherwise) provided to you in connection with this confidential investigation.  You are hereby further advised that violations of this order may result in disciplinary action against you.**

**If you are entitled to FOP representation in this interview and you waive your right to that representation, you retain the right to consult with an FOP representative at a later date.  However, if an FOP representative was not present in the interview and you desire to consult a representative after the interview, you must notify the Internal Affairs Division agent in your case of the name of the FOP representative you intend to discuss this matter with PRIOR to discussing the case with any FOP representative.  The IAD agent to be notified is** _Webster_ **_____ on 727-** _0066_ **.**

**These orders will remain in effect until you have been notified that this investigation has been concluded.**

_____
**(Serving Agent)**

_____
**(Signature of Member Served)**

_4/29/09      1029 HL_
**(Date & Time)**

DC 001527

*Report ref: S009*

# Metropolitan Police Department
# Internal Affairs Report

Run Dat **04/29/2008**

## Officer History Summary

*Report ref #: D004*

**Best, Darrell L**

Employee ID: ██████

` `

Phone

Age: **35**  Sex: **M**  Race: **Black**          Education: **12**

Rank: **Sergeant**          Assignment: **7th District**

Length Of Service: **15**  Supervisor:

No Photo

| Type | Date | CASE | Charge | Charge Disp |
|------|------|------|--------|-------------|
| IA | 6/22/01 | CS-01-982 | Abuse of Authority | Exonerated |
| IA | 12/14/01 | CS-01-1441 | Fail Take Prop Police Action | Unfounded |
| IA | 8/20/02 | CS-02-1080 | Fail Take Prop Police Action | Sustained |
| IA | 1/13/03 | CS-03-0243 | Excessive Force/Assault | OCCR Dismissed |
| IA | 6/14/03 | CS-03-0744 | Vehicle Pursuit | Within Policy |
| IA | 3/2/04 | CS-04-0396 | Fraud/Time & Attendance | Exonerated |

**Webster, Nicole (MPD)**

| | |
|---|---|
| **From:** | Vaughan-Roach, Sharon R. (MPD) |
| **Sent:** | Wednesday, April 23, 2008 9:43 AM |
| **To:** | Webster, Nicole (MPD) |
| **Subject:** | FW: Cadet complaint |

Nicole:

Please call her this morning.

Thanks

Sharon

---

**From:** Newsham, Peter (MPD)
**Sent:** Tuesday, April 22, 2008 8:19 AM
**To:** Overton, Lillian (MPD)
**Cc:** Vaughan-Roach, Sharon R. (MPD)
**Subject:** RE: Cadet complaint

Thank you.  Sharon Vaughn-Roach, our EEO director will likely be in contact for details.

A/C PN

---

**From:** Overton, Lillian (MPD)
**Sent:** Tuesday, April 22, 2008 7:29 AM
**To:** Newsham, Peter (MPD)
**Subject:** Cadet complaint

Chief, I just wanted to give you a heads up that one of the female cadet's has alleged that Sergeant Daryl Best, assigned to the academy, made inappropriate advances toward her, touched her bottom, breast and tried to kiss her neck.  This apparently happened during the last rotation to the academy (September through December) and was not reported until this rotation.  My team will draw IS #'s this morning.

4/28/2008

DC 001537

# _Things to Do_

1. Interview all female cadets

2. Interview former cadets

3. Interview Haywood

4. Final Report

5. Subpoena phone records ( Best and Jones')

6.

7.

8.

9.

10.

Greetings Sharon,

Listed below are cases assigned to me along with a brief synopsis of each.

**1. Cadet Raynette Jones  v. Sergeant Darrell Best**
Metropolitan Police academy
Sexual Harassment/ IS # 08003668
April 28, 2008
**<u>Insufficient Facts</u>**

Cadet Jones alleged that Sergeant Best touched her on her breast and buttocks, and Sergeant Best repeatedly asked her for oral and vaginal sex.   The case was reviewed by Assistant US Attorney Kelly Higashi, Chief of the Sex Branch Unit, who issued a declination.  The case did not have the criminal elements necessary for the charge of Second Degree Sexual Abuse of a Ward.  Additionally, I was unable to prove or disprove the allegations.

**2. Ms. Janice Lee v. Sergeant Darrell Best**
Fifth District
Sexual Harassment/ IS #08004561
October 21, 2008



Ms. Lee alleged that Sergeant Best touched her on her buttocks while walking down the station level corridor at the Fifth District.   Currently, there are no witnesses to this offense.

**3.**



**4.**



### METROPOLITAN POLICE DEPARTMENT

#### Internal Affairs Division

**COMPACT DISC (CD) NUMBER:** *08-0327*

**DATE:**        April 28, 2008

**TIME:**        1200 Hours

**LOCATION:** 51 N Street, Northeast, Suite 400, Washington, DC 20002

**PRESENT:**   Agents Nicole Webster, Office of Diversity and Equal Employment Opportunity (EEO) Compliance; Barbara Brantley, Internal Affairs Division (IAD) (formerly Internal Affairs Branch [IAB]), Cadet Renette Jones, Maurice T. Turner, Junior Police Academy

**INCIDENT SUMMARY (IS) NUMBER:**                08-000790

**INTERNAL AFFAIRS DIVISION (IAD) NUMBER:**   08-   [EEO]

**STATEMENT OF:**                Cadet Jones

**AGENT WEBSTER:**

Q: Today is Monday, April twenty eighth, two thousand eight. And, the time is now twelve-o, twelve hundred hours. And, we're located at number 51 N Street, Northeast, at the Internal Affairs Division, fourth floor. And, present for this interview is Agents Barbara Brantley and Nicole Webster, and also Cadet Regette, Regette?

A: Renette.

Q: Renette Jones, I'm sorry. This case is in reference, an EEO case, and it came in on April twenty second, Tuesday, April twenty (noise) second. And, it is unnumbered at this time. But Offi-, Cadet Jones, prior to going on tape I gave you two Internal Affairs memorandums. And, the first one is, explained to you that this is a confidential investigation and you're not to discuss it with anyone outside this room. Did you read that?

A: Yes.

Q: Did you understand it?

A: Yes.

Q: And, did you sign it?

DC 001550

A:  Yes.

Q:  And, the second form I, is two, is two excerpts from our general orders.  And, it explains to you that this is a, that whenever you're questioned by an agent in Internal Affairs you're to respond truthfully.

A:  Yes.

Q:  Did you read that?

A:  Yes.

Q:  Did you understand it?

A:  Yes.

Q:  And, the second excerpt explained to you the penalties associated with being untruthful.  Did you read that?

A:  Yes.

Q:  You understood it?

A:  Yes.

Q:  Did you sign the form?

A:  Yes.

Q:  Thank you.  Cadet Jones, on the twenty second, like I said on the twenty second, I received a complaint by your sergeant…

A:  Umm hmm.

Q:  …that you…

A:  Yes.

Q:  …had been harassed by one of, another official on the Metropolitan Police Department. Are you, did you tell your…

A:  Yes.

Q:  Well, which sergeant did you report the incident to?

A:  Sergeant Calvin.

DC 001551

Q:  And, what did you report to her?

A:  That I had problems with one of the sergeants at the academy later, last year when I started.

Q:  Ok.  How long have you been a member of the Cadet Program?

A:  Since July twenty seventh, two thousand seven.

Q:  And, what have, where have you been assigned since, since that period?

A:  When I first came I was assigned to Youth Division, on Rhode Island.  And, from there we was assigned to the academy.  And, after the academy we had to do the Toys for Tot at the Boys and Girls Club by Sixth District.  And, we were in school as well and now we're back at the academy.

Q:  So, at Youth Division, you were there for how long?

A:  Since September.

Q:  From July 'til September?

A:  Yes.

Q:  And, then you went to the academy,…

A:  Yes.

Q:  …from what time to what time?

A:  September to December.

Q:  Ok.  Then you went to Toys for Tots…

A:  In December.

Q:  Ok.  And, then I didn't get the rest.

A:  In January we were assigned to districts.  I was in 6D, and after the district's detail was done we went back to school, and we're back at, at the academy now.

Q:  Ok.  So, this incident happened while you were assigned at the academy?

A:  Yes.

Q:  Between September and December?

DC 001552

4

A: Yes.

Q: Ok. Can you tell me about the incident?

A: Well, like I wrote in the statement, I met sergeant, do I need to say his name?

Q: Yes.

A: I met Sergeant Darrell Best through my mom because I was interested in being a police cadet. So, me, and my friend had went down to the academy and he helped, she wanted to be a police officer. So, he helped both of us fill out the application. And, while we were sitting there he was like making flirtatious remarks, like if we want to come swimming we can come down there. He'll swim with us. And, stuff like that. But we didn't really say anything about it (cough), so me, and her talked, talked amongst each other about it. And, while she wasn't looking he would like wink at me and just, just look at me like…He, just look at me flirtatious. So, after I found out that I was hired…Once I got to the academy I ran into him again and he would still do the same thing, and he would call me to his office. He would feel on me; touching me. I mean (crying)…He would touch on me; hunt me; he would lock his office door and…

Q: You need some tissue? You want to take a break?

A: No.

Q: Ok.

A: He would lock his office door, and physically touch me. And, when we go on details he would blow kisses at me. And, one time we was at the old folks home for…We had to help them, like they had a, a party going on that day. Think it's over there on MLK, and we was in a room. And, I was putting my coat up, and he had locked the door. And, he started touching on me. But I never said anything to anybody because I never had proof about it. (Sniffing) So, at one of our meetings at the academy with Commander Overton at Youth Division, other girls was like, that he was a pervert. And, I wanted to talk to her about it, but she, she had left. And, he would tell the, the female cadets that if we wanted to swim we, we can't swim in nothing but a bathing suit. And, he, I think he said it had to be a two piece. And, everybody call him a pervert. And, I found out I wasn't the only one he was making comments to. He made comments to other cadets 'cause why, why would they call him a pervert if he never said anything to them. And, when I got back recently he, he had said to me, 'cause I stopped communicating with him since I got back, because I just needed to tell somebody what's been going on while I was there. And, he had said to me, "You treating like this and I helped…

Q: Ok. The time is now twelve ten hours. And, we're going to pause. Ok. The time is twelve eleven hours. And, we're back on tape.

DC 001553

A:  When I made con-, contact with him again starting this year he would see me and pull me to the side, and say, "What you, you don't want to talk to me no more," or like communications-wise what's wrong with me.  And, personal issues that I wasn't talking to anyone about, and he would question me about them.  And, now the last thing he said to me was, "I'm the one that got you, got you this job.  You don't need to treat me like that."  So, I felt that he was using that against me to do what he was doing.  And, I never told anyone, not even my mom, my sister, no one, or my lieutenant.  I just didn't tell anyone because I didn't have proof.  So, that's it.

Q:  Ok.  You said you met Sergeant Darrell Best…

A:  Yes.

Q:  …through your mom?

A:  Yes.

Q:  And, and what's the relationship, how did…

A:  I guess he, 'cause she works at Johnson Junior High, in Southeast, and I guess he was over there.  And, I guess she started talking to him about my interest with the MPD.  And, from there she had gave me his number and I called him.  And, we made a appointment to meet down at his office at the academy.

Q:  Ok.  So, y'all called him direct?

A:  Yes.

Q:  And, then, when you said you filled out the paperwork, you met him at the academy?

A:  At his office.

Q:  So, he was assigned, or he was working at the academy at that time?

A:  Yes.

Q:  Ok.  What's your mom's name?

A:  (Burp) ███████████.

Q:  Ok.  And, a phone number for your mom?

A:  2…

Q:  Have you spoken to your mom about this?

A: No.

Q: Ok.

A: *Inaudible...*

Q: Ok. Well, don't worry about that. Now, who's your, your friend? You said you and your friend came down and fill out an application.

A: ...

Q: What's her name?

A: ███████████████

Q: Spell her name, please?

A: █████████████

Q: Yeah.

A: ██████████

Q: Ok. Now, is she currently a police cadet?

A: No, she was applying for a officer, but she was, she didn't get it.

Q: Ok. Now, did she, did he make any comments in front of her, any flirtatious comments that you mentioned?

A: Everything he did she wasn't paying attention, like she was looking opposite ways. She was just in the room, but she, only thing she know about, he asking us if we want to swim we can come down there and swim.

Q: Ok. Now, when he was talking about swimming, where was he talking about swimming?

A: Down at the academy.

Q: Ok. Ok. Now, you said he used flirtatious words, can you tell me exactly what he said?

A: Like, "When you going to stop dealing with women and get back with men," far as sex.

Q: Say that again, I didn't hear the last part?

A: Far as sex, like sexual things.

Q:  If you could please tell me to the best of your knowledge exactly what he said that would help?

A:  When am I going to come over his house and have sex with him?  We can do it in the, the academy parking lot, and on that residential parking lot.  Can't really recall everything, but...

Q:  And, those were some of the things he said the first time you were over there?

A:  I was never over his house, that's...

Q:  No, I'm talking about...

A:  At the academy?

Q:  I'm sorry, first time that you were at the academy filling out the application.

A:  No, that's, that's what he said while I was detailed at the academy, like different day that he would call my phone, stuff like that.

Q:  Ok.  Now, how, how did he get your phone number?

A:  We was ordered to give the sergeants our cell phone number just in case we had to call for emergency or to say we running late or anything like that.

Q:  And, Sergeant Best was, he's one of the cadet coordinators?

A:  He...

Q:  Or, one of the sergeants for...

A:  He wanted...

Q:  ...the cadets?

A:  We, he was assigned to us our first time at the academy.  But since we have our own sergeants, I'm not for sure.  I don't think he's still with us now.  But the still like come to our classroom and give us information, but far as taking us places, he doesn't do that anymore.

Q:  Ok.  So, in the beginning, when, about...So, you said you started in July?

A:  Yes.

Q:  When did he start calling you on the telephone?

A:  Around September.

Q:  Ok.

A:  Soon as he...

Q:  Once you were assigned to the academy?

A:  Yes.

Q:  Ok.  And, that's when all the flirting,...

A:  Yes.

Q:  ...flirtatious comments came in?

A:  Yes.

Q:  And, he asked you for sex?

A:  Yes.

Q:  Ok.  And (pages turning), what, what, what was your response to those questions or ...

A:  I would...

Q:  ...statements?

A:  ...say, "You have a wife."  I mean being as though I'm into females I told, he knows I have a girlfriend.  And, that was her who was with us during the time we filled out the application.  And, he would say like, "You, she can't do the things I can do," and "What she don't know won't hurt her," little things like that.

Q:  Ok.  All right, and you said the Soldier's Home, where is the Soldier's Home.

A:  Soldier's?

Q:  Or, old folks home, I'm sorry.

A:  Oh, that was...

ALL:  (Laugh)

Q:  I'm so sorry (laugh).

A:  That was by the place, off of Horner Place, it's a little, it look like a club, but I think it's for old folks.

Q:  Ok.  And, you all went there to do community service or...

A:  We was there, they had like a party for them, and we were like their hostess, serving them food and things like that.  It was like a party for them.

Q:  And, you, you were in uniform?

A:  Yes.

Q:  So, it was a duty assignment?

A:  Yes.

Q:  And, Sergeant Best, was he assigned as the sergeant or he just showed up?

A:  He was the sergeant then.

Q:  Ok.  Who else, who, who were the other supervisors?

A:  Lieutenant Michael Jamison;...Officer Kevin Davis was there, and I think that's it, and well back then she was Inspector Overton, at Youth Division.

Q:  Ok.

A:  She was there, and Chief Lanier, have of the MPD.

Q:  Ok.  Who is your current supervisor and your sergeant, lieutenant?

A:  Lieutenant, well Commander Overton; Lieutenant Jamison, Captain Davis, Sergeant Calvin and Sergeant Queen.

Q:  Ok.  All right, now you mentioned that he (noise), he was feeling on you?

A:  Yes.

Q:  What do you mean by that?

A:  He would kiss my neck; touch my breasts, my bottom; he never did anything with clothes off.  He would just do everything with clothes on.

Q:  Ok.  And, how did you respond to that?

A:  I just basically let him, 'cause no one, it was…This stuff would happen when we're, when we're finishing up PT and he would tell me he need, he, he need to see me in his office. And, he would shut his door, lock it and just do numerous and sexual things…

Q:  When…

A:  …far as touching.

Q:  When did he, when did this happen in, from September to December, about what time? Or, when, can you remember a date?  Did you write anything down?

A:  No.

Q:  Did you tell anybody?

A:  I haven't told no one.

Q:  Ok.  So, about…

A:  I did tell one of the cadets.  Me, and him was talking, having a conversation about the sergeant.  And, he had brought up, brought to my attention that one day they was detailed with our lieutenant…No, our lieutenant was telling the cadet boys about Sergeant Best, how he had went in a female house and I think had sex with her.  I can't really recall the story, but we had a conversation amongst the sergeant.  And, I had told him and I told him that I didn't tell anyone.  And, it was just, he was the only one.

Q:  Did he say what that female's name was?

A:  No.

Q:  And, who is the officer who told you that?

A:  It was a cadet, his name Haywood.

Q:  Ok.  Haywood is his last name or first name?

A:  Last name.

Q:  Well, you know his first name?

A:  Darrell.

Q:  Ok.  And, so you told Cadet Haywood that Sergeant Bells, Best was interested (tap) in you or did you tell him that he was feeling and touching on you and…

A: I just told him he was interest, interested in me and about some of the comments he had made. I didn't tell him like everything. I just informed him about it. I didn't give him all details about it.

Q: Do you remember when you told him?

A: This was like in January, maybe a little bit after New Years.

Q: Ok. And, how, what was his response?

A: That's when he told me about what Lieutenant Jamison had told him about Sergeant Best going to another female's apartment.

Q: Ok. Now, what was the incident at that old folks' home? I know you said y'all were there. But what was the incident that happened there?

A: We were told to put our jackets in a room and while I was putting mines in there he had came in a shut the door. And, he stood up against the door and started kissing me and touching me while I was trying to get out the room.

Q: Ok. Kissing you how?

A: Kissing me on my neck and grabbing my behind.

Q: Ok. And, and did, how did you respond?

A: I just tried to get out the room.

Q: Ok. You were pushing him off of you?

A: ...

Q: And, did anybody hear or see this?

A: No.

Q: Now, when you came out the room was there anybody who noticed you two coming out the room together?

A: No.

Q: Ok. When he, when you were taking PT and he would tell you he, or he would want to see you, who would inform you that he wanted to see you?

A: He would call my cell phone.

Q:  So, you would PT with your cell phone on?

A:  No, after PD he would either be down there once we finishing up and having our discussion with the officers who was in charge of us at the time.  And, after that, once we were dismissed he would call me to the side and tell me come to his office before I leave.

Q:  Ok.  And, then you would do what?

A:  I would put back on my uniform and I would go.

Q:  And, then what would happen?

A:  He would ask me about the stuff that we did and then...

Q:  The stuff that you did, what...

A:  Far as like in class or for that whole day.  (Clearing throat) As me about homework, do I need help with any homework that I have for classes.  And, then start making non-business conversation, far as are me, and my girlfriend still together.  And, just outside work business.  He would, started make conversation about that.

Q:  Ok.  Tell me what it is?

A:  Far as about me, and my girlfriend relationship, want to know when we going to break up; when am I going come to his house, the same stuff that he said the first time.  He would say it repeatedly.  And...

Q:  How often did that happen?

A:  We were only there Monday and Wednesdays, sometimes Fridays.  So, it would happen between Mondays, Wednesday and Fridays.

Q:  Ok.  So, about how many times you would say these incidents occurred?

A:  Between five and ten.

Q:  Ok.  Do you know of anyone else that this hap-, has experienced what you experienced with Sergeant Best?

A:  Besides me recalling the female cadets calling him a pervert, and when we had informed our commander about he saying that we could wear our bathing suits and come swimming, they would call him a pervert.  So, I'm thinking that he has made comments to them, 'cause I think he helped another cadet get the job as well.  But I figured that I wasn't the only one he had, he was making comments to because they said the same thing.  Well, I don't know what comments he said to them, but far as him being a, a pervert, I'm guessing that he had said something to them that wasn't really appropriate.

DC 001561

Q:  Ok.  Who is the cadet that you think he helped get on the department?

A:  Cadet Bush.

Q:  Bush, you know her first name?

A:  Meredith.

Q:  And, the ones who called him perverts, who are they?

A:  Tracey Chamberlain; Meredith Bush;...

*UNKNOWN:  Inaudible.*

A:  ...Ebony Norris; Tiara Mims;...

Q:  Hold on, Ebony Norris?

A:  Yes.

Q:  Ok.  And, Tiara...

A:  Mims.

Q:  Mims?

A:  Yes.

Q:  Ok.

A:  Those the only ones I can think of.

Q:  Ok.  But other than them calling him a pervert, you never heard them say exactly what...

A:  No.

Q:  ...they meant by that?  The time is now twelve twenty-five hours.  And, we're going to pause.  Ok.  The time is now twelve twenty-six.  And, we're back on tape.  And, prior to going on the tape you mentioned (cough) that you in-, your commander was informed about the swimming issue.  Can you (noise) address that for me, please?

A:  Well, we had a females' meeting Monday at that academy before we were detailed to the Toys for Tot.  And,...

Q:  Monday, and so this was a Monday in December?

A: No, this was while we at…This was before we were detailed in December. So, this had to happen maybe in November.

Q: Ok.

A: And, we was having a female meeting amongst the cadets and our inspector at the time. And, we had told her that Sergeant Best had wanted us to buy black bathing suits, and we can go swimming. And, that's when the female cadets was calling him a pervert. But I don't think she ever addressed anyone personally, because I just don't think she ever addressed anyone personally. And, when we informed our lieutenant about it he told us we didn't have to buy bathing suits. So, that's why no one ever bought a bathing suit.

Q: Ok. Now, were y'all planning a swimming party or something?

A: No.

Q: How did the bathing suit issue come up, come about?

A: I think when the cadets had asked can they go swimming, and since then, that's when the bathing suit issue came about.

Q: Ok. So, I, when you all asked to go swimming, Sergeant Best said, "Yeah, you can, but you have to buy a black bathing suit?"

A: Yes.

Q: Am I correct?

A: Yes.

Q: Ok. And, who was the commander who was informed of this?

A: At the time she was our Inspector Overton, now she's Commander Overton, at Youth Division.

Q: Ok. Thank you. And, you said Sergeant Best, you gave, he was, he got your phone number because you all had to give it to your sergeant?

A: Yes.

Q: Ok. Other than for personal reasons did Sergeant Best ever call you on your cell phone or home phone, or any telephone?

A: He would call my cell phone, but I never would answer it because I was in the house with my significant other, so I never answered it.

Q: Ok. And, when you would answer it, did you ever answer it when he called?

A: He had called me, I can recall him calling me one, one time we was leaving the academy. And, he had asked me what I was doing, and what was I doing for the night. And, I told him I was going in the house to do my homework. And, another issue was that one time around lunch break, they, him and Sergeant Clark at the academy, had took us to America Buffet. I think that's in Virginia. I think so. And, they was having a discussion about, that, I'm trying to recall exactly…They was having this discussion about who to be close to, far as your supervisors. And, they were saying that it was good to be close with your supervisor because if you ever need a day off then it's easy to get it, or you ever running late, and you could be excused for it without a reasonable excuse. And, when he made that comment I knew that he was talking about me, because the way he looked when he said it, how it was good to have a, a relationship with the person who's in charge of your time and, who's in charge of you while you're at work. So, that was when we was at America Buffet.

Q: Ok. Who is, you said it was Officer Clark, who's…

A: Sergeant Clark.

Q: Sergeant Clark, what's Sergeant Clark's, you know…

A: Debbie Clark.

Q: Oh, ok. And, who else went to the buffet?

A: All of the cadets and the two sergeants.

Q: How many cadets are there?

A: Between twenty-eight and thirty, *inaudible*…

Q: So, all, the entire class went, and then…

A: Yes.

Q: And, who heard the conversation?

A: Can't really recall who was there, but I know it was me, and the two sergeants on both of the sides. And, I can't re-, really remember who was sitting by them, and further down the table.

Q: Oh, ok. Now, did, was Sergeant Clark, was she aware of Sergeant Best trying to date you?

A: No.

Q:  Ok.

A:  Not that I know of.

Q:  All right.  And, how many times would you say Sergeant Best called you on the phone?

A:  ...I say maybe three to five times, and one day that I was running late I had called him and told him I'll be about fifteen minutes late.  And, he said, "That's why I made that com-...

Q:  (Coughing)

A:  "That's why I made that comment that I said at the buffet, because I told you I got you.  And, it's ok, just come in when you can."

Q:  Ok.  But you did make the notification?

A:  Yes.

Q:  Ok.  Now, were, did he take leave from you that particular day?

A:  No.

Q:  Ok.  And, you mentioned that, you said when you make contact with him again, was, this was earlier on in the interview, and it was aft-, I guess what, what did you mean by that?

A:  Since I been back here, at the academy this year?

Q:  Umm hmm.

A:  He would just ask me what's wrong with me.  Why haven't I been calling him and talking to him.  And, like I said the last comment he made to me was don't forget I was the one that got you this job.  And, the last time I saw him was that, I think it was Wednesday that I informed my sergeant about it.  And, I had told her I wasn't comfortable with being around Sergeant Best.  And, I asked her when he's in there can she stay in there because he still look at me, like he'll just look at me.  And, I wouldn't look at him.  And, the last time he was there he was going over, think it was the PD 252s and he was asking that, he was telling us how to fill them out.  And, I had asked him can I be excused 'cause that's when I went to go talk to the sergeant about everything I just discussed.

Q:  Ok.  And, what sergeant was this?

A:  Sergeant Cowen.

Q:  Which sergeant?  Ok.  (Writing) Ok.  Have you and Sergeant Best ever gone out before?

A:  No.

Q:  Have, do you know where he live?

A:  No.

Q:  Did he ever give you his address?

A:  No.

Q:  But you did say he invited you over his house?

A:  Yes.

Q:  Ok.  Have you ever had sex with Sergeant Best?

A:  No.

Q:  Have he, it, but he did ask you for sex?

A:  Yes.

Q:  Ok.

A:  Also, sex and oral sex.

Q:  What, when did he ask you for oral sex?

A:  Around the same time he was asking for intercourse sex.  He would tell me how he can eat me out as he would say better than my girlfriend can.  That's all I can recall about the oral sex part.

Q:  Ok.  And, when, you said all of that happened in September when you were working at the academy?

A:  Yes.

Q:  Ok.  Has he ever been to your house?

A:  No.

Q:  Does he know where you live?

A: No, if he ever looked at my information, no.

Q: But you've never given him the...

A: No.

Q: ...invitation to...Ok. And, you said you didn't answer your phone when you were with your significant other, why, when he would call?

A: Because I knew it was never business-wise. I always-, I just knew it was something that shouldn't be discussed. So, I just never answered the phone.

Q: Ok. Is, is your significant other aware of...

A: No.

Q: ...problems you've been having?

A: No.

Q: And, you said you didn't tell your mother or your sister?

A: No.

Q: Ok. So, when you, your first time talking about this was with Sergeant Cowan?

A: Yes.

Q: Ok. And, what date was that?

A: What's today, last Wednesday, if I'm correct?

Q: Ok. Ok. All right, well I don't have any further questions. Do you? Well, yes, I do, before we end. Is there anybody else you think I should interview regarding Sergeant Bush, Sergeant Best mis-, Sergeant Best's conduct?

A: As far as the female cadets, the ones that I have mentioned. I'm not for sure about anyone else

Q: And, that was Meredith Bush; Tracey Chambers;...

A: Chamberlain.

Q: Ebony, Cham-, Chamberlain?

A: Yes.

DC 001567

Q: Ebony Norris and Tiara Nims?

A: Mims.

Q: Mims, ok.  And, also Darrell Haywood is who you said you did…

A: Yes.

Q: …inform?

A: Yes.

Q: Ok.  What would you like to see done about this?

A: Right now I'm not sure because if I don't have proof, what can be done?  I wouldn't want it to happen to anyone else.  So, I'm not really sure.

Q: Ok.

A: Maybe suspension or I don't know.

Q: Do you think he should still work with the Cadet Program?

A: No.

Q: Why?

A: Because he talks about other people, far as out in the street doing things they're not supposed to do when he's doing the same thing.

Q: Ok.  Oh, well I don't have anything further.  Do you have any questions for me?

A: Are y'all going to investigate him?

Q: Oh, definitely, I am assigned to the Internal Affairs Division, but I'm detailed to the EEO Office, that's the Equal Opportunity Employment, Employment, Equal Opportunity Office (laugh), and we do investigate all sexual harassment complaints.  And, so I'll interview the witnesses you named.  He'll be the last person that I'll talk to, and, but between now and then if anything is said to you, you filled out a, you signed this Confidential Agreement (pages turning).  So, I don't expect you to go out and talk about it, but if anything comes to you, you have my card, you can call me and give me the information, and, especially if Sergeant Best tries to contact you.

A: Ok.

Q: I need you to call me to let me know, but, yes, it will be investigated.

DC 001568

A:  Ok.

Q:  Ok.  And, if you think of anything that you, we didn't put on tape you can call me.

A:  Ok.

Q:  And, or any questions you may have.  Ok.  And, the time is now twelve forty hours. And, that's going to conclude this interview.

_____          _____
*Signature*                                    *Date and Time*

*Prepared by:* lic

### METROPOLITAN POLICE DEPARTMENT

#### Internal Affairs Division

**COMPACT DISC (CD) NUMBER: 08-0331**

**DATE:**      April 29, 2008

**TIME:**      10:30 Hours

**LOCATION:**  51 N Street, Northeast, Suite 400, Washington, DC  20002

**PRESENT:**   Agents Nicole Webster (Office of Diversity and Equal Employment Opportunity (EEO) Compliance; Barbara Brantley, Internal Affairs Division (IAD) (formerly Internal Affairs Branch [IAB]), Sergeant Tiffany Cowan, Youth Investigations Division (YID)

**INCIDENT SUMMARY (IS) NUMBER:**          08-000790

**INTERNAL AFFAIRS DIVISION (IAD) NUMBER:**      08-

**STATEMENT OF:**                          Sergeant Cowan

**AGENT WEBSTER:**

Q:  Ok.

A:  *Inaudible.*

Q:  Today is Tuesday, April twenty ninth, two thousand eight, at ten thirty a., ten thirty hours.  Present for this interview is Sergeant Barbara Brantley and Nicole Webster, also Sergeant Tiffany Cowan. The location is number 51 N Street, Northeast, fourth floor, at the Internal Affairs Division.  And, this is in reference to Cadet Renette Jones versus Sergeant Darrell Best.  And, this will be the statement of Sergeant Tiffany Cowan.  Sergeant Cowan, for the record can you state your name and spell your last name, please?

A:  Sergeant Tiffany Cowen, COWAN.

Q:  (Clearing throat) Thank you.  And, prior to going on tape, Sergeant Cowan, I gave you two (pages turning) Internal Affairs memorandums.  The first one explains to you that this is a confidential investigation and you're not to discuss it with anyone outside the room.  Did you read that document?

A:  Yes.

Q:  You, did you understand it?

DC 001570

A: ...she just...

Q: ...say recent?

A: She just, she didn't say like it happened like, you know, since we've been here this time or since you're been working with us. I, if I can remember it happened in the previous rotation.

Q: Umm hmm.

A: And, they were there sometime in like September, September to December they do different rotations, go to different locations. So, they were at the academy last year around September.

Q: Ok. For how long, from September to...

A: September to maybe around November or December they started getting ready for Christmas and doing things to help with the Toys for Tots. So, it was, it was during, I think it was during that time that she was there...

Q: Ok.

A: ...that it happened.

Q: So, it could have happened between that time period, when she was there before?

A: Right.

Q: Ok. Have you ever heard of any other allegations like this with, from any other cadets concerning Sergeant Best?

A: No.

Q: Oh, did you believe, do you believe Cadet Jones?

A: I, I believe that it is possible only from the standpoint that, I mean she has nothing to, to gain by making it up, as far as, I mean he's not grading her. They're not taking tests under him that they have to pass. So, I couldn't see why she would create this type of story (beep).

Q: Umm hmm.

A: I mean I just, I don't, I mean I don't know. I mean people, you know, I guess people say and do different things. But just off of I guess what's on the line she has nothing really

A: But they, you know, they kind of reserved in how they approach people that they don't really know. So, she's kind of, you know, quiet, you know. She does what I ask her to do if I need her to do whatever it is, but just more, just like quiet, you know.

Q: Uh huh.

A: Not real vocal with the others. 'Cause there's some of the cadets she does talk to. I mean she's not completely like a loaner or anything like that. I mean she does engage with other cadets, but she's, she's just sort of to herself, but you know. Like I said I'm just getting there in January. So, I really haven't been able to say, you know, based, just based on the time I been there, I just would say she was quiet. She does what I ask her to do.

Q: Umm hmm.

A: That's pretty much, that's pretty much it.

Q: And, you, you think she came to you because...Why do you think she came to you versus another official?

A: Well, the, it's two of us. One's a male. My partner's a male. So, I'm going to think it's with this being more like a woman issue she felt comfortable coming to me opposed to going to a man.

Q: Ok. And, what's your partner's name?

A: David Queen, Sergeant David Queen.

Q: Ok. And, you said she, she does interact, Cadet Jones interacts with other cadets. Who would you say are her closest friends that she would interact with?

A: Well, I've seen her talk to the most to is Cadet Katria Washington.

Q: Umm hmm.

A: They apparently have established like a new friendship or sort of co-, they're closer apparently than I guess when they, when they first got there. It sounds like...

Q: Umm hmm.

A: I don't know, 'cause I wasn't there. Her and Cadet Sheena Sanders went to high school together.

Q: Ok.

A: But they kind of like parted ways as friends and now they're just starting to talk again.

DC 001575

Q:  Ok.

A:  Those are the main two.  Then as far as the males, Cadet Darrell Haywood, she engages in conversation with him more than I've seen of any other of the guys.

Q:  Ok.  Now, her and Haywood, are they a, like a couple or just friends?

A:  Friends.

Q:  Ok.

A:  To, to my knowledge, friends.

Q:  Ok.  And, you said Sheena Sanders went to high school with her?

A:  Umm hmm.

Q:  You know which high school?

A:  They went to Dunbar.

Q:  Ok.  Now, Sergeant Best, how would you describe him?  How does he interact with the cadets?  And, what is his role with the cadets?

A:  Well, the reason why he was, had any type of involvement with the cadets is because like we haven't been certified to teach.  So, he'll come in and go over certain things, but generally I'm in the classroom.

Q:  Ok.

A:  On the twenty first I was out of the classroom for a few, for a, well I don't know maybe twenty minutes.  I'm really not sure exactly how long I was out of the classroom.  But I came back in 'cause I like to hear what the instructors are, are telling the, the cadets.  So, that's why he's involved with them because he's going over some like blocks of instruction...

Q:  Umm hmm.

A:  ...with them.  He's done report writing with them and (noise) he was recently doing property as of on the twenty first.  That's what they was going over.  So, that's why he's involved and then he was a cadet, so I think sometimes he may talk about some cadet experiences.  And, experiences like when he was in patrol, that type of thing.

Q:  Ok.  Did you know Sergeant Best before you were assigned with the cadets?

A:  Yes.

DC 001576

# EXHIBIT 4

**METROPOLITAN POLICE DEPARTMENT**
**Office of Professional Responsibility**





## MEMORANDUM

TO:         Director
            Disciplinary Review Office

SUBJECT:    Final Investigative Report with Recommendation Relative to the Internal Affairs
            Division; Confidential Investigation Number 06003803 / IAD#06-158

Your attention is invited to the attached investigative report, together with twenty-three (23)
attachments, submitted by Agent Denise A. Garrett of the Internal Affairs Division (IAD).  This
investigation concerns allegations of misconduct by Sergeant Darrell L. Best, Superintendent of
Detectives Division, Domestic Violence Unit.

Agent Garrett's initial investigation resulted in a finding of **SUSTAINED**, whereas the evidence
presented did support the allegation that Sergeant Darrell Best, Domestic Violence Unit,
committed Time and Attendance Fraud.

Sergeant Best is currently in a Full Duty Status.  It is further recommended that he remain on
Full Duty pending a determination by the Disciplinary Review Division.

William R. Ponton
Assistant Chief of Police

Attachments

**METROPOLITAN POLICE DEPARTMENT**
**Office of Professional Responsibility**

  

## MEMORANDUM

TO:      Director
         Disciplinary Review Office

SUBJECT:  Final Investigative Report with Recommendation Relative to the Internal Affairs
          Division; Confidential Investigation Number 06003803 / IAD#06-158

Your attention is invited to the attached investigative report, together with twenty-three (23)
attachments, submitted by Agent Denise A. Garrett of the Internal Affairs Division (IAD).  This
investigation concerns allegations of misconduct by Sergeant Darrell L. Best, Superintendent of
Detectives Division, Domestic Violence Unit.

Agent Garrett's initial investigation resulted in a finding of **SUSTAINED**, whereas the evidence
presented did support the allegation that Sergeant Darrell Best, Domestic Violence Unit,
committed Time and Attendance Fraud.

Sergeant Best is currently in a Full Duty Status.  It is further recommended that he remain on
Full Duty pending a determination by the Disciplinary Review Division.

William R. Ponton
Assistant Chief of Police

Attachments

DC 001118

In addition, the interview, offered by Sergeant Best at the Internal Affairs Division, yielded no logical explanation as to the notable overlap of part-time hours worked in conjunction with his official duties and responsibilities only that, his statement provided a preponderance of evidence that his actions proved to be intentional.

Since the revelation of this allegation, it was determined that Sergeant Best worked a total of fifty-two (52) hours of authorized part-time work which overlapped his official on duty hours, whereby, his actions cost the Metropolitan Police Department an estimated $1997.32 in monies in which he was fraudulently compensated for.  Therefore, based upon the facts and circumstances outlined in this investigative report, the undersigned finds that this case be classified as **SUSTAINED.**

## RECOMMENDATIONS

It is recommended that IAD Case Number 06-158 be **CLOSED** and, further, it is recommended that Sergeant Darrell L. Best, Superintendent of Detectives Division, Domestic Violence Unit, be cited for **Adverse Action** on the following charges and specification:

| | |
|---|---|
| Charge No. 1: | Violation of General Order Series 1202, Number 1, Part I-B-12, which provides: "Conduct unbecoming an officer, including acts detrimental to good discipline, conduct that would affect adversely the employee's or the agency's ability to perform effectively, or violations of any law of the United States or any law, municipal ordinance, or regulation of the District of Columbia." This misconduct is further defined in General Order Series 201, Number 26, Part I-B-22 which provides: "Members shall conduct their private and professional lives in such a manner as to avoid bringing discredit upon themselves or the department."  This misconduct is defined as cause in Title 1, Section 617.1(d), Number(s) (10) (11) (16) of the D.C. Code. |
| Specification No. 1: | During the time period beginning January 6, 2006, until June 24, 2006, Sergeant Darrell Best worked, intermittently, a total of fifty-two (52) hours of authorized part-time work in conjunction with his official on-duty hours, whereby, his actions cost the Metropolitan Police Department an estimated $1997.32 in monies in which he was fraudulently compensated for. |

DC 001131

Charge No. 2:

Violation of General Order Series 1202, Number 1, Part I-B-6, which provides: "Willfully and knowingly making an untruthful statement of any kind in any verbal or written report pertaining to his/her official duties as a Metropolitan Police Officer to, or in the presence of any superior officer, or intended for the information of any superior officer, or making an untruthful statement before any court or hearing." This misconduct is further defined in General Order Series 201, Number 26, Part I-B-30 which provides in relevant part:  "When questioned by superior officers in connection with matters relating to the official business of the police department, subordinate members shall respond truthfully."  This misconduct is defined as cause in Title 1, Section 617.1(d), Number(s) (4) (6) of the D.C. Code.

Specification No. 1:

As part of a previous investigation, Lieutenant Michelle Robinson directed Sergeant Darrell Best to provide documentation of time worked at the Andrews Federal Credit Union, which would have occurred between January 29, 2006 thru February 10, 2006. Lieutenant Robinson indicated that Sergeant Best submitted a timecard which appeared to be altered in which the information relating to the dates being investigated therein were covered with "Wite-out" to include a diagonal line drawn though each day not worked.  She then reported that, when questioning Sergeant Best regarding the obvious alteration, he became somewhat evasive and advised that he was unsure of his actual hours worked during that time period.

Charge No. 3:

Violation of General Order Series 1202, Number 1, Part I-B-17, which provides: "Fraud in securing appointment or falsification of official records or reports."  This misconduct is defined as cause in Title 1, Section 617.1(d), Number(s)   of the D.C. Code.

Specification No. 1:

In that Sergeant Darrell Best provided an altered timecard to Lieutenant Michelle Robinson intended for use in an investigation of a violation of departmental

14

DC 001132

policy.  Not only was the information covered with "Wite-Out," but a mark was made to mislead that no time was worked on February 4, 2006.

*Denise A Garrett*

Denise A. Garrett
Agent/Sergeant
Police Corruption Unit ~ Two

## **MISCELLANEOUS**

Before completion of this final report, the undersigned agent conducted a preliminary conference with Lieutenant Scott Dignan, Internal Affairs Division, who concurred with the findings and recommendation of this report.  At present, Sergeant Darrell L. Best is in a Full Duty status.

DC 001133

# EXHIBIT 5

**Inspector Dickerson**

Page 1

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF COLUMBIA

3                      Civil Division

4      - - - - - - - - - - - - - - x

5      JAQUIA BUIE,                    :

6            Plaintiff,        :   Civil Action No.

7         v.                     :   I:16-CV-1090

8      DISTRICT OF COLUMBIA, et al.:   (CKK/RMM)

9            Defendants.       :

10     - - - - - - - - - - - - - - x

11                      November 20, 2019

12                      Washington, DC

13     Deposition of:

14            INSPECTOR DICKERSON

15     the Witness, called for examination by counsel

16     for the Complainant, at the Law Offices of

17     of Smith Mustille, LLC, 2200 Pennsylvania

18     Avenue, N.W., 4th Floor East, Washington, D.C,

19     beginning at 9:30 a.m., before Debra Derr, Court

20     Reporter and Notary Public for the District of

21     Columbia, and were present on behalf of the

22     respective parties:

Page 2

1    APPEARANCES:

2

3         On Behalf of the Plaintiff:

4         SMITH MUSTILLE, LLC

5         BY:  Mark A. Smith, Esquire

6              Judith A. Mustille, Esquire

7              2200 Pennsylvania Ave., NW

8              Fourth Floor East

9              Washington, DC  20037

10             202-776-0022

11

12        On Behalf of the Agency:

13        OFFICE OF THE ATTORNEY GENERAL

14        BY:  David A. Jackson, Esquire

15             Philip A. Medley, Esquire

16             Assistants Attorney General

17             441 Fourth Street, NW

18             Suite 630 South

19             Washington, DC  20001

20

21

22

Page 37

1    really trying to be nice today.  I hope you'll

2    let me, David.  I hope you'll let me.

3            BY MR. SMITH:

4     Q.   If you were going to assign   you

5    know, an IS number gets triggered.  A complaint

6    comes in, IS number gets triggered, and you're

7    going to make a decision who you are going to

8    assign as the investigator, right?

9     A.   Yes.

10     Q.   And you know, you have knowledge that

11    the person you are going to sign as an

12    investigator has had a 20-plus year friendship

13    with the person who is the target of the

14    investigation.  Is that a potential conflict?

15     A.   It is a conflict.

16            MR. SMITH:  Oh, she went past me.  It

17    is a conflict.  All right.

18            BY MR. SMITH:

19     Q.   I'm going to ask you a couple more

20    questions from this.  Okay, I have one.  This is

21    a little more obscure, but since you're here and

22    you seem knowledgeable, I'm going to ask you.

Page 65

```
1      A.     But it's like --

2      Q.     Is that fair?

3      A.     That's fair.  Maybe you could believe

4    what she's saying and maybe you can't based on

5    the gossipy talk.

6      Q.     But a person whose -- but she mostly

7    stays to herself, has the opposite effect.

8    This is not a person who just is running her

9    mouth all the time.  She stays to herself, so

10   that lends -- that certainly lends credibility

11   to her?

12     A.     In a way, yes.

13     Q.     You agree?

14     A.     I agree.

15     Q.     So that might be why she put in there,

16   right?

17     A.     It's possible, but I wouldn't want to

18   say 100 percent.

19     Q.     I understand, but -- I understand.

20     A.     Without -- because everything is not

21   here.

22     Q.     Say no more.  So, is it fair to say
```

Page 66

1   that it's the practice of the Internal Affairs

2   division and what are characterized as he

3   said-she said cases to find insufficient facts?

4       A.    Without any other evidence, yes.

5       Q.    That's what's he said-she said.

6       A.    Correct.

7       Q.    Now, you mentioned as other evidence,

8   you mentioned video, a third-party eye witness

9   and a contemporaneous statement to a third

10  party.  So, in the same exhibit that we're on,

11  this exhibit, go to page, well, it's numbered

12  page 5 of the final report and it's bate stamp

13  number DC001001 and the heading is findings,

14  okay.  And this is in the finding section.  And

15  I've seen this on other documents, too.

16          "The EEOC has recognized that sexual

17  harassment complaints may present evidentiary

18  problems.  Since sexually harassing conduct is

19  often displayed behind closed doors with no eye

20  witness, the EEOC permits the use of

21  circumstantial evidence to raise an inference

22  of discrimination.

Inspector Dickerson

Page 89

1    lying, that's what the finding was here, all

2    right, you agree, don't you?

3        A.    I agree.

4        Q.    Yes.  Now, why am I sharing this,

5    because now we're going to back to the exhibit --

6    what's this one --

7            MADAM REPORTER:  The sticker is right

8    at the bottom.

9            MR. SMITH:  What is it?

10           THE WITNESS:  Exhibit 4.

11           BY MR. SMITH:

12       Q.    Right, I should mark this.  So,

13   anyway, Exhibit 4.  Remember, you recall the

14   discussion we had about he said-she said,

15   right?

16       A.    I do.

17       Q.    And you recall that we had gotten into

18   the language in the document about credibility

19   in situations of he said-she said?

20       A.    I recall.

21       Q.    Now, once again, imagine that Officer

22   Norman, Norman Jones is out of the picture.

Inspector Dickerson

Page 90

1    He's not involved.  And so you have Janice Lee

2    with her story of X and Daryl Best of his story

3    with not X, right?

4        A.    Yes.

5        Q.    And you say it is the practice of MPD

6    to treat those as insufficient facts when

7    that's what the situation is, without some

8    extraneous witness or recording or

9    corroborating data, right?

10       A.    Correct.

11       Q.    But we're in the credibility zone here

12   now.  So, Janice Lee, who was a civilian

13   member, has no, no findings of being a liar and

14   a thief in the course of her job as a member of

15   MPD, none, but this, this conclusion about

16   Daryl Best in Exhibit 8, I guess it was -- no,

17   no, I'm not talking about this.  I'm

18   referencing the other one -- indicates that he

19   both stole and lied.

20            So, would that not be relevant as a

21   consideration for assessing his credibility

22   versus Janice Lee's and could -- that's the

Page 101

1   of the document that date of incident, time of

2   incident, right, and then it's got date

3   notified, time notified, right?

4       A.    Yes.

5       Q.    So, the date notified is the date that

6   the MPD is notified of the incident, right?

7       A.    That's what that should indicate, yes.

8       Q.    That's what that -- when you say that

9   should indicate that, that sometimes doesn't

10  indicate that?

11      A.    Well, this information is inputted by

12  humans and sometimes they make errors.  I'm not

13  saying they did in this case.

14      Q.    Right, right, but that's what that's

15  supposed to indicate, right?

16      A.    It should indicate that, yes.

17      Q.    And it ought to be the case that on

18  the bottom of page, "IS created by," and it has

19  a person's name -- the IS number should be

20  created the same day as the date notified of

21  the incident, right?

22      A.    It should be, yes.

Page 102

1    Q.    And when it's not that way, something

2    improper has occurred, right?

3          MR. JACKSON:  Objection as to the form

4    of the question.

5          BY MR. SMITH:

6    Q.    The system is not working the way it's

7    supposed to, if that doesn't happen, right?

8    A.    The way the system is designed, yes.

9    Q.    You mean the system is not working as

10   designed when there is a discrepancy between

11   the date notified and the IS number, right?

12   A.    Correct.

13   Q.    But as you said, there's humans

14   involved, so I imagine sometimes there's a one

15   or two day variation?

16   A.    Sometimes.

17   Q.    Right, but it's not going to be a

18   month long variation, right?

19   A.    No.  That's not the norm, no.

20   Q.    And if it is the month long variation,

21   something is -- it's not just a minor error.

22   Something is out of order, right, on a bigger

Page 123

1    Q.    But the date notified, she spoke to a

2    different sergeant about this on 4-21-2008.

3    Okay, let's just walk through this.

4    A.    Yes.

5    Q.    Now, this final report is dated

6    January 6, 2009, right?

7    A.    Yes.

8    Q.    I see you making faces and you might

9    be feeling something --

10   A.    I'm just looking at the dates.  That's

11   all.

12   Q.    I know, but the dates don't make any

13   sense to me.  Is that why you're making those

14   faces, because they don't make sense to you

15   either?

16   A.    The dates don't make sense to me.

17   Q.    Explain what you mean by the dates

18   don't make sense to you?

19   A.    Well, of course, you know, we've

20   talked in depth about the varying dates between

21   the date notified, which is 4-21 and the date

22   that the IS numbers were generated, which is

Inspector Dickerson

Page 124

1   August 5th and then, here, there's another date

2   introduced when she actually filed the

3   complaint with the EEOC and then the report

4   itself doesn't have an author date.  Although,

5   this one doesn't have any signatures on it, but

6   it does say January 6, 2009, which are all

7   significant gaps in time.

8       Q.    Right.  It would be, apart from

9   extraordinary developments, way outside the

10  90-day limit, right?

11      A.    Absolutely.

12      Q.    Now, I'm going to ask you a question

13  and I'm not questioning your voracity as you

14  strike me as -- and I'm not just trying to make

15  you feel good -- you strike me as a forthright

16  witness, but I'm going to ask you this.

17          Have there not been situations at the

18  MPD where in an effort to spare a target

19  disciplinary action, someone intentionally runs

20  past the 90 days?  And if you can -- that's the

21  question.  That's the first question.

22      A.    Well, I can't say it hasn't happened

Inspector Dickerson

1   **What's that 5-23-06?**

2      A.    I don't know.  It may be referring to

3   another case.

4      **Q.    Okay, forget about it.  I was just**

5   **looking at it and I was wondering if you might**

6   **educate me, but that's not the main reason I'm**

7   **showing you this.**

8      A.    Okay.

9      **Q.    Do you see this, look, "Interview**

10  **Haywood," okay?**

11     A.    Yes.

12     **Q.    Now, in this Daryl Best, Raynette**

13  **Jones case, if you read the narrative, you may**

14  **recall that she only said, "I spoke to one**

15  **person, Daryl Haywood."  Okay, now Daryl**

16  **Haywood's name shows up a couple times in this**

17  **file, handwritten by Ms. Webster.  Ms. Webster**

18  **never interviewed him?**

19     A.    I don't remember reading a statement

20  from him.

21     **Q.    That's because there is no one?**

22     A.    Correct.

Page 153

1      Q.      Now, you see "Subpoena phone records

2      (Best and Jones)?"

3      A.      I do.

4      Q.      Those phone record were never

5      subpoenaed.  Did you see any phone records?

6      A.      No.

7      Q.      Okay.  So, let's just take a step back

8      for a moment, okay, because this is -- I'm not

9      trying to be like a parent, but this bears

10     repeating at this moment.  If I didn't repeat

11     it, I would be negligent.

12              "The quality of an investigation is

13     the foundation on which the reputation of the

14     Office of Internal Affairs is based," okay?

15              Based on your experience for 21 years

16     and your two years as the director of IAD,

17     what's your evaluation of this investigation?

18              MR. JACKSON:  Objection as to the form

19     of the question.

20              THE WITNESS:  My evaluation is that

21     it's not comprehensive.  It doesn't cover all

22     bases as, if you will, it doesn't dot all the

Inspector Dickerson

1   Is and cross all the Ts.

2           BY MR. SMITH:

3       Q.    **Was this investigation fair to**

4   **Raynette Jones?**

5           MR. JACKSON:  Objection to relevance.

6           THE WITNESS:  No, because it was not

7   comprehensive.

8           BY MR. SMITH:

9       Q.    **Do you recognize that the -- when you**

10  **review this file -- let me show you something.**

11  **Before I ask you the next question, I'm going**

12  **to show you this.**

13      A.    Okay.

14          (Discussion off the record.)

15          MR. SMITH:  Debra, Let's mark this as

16  Exhibit 11?

17          MADAM REPORTER:  12.

18          MR. SMITH:  12, even dozen.  Turn to

19  1529.  Actually, you know what, I don't know

20  why I did that.  It's in your file, 1529, yes.

21  So kill that Exhibit 12.

22          MADAM REPORTER:  Okay.

Inspector Dickerson

Page 163

1    Sergeant -- oh, this is Sergeant -- who is

2    saying this --

3              (Discussion off the record.)

4              Okay, now there's a document I want to

5    show you, but I don't have a copy of it, so I'm

6    going to show it to you and both of your

7    lawyers can take a look at it to make sure that

8    I'm not showing you something out of line.  All

9    it is, is the list of sex abuse offenses, okay?

10   A.    Okay.

11   Q.    Okay, now it's D.C. Code Title 22,

12   Criminal Offenses, Chapter 30, Sexual Abuse,

13   subchapter 2, Sex Offenses," sections 223002

14   through 223009.04, right?

15   A.    Yes.

16   Q.    And you see one of them is sexual

17   abuse with a ward, okay?

18   A.    I don't see that exact one, the ward.

19   I do see second degree child sexual abuse and

20   first degree child sexual abuse.  Is the ward

21   on here?

22   Q.    Yes, it's on there.

Page 164

1     A.     I'm getting my pages all confused.

2     **Q.     Okay, there it is right there**

3  **(indicating).**

4     A.     Okay, I can make it bigger.

5            MR. JACKSON:  Just so you don't get

6  confused.

7            THE WITNESS:  Are these yours?  I

8  think those are yours because I have them right

9  here.

10           BY MR. SMITH:

11    **Q.     All right,**

12    A.     Double click it, there we go.

13    **Q.     Now, will you read that out loud?**

14    A.     The statute?

15    **Q.     Yes.**

16    A.     Sure.  "Any staff member, employee

17  contract employee, consultant or volunteer at a

18  hospital, treatment facility, detention or

19  correctional facility, group home or other

20  institution, anyone who is an ambulance driver

21  or attendant, a bus driver or attendant or

22  person who participates in the transportation of

Page 165

1    a ward, patient, client or prisoner to and from

2    such institution or any official custodian of a

3    ward, patient, client or prisoner who engages

4    in a sexual contact with a ward, patient,

5    client or prisoner or causes a ward, patient,

6    client or prisoner to engage in or submit to a

7    sexual contact shall be imprisoned for not more

8    than five years or fined not more than the

9    amount set forth in."

10       **Q.    Okay, now, based on that description**

11   **of that crime, how would this have anything to**

12   **do with this case?**

13       A.    I don't think that it does.  So, are

14   you asking me does this charge fit what we've

15   talked about?

16       **Q.    It wouldn't.  We're talking about the**

17   **Raynette Jones' case, right, from there to now?**

18       A.    Yes.

19       **Q.    Now, at the same time, why would the**

20   **facts of this case be related to that charge as**

21   **a possibility?  We don't have a ward involved,**

22   **right?**

Page 166

```
 1      A.     Agree.

 2      Q.     So, this is -- you agree also that

 3   this is one of many peculiar dimensions to this

 4   investigation, right?

 5      A.     Yes, in that the declination has that

 6   language.

 7      Q.     When you say "in that the declination

 8   has that language," that's the charge that was

 9   declined."  Look at this.  Look at how easy

10   this could have been done.

11             I mean, look at misdemeanor, sexual

12   abuse.  Will you read that one, please?

13      A.     Sure.  "Whoever engages in a sexual

14   act or sexual contact with another person and

15   who should have knowledge or reason to know

16   that the act was committed without that other

17   person's permission shall be imprisoned for not

18   more than 180 days."

19      Q.     I'm not asking you, should he be

20   convicted of that, but if a credible, possible

21   charge was to be contemplated, wouldn't that

22   make totally more sense than second degree
```

Page 167

1    sexual abuse with a ward?

2        A.    Yes.

3        Q.    All right.  Hold on, we're coming

4    along fine here.  You know, I think we'll be

5    done before 4:00, I do.

6              Are you in headquarters, is your

7    office in headquarters?

8        A.    Yes.

9        Q.    Are you on the fifth floor?

10       A.    I am.

11       Q.    How long have you been there?

12       A.    Since March of this year, the end of

13   March this year.

14       Q.    Do you have restricted access to the

15   elevator?

16       A.    Do I?

17       Q.    Yes.

18       A.    To come to my floor?

19       Q.    To come to the fifth floor.

20       A.    Yes, I have to swipe my ID to come to

21   that floor.

22       Q.    Everybody can't just come to the fifth

Inspector Dickerson

Page 168

1    floor, right?

2      A.    That's correct.

3      Q.    **How is it determined who gets to come**

4    **to the fifth floor?**

5      A.    I don't know who makes that

6    determination.

7      Q.    **And everybody can't get into the**

8    **parking garage either, right?**

9      A.    That's correct.

10     Q.    **How is it determined who gets into the**

11   **parking garage?**

12     A.    Well, there's a security guard there

13   and we have placards in our cars as well as I

14   drive a vehicle that has government tags.

15     Q.    **So, any vehicle with government tags**

16   **can get in the garage?**

17     A.    I don't know the exact procedure, but

18   I don't see why they would challenge that

19   person.

20     Q.    **Well, do you know about officers being**

21   **detailed?**

22     A.    Do I know about it?

Inspector Dickerson

Page 170

1      A.    I understand.

2      **Q.    The transfer is permanent, right?**

3      A.    Yes.

4      **Q.    Okay, so are you familiar with the**

5  **organization, International Association of**

6  **Chiefs of Police?**

7      A.    I'm aware of what it is, yes.

8      **Q.    And the District participates in that**

9  **organization?**

10          MR. JACKSON:  Objection.

11          THE WITNESS:  I do believe so, yes.

12          BY MR. SMITH:

13     **Q.    Why do you believe that?**

14     A.    Because I've been aware that our chief

15  has attended that conference.

16          MR. SMITH:  Okay, I want you to mark

17  this document as exhibit whatever it is.

18          MADAM REPORTER:  12.

19          MR. SMITH:  12?

20          MADAM REPORTER:  Yes.

21          (Discussion off the record.)

22          BY MR. SMITH:

Inspector Dickerson

Page 171

1      Q.      Okay, now, are you ready for me to ask

2   you a few questions?

3      A.      Sure.

4      Q.      So, according to this document -- and

5   what is this document, ma'am?

6      A.      Well, this is the International

7   Association of Chiefs of Police Executive Guide

8   addressing sexual offenses and misconduct by

9   law enforcement.

10             (Documentation referred to above was

11              marked Deposition Exhibit Number 12

12              for Identification, copy of which is

13              attached to the transcript.)

14             BY MR. SMITH:

15      Q.      Now, you mentioned that you've had

16   prior knowledge of this organization.  What

17   does this organization, in general, apart from

18   this document, exist to do?

19      A.      I guess in what knowledge I do have,

20   they suggest or create policies or guidelines

21   for law enforcement from varying subjects such

22   as this to just everyday interactions with

Inspector Dickerson

Page 172

1   citizens and anything, of course, that can

2   adversely effect the profession.

3       Q.    And in the spirit of my -- at least

4   for purposes of this deposition, my hero,

5   Mr. Michael Anzallo, okay --

6       A.    Okay.

7       Q.    You know, earlier on, we talked about

8   the duty to identify trends and developments,

9   you know, proactively to seek them out, right?

10      A.    We did.

11      Q.    So, let me ask you this.  When was

12  this document published?  Just to help you out,

13  go to the last page, the very last page.  What

14  does it indicate?

15      A.    Okay, June of 2011.

16      Q.    June of 2011.  And where is the

17  International Association of Chiefs of Police

18  located?

19      A.    In Alexandria, Virginia.

20      Q.    Right in out backyard, right?

21      A.    Correct.

22      Q.    So it makes it easy for the

Page 180

1    dominated endeavor, but D.C. actually has more

2    females than most police departments, don't

3    they?

4       A.    I really don't know.

5       Q.    Do you have a sense of what the

6    percentage of females are at the MPD?

7       A.    Possibly 18 to 20 percent.

8       Q.    18 to 20?

9       A.    Maybe.

10      Q.    I bet you it's slightly higher than

11   that, but the point is that in modern policing,

12   don't you believe sexual misconduct policy

13   ought to exist in the police department?

14      A.    I do.

15      Q.    Do you wonder why it's not at MPD?

16            MR. JACKSON:  Objection.  Misstates

17   the policies and procedures effective at MPD.

18            THE WITNESS:  Do I wonder why?

19            BY MR. SMITH:

20      Q.    That there is not police sexual

21   misconduct policy at the MPD --

22            MR. JACKSON:  Objection.

Page 181

1          BY MR. SMITH:

2     **Q.     -- besides the one strand of EEO**

3  **harassment?**

4     A.    I wouldn't say that I wonder why, but

5  I do believe that it needs to be more clearly

6  defined.

7     **Q.    So, is it your view that there already**

8  **is a policy?**

9     A.    We have policies that govern our

10 behavior.  However, it's not clearly defined.

11    **Q.    As police sexual misconduct?**

12    A.    As police sexual misconduct and as,

13 for example, what we have here, clearly

14 delineated for all to see, these are the things

15 that we're saying or potentially would say as

16 an agency that relate to sexual misconduct.

17    **Q.    Okay, why do you think that is the**

18 **case; is it left intentionally ambiguous in**

19 **your view?**

20    A.    I don't believe so.  I don't think

21 it's intentionally ambiguous.  Why it's not

22 done, I don't really know.  Do I think it's

Page 182

1    needed, absolutely.

2        Q.    Okay, bear with me a moment.  All

3    right, hold on for a minute.  Okay, go to page

4    11 of this document that we're looking at now.

5    Thematically, this is something worth

6    discovering.  This pertains to investigations,

7    right?

8        A.    Okay.

9        Q.    This is the product of commensurating

10   chiefs of police trying to address this

11   problem.  This is not my document, right?

12       A.    Understood.

13       Q.    "Victims" -- mid page -- "Victims may

14   be reluctant to report an incident and/or

15   participate in the investigation for a variety

16   of reasons, including trauma of the incident,

17   fear of not being believed, retaliation from

18   the perpetrator or other officers and previous

19   bad experiences with law enforcement."

20           So do you agree that these points

21   annunciated in here are relevant to the

22   environment at MPD?

Page 202

1      Q.     Right and so the idea is that, well,

2   in my judgment, this triggers sustained, but I

3   don't make the calls about what you're going to

4   do about it?

5      A.     Correct.

6      Q.     Okay, I got it.  Now, you know about

7   the SSP system, right?

8      A.     Yes, I'm aware of the system.

9      Q.     In your position, if you weren't that

10  would be a problem, but it was used in 2008,

11  right?

12     A.     The first time SSP -- I'm sorry, I'm

13  just talking to --

14     Q.     You're thinking out loud.  I get it.

15     A.     I'm thinking out loud.  The first time

16  SSP was around, was around 2007, but I don't

17  exactly know when in 2007.

18     Q.     I understand.  I understand, but that

19  would cover -- that would get us to 2008.

20     A.     It covers 2008.

21     Q.     Right, so the point system, a

22  sustained sexual misconduct, that's 100 points,

Inspector Dickerson

Page 203

1    right?

2         A.    It should be.  I don't see why it

3    wouldn't be.

4         Q.    You don't know?

5         A.    Don't know what?

6         Q.    Whether it's 100 points.

7         A.    I think an allegation of that

8    magnitude would be a sustained 100 points.

9         Q.    Okay, so I don't see any indication

10   that after he managed to dodge the much more

11   serious allegations of Raynette Jones and then,

12   Ms. Webster sustained the further serious, even

13   though important, the further serious

14   allegations -- one woman getting her butt

15   touched one time, and she's a grown woman --

16   not that you get to touch grown women, but you

17   understand, she's just more capable of enduring

18   these kind of infringements than a young

19   non-adult who is more trusting and vulnerable

20   and even -- I'm sorry -- I got lost.

21              So, the question is, what was the

22   question?  We don't see anything about SSP in

Page 209

```
 1   minute break.

 2            (Brief Recess)

 3            BY MR. SMITH:

 4       Q.    This is Exhibit 14.  Please take a

 5   look at that packet and I want to ask you a few

 6   questions.

 7       A.    Okay.

 8            (Documentation referred to above was

 9             marked Deposition Exhibit Number 14

10             for Identification, copy of which is

11             attached to the transcript.)

12            BY MR. SMITH:

13       Q.    Okay.  So another incident of alleged

14   misconduct against Officer Best, right?  The

15   main reason I'm pointing this one out is that

16   the cover sheet has the following discrepancies

17   were found and it reads, "Please interview wife

18   of complainant with whom Officer Best is

19   alleged to being having the affair," and then,

20   "Officer Best's response to the allegation of

21   wearing his gun and badge in the pulpit of his

22   church does not adequately answer the
```

Inspector Dickerson

Page 210

1   question."

2           If you review this, you'll see that,

3   okay, Officer Best enhanced his statement.

4   They never interviewed this guy's wife?

5       A.    No.

6       Q.    You see that, right?

7       A.    Yes.

8       Q.    And you know he denied that he was

9   having an affair with her and then, he went

10  onto marry her later.  You know that, right?

11      A.    I do know that.

12      Q.    It's not funny, but it is.

13      A.    It's not.

14      Q.    It's not funny, but it is.  So, is it

15  your view that -- you didn't have anything to

16  do with this investigation, right, Inspector?

17      A.    Oh, no.

18      Q.    But his wife should have been spoken

19  to, right?

20      A.    Absolutely.

21      Q.    So, this is a failed investigation,

22  right?

Inspector Dickerson

Page 211

1      A.    It's not comprehensive.

2      **Q.    And so, is it not comprehensive a**

3  **euphemism for failed?  I mean, so at what point**

4  **is -- seriously -- what makes a failed**

5  **investigation in your estimation?  How many**

6  **things have to be wrong, because you said the**

7  **Raynette Jones investigation was not**

8  **comprehensive and it's got -- it's like Swiss**

9  **cheese.**

10         **So what makes for a failed**

11 **investigation, must an investigator -- how many**

12 **balls must be dropped for you to comment as**

13 **failed?**

14     A.    Well, I think you use one term and I

15 use another.

16     **Q.    Okay, fine.  So, if not --**

17     A.    Maybe our outcome is the same, but I

18 say not comprehensive and you say failed.

19     **Q.    Okay.  Fair enough.  I think we're**

20 **done.  Oh, one more question that I didn't ask.**

21 **Going back to the Raynette Jones investigation,**

22 **if the sustained allegations associated with**

Inspector Dickerson

Page 212

1    lying and stealing from the District had been

2    applied in the Raynette Jones investigation,

3    had been taken into account so that she is

4    saying she, the 20 year-old whose got nothing

5    to gain and everything to lose by accusing this

6    man, stepped forward, levies her allegations,

7    he has a great deal to lose and everything to

8    gain by lying and so we've got -- because no

9    form records were obtained and her only witness

10   that offered any level of corroboration -- and

11   she didn't say, "He's going to tell you, I told

12   him everything."  She said, "I told him certain

13   things," but it would have been some level, was

14   not pursued, so it was turned into an

15   artificial he said-she said because of a

16   failure to pursue evidence, shouldn't that --

17   in that situation, given that the pre-existing

18   adverse action have operated against the

19   credibility of Daryl Best to turn the tide in

20   that situation to a sustained?

21        A.    I think that it should have, but I

22   also testified earlier that, that investigation

Page 213

1   was not comprehensive, so had there been a

2   comprehensive investigation coupled with the

3   allegations and the findings of the other

4   investigation, lending to the, as you said, the

5   20 year-old who has everything to lose in this

6   situation by coming forward and the history and

7   the disciplinary or investigative history of

8   Best, I do believe we could have reached a

9   preponderance of evidence in the Jones case,

10  but again, I stress had there been a

11  comprehensive investigation.

12      **Q.    And what I'd say, if it hadn't been a**

13  **failed investigation?**

14      A.    If hadn't have been.

15      **Q.    A failed, but yes.**

16          MR. SMITH:  For now, unless do you

17  want to ask her any questions?

18          MR. JACKSON:  I have no questions.

19          MR. SMITH:  Well, let me just make

20  sure that I'm not sleeping because I'm out of

21  energy and I'm not feeling -- I had lots of

22  energy when I came this morning, but now I feel

# EXHIBIT 6

DC 001758

METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.
MOTOR POOL CRUISER DISPATCH REPORT - PROPERTY DIVISION

P.D. 872 Rev. 3/74

| DATE | OPERATOR'S NAME | PHONE | ORG ELM | PURPOSE | TIME OUT | IN | OUT | MILEAGE IN | P.D. 378 | OPERATOR'S SIGNATURE |
|------|-----------------|-------|---------|---------|----------|-----|-----|-----------|----------|---------------------|
| 12/1/14 | Watson | 24193 | CSS | Car theft | 140 | 1115 | 1973c | 12318 | | |
| 12/1/14 | RSS | | CVS | | | | 1435 | | | |
| 12/1/14 | | | | | | | | | | |
| 12/14 | Winston SC | | PKG | Patrol | 8900 | 000 | 20238 | 20214 | | |

DC 7802

DECEMBER 14

PAGE ____ OF ____ PAGES

DC 001759

METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.

MOTOR POOL CRUISER DISPATCH REPORT - PROPERTY DIVISION

169004    DC 7802

| DATE | OPERATOR'S NAME | PHONE | ORG. ELM | PURPOSE | TIME OUT | TIME IN | MILEAGE OUT | MILEAGE IN | P.O. 175 | OPERATOR'S SIGNATURE |
|------|-----------------|-------|----------|---------|----------|---------|-------------|------------|----------|----------------------|



Metropolitan Police Department
Washington, DC

Organizational Chart
February 21, 2020

# EXHIBIT 7



# Addressing Sexual Offenses and Misconduct by Law Enforcement:

## EXECUTIVE GUIDE



# Table of Contents

**Introduction** . . . . . . . . . . . . . . . . . .1

**How To Use This Guide**. . . . . . . . . . . . .1

**Background** . . . . . . . . . . . . . . . . . . . .2

**Overview**. . . . . . . . . . . . . . . . . . . . .2
The Reality Facing Law Enforcement . . . . . . .2
Definitions . . . . . . . . . . . . . . . . . . . . .3
The Culture of Law Enforcement . . . . . . . . .4

**Leadership Actions** . . . . . . . . . . . . . .5
Considering A Policy . . . . . . . . . . . . . . .5
Hiring . . . . . . . . . . . . . . . . . . . . . . . .7
Training . . . . . . . . . . . . . . . . . . . . . . .8
Evaluations and Early Intervention Systems . . . .9

**Incidents and Investigations** . . . . . . .10
Reports or Complaints . . . . . . . . . . . . . .10
The Investigation . . . . . . . . . . . . . . . .11
Dispositions . . . . . . . . . . . . . . . . . . .12
Victims . . . . . . . . . . . . . . . . . . . . . .13

**Collaboration** . . . . . . . . . . . . . . . . .14
Criminal Justice System Collaboration . . . . . .14
Community Collaboration . . . . . . . . . . . .15

**Conclusion** . . . . . . . . . . . . . . . . . . .15

## IACP National Working Group on Sexual Offenses by Police Officers

**Carrie Abner, Project Director**
Council of State Governments
American Probation & Parole Association

**Dan Clark, Director of Professional Training**
Cleveland Rape Crisis Center

**Tracy Dahmer Farris, Director**
Domestic Violence and Sexual Assault Project
LA Dept of Justice, Office of Attorney General

**Chief Bernadette DiPino**
Ocean City Police Department

**Chief Judge Arthur Gamble**
Polk County Courthouse

**Lieutenant Terence M. Gibbs**
Philadelphia Police Department

**Professor Roger Goldman**
Saint Louis University School of Law

**Dr. Lorraine W. Greene, Psychologist**
Metropolitan Nashville Police

**Chief Kimberly S. Lettner**
Virginia Division of Capitol Police

**Rachel Lloyd, Executive Director**
Girls Educational and Mentoring Services

**Timothy Maher, Director**
Outreach Program, University of Missouri-St Louis

**Chief Russell Martin**
Delaware Police Department

**Susan Nichols, Director**
ILETSB Executive Institute, Western Illinois University

**Chief David W. Nye**
Fredericksburg Police Department

**Susan D. Reed, Criminal District Attorney**
Bexar County District Attorney's Office

**Major Charles Skurkis**
Pennsylvania State Police Department

**Patsy Taylor, Director**
Louisiana Protective Order Registry

**Major Hector Velez**
Prince George's County Police Department

**Professor Samuel Walker**
School of Criminology, University of Nebraska

**Susan Weinstein, Writer/Researcher**
Grand Strategies, Inc

### IACP Fellows

**Jeffrey Ebersole**
Captain – Loudoun County Sheriff's Office
Fellow – IACP Research Directorate

**Charles Hoffman**
Lieutenant – Prince William County Police Department
Fellow – IACP Research Directorate

### IACP Project Staff

**Deborah Chandler,
Former Policy and Training Coordinator**

**Aviva Kurash, Program Manager**

**Michael Rizzo, Project Manager**

**Nancy Turner, Sr. Program Manager**

### IACP Executive Staff

**Daniel Rosenblatt, Executive Director**

**James McMahon, Deputy Executive Director**

**John Firman, Research Center Director**

Every effort has been made to ensure that this document reflects current and comprehensive information. A wide array of feedback was solicited, and many subject matter experts contributed their knowledge.

This project was supported by grant no. 2005-WT-AX-K077 awarded by the Office on Violence Against Women, U.S. Department of Justice. The opinions, findings, conclusions, and recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the Department of Justice, Office on Violence Against Women.

"It is imperative to the protection of citizens' civil rights and the trust communities place in law enforcement that policies be adopted as part of a clear statement that sexual misconduct will not be tolerated."

—Chief David Nye, Fredericksburg Police Department, VA

# Introduction

The problem of sexual misconduct by officers warrants the full attention of law enforcement leadership. It represents a grave abuse of authority and a violation of the civil rights of those victimized.* Law enforcement agencies and executives have a duty to prevent sexual victimization, to ensure it is not perpetrated by their officers, and to take every step possible to ensure the safety and dignity of everyone in the community.

When an incident of sexual misconduct involving a law enforcement officer is reported, it presents one of the most difficult challenges a law enforcement executive can face. Therefore, it is imperative that executives prepare through agency mission, policy, and training to proactively address and prevent incidents. Leaders must demonstrate to their officers and their community a consistent, focused effort to identify and eliminate misconduct through the institutionalization of a zero tolerance position.

Sexual misconduct within an agency may be indicative of a need for systemic and cultural changes. Creating and implementing a policy are key steps to ensure an agency is prepared to respond to allegations, reinforce officer accountability, and ultimately prevent abuses of power.

> **Accountability of Law Enforcement: Under the 'Color of Law'**
>
> * According to 18 U.S.C. § 241, it is unlawful for two or more persons to conspire to injure, oppress, threaten or intimidate another person in the free exercise of any right or privilege provided to another by the Constitution or laws of the United States. Similarly, 18 U.S.C. § 242 makes it a crime for a person who is acting under the color of law to willfully deprive another person of any right or privilege provided to another by the Constitution or laws of the United States. Under § 242, acts performed under the "color of law" include those conducted by federal, state, and local law enforcement officials within their lawful authority and any act conducted while the official is pretending to act in accordance with his or her official duties. The types of misconduct covered by these laws include: excessive force, sexual assault, intentional false arrest, and the intentional fabrication of evidence resulting in a loss of liberty to another.  Enforcement of these provisions does not require that any racial, religious, or other discriminatory motive exists.

# How to Use this Guide

This guide has been created to promote an understanding of the complexities of sexual offense and misconduct cases involving officers and to encourage the proactive adoption of policy and prevention efforts within law enforcement agencies.

Within this guide, references to misconduct are intended to encompass criminal offenses as well as non-criminal sexual conduct that is inappropriate, unprofessional, and damaging to the public confidence in the department.

This guide's reference to officers is intended as an inclusive term for all sworn agency employees. Departments are encouraged to apply these strategies to all employees, civilian and sworn, as appropriate.

# Background

Recurring accusations of sexual offenses implicating law enforcement officers were noted with concern by the Office on Violence Against Women of the U.S. Department of Justice which funded the IACP to examine the problem of sexual offenses and misconduct and to develop resources to assist law enforcement leaders in investigating and preventing incidents.

IACP's work in the 1990's to address domestic violence committed by law enforcement officers uniquely situated the Association to explore this serious problem and issue recommendations to the field. In 2007 the IACP hosted a roundtable discussion during the Association's 114th Annual Conference in New Orleans to learn from department leaders about situations they confronted and the resulting problems. Over seventy executives chose to attend this moderated discussion that was closed to the media. The range of concerns and incidents many had faced in their own agencies made it clear that sexual offenses and sexual misconduct committed while officers were on or off duty necessitated focused attention and a proactive response.

As a leadership organization with a history of addressing difficult issues in law enforcement including civil rights, racial profiling, immigration, and the use of force, the IACP took on the work of addressing sexual offenses and sexual misconduct committed by officers with an intent to develop tools to assist the profession and prevent abuses of power. Building from a variety of tools created to address the crime of sexual assault including Sexual Assault Investigative Guidelines, a Model Policy on Sexual Assault, and a roll call training video on preparing sexual assault cases for effective prosecution, the IACP assembled a multidisciplinary working group to guide efforts to examine sexual offenses committed by law enforcement officers. Through a process of study and discussion, the working group drafted this guide to assist executives. Following outside review by victim advocacy and criminal justice professionals, including some law enforcement leaders who attended a 2007 roundtable discussion on this matter and others who are alumni of the IACP's National Law Enforcement Leadership Institute on Violence Against Women, recommendations were explored and this guide finalized.

# Overview

## The Reality Facing Law Enforcement

While the vast majority of law enforcement personnel perform honorable and conscientious work on a daily basis, the reputation of their respected profession is tarnished by just one incident of sexual misconduct.

Cases of sexual misconduct committed by law enforcement grab the attention of the public and media because such offenses are particularly egregious violations of trust and authority. Situations where officers engage in sexual misconduct and victimize those they are sworn to protect and serve amount to civil rights violations. Reported and investigated cases of sexual misconduct by officers appear all too frequently in the news. Regardless of the rate of occurrence, the problem is real.

**Headlines**

The following sample of 2009 and 2010 cases in the news highlights the variety of ways sexual misconduct by law enforcement can manifest itself.

- After a sheriff from an agency in a great plains state was sentenced to 79 years in prison for sexually abusing numerous female inmates and drug court defendants, the municipality was found liable for $10 million in damages.

- A police chief and assistant chief from a small department in the midwest were each sentenced to 25 years in prison for raping a woman in a bar after hours while off duty. The convictions, which

were supported by evidence including admissions, require them to serve at least 14 years before being eligible for parole, and they will be on the state sex offender registry for the rest of their lives.

- Following an investigation by the FBI, an officer with a west coast agency received a nine year federal prison sentence for sexually assaulting a motorist and violating her civil rights. The officer admitted in court that he took the victim in his patrol car to an isolated parking lot away from the traffic stop and assaulted her while armed and in his full police uniform. The victim left her job after the officer twice went to her workplace to warn her he was watching her.

- A police officer from an agency in the west received one year in jail for fondling a woman he had in custody and was transporting to a hospital for a psychiatric evaluation. The department had previously received a complaint that this officer made sexual comments to a woman during a traffic stop.

- A major city police department in the eastern United States settled a lawsuit alleging that an off-duty officer who was in uniform working security at a nightclub lifted a woman's skirt and "offensively touched" and assaulted her while escorting her from the club.

- A small western department suspended an officer for inappropriate conduct after he sent text messages and a picture of himself to a rape victim. Prior to being suspended, he had been assigned to investigate sex crimes and was demoted for having an intimate relationship with a victim.

This list of cases is troubling and indicates that this problem can and does occur in every section of the country.

## Definitions

Sexual misconduct by law enforcement is defined as any behavior by an officer that takes advantage of the officer's position in law enforcement to misuse authority and power (including force) in order to commit a sexual act, initiate sexual contact with another person, or respond to a perceived sexually motivated cue (from a subtle suggestion to an overt action) from another person. It also includes any communication or behavior by an officer that would likely be construed as lewd, lascivious, inappropriate, or conduct unbecoming an officer and violates general principles of acceptable conduct common to law enforcement.[1]

> "There are hundreds of thousands of police officers doing a wonderful job out there, and to protect them, we need to respond aggressively when officers violate the community's trust."
>
> — Chief Bernadette DiPino, Ocean City Police Department, MD

The limited research to date has focused on criminal sexual misconduct committed by officers while on duty. However, in recent years concern has extended to additional forms of sexual misconduct that include adult consensual sexual contact while on duty, voyeuristic behavior, and non-sexual contacts (e.g., unnecessary call backs to crime victims and witnesses).

The various forms of sexual misconduct by law enforcement, some of which are criminal acts, may be directed at colleagues, citizens, detainees, juveniles, and crime victims or witnesses.[2] Forms may include, but are not limited to, the following:

1. sexual contact by force (*e.g.*, sexual assault, rape);

2. sexual shakedowns (*e.g.*, extorting sexual favors in exchange for not ticketing or arresting a citizen);

---

[1]  This definition is adapted from one developed by Timothy M. Maher, professor of criminology and criminal justice at the University of Missouri at St. Louis.

[2]  In 1994, researcher Allen Sapp developed seven individual categories of police sexual offenses (Sapp, Allen, D., "Sexual Misconduct by Police Officers," *Police Deviance*, Cincinnati, OH: Anderson Publishing, 1994), and Timothy Maher added an eighth based on his research. (Maher, Timothy M., "Police Sexual Misconduct," *Contemporary Policing: Controversies, Challenges and Solutions*, Los Angeles, CA, Roxbury Publishing Company, 2004, pp. 327-338).

3. gratuitous physical contact with suspects (*e.g.*, inappropriate or unnecessary searches, frisks or pat-downs);

4. officer-initiated sexual contacts while on duty;

5. sexual harassment of colleagues/co-workers;

6. engaging in citizen-initiated sexual contact while on duty;

7. sexual behavior while on duty (*e.g.*, masturbation, viewing and/or distributing pornographic images, sexting);

8. voyeuristic actions that are sexually motivated (*e.g.*, looking in windows of residences for sexually motivated reasons);

9. unnecessary contacts/actions taken by officers for personally and/or sexually motivated reasons (*e.g.*, unwarranted call backs to crime victims, making a traffic stop to get a closer look at the driver for non-professional reasons); and

10. inappropriate and unauthorized use of department resources and/or information systems for other than legitimate law enforcement purposes.

Further complicating a full understanding of the scope of the problem is due in part to the reluctance of victims to report to authorities. In addition to experiencing the trauma of the violation, victims struggle with feelings of humiliation and fear retaliation or not being believed. Another reason it is difficult to gauge the extent of the problem is because accused officers will resign, expecting to avoid a complete administrative investigation. These officers might then be hired by another agency where they may continue to commit offenses against colleagues and/or citizens. Therefore, it is imperative that a complete investigation is carried out whether or not the accused officer resigns.

Putting the scope of the problem aside, it is certainly clear that sexual misconduct by officers requires the attention of law enforcement leaders. Law enforcement executives are responsible for establishing and maintaining a healthy culture within their agencies and need to recognize that elements of law enforcement culture can contribute to the proliferation of sexual misconduct and its subsequent minimization. This requires leaders to consistently look to identify and prevent even the most subtle forms of misconduct which left unchecked can encourage widespread abuses and adversely affect the law enforcement agency and profession. Through their own words and actions, leaders must embody the highest standard of professionalism for their officers.

## The Culture of Law Enforcement

Within the policing profession some conditions of the job may inadvertently create opportunities for sexual misconduct. Law enforcement officers (1) have power and authority over others; (2) work independently; (3) sometimes function without direct supervision; (4) often work late into the night when their conduct is less in the public eye[3]; and (5) engage with vulnerable populations who lack power and are often perceived as less credible (*e.g.*, juveniles, crime victims, undocumented people, and those with addictions and mental illness). Furthermore, some people are so impressed by and attracted to the authority the uniform and badge represent that they will seek to engage officers in sexual relations in order to have a vicarious connection to the power of the profession.[4]

> "It is the agency executive's responsibility to foster an environment in which ethical behavior is expected and each member of the department is held accountable for meeting those standards."
>
> —Chief Russ Martin, Delaware Police Department, OH

---

[3]  Lettner, Kimberly S., "Developing Policies to Address Police Sexual Misconduct," Richmond, VA, University of Richmond, 2004, pp. 12-13; and Maher, Timothy M., "Police Sexual Misconduct: Female Police Officers' Views Regarding its Nature and Extent," *Woman and Criminal Justice*, Vol. 20, Issue 3, 2010, pp. 263-282.

[4]  Discussion at IACP Focus Group, Alexandria, VA, March 15, 2010.

Within the profession, the existence of a law enforcement culture of allegiance and loyalty forms an important backdrop against which officers risk personal safety to protect and serve the public. While admirable in circumstances that are legitimate to effective policing, these principles may lead to the belief that fellow officers will protect or provide cover in questionable circumstances. This could result in situations where unprofessional and even illegal behavior is tolerated out of a misplaced sense of loyalty. Over the past decade, work by professional leadership organizations, including the IACP, with law enforcement officials on ethics, accountability, and peer-to-peer mentoring have done much to mitigate this potential.

Sexual misconduct within the ranks must be recognized so agencies can then take appropriate administrative and criminal actions to deter and prevent future incidents[5], promote healthy environments and build community trust. Failure to identify misconduct and enforce accountability for even seemingly minor indiscretions may not only empower the officer, but may also encourage those who have knowledge of, or were witness to, the behavior to commit similar or more serious offenses. Tolerance at any level will invite more of the same conduct. Therefore, it is critical that law enforcement executives ensure that every reported incident of sexual misconduct is investigated thoroughly and all employees with knowledge of sexual offense(s) who fail to report it are held accountable.

---

**Sexual Harassment in the Ranks**

Historically law enforcement has been a male-dominated profession; today women comprise just 18% of state and local law enforcement (LEMAS, 2007). As a minority within the profession, women are sometimes subjected to sexually harassing behavior from colleagues that seems designed to challenge their right to work in law enforcement. Legal liability for sexual harassment in the workplace was established in the 1980's and, as a result, once an employer is informed about actions of an employee, they can be held accountable if they fail to stop such behavior or allow the creation of a hostile work environment. Agency leadership needs to be aware of subtle as well as overt aspects of internal agency culture directed at those in the minority, whether along the lines of gender, race, religion, sexual orientation, or nationality, that may negatively shape the job climate. The potential for these attitudes to spill over and affect the perception and treatment of members of the public should also be recognized and addressed. In addition to shaping the culture with their priorities, standards, and expectations, leaders need to proactively monitor the culture within their agencies and establish employee reporting mechanisms that provide protections from retaliation.

---

# Leadership Actions

## Considering a Policy

Any type of officer misconduct erodes trust in, and respect for, the profession. When a leader fails to ensure the adequate monitoring of officer actions or disregards complaints or concerns about officer conduct, the department in effect condones the misconduct and enables it to proliferate. It is the leader's responsibility to ensure that policies to address and prevent sexual offenses are implemented; that all employees regularly receive effective training (*see page 11*); and that roles, responsibilities, and professional standards are communicated clearly and reinforced consistently throughout the department.[6] Through strong leadership and policies, agency employees at all levels can be held accountable for their actions.

While strong policies prohibiting sexual harassment are necessary, relying on existing sexual harassment policies to cover matters of sexual misconduct involving members of the public is

---

5   Maher, "Police Sexual Misconduct" pp. 327-338, citing Sapp.

6   Walker, Samuel and Dawn Irlbeck, "Driving While Female: A National Problem in Police Misconduct," Omaha, NE, University of Nebraska, 2002, p. 3

completely inadequate. Similarly, provisions covering conduct unbecoming an officer are generally insufficient, for example, to address the full range of predatory or stalking behaviors that can be precursors to assaults but may appear to be reasonable surveillance actions as part of an investigation.

Two reasons are commonly offered by executives as to why they would resist instituting a sexual misconduct policy or program. First, they report that there is no sexual misconduct problem in their agency. This may be an indicator of an undetected or denied problem. Leaders must be aware of the potential and willing to implement policy and procedures for monitoring and intervening proactively. Second, because policies are typically "incident driven," they admit they are unlikely to develop a policy until one is absolutely necessary.[7] To merely address issues and behaviors after they arise is an ineffective operating model and a lapse in critical oversight that can create significant liability while risking the public's trust and confidence.

As the profession has learned through community policing, proactive problem solving is much more effective than reactive problem solving. Therefore, it is incumbent on law enforcement leaders to pro-actively implement a well-crafted policy and clear plan to ensure that everyone understands the agency's position and their specific roles and responsibilities. An agency leader may choose to make a public statement about the agency's position by posting the policy on the department website as part of a transparency effort that will serve to reinforce a commitment to accountability.

## Law Enforcement Authority

In order to combat the abuse of authority by employees, the community corrections field has adopted the principle that no on-duty sexual activity by corrections staff is permissible. All 50 states, the District of Columbia, Guam, and Puerto Rico have laws criminalizing sexual contact between corrections staff and jailed/imprisoned individuals, and many community corrections agencies have implemented internal policies on the subject.[8]

Given law enforcement's authority to detain and arrest citizens, a profession-wide position prohibiting on-duty sexual activity seems fundamental. Agencies already addressing this problem specifically prohibit all on-duty sexual conduct. In addition, agencies should also restrict consensual off-duty sexual activity from occurring on department property (*e.g.*, within buildings or vehicles). A number of departments, including the Colorado State Patrol, Maryland State Police, Pennsylvania State Police, and Virginia Capitol Police, have instituted comprehensive policies that prohibit employees from engaging in any on-duty sexual behavior or off-duty sexual behavior on workplace premises.

Because off-duty conduct by officers can potentially undermine the efficiency and effectiveness of an agency and lead to abuse of authority, agency leaders have a vested interest in setting parameters and managing agency risk. Court rulings support reasonable and appropriate efforts to regulate off duty behavior and activities.

## Agency Authority

Law enforcement leaders should directly address the problem of sexual misconduct by instituting a zero-tolerance standard and demonstrating that allegations will be promptly and thoroughly investigated. Any meaningful policy addressing sexual misconduct and offenses should state that an abuse of authority is grounds for disciplinary action, up to and including termination.[9] In keeping with efforts undertaken by the corrections field, local law enforcement executives should establish an agency wide  culture of accountability and seek commitments from key stakeholders, including their governing body, police unions and their members, to support this standard.

[7]   Maher, Timothy M., "Police Chiefs' Views on the Nature, Extent and Causes of Police Sexual Misconduct," *Police Practice and Research: an International Journal*, Vol. 9, 2008, pp. 239-250.

Maher, Timothy M., "Police Sexual Misconduct: Female Police Officers' Views Regarding its Nature and Extent," *Woman and Criminal Justice*, Vol. 20, Issue 3, 2010, p. 265.

[8]   *Preventing and Responding to Corrections-based Sexual Abuse: A Guide for Community Corrections Professionals*, Washington, DC, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance, 2009, p. 10.

[9]   Lonsway, Kimberly A., "Preventing and Responding to Police Sexual Misconduct," *Law and Order*, Herndon Publishing Co., 2009, p. 8.

An agency's policy should be written with input from the state licensing board or Peace Officer Standards and Training Board (POST), a local prosecutor, CALEA, and victim service providers in the community.

An effective department policy aimed at deterring sexual misconduct should include:

1. the reason for the written policy;

2. definitions of various sexual offenses;

3. strategies to prevent sexual misconduct (e.g., applicant screening and accountability standards);

4. specific measures the agency will take to foster professional behavior (e.g., supervision and training);

5. a structured process for accepting, documenting, and responding to reported incidents and conducting administrative and criminal investigations; and

6. the range of possible disciplinary sanctions, should allegations of sexual misconduct be sustained.[10]

A written policy should include provisions to protect employees who report allegations from any retaliation. It also should stipulate disciplinary action for any employee who has knowledge of and fails to report sexual misconduct by a member of the department, except when the officer is the victim. The policy should affirm the department's intent to conduct a thorough investigation of every reported allegation even when the victim is reluctant to participate.

Agency policy can be augmented with specific preventive/protective strategies that can serve as deterrents. For example, some agencies require that traffic stops be recorded or videotaped and that officers provide dispatch with timing for the start and finish when transporting a citizen/arrestee. Additionally, a policy should specify that employee electronic communication and internet postings, which affect professional credibility, will be regularly conducted.[11]

---

**Prison Rape Elimination Act and Custodial Situations**

Because offenses often occur when an individual is in custody, it is essential that police agencies, especially those with holding facilities, be aware of the 2003 Prison Rape Elimination Act (PREA). PREA was enacted to address sexual misconduct in all custodial settings, including police lock-ups, holding facilities and jails*. According to recent statistics, "25 percent of local police departments operate temporary lockup facilities for overnight detention of adults in a location separate from a jail, 13 percent operate juvenile lockups, and 9 percent of local police departments are responsible for operating a jail."** Under PREA, numerous national standards have been drafted for the prevention, detection, response, and monitoring of sexual misconduct in lock-ups. These standards, when finalized, will apply to law enforcement. It is critical that all law enforcement executives are cognizant of the standards and aware of the implications of PREA for their agencies.

* For more information, log on to www.ojp.usdoj.gov/programs/prisonrapeelimination.htm.
** McCampbell, Michael S., "Update and on the Prison Rape Elimination Act," *The Police Chief Magazine*, International Association of Chiefs of Police, Alexandria, VA, March 2011.

---

## Hiring

Through a rigorous selection process, law enforcement agencies should recruit and hire individuals who demonstrate high standards of integrity by screening out those who do not exhibit the ethical characteristics necessary for the profession. This can be achieved through a combination of (1) medical, psychiatric, psychological, polygraph and integrity testing; (2) detailed personal interviews; and (3) thorough background investigations that include a review of social networking websites.

---

[10]   Lettner, "Developing Policies to Address Police Sexual Misconduct," pp. 8-9.

[11]   For more information, logon to www.theiacp.org and see IACP Social Media Project and Model Policy.

The professionals conducting the examinations and interviews should be knowledgeable about and specifically screen for patterns of inappropriate behavior or attitude as well as prior sexual offenses. Any candidate found through these processes to have a history of sexual misconduct or unacceptable sexual activities should be deemed ineligible for employment.

When considering experienced personnel for hire from other agencies, the hiring agency should require candidates to sign a full-disclosure waiver that enables previous places of employment to provide in-depth references and copies of the officer's complete internal affairs file and all employment files, including details contained in any non-disclosure agreement and circumstances surrounding separations from service. This practice can prevent experienced officers who are facing potential charges from moving to another agency prior to being disciplined or terminated. Additionally, agencies should contact the state licensing boards or POSTs[12] in the states where the officers previously worked to determine whether the officer had been disciplined.

Forty-four state POSTs have the authority to revoke peace officer certification due to misconduct. In some states, there must be a criminal conviction in order to revoke; in others, certification may be revoked for misconduct after a hearing before an administrative law judge. Issues arise when an accused officer who has engaged in misconduct is either terminated or allowed to resign from his or her current agency, and that department does not report the reasons for the termination or resignation. The result is that the officer may be hired by another agency in the state that is unaware of the problems in the prior department. Also, these officers may seek employment in other states, which raises the problem of interstate movement of unfit officers. Currently, the International Association of Directors of Law Enforcement Standards and Training (IADLEST) operates the National Decertification Index (NDI). The NDI includes the names of officers who have been decertified. Currently only twenty-nine state POSTs contribute names to the NDI. All state POSTs may query the NDI, and POST directors may authorize law enforcement executives to query the NDI. Since the NDI only gathers information concerning de-certifications, information on discipline of a less serious nature, such as a suspension of the certificate, must be gathered by contacting the state POST directly. Some states, like Florida, publish quarterly the names of the officers and any disciplinary action taken by POST against the officer. This allows other jurisdictions to check the list before hiring an officer from Florida.

## Training

Ethical considerations should be woven into all aspects of training, education, policies, and procedures, along with law enforcement's role in upholding civil rights. Initial academy instruction on the ethics of appropriate conduct should be reinforced at in-service opportunities and training for new supervisors and field training officers (FTO).

It is the responsibility of law enforcement leadership to ensure that training, including academy curricula, covers the definition of sexual misconduct to include criminal and non-criminal behavior. Department-specific training should cover a review of the policy, response to sexual misconduct, and information on behaviors that are prohibited by the policy. Discussions using hypothetical scenarios and role-playing exercises can help officers anticipate and think through situations that warrant an ethical response and understand when their responsibilities under agency policy come into play. The administration of pre- and post-training tests will help the agency gauge the increased knowledge and understanding imparted through the training.

> "Training in ethics, integrity and discretion should begin in the police academy and continue on a regular basis until the officer retires."
>
> —**International Association of Chiefs of Police,** "Building Trust between the Police and the Citizens they Serve: An Internal Affairs Promising Practices Guide for Law Enforcement," Washington, DC, U.S. Department of Justice, Office of Community Oriented Policing Services, 2010, p. 11

---

[12] For the name of the licensing body or POST in any state, logon to www.iadlest.org.

Because FTOs help shape the character of individual officers, each FTO must receive in-depth training on: (1) the agency policy, procedures, and discipline related to sexual misconduct; (2) indicators of sexual misconduct; (3) how to support the department's zero-tolerance stance on sexual misconduct; and (4) how to respect boundaries and confront challenging circumstances that may be encountered on the job.

When under consideration for a promotion, an officer's direct supervisor and the agency's human resources staff should be consulted for input. With supervisory positions, including Field Training, newly promoted employees must receive training on: (1) the department's sexual misconduct policy; (2) guidelines for how to respond to sexual misconduct by employees;[13] (3) criminal and civil liability for the department and governing body; (4) public relations and protocol for dealing with the media; and (5) criminal and administrative investigations.

## Evaluations and Early Intervention Systems

Supervisors are in a unique position to detect warning signs and patterns of sexual misconduct by officers. Specific training on indicators of sexual misconduct and strategies for effective oversight of officer conduct should be provided to those with supervisory responsibilities. Consistent employee reviews and follow-up are essential to monitoring behavior. However, if an officer is demonstrating problematic behavior, the supervisor should not wait for the officer's scheduled review to address the situation. The supervisor must act immediately to address the behavior in question, offer support and/or referrals, fully document the situation, and provide required notification up the chain of command. Supervisors should periodically remind officers of their professional obligation to report knowledge of sexual misconduct by a member of the department.

Since part of the authority with which law enforcement is entrusted involves access to systems of information, supervisors should be tasked with monitoring officer access for non-professional, personally-motivated reasons. Additionally, periodic audits of each officer's traffic stops and final call dispositions are essential for identifying problematic patterns. Random checks of department-issued cell phones and computers should be built into oversight plans in accordance with contracts governing officer rights. Agencies can incorporate into existing systems newly available software designed to identify pornographic images on electronic devices, as feasible, and assign monitoring responsibilities to internal investigations. Periodic reviews of personal information and pages on social networking websites should be conducted to ensure nothing potentially compromising or questionable is posted on the internet.

Early intervention systems are helpful for monitoring, identifying, and preventing problem behavior and electronic communications (e.g., email, text messaging). These systems come in many forms, but generally they collect, review, and analyze data on each officer, thereby enabling the identification of troubling patterns of behavior or suspicious trends that might otherwise go undetected. Such was the case in a midwestern state capital city where a police officer was disciplined and received special training after a review of his traffic stops revealed that 89 percent over a four-month period were of female drivers.[14]

When an officer demonstrates any inappropriate or suspicious behavior *(see ten forms of sexual misconduct and offenses, pp. 3-4)*, a psychological fitness-for-duty examination should be required and arranged promptly. This is particularly important when the conduct does not rise to the level of termination or criminal conduct but for which sufficient cause for concern exists. Examination conclusions will need to be addressed in terms of the officer's assignments and supervision.

---

[13]  Lonsway, "Preventing and Responding to Police Sexual Misconduct," p. 3.

[14]  Walker and Irlbeck, "Driving While Female," p. 3

# Incidents and Investigations

Any and all allegations or suspicions of sexual misconduct must be accepted by the designated authority within the agency and investigated in a timely fashion. Dispatchers along with all members of the department need specific direction and training on protocols for accepting, documenting, forwarding, and processing reports or complaints against an officer. Officers approached with complaints should be required by department policy to provide citizens with complaint forms, document the information received, and pass the complaint through proper channels.

> "[S]exual misconduct that is not documented, investigated and adjudicated often escalates."
>
> —**Lonsway, Kimberly A.,** "Preventing and Responding to Police Sexual Misconduct," Law and Order, Herndon Publishing Co., 2009, p. 2

## Reports or Complaints

It is imperative to have procedures in place in order to effectively handle incident reports or complaints concerning officers. The process[15] must be:

1. comprehensive, where an agency investigates all complaints received, including those that are anonymous or from third parties;

2. accessible, where the procedures for making a report or filing a complaint are streamlined and not burdensome to the individual complainant and information about the rights of law enforcement personnel and the public to file a complaint and the procedures for doing so are widely available;

3. fair, where the officer accused of misconduct is treated respectfully and receives a detailed investigation into the allegation;

4. thorough, where the investigation is complete enough to determine validity of complaints and identify and unfound those that are false; and

5. transparent, where a formal process to accept complaints exists, and all personnel know how to handle a complaint.

Once a report or complaint is received, it should be documented (preferably electronically) and protected in a secure file, apart from regular personnel records.[16] Documentation and preservation of findings in personnel and internal affairs files, even with unfounded or exonerated outcomes, is necessary for future investigations in order to support the identification of patterns of behavior and progressive discipline as necessary.

Having comprehensive cross-jurisdictional memoranda of understanding in place with surrounding agencies will ensure timely notification of an incident involving a department employee in another jurisdiction. It will also provide guidance to officers responding to reports involving employees from other departments, including provisions for notifying the employing agency.

With transparency as a goal, the subject officer should be notified promptly of the complaint either in writing or by other means of communication unless the criminal investigation would prohibit it or be compromised. This notification should include the nature of the allegation, a copy of the complaint, and the name and contact information of the assigned investigator. The confidentiality of the victim's information should be protected to the maximum extent possible by law and department policy. All parties who are interviewed, including witnesses, as part of the investigation should be cautioned about the potential for retaliation and instructed how to report such actions to the department.

---

[15] Adapted from the following: Commission on Accreditation for Law Enforcement Agencies' (CALEA) Standard No. 52.1.1; CALEA Accreditation Standard No. 52.1.4; *Preventing and Responding to Community Corrections Based Sexual Abuse*, p. 48; and IACP, "Building Trust between the Police and the Citizens they Serve," p. 21.

[16] CALEA Accreditation Standard No. 52.1.2.

## The Investigation

Complaints of officer sexual misconduct will be received directly or tracked into the Internal Investigations Unit or to a member of the command staff who handles internal investigations. Upon initial assessment, if it is evident that criminal allegations are involved, an immediate referral should be made to the criminal investigations unit or lead criminal investigator.

Reports of incidents or crimes alleging officer sexual misconduct may come to the agency through communications (e.g., 9-1-1 or non-emergency systems) and should result in immediate notification of criminal investigations and internal investigations by the supervisor in charge.

All criminal cases will require an administrative investigation also be conducted. In order to preserve the integrity of investigations, especially in high-profile cases, the chief may want to seek the services of a neighboring department or state police to conduct either the administrative or criminal investigation. The propriety of the investigation is less likely to be questioned when an outside investigative agency is involved. The administrative and criminal investigations can be conducted simultaneously as separate, parallel investigations. The agency leader should ensure a firewall is maintained between the administrative and criminal investigations and that the accused officer's rights are upheld especially in accordance with *Garrity v. New Jersey*.[17]

The investigative process should be transparent to both the complainant and the accused officer. All procedures should be victim-centered and include periodic updates, and uphold the accused officer's rights set forth in collective bargaining agreements. A member of the command staff should serve as the principal point of contact for the complainant to share information and respond to questions.

Victims may be reluctant to report an incident and/or participate in the investigation for a variety of reasons, including trauma of the incident; fear of not being believed; retaliation from the perpetrator or other officers; and previous bad experiences with law enforcement. These same reasons may account for why a victim recants or seeks to withdraw a complaint. A victim's reluctance to participate in an investigation is neither indicative of a false allegation nor reason to forego a thorough investigation. A detailed investigation should uncover unethical or illegal conduct just as it will reveal unfounded claims.

As part of the investigation, efforts should be made to identify and interview any additional victims. Following the initial filing of criminal charges against the accused officer, an agency can seek to identify additional victims through the use of media outlets. All subsequent reports of incidents will require documentation and investigation.

The agency leader must monitor the investigation for signs of retaliation and harassment directed against a complainant or an employee who reported knowledge of sexual misconduct, including abuse of the complaint procedure and violations of confidentiality guidelines.[18] Parties to the case must be cautioned about the possibility of intimidation, retaliation, and/or coercion and advised on steps to take to report such actions (e.g., immediate notification of the department, preservation of evidence). Within a designated time period (usually after a few weeks and again after 60 days), the complainant should be asked by the point of contact about any intimidation or retaliation. Victims should be provided with information and referrals to the court to petition for orders of protection as needed.

If the accused officer is not placed on administrative leave pending the outcome of the administrative and/or criminal investigations, the officer's assignments should be considered carefully. In the event of administrative leave, a transfer of the accused officer's case knowledge will be important to the continuation of official agency business. Arrangements should be undertaken to reassign the subject officer's cases.

Law enforcement executives have a range of administrative options and tools available to reduce the likelihood of further sexual misconduct or retaliation. Employing these options in a consistent

---

[17] 385 U.S. 493 (1967).

[18] Lonsway, "Preventing and Responding to Police Sexual Misconduct," p. 8.

and timely manner is crucial to victim safety and community confidence, as well as the well-being of the officer and the efficient operation of the department. The executive should consider issuing an Administrative Order of Protection[19] to support clear communication with the accused officer(s) and reinforce accountability.

If an employee resigns during the investigation, the investigation must still be completed and decisions regarding the findings and administrative sanctions that would have otherwise been imposed should be documented in the employee's personnel and internal affairs files.

The agency leader should track the complaint through to its conclusion(s).

## Dispositions

Affirming the findings of the investigations is the responsibility of the law enforcement executive. When an administrative investigation is sustained, even if the misconduct was not determined to have been criminal or the criminal outcome has not yet been determined, the accused officer should be informed in person and in writing and offered the opportunity to respond to the administrative findings.

Following the officer's response to the administrative findings, the executive should consider the full range of sanctions for the officer found to have violated department policy. Before deciding how to address the issue with the officer, an examination of human resource policies, state and local laws, and collective bargaining agreements that may be in effect should ensure compliance with legal and contractual rights. It is important to understand in determining discipline that the confidence in the officer may have been severely compromised by a violation of department policy and, therefore, termination may be the most appropriate option. Disciplinary decisions should be communicated to the officer in person and in writing.

> "Behavior that violates power, authority and ethical standards generally associated with law enforcement undermines the criminal justice system and betrays the public trust."
>
> —Timothy M. Maher, "Police Sexual Misconduct: Female Police Officers' Views Regarding its Nature and Extent," Woman and Criminal Justice, Vol. 20, Issue 3, 2010, pp. 263-282

When an allegation of sexual misconduct is sustained but termination is not warranted, demotions, re-assignment, and/or unpaid leave are possible administrative sanctions the law enforcement executive can impose. Sanctions should be severe enough to reinforce the agency's zero-tolerance position. Discipline short of termination should include a warning of termination for any subsequent misconduct and be referenced in writing as part of an employee's regularly scheduled review.

Criminal investigation findings should conform to one of the following determinations in keeping with the FBI's Uniform Crime Report:

1. Unfounded: the allegation was investigated and found devoid of fact or false;

2. Exonerated: the act occurred but was lawful and consistent with policy;

3. Not sustained: the evidence was insufficient to either prove or disprove the allegation; or

4. Sustained: the evidence was sufficient to prove the allegation.

Once a finding concerning the criminal investigation is reached, the agency leader or designated principal point of contact should ensure the complainant is notified. The accused officer should be notified in writing.[20] If the criminal allegation is upheld through the investigation, the prosecutor will need to be consulted concerning charging actions.

---

[19] Valle, Glenn, Chief Counsel, New York State Police, Albany, NY, "Administrative Orders of Protection: A Chief's Best Tool for Victim Safety", The Police Chief Magazine, November 2000, http://www.theiacp.org/LinkClick.aspx?fileticket=RNf31dlKLFk%3d&tabid=372

[20] CALEA Standard 52.2.8.

Any officer who has been found guilty of committing a sexual offense must be terminated immediately. In the event of a termination, the officer should be notified by the executive in person and in writing. Because of the heightened risk for violence at the point of termination, the department should ensure a lethality assessment is conducted and adequate precautions taken to protect against violence in the workplace or retaliatory violence against those who reported the allegations. It is critical that the officer be given information and referrals on available support services.

Some states may require reporting to the state licensing board or POST even when the officer is not terminated but has resigned or been given discipline short of termination. To prevent the officer from continuing in law enforcement, the state licensing board or POST should be notified promptly about the officer's termination to pursue decertification, as applicable.[21]

## Victims

All levels of law enforcement should treat anyone who alleges sexual misconduct with professionalism and dignity. From the onset, it is essential that citizens making reports or filing complaints are shown respect and their allegations are taken seriously throughout the investigative process. The way an agency receives and responds to each complaint or report will impact the willingness of other crime victims to come forward and will be noted by members of the department.

> "I feel that I have been given a life sentence... I frequently have intrusive memories of the assault... I cringe every time I see… a male officer in uniform, or a law enforcement vehicle. I am not the same person I was before the assault and I might never be that person again."
>
> —Survivor of Sexual Assault by Law Enforcement

The reasons why authority figures may engage in inappropriate and sometimes criminal behavior are varied, and each case is unique. Predators select victims based on vulnerabilities and a perceived lack of credibility, and therefore, victimization is often higher among certain populations including: (1) minors; (2) individuals in prostitution and/or the commercial sex industry; (3) individuals under the influence of drugs or alcohol; (4) immigrants and undocumented persons; (5) individuals with limited English proficiency; (6) people with mental illness or developmental challenges; (7) individuals with physical disabilities; and (8) those who have been victimized previously. Agencies should not query the criminal history of the complainant, and references about the complainant's criminal history should not be included in internal agency reports.

It is important to note that although a majority of the victims are female, men and boys are also victimized. Some victims of sexual offenses may not view themselves as victims. Conduct that a victim may deem to be flattering attention or empathetic concern may be inappropriate, nonetheless. A 16-year-old in an Explorer Program may not think that a "romantic relationship" with the 25-year-old sworn officer who oversees the program is inappropriate. Whether or not a minor feels that the interaction is consensual, a state's statutory rape laws may make any sexual contact illegal. A victim who is compromised due to alcohol, drugs, mental illness, or disability may under state law be unable to give consent for sexual contact. In every case, the investigator must actively attempt to engage the victim in the investigation and offer contacts and referrals for services available in the community. It should also be recommended to a victim that an order of protection be sought from the court if safety concerns exist.

The law enforcement executive should designate a principal point of contact to address the needs and concerns of the victim. These include: (1) Safety: law enforcement must protect victims from intimidation and educate them on how to decrease their likelihood of re-victimization; (2) Support: law enforcement must ensure that victims receive current and accurate referral information about victims' services; (3) Information: law enforcement must provide victims with information about their

---

[21] For more information about POSTs or decertification, see Resources section of this publication.

rights, the criminal justice process, and resources available to them; (4) Access: law enforcement agencies must ensure that information is readily available in languages that represent the populations in the community and attend to the special needs and circumstances of various victims; (5) Continuity: law enforcement must have sustained partnerships with victim service providers and allied criminal justice professionals; (6) Voice: law enforcement must empower victims by encouraging a dialogue with them; and (7) Justice: law enforcement must work in the best interests of victims to protect their safety and rights.[22]

The zero-tolerance sexual offense policy should set forth clear guidelines of how to support victims and provide a setting/environment in which a victim can feel safe reporting the victimization. Some victims have reported that although his or her complaint was taken by a compassionate officer, the environment of the cubicle in which the information was taken was uncomfortable due to the close proximity of others or the presence of pornographic images. Another victim complained that while she was being taken into custody and handcuffed, she was asked out on a date by a member of the department. A good example of how to educate officers in these and other important areas is the "Tools for Tolerance for Law Enforcement" (Simon Wiesenthal Center- www.toolsfortolerance.com) curriculum which is designed to train officers on how to deliver a more effective level of service to members of the public. Awareness training such as TTLE enables law enforcement to identify and address problems before they may become criminal in nature. Nonetheless, in order to establish an environment in which a victim feels secure enough to report mistreatment, law enforcement should receive ethics and sensitivity training as a matter of course.

# Collaboration

## Criminal Justice System Collaboration

Collaboration among criminal justice system partners and allied professionals is of utmost importance. Following the adoption of a policy to address sexual misconduct, agency leaders should reach out to prosecutors and victim assistance personnel to inform them of the agency's position of zero tolerance and plan for responding to reported incidents and complaints.

One of the most important criminal justice partnerships is between law enforcement and victim assistance representatives who work within the criminal justice system. These representatives can include victim-witness coordinators, victim advocates, or department-based victim service personnel. Although department advocates cannot provide confidentiality to victims because they are required to discuss relevant information obtained from the victims with investigators, these advocates can provide much needed services to victims by guiding them through the maze of the criminal justice system, securing resources they need, and providing counseling referrals. Specifically, the department's victim advocates not only help victims navigate the process of filing a complaint and ensure follow-up, but they can also act as liaisons between victims and the agency and educate officers about the impact of trauma on crime victims. Departments that cannot afford to employ advocates should work closely with community-based victim service agencies.

Additionally, during any criminal investigation of an officer, the agency should appoint a liaison to work closely with the prosecutor's office and follow processes established for working on any high-profile case *(see p. 11 for cross-jurisdictional assistance with case investigation).*

---

[22] IACP, "Enhancing Law Enforcement Response to Victims: A 21st Century Strategy," Washington, DC, U.S. Department of Justice, Office for Victims of Crime, 2008, pp. 23-24.

## Community Collaboration

Once a policy has been implemented, law enforcement leadership should support continuous dialogue and working relationships with victim service agencies in order to promote an understanding of the department's zero-tolerance position. Collaboration with victim service agencies in the community can encourage the reporting of incidents. Victim advocates need to know that the department takes allegations seriously and wants to receive information about any incidents or offenses, with the consent of the victim, even if communicated through a third party.

Although confidentiality laws may prohibit the sharing of information, community-based advocates can provide long-term counseling and support for victims, as necessary. When working with these advocates, whether or not a department has its own victim advocates, it is recommended that the department establish a memorandum of understanding with each organization to which it subsequently refers victims.

Law enforcement personnel and allied professionals should seek opportunities for cross training and other types of information exchanges. For example, prosecutors, sworn personnel, and victim advocates should participate in one another's specialized trainings (e.g., statewide conferences) and meetings (e.g., roll calls) to obtain a broader perspective on the issues of sexual assault, harassment, and misconduct. Additionally, they should spend time with one another on their respective "turfs." In order to understand the intense nature of police work, victim advocates should accompany officers on ride-alongs. In turn, officers can use this extended time with the advocate to obtain information about the advocate's role in assisting victims. When possible, officers should be involved in training victim service agency staff and volunteers, and they should be included in the drafting of a department's position and policy addressing sexual misconduct.

To get out the message that a law enforcement department takes incidents of sexual misconduct seriously and encourages those with information about offenses to come forward, agency leaders need to actively engage the community. Law enforcement leaders should build awareness of the department's policy and zero-tolerance position, including the posting of the policy on the agency's website. Information shared should include the methods and procedures for reporting an incident and filing a complaint *(see pg. 10)*. Proactive outreach can happen through multiple avenues, including citizen academies, town hall meetings, and public relations efforts. These efforts at transparency will not only combat inappropriate behavior but also contribute to building community trust and confidence.

# Conclusion

Members of law enforcement are in a unique and visible position in the communities they serve. They are entrusted with the authority to enforce laws and protect citizens' civil rights. Central to the executive's responsibility to the community is the proactive enforcement of ethical standards of conduct and officer accountability. Leaders must establish zero-tolerance policies to address and prevent sexual misconduct and reinforce the expectation of integrity through meaningful training and effective supervision.

> "Along with effective supervision, agency guidelines can reinforce standards of conduct and accountability and provide necessary safeguards."
>
> —Major Charles J. Skurkis, Pennsylvania State Police, PA Director, Bureau of Integrity and Professional Standards

# Resources

"Administrative Orders of Protection," The Police Chief (November 2000) **www.iacpresearch.org**

Alpert, Geoffrey P., Dennis J. Kenney and, Samuel Walker. "Early Warning Systems: Responding to the Problem Police Officer." National Institute of Justice (July 2001) **http://www.ncjrs.gov/pdffiles1/nij/188565.pdf**

Archambault, Sgt. Joanne (Ret.), Dr. David Lisak and Dr. Kimberly Lonsway. "False Reports: Moving Beyond the Issue to Successfully Investigate and Prosecutor Non-Stranger Sexual Assault." The Voice  American Prosecutors Research Institute, Vol. 3, No 1 **http://www.ndaa.org/pdf/the_voice_vol_3_no_1_2009.pdf**

Gleason, Tag. "Ethics Training for Police." The Police Chief (November 2006) **http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_ arch&article_id=1054&issue_id=112006**

Goldman, Roger L. "Revocation of Police Officer Certification: A Viable Remedy for Police Misconduct?" Saint Louis University, School of Law **http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1425622**

Goldman,  Roger L. "State Revocation of Law Enforcement Officers' Licenses and Federal Criminal Prosecution: An Opportunity for Cooperative Federalism."  Saint Louis University, School of Law **http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1421311**

Hughes, Frank. "Problem Officer Variables and Early-Warning Systems." The Police Chief (October 2007) **http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display&article_ id=1313&issue_id=102007**

Irlbeck, Dawn and Samuel Walker. "Driving While Female: A National Problem in Police Misconduct." University of Nebraska at Omaha, Department of Criminal Justice, Police Professionalism Initiative. (March 2002) **http://samuelwalker.net/wp-content/uploads/2010/06/dwf2002.pdf**

Irlbeck, Dawn and Samuel Walker. "Police Sexual Abuse of Teenage Girls: A 2003 Update on 'Driving While Female'" University of Nebraska at Omaha, Department of Criminal Justice, Police Professionalism Initiative (June 2003) **http://www.unomaha.edu/criminaljustice/PDF/dwf2003final.pdf**

Kruger, Karen J. "Investigating and Disciplining Off-Duty Sexual Conduct: Is There a Right to Privacy?" The Police Chief  (September 2008) **http://policechiefmagazine.org/magazine/index.cfm?fuseaction=display&article_ id=1597&issue_id=92008**

Martinnelli, Thomas. "Minimizing Risk by Defining Off-Duty Misconduct." The Police Chief (June 2007) **http://policechiefmagazine.org/magazine/index.cfm?fuseaction=display_arch&article_ id=1208&issue_id=62007**

Rishner, Julie. "Fairness and Consistency in Disciplinary Actions." The Police Chief (September 2005) **http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_ arch&article_id=682&issue_id=92005**

Thurnauer, Beau. "Internal Affairs: A Policy Strategy for Smaller Departments," IACP Smaller Police Departments Technical Assistance Program **http://www.theiacp.org/LinkClick.aspx?fileticket=4B%2F4SDZtgV8%3D&tabid=392**

Rape, Sexual Assault, & Sexual Harassment, INCITE! Women of Color Against Violence **http://www.incite-national.org/media/docs/7715_toolkitrev-sexualassault.pdf**

International Association of Chiefs of Police, Police Ethics in "Leadership and Management," chap. 1 in *Police Chiefs Desk Reference*, 149, http://www.theiacp.org/Portals/0/PCDR2/base 4.html (accessed June 15, 2011) **http://www.theiacp.org/Portals/0/PCDR2/base 4.html**

## Websites/Resources

International Association of Directors of Law Enforcement Standards and Training (IADLEST)
**www.iadlest.org**

National Decertification Index (NDI)
**https://www.pocis.net/NDI/default.php**

Prison Rape Elimination Act (2003)
**http://www.ojjdp.gov/about/PubLNo108-79.txt**

## IACP Tools and Policies

Sexual Assault Incident Reports: Investigative Strategies
**http://www.theiacp.org/LinkClick.aspx?fileticket=PxEJMvQbU7c%3d&tabid=392**

Sexual Assault Supplemental Report Form
**http://www.theiacp.org/LinkClick.aspx?fileticket=CHt0qVEWYus%3d&tabid=392**

Sexual Assault Model Policy
**http://www.theiacp.org/tabid/299/Default.aspx?id=1133&v=1**

Domestic Violence by Police Officers Model Policy
**http://www.theiacp.org/tabid/299/Default.aspx?id=1130&v=1**

Enhancing Law Enforcement Response to Victims: A 21st Century Strategy
**www.responsetovictims.org**

Guidelines to Address Officers Under Orders of Protection
**http://www.theiacp.org/LinkClick.aspx?fileticket=IABVVd%2bgJNw%3d&tabid=87**

## Resources That Can be Purchased Online:

Maher, Timothy M. "Police Sexual Misconduct: Female Police Officers' Views Regarding Its Nature and Extent." Women and Criminal Justice 20, 263-282. 2010

Maher, Timothy M. "Police Chiefs' Views on Police Sexual Misconduct." Police Practice and Research an International Journal 9, 239-250. 2008

Maher, Timothy M. "Police Sexual Misconduct: Officers' Perceptions of Its Extent and Causality." Criminal Justice Review 29(2), 355-381. 2003



**International Association
of Chiefs of Police**

515 North Washington Street
Alexandria, VA 22314-2357
www.theiacp.org

*Published June 2011*

# EXHIBIT 8

  

**Metropolitan Police Academy**

4665 Blue Plains Drive, SW, Washington D.C., 20032   (202) 645-6669   FAX (202) 645-0057

<u>Course Title</u>:  Recruit Officer Training Program

<u>Lesson Plan Title</u>:  Equal Employment Opportunities/Sexual Harassment

<u>Prepared By</u>:  Sgt. Kimberly T.  Butler

<u>Date Prepared</u>:  May 2011        <u>Date of Last Edit</u>:  N/A

<u>Time Frame</u>: 2 Hours

<u>Audience</u>:   Recruits Officers

## PERFORMANCE OBJECTIVES:

1.      Define Equal Employment Opportunity (EEO).

2.      Discuss the MPD EEO policy.

3.      Discuss the groups covered under the EEO Policy.

4.      Define discrimination.

5.      Define sexual harassment.

6.      Discuss how language can be offensive under the EEO policy.

7.      Describe the procedures for filing an EEO complaint.

8.      Discuss the procedures for filing a sexual harassment complaint.

9.      Define EEO Officer.

10.     Explain the role of the EEO Officer.

11.     Define EEO counselor.

12.     Explain the role of the EEO counselor.

## ASSESSMENT TECHNIQUE:

1.  Through facilitated discussion students' level of comprehension of the definition of Equal Employment Opportunities will be defined through feedback.

2.  Through facilitated discussion students' level of comprehension of comprehension of the MPD EEO policy will be defined through feedback.

3.  Through facilitated discussion students' will be able to identify the groups covered under the EEO policy will be assessed through feedback and group participation.

4.  Through facilitated discussion students' level of comprehension of the definition of discrimination will be assessed through feedback and group participation.

5.  Through facilitated discussion students' level of comprehension of the definition of sexual harassment will be assessed through feedback and group participation.

6.  Through facilitated discussion students' level of comprehension of how language can be offensive under the EEO policy will be assessed through feedback and group participation.

7.  Through facilitated discussion students' level of comprehension of the procedures for filing an EEO complaint will be assessed through feedback and group participation.

8.  Through facilitated discussion students' level of comprehension of filing a sexual harassment complaint will be defined through feedback.

9.  Through facilitated discussion students' level of comprehension of the definition of the EEO Officer will be defined through feedback.

10. Through facilitated discussion students' level of comprehension of the role of an EEO Officer will be defined through feedback.

11. Through facilitated discussion students' level of comprehension of the definition of an EEO Counselor will be defined through feedback.

12. Through facilitated discussion students' level of comprehension of the role of the EEO counselor will be assessed through feedback.

## INSTRUCTOR MATERIALS:

☑ Power Point Slides    ☐ Videotapes
☑ References    ☐ Posters

## EQUIPMENT/SUPPLIES NEEDED

☑ PowerPoint Projector     ☑ Projector Screen
☐ Easel Pads     ☐ Videotape Player
☐ Video camera     ☐ Overhead Projector
☐ Masking Tape     ☐ Televisions
☐ Dry Erase Board     ☐ Dry Erase Markers
☐ Computer

## TRAINING PARTICIPANT HANDOUTS
N/A

## METHODS/TECHNIQUES:
**Lecture**

## REFERENCES:
GO 201.09

## GENERAL COMMENTS:

## ANTICIPATORY SET:

As student officers, it is imperative to understand the Metropolitan Police Department's Equal Employment Opportunity Policy. During this block of instruction, we will discuss the MPD's EEO program, MPD's responsibility to its employees as an Equal Opportunity Employer, and the complaint process and procedures.

## INSTRUCTIONAL INPUT/CONTENT:

### Equal Opportunity
Equal opportunity employment is ***THE LAW***. Applicants to and employees of most private employers, state and local governments, educational institutions, employment agencies, and labor organizations are protected under Federal law

from discrimination on the following bases: race, color, religion, sex, national origin, disability, age, sex, genetics, and retaliation.

**NTI:** The applicable laws for protected groups
(Title VII of the Civil Rights Act of 1964)
(Title I and V of the American Disabilities Act of 1990)
(Age Discrimination Act of 1967)
(Title VII of the Civil Rights Act of 1964 as amended the Equal Pay Act of 1963)
(Title II of the Genetic Nondiscrimination Act of 2008) *(Genetic information includes information about genetic tests of applicants employees, or their family members (family medical history); and requests for or receipt of genetic services by applicants, employees, or their family members.)*

Employment discrimination is prohibited by the DC Human Rights Act of 1977, as well as Title VII of the Civil Rights Act of 1964, and Title VI of the Omnibus Safe Streets Act, as amended.

All individuals, including those that fall under the protected classes, have an equal opportunity for employment and advancement within an organization.

## MPD's EEO Policy

The Metropolitan Police Department is committed to providing a workplace free of any demeaning, derogatory, or abusive language, actions, and/or gestures relating to a persons race, color, national origin, sex/gender, age, religion, disability, sexual orientation, language harassment, discrimination, retaliation. MPD senior command staff officials, managers, and supervisors are to ensure that all employees are treated according to these guidelines. Every employee of the department, sworn and civilian, regardless of rank, title or position, shall be held responsible for the contents of General Order 201.09.

MPD employees are reminded that EEO is a law and as an employer, MPD has the responsibility for preventing discrimination in the work place. Conduct of this nature is prohibited, even if the conduct is not specifically intended to be offensive to anyone, and the member to whom it is directed is not personally offended by the conduct.

**Example:** Two friends (male and female) are having a conversation. The male begins to tell his female friend some jokes with sexual content about women. A third party was in the room and hears the jokes and immediately becomes offended and advised the male to stop or she would complain. Although the female friend is not offended by the comments that the male is making about women, the third party is offended. This is a violation of the EEO laws.

No MPD employee shall knowingly discriminate nor harass another employee. All MPD employees shall comply with the obligations prescribed under the Department's Workplace Environment plan and shall make themselves familiar

with the Department's Affirmative Action Plan. The Department prohibits, and will not tolerate, sexual and/or any other form of unlawful harassment or discrimination. Such conduct may result in disciplinary action as necessary, up to, and including termination of employment.

This does not mean that because you fall into one of the protected groups and you perceive that an individual's act toward you is discriminatory because you are different from them, that there has been an EEO violation.

**Example:** A female recruit is being singled out by her male instructor during a PT run because she consistently falls behind on the run. Each time the class goes out for a run, the male instructor tells her "keep up, you are always falling behind!" Finally, the recruit consults her EEO Counselor because she says that the instructor is creating a hostile work environment and that he does not like women.

*QTC: Based on what you have learned so far does the recruit have an EEO complaint?*

*Answer: No. The female recruit does not have a complaint based on the EEO guidelines. The instructor did not use any demeaning or derogatory language toward her nor was he harassing her. He was just simply stating a fact. The instructor could be advised by the EEO Counselor to find a more positive way to motivate her through the run besides telling her that she is always falling behind. There is no EEO violation.*

## EEO sanctioned "Groups"
The following group/groups of people are protected by the EEO policy of MPD:

1. Age (40 and over)
2. Disability
3. Familial Status/Family Responsibilities
4. Gender
5. Sexual orientations
6. Marital Status
7. Matriculation
8. National origin
9. Personal Appearance
10. Political Affiliation
11. Race
12. Color
13. Religion
14. Physical handicap
15. Genetic Information

## Retaliation

Acts of retaliation are strictly prohibited against an employee who files a charge of sexual harassment. Managers and supervisors shall be held accountable for promptly reporting and/or correcting unlawful discriminatory practices within their knowledge and responsibility. Employees shall not be subjected to any form of retaliation, disciplinary or corrective action, transfers, or changes in assignment SOLELY because the employee opposed what he or she believed to be an unlawful employment practice to include filing a complaint, testifying, assisting, or participating an investigation, proceeding, or hearing under Title VII and the DC Human Rights Act.

An employee is protected against retaliation for his/her opposition to discrimination, as long as the employee has a reasonable and "good faith" belief that the employer's conduct is illegal, even if it turns out that the employee was mistaken as to the legality of the employer's conduct.

*NTI:* The following groups are covered under the federal law race, color, sex, religion, national origin, age, disability, and genetic information.
The DC Human Rights Act of 1977 includes sexual orientation, gender identity or expression, family responsibilities, matriculation, political affiliation, marital status, personal appearance.

## Discrimination

*QTC: You may be familiar with the word "discrimination," but do you know what it means? How would you define discrimination?*

*Answer: To discriminate against someone means to treat that person differently or less favorably for some reason. Discrimination can occur while at work, school, or other public place. Discrimination as defined by GO 201.09 is the failure to treat all persons equally where no reasonable distinction can be found between those favored and those not favored.*

You cannot file an EEO complaint based simply on what you perceive. There has to be an action that violates the law.

**Example:** The official is a white male and you are a black male. You are in roll call and your official advises you that you cannot wear your Mountain Bike Uniform because you will be patrolling in a scout car. Your official advises you that the GO states that you cannot wear a Mountain Bike Uniform while patrolling in a scout car. You ignored the official's instructions to change your uniform. For two more days you are assigned to a scout car and the official advises you to change your uniform both days. On the fourth day the official writes you up for failing to follow

his directive.  You consult your EEO Counselor wanting to make a complaint stating that the official is discriminating against you because you are black.  You feel that the white official is discriminating because you observed a white officer come from court in a mountain bike uniform and stay in the uniform until he left. You noticed that the white official did not make the officer change his mountain bike uniform.

***QTC:  Would you have a valid EEO complaint based on discrimination?***

***Answer: No. You were told several times to change the uniform and did not. The official did not single you out because of your race. The official was performing his duty as a supervisor.***

**Sexual Harassment**
Sexual harassment is an unwelcome sexual advance, request for favors, and/or other verbal or physical conduct of a sexual nature.

1. Submission to such conduct is made either explicitly or implicitly as a term or condition of employment
2. Submission to, or rejection of, such conduct by an individual is used as the basis for employment decisions affecting such individual.
3. Such conduct has the ability to unreasonably interfere with an employee's work performance, or create an intimidating, hostile, or offensive working environment.

Sexual harassment may include but is not limited to verbal harassment or abuse, subtle pressure for sexual activity, patting or pinching, intentionally brushing against another person's body, and demands for sexual favors.  Sexual harassment does not have to be of a sexual nature and can include offensive remarks about a person's sex.

**Example:**  It is illegal to harass a woman by making offensive comments about women in general.

Both the victim and harasser can be either man or woman, and the victim and the harasser can be the same sex.

**Example:**  A male and female coworker just walked out of a meeting with their boss.  They walk down the hall to their offices together talking about what was just discussed in the meeting.  The female stops to walk in to her office. The male turns to her and sticks his tongue in her ear. Because of his action that female immediately became a victim of sexual harassment. His actions were unwelcomed. The female immediately reported her male coworker's action to their supervisor and the male was terminated within 48 hours.

Although the law doesn't prohibit simple teasing, offhand comments, or isolated incidents that are not very serious, harassment is illegal when it is so frequent or severe that it creates a hostile or offensive work environment or when it results in an adverse employment decision, such as the victim being fired or demoted.

The harasser can be the victim's supervisor, a supervisor in another area, a co-worker, or someone who is not an employee of the employer, such as a client or customer.

## Offensive Language under the EEO Policy

Slurs and other verbal conduct relating to an individual's race, color, national origin, sex/gender, age, religion, disability or sexual orientation constitute harassment when the conduct:

1. Affects or creates an intimidating, hostile or offensive working environment.
2. Affects or unreasonably interferes with an individual's work performance
3. Otherwise adversely affects a person's employment opportunity

The MPD requires its employees to be courteous, civil and respectful to all persons.

Employees shall not use terms or resort to names that might be interpreted as derogatory, disrespectful, or offensive to the dignity of any person. Employees shall not engage in idle conversation, tell jokes, or make comments that relate to the race, color, national origin, sex, age, religion, disability or sexual orientation of any individual. Members can also be held accountable for this behavior while off duty.

## Filing an EEO Complaint

When a member feels that they are or someone else has been a victim of an EEO violation, the member should contact their supervisor or District EEO Counselor within 180 days of the incident.

It is the primary objective of the Department to resolve the complainant's allegations of discrimination promptly and appropriately.

At any stage of the complaint process, the complainant shall have the right to be accompanied, represented, and advised by legal counsel of the complainant's own choosing.

The complainant and his or her legal or union representation shall have a reasonable amount of official time for the preparation and presentation of the complaint, as permitted by the applicable union contract and/or the District Personnel Manual.

An employee should consult with his/her local EEO Counselor prior to filing an EEO complaint.  If after the initial consultation the employee wishes to file an internal complaint, the EEO Counselor shall refer the complainant to the Diversity and EEO Compliance Branch.

***NTI:***  Employees are encouraged to contact the Diversity and EEO Compliance Branch to schedule an initial interview.  The employee may contact the Diversity and EEO Compliance Branch without consulting with the local EEO Counselor

The EEO Officer shall investigate the allegations in the complaint, determine whether a violation has occurred, and recommend a finding. The EEO counselor will advise the complainant of the findings.

***NTI:  The EEO Officer has 60 calendar days to investigate and render a determination or recommendation to remedy the situation if the claim is sustainable.***

***For all complaints involving Inspectors and above, civilian employees MSS 14 and above, and all Excepted Service Personnel; the Chief of Police will conduct the final review and make the final determination.  For all other personnel, the Assistant Chief of the Internal Affairs Bureau will conduct the final review and make a final determination.***

If it is determined that the charge is without merit, the complaint shall be dismissed with notice to the complainant and the respondent.  The notice shall state the reasons for the dismissal.

If it is determined that reasonable cause exists, immediate action shall be taken to eliminate the alleged unlawful practice, and any appropriate sanctions shall be imposed.

If a complainant is not satisfied with the written decision of the EEO Officer, they have the right to pursue a complaint with an outside agency.

***NTI:  External complaints may be filed with the Office of Human Rights but an exit letter must first be obtained from the Diversity and EEO Compliance Branch.  Complaints filed with the Office of Human Rights must be done within 15 days from the receipt of the exit letter.  An exit letter is not necessary for sexual harassment complaints; those complaints can be filed directly to the Office of Human Rights.***

## Filing a sexual harassment complaint

The Diversity and EEO Compliance Branch in the Internal Affairs Bureau has the authority to investigate sexual harassment complaints.  Upon learning of sexual harassment allegations either from the victim or a third party, it is the responsibility of supervisors and EEO counselors to notify the Diversity and EEO Compliance Branch of said allegations.  It is imperative that supervisors and EEO counselors encourage the complainant to personally contact the Diversity and EEO Compliance Branch.

After the filing of the complaint, the EEO Officer shall make a prompt and comprehensive investigation of the allegations in the complaint.  The accused person, the accused person's supervisor, and the Assistant Chief of Police Internal Affairs Bureau are to be notified.

When an EEO complaint is filed there should be no discussion with persons not directly involved in the complaint, about the allegations.

The Assistant Chief of Police IAB or the Chief of Police shall conduct the final review and make the final determination after the comprehensive investigation.

If the complaint is found to be without merit, the complaint shall be dismissed with notice to the complainant, the accused person, the accused person's supervisor, and the element Commander/Director.  The notice shall state the reasons for the dismissal.  If it is determined that reasonable cause exists, immediate action shall be taken to eliminate the alleged unlawful practice and any appropriate sanctions shall be imposed.

If a complainant is not satisfied with the written decision of the EEO Officer the complainant has a right to pursue a complaint with an outside agency.

## EEO Officer

The Equal Employment Opportunity Officer is the Manger of the Diversity and EEO Compliance Branch.

## The role of the EEO Officer

The EEO Officer counsels, investigates, and recommend determinations for inappropriate employee behavior that is demeaning, derogatory, abusive in language, actions, and or gestures, that is related to another person's race, color, national origin, sex/gender, age/religion, disability, or sexual orientation.

## EEO Counselors

Equal Employment Opportunity Counselors consists of sworn and civilian employees who are authorized to provide access and counsel to employees on how to

use the EEO complaint process, as well as other avenues for addressing their complaint, both internally and externally.

## The role of the EEO counselor

EEO Counselors provide advice and counsel to employees within their unit who feel they have been subjected to discriminating treatment.  The counselors provide information on the complaint process and avenues the employee may use to have their complaint addressed, including the right to seek counseling services from any other counselor or outside the agency, if the employee chooses to do so.  Counselor also may provide information to the employee on the Employee Assistance Program. EEO Counselors serve only in an advisory, non-investigative role and have no authority to investigate.

## SUMMARY/EVALUATION:

The EEO law was not established for individuals to file petty complaints because of what they perceive or based on one person's own prejudices or stereotypes.  Rather the EEO law was established to protect applicants to and employees of  most private employers, state and local governments, educational institutions, and employment agencies from discrimination on the following bases:  race, color, religion, sex, national origin (Title VII of the Civil Rights Act of 1964), disability (Title I and V of the American Disabilities Act of 1990), age (Age Discrimination Act of 1967), sex (wages-Title VII of the Civil Rights Act of 1964 as amended the Equal Pay Act of 1963), genetics ( Title II of the Genetic Nondiscrimination Act of 2008), and retaliation.

# EXHIBIT 9

# Card Access Granted Events

Card Number is one of: 154256231629
Event Date is between 12/1/2014 and 12/20/2014 11:59:59 PM

**Access It! Universal**

## Card #(F/C)

| Event Date | Cardholder | Event Description | Event Location |
|---|---|---|---|
| **154256231629(-1)** | | | |
| 12/1/2014 8:58:49 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/1/2014 12:00:52 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 4 |
| 12/1/2014 12:32:41 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 8 |
| 12/1/2014 1:19:32 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/1/2014 1:24:58 PM | BEST, DARRELL L | Access Granted | HQ 5th flr.- COP Rear Entry |
| 12/2/2014 9:23:40 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/2/2014 12:32:12 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/2/2014 3:06:39 PM | BEST, DARRELL L | Access Granted | HQ- 4th Fl. Stair D |
| 12/2/2014 3:14:01 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/2/2014 3:33:23 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/2/2014 6:07:45 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/3/2014 8:39:13 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/3/2014 9:39:15 AM | BEST, DARRELL L | Access Granted | HQ- 4th Fl. Stair D |
| 12/3/2014 9:41:09 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/3/2014 10:43:59 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/3/2014 12:18:33 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/3/2014 12:55:47 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/3/2014 3:29:31 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/3/2014 3:39:49 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/3/2014 4:44:06 PM | BEST, DARRELL L | Access Granted | HQ 5th flr.- COP Rear Entry |
| 12/3/2014 5:31:45 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/3/2014 7:20:39 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/3/2014 8:29:11 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/4/2014 9:31:37 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/4/2014 12:37:33 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/4/2014 1:48:10 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/4/2014 2:01:33 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 2 |
| 12/4/2014 5:09:35 PM | BEST, DARRELL L | Access Granted | HQ 5th flr.- COP Rear Entry |
| 12/5/2014 9:14:23 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 2 |
| 12/5/2014 10:19:15 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/5/2014 10:20:29 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/5/2014 10:48:25 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/5/2014 10:49:49 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/5/2014 10:50:00 AM | BEST, DARRELL L | Access Granted | HQ 5th flr.- COP Rear Entry |
| 12/5/2014 11:16:55 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/5/2014 2:09:13 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 8 |
| 12/5/2014 2:13:34 PM | BEST, DARRELL L | Access Granted | HQ 5th flr.- SOCC Main Entry |
| 12/5/2014 2:13:56 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 12 |
| 12/5/2014 2:38:56 PM | BEST, DARRELL L | Access Granted | HQ 5th flr.- COP Rear Entry |
| 12/5/2014 3:52:48 PM | BEST, DARRELL L | Access Granted | HQ 5th flr.- COP Main Entry |
| 12/8/2014 1:35:46 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 4 |
| 12/8/2014 3:57:25 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 3 |
| 12/8/2014 5:03:17 PM | BEST, DARRELL L | Access Granted | HQ 5th flr.- COP Rear Entry |
| 12/8/2014 5:04:55 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/8/2014 6:14:54 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 13 |
| 12/9/2014 8:29:26 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 2 |
| 12/9/2014 10:39:44 AM | BEST, DARRELL L | Access Granted | HQ 5th flr.- COP Rear Entry |
| 12/9/2014 11:42:20 AM | BEST, DARRELL L | Access Granted | HQ 5th flr.- COP Rear Entry |
| 12/9/2014 11:55:05 AM | BEST, DARRELL L | Access Granted | HQ- Elevator 2 |
| 12/9/2014 12:50:39 PM | BEST, DARRELL L | Access Granted | HQ- Elevator 2 |
| 12/9/2014 12:56:26 PM | BEST, DARRELL L | Access Granted | |

Printed 3/16/2015 12:48:45 PM

CONFIDENTIAL

DC 002032

# EXHIBIT 10



DC 000231

DC 000232

# EXHIBIT 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____

IN THE MATTER OF:              :
                               :
JAQUIA BUIE,                   :
                               :
            Plaintiff, :
                       : C.A. No.
      v.               : 1:16-CV-01920
                       :
DISTRICT OF COLUMBIA,  :
et al.,                :
                       :
            Defendants.:
                       :
_____:

            Monday,
            May 7, 2018

            Washington, D.C.


DEPOSITION OF:

            SHENITA BUIE

called for examination by Counsel for the

Defendant, pursuant to Notice of Subpoena, in the

D.C. Office of the Attorney General, located at

441 4th Street, NW, Suite 630 South, Washington,

D.C., when were present on behalf of the

respective parties:

**APPEARANCES:**

On Behalf of the Plaintiff, Jaquia Buie:

MARK A. SMITH, ESQ.
JUDITH MUSTILLE, ESQ.
Smith Mustille, LLC
2200 Pennsylvania Avenue, NW
4th Floor East
Washington, D.C. 20037
202-776-0022
masmith@smithmustille.com




On Behalf of Defendant, District of Columbia:

PATRICIA DONKOR, ESQ.
DAVID JACKSON, ESQ.
Office of the Attorney General
For The District of Columbia
One Judiciary Square
441 4th Street, NW
Suite 630 South
Washington, D.C. 20001
202-727-9624 (Donkor)
202-724-6618 (Jackson)
patricia.donkor@dc.gov

david.jackson@dc.gov

1        to the church that -- for spiritual guidance, to

2        be able to worship, to be around goodness.  To be

3        around good people.  So, I can recall Darrell

4        asking, had my daughter made a decision on what

5        she wanted to do after high school.

6                So, you know, I trusted this guy, and

7        I wanted him -- I wanted all the help that I

8        could get to make my children -- to make my

9        daughter better, to get her mind focused on what

10       she could do as far as becoming an adult, to be

11       self-sufficient for herself.

12               I -- good gracious.  Mmm.  I think she

13       was considering becoming a police officer.  You

14       know, everybody bragging on this guy.  He was

15       such a good guy.  Supposed to be such a standup

16       guy, a pastor, you know, a husband, you know,

17       somebody that's going good for their mom.

18               I'm thanking God for this guy, for him

19       to be able to say, you know, this is what you --

20       put my baby on the right -- in the right

21       direction.  And, you know, after all of the

22       commo- -- all of everything -- all of that, she

1    no longer wanted to become a police officer,

2    needless to say.  So, he messed that one up.

3        Q    So, before you put -- before you went

4    to him to, like you said --

5        A    I didn't go to him.  I didn't go to

6    him.  He came to me.

7        Q    He came to you.  Okay.

8        A    He asked me,  you know, what did my

9    daughter want to do after high school.

10        Q    Okay.  Before that point where he

11    approached you, had Jaquia talked about becoming

12    a police officer?

13        A    Yeah, she had talked about it.

14        Q    Okay.

15        A    She talked about it.

16        Q    Had she taken any steps towards

17    pursuing it?

18        A    As far as I know, no steps had been

19    taken for pursuing it.  After the ordeal, she no

20    longer wanted to do anything that dealt with

21    police officer.

22        Q    Okay.  When she did talk about it,

1         A      He's never preached about him being a

2    police officer that I can recall.  Never.

3         Q      Okay.  And you said that he -- you

4    never went to the police any of the -- any police

5    station or police building --

6         A      No.

7         Q      -- with Best?

8         A      I've never.

9         Q      And outside of Jaquia, do you know of

10    him taking anyone else?

11        A      No, I haven't.

12        Q      Okay.

13        A      Uh-uh, I don't.

14        Q      And what about riding in the Dodge

15    Avenger that you -- I mean, not the -- the Dodge

16    car that you mentioned before?  Do you know of

17    anyone riding in that vehicle?

18        A      Never.  Uh-uh.

19        Q      So, you never saw the inside of that

20    vehicle.

21        A      Never.

22        Q      And so, we were talking earlier

1    guidance in life, because she has me.  This was

2    about her future.  You know, what she wanted to

3    do after high school.  This is what this came

4    down to, about, you know, what she wanted to do

5    with her future, you know, after high school.

6         Q    So, had she gone to him and mentioned,

7    you know, I really was interes- --

8         A    Never.  Never.

9         Q    Well --

10        A    He came to me.

11        Q    No no no.  I was going to say --

12        A    Good gracious.

13        Q    No, I wasn't -- I think you

14   misinterpreted where I was going.  I was going to

15   say, did you want him to talk to her solely about

16   potentially becoming a police officer?  Or did

17   you want him to talk to her about career options

18   in general?

19        A    Career options in general, what she

20   wanted to do with her life.  How she wanted to

21   pursue her dreams after high school.

22        Q    Okay.  And is it safe to say that had

1      you not developed this rapport with Best to the

2      point where you considered him family, that you

3      wouldn't have allowed him and Jaquia to meet?

4          A     What I can say is -- I can't say that.

5      I can't say that.  What I can say is, is what

6      happened.  I went to this church.  I became

7      leadership in this church.  Darrell Best is

8      family.  And some of the church members were

9      people that I trusted.

10             So, for him and the positive light

11     that I've seen through him, I trusted -- I

12     trusted him -- I trusted him.

13         Q     Okay.  And so, they're at -- so

14     Jaquia -- Best approached you about Jaquia.  And

15     how does the -- can you walk me through how the

16     meeting ended up -- how the plans for the meeting

17     came about?

18         A     So, he addressed me.  He asked --

19     well, it started with, you know, awards and

20     things in church.  And, you know, some of the

21     other kids were -- some of the kids were getting

22     awards.  He approached me and asked me what was

1      Jaquia going to be doing after high school.

2              And I said, well, you know, she's

3      undecided.  And he was like, well -- he had been

4      talking about going out to lunch or brunch, and

5      he was like, well, maybe I'll take her to lunch

6      of brunch, you know.  He was like, but you know

7      how everybody else is in the church.  You can't

8      really say anything.  You know what I mean?

9              I'm like, oh, okay, you know.  I'll

10     take her and talk to her.  This was over a period

11     of months -- maybe three or four months.  It

12     never happened until it happened.

13             And, I'll talk to her.  He says, I'll

14     talk to her.  I'll find out what she wants to do.

15     And that was that.  And then this.

16     Q     So, how did the -- who planned the

17     meeting?  Did Jaquia and Best get in contact with

18     each other without you?  Or did you -- did --

19     were the date and time selected through you?

20     A     Okay, so the date and time was not

21     selected through me, because it was on his work

22     schedule.  However his work schedule was supposed

1    to be is what happened.  I was okay with Darrell

2    planning -- I was okay with him planning it out.

3    I was okay with that.  And that's what was done.

4         Q    Okay.  And so you felt completely

5    comfortable with him?

6         A    I -- yes, I did.  I felt completely

7    comfortable.

8         Q    Okay.  And so, were the two of them

9    communicating by phone, email, do you know?

10        A    That -- that I don't recall.  I don't

11   recall how it was set up, but I do know when it

12   was set up, I did know it was going to be at

13   Georgia Brown's.  She going to, I believe,

14   archives, and from archives I think he may have

15   picked her up and was going to go on to Georgia

16   Brown's.  That is all I know as far as

17   communication on how it was supposed to have

18   been, you know, set up.

19        Q    Okay.  Were you ever supposed to join

20   them?

21        A    Never.  I wasn't supposed to join.

22        Q    Okay.  And after -- well, when Jaquia

1    and that he pulls up in, I think, the parking

2    garage, or wherever you have to go to park the

3    car.  And, you know, she said, well I'll just sit

4    here until you get back.

5              She told me, she said, I'll just sit

6    here until you get back.  And he was like, no.

7    You got to come in.  Something to that effect.

8    So, she said she ended up going in.  She tells me

9    that she was walking past this, I guess, door or

10   whatever, to get into the building.  And she --

11   it was this security camera or something.

12             She said she was really scared, she

13   didn't know what he was going to do.  She wanted

14   to make sure that the security camera got a

15   picture of her face if anything happened.

16             And they ended up going into a

17   building or -- like some type of secure building.

18   It was folks still there, and he was telling her,

19   shhh, don't say nothing, be quiet.  He put his

20   hand over her mouth, or something like that.

21             He tried to make pa- -- they went into

22   a dark room, he tried to make passes at her,

# EXHIBIT 12

# GENERAL ORDER



**DISTRICT OF COLUMBIA**

| Subject | | |
|---|---|---|
| **Disciplinary Procedures and Processes** | | |
| Topic | Series | Number |
| **PER** | **120** | **21** |
| Effective Date | | |
| **April 13, 2006** | | |
| Replaces: | | |
| General Order 1202.1 (Disciplinary Procedures and Processes) Effective Date November 10, 1983 | | |

| I. | Background.………………….... | Page | 1 | V. | Regulations........................................ | Page | 5 |
|---|---|---|---|---|---|---|---|
| II. | Policy.……………………........ | Page | 1 | VI. | Procedural Guidelines........................ | Page | 6 |
| III. | Definitions. ……………………. | Page | 2 | VII. | Cross References.............................. | Page | 19 |
| IV. | Rules..…………………………... | Page | 4 | VIII. | Attachments....................................... | Page | 20 |

## I.   BACKGROUND

The purpose of this order is to establish policies, rules and procedures for handling discipline relating to the alleged misconduct of sworn members in a manner that is consistent with the mission of the Department, applicable labor agreements, and District of Columbia law concerning disciplinary appeals. Any provision for the review of corrective and adverse actions negotiated between the Department and the labor organization shall take precedence over the provisions of the D.C. Comprehensive Merit Personnel Act for members in the collective bargaining unit, to the extent that there is a difference. This order does not apply to the disciplinary process relating to civilian members.

## II.   POLICY

The policy of the Metropolitan Police Department is that members shall be subject to disciplinary action for cause. The Department recognizes the distinction between those misconduct matters that warrant a serious disciplinary response at the Department level, and those types of misconduct that may be handled effectively at the assigned element, and that permit non-disciplinary action or performance improvement action.

Discipline shall be prompt, consistent, fair, and equitable, and the Department shall utilize progressive discipline as appropriate. Members shall have the opportunity to present a response, or a defense, and to appeal disciplinary actions. (CALEA 26.1.1)

DC 000043

## III.    DEFINITIONS

When used in this directive, the following terms shall have the meanings designated:

1.    Adverse Action – Any fine, suspension, removal from service, or any reduction in rank or pay of any member who is not serving a probationary period.

2.    Cause – (see D.C. Personnel Regulations, Section 1603 [Final Rulemaking, pursuant to D.C. Official Code § 1-616.5, published in the D.C. Register on Sept. 10, 1999])

    a.    A conviction (including a plea of *nolo contendere)* of a felony;

    b.    A conviction (including a plea of *nolo contendere)* of any crime (regardless of punishment). No relationship need be established between the crime, and the member's position in the case of sworn members of the Department;

    c.    Any act or omission, whether occurring on or off duty, which constitutes a criminal offense, whether or not such act or omission results in a conviction;

    d.    Any credible evidence of use of an illegal drug or unauthorized use or abuse of prescription drugs, including without limitation, the results of any drug test;

    e.    Any knowing or negligent material misrepresentation on an employment application or other document given to a government agency;

    f.    Any on-duty or employment-related act or omission that the member knew, or should reasonably have known, is a violation of law;

    g.    Any on-duty or employment-related act or omission that interferes with the efficiency, or integrity, of government operations;

    h.    Any other on-duty or employment-related reason for corrective or adverse action that is not arbitrary and capricious.

The definition of cause includes, without limitation:

    i.    Unauthorized Absence – The absence from duty without authorized leave;

  j.  Negligence – Performing a job duty or responsibility in a manner that demonstrates that the member is not using due care or prudence in carrying out job responsibilities. A member engages in negligent conduct if the conduct falls below the standards established by the element, and can include such actions as inadvertence, thoughtlessness and inattention;

  k.  Incompetence – The lack of ability, legal qualification, or fitness to discharge a required duty;

  l.  Insubordination – The failure to obey directives or orders issued from a supervisory official, or showing disrespect to a supervisory official;

  m.  Misfeasance – The improper performance of a duty or responsibility that is within the scope of duties of the member and duties that the member is lawfully able to perform;

  n.  Malfeasance – The performance of a duty or act that the member is not authorized to perform, and is not in the scope of duties or responsibilities of the member; or

  o.  Unreasonable failure to assist a fellow government employee in performing his or her official duties; or

  p.  Unreasonable failure to give assistance to a member of the public seeking services, or information from the government.

3.  Collective Bargaining Agreement (CBA) – The agreement entered into between the Metropolitan Police Department and the Fraternal Order of Police/Metropolitan Police Department Labor Committee.

4.  Commander or Commanding Officer – In this directive, includes civilian directors and supervisors when supervising sworn personnel.

5.  Commander's Resolution Conference – A face-to-face meeting between the Commanding Officer, or the Director, Disciplinary Review Division (DDRD), and the subject member in cases where the proposed penalty does not exceed a fine or suspension of ten (10) days.

6.  Conviction – Includes conviction of a member in any court of competent jurisdiction of any criminal or quasi-criminal offense, or any offense in which the member either pleads guilty, receives a verdict of guilty, or a conviction following a plea of *nolo contendere.*

7.  Corrective Action – A PD Form 750 (Dereliction Report), a letter of prejudice, or an official reprimand.

8.      Disciplinary Action – A Corrective Action or Adverse Action taken against a member.

9.      Hearing Tribunal – In this directive, the term "tribunal" includes Trial Boards as defined in D.C. Official Code § 5-133.06 (Trial Boards), Adverse Action Panels, and Department Hearing Panels as contemplated by the FOP/MPD Collective Bargaining Agreement.

10.     Letter of Prejudice – A written notice to a member outlining specific misconduct and warning of future disciplinary action, considered as corrective action.

11.     Officials – Sworn members the rank of sergeant or above, and civilian equivalents who supervise sworn and/or civilian members.

12.     Official Reprimand – A Commanding Officer's formal written censure for specific misconduct.

13.     PD Form 750 (Dereliction Report) – A written notice used to cite members for misconduct as determined by their Commanding Officers.

14.     Rehabilitation – The ability of a member to recover from the misconduct to perform all of the essential functions of the job of police officer.

15.     Suspension – A temporary cessation of pay and police authority, with or without a definite date of restoration.

16.     Termination or Removal – Dismissal from the Metropolitan Police Department for cause in accordance with due process.

## IV.   RULES

A.      The Chief of Police is the designated final authority with respect to discipline. Such authority may be delegated.

B.      The Chief of Police shall review and decide all appeals of disciplinary actions. The decision of the Chief of Police, or his/her designee, on appeals of Corrective Actions shall be the final administrative review of these actions.

C.      All disciplinary actions are subject to the provisions of GO-PER-201.22 (Fire and Police Disciplinary Action Procedure Act of 2004), which sets forth the internal timelines governing the handling and commencement of Corrective Action or Adverse Action against sworn or civilian members of the Department in order to comply with the 90-day requirement as set forth in D.C. Official Code § 5-1031.

## V.     REGULATIONS

A.     Members shall immediately notify supervisors upon observing, or becoming aware of, an alleged violation of Department policies, laws, rules, regulations, or directives. Supervisors shall immediately initiate a preliminary investigation by assigning a member not directly involved, obtain Incident Summary (IS) numbers when appropriate, and thereafter shall perform the duties, and assume the obligations, of their rank or grade as related to the investigation. (CALEA 26.1.5)

B.     All Officers (including supervisors and managers who learn of evidence of possible misconduct through their review of an Officer's work) shall notify the Office of Professional Responsibility (OPR) within one hour of any conduct by other Officers that reasonably appears to constitute any of the following:

1.     An excessive use of force, or improper threat of force;

2.     A false arrest, or filing of false charges;

3.     An unlawful search or seizure;

4.     Unlawful discrimination;

5.     An intentional failure to complete use of force reports required by MPD policies, and in accordance with procedures;

6.     An act of retaliation for complying with any MPD policy and procedures;

7.     An intentional provision of false information in an MPD or Office of Police Complaints (OPC) investigation, or in any official report, log, or electronic transmittal of information.

C.     Members shall cooperate fully with any member of the Department conducting misconduct investigations.

D.     The Assistant Chief, OPR, in coordination with the Assistant Chief, Office of Human Services (OHS), shall investigate and propose discipline as appropriate. The Chief of Police is the final decision maker on all discipline, and may modify a penalty in his sole discretion.

E.     The procedures for Adverse Action do not apply to allegations of unsatisfactory performance or misconduct on the part of probationary members. Allegations involving probationary members shall be handled in accordance with the applicable provisions in General Order 201.7 (Review Boards).

F.   Sustained allegations of misconduct against at-will members that may result in suspension or termination of the member's contract shall be forwarded to the Chief of Police for determination.

G.   Except where a less restrictive standard is provided by statute, or other provision of law, members not covered by collective bargaining, to include Senior Police Officers, may only receive Corrective Action or Adverse Action for cause, and shall be subject to the same procedures and penalties prescribed in this directive so far as is applicable, or as determined by the Chief of Police.

H.   Allegations of unsatisfactory performance or misconduct involving probationary members shall be handled in accordance with General Order 201.7 (Review Boards).

I.   All disciplinary actions shall be tracked and recorded by OPR.

J.   All copies of signed and served notices involving corrective action that does not require IS numbers shall be sent to OPR. (CALEA 35.1.15 and 26.1.8)

K.   Non-disciplinary action or performance improvement action shall be conducted in accordance with GO-PER-201.20 (Performance Management System [PMS] for Sworn Members in the Rank/Position of Civil Service Sergeant, Investigative Personnel, and Officer).

L.   Every member of the Department shall familiarize himself/herself with all policies, laws, rules, regulations, and directives governing the Department before the completion of recruit training, and shall maintain familiarity, throughout their employment, with all updates and revisions as they are disseminated.

M.   All investigative reports received from the OPC recommending disciplinary action shall be processed in accordance with General Order 1202.5 (Citizen Complaints), and this order.

N.   Civilian directors and supervisors shall have the same disciplinary authority as equivalent Commanders and sworn officials when supervising sworn personnel. (CALEA 11.3.1)

O.   The provisions in this order are not applicable to members of the Reserve Corps, or to civilian members of the Department.

## VI.   PROCEDURAL GUIDELINES

A.   General

1.   The Table of Offenses and Penalties (Attachment A) is provided as a guide for the administration of consistent disciplinary measures.

2.    The Department shall thoroughly and objectively investigate all allegations of misconduct.

3.    Disciplinary action shall be taken in a manner, and at a level, appropriate with the member's past record, and the seriousness of the offense.

4.    Appropriate consideration may be given to aggravating or mitigating circumstances that, when weighed, would require discipline at a different level.

5.    Determination of misconduct charges shall be based upon a preponderance of the evidence.

6.    Members who are being investigated for misconduct charges shall be provided with the charges and specifications that pertain to their case at the time of their interview. This does not preclude the possibility that additional charges and specifications may be discovered and added during the course of the investigation.

7.    Subject to compliance with applicable terms and conditions of the existing CBA, the MPD shall employ Corrective Action, or Adverse Action, in response to misconduct by members of the Department.

B.    Corrective Action

1.    Corrective Action is unit-level discipline.

2.    Commanding Officers/Directors may issue corrective action as described in Section VI.(C-E) of this directive. In general, progressive discipline for a corrective action ranges from the administration of a PD Form 750, to a Letter of Prejudice, to an Official Reprimand (Attachments B and C to this General Order provide templates for the Letters of Prejudice and Official Reprimand). (CALEA 26.1.5)

3.    When an Official Reprimand is under consideration, the Commanding Officer/Director must interview the offending member, and consider his/her comments for mitigation.

4.    After reviewing the investigative summary, Commanding Officers/Directors (upon consideration and articulation of appropriate mitigating or aggravating factors) shall decide the appropriate level of action, and issue such action over their signatures.

5.    An employee covered by the CBA, against whom corrective action is taken, has the right to appeal the action to the Chief of Police as provided in the CBA. The decision of the Chief of Police will not be subject to further appeal, or arbitration. (CALEA 26.1.6)

6.  Commanders and Directors shall forward to the DDRD copies of all corrective actions (Official Reprimands, Letters of Prejudice, or PD Form 750s) at the time any such corrective action is issued.

7.  Records of Corrective Actions shall be sent to OPR and retained in the cited member's element personnel folder for a period of three (3) years after issuance. Upon application by the member, the records may be ordered removed by the member's Commanding Officer/Director, Assistant Chief, or the Chief of Police. (CALEA 26.1.8)

C.  PD Form 750 (Dereliction Report)

1.  The PD Form 750 is used as a record of derelict performance in matters that have not reached a serious level of concern or impact, but which need to be brought to the attention of the member so that conduct can be modified to avoid future problems.

2.  The PD Form 750 shall:

a.  Describe the specific violation(s);

b.  Identify measures needed to correct deficiencies; and

c.  Include a statement that such action may be:

(1)  Considered in performance evaluations; and

(2)  Considered in deciding greater degrees of disciplinary action.

3.  Unless otherwise directed by the Chief of Police, some appropriate uses of the PD Form 750 may include, but are not limited to, the first instances of the following:

a.  Lateness appearing for an assignment;

b.  Failure to appear for an assignment;

c.  Court-related derelictions;

d.  Minor crash-related derelictions; or

e.  Uniform or equipment deficiencies.

D.    Letter of Prejudice (CALEA 26.1.4)

    1.    A Letter of Prejudice is a written notice to a member outlining the specific misconduct, and future consequences.

       Letters of Prejudice shall include a notice outlining:

       a.    Additional supervision;

       b.    Counseling; (CALEA 26.1.4-b)

       c.    Training; (CALEA 26.1.4-a)

       d.    Professional assistance; and

       e.    A statement that such action shall:

          (1)    Be considered in performance evaluations;

          (2)    Be considered in deciding greater degrees of disciplinary action; and

          (3)    Be used as a basis for an official reprimand, or adverse action for any similar infraction within a two-year period.

    2.    Commanding Officers/Directors shall issue a Letter of Prejudice when the following criteria exist:

       a.    The infraction is such that it does not have a serious impact on the image, reputation, or efficiency of the Department, yet tends to have a serious effect upon the supervisor's confidence in the member's ability to perform assigned duties;

       b.    Repeated or continued infractions may have a serious impact upon the image, reputation, or efficiency of the Department;

       c.    There is a positive potential for the member's rehabilitation.

E.    Official Reprimand

    1.    An Official Reprimand is a Commanding Officer/Director's formal written censure for specific misconduct. (CALEA 26.1.4-c)

    2.    An Official Reprimand shall be considered in performance evaluations and personnel assignment decisions, and in deciding greater degrees of disciplinary action for offenses committed within a three-year period.

DC 000051

3.     Receipt of three Official Reprimands within a two-year period shall subject the member to an unsatisfactory performance-of-duty rating at his/her next rating period.

4.     Commanding Officers/Directors shall issue an Official Reprimand when the following criteria exist:

   a.     The violation is such that it could have a serious impact upon the image, reputation, or efficiency of the Department;

   b.     The violation is such that it has a serious impact upon the supervisor's confidence in the member's ability to perform assigned duties;

   c.     There is a positive potential for the member's rehabilitation.

F.     Commander's Resolution Conference

1.     The Commanding Officer/Director shall attempt to resolve a disciplinary matter during a Commander's Resolution Conference with an affected member and his/her Union representative, unless the member voluntarily waives representation. Once notified, and prior to the conference, the member may, during the day-work tour, review the investigative report of the incident that resulted in the proposal that is the subject of the conference.

2.     Transfer, reassignment, change of days off, and nontraditional remedies that include, but are not limited to, community service, counseling, training, professional assistance, etc., may be employed when voluntarily agreed to by a member during a Commander's Resolution Conference.

3.     If discipline is recommended by OPC, or by a Commander/Director other than the one to whom the member is permanently assigned, the Commander's Resolution Conference shall be held with the DDRD.

4.     Members facing suspensions may request to forfeit accrued annual leave or compensatory time (not including sick leave) in lieu of suspension for any period up to five (5) days in discipline cases. Members may not work extra duty to compensate for suspended days.

5.     If an agreement is reached as the result of a Commander's Resolution Conference that includes discipline to be held in abeyance, the discipline should be held in abeyance for a minimum of twelve (12) months from the date the agreement was reached.

6.   The Assistant Chief, OPR, shall ensure appropriate tracking, receiving, and recording of all disciplinary information derived from the process described in this general order.

G.  Adverse Action (CALEA 26.1.4-c)

1.  Adverse Action is Department-level discipline.

2.  Adverse Action shall include:

   a.   Any fine;

   b.   Any suspension (Suspensions not exceeding ten (10) days may be resolved at the element level);

   c.   Reduction in rank or pay;

   d.   Removal from service.

3.  Commanding Officers/Directors shall not specify, recommend, or suggest a penalty or penalty range regarding the number of days suspended. If Commanding Officers or Directors recommend a reduction in rank, or removal from any specialized positions/unit, the Commanding Officers/Directors shall articulate the reason(s) for these recommendations.

4.  Completed investigative reports involving recommendations for Adverse Action shall be handled in accordance with the timeframe established in GO-PER-201.22 (Fire and Police Disciplinary Action Procedure Act of 2004), and as follows:

   a.   For all sworn members, the reports shall be reviewed by the appropriate Assistant Chief or (Senior) Executive Director, and s hall be forwarded to the Office of Human Services (OHS) for appropriate processing.

5.  Assistant Chiefs/Senior Executive Directors who receive investigative reports and recommendations shall review such reports within five (5) working days, if practicable, and shall either concur or not concur, stating reasons for non-concurrence.

   Assistant Chiefs/Senior Executive Directors may return the matter to the element commander for further investigation, and may add comments, questions, or suggestions. When investigations are

**Revised
06/07/07**

DC 000053

returned to an element for correction or additional information, the element shall notify OPR to adjust the due date for tracking purposes.

6.    The DDRD, in administering the disciplinary process, shall:

   a.    Review investigative reports and disciplinary recommendations for completeness and accuracy.

   b.    Depending on the severity and nature of the alleged violation, and consideration of appropriate mitigating or aggravating factors, recommend that:

      (1)    Adverse Action be taken;

      (2)    The case be heard by a Department Hearing Tribunal;

      (3)    The case be returned to the forwarding element for further investigation, or for other disciplinary action as the Commanding Officer/Director deems appropriate; or

      (4)    The charges be dismissed due to extenuating circumstances.

   c.    When the DDRD recommends a "Suspension Not Exceeding Ten Days," a Commanding Officer/Director has the authority to resolve the disciplinary action through a Commander's Resolution Conference. In suspension cases where no agreement is reached, such matters shall be remanded to the DDRD for appropriate processing.

7.    Upon review by the DDRD, investigative reports recommending adverse action shall be referred to the Assistant Chief, OHS, with charges and specifications recommended by the DDRD, for appropriate concurrence and processing by the Assistant Chief, OHS.

H.    Notice of Proposed Adverse Action

1.    The Assistant Chief, OHS, shall issue a Notice of Proposed Adverse Action. The member shall be given an opportunity to respond to the notice, in writing, within fifteen (15) business days, and the Assistant Chief, OHS, shall consider the member's response before rendering a written decision. In the event the Department proposes termination, the member shall have twenty-one (21) business days to submit his/her response, and to indicate whether he/she desires a Departmental hearing.

2.    The Notice of Proposed Adverse Action issued by the Assistant Chief, OHS, shall include:

    a.      Charges – specific regulation(s) alleged to have been violated;

    b.      Specification(s) – the date and location of the alleged act or omission, and a statement of the alleged act or omission;

    c.      The proposed action; and

    d.      A copy of the investigative report.

3.      In the event termination is proposed, the Notice of Proposed Adverse Action shall inform that:

    a.      The member has a right to be represented by an attorney licensed to practice in the District of Columbia, or by a union representative at all steps of a hearing;

    b.      The member must be provided with a history of charges up to the current date;

    c.      The appropriate hearing procedures will be used, including the DDRD Hearing Manual, or Trial Board Rules;

    d.      The accused member must furnish any pertinent documents, or copies thereof, that he/she wishes to offer as evidence;

    e.      The names of any witnesses he/she wishes to testify on his/her behalf must be submitted, in writing, to the DDRD not less than five (5) days (exclusive of Saturdays, Sundays and legal holidays) prior to the time set for the hearing.

I.     Service of Notice of Proposed Adverse Action

1.      Service of Notice of Proposed Adverse Action shall be made by an official of the Department, to include civilian supervisors as defined in Section III.11. of this order.

2.      Upon receipt of the Notice of Proposed Adverse Action, the Commanding Officer/Director shall direct an official of his/her element to:

    a.      Serve the original of the Notice of Proposed Adverse Action upon the member as instructed;

    b.      Deliver charges and specifications to the member, and require him/her to acknowledge receipt by affixing his/her signature;

    c.      Have the member acknowledge receipt of the attached copy of the entire investigative report;

    d.      Sign the original and attached copies of the proposed notice as a witness;

    e.      Keep a copy of the Notice of Proposed Adverse Action for element files; and

    f.      Immediately forward two signed copies to the DDRD.

3.      Accused members shall:

    a.      Keep a copy of the Notice of Proposed Adverse Action; and

    b.      Sign the original, and attached copies, and return the copies to the official effecting service.

4.      If timely personal service of the charges cannot be made, the responsible official shall notify the DDRD and the Commanding Officer/ Director, Watch Commander, or acting director, who may authorize alternative manners of service designed to effect actual notice or constructive service, such as leaving a copy for the member at the last address of record, as appropriate.

J.    Disciplinary Hearings

1.      In cases where termination is proposed, or at the discretion of the Assistant Chief, OHS, a hearing shall be conducted by a Hearing Tribunal as a fact-finding forum to make recommendations to the Assistant Chief, OHS, subject to review and approval by the Chief of Police.

2.      When a hearing has been set, the Assistant Chief, OHS, shall serve notice of the Department's proposed adverse action on the affected member, informing him/her of the hearing date, the name and rank of each selected panel member, and the type of hearing, i.e., Adverse Action Panel/Trial Board.

3.      The DDRD is authorized to:

    a.      Order any member of the Department to appear before him/her, or before any person(s) designated by him/her, to give testimony and/or produce all official books, records, papers or documents pertaining to the case;

    b.      Grant continuances;

    c.      Administer the Oath of Office to members of the Hearing Tribunal with authority to delegate the same.

K.  Selection of Hearing Tribunal

1.  The Chief of Police, or his/her designee, shall select the Hearing Tribunal members.

2.  In selecting members for Hearing Tribunals, the Chief of Police, or his/her designee, shall select from:

   a.  All Commanders and Inspectors who have previous experience as Hearing Tribunal members, without regard to rank, to serve as chairman.

   b.  All Commanders, Inspectors, and Captains to serve as Hearing Tribunal members, except members from OPR.

   c.  The Chief of Police, or his/her designee, can exclude any member for service on the Hearing Tribunal.

3.  Hearing Tribunals are empowered to do the following:

   a.  Summon any member of the Department to appear before the Hearing Tribunal to give testimony, and/or produce all official books, records, papers, or documents pertaining to the case;

   b.  Enter into the record pleas of guilty or not guilty to the charges and specifications, which may be with, or without extenuating circumstances. The Hearing Tribunal shall have no authority to agree to any penalty in exchange for a guilty plea or otherwise, nor shall any such agreement have any binding force or effect upon the Department;

   c.  Grant continuances;

   d.  Make findings of fact;

   e.  Make or cause depositions to be taken;

   f.  Make findings and recommendations for punishment consistent with governing regulations;

   g.  Add, alter, and/or amend charges and specifications that are not compatible with the evidence; provided the accused has an opportunity to respond to the charges before the hearing concludes;

   h.  Rule on all questions at issue in taking testimony, or submitting evidence, but may have exceptions noted to the rulings;

     i.     Revoke the privilege extended for the attendance of any counsel during a proceeding for sufficient cause; but this action shall in no way prevent the accused from substituting other counsel;

     j.     Require respectful conduct on the part of any and all persons in attendance.

         (1)     Chairpersons are empowered to resolve any dispute, and shall make record of their action in any such case;

         (2)     Close any hearing to the public for good reason; making a record of such reason.

4.     The findings of Hearing Tribunals shall be recorded and maintained by the DDRD, which shall be open for inspection by the accused.

5.     Authority of Hearing Tribunals shall be set forth in a "Hearing Manual" issued by the DDRD. The manual shall be consistent with guidelines set forth in this directive; D.C. Personnel Regulations Chapter 16; D.C. Official Code § 5-127.01 (Conduct of Force), and § 5-133.06 (Trial Boards); Title 6A DCMR, Chapter 10 (Disciplinary Procedures); and applicable provisions of the current CBA.

6.     At the conclusion of a hearing, the Hearing Tribunal shall write findings of fact and conclusions of law with recommendations to the Assistant Chief, OHS, outlining the Tribunal's findings and proposed decision.

7.     In the event that the Hearing Tribunal recommends a lesser penalty when termination has been proposed, the Tribunal shall, as part of their findings and proposed decision, provide a specific written rationale to justify their recommendation for mitigation of the proposed termination.

8.     After reviewing the Hearing Tribunal's proposed decision, the Assistant Chief, OHS, may remand the case to the same, or a different tribunal, or issue a decision (Final Notice of Adverse Action) affirming, reducing, or setting aside the action, as originally proposed in the Notice of Proposed Adverse Action.

9.     The Assistant Chief, OHS, shall issue the Final Notice of Adverse Action. The final notice of adverse action shall be issued in compliance with D.C. personnel rules and regulations and, as applicable, the related provisions in the CBA. Deadlines may be extended by request of the affected member, or through applicable agreement(s) referenced above.

L.    Adverse Action Appeals (CALEA 26.1.6)

1.    Upon receipt of a written Final Notice of Adverse Action, members may, within ten (10) business days, appeal the action to the Chief of Police, or Mayor, if applicable, or as outlined in an applicable CBA or law.

2.    The Chief of Police shall respond to the member's appeal within fifteen (15) business days. Upon receipt of an adverse decision from the Chief of Police, members may appeal to the D.C. Office of Employee Appeals, as permitted by the District Personnel Manual, or to arbitration, as outlined in the existing CBA.

3.    Appeals shall not serve to delay the effective date of the decision of the Department.

4.    When an appeal is made, the appropriate papers shall be forwarded to the Chief of Police, who may affirm or modify the findings and/or the penalty imposed, remand the case to a previous step in the process, or remand the case for an alternative process, as he/she deems appropriate.

5.    The Chief of Police may impose a higher penalty than recommended by the Hearing Tribunal, or the Assistant Chief, OHS.

M.    Appeal Rights Outside of Agency

1.    D.C. Office of Employee Appeals (OEA)

a.    A member may appeal to the OEA any Adverse Action for cause that results in removal, reduction in grade, or suspension for ten (10) days or more.

b.    Any such appeal shall be filed within thirty (30) days of the effective date of the agency action.

2.    Arbitration Process

The Fraternal Order of Police may elect to go to arbitration pursuant to Article 19-E (Arbitration) of the CBA with regard to a member covered by the CBA, against whom a decision by the Chief of Police has been made on Adverse Action exceeding a penalty of five (5) days.

3.      Grievance Procedures

A member covered by the CBA, who is to be suspended for less than six (6) days, has the right to appeal the action to the Chief of Police as provided in the CBA. The decision of the Chief of Police will not be subject to further appeal or arbitration. (CALEA 26.1.6)

N.     Element Commanders shall ensure that all service of suspension and/or forfeited leave is documented and forwarded to OHS and OPR the next business day after the Commander's Resolution Conference.

O.     The Assistant Chief, OPR, shall be responsible for the investigation, review, or assignment of the following types of cases:

1.      Formal charges by citizens against Department personnel, which may include those received and processed by the OPC.

2.      Allegations against Department personnel involving the commission of criminal offenses, or serious misconduct as defined by GO-PER-120.23 (Serious Misconduct Investigations).

3.      Allegations against Department personnel involving chain of command misconduct. Upon receipt of an alleged violation, the Assistant Chief, OPR, shall take one of the following actions:

a.      Refer it to the appropriate command;

b.      Conduct a preliminary investigation, and then, if appropriate, refer it to an appropriate command; or

c.      Order an investigator assigned to the OPR to conduct the investigation.

4.      OPR shall provide assistance to investigators engaged in complaint investigations when that element determines that assistance is needed.

P.     The Assistant Chief, OHS, shall:

1.      Review investigative reports and issue Proposed Notices of Adverse Action that include a statement of the charges citing violations of General Orders, and specific description of the manner in which the General Order was violated.

2.      Review Appeals of Proposed Notices, and issue Final Notices of Adverse Action in accordance with the deadlines contained in the CBA, or when there is no appeal, at the expiration of the deadline.

DC 000060

3.      Disseminate Proposed, Final, and Final Agency Action Notices to element commanders that involve members in their command. The memorandum that accompanies these service documents shall provide the deadline within which the member shall be served.

4.      Schedule disciplinary suspensions. These suspensions shall be scheduled as soon as possible after the issuance of the Final Notice of Adverse Action, or the Final Agency Action, as applicable.

5.      Ensure that disciplinary suspensions and terminations are documented by the creation of a personnel action, and that a copy of such action is placed in the member's Official Personnel Folder. Copies of all personnel actions documenting suspensions shall be sent to OPR.

Q.      Disciplinary action will not preclude a member from participating in the promotional process.

1.      If, after the eligibility list is formed, a final disciplinary penalty of a suspension of twenty (20) days or greater is imposed, the member need not be promoted from that list.

2.      If an Adverse Action is proposed after the eligibility list is formed, the promotion may be suspended pending a final disposition.

3.      If the disposition is favorable to the member, or the penalty is less than a suspension of twenty (20) days, the member shall be promoted with back pay retroactive to the date when the member would otherwise have been promoted.

R.      Any person who has filed a formal complaint of misconduct against a member of the MPD is entitled to notification, in writing, of the resolution, including significant dates, general allegations, and the disposition of their complaint in accordance with General Order 1202.5 (Citizen Complaints).

## VII.    CROSS REFERENCES

A.      GO-PER-120.23 (Serious Misconduct Investigations)

B.      General Order 201.7 (Review Boards)

C.      GO-PER-201.20 (Performance Management System [PMS] for Sworn Members in the Rank/Position of Civil Service Sergeant, Investigative Personnel, and Officer)

D.      GO-PER-201.22 (Fire and Police Disciplinary Action Procedure Act of 2004)

E.      General Order 1202.5 (Citizen Complaints)

## VIII.   ATTACHMENTS

1.   Attachment A: Table of Offenses and Penalties

2.   Attachment B: Template for Letter of Prejudice

3.   Attachment C: Template for Letter of Official Reprimand

//SIGNED//
Charles H. Ramsey
Chief of Police

CHR:SOA:DAH:JAH:afa:jah

DC 000062

# TABLE OF OFFENSES AND PENALTIES

**A.     OFFENSES**

Conduct described below is prohibited, and shall serve as the basis for an Official Reprimand, or Adverse Action.

1.      Drinking "alcoholic beverage" or "beverage" as described in Section 25-101, subsection (5) of the D.C. Code, District of Columbia Alcoholic Beverage Control Act, or being under the influence of "alcoholic beverage" or "beverage", while on duty.

2.      Drinking "alcoholic beverage" or "beverage" as described in Section 25-101, subsection (5) of the D.C. Code, District of Columbia Alcoholic Beverage Control Act, "while in uniform off duty"; or being under the influence of "alcoholic beverage" when off duty.

3.      The taking of any drug or substance, on or off-duty, as described in the D.C. Uniform Controlled Substances Act of 1981, unless taken upon the prescription of a licensed physician, or registered practitioner authorized to dispense a controlled substance during the course of professional practice.

4.      Malingering or feigning illness or disability in order to evade the performance of duty.

5.      Willfully disobeying orders, or insubordination.

6.      Willfully and knowingly making an untruthful statement of any kind in any verbal or written report pertaining to his/her official duties as a Metropolitan Police Officer to, or in the presence of, any superior officer, or intended for the information of any superior officer, or making an untruthful statement before any court or any hearing.

7.      Conviction of any member of the force in any court of competent jurisdiction of any criminal or quasi-criminal offense, or of any offense in which the member either pleads guilty, receives a verdict of guilty or a conviction following a plea of *nolo contendere*, or is deemed to have been involved in the commission of any act which would constitute a crime, whether or not a court record reflects a conviction. Members who are accused of criminal or quasi-criminal offenses shall promptly report, or have reported their involvement to their commanding officers.

8.      Inefficiency as evidenced by repeated and well-founded complaints from superior officers, or others, concerning the performance of police duty, or the neglect of duty. Three sustained Adverse Actions within a 12-month

**TABLE OF OFFENSES AND PENALTIES**                    Page 2 of 5

period upon charges involving misconduct, as provided in this section, shall be prima facie evidence of inefficiency. The Adverse Action charges need not be related.

9.   Receiving money, or other valuable consideration, contrary to the rules and regulations of the Department, or the laws in force in the District of Columbia.

10.   AWOL (Absent Without Leave), i.e., reporting late for duty more than six (6) times within a one-year period, an absence from duty without official leave in excess of the first four (4) hours of a scheduled tour of duty, or any unexcused absence from a scheduled duty assignment that is not in the category of "lateness."

11.   Using unnecessary and wanton force in arresting or imprisoning any person, or being discourteous, or using unnecessary violence toward any person(s), or the public.

12.   Conduct unbecoming an officer, including acts detrimental to good discipline, conduct that would adversely affect the employee's or the agency's ability to perform effectively, or violations of any law of the United States, or of any law, municipal ordinance, or regulation of the District of Columbia.

13.   Willful failure to promptly report to the Chief of Police, or the Assistant Chief, Office of Professional Responsibility, through channels or directly, any disloyalty, or suspected disloyalty, to the United States or to the Government of the District of Columbia; or to promptly report any violation by any person whomsoever, without or within the Metropolitan Police Department, of the Criminal Code of either the United States, or the District of Columbia; or to report the violation of any section of the rules and regulations of the Department.

14.   Neglect of duty to which assigned, or required by rules and regulations adopted by the Department.

15.   Compromising a felony or any other unlawful act, or to participate in, assent to, aid, or assist any person suspected of a crime to escape full judicial examination by failing to give known facts, or reasonable causes of suspicion, or withdrawing any information relative to the charge or suspicion from the proper judicial authorities; or in any manner to receive any money, property, favor, or other compensation from, or on account of, any person arrested, or subject to arrest, for any crime or supposed crime; or to permit any such person to go at large without due effort to secure an investigation of such supposed crime.

**TABLE OF OFFENSES AND PENALTIES**                    Page 3 of 5

16.    Failure to obey orders or directives issued by the Chief of Police.

17.    Fraud in securing appointment, or falsification of official records or reports.

18.    Improper political activity, or engaging in a strike.

19.    Willful misuse or mutilation, or willful or neglectful destruction of District of Columbia property or funds.

20.    Misuse of official position, or unlawful coercion of an employee for personal gain or benefit.

21.    Undependability as evidenced by repeated and well-founded tardiness complaints from superior officers, which results in adverse action. Three such complaints within a 12-month period shall be prima facie evidence of undependability. The member shall be cited for undependability on the fourth such instance.

22.    The use of, or negligent loss of a firearm, and/or radios, badges, or other Department-issued equipment, not in conformity with Section 207, Title 6A, District of Columbia Municipal Regulations; and/or not in conformity with General Order RAR-901.01 (Handling of Service Weapons).

23.    The refusal of a member to submit to urinalysis testing, Breathalyzer test, or other tests that measure drugs and/or alcohol in the system (e.g. an Intoxilyzer test) when required, at the Medical Services Section.

24.    A finding that a member has violated Department Equal Opportunity policies, the D.C. Human Rights Act, or equivalent federal laws or regulations. This includes the provision of equal services as required by District or federal law.

25.    Any conduct not specifically set forth in this order, which is prejudicial to the reputation and good order of the police force, or involving failure to obey, or properly observe any of the rules, regulations, and orders relating to the discipline and performance of the force.

**TABLE OF OFFENSES AND PENALTIES**                    Page 4 of 5

**B.    PENALTIES**

The following Table of Penalties Guide shall be used as specified in this order. Use of this guide shall be mandatory as applicable. Where an individual order or directive provides for penalties, such penalties will supersede those contained in this Table of Penalties Guide. However, the Chief of Police, or the Assistant Chief, Office of Human Services (as appropriate), may, without regard to the provisions of this section, in extraordinary circumstances when confronted by a unique factual situation:

1.    Determine that a penalty less than that established in the Table of Penalties shall be imposed, provided that such authority finds that, under all circumstances of the case, the mitigating considerations outweigh the aggravating considerations, or;

2.    Determine that a penalty greater than that established in the Table of Penalties shall be imposed, provided that such authority finds that, under all the circumstances of the case, the aggravating considerations outweigh the mitigating considerations. Such considerations shall be set forth on the record with particularity, and such findings shall be made by a preponderance of the evidence.

## TABLE OF OFFENSES AND PENALTIES GUIDE

| # | Violation (abbreviated) | 1st | 2nd | 3rd |
|---|---|---|---|---|
| 1. | On-Duty Alcohol | Suspension for 3 days to removal | Suspension for 10 days to removal | Removal |
| 2. | Off-Duty Alcohol | Suspension for 3 days to removal | Suspension for 10 days to removal | Removal |
| 3. | Drug Use | Removal | | |
| 4. | Malingering | Reprimand to removal | Removal | |
| 5. | Insubordination | Suspension for 10 days to removal | Suspension for 15 days to removal | Removal |
| 6. | Untruthful Statement | Suspension for 15 days to removal | Suspension for 30 days to removal | Removal |
| 7. | Conviction | Removal | | |
| 8. | Inefficiency | Reprimand to removal | Suspension for 10 days to removal | Removal |
| 9. | Receiving consideration/gratuity | Reprimand to removal | Removal | |
| 10. | AWOL | Reprimand to removal | Suspension for 5 days to removal | Removal |
| 11. | Unnecessary or Wanton Force | Suspension for 3 days to removal | Suspension for 10 days to removal | Removal |
| 12. | Conduct Unbecoming | Suspension for 3 days to removal | Suspension for 5 days to removal | Removal |
| 13. | Failure to Report Certain Violations | Reprimand to removal | Suspension for 10 days to removal | Removal |
| 14. | Neglect of Duty | Reprimand to removal | Suspension for 15 days to removal | Removal |
| 15. | Compromising a Felony | Removal | | |

# TABLE OF OFFENSES AND PENALTIES

| | | | | |
|---|---|---|---|---|
| 16. | Failure to Obey Orders & Directives of COP | Reprimand to removal | Suspension for 1 day to removal | Suspension for 15 days to removal |
| 17. | Fraud in appt. or falsification of records | Suspension for 30 days to removal | Removal | |
| 18. | Improper political activity or strike | Removal | | |
| 19. | Misuse or mutilation of D.C. property or funds | Reprimand to removal | Suspension for 10 days to removal | Removal |
| 20. | Misuse of position | Removal | | |
| 21. | Undependability (Tardiness) | Reprimand to Removal | | |
| 22. | Negligent Use or Loss of Firearm, radios, badges, or other Department-issued equipment | Suspension for 10 days to removal | Suspension for 20 days to removal | Removal |
| 23. | Refusal to Submit to Urinalysis/Breathalyzer/ Intoxilyzer | Removal | | |
| 24. | Sustained EEO Complaint | Reprimand to Removal | Removal | |
| 25. | Prejudicial Conduct | Reprimand to removal | Suspension for 15 days to removal | Removal |

# TEMPLATE FOR LETTER OF PREJUDICE

## METROPOLITAN POLICE DEPARTMENT

CS#_____

**MEMORANDUM**

**TO:**      Member:
            District/Division:

**SUBJECT:**   LETTER OF PREJUDICE

You are hereby issued this Letter of Prejudice for the following dereliction of duty:

> **(Describe action that supports the dereliction of duty, and any recommendation by the Commanding Officer)**

This notice will be considered in performance evaluations, and will be used in deciding greater degrees of disciplinary action.  Consistent with General Order 120.21 (Disciplinary Processes and Procedures), should you be cited for a similar violation within a two-year period, you will receive an official reprimand or be cited for adverse action.

A copy of this Letter of Prejudice will be placed in your personnel folder.  This constitutes a corrective action as defined in Article 12, Section 2, of the Collective Bargaining Agreement covering officers and sergeants, and may be appealed through the grievance procedure outlined in that agreement.  (Members not represented by the collective bargaining unit for officers and sergeants may file a written appeal directly to the Chief of Police within ten (10) business days of issuance of this Letter of Prejudice).

You shall acknowledge receipt of this action by affixing your signature on all copies, the original of which shall be retained in your personnel folder for a period of two (2) years of acknowledgement.

_____
Commander

**ACKNOWLEDGEMENT**
I hereby acknowledge receipt of this Letter of Prejudice, and I am aware that this report will be made part of my personnel folder.

_____      _____
Signature of member                          Date

_____      _____
Signature of serving official                Date

# TEMPLATE FOR LETTER OF OFFICIAL REPRIMAND

### METROPOLITAN POLICE DEPARTMENT

CS #_____

### MEMORANDUM

**TO:**     Member:
District/Division:

**SUBJECT:**   OFFICIAL REPRIMAND

You are hereby issued this Official Reprimand for the following dereliction of duty:

> **(Describe action that supports the dereliction of duty, and any recommendation by the Commanding Officer)**

This Official Reprimand is a written censure being issued to you as a formal notice of your unsatisfactory conduct.  This notice will be considered in performance evaluations, and will be used in deciding greater degrees of disciplinary action within a three-year period.  Receipt of three official reprimands within a two-year period will subject you to an unsatisfactory performance rating for your next rating period.

A copy of this Official Reprimand shall be placed in your personnel folder.  This constitutes a corrective action as defined in Article 12, Section 2, of the Collective Bargaining Agreement covering officers and sergeants, and may be appealed through the grievance procedure outlined in that agreement.  (Members not represented by the collective bargaining unit for officers and sergeants, may file a written appeal directly to the Chief of Police within ten (10) business days of issuance of this Official Reprimand).

_____
Commander

### ACKNOWLEDGEMENT
I hereby acknowledge receipt of this Official Reprimand, and I am aware that this report will be made part of my personnel folder.

_____          _____
Signature of member                                                        Date

_____          _____
Signature of serving official                                           Date

# EXHIBIT 13

# GENERAL ORDER



METROPOLITAN

# POLICE

## DISTRICT OF COLUMBIA

**Title**
**Serious Misconduct Investigations**

**Series / Number**
**GO – PER – 120.23**

**Effective Date**
**January 16, 2004**

**Distribution**
**B**

**Replaces/ rescinds**
**General Order 1202.3 (Investigative Responsibilities Where Sworn Members of This Department Are Arrested or Are Suspected of Criminal Misconduct)**

I. Background ...........................…...Page 1
II. Policy ...…...….……..…....…….Page 1
III. Definitions.……..….…....…......Page 2

IV. Regulations………….…........Page 4
V. Procedural Guidelines….…….....Page 6
VI. Cross References……….….…..Page 15

## I.    BACKGROUND

Sworn members of the Metropolitan Police Department are expected to maintain the highest standards of conduct.  Members should conduct themselves properly and professionally, on or off duty.  When a member is accused of misconduct, a thorough investigation will be conducted. The purpose of this directive is to establish responsibilities and procedures for reporting and conducting investigations of serious misconduct (administrative and/or criminal) that may result in disciplinary action.

## II.    POLICY

The policy of the Metropolitan Police Department (MPD) is to investigate every instance of alleged misconduct against a member of this Department (whether criminal or administrative in nature), in accordance with the laws of the District of Columbia and the policies and procedures of MPD.  Investigations shall be conducted in a fair and consistent manner. (CALEA 52.1.1)

The Office of Internal Affairs (OIA) within the Office of Professional Responsibility (OPR) shall be responsible for the investigation of all allegations of serious misconduct by members of the Department.  (CALEA 52.1.1 b-c)

The Force Investigation Team (FIT) within the Office of Professional Responsibility shall be responsible for investigating force-related misconduct pursuant to General Order RAR – 901.08 (Use of Force Investigations).  (CALEA 52.1.1 b-c)

Other administrative or policy misconduct shall be investigated at the command level pursuant to General Order PER – 120.20 (Chain-of-Command Misconduct Investigations).  (CALEA 52.1.1 a)

Where applicable and pursuant to General Order PER – 120.25 (Processing Citizen Complaints), certain use-of-force misconduct, serious misconduct, and other administrative or policy misconduct cases will be investigated by the Office of Citizen Complaint Review through the Citizen Complaint process. (CALEA 52.1.1)

DC 002488

III.   **DEFINITIONS**

When used in this directive, the following terms shall have the meanings designated:

1.   **Agent** – positions held by Sergeants and Detective Grades I and II, assigned to the Office of Internal Affairs (OIA).  While engaged in official duties, an OIA agent may assert authority over a higher-ranking member involved in the investigation.

2.   **Officer/Member** – interchangeable terms referring to sworn law enforcement personnel of the Department.  The terms do not include civilian employees of the Department.

3.   **Serious Misconduct** – suspected criminal misconduct and the following specific forms of misconduct listed below (except that for the purposes of this directive, serious misconduct involving a use of force within the jurisdiction of the Force Investigation Team pursuant to GO RAR-901.08 shall be investigated by the Force Investigation Team):

   a.   all civil suits alleging any misconduct by an officer while acting in an official capacity;

   b.   all civil suits against an officer for off-duty conduct (while not acting in an official capacity) alleging physical violence, threats of physical violence, racial bias, dishonesty, or fraud;

   c.   all criminal arrests or filing of criminal charges against an officer;

   d.   all allegations of unlawful discrimination (e.g., on the basis of race, ethnicity, gender, religion, national origin, sexual orientation, or disability), including improper ethnic remarks and gender bias, but excluding employment discrimination;

   e.   all allegations of an unlawful search and seizure;

   f.   all allegations of an unlawful stop;

   g.   all allegations of false arrests or filing of false charges;

   h.   any act of retaliation or retribution against an officer or person;

   i.   any act of retaliation or retribution against a person for filing a complaint against a member;

DC 002489

  j.  all allegations of excessive use of force or improper threat of force (including strikes, blows, kicks, or other similar uses of force against a compliant subject or administered with a punitive purpose);

  k.  any intentional failure to complete use of force reports required by MPD policies and in accordance with procedures;

  l.  any intentional provision of false information in an MPD or an Office of Citizen Complaint Review (OCCR) investigation or in any official report, log, or electronic transmittal of information;

  m.  all incidents in which (1) a person is charged by an officer with assault on a police officer or resisting arrest or disorderly conduct, and (2) the United States Attorney's Office (USAO) or the Office of the Corporation Counsel (OCC) notifies MPD that it is dismissing the charge based upon officer credibility or a judge dismissed the charge based upon officer credibility;

  n.  all incidents in which MPD has received written notification from a prosecuting agency in a criminal case that there has been (1) an order suppressing evidence because of any constitutional violation involving potential misconduct by an MPD officer, or (2) any other judicial finding of officer misconduct made in the course of a judicial proceeding or any request by a federal or District of Columbia judge or magistrate that a misconduct investigation be initiated pursuant to some information developed during a judicial proceeding before a judge or magistrate. MPD shall request that all prosecuting agencies provide them with written notification whenever the prosecuting agency has determined that any of the above has occurred;

  o.  all referrals pursuant to Sections IV-A and IV-B (Regulations) of this General Order; and

  p.  all positive tests under the MPD's Drug Screening Program [GO-PER-100.24 (Drug Screening Program)].

4. **Underlying Matter –** an incident which would require appropriate police action and during which a responding or involved officer is charged with misconduct. This directive focuses on the handling of the alleged misconduct while recognizing that the "underlying matter" is a police responsibility that must also be processed to completion.

5. **Probable Cause –** whether a reasonably prudent police officer, considering the total circumstances confronting him/her and drawing from his/her experience, would be warranted in the belief that an offense has been or is being committed. (CALEA 1.3.2)

Case 1:16-cv-01920-CKK-RMM   Document 91   Filed 12/22/20   Page 318 of 598

## IV.   REGULATIONS

A.   All officers shall promptly notify OPR or a supervisor (who shall report the information to OPR) of the following:

1.   the officer is arrested or criminally charged for any conduct;

2.   the officer is named as a party in any civil suit involving his or her conduct while on duty (or otherwise while acting in an official capacity); or

3.   the officer is named as a party in any civil suit regarding off-duty conduct (while not acting in an official capacity) that alleges any of the following:

   a.   physical violence,

   b.   threats of physical violence,

   c.   racial bias,

   d.   dishonesty, or

   e.   fraud by the officer.

B.   All officers (including supervisors and managers who learn of evidence of possible misconduct through their review of an officer's work) shall promptly notify OPR of any conduct by other officers that reasonably appears to constitute any of the following:

1.   an excessive use of force or improper threat of force;

2.   a false arrest or filing of false charges;

3.   an unlawful search or seizure;

4.   unlawful discrimination;

5.   an intentional failure to complete use of force reports required by MPD policies and in accordance with procedures;

6.   an act of retaliation for complying with any MPD policy or procedure; or

7.   an intentional provision of false information in an MPD or OCCR investigation or in any official report, log, or electronic transmittal of information.

C.   Failure to voluntarily report officer conduct as described in Sections A and B above shall be an offense subject to discipline if sustained.

DC 002491

D.      Any member who has reason to believe that reporting misconduct to an element official may compromise the investigation may report the information to OPR directly.

E.      MPD shall notify and consult with the USAO immediately, in no case later than the next business day, following the receipt or discovery of any allegations of criminal misconduct referred to in Section III-3 (Serious Misconduct) above.  In every such incident involving allegations of criminal misconduct, the USAO will notify and consult with the appropriate OPR official whenever possible, unless doing so would compromise the investigation, or is otherwise prohibited by law, rule, or regulation.

F.      Failure to voluntarily make a timely and proper notification of possible misconduct shall be an offense subject to discipline, if sustained, up to and including removal from the Department.

G.      Members of this Department shall take appropriate police action in any situation involving serious allegations of misconduct against another member.  Appropriate action may include, but is not limited to, arrest based on probable cause.

H.      Any member who has a potential conflict of interest related to a pending misconduct investigation shall not be allowed to participate in any way in the conduct or review of that investigation.

I.      No member shall interfere with the process of a lawful arrest of another member, whether on or off duty.

J.      Investigative responsibility is assigned to the Office of Professional Responsibility for all incidents of serious misconduct as defined by Section III-3 of this order.  OPR shall review all misconduct complaints as they are received and shall determine whether a misconduct complaint meets the criteria for being assigned for investigation outside of the District Chain of Command, except that whenever an incident of serious misconduct involves a use of force within the jurisdiction of the Force Investigation Team pursuant to General Order RAR – 901.08 (Use of Force Investigations), the Force Investigation Team shall conduct the investigation. (CALEA 52.1.1-b)

K.      Where applicable and pursuant to General Order PER – 120.25 (Processing Citizen Complaints), certain use-of-force misconduct, serious misconduct, and other administrative or policy misconduct cases within the concurrent jurisdiction of MPD and OCCR will be investigated by the Office of Citizen Complaint Review through the Citizen Complaint process. (CALEA 52.1.1)

DC 002492

## V.   PROCEDURAL GUIDELINES

A.   Initial Duties at the Scene of an Allegation of Serious Misconduct

1.   When a member is handling a police matter and an act of misconduct is alleged, the initial responsibility of the member shall be to ensure that the scene is safe, render first aid if applicable, and secure the scene's integrity.

2.   If an arrest or other police action is required in the underlying matter, the officer shall complete all necessary and appropriate police duties unless otherwise directed by an official.

3.   A member who is involved in an alleged act of misconduct shall not be compelled to provide a statement when the alleged incident indicates potential criminal misconduct in accordance with Section V-E-2 of this order.

B.   Duties of Members

Members of the Department shall immediately notify an official when any member:

a.   is accused of misconduct or an allegation of misconduct is made;

b.   is arrested and/or criminally charged for any misconduct in any jurisdiction;

c.   has knowledge of any serious or criminal misconduct by another member;

d.   is named as a party in any civil suit involving his or her conduct while on duty or otherwise acting in an official capacity;

e.   is named as a party in any civil suit regarding off-duty conduct while not acting in an official capacity that alleges:

(1)   physical violence,

(2)   threats of physical violence,

(3)   racial bias,

(4)   dishonesty, or

(5)   fraud;

    f.    learns of an existing warrant, summons or protection order for himself/herself or another member, regardless of jurisdiction;

    g.    has knowledge of an alleged use of force, excessive force or improper threat of force by another member;

    h.    has knowledge of a false arrest or filing of false charges by another member;

    i.    has knowledge of an unlawful stop, search and/or seizure by another member;

    j.    has knowledge of any conduct by another member that reasonably appears to constitute unlawful discrimination;

    k.    has knowledge of an act of retaliation or retribution toward any person for complying with any MPD policy or procedure;

    l.    has knowledge of another member's intentional failure to complete a Use of Force Incident Report (PD Form 901-e) when required; or

    m.    has knowledge that another member intentionally provided false information in an MPD or an Office of Citizen Complaint Review (OCCR) investigation or in any official report, log or electronic transmittal of information.

C.    Obtaining Complaint System (CS) Tracking Numbers

Officials of the Department shall notify the Office of Professional Responsibility and obtain Complaint System tracking numbers within one (1) hour of learning of an incident of alleged serious misconduct –

    a.    During normal weekday business hours (from 0700 – 1900), notify the Office of Professional Responsibility directly at 727-4385, or

    b.    During non-business hours (from 1900 – 0700), notify the on-call OPR Agent.  The agent may be contacted through the Synchronized Operations Command Center (SOCC).

D.    Investigation of Underlying Matter or Offense Related to the Allegation of Serious Misconduct

    1.    The Office of Internal Affairs is responsible for investigating all allegations of serious misconduct except those incidents within the jurisdiction of FIT or OCCR.

2.   The Office of the Superintendent of Detectives (OSD) is responsible for conducting the investigation of the underlying offense related to the allegation of serious misconduct.

3.   The OSD shall immediately respond to begin their investigation and secure evidence, witnesses, and other information related to the crime that led up to the alleged misconduct.  An OSD official shall designate a lead investigator for the crime that led up to the allegation of misconduct.

4.   The OSD lead investigator shall coordinate all investigative information with the Office of Internal Affairs.

5.   The OSD is responsible for handling the arrest and processing of any individual charged as a result of the underlying offense related to the alleged misconduct.

6.   Members from the Forensic Science Services Division shall respond and be responsible for evidentiary crime scene processing.

7.   The Forensic Science Services Division Technician handling the scene shall be required to coordinate all evidentiary information with the Office of Internal Affairs.

E.   Investigation of Serious Misconduct Incidents
Within the District of Columbia

1.   Interviewing Subjects, Members and Witnesses (General)

In conducting serious misconduct investigations, the Office of Internal Affairs or other appropriate investigators shall include, subject to and in conformance with applicable law and MPD directives, the following measures:

a.   If, during the course of an investigation, the investigator has reason to believe that misconduct occurred other than that alleged, the investigator also shall investigate the additional potential misconduct to its logical conclusion.

b.   In investigations involving a serious use of force or serious physical injury, MPD investigators shall tape record or videotape interviews of complainants, involved officers, and material witnesses (if a complainant or non-officer witness refuses to be tape-recorded or videotaped, then MPD shall prepare a written narrative of the statement to be signed by the complainant or non-officer witness)

c.   Whenever practicable and appropriate, complainants and witnesses shall be interviewed at sites and times convenient for them, including at their residences or places of business.

d.  Officers involved in a serious misconduct incident shall be sequestered until interviewed by a member of OIA or by appropriate supervisory personnel.

e.  Group interviews are prohibited.

f.  Supervisors of the involved members subject to the investigation shall be notified, as appropriate.

g.  All appropriate MPD members, including supervisors, shall be interviewed.

h.  Investigators shall ensure that all appropriate evidence is collected, preserved, and analyzed, including canvassing the scene to locate witnesses and obtaining complainant medical records, where appropriate.

i.  Any inconsistencies in officer and witness interview statements gathered during the investigation shall be identified and reported in writing.

2.  **Duties of Officials When Notified of Alleged Serious Misconduct Indicating Potential Criminal Charges or Arrest in the District of Columbia**

a.  In all cases of serious misconduct involving potential criminal charges or the arrest of an officer, the subject officer shall not be compelled or ordered to make a statement (which includes interview by video or tape-recording) until the USAO has issued a written declination and an authorized Reverse-Garrity warning has been issued; or criminal prosecution of the officer has been completed.  (Refer to Section V-D-1 of General Order RAR-901.08 regarding use of force incidents required to be investigated by the Force Investigation Team.)

b.  **Misconduct situations in which the "Reverse-Garrity Warning" is used shall be authorized by an official at the rank of Captain and above, who is assigned to OPR. Officials at the rank of Lieutenant and above, who are assigned to the Civil Rights and Force Investigation Section, IAD, shall authorize the issuance of "Reverse-Garrity Warnings" to members who decline to complete the PD Forms 901-e (UFIR) or 901-g (RIF).**

DC 002496

    **c.**     **Questions concerning the use of "Garrity Warning" or the "Reverse-Garrity Warning" should be addressed to the OPR.**

    d.     In those instances in the District of Columbia when a member, either on or off duty, is arrested or suspected of criminal misconduct, the Assistant District Commander or Watch Commander of the district of occurrence shall:

        (1)     Immediately respond to the scene and determine if the member shall be summarily arrested; and

# THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK

DC 002497

       (2)    Whether or not an arrest is made, the potential crime scene shall be protected and the responding official shall ensure that all evidence is preserved.

       (3)    Ensure that the Office of Professional Responsibility has been notified as prescribed by Section V-D of this general order.

       (4)    Ensure that the USAO has been timely notified, pursuant to Section IV-E (Regulations) of this general order.

e.    Upon receiving notification that a member has been arrested or suspected of criminal misconduct, a member from OPR shall respond to the scene.

f.    The official responding to the scene of an arrested member or a member suspected of criminal misconduct shall:

       (1)    Ensure that the Office of Professional Responsibility has been notified as prescribed by Section V-C of this general order;

       (2)    Turn over all pertinent information to the investigating official of the OPR;

       (3)    Take possession of appropriate Department property not seized as evidence; and

       (4)    Interview those present to verify the essential aspects of the incident and gather all pertinent information needed until such time as a member of OPR responds to handle the investigation, if applicable.

3.    Responsibilities of Officials when Notified of Alleged Serious Misconduct

The official or supervisor receiving notification of serious misconduct by a member shall:

a.    Notify his/her commanding officer or the Assistant District Commander through the chain of command;

b.    Modify the member's duty status, if applicable, and cause the appropriate entries to be made in the Patrol Signal System (PSS) Book of the arrested member's element. (CALEA 1.3.8)

c.    Cause the applicable preliminary report, PD Form 99 (Citizen Complaint Report) and/or OCCR complaint form to be transmitted either by facsimile or hand-carried to the OPR prior to being relieved from duty.

d.    Immediately notify (no later than the next business day) the USAO regarding the misconduct.

F.    Duties and Responsibilities of the Office of Professional Responsibility

    1.    The Office of Professional Responsibility shall maintain responsibility for conducting the administrative investigation, in conjunction with any other investigative component that is involved, in all situations where a member:

        a.    is arrested;

        b.    is the subject of an arrest warrant; criminal information or criminal indictment; or

        c.    is the subject of a protection order.

    2.    Members of the Office of Internal Affairs have the authority and responsibility to conduct investigations assigned by the Assistant Chief of the Office of Professional Responsibility or the Chief of Police. As such, they have the following authority, as required by their position:

        a.    Conduct activities in the furtherance of an investigation;

        b.    Request and receive all Department records and/or information to facilitate an investigation;

        c.    Direct a member of this Department to appear at designated locations for interviews;

        d.    Require members to provide truthful statements for use in an investigation (subject to "Reverse-Garrity" requirements, after a criminal declination by the USAO, or after any criminal prosecution of the officer has been completed).

        e.    Cause the police powers of a sworn member to be revoked in connection with an investigation being conducted by the Office of Internal Affairs. (CALEA 52.1.8)

        f.    Assert authority over a higher-ranking member involved in the investigation while engaged in official duties.

    3.    The Director, Office of Internal Affairs, or the Director, Civil Rights and Force Investigations Division, when applicable, shall be responsible for:

        a.    Completing any administrative investigations of serious misconduct, absent special circumstances, within 90 calendar days of receiving the complaint, criminal declination, or conclusion of a criminal prosecution where applicable (Special circumstances causing any delay in an administrative

investigation shall be documented and the investigating member shall submit a written status report of the investigation at least every thirty days thereafter.); (CALEA 52.1.4)

b.   Investigating all incidents of serious misconduct as defined in this order, (CALEA 52.1.1-b);

c.   Monitoring each related case in the judicial process;

d.   Designating members to serve in an "on-call" capacity;

e.   Tracking all allegations of misconduct against MPD members; (CALEA 52.1.10)

f.   Ensuring that, in those cases where members of OPR are required to investigate a case in conjunction with another investigative unit, copies of all statements taken from involved parties and witnesses, along with any tapes, are kept on file at the OPR; and

g.   Approving requests from other involved investigative units for records and copies of statements taken by OPR personnel.

G.   Handling of Arrests of Members

When a member is arrested by MPD personnel, the arresting officer shall:

a.   Upon learning that an arrested person is a member of MPD, immediately notify his/her Assistant District Commander or Watch Commander.  The notified official shall follow the procedures outlined in Section V-E of this general order.

b.   Handle the arrest in an appropriate manner, consistent with the requirements of this order;

c.   Transport the arrested member to the appropriate element for processing;

d.   Where multiple members are arrested, sequester them from each other during processing;

e.   Be responsible for processing the case and meeting all court obligations; (a member of OPR shall assist the arresting officer in meeting these obligations);

f.   Turn in all Department equipment, not held as evidence, to the arrested member's immediate supervisor or, if not available, to the official who responds from the arrested member's element.

H.   Responsibilities of Commanding Officer After Arrest of a Member

Upon learning that a sworn member of the Department is involved in criminal misconduct requiring arrest, the arresting officer's commanding officer shall:

1.   Notify the arrested member's commanding officer, if the arrested member is from another district or unit;

2.   Ensure that the member's duty status is appropriately modified, if applicable;

3.   Ensure that an official from the arrested member's unit responds to the location of the arrest to assist with the investigation and take possession of any department property not seized as evidence; and

4.   Ensure that the proper entries are made in the PSS Book and the Time and Attendance Court Information System (TACIS).

I.   Responsibility of Synchronized Operations Command Center (SOCC)

The official in charge of SOCC shall be responsible for:

1.   Notifying an official of the OPR immediately upon receiving all notifications in Section V-B of these procedural guidelines:

a.   During normal weekday business hours, from 0700 – 1900, notify OPR, or

b.   During non-business hours, from 1900 – 0700, notify the on-call OPR Agent through SOCC;

2.   Maintaining an on-call duty schedule of all OPR members and their assigned pager numbers; and

3.   Notifying the Chief of Police or official then in command of the Department, in all cases where a sworn member of this Department has been arrested. (CALEA 52.1.3)

J.   Processing Serious Misconduct Involving MPD Members
Outside of the District of Columbia

When a member is involved in serious misconduct *outside* of the District of Columbia, whether on or off duty:

1.   The member shall immediately notify the Watch Commander of his/her element through the Communications Division or SOCC.

2.   The Communications Division or SOCC shall notify the Office of Professional Responsibility.

3.      The Office of Professional Responsibility shall respond as may be appropriate under the particular circumstances.

4.      The appropriate law enforcement authority of the jurisdiction of occurrence will maintain primary responsibility for conducting a criminal investigation of the incident or the underlying matter.

5.      The Office of Internal Affairs shall initiate a concurrent administrative investigation, and shall work closely with the investigator/official from the originating police jurisdiction investigating the primary criminal offense.  In cases where the United States Attorney's Office or the competent prosecutorial authority has not yet issued a written declination, OIA shall not compel or order a subject officer to make a statement.

K.      Investigative Report Contents and Completion Schedules

1.      In instances of serious misconduct by an officer, the OIA Investigators shall complete a final investigative report with conclusions and recommendations within ninety (90) days as prescribed in Section V-G-3a of this general order.

2.      The final investigative report shall include a description of the serious misconduct identified during the course of the investigation; a summary and analysis of all relevant evidence gathered during the investigation, and proposed findings and analysis supporting those findings.

3.      To ensure comprehensive and timely completion of investigations by OIA, all MPD special units, whether located at the district level or operating from a centralized location, shall liaison and provide full cooperation with members of OIA.

4.      A duplicate copy of all reports, records, communications, and information related to the enumerated misconduct incident shall be provided immediately to the OIA Agent by any support unit having any such related materials.

5.      The standard of review in a criminal investigation is *probable cause*. The standard of review in a policy review (administrative) investigation is a *preponderance of the evidence*.

6.      When allegations of serious misconduct are made, the Office of Internal Affairs, shall make one of the following dispositions:

a.      **Unfounded:**  Where the investigation determined that there are no facts to support the incident complained of actually occurred.

b.  **Sustained:**  Where the person's allegation is supported by a preponderance of the evidence to determine that the incident occurred and the actions of the officer were improper.

c.  **Insufficient Facts:**  Where there are insufficient facts to decide whether the alleged misconduct occurred.

d.  **Exonerated:**  Where a preponderance of the evidence shows that the alleged conduct did occur, but did not violate MPD policies, procedures, or training.

## VI.  CROSS REFERENCES

### A.  Related Directives

1.  GO OPS-304.10 (Police-Citizen Contacts, Stops and Frisks)
2.  GO PCA-502.07 (Medical Treatment and Hospitalization of Prisoners)
3.  GO RAR-901.01 (Handling of Service Weapons)
4.  GO RAR-901.04 (Aerosol Oleoresin Capsicum Spray Dispensers)
5.  GO RAR-901.07 (Use of Force)
6.  GO RAR-901.08 (Use of Force Investigations)
7.  GO PER-120.20 (Chain-of-Command Misconduct Investigations)
8.  GO PER-120.25 (Processing Citizen Complaints)
9.  GO PER-201.26 (Duties, Responsibilities and Conduct of Members)

### B.  Court Opinions

1.  Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)
2.  Graham v. Connor, 490 U.S. 386 (1989), 104 L. Ed 2d 443, 447
3.  Garrity v. New Jersey, 385 U.S. 493 (1967)
4.  Saucier v. Katz, 533 U.S. 194 (June 18, 2001)

### C.  Laws and Regulations

1.  D.C. Official Code § 5-1101, *et seq.* (Review of Citizen Complaints Involving Police)
2.  D.C. Municipal Regulations, Title 6A, §200 (Performance of Duty) and §202 (Standards of Conduct)

//SIGNED//
Charles H. Ramsey
Chief of Police

CHR:NMJ:JAE:MAR:LN:AFA:afa

# EXHIBIT 14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____
                              :
IN THE MATTER OF:             :
                              :
JAQUIA BUIE,                  :
                              :
          Plaintiff,          :
                              :
     v.                       :   Case No.
                              :   1:16-cv-01920-CKK-RMM
DISTRICT OF COLUMBIA,         :
ET AL.,                       :
                              :
          Defendants.         :
_____:

Thursday,
February 28, 2019

Alpharetta, Georgia


DEPOSITION OF:

LOU REITER

called for examination by Counsel for the
Defendants, pursuant to Notice of Deposition, in
the Deerfield Room, Holiday Inn Express & Suites,
12505 Innovation Way, Alpharetta, Georgia, when
were present on behalf of the respective parties:

APPEARANCES:

On Behalf of the Government:

DAVID A. JACKSON, ESQ.
Civil Litigation Division, Section III
441 Fourth Street, NW, Suite 6305
Washington, DC 20001
202-724-6618
davida.jackson@dc.gov

On Behalf of the Deponent:

MARK A. SMITH, ESQ.
Smith Mustille, LLC
2200 Pennsylvania Avenue, 4th Floor East
Washington, DC 20037
202-776-0022
masmith@smithmustille.com

## CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Lou Reiter | 5 | 105 | 113 | |

```
1                    P-R-O-C-E-E-D-I-N-G-S

2                                        (10:10 a.m.)

3              MR. JACKSON:  Sir, will you please

4    state your name.

5              MR. REITER:  Yes.  Lou Reiter, L-O-U,

6    R-E-I-T-E-R.

7              MR. JACKSON:  Madam Court Reporter,

8    will you swear the witness, please.

9              THE REPORTER:  Yes, sir.  Please raise

10   your right hand.

11   Whereupon,

12                    LOU REITER

13   having been first duly sworn, was called as a

14   witness herein and was examined and testified as

15   follows:

16              THE REPORTER:  Please state and spell

17   your name for the record.

18              THE WITNESS:  Lou, L-O-U, Reiter, R-E-

19   I-T-E-R.

20              THE REPORTER:  Thank you.

21                   DIRECT EXAMINATION

22              BY MR. JACKSON:
```

1          Q          So, Mr. Reiter, my name is David

2     Jackson.  I'm an assistant attorney general, and

3     I will be the person questioning you today.  Just

4     as a housekeeping matter, we have in our

5     possession a check for your fee.  Would you just

6     tell us how you want to receive that check.

7               MR. SMITH:  If I -- as a housekeeping

8     matter -- and he'll respond, but having not

9     received a check, it was unclear that the

10    District was going to provide him the check as

11    had been arranged.  We sent the District on

12    February 8 an email, specifically asking, Are you

13    going to provide the check for the expert

14    witness, $2,500 check for the expert witness, by

15    or before the deposition.  We received no

16    response to that email.

17               Subsequently the witness informed us

18    that if he did not have a check at the

19    deposition, he would not be conducting the

20    deposition.  Okay.  And in the wake of the

21    silence of the District of Columbia, the law

22    office of Smith Mustille fronted a check to him.

1                    Now, you can make clear whether or not

2      you cashed that check or not, and if you didn't,

3      you can receive this check by FedEx, and we can

4      just -- you can just destroy that other check.

5      So proceed.

6                    THE WITNESS:  I'll give Mr. Smith's

7      check back to him.  Why don't you just FedEx me

8      that check.  The address is 87 Chula, C-H-U-L-A,

9      Drive, Jasper, J-A-S-P-E-R, Georgia  30143.

10                   BY MR. JACKSON:

11          Q       So we have the address.  We will check

12     with our folks about how we go about FedExing it,

13     but we will make sure that it is in the mail to

14     you one way or the other at the address that you

15     just gave us, and we'll make sure that it gets

16     in --

17          A       Okay.

18          Q       -- the mail --

19          A       Let me put another address on, because

20     I don't know what you're going to use, because if

21     you use post office or UPS, you have to also add

22     another address.  10603, two words, Big, B-I-G, a

1    new word, Canoe, C-A-N-O-E, still Jasper, Georgia

2    30143.

3         Q      And just so that you are convinced,

4    can you see the check that I'm holding up?

5         A      I can see a piece of paper.  Now you

6    went small.  I -- Mr. Jackson, I'll accept your

7    representation that that is a check for $2,500.

8    All right?

9         Q      Okay.  Thank you, sir.  Now, Mr. -- to

10   make sure I pronounce your name correctly.  Is it

11   Reiter?

12        A      Yes, sir.

13        Q      Okay.  Mr. Reiter, you have been

14   retained in this case to opine on issues relating

15   to Ms. Buie's claims against the District of

16   Columbia.  Is that correct?

17        A      Yes.

18        Q      Okay.  And you have produced for us

19   two reports, the original report and then a

20   supplemental report.  Is that correct?

21        A      Yes.

22        Q      And are all of the opinions that you

1    have relating to this case contained in those two

2    reports?

3         A     As of this date, that's correct.

4         Q     And what does that mean, as of this

5    date?  Do you anticipate doing a second

6    supplemental report?

7         A     If I'm asked to -- it's my

8    understanding that the District has been ordered

9    to produce additional administrative

10   investigation files, so if I'm asked to review

11   those and provide an additional supplemental

12   report, I will do so.

13        Q     And in terms of in preparation for

14   today's deposition, what steps or what did you do

15   to prepare for the deposition today?

16        A     I reviewed my materials.  I reviewed

17   my -- both of the reports I did.  I read over

18   again the report of 2011 from the International

19   Association of Chiefs of Police, which was

20   titled, Addressing Sexual Offenses and Misconduct

21   by Law Enforcement.  I spent a couple of hours

22   with Mr. Smith yesterday.

1      Q      That IACP document that you just

2  mentioned that you read over --

3      A      Yes.

4      Q      Okay.  Did you provide that to

5  Plaintiff's counsel to produce to the Defendant

6  or District?

7      A      I have provided them a copy.  What

8  they did with it, I don't know.  And by the way,

9  I've also --

10     Q      What did --

11     A      I've also noted it in my original

12  expert report.

13     Q      Okay.  What year is that document that

14  you just referenced?

15     A      The research began in 2005, and it was

16  actually printed in 2011 by the IACP.

17     Q      Now, in your -- in both reports, you

18  set out all of the material that you reviewed in

19  preparing both your initial report and your

20  supplemental report.  Did you rely on any other

21  documents that are not listed in either your

22  initial report or your supplemental report?

1      A      No.

2      Q      Now, what was your understanding of

3  what you were asked to opine on in this case?

4      A      I was asked to look at the practices

5  of the police department in investigating

6  allegations alleging sexual misconduct by its

7  officers.

8      Q      And was it your understanding or is

9  your understanding that the opinions that you

10  have given us or rendered in this case are

11  sufficient to establish, one, a constitutional

12  claim against the District of Columbia, and/or,

13  two, a negligence claim against the District of

14  Columbia?

15      A      Remember, I'm not a lawyer, so what

16  you're asking me is to look at a legal issue.

17  But from my experience, knowledge and skills, and

18  education and the continuous training that I do,

19  in my opinion what I have seen in the

20  investigative reports that I have looked at the

21  disciplinary procedures of the District, in my

22  opinion it has established a pattern of practice

1  of being deliberately indifferent to sexual

2  misconduct allegations by its police officers.

3  So if that fits in the constitutional

4  arena -- I mean, that's for lawyers and the judge

5  to make a decision.  In my opinion, it goes far

6  beyond, however, just negligence.

7  Q      You have identified in both your

8  original report and your initial report six

9  opinions that you have given us.  Is that

10  correct?

11  A      Yes.

12  Q      And just so that we are clear, those

13  six opinions are -- one is that the lack of

14  adequate and realistic written policies --

15  that's -- one of your opinions deals with that

16  issue.  Correct?

17  MR. SMITH:  Objection.  I wasn't clear

18  on the question just now, and I don't know that

19  the witness was.

20  BY MR. JACKSON:

21  Q      Well, Mr. Reiter, if -- let's just do

22  this, because I know that you have been deposed

1    in a number of cases.  I should have did this at

2    the very beginning.  Let's just set out the

3    ground rules that I know you're familiar with.

4           One is that if I ask you a question

5    and you are not clear on the question I am

6    asking, would you please let me know that, sir.

7        A    I will.

8        Q    Okay.  And certainly if you want me to

9    clarify something, I'm more than willing to do

10    that, so just let me know that you want me to

11    clarify any question that I may ask.

12        A    You're speaking of the six areas of my

13    preliminary report, which is paragraph number 2

14    of the preliminary report.  Is that correct?

15        Q    Well, I am actually looking at page

16    17, but let me see if they're also repeated on

17    page 2.  (Perusing document.)

18           No, sir.  I don't see your opinions on

19    page 2.  I mean -- or paragraph 2.  (Perusing

20    document.)  No.  They do not appear in paragraph

21    2 in the report that I have.  And let's make sure

22    that we are talking about the same report.  The

1  report that I'm looking at is one that was signed

2  by you under the penalties of perjury on the 4th

3  day of August of 2008.  Is that the one you're

4  looking at?

5      A      Yes --

6      Q      I mean, 2018.  Is that the one you're

7  looking at?

8      A      Yes.  But, see, I said paragraph 22,

9  not 2.

10     Q      Oh, 22.  I'm sorry.  22.  I didn't

11  hear you.  Okay.  So then we are on the same

12  document.  And the six issues that your report

13  lays out that it will address is, one, the lack

14  of adequate and realistic written policies.  Is

15  that correct?

16     A      Yes.

17     Q      And number two is the lack of training

18  specific to sexual and domestic misconduct.

19  Correct?

20     A      Yes.

21     Q      And three is the filing of reports of

22  employee misconduct.  Correct?

1      A      Yes.

2      Q      And four is Officer Best's

3   disciplinary record and performance evaluations.

4   Is that correct?

5      A      Yes.

6      Q      And five is the supervisory oversight

7   failures, including Best's retention.   Correct?

8      A      Yes.

9      Q      And six is the administrative

10   investigative inadequacies.   Is that correct?

11      A      Correct.

12      Q      Okay.   And the six areas that I just

13   mentioned to you are the same six areas that are

14   mentioned in your supplemental expert report.   Is

15   that correct?

16      A      Yes.

17      Q      Okay.   Are there any other areas of

18   opinions that you would testify at trial that are

19   not listed here in either your original report or

20   your supplemental report?

21      A      Not as of today.   Of course, they

22   might be elaborated on, but they will still all

1 fall within these six areas, because we're

2 talking about the environment and culture of the

3 police department when it comes to sexual

4 misconduct allegations, investigation and

5 discipline.

6   Q So let's start with your background.

7 And can you tell me whether or not you have had

8 any experience in the area of applied

9 mathematics.

10   A I'm a police practices expert.  That's

11 what I -- and I'm basing my opinions on my 58

12 years in law enforcement and my specialized

13 knowledge, skills, training and experience.  i am

14 not a statistician.

15   Q Okay.  And you have no educational

16 background as a statistician.  Is that correct?

17   A I took a course once and I passed it,

18 but other than that, no.

19   Q Okay.  And you have never -- or have

20 you ever rendered an opinion as a statistician?

21   A No.

22   Q Have you ever attempted to qualify or

1    has anybody attempted to qualify you as an expert

2    in the area of being a statistician?

3         A     No.

4         Q     Have you ever testified as an expert

5    on EEO matters generally?

6         A     Your question would have to be more

7    specific.  I have testified many times on police

8    personnel issues that have dealt with EEO issues,

9    sexual harassment, and employee retaliation.  But

10   I am not an expert in EEO.

11        Q     Have you ever conducted EEO training?

12        A     Not specifically.  No.

13        Q     Have you ever drafted or written any

14   kind of EEO policies?

15        A     No.

16        Q     So at different times in this case,

17   the terms "sexual misconduct/harassment" have

18   been used.  In your mind is there a distinction

19   between sexual misconduct and sexual harassment?

20        A     You know, in the first place, you'd

21   have to clarify, where has it stated in any of

22   the materials that I've seen or that I've written

1    sexual misconduct/harassment.  I have not used

2    that term.

3        Q      Well, I didn't say that you used the

4    term.  I just said that during the course of this

5    litigation, those are the terms that have been

6    used.  I want to know from you, what do you

7    understand the distinction to be between sexual

8    misconduct and sexual harassment.

9        A      I think they're two totally distinct

10   areas of police misconduct.

11       Q      Okay.  And so what is -- what kinds of

12   events or incidents would fall under sexual

13   misconduct?

14       A      Sexual misconduct would be demanding

15   services from prostitutes, using your official

16   authority as a police officer over vulnerable

17   persons in the community.  They might be drug

18   dealers.  They may be runaways.  They may be drug

19   users.  They could be prostitutes.  They could be

20   victims of crimes.  They could be victims of

21   domestic violence.  And they're using -- the

22   officer is using his authority as a police

1      officer or some indices of his office to

2      accomplish those acts of sexual misconduct.

3              Sexual misconduct could be touching,

4      fondling, masturbating in front of the person,

5      actually having forced intercourse, having

6      consensual intercourse.

7          Q      Mr. Reiter, can you tell me on the

8      record what it is that counsel just wrote to you

9      that you looked at.

10         A      He wrote, "other officers."

11         Q      Do you understand what that means?

12         A      No.  Not in the context of sexual

13     misconduct.

14         Q      And what is your understanding of the

15     definition of sexual harassment?

16         A      My understanding of sexual harassment

17     would be normally it's an employment issue where

18     there are unwelcome advances.  It could be a

19     hostile work environment where persons believe

20     they're being harassed because of their gender or

21     their sexual orientation.  It's an employee

22     against employee.

1        Q      And so do you have an understanding of

2    how the Metropolitan Police Department deals with

3    claims of sexual harassment?

4        A      Yes.

5        Q      And what is your understanding?

6        A      They have a separate investigative

7    unit, and I've looked at some of their

8    investigations.  And it's -- I believe it's

9    called the EEO investigative unit.  It's separate

10   and apart from internal affairs.

11       Q      Okay.  And would you agree that in

12   terms of dealing with issues of sexual

13   harassment, that it is the appropriate structure

14   within a police department to have a separate

15   unit that deals with sexual harassment?

16       A      It's appropriate.  Some departments do

17   that.  It depends on the size of the department.

18   It certainly is appropriate in a department the

19   size of D.C.  In addition, they are different

20   types of investigations.  EEO investigation has

21   different foundation, different methods of

22   investigation than sexual misconduct which is

1     normally done by internal affairs or the office

2     of professional standards.

3         Q     Do you have an opinion as to whether

4     or not the Metropolitan Police Department's EEO

5     office deviates in some way from a national

6     standard?

7         A     I don't have an opinion on that.

8         Q     Do you have an opinion as to whether

9     or not the way the EEO office conducts their

10    investigations deviates from national standards?

11        A     I have no opinion on that.

12        Q     Do you have an opinion as to whether

13    or not the way that the EEO office maintains

14    their records deviates from a national standard?

15        A     I have no opinion on that.

16        Q     So are your opinions that you have

17    rendered in this case more focused on incidences

18    of sexual misconduct as opposed to sexual

19    harassment?

20        A     Yes.

21        Q     And what is your understanding how the

22    Metropolitan -- strike that.  What is your

1    understanding of the different ways that a sexual

2    misconduct allegation can come into the

3    Metropolitan Police Department?

4        A       It could come from a variety of ways.

5    It could come from an anonymous call.  It could

6    come from a citizen's complaint.  It could come

7    from other officers observing misconduct and

8    reporting it.  It could come to the attention of

9    the District by a criminal investigation being

10   conducted by the U.S. Attorney's Office.

11              It could come to the attention -- it

12   might come through a civil proceeding that could

13   be like a divorce or a stalking -- temporary

14   protective order being filed against one of the

15   officers.  So it could come from a myriad of

16   sources.

17       Q       And in your opinion, is it appropriate

18   for a police department to have all of these

19   different ways in which they are willing to

20   accept complaints of police misconduct in the

21   sexual assault arena?

22       A       Sexual misconduct arena?  Yes.

1        Q       Sexual misconduct.

2        A       Yes.

3        Q       So am I correct that you do not have

4    a concern that the Metropolitan Police

5    Department -- you do not have a concern of the

6    way the Metropolitan Police Department allows

7    complaints to come to its attention?  Is that

8    correct?

9        A       You know, I know what they have in

10   their written policy.  I don't have a problem

11   with the written policy.  I don't have enough

12   information to say whether that written policy is

13   implemented 100 percent in the field and the

14   geographic districts.

15       Q       Now, which policy are you referring

16   to?

17       A       Well, I've read several.  I've read

18   citizen complaints.  I've read investigating

19   allegations of misconduct.  I've looked at

20   investigating serious allegations of misconduct.

21   Those are the three that stick in my mind,

22   directly relating to intake of complaints.

1          I'm also aware of 2004, how you apply

2     a disciplinary act in 2004.  The main focus of

3     that written policy was that the officer had to

4     be notified within 90 days, business days, when

5     there was potential adverse disciplinary measures

6     that might be taken against the officer.  But

7     that's not intake of complaints.

8          Q     Excuse me one second.

9                (Pause.)

10               BY MR. JACKSON:

11          Q     So if I understand you correctly, sir,

12    are you saying that as an expert in police

13    practices, you do not have an issue with the

14    general orders that you just referred to?

15          A     Actually I only had one of the ones

16    that I've referred to.  There are others that

17    I've looked at in this case which I've enumerated

18    in both of my reports.  The only one that I would

19    have some concern with, if I were running a

20    police department and looking at national

21    generally accepted practices is in the

22    investigation of serious allegations.

1            There's a requirement that the police

2    department get a declination from the U.S.

3    Attorney's Office before they can compel an

4    officer to give a statement during the

5    administrative investigation of an allegation

6    concerning serious misconduct.

7            What they've done is they've given

8    away one of the principal tools that a police

9    department can use to undercut a culture of a

10   department and hold employees accountable for

11   misconduct by abrogating that right to the U.S.

12   Attorney's Office who's looking at it strictly

13   from a criminal point of view, not from an

14   administrative and effective running of a police

15   department.

16       Q     Okay.  So would you agree that not all

17   sexual misconduct investigations are the same?

18   Can we agree on that?

19       A     I'm sorry?  The protocol?

20       Q     Could we -- could we agree that not

21   all allegations of sexual misconduct are the

22   same?  Correct?

1          MR. SMITH:  Objection.  I don't --

2    unclear question.  The same as what?  What do you

3    mean by this?

4          BY MR. JACKSON:

5      Q      Okay.  Mr. Reiter, do you understand

6    what I mean, or do you want me to clarify?

7      A      It would help if you could clarify it.

8      Q      Would you agree that all sexual

9    misconduct allegations might not rise to the

10   level of a criminal matter?

11     A      I think there's always the potential,

12   because it is an abuse of authority.  It could be

13   a battery.  It could be an assault.  So I think

14   there's always in sexual misconduct allegations,

15   there is a high likelihood that there may be an

16   underlying criminal issue involved.  Whether it's

17   prosecuted or not is another matter.

18     Q      So would you agree that --

19     A      Well, let me --

20     Q      -- a police --

21     A      Let me back up a little bit if I can,

22   because I just thought of one.  Sexual

1      misconduct -- as an example, two officers on duty

2      having sex in their patrol car probably would not

3      rise to a criminal charge.

4          Q      All right.  And yet that could be

5      considered sexual misconduct.  Correct?

6          A      Absolutely.

7          Q      Okay.  And so -- but when the

8      allegation does arise to the level of a criminal

9      matter, a police officer would be no different

10     than any other criminal.  Correct?

11         A      Correct.

12         Q      And we know that criminals have

13     certain constitutional rights.  Right?

14         A      Yes.

15         Q      And one of those rights is they don't

16     have to make a statement without an attorney

17     present.  Correct?

18         A      Yes.  If it is not being done

19     administratively, if it is a purely criminal

20     investigation, they can -- they don't have to

21     provide a statement.  They can rely on the Fifth

22     Amendment.

1        Q        Correct.  And in the cases that are

2    referred to the United States Attorney's Office,

3    you understand that until that United States

4    Attorney certifies to MPD that they will not

5    bring criminal charges, that particular officer

6    has a right against self-incrimination.  Right?

7        A        In their -- in any dealings that the

8    officer would have with the criminal

9    investigators who would be working for the U.S.

10   Attorney's Office, that's correct.

11       Q        Okay.  And so the investigator cannot

12   compel that officer to give a statement.  Isn't

13   that correct?

14       A        Well, that's in the D.C., yes, because

15   you have given up that authority of the police

16   department.  In all other departments across the

17   country, we bifurcate the cases, so the criminal

18   is handled either by a separate unit or an

19   outside entity, so that there's no

20   misunderstanding on the part of the officer that

21   he or she is compelled to give a statement in

22   that criminal matter.

1          However, the administrative matter,

2   which can run concurrently with a criminal

3   investigation, they do not have that right and

4   can be ordered, under Garrity, to give a

5   compelled statement regarding their performance

6   or their actions or their failures.

7      Q      So is it your opinion that the fact

8   that the  District chose to involve the U.S.

9   Attorney in their investigation of sexual

10  misconduct that rise to a level of a criminal --

11  of a possible criminal case somehow deviates from

12  a standard of care or a national standard?

13     A      It's not a standard.  A generally

14  accepted practice, yes.  We bifurcate the

15  criminal, and we have what some people refer to

16  as a Chinese wall between them.  But the training

17  I provide and the training that I know other

18  people who train in internal affairs and police

19  discipline matters say that you should bifurcate

20  the case and run them concurrently.

21          Otherwise you could be sitting with an

22  officer for upwards of 18 months to two years

1    that you don't know what to do with as long as

2    the criminal case is plodding along or just

3    languishing over in some prosecutor's office.

4         Q       So in the District of Columbia, when

5    an officer that is accused of sexual misconduct

6    in the criminal sense, do you know the -- are you

7    familiar with the procedure that Metropolitan

8    Police Department implements to constrict or

9    control that officer's authority to act as a

10   police officer?

11             MR. SMITH:  Objection.  First of all,

12   when you say, sexual misconduct in a criminal

13   sense, is there -- are we talking about a charge

14   called sexual misconduct in a criminal sense,

15   because I'm unaware of such a charge.  So could

16   you be more specific.

17             BY MR. JACKSON:

18        Q       Mr. Reiter, do you understand my

19   question?

20        A       Well, I think Mr. Smith, you know,

21   stated something proper because the criminal

22   would be sexual assault.  It could be a lot of

1    other.  But that -- you know, sexual misconduct

2    is not a criminal charge.  That's why in law

3    enforcement we use the term "sexual misconduct,"

4    because we don't want to confuse it with a

5    criminal aspect of an officer's action.  We want

6    to make a distinction between the criminal side

7    of it and the administrative side of it.

8        Q     Okay.  So here's what --

9        MR. SMITH:  And one other thing --

10        BY MR. JACKSON:

11        Q     Here's what I'm trying to --

12        MR. SMITH:  No.  As a housekeeping

13    matter, as a housekeeping matter, the screen

14    keeps shrinking, so that all we see is an image

15    of you that is an inch and a half.  The whole

16    screen image is an inch and a half.  You're a

17    micro, unidentifiable dark figure, and everybody

18    else in the room is also.  It's not -- so could

19    you do something to try to adjust that, because

20    we don't -- we can't see you.

21        MR. JACKSON:  That's on your end.  It

22    has nothing to do with us.

1           MR. SMITH:  No, no.  When you say,

2     it's on our end, this is your deposition, and you

3     structured this this way, so the only party I

4     have to talk to that's responsible for this is

5     the District.  The court reporter here works for

6     you.  When you say, it's on our end, we don't

7     have an end.  This is one deposition.  You set it

8     up this way, and I'm complaining about it.

9           MR. JACKSON:  It's the court reporting

10    service.  It's not us.

11          MR. SMITH:  It's the court

12    reporter's --

13          MR. JACKSON:  Madam Court --

14          MR. SMITH:  Excuse me.  I'm

15    representing the deponent, as you're aware, and I

16    have no responsibility for the fact that we're

17    looking at you on a screen that itself is a mere

18    12 inches, and then the actual portion that

19    displays your image is, like I said, an inch and

20    a quarter by a half an inch.  We cannot see you,

21    and it keeps going in and out and in and out.

22          BY MR. JACKSON:

1      Q      Mr. Reiter, can you hear me okay?

2      A      I can hear you fine.

3      Q      Okay.  As the deponent in this case,

4  is it troublesome to you that whatever you're --

5  however you're seeing us is not a full screen?

6  Is that a problem for continuing with this

7  deposition?

8      A      It's just distracting, but I've done

9  telephone depositions before, so I can do it just

10  on audio.

11      Q      Okay.  Thank you.  So my questions,

12  Mr. Reiter, are geared to trying to understand

13  the issue that you named about in the District of

14  Columbia having the process of referring, let's

15  say, a sexual assault case to the U.S. Attorney's

16  Office.  As I understand you, you're saying that

17  that deviates from the standard practice.  Is

18  that correct?

19      A      No.  You misunderstood me.  I said

20  we --

21      Q      Okay.

22      A      -- always bifurcate the criminal case,

1    and it could be done in house with, say, a sexual

2    assault unit, and then they deal with the

3    prosecutor to determine whether there's going to

4    be any filing.

5              But the administrative side can run

6    concurrently, and that's the generally accepted

7    practice in law enforcement, because otherwise,

8    you could be stuck waiting 18 months to two

9    years, and you've got an officer who might be --

10   we call it on the bench or on the beach, you

11   know, during that time.

12             Now, you're a large enough

13   organization, you've got closets you can put that

14   person into.  A lot of departments aren't as big

15   as you are.

16        Q    Okay.  So it's -- your issue is that

17   a police officer who is in the situation that

18   we're talking about is a referral to the United

19   States Attorney's Office to determine whether or

20   not criminal charges could be lodged.  That

21   officer could be just -- I think you said, on the

22   beach.  Is that what you said?

1        A       Yes.

2        Q       Do you know what steps the

3   Metropolitan Police Department take when that

4   particular officer is referred to the United

5   States Attorney's Office, what processes does the

6   MPD have in place to control that officer's

7   movements during his tour of duty?

8        A       I have seen in some of the

9   investigative files, but not all of them, where

10   the officer's issued, I believe it's called, a

11   PO77, which is a revocation of police powers,

12   which means that the officer, my understanding,

13   doesn't have a badge or ID card, can't do any

14   enforcement duties, can't work off-duty paid

15   details as an enforcement officer.

16        Q       And do you know if that officer is

17   then assigned to do some work within the local

18   district that they are assigned?

19        A       You know, I don't have enough

20   information to give you an opinion on what

21   happens to that officer, whether they're sent

22   home, whether they're put in a closet, whether

1    they're given menial tasks.  I just -- in the

2    materials I looked at, I couldn't see any

3    specificity to that.

4              And I don't recall -- could be

5    mistaken.  I don't recall seeing that laid out in

6    any of the general orders, but it could be there.

7    I just don't recall.

8        Q    Okay.  Would it be acceptable police

9    practice if that particular officer is -- not

10   only loses their police powers, their badge,

11   their service weapon, all the other service

12   equipment, but they are assigned only to desk

13   duty?  Is that within acceptable police

14   practices?

15       A    Yes.

16       Q    Mr. Reiter, do you know why it is that

17   the District sends cases to the U.S. Attorney's

18   Office?

19             MR. SMITH:  Objection.  Let me --

20   under what circumstances?  What are we talking

21   about right now?

22             BY MR. JACKSON:

1      Q      Mr. Reiter, do you understand my

2   question?

3      A      Yes.

4      Q      Okay.  And what is your answer?

5      A      I don't know why.  I know what is

6   generally accepted.  If you believe there is a

7   possible criminal charge that prosecutor could

8   bring against the officer for whatever act of

9   misconduct they've been accused of, the only

10   person that can authorize the officer to be

11   criminally charged is a prosecutor.  And in your

12   case, it's the U.S. Attorney's Office.

13      Q      Do you know of any jurisdictions that

14   do not create what you call a Chinese wall and

15   first seek a declaration from the local

16   prosecutor's office before they proceed with the

17   administrative case against a law enforcement

18   officer?  Do you know of any jurisdiction, other

19   than the District?

20      A      Sure.  There's a lot of them.

21      Q      And which jurisdictions are those?

22      A      Well, for one example, my -- in

1      past -- I know Philadelphia had that when they

2      had, oh, the woman who had been their DA for 50

3      years.  A lot of other departments do it.  So it

4      depends.  But I also know other departments who

5      do concurrent investigations, because they don't

6      want to wait for a prosecutor to make a decision.

7              And particularly when they believe

8      they have sufficient evidence in the

9      administrative investigation to go ahead and

10     terminate or separate the officer from

11     employment, they go ahead and do that --

12     Q      Okay.  I --

13     A      -- and not wait for the prosecutor,

14     because then they don't have to keep paying the

15     person, because most departments, until the

16     officer is --

17     Q      So --

18     A      -- criminally charged with a felony,

19     most departments have to suspend the officer but

20     have to keep paying the officer.

21     Q      So just so I'm clear, so the District

22     of Columbia isn't the only municipality that has

1        that process where matters are referred, criminal

2        matters, in this case a sexual assault, for

3        example, might be referred to a local prosecutor

4        before the administrative process or the

5        administrative case is completed within the

6        department.  Correct?

7            A       That's correct.

8            Q       And do you have an idea of how many

9        different jurisdictions are similar to the

10       District?

11           A       I have no way of knowing.  You know,

12       we don't even know how many police jurisdictions

13       there are.  You've got numbers ranging from

14       13,000 to 18,000.  We can't even identify how

15       many there are in the United States.  But, no, I

16       can't.

17           Q       Now, within the Metropolitan Police

18       Department, how many different units are there

19       that actually investigate sexual assault cases

20       involving police officers?

21           A       I don't know.

22           Q       Is there acceptable police practices

1      for a police department to have what I will call

2      for the purposes a specialized unit to

3      investigate certain types of sexual assault

4      cases?

5          A      Yes.

6          Q      And are you aware of whether or not

7      the Metropolitan Police Department has any

8      specialized units that investigate a certain type

9      of sexual assault case?

10         A      Yes.

11         Q      And what's your understanding?

12         A      My understanding, you have at least

13     one that I'm aware of, a sexual assault unit.

14         Q      Any other kind of units?

15         A      That's the only one I've seen in

16     relation to the materials that I've reviewed in

17     this case.  But I have reviewed a general order,

18     but it was sexual assault investigations, but it

19     was not specific to police officer-involved

20     issues of misconduct.  It was a generic sexual

21     assault unit.

22         Q      Is it within acceptable police

1     practices for a police department to have a unit

2     that focuses on sexual assaults regarding

3     children?

4           A     Yes.

5           Q     Do you know whether or not the

6     Metropolitan Police Department has such a unit?

7           A     I believe they do.  I'm sure they do.

8     I would be surprised if they didn't.

9           Q     Okay.  Well, I -- do you know for

10    sure, or are you guessing?

11          A     I'm just assuming that a department

12    that size is going to have a specialized unit

13    dealing with child sex abuse.  Yes.  Now, I could

14    go to the -- I could go back to my home.  I've

15    got the general order on investigating

16    allegations of sexual assault and review it, but

17    I don't have that with me.

18          Q     And so is it an accepted police

19    practices for the Metropolitan Police Department

20    to have a unit that investigates cases in which

21    the victim is a child?  Correct?

22          A     Yes.

1          Q       Okay.  And do you have an opinion as

2     to whether or not the sexual assault unit of the

3     Metropolitan Police Department deviates from

4     nationally accepted standards?

5          A       No.  I don't have an opinion on that.

6          Q       Excuse me, sir.

7          (Pause.)

8          BY MR. JACKSON:

9          Q       Let me ask you, Mr. Reiter, about the

10    opinions that you hold as it relates to --

11         A       You know, if we're going into -- Mr.

12    Jackson, if we're going into another area, could

13    we take like a five-minute break?

14         Q       Oh, sure.  You want to take that now?

15         A       Yes.  Since you're going into another

16    area, yes, please.

17         Q       Okay.  Sure.

18         MR. JACKSON:  We'll take a five-minute

19    break.

20         (Whereupon, a short recess was taken.)

21         BY MR. JACKSON:

22         Q       Mr. Reiter --

1      A      Yes.

2      Q      Okay.  Thank you for your patience.

3  I don't know what happened.  We haven't touched

4  anything at this end, but thank you for your

5  patience.

6           So, Mr. Reiter, now I just want to ask

7  you some questions on four different areas of

8  how -- on proving a constitutional claim against

9  a municipality.  Okay?  But I understand you're

10  not a lawyer, but just to give you a broad

11  understanding of where I'm going to go with my

12  questions, but you'll see once I start to ask.

13  Okay?

14      A      All right.

15      Q      Okay.  So do you have an opinion

16  whether or not the District of Columbia has a

17  written express policy of allowing officers to

18  engage in sexual misconduct of any kind?

19      A      They have no written policy concerning

20  sexual misconduct at all.  In fact, the director

21  of your disciplinary review division, in his

22  deposition, indicated he thought sexual

1    misconduct was a vague term.  I mean, that's

2    ludicrous for any management, particularly one

3    who is over the disciplinary -- the final

4    disciplinary control body that metes out

5    discipline for an allegation such as sexual

6    misconduct to say it's a vague term.

7              But to answer your question, they have

8    no written policy specifically authorizing them

9    to engage in sexual misconduct, because they have

10   no written policy at all that covers that area of

11   known police misconduct.

12        Q    Do you have an opinion as to whether

13   or not the -- a District of Columbia policymaker

14   has adopted an unconstitutional policy as it

15   relates to police officers engaging in sexual

16   misconduct?

17        A    Okay.  Are you talking about a written

18   policy?  Or are you talking about an operational

19   policy covering patterns or practice?

20        Q    Yes.  The latter.  Or either one.

21        A    I have not seen a written policy by

22   the policymaker, but in my opinion, looking at

1    nearly 50 administrative investigative files

2    involving 13 different employees, including

3    Officer Best and looking at the depositions and

4    training records, in my opinion, they have an

5    operational policy of not addressing a known

6    police misconduct area involving sexual

7    misconduct, whether it's on or off duty, or

8    involving citizens or between officers.

9              So in my opinion, they have created

10   this culture within the department by having a

11   pattern or practice of not addressing the issue,

12   either in written format or in training format.

13   And their investigative practices in the

14   administrative investigations I've looked at are

15   severely egregious and contrary to generally

16   accepted practices for this kind of serious act

17   of police misconduct.

18       Q      Okay.  And what is your understanding

19   of who is a policymaker?

20       A      In looking at the general orders, it's

21   signed by the chief of police.

22       Q      So do you have an opinion that the

1     chief of police has adopted a policy that allows

2     police officers to engage in sexual misconduct?

3          A     No.  The chief of police has made a

4     conscious choice not to even address the issue of

5     sexual misconduct, one way or the other.

6          Q     And who is the chief of police you are

7     referring to?

8          A     Well, looking at the record here, it

9     would go back to -- no.  I think Chuck Ramsey

10    left by that time, so it would be -- right now I

11    think it's Newcomb, Newsham and prior to that, it

12    was Chief Lanier.

13         Q     Okay.  So tell me.  What did Chief

14    Lanier do or did not do according to you?

15         A     She did not enact a policy concerning

16    sexual misconduct by police officers.  She did

17    not ensure that it was dealt with in training.

18    She did not articulate a proper definition of

19    what constitutes sexual misconduct by police

20    officers.  She did not ensure that there was a

21    reference number where the agency could, in fact,

22    access data to determine the frequency of these

1      allegations of sexual misconduct by the police

2      officers.

3           Q      And how did the training -- can you

4      hear me?

5           A      I can.

6           Q      And can you tell me in what way the

7      training was deficient?

8           A      Well --

9           Q      What did they fail to train the police

10     officers on?

11          A      I've looked at the basic academy

12     curriculum.   There is nothing there dealing with

13     sexual misconduct.   In fact, the person who was

14     deposed acknowledged that he had no knowledge of

15     a specific lesson plan that dealt with the issue

16     of sexual misconduct and thought that it might be

17     included possibly in the area of ethics, but he

18     did not know, and he was the person designated as

19     the 30(b)(6) person from the District.

20                 But I also, in looking at the

21     curriculum, basic academy curriculum, there is

22     nothing in there regarding sexual misconduct.

1      Q      And who was the person from the
2   academy whose deposition you read?
3      A      I believe it was Alphonso Lee.  That's
4   A-L-P-H-O-N-S-O.  But let me check my report.
5   (Perusing document.)  No.  I was mistaken.  It's
6   Lieutenant Arthur Davis, director of recruit
7   training.
8      Q      Did you see any -- did you see
9   anything in Lieutenant Davis's deposition that
10   indicated to you that they do teach or they do
11   address criminal conduct in the training?
12      A      My note that I took was, "There's a
13   block on sexual assault crimes and
14   investigation."  Yes.
15      Q      Okay.  And did you see where -- and is
16   it your opinion that that training would be
17   inadequate?
18      A      Is that the question, or were you
19   going to continue?
20      Q      No.  That was the question.
21      A      Inadequate for what?
22      Q      To teach officers during the training

1     about sexual misconduct.

2          A     Yes.

3          Q     Is it -- why is that inadequate?

4          A     Because that deals with dealing with

5     victims and suspects who are engaged -- who have

6     committed a sexual assault.  It does not talk

7     about the culture of the agency and the abuse of

8     authority on the part of the officer who uses his

9     or her badge and indices of the office to commit

10    sexual misconduct on normally very vulnerable

11    people in the community.

12               Those are not topics that are

13    covered -- from my understanding of that section

14    of training for police officers, those are not

15    subjects that would be covered under the generic

16    investigating sexual assault crimes.

17         Q     So let me understand and see if I

18    understand you correctly.  Is it your opinion

19    that the Metropolitan Police Department should

20    have a portion of their training dealing strictly

21    with police officers' conduct as it relates to

22    sexual misconduct?

1          A       It's not only my opinion.  It's the

2      opinion of the International Association of

3      Chiefs of Police.  It's the opinion of Neal

4      Troutman, who's been doing ethics training for

5      law enforcement since the early 1990s.

6                   And it's my understanding of the same

7      opinion -- I mean, I've written policies and

8      directed training be conducted in this field for

9      17 state risk insurance pools that are associated

10     with Legal and Liability Risk Management

11     Institute that they use in dealing with their

12     clients in 17 different states.

13                  So it's not just me.  It's the law

14     enforcement industry that has said, this is a

15     specific area of police misconduct that any

16     reasonable police manager should know will more

17     likely than not occur in their agency, and that

18     training will help guide officers in doing the

19     right thing.  And then absence of training crates

20     the culture within the agency where officers may

21     engage in sexual misconduct.

22                  I mean, a lot of officers who engage

1    in sexual misconduct, particularly with crime

2    victims, say, In my opinion, it was consensual.

3    You know, consensual when they come to a victim

4    of a domestic violence, a person's been violated

5    by her significant other and now the officer

6    violates her again, as he consoles her and grooms

7    her to engage in sexual misconduct.  I mean,

8    that's something that is specific to law

9    enforcement, has nothing to do with sexual

10   assault investigations and training.

11        Q      What other kinds of crimes are

12   prevalent among police officers?

13        A      Excessive force, theft.  Those are the

14   big, large ones.  Falsification of reports in

15   probable cause affidavits for search warrants or

16   arrest warrants.  Those are probably the top tier

17   of serious allegations of misconduct involving

18   police officers.

19        Q      What about drug use or involvement?

20        A      Well, that's also misconduct as well.

21   But  I'm saying the serious ones that have a

22   direct impact on citizens -- drug use has an

51

1    impact on the employee, and that can be

2    catastrophic to his or her performance.

3              Now, when you're dealing with

4    falsification or erroneous probable cause

5    affidavit to enter someone's home, now you're

6    dealing with the citizens' rights.  When you're

7    dealing with sexual misconduct involving law

8    enforcement, you're dealing with vulnerable

9    people, traffic violators, someone who's been

10   stopped for DWI, a drug user, a runaway, a

11   juvenile, an Explorer Scout.

12             Those deal directly with citizens, and

13   they're abuse of citizens through the abuse of

14   the police powers.  Sure, other things -- I mean,

15   crinkling a fender in your patrol car by running

16   into a light stanchion in a Starbucks, yes,

17   that's misconduct.  That's not the serious

18   misconduct we're talking about here.

19        Q    So is it adequate that the

20   Metropolitan Police Department teaches officers

21   of the criminal code which also -- which would

22   include sexual offenses, and they also have a EEO

1    training program that all officers must go

2    through?

3         A     Well, sure.  That's because the

4    Federal Government has told us we have to go

5    through EEO training.  We have to have bulletins

6    on the bulletin boards, covering what EEO is.  We

7    don't have bulletin boards talking about what

8    sexual misconduct is, do we?

9              But even in the EEO area, even in

10   sexual harassment, yes, there could be sexual

11   misconduct.  But that is a different area of law

12   enforcement practices.  EEO has specific

13   requirements.  They have a different -- you know,

14   they talk about Title 7.  They have different

15   title they deal with than police sexual

16   misconduct.

17             But that in itself -- I'm glad that

18   they have a two-hour block, which the persons

19   most knowledgeable said they did have, and that's

20   appropriate, because if we're abusing our own

21   employees, I mean, how do you expect an officer

22   not to feel it's okay to abuse citizens?

1          So, of course, we don't want our

2     employees to be abused, so EEO training is

3     appropriate.

4          Q     So can you articulate for me what this

5     policy you're talking about, what is that policy?

6     What does it say to police officers?

7          A     Well, I think better than that -- I

8     mean, I can read it over.  I put two policies in

9     my first report.  One of them is from the

10    International Association of Chiefs of Police,

11    which go through definitions.  It goes through

12    considering a policy for the chief.  Then I also

13    have put -- and that's on paragraph 11.

14          Paragraph 12, which appears on page

15    11, is the sexual misconduct that I've written

16    for our insurance pool clients.  So I think look

17    at that, and you'll see what I'm saying the

18    District has made a conscious choice not to

19    involve or not to implement or create with -- for

20    their officers in the District.

21          Now, I can read it if you want me to.

22          Q     No.  That's okay.  I have a question.

1    Let's look at your paragraph 11.

2         A     Yes.

3         Q     Okay.  And at the bottom, you set out

4    a model policy.  Correct?

5         A     The International Association of

6    Chiefs of Police have.  Yes.

7         Q     Right.  I'm sorry.  You have

8    incorporated that into your report then.

9    Correct?

10        A     Yes.  As an example of one

11   authoritative organization within law enforcement

12   of what they've identified as being an ongoing

13   problem and to address that problem, you address

14   it through policy and you address it through

15   training.

16        Q     And in the definition that the IACP

17   gives, it says that it also includes "any

18   communication or behavior by an officer that

19   would likely be construed lewd, lascivious,

20   inappropriate, or conduct unbecoming of an

21   officer."  Do you see that?

22        A     I do.

1       Q      And as a matter of fact, in the

2   disciplinary policies of the Metropolitan Police

3   Department, one of the charges, the most serious

4   charge, is conduct unbecoming, isn't it?  Is that

5   correct?

6       A      That's a catch-all phrase they have.

7   I think one of -- I believe you have 23 of them.

8   That's one of them.  Yes.

9       Q      But in that sense, the Metropolitan

10  Police Department general order would be

11  consistent with the International Association of

12  Police by using the terms "conduct unbecoming of

13  an officer."  Isn't that correct?

14      A      No.  I disagree with you, because it

15  doesn't talk about the specificity that the IACP

16  policy talks about in specific regard to sexual

17  misconduct.

18      Q      Okay.  So if I understand you, your

19  opinion is that the Metropolitan Police

20  Department should tell police officers that you

21  cannot have sex with a child.  Is that correct?

22      A      Yes.

1      Q      And they should tell police officers,

2   you cannot rape a person.  Correct?

3      A      Yes.

4      Q      And they should tell police officers,

5   you cannot touch the private parts of another

6   person.  Is that what you're saying?

7      A      Yes.  I'm saying that we have --

8      Q      It's not enough --

9          MR. SMITH:  You're talking over him.

10          THE WITNESS:  I'm saying that you have

11   to tell the police officers, You now are

12   different than a normal citizen.  You now are

13   wearing this badge and have the authority over

14   vulnerable people, over arrestees, over inmates.

15   You have power that a normal citizen does not

16   have.

17          You can use the indices of your office

18   to engage in something of a sexual nature when

19   the person is in a position, vulnerable position,

20   where they can't refuse you or they feel

21   reluctant to refuse you.  Yes.

22          They are absolutely different, and

1  they have to be codified, and they have to be

2  trained with specificity to tell some person who

3  has never been a police officer before, has never

4  had that level of authority over citizens before,

5  has never encountered temptations like they will

6  as a police officer.  Yes.

7          You have to train that person that

8  these are the things that you cannot do, and this

9  is the stance of our position.  These are

10  horrendous crimes.  These underrode the

11  professionalism and the image of our department.

12  Yes.

13          And not only are we training you.

14  We're going to monitor you.  We're going to do

15  callbacks.  We're going to tenaciously

16  investigate allegations that come to us from any

17  source where there is an allegation of sexual

18  misconduct.  Yes.  They're different.  They're --

19          BY MR. JACKSON:

20  Q      And am I --

21  A      -- distinct.

22          MR. SMITH:  Could you not talk over

1    him, please.

2              THE WITNESS:  I'm done.

3              BY MR. JACKSON:

4    Q      Thank you.  And consistent with your

5    opinion, wouldn't they also have to teach a

6    police officer that now that you are carrying a

7    gun, you have authority over people, you cannot

8    go out and shoot people?  Correct?

9    A      Yes.  And they do a great job there,

10   because they've got hours and hours and hours

11   about use of force training and how to shoot

12   proficiently.  But I'll be honest with you.

13   We've got a lot more sexual misconduct than we do

14   police officers killing citizens during the

15   course and scope of their duties.

16   Q      And do you know specifically what is

17   taught at the police academy as it relates to the

18   D.C. code and sexual assaults?  Do you know the

19   curriculum?

20   A      I don't believe I've seen that lesson

21   plan.  No.

22   Q      Now, you said that there's some police

1      officers who have never had -- or police officers

2      who've never been in a position where they've had

3      so much power, and that's one of the concerns,

4      that they now have this power, and they have to

5      understand that they cannot use their power in an

6      illegal manner.   Correct?

7          A       Yes.

8          Q       But would you agree that there are

9      police officers who change from one jurisdiction

10      to another jurisdiction?

11          A       You mean, move from one department to

12      another department?

13          Q       Yes.

14          A       Yes.

15          Q       And when that happens, is it your

16      opinion that that particular officer needs to go

17      through this training program that you were just

18      articulating?

19          A       You would have to evaluate.   I mean,

20      some -- you know, they can come to some training

21      programs where they get 400 hours of training.

22      In your case, in Metro PD, I believe you give

1    five or six months of training.  So you'd have to

2    evaluate whether their training is going to be

3    adequate and comparable to how you train new

4    people.  Otherwise, you may be hiring someone who

5    has less knowledge and skills than a recruit

6    coming out from your own department.

7            But still, the underlying issue is you

8    have no written policy that articulates what

9    sexual misconduct is, and you have no specific

10   training in your agency that addresses that

11   particular known area of police misconduct.

12           So if you want to bring in an officer

13   from outside and they have less than the training

14   you provide your recruits, shame on you if you

15   don't provide them some sort of updated training

16   to make sure they now have training relevant to

17   what is necessary for the MPD.

18   Q       Are you familiar with the kind of

19   training sessions that the DC office of human

20   rights offers to all DC employees?

21   A       The office of human rights?  Yes.

22   A       Is that what you said?

1          Q      Yes, sir.

2          A      No.

3          Q      Would it surprise you to know that the

4     EEO training talks more -- doesn't talk only

5     about sexual harassment, but also the stuff

6     that's -- and gives examples of sexual

7     misconduct?  Are you aware of that?

8          A      I haven't seen the lesson plan.  I

9     would suspect that it should, if it's a

10    reasonable training on EEOC provisions.  I mean,

11    you know, if an officer is -- you know, examples

12    in law enforcement:  If an officer, during the,

13    say, inspection at ongoing shift, one officer

14    takes his penis out and puts in the hand of a

15    female officer who has her hands behind her back

16    in a parade rest format, yes.  I would hope that

17    it would cover that and say, We don't do that.

18               I would hope that it says, We don't

19    watch pornographic movies on your own smart phone

20    in a police car or in the station.  We don't

21    share with other officers pornographic images via

22    email or text or any other format.  I would hope

1     that it would cover that.  I have not seen the

2     lesson plan.  I don't know whether it covers that

3     or not.

4          Q     So is it your opinion that the

5     Metropolitan Police Department has to

6     specifically tell officers that you cannot do the

7     things that you just described?

8          A     Yes.

9          Q     And can you tell me the different

10    police departments that have lesson plans

11    consistent with what you just described to us.

12         A     I can't as I sit here right now.  No.

13    I can't tell you that.  I can tell you the IACP

14    talks about having specific, realistic training.

15    I can tell you that the model policy I created

16    that's provided to 17 states' insurance risk

17    pools talk about realistic and specific training.

18              I can tell you that the block of

19    time -- I spend a two-hour block in the internal

20    affairs training programs I do specifically on

21    sexual misconduct, which are very specific and

22    deal not only with those kind -- I deal with the

1    case law.  I deal with videotapes of what's

2    occurred in other departments.  I don't talk

3    about generic phraseology.  I get into the nuts

4    and bolts, dirt of police work.

5        Q    So tell me the jurisdictions -- or how

6    many jurisdictions have adopted your model

7    policy?

8        A    I can tell you that the insurance risk

9    pools in 17 states have adopted and provide this

10    policy to all of their client agencies.  Now,

11    those are sheriff and police departments.  I

12    can't tell you which ones specifically have

13    adopted them.

14        And more importantly, a lot of

15    departments still stick their head in the sand,

16    kind of like what Metro PD does, and have not

17    done that, even though the IACP has said, This is

18    a critical issue; you need to do it.  And we

19    can't mandate that they do it.

20        But we can then chastise them when

21    these instances of police misconduct arise in

22    their department and point the finger and say,

1      You knew better; you had guidance; you made a

2      choice not to do what was proper to ensure your

3      officers knew what they could or could not do.

4           Q      So of these 17 jurisdictions, you

5      don't know which ones, if any, have actually

6      adopted your model policy.  Correct?

7           A      I don't.

8           Q      What are some of these 17

9      jurisdictions?

10          A      I'm sorry?

11          Q      What are those jurisdictions that

12     you're referring to?

13          A      They're the states of Vermont,

14     Michigan, Ohio, Illinois, Kentucky, Tennessee,

15     South Carolina, North Carolina, Nebraska, Kansas,

16     South Dakota, Arkansas.  Those are the ones that

17     I can recall off the top of my head.  I probably

18     got close to 17.

19          Q      And just remind me again.  You offered

20     your model policy to a group -- what's the group

21     called again?

22          A      Well, I forgot Georgia.  In Georgia,

1      it's GIRMA, Governmental -- Georgia

2      Intergovernmental Risk Management Association.

3      In South Dakota, it's the Risk Management

4      Association.  They're the underlying insurance

5      pools that underwrite police and sheriff

6      departments and will support them in lawsuits as

7      far as payouts and settlement agreements, or if

8      necessary, defend them in court.

9            Q      So these are insurance companies?

10           A      No.  They're not actual insurance

11     companies.  What they are is they're

12     governmental -- intergovernmental risk pools that

13     get together under a memo of understanding t

14     provide risk management services to their client

15     agencies.  And some of them may have 20.  Some of

16     them may have 150 in the state where they offer

17     that service.

18           Q      Okay.  And the client agencies can be

19     law enforcement and non-law enforcement.

20     Correct?

21           A      No.  These are all law enforcement,

22     either police or sheriffs.

1     Q     All police or sheriffs.  Okay.  And of

2     all of these 17 jurisdictions, you don't know how

3     many police departments have actually adopted

4     your model policy.  Am I correct?

5     A     That's correct.

6     Q     Do you know if any department has

7     adopted your model policy?

8     A     I've seen it in their policy, but I

9     can't tell you as I sit here which agency that

10    might be.  No.

11    Q     What jurisdiction?

12    A     I say, I can't tell you as I sit here

13    right now.  I don't know.

14          MR. SMITH:  And next time you --

15          BY MR. JACKSON:

16    Q     When was the last time you saw it --

17    whatever jurisdiction is in your mind, when was

18    the last time you saw that?

19    A     Within the last couple of years.

20    Q     Okay.

21          MR. SMITH:  Hold on for a minute.

22    There's some ambient music playing in this room

1    suddenly.  This is like a -- can we take a -- we

2    need to pause this.

3              THE REPORTER:  Sure.

4              MR. SMITH:  Ask the manager what it

5    is.

6              VOICE:  It's off now.

7              MR. SMITH:  We don't want it to come

8    back.  And it's background.  You've got to

9    communicate with people and tell them we're on

10   break right now.  We're on pause.

11             THE REPORTER:  Mr. Jackson --

12             MR. JACKSON:  Yes.

13             THE REPORTER:  We're trying to find

14   out where the loud music is coming from.  It's

15   disturbing these gentlemen, so we're going to go

16   do that for a couple of minutes if you don't mind

17   just holding on.  Thank you.

18             MR. JACKSON:  I'm going to step out

19   and use the restroom, so five minutes?

20             THE REPORTER:  Okay.  That'll be good.

21   Thank you.

22             (Whereupon, a short recess was taken.)

1          THE REPORTER:  We're on.

2          MR. JACKSON:  Thank you.

3          BY MR. JACKSON:

4      Q      Is it your opinion that but for this

5  lack of training as you just described it, that

6  this incident involving Ms. Buie would not have

7  occurred?

8      A      No.  That's not my opinion.  We're

9  really talking -- this is one cog of developing

10  the culture within an agency where an employee

11  believed he could use the indices of his office

12  and do what he did on MPD property, on the fifth

13  floor where all the command staff normally hang

14  out, and in the internal affairs office.

15  Training alone is not adequate.

16          It's the policy.  It's the training.

17  It's not only basic training, but it's in-service

18  training to reiterate it.  It's the

19  administrative investigations.  It's the

20  monitoring of officers and doing normal

21  supervisory oversight of officers.

22          So I can't take one of them out and

1    say, This is the key to Ms. Buie's harm.  No.  I

2    can't do that.

3        Q    So based on all of those factors that

4    you just laid out for us or all of those areas

5    that you just laid out, do you have an opinion

6    that if those areas were different, that this

7    incident with Ms. Buie would not have taken

8    place?

9        A    I can't say it wouldn't have taken

10   place.  I'm saying that more likely than not,

11   an -- a reasonable officer on any police

12   department would not go to the extent of what

13   Officer Best did with Ms. Buie.

14            Now, of course, we're going to have

15   malignant officers, and if your agency, MPD, had

16   done all the things that I'm saying the law

17   enforcement industry says they should be doing,

18   if you had done all those things, I wouldn't be

19   here, because they wouldn't need a police

20   practices expert to opine on the customs and

21   practices of the agency, because I would say,

22   They're doing everything possible; they had a

1    malignant officer that committed a dastardly act

2    of misconduct, but at least they have done

3    everything reasonable to create a culture where

4    any reasonable officer would know that is not

5    acceptable.

6         Q    Okay.  So tell me, within the confines

7    of those things that you just stated, how could

8    MPD have prevented Officer Best from doing what

9    he did to Ms. Buie.

10             MR. SMITH:  Objection.  It restates

11   his answer incorrectly.  Implicit in your

12   question is not adopting the answer he gave you.

13             BY MR. JACKSON:

14        Q    Mr. Reiter, do you understand my

15   question?

16        A    Sort of.  You know, the one thing

17   you're asking me to do is to get into Officer

18   Best's mind.  I can't do that.  I -- nobody can

19   do that.  Nobody can get into his mind and

20   determine why he did what he did.  But I'm saying

21   that more likely than not, had MPD done all those

22   things that the law enforcement industry has

1    advocated, more likely than not, it would not

2    have occurred.  Now, can I say absolutely it

3    won't?  No.

4         Q       So is that the best that you can say,

5    is more likely than not, it might not have

6    occurred?

7         A       Yes.

8         Q       Okay.  Do you have an opinion as to

9    whether or not MPD had a custom and usage -- or a

10   custom or usage of allowing police officers to

11   engage in sexual misconduct at any level?

12        A       You know, I don't have enough

13   information.  I know that looking at -- there've

14   been a lot of discovery issues and problems with

15   this entire case.  I think I would have a better

16   ability to answer that question if there had been

17   more specific robust discovery on the part of the

18   District.

19            But with the limited discovery and the

20   inadequacies the discovery displayed with the

21   recordkeeping of the District, I really can't

22   answer that question.

1      Q      Have you been retained in this case

2   and asked to render an opinion as to the

3   discovery in this case?

4      A      I think my report talks about the

5   inadequate, inept filing system.  I know that I

6   have worked with the Plaintiff attorneys during

7   the discovery process.  I have told them what a

8   reasonable police agency should have and should

9   have the ability to discover, and to my chagrin,

10  the District apparently doesn't have any of those

11  reasonable systems in place.

12     Q      So am I correct that based on the

13  reports -- or I'm sorry -- based on the materials

14  that you have identified in your two reports as

15  to what you considered, you cannot opine as to

16  whether or not it is a custom or usage in the

17  District of Columbia allowing police officers to

18  engage in sexual misconduct?  Is that correct?

19            MR. SMITH:  Objection.  Now, you say,

20  custom or usage.  Is that what you're saying?

21  What is usage --

22            MR. JACKSON:  That's what I'm saying.

1           MR. SMITH:  What's "usage" mean in

2    this situation?  I haven't heard that language.

3           MR. JACKSON:  It's a part of the legal

4    standard.

5           MR. SMITH:  I'm used to custom or

6    practice.  Custom or practice -- at least is that

7    what -- is that considered synonymous with what

8    you're saying, custom or usage?

9           BY MR. JACKSON:

10    Q    Mr. Reiter, do you understand what I

11    mean?

12           MR. SMITH:  I'm asking you a question.

13    I asked the question.  I have a question on the

14    table.  Don't talk past me, because that won't

15    work.

16           BY MR. JACKSON:

17    Q    Mr. Reiter, do you understand my

18    question?

19    A    I don't understand "usage."  "Usage"

20    is not how I train when we talk about civil

21    liability in law enforcement.

22    Q    Okay.  Forget about the word "usage."

1      Do you have an opinion -- my understanding, based

2      on all of the materials you have identified in

3      your two reports that you have reviewed, am I

4      correct that you cannot -- or you do not have an

5      opinion whether or not there is a custom within

6      MPD of allowing police officers to engage in

7      sexual misconduct?

8                  MR. SMITH:  Objection.  That garbled

9      question -- could you ask a straightforward

10     question, please.

11                 BY MR. JACKSON:

12        Q      Mr. Reiter, do you understand my

13     question?

14        A      Not really.  No.

15        Q      What do you not understand?  I'll

16     explain it.  Let me know what you don't

17     understand.

18                 MR. SMITH:  We're asking you to

19     restate the question in a simpler fashion.

20                 BY MR. JACKSON:

21        Q      Mr. Reiter, you testified that you did

22     not have enough information, when I first asked

1    the question, to answer my question regarding

2    whether or not there was a custom in the District

3    of Columbia allowing police officers to engage in

4    sexual misconduct.  And you talked about the

5    discovery.

6              My question to you is:  Based on the

7    documents that you have identified in your two

8    reports that you relied on in reaching your

9    opinions, am I correct that you do not at this

10   point have an opinion as to whether or not

11   there's a custom in the District of Columbia

12   allowing police officers to engage in sexual

13   misconduct?

14   A      Well, in the first place, I don't know

15   of any police department that has a custom of

16   allowing officers to engage in sexual misconduct.

17   But I do believe from my review of the materials

18   in this case that the District has created a

19   culture within the agency that could allow an

20   officer who wanted to abuse a female -- or wanted

21   to abuse someone's sexually, the belief that they

22   may not be held accountable for it, I believe,

1    yes, the deficiencies in the District's systems

2    and investigative practices and lack of a

3    specific written policy and lack of specific

4    training and lack of specific supervisory

5    monitoring can create the culture where some

6    officers may believe they could engage in sexual

7    misconduct and not be held accountable for it.

8          The District has never said, Hey, go

9    out there and sexually abuse females.  No.  They

10   have not said that directly.  But in acquiescing,

11   by not doing any of these other proactive

12   measures, they're not creating a culture that

13   would communicate to employees, This is wrong;

14   you can't do this.

15        Q     So what are those deficiencies in the

16   system that you keep talking about?  What are the

17   deficiencies?

18        A     Okay.  The first one, no written

19   policy on sexual misconduct.  The second one, no

20   specific training on sexual misconduct.  A third

21   one, deficient administrative investigations when

22   it comes to handling cases involving allegations

1    of sexual misconduct.

2            The inept filing of reports and

3    adjudications which leave so many unanswered

4    questions about what the District actually

5    finally did with officers who engaged in sexual

6    misconduct. I believe that probably covers most

7    of them.

8        Q     Okay.  So if there was a written

9    policy, is it your opinion that former Officer

10   Best would not have done what he did as it

11   relates to Ms. Buie?

12       A     You know, again, I don't know what was

13   going on in Officer Best's mind.  I don't know --

14   I've never met the man.  I have no idea.  I know

15   that he was in -- I know that he was engaged in

16   several acts of sustained misconduct.

17           I was surprised when he put

18   fraudulent -- when he was accused of fraudulent

19   timesheets and found to have lied, that the

20   department kept him on the job.  I mean, there's

21   a Brady and Gigilio issue -- by the way, Gigilio

22   is G-I-G-I-L-I-O -- and that the systems that --

1      great written order the systems had on the PPMS

2      and the SSP, which is a -- kind of like an early

3      identification intervention system, great written

4      order with one exception. They don't tell me what

5      the threshold number is.

6            But like I mentioned in my report,

7      Officer Best, I believe, in a three-year period

8      amassed 300 points on your own scale.  And

9      there's no documentation that he was ever

10     identified by this comprehensive written system

11     that the District says it has.  That in itself,

12     something happened.  Something had to fail if

13     that system, with 300 -- someone who garnered 300

14     threshold points, if that doesn't red flag an

15     employee, then the system simply doesn't work.

16        Q      So let me go on to my last area of --

17     my last section of this area, my last area of the

18     section.  Do you have an opinion as to whether or

19     not somebody within the Metropolitan Police

20     Department in a supervisory role was deliberate

21     indifferent to a need for further training as it

22     relates to sexual misconduct?

1    A    I've already said that.  I said

2    they've stuck their hand in the sand.  Here we

3    have all these national bodies and all these

4    reports and all these articles that have been

5    written that have identified this serious act of

6    police misconduct and that training is an

7    essential -- one of the essential elements to try

8    to nip it in the bud, and they -- somebody on MPD

9    has elected not to create that level of basic and

10   in-service training.

11   Q    And --

12   A    That would be --

13   Q    -- am I correct that the person that

14   you identified was former chief of police Cathy

15   Lanier?

16   A    No.  That was the question when you

17   asked me, who was the policymaker, and that's

18   where I said Ramsey and Lanier.  Now, I don't

19   know who -- I don't know if they have a training

20   committee.  I don't know who it is that

21   identifies what training will be provided to

22   District officers.  I don't know that person.

1        Q        And I'm just a little bit confused,

2     but just correct me if I'm wrong.  Your opinion

3     as to deliberate indifference is the same opinion

4     that you gave as it relates to the policymaker?

5                 MR. SMITH:  Objection.  I mean, ask

6     that -- he doesn't remember everything he said.

7     What's the specific question you're asking?

8                 BY MR. JACKSON:

9        Q        Mr. Reiter, do you understand my

10    question?

11       A        No.

12       Q        Okay.  So is there somebody that you

13    can point to within the Metropolitan Police

14    Department that you believe was deliberate

15    indifferent to police officers engaging in sexual

16    misconduct?

17                MR. SMITH:  First I'm going to say,

18    objection, asked and answered.  But go ahead.

19                THE WITNESS:  I've already said that

20    in my opinion, Chief Lanier was the policymaker

21    and the failures on the part of the District

22    ultimately rise to her level, and the fact that

1    she made a conscious choice not to develop a

2    specific written policy, specific training for

3    basic and in-service, and ensure that the

4    administrative investigations were done in a

5    reasonable, efficient manner, yes.  She was

6    deliberately indifferent.

7                Now, I know there's a whole bunch of

8    other people down the chain of command who had

9    specific responsibilities for those areas.  I

10   don't know specifically who they are.  If they

11   were identified, yes, I would say they're

12   being -- they were deliberately indifferent as

13   well.

14               BY MR. JACKSON:

15      Q      Okay.  And although you might not know

16   their names, tell me the position these people

17   held.

18      A      I don't know.  I'm saying, chain of

19   command.  It could be assistant chief.  It could

20   be deputy chief, could be the director of

21   training.  It could be, you know, the head of

22   internal affairs.

1              I don't know those people, because

2      those persons -- even if I did know who they

3      were, they were not asked specific questions,

4      even if they had any knowledge, the few

5      depositions that I did read involving some of

6      those persons, so I can't identify who in your

7      chain of command would have had that

8      responsibility.

9          Q      So let me -- going to page 20 of your

10     report --

11         A      That's the original report?

12         Q      I'm sorry.  Yes, sir.

13         A      All right.

14         Q      I'm sorry.  Just give me one second,

15     please.

16              (Pause.)

17              BY MR. JACKSON:

18         Q      Let me just -- let me ask you some

19     questions about Mr. Best.

20         A      All right.

21         Q      This incident occurred on December 3

22     of 2014.  Is that your recollection?

1        A       Yes.

2        Q       And in your report, I know that you

3    talk about -- do you have an understanding of

4    whether or not Mr. Best was on duty or off duty

5    at the time of this incident?

6        A       I know that he was in uniform, driving

7    a District vehicle.  He drove to the headquarters

8    building.  He used a key card to get into a

9    secure elevator.  He went up to the fifth floor,

10   a secure floor, where command staff and internal

11   affairs are located, and that's where the act

12   occurred.  He had his badge, his gun.

13               Whether he was on or off duty, I don't

14   specifically know, but I know most police

15   departments consider an officer on duty 24/7 and

16   can be held accountable for anything that happens

17   24/7.  And that's from a public safety

18   standpoint, but more importantly in his case, he

19   had all the equipment and indices of the office.

20               So in my opinion, I would say, yes, he

21   was on duty.

22       Q       So your opinion is based on whether or

1    not former Officer Best can be held responsible

2    for what he did.  My question is whether or not

3    the employer -- does it make a difference in your

4    opinion as to the employer's liability if the

5    employee is on duty or off duty?

6              MR. SMITH:  Okay.  First of all, I'm

7    going to object, because that would -- you didn't

8    ask that question.  You might have that question

9    in your mind.  You certainly never said it to us.

10   Now if you want to ask that question now, fine,

11   but I object to the idea that you asked that

12   question.

13             BY MR. JACKSON:

14       Q     Would you answer my question, Mr.

15   Reiter.

16             MR. SMITH:  Could you restate the

17   question, because he can't remember.

18             BY MR. JACKSON:

19       Q     Mr. Reiter, can you -- you look a very

20   healthy man to me, Mr. Reiter.  Do you remember

21   the question?

22       A     The last question?  I remember the

1    first one and the last one.  Which one do you

2    want me to answer?

3         Q      The last question.

4         A      The last question, can the employer be

5    held liable?  Yes.

6         Q      Even if the employee is off duty.

7         A      You need I read case law, and I train

8    in seminars.  Absolutely.  I mean, that has been

9    a consistent trend.  All you have to do is look

10   at even Supreme Court cases that involve sexual

11   misconduct, and I used some from the Fifth

12   Circuit and from the Eleventh Circuit and from

13   the Ninth Circuit, and these are all off-duty

14   cases.

15            And I remember Justice Scalia saying

16   in the one case -- and this is the one from San

17   Diego.  He said, you know, We're not going to

18   allow some police officers to engage in

19   masturbating and selling videotapes on eBay; no;

20   that's wrong.  And, I mean, it was all off duty.

21   Not my favorite Justice, but, you know, he had

22   some colorful opinions.

1          So, yes.  I think the court cases have

2    continuously said that police departments have

3    the authority to control their employees on and

4    off the job.

5          Q      Have you had an opportunity to look at

6    Officer or former Officer Best's time and

7    attendance record for December 3?

8          A      I don't have a recall of that.  No.

9    I may have seen it.  I don't --

10         Q      One of the things that you said that

11   you read was former Chief Kimberly Chisley-

12   Missouri's deposition.  Remember that?  Remember

13   reading that?

14         A      I did.  Yes.

15         Q      And did you look at the exhibits that

16   were attached to that deposition?

17         A      There were voluminous, and I did.  But

18   I don't have a specific recall to any time

19   record.

20         Q      Well, if I represent to you that

21   Darrell Best was not on duty at the time of this

22   incident, does that change your opinion at all?

1        A      No.

2        Q      And is it your opinion that if the MPD

3    did everything that you have identified that was

4    deficient, that somehow Ms. Buie would not have

5    been assaulted?

6        A      You know, I've answered that numerous

7    times.  I've said I can't get into Officer Best's

8    mind.  I don't know what was going on there.  I

9    can say that if the culture represented by my

10    readings of the materials in this case and the

11    administrative investigations, if the culture had

12    been what I'm recommending it should have been,

13    more likely than not, it may not have occurred.

14    But that's the best I can do, to answer your

15    question.

16        Q      Just give me one second, please.

17               (Pause.)

18               BY MR. JACKSON:

19        Q      Mr. Reiter, what is your understanding

20    of how the relationship between Ms. Buie and

21    former Officer Best developed?

22               MR. SMITH:  Objection.  When you say,

1      the relationship, what are you talking about?

2                    BY MR. JACKSON:

3          Q      The knowledge of each other, how did

4      that come about?  What is your understanding?

5          A      It's my understanding they knew each

6      other prior to this incident occurring.  Vaguely

7      I recall, I believe it was from something to do

8      with his church where he was the preacher of his

9      church, but I'm not positive about that.  But I

10     believe, yes, they knew each other.

11         Q      Is there -- in your opinion, is there

12     anything that the Metropolitan Police Department

13     could have done to prevent Officer or former

14     Officer Best from assaulting Ms. Buie?

15                    MR. SMITH:  Okay.  Again, I'm going to

16     object as asked and answered on multiple

17     occasions.  But go ahead.  Proceed.

18                    THE WITNESS:  You know, like I've

19     said, in my opinion, from the materials I've

20     reviewed, the agency has created a culture that

21     has not adequately defined in written format,

22     trained with specific, realistic examples, both

1    at basic and in-service, monitored and then

2    created administrative investigations and filing,

3    and the whole issue of being able to look at an

4    overview of what their officers are doing that

5    are getting them in trouble and making corrective

6    moves there, and there's no indication that

7    there's any ongoing monitoring of what the

8    officers are engaged in on a realistic way.

9            I mean, just the number of instances

10   that have come from the 7th District that I've

11   seen -- and I've only scratched the surface on

12   this documentation -- any reasonable manager

13   would say, What the hell's going on down there;

14   is this some sort of frat house that we've got in

15   the 7th District.

16           And, now, would all of those things

17   have stopped the sexual assault against Ms. Buie?

18   I'm saying, more likely than not.  That's why we

19   do this.  Could it have occurred?  Possibly, yes.

20   But it's the idea that if they had done all those

21   things, I wouldn't be here doing this deposition

22   now.

1              BY MR. JACKSON:

2        Q     So, Mr. Reiter, you have been retained

3   as an expert in many cases.  Correct?

4        A     I have, even by the District.

5        Q     All right.  Even by the District.  And

6   those cases have ranged from constitutional

7   claims to negligent claims.  Correct?

8        A     Yes.

9        Q     And you know that it is always

10  important to establish causation in a lot of

11  cases.  Correct?

12       A     Well, I know that's the plaintiff's

13  job.  That's rarely the job of the expert.

14       Q     So you -- based on what you just said,

15  am I correct that you have no opinion as to

16  causation in this case?  Is that correct?

17             MR. SMITH:  Objection.  Restating

18  incorrectly the witness's answer -- if you want

19  to ask him a question, go ahead and do it, but

20  you don't have to twist his words.

21             BY MR. JACKSON:

22       Q     I didn't ask you if what I said to you

1    was repeating your words.  My question is:  You

2    cannot opine in this case on the issue of

3    causation.  Isn't that correct?

4         A    I don't do that as an expert.

5         Q    Okay.

6         A    So I don't have an opinion --

7         Q    But isn't it correct --

8         A    I don't have an opinion.  That's

9    not -- in my opinion, that's not the role of an

10   expert, at least police practices expert.

11             MR. SMITH:  They can mute.  They

12   probably can hear us right now, but we can't hear

13   them.  That's not your fault, but -- can you hear

14   us?

15             (No response.)

16             MR. SMITH:  Yes, he can hear us,

17   because he's looking at me right now.

18             MR. JACKSON:  Go ahead.

19             MR. SMITH:  You can hear us.  Right?

20             MR. JACKSON:  I can now.

21             MR. SMITH:  We're on the record it's

22   structured so you can mute us, but we can't mute

1    you.

2             THE WITNESS:  No.  It's the reverse.

3    They mute themselves.

4             MR. SMITH:  Right.  I know.  They can

5    talk among themselves, but we can't.

6             MR. JACKSON:  Can we go off the record

7    for one second.

8             (Whereupon, a short recess was taken.)

9             THE REPORTER:  We're on.

10            MR. JACKSON:  We're on?  Thank you.

11            BY MR. JACKSON:

12        Q      Mr. Reiter, you indicated that Officer

13   Best had accumulated 300 points in the PPMS

14   system.  Correct?

15        A      My interpretation of it, yes.

16        Q      Okay.  And where did you get the 300

17   points?

18        A      Well, you know, attached to your --

19   the order, at the end of it, there are

20   actually -- the categories of acts of misconduct

21   that give a point scale, and all I did is add

22   them up.

1        Q        Okay.  And which misconducts did you

2    add up?

3        A        (Perusing document.)  Okay.  I have to

4    go to my notes, so can you hang on a minute?

5        Q        Sure.

6        A        (Perusing document.)  Okay.  In a

7    three-year period between 2006 and 2008, he had

8    four administrative investigations.  Three of

9    them were sustained.  The first one was 06-158,

10    which was the time and attempted fraud and lying.

11    He got a 30-day suspension.  The SSP points would

12    be 100 for that.

13            In '07, IA 07-2351 was the -- he had

14    a domestic incident with his wife and a temporary

15    protective order served on him.  I looked at

16    that, even though there's an unknown disposition,

17    under the chart, that would have been a hundred

18    points.

19            And then 2008, the incident with Ms.

20    Lee, the sexual harassment, where he was demoted,

21    and he was not truthful was another hundred

22    points.

1      Q      Is that it?

2      A      Those -- that's how I amassed 300

3   points.  That's what you asked me.

4      Q      Okay.  So the 2006 incident, that

5   would not have been included in PPMS.  Isn't that

6   correct?

7      A      Why would you say -- oh, are you

8   saying because it was the -- I'd have to go back

9   to see -- are you saying that the order was

10  not -- that program was not in effect at that

11  time?

12     Q      The PPMS operating procedures have a

13  date of April 2007, so that would not have picked

14  up the 2006 incident.  Isn't that correct?

15     A      Well, actually, you know, that's the

16  fallacy of the District.  I mean, you enact

17  something.  Why wouldn't you go back for the same

18  period of time for just the -- if you're going to

19  have a threshold -- a span of either two years or

20  three years, you would make it retroactive.

21            So, I mean, that's a deficiency they

22  had.  I don't think that's -- so I disagree with

1        you.  I think it's still -- any reasonable

2        agency, when you enact that would go back.  You

3        don't start fresh.  You got to say, Do we have

4        any people we need to worry about now, based on

5        what occurred one year before or two years

6        before.  Now you have the ability to do that.

7                Q        So was it --

8                A        But it doesn't matter, because in his

9        case, I don't think it was ever done.  And nobody

10       has said what the threshold is.  Nobody has -- in

11       any of the depositions, including the assistant

12       chief -- I forgot his -- he started with an M,

13       his last name.  He didn't know what the number of

14       points necessary to trigger the PPMS or the SSP

15       either.  I don't know who knows that.

16               Q        Do you have an opinion as to whether

17       or not the Metropolitan Police Department should

18       have terminated Best prior to the incident with

19       Ms. Buie?

20               A        You know, I don't have enough

21       information to give you an opinion on that.  I'm

22       saying -- mainly because I don't -- when you get

1      into termination, you have to know the person

2      themselves.  It's more than what's on paper, so I

3      really don't have an opinion.

4           Q       Okay.  Well, let me  --

5           A       Now -- well, let me back up.

6           Q       -- ask.  Based on the --

7           A       Let me back up.  Could they have?

8      Based on what limited I've seen, sure.  I mean,

9      twice he's been untruthful.  I mean, what good is

10     an officer who's lying during administrative

11     investigations?  But apparently that was not

12     enough to get him terminated.  Could they have

13     terminated him for lying in two administrative

14     investigations?  Yes.

15          Q       I understand that they could have

16     terminated him.  My question is:  Based on your

17     expert opinion, on your experience, do you have

18     an opinion as to whether that they should have

19     terminated Officer Best prior to the incident

20     involving Ms. Buie?

21          A       No.  I can't answer that, because I

22     don't know Officer Best.  When you get into a

1    personnel decision like that, you have to have

2    intimate knowledge of the employee.  So I have no

3    opinion on that.

4         Q     Are you aware of any other

5    jurisdictions that have allowed police officers

6    who have been accused of sexual misconduct to

7    remain on the job?

8         A     Some have.

9         Q     And am I correct that if I ask you,

10   Mr. Reiter, if the Metropolitan Police Department

11   had terminated Officer Best, that the incident

12   with Ms. Buie would not have occurred, you don't

13   have an opinion on that.  Correct?

14             MR. SMITH:  Objection.  It's a

15   ridiculous question.

16             THE WITNESS:  It would not have

17   occurred where he's using his authority as a

18   police officer, the indices and equipment of the

19   police department.  That would not have occurred.

20    Yes.  Now, he might have raped her in his church

21   office.  I don't know.

22             BY MR. JACKSON:

1          Q        And just so that we're clear, Mr.

2     Reiter, you're aware that Officer -- former

3     Officer Best did not rape Ms. Buie.   Correct?

4          A        No.   It was an attempt rape.   Yes.

5          Q        So let me just -- I think I'm going to

6     be finished probably within the next half-hour or

7     so, maybe less than that.   I just want to ask you

8     about some of the specific claims in this case.

9               I understand that you are not an

10    attorney, Mr. Reiter, but let me ask you.   Do you

11    have an opinion as to whether or not the District

12    violated Ms. Buie's Fifth Amendment rights?

13               MR. SMITH:   Objection.   He's not an

14    attorney, and you shouldn't be asking that

15    question.

16               BY MR. JACKSON:

17          Q        You can answer, Mr. Reiter.

18          A        No, I don't have an opinion.

19          Q        Do you have an opinion as to whether

20    the District deprived Ms. Buie of her liberty?

21               MR. SMITH:   Objection.   He's not an

22    attorney.   But go ahead.

1          THE WITNESS:  No, I don't have an

2     opinion.

3          BY MR. JACKSON:

4     Q      Thank you.  Do you have an opinion,

5     Mr. Reiter, as to whether or not the District

6     deprived Ms. Buie of her right to bodily

7     integrity?

8     A      I don't have an opinion.

9          MR. SMITH:  Objection.  Not an

10    attorney.  Go ahead.

11         THE WITNESS:  No, I don't have an

12    opinion.

13         MR. JACKSON:  Mr. Smith, I will give

14    you a running objection on all these questions if

15    you want, but if you want to state it for the

16    record, that's fine with me.

17         MR. SMITH:  Okay.  Thank you for the

18    running objection, David.  That's nice of you.

19         BY MR. JACKSON:

20    Q      Mr. Reiter, have you been asked to

21    render an opinion as to whether or not the

22    District negligently entrusted Ms. Buie with

1    Officer Best?

2         A      I have not been asked that.

3         Q      Have you been asked to render an

4    opinion as to whether or not the District was

5    negligent in retaining Officer Best?

6         A      I have not.  I have not been asked

7    that.

8         Q      And do you have an opinion on that at

9    this point?

10        A      No.

11        Q      Mr. Reiter --

12        A      Yes.  Still here.

13        Q      Okay.  Have you looked at any videos

14   relevant to this case?

15        A      No.

16        Q      Have you spoken with Ms. Buie?

17        A      I have not.

18        Q      Have you spoken with Ms. Buie's

19   mother?

20        A      No.

21        Q      Have you read Mrs. Buie's deposition

22   transcript?

1      A      Oh, the mother?  No.

2             MR. SMITH:  Because you said Mrs.

3      Buie.

4             MR. JACKSON:  Yes.

5             BY MR. JACKSON:

6      Q      The mother.

7      A      No.

8      Q      Do you have an opinion as to the

9      quality of the investigation report that was

10     completed by Nicole Webster?

11            MR. SMITH:  Objection.  Could you

12     clarify?  There's more than one, so which one are

13     you talking about?

14            BY MR. JACKSON:

15     Q      The investigation report relating to

16     Ms. Buie.

17     A      You know, there were about six

18     different citations on that case, so I'm not sure

19     exactly which you're talking about.

20     Q      The list of documents that you said

21     that you reviewed, one of those was the

22     deposition transcript of Nicole Patrice Webster.

1      So you read her deposition.  Did you look at any

2      of the exhibits that were attached to that

3      deposition?

4               MR. SMITH:  Hold on for a minute.

5      Even -- I'm genuinely confused about the question

6      you asked then.  What -- could you restate the

7      original question, because neither one of us

8      understood it.

9               BY MR. JACKSON:

10     Q      Mr. Reiter, do you understand my

11     question?

12     A      No.  Tell me which case you're

13     referring to that Lieutenant Webster did.  Which

14     case am I looking at?

15     Q      Let me refer you to your report, where

16     you mentioned her.  Just bear with me for one

17     second, please.

18               (Pause.)

19               BY MR. JACKSON:

20     Q      Going to your paragraph 43 in the

21     original report or the initial report --

22     A      Yes.

1      Q      -- you talk about the administrative

2    investigation by -- regarding recruit Officer

3    Rayna [phonetic] Jones.

4              MR. SMITH:  Is that a question or is

5    it a statement?

6              MR. JACKSON:  It's a statement.  I

7    just want to make sure that we're -- he's on

8    that.

9              BY MR. JACKSON:

10     Q      Do you see that?

11     A      I'm on that paragraph.  Yes.

12     Q      So the investigation that you're

13   referring to there, do you have an opinion as to

14   the adequacy of Lieutenant Webster's report?

15     A      The -- I have an opinion regarding her

16   investigation or lack of it.  Yes.

17     Q      And what is your opinion?

18     A      That is was egregiously deficient.

19   She basically dropped the ball, and she didn't

20   pick it up and do an administrative investigation

21   regarding the allegations from Ms. Jones.  And I

22   think I've laid it out, both in paragraph 43 and

1    44, specifically what I thought -- why I thought

2    this was so egregiously deficient.

3        Q       And do you have an opinion as to

4    whether or not, if the report was not -- if it

5    was not egregiously deficient, whether or not the

6    incident involving Officer Best and Ms. Buie

7    would not have occurred?

8        A       No, I don't have an opinion.  You

9    know, it's the idea if they had sustained it, who

10   knows what would have happened?  I don't.

11       Q       And you cannot say within a reasonable

12   degree of your -- of professional practice that

13   there is a causation between Lieutenant Webster's

14   report and the incident involving Ms. Buie.

15   Correct?

16       A       Well, I've already answered the

17   question on causation.  But I think what this

18   really reflects is the failure of the

19   administrative investigation into a serious

20   allegation by a police recruit, and that leads

21   into all of my answers regarding the creation of

22   this culture within the department.

1           I mean, they dropped the ball on this

2     case.  She never even -- she acknowledged --

3     Lieutenant Webster acknowledged she didn't even

4     know there had been a sexual assault unit

5     investigation, never saw the reports.  I mean,

6     but I can't say that in and of itself, that led

7     to what occurred with Ms. Buie.  No.  I have no

8     opinion on that.

9           MR. JACKSON:  All right.  Well, I have

10    at this point no further questions, and I thank

11    you very much.  I'm not sure if Mr. Smith has

12    some questions for you.

13          MR. SMITH:  I'm going to ask him a

14    couple questions.  Okay.

15                  CROSS-EXAMINATION

16          BY MR. SMITH:

17    Q       And since we're right at this Rayna

18    Jones situation and what he just asked, I'm going

19    to turn on that and ask a slightly different

20    question.  Now, you are aware that the case that

21    followed the Rayna Jones investigation was the

22    Janice Lee investigation.  Right?

1          A      Yes.

2          Q      And though that situation involved

3   allegations of sexual misconduct as well.

4   Correct?

5          A      Yes.

6          Q      Now, let me take a moment to clarify.

7   Earlier in this deposition, Mr. Jackson asked you

8   if there was a distinction between sexual

9   harassment and sexual misconduct.  And you said,

10  yes, there was, and you opined on that

11  distinction.  Okay.

12              But now I'm going to ask you:  Despite

13  that distinction, which I'm not resisting that

14  these two things are to be distinguished, are

15  you -- do you not recognize the view that sexual

16  misconduct is the broader term, and sexual

17  harassment can fall under that broader term, even

18  despite the distinction you recognize?

19          A      Of course it can --

20              MR. JACKSON:  Objection as to the form

21  of the question.

22              MR. SMITH:  Would you -- did I --

1          THE WITNESS:  He might want to have an

2    objection.

3          MR. SMITH:  Okay.  Are you objecting?

4          MR. JACKSON:  Yes.  Objection as to

5    the form of the question.

6          MR. SMITH:  Okay.  Fine.

7          BY MR. SMITH:

8    Q     Now go ahead.

9    A     No.  It can be a subsection, depending

10   on what the nature of the sexual harassment is,

11   because more importantly, you get someone who is

12   engaged in sexual harassment of other employees.

13   That also can be indicative of someone who has

14   some real issues with gender discrimination, so

15   that can be an employee as well as a citizen.

16          Not necessarily true, but in my

17   opinion, yes.  Sexual harassment is under the

18   umbrella, total umbrella, of sexual misconduct.

19   But the investigative techniques may be

20   different.

21   Q     Okay.  Now -- and that was a

22   parenthetical.  Back to the broader question.

1      All right.  So you know that the Janice Lee -- do

2      you recall the underlying allegation associated

3      with the Janice Lee investigation?

4          A      I'd have to go back to my notes.  I

5      know she was an employee, and I believe they

6      were -- I think he was making some utterances.

7      And I have to go back.  He regularly made

8      utterances about wanting to, using the

9      vernacular, eat pussy, and I don't know if that

10     was part of it with Janice Lee or not.  But I

11     know that was a common thread that he apparently

12     had.

13         Q      Okay.  Are you aware that the Janice

14     Lee allegations were sustained?

15         A      They were.

16         Q      Okay.  Now, and the Rayna Jones matter

17     preceded the Janice Lee matter.  Correct?

18         A      It did.

19         Q      And do you recall that it was while

20     the Rayna Jones matter was under investigation

21     that the Janice Lee incident occurred?

22         A      Yes.

1          Q     Okay.  So related to the question he

2    asked you but distinctly different, if the Rayna

3    Jones case had been sustained and as we know, the

4    Janice Lee case had been sustained, do you have

5    an opinion on whether or not Mr. Best should have

6    been fired?

7                MR. JACKSON:  Objection.  Asked and

8    answered.

9                MR. SMITH:  I never asked that

10   question, so I don't know what you're talking

11   about.  Asked and answered by whom?  This is the

12   first time I asked him the question.

13               BY MR. SMITH:

14         Q     But anyway, go ahead.

15         A     No, I don't have a definite opinion

16   there.  I'm saying it would be another build-up,

17   and that would have meant four instances in that

18   period of time as well.  It could have resulted

19   in termination.

20         Q     Okay.  Just bear with me, because I

21   don't have much.  Oh, now, earlier in your

22   testimony, the dialogue between you and Mr.

1    Jackson, you talked about the issue of

2    declaration, and you said, well, that's a

3    conscious decision that the District has made to

4    suspend administrative investigation while the

5    criminal inquiry by the United States Attorney's

6    Office is being made; they didn't have to set it

7    up that way.  Is that correct?  Did I hear you

8    correctly?

9         A    Yes.

10        Q    Okay.  So --

11             MR. JACKSON:  Objection as to form.

12             MR. SMITH:  I'm sorry?

13             MR. JACKSON:  Objection as to the form

14    of your question.

15             MR. SMITH:  Okay.

16             BY MR. SMITH:

17        Q    So then what are some of, in your

18    opinion, the philosophical implications of the

19    fact that they did choose to set it up that way,

20    the District?

21             MR. JACKSON:  Objection as to the form

22    of the question.

1              THE WITNESS:  Well, there can be

2     several.  One thing, we know that prosecutors

3     have a different burden of proof, so in many

4     cases, the incident may have occurred, but it

5     doesn't reach the beyond a reasonable doubt, and

6     prosecutors are very conscious normally about

7     their success rate.

8              And then throughout the country, some

9     police agencies will then use a declination to

10    prosecute as a reason to suspend the

11    administrative investigation and simply not look

12    beyond the four corners of what occurred here and

13    look at the cultural implications, the

14    supervisory implications, what other officers may

15    have known and maybe didn't report.

16             So there's a lot of other things that

17    if an agency -- if a prosecutor declines to

18    prosecute a police officer who is involved in,

19    let's say, a sexual assault case, the agency may

20    overlook all of those other areas that could be

21    uncovered in the administrative investigation and

22    lead to a disruption of a false culture within

1    the department.

2              So, I mean, some departments -- and I

3    don't know if MPD does that, because the cases

4    that we've looked at, in all those cases -- well,

5    I can't say that.  Well, yes, I can say that,

6    because in the case of Rayna Jones is a good

7    example.  There was a declination on the part of

8    the prosecutor in that case, and Lieutenant

9    Wilson dropped the ball and didn't conduct an

10   administrative investigation --

11        Q       Do you mean Lieutenant Webster not --

12        A       Lieutenant Webster didn't conduct, and

13   so there's a specific example involved in the

14   production in this case that shows the

15   consequences of having this kind of set-up with

16   the prosecutor and not bifurcating the cases and

17   investigating them concurrently.

18        Q       So would you say structuring the

19   investigative process the way the District has

20   it, so that it's suspended during the declination

21   inquiry, is consistent with your other opinion

22   that the District has developed a culture of

1    conscious indifference towards sexual misconduct?

2         A      Yes.  That could be true.  Yes.

3         Q      Okay.

4         A      Long-winded question.

5         Q      Yes, I know.  They happen sometimes.

6              MR. SMITH:  All right.  I'm good for

7    now.  No more questions from me.

8         REDIRECT EXAMINATION

9              BY MR. JACKSON:

10        Q      Just to follow up, Mr. Reiter, do you

11   know what happens in the District of Columbia

12   once the U.S. Attorney's Office issues the letter

13   of declination?

14        A      Do I know what the District then does

15   when they get a declination?  Is that what you're

16   asking me?

17        Q      Yes.  Let me rephrase that, because it

18   might not have been clear.  Do you know what

19   steps, if any, the Metropolitan Police Department

20   takes as it relates to the administrative

21   investigation, once the U.S. Attorney's Office

22   issues their letter of declination?

1          A       I don't have a specific protocol of

2     what they would do, because there's -- in the

3     materials I've looked at, there's so few of

4     those.   The only one I can point to is Rayna

5     Jones when they declined a filing and they

6     dropped the administrative investigation.

7                There may have been one other,

8     possibly with Officer Dixon [phonetic], but I'd

9     have to go -- he was the detective who was -- no.

10    In that case, they got the declination.   They

11    went ahead and administratively -- they

12    investigated that case, so that was a little bit

13    different.

14                But I don't know if there's a standard

15    protocol or not, so I can't answer your question,

16    Mr. Jackson.

17                MR. JACKSON:   Okay.   Thank you very

18    much.   That's all that I have.   And we will make

19    sure that we put this check in the mail --

20                MR. SMITH:   No.   Go ahead.   I'm sorry.

21                MR. JACKSON:   Okay.   So we'll make

22    sure that we put your check in the mail to you

1     today.  And again, thank you.  We're finished.

2     I'm finished.

3                MR. SMITH:  Okay.  Well, hold one.

4     There might be one more housekeeping issues.  I

5     just need to make sure.

6                (Pause.)

7                MR. SMITH:  All right.  We're fine.

8                THE WITNESS:  Thank you, Mr. Jackson.

9                MR. JACKSON:  Thank you.  Are you

10    going to read and sign?

11               THE WITNESS:  I'd like to.  Yes.

12               MR. JACKSON:  Okay.  Thank you very

13    much.  Have a good day.

14               (Whereupon, at 1:22 p.m., the taking

15    of the instant deposition was concluded.)

16

17

18

19

20

21

22

**A**

A-L-P-H-O-N-S-O 47:4
a.m 4:2
ability 71:16 72:9 95:6
able 89:3
abrogating 24:11
absence 49:19
absolutely 26:6 56:22
  71:2 85:8
abuse 25:12 40:13 48:7
  51:13,13 52:22 75:20
  75:21 76:9
abused 53:2
abusing 52:20
academy 46:11,21 47:2
  58:17
accept 7:6 21:20
acceptable 35:8,13
  38:22 39:22 70:5
accepted 23:21 28:14
  33:6 36:6 40:18 41:4
  44:16
access 45:22
accomplish 18:2
accountable 24:10
  75:22 76:7 83:16
accumulated 92:13
accused 29:5 36:9
  77:18 97:6
acknowledged 46:14
  105:2,3
acquiescing 76:10
act 23:2 29:9 36:8 44:16
  70:1 79:5 83:11
action 30:5
actions 28:6
acts 18:2 77:16 92:20
actual 31:18 65:10
add 6:21 92:21 93:2
addition 19:19
additional 8:9,11
address 6:8,11,14,19
  6:22 13:13 45:4 47:11
  54:13,13,14
addresses 60:10
addressing 8:20 44:5
  44:11
adequacy 103:14
adequate 11:14 13:14
  51:19 60:3 68:15
adequately 88:21
adjudications 77:3
adjust 30:19
administrative 8:9 14:9
  24:5,14 28:1 30:7
  33:5 36:17 37:9 38:4
  38:5 44:1,14 68:19
  76:21 81:4 87:11 89:2

93:8 96:10,13 103:1
  103:20 104:19 110:4
  111:11,21 112:10
  113:20 114:6
administratively 26:19
  114:11
adopted 43:14 45:1
  63:6,9,13 64:6 66:3,7
adopting 70:12
advances 18:18
adverse 23:5
advocated 71:1
affairs 19:10 20:1 28:18
  62:20 68:14 81:22
  83:11
affidavit 51:5
affidavits 50:15
agencies 63:10 65:15
  65:18 111:9
agency 45:21 48:7
  49:17,20 60:10 66:9
  68:10 69:15,21 72:8
  75:19 88:20 95:2
  111:17,19
agree 19:11 24:16,18
  24:20 25:8,18 59:8
agreements 65:7
ahead 37:9,11 80:18
  88:17 90:19 91:18
  98:22 99:10 107:8
  109:14 114:11,20
AL 1:9
allegation 21:2 24:5
  26:8 43:5 57:17
  104:20 108:2
allegations 10:6 11:2
  15:4 22:19,20 23:22
  24:21 25:9,14 40:16
  46:1 50:17 57:16
  76:22 103:21 106:3
  108:14
alleging 10:6
allow 75:19 85:18
allowed 97:5
allowing 42:17 71:10
  72:17 74:6 75:3,12,16
allows 22:6 45:1
Alpharetta 1:13,18
Alphonso 47:3
amassed 78:8 94:2
ambient 66:22
Amendment 26:22
  98:12
and/or 10:12
anonymous 21:5
answer 36:4 43:7 70:11
  70:12 71:16,22 75:1
  84:14 85:2 87:14

90:18 96:21 98:17
  114:15
answered 80:18 87:6
  88:16 104:16 109:8
  109:11
answers 104:21
anticipate 8:5
anybody 16:1
anyway 109:14
apart 19:10
apparently 72:10 96:11
  108:11
appear 12:20
APPEARANCES 2:1
appears 53:14
applied 15:8
apply 23:1
appropriate 19:13,16
  19:18 21:17 52:20
  53:3
April 94:13
area 15:8 16:2 41:12,16
  43:10 44:6 46:17
  49:15 52:9,11 60:11
  78:16,17,17
areas 12:12 14:12,13
  14:17 15:1 17:10 42:7
  69:4,6 81:9 111:20
arena 11:4 21:21,22
Arkansas 64:16
arranged 5:11
arrest 50:16
arrestees 56:14
Arthur 47:6
articles 79:4
articulate 45:18 53:4
articulates 60:8
articulating 59:18
asked 8:7,10 10:3,4
  72:2 73:13 74:22
  79:17 80:18 82:3
  84:11 88:16 94:3
  99:20 100:2,3,6 102:6
  105:18 106:7 109:2,7
  109:9,11,12
asking 5:12 10:16 12:6
  70:17 73:12 74:18
  80:7 98:14 113:16
aspect 30:5
assault 21:21 25:13
  29:22 32:15 33:2 38:2
  38:19 39:3,9,13,18,21
  40:16 41:2 47:13 48:6
  48:16 50:10 89:17
  105:4 111:19
assaulted 87:5
assaulting 88:14
assaults 40:2 58:18

90:18 96:21 98:17

assigned 34:17,18
  35:12
assistant 5:2 81:19
  95:11
associated 49:9 108:2
Association 8:19 49:2
  53:10 54:5 55:11 65:2
  65:4
assuming 40:11
attached 86:16 92:18
  102:2
attempt 98:4
attempted 15:22 16:1
  93:10
attendance 86:7
attention 21:8,11 22:7
attorney 5:2 26:16 27:4
  28:9 98:10,14,22
  99:10
Attorney's 21:10 24:3
  24:12 27:2,10 32:15
  33:19 34:5 35:17
  36:12 110:5 113:12
  113:21
attorneys 72:6
audio 32:10
August 13:3
authoritative 54:11
authority 17:16,22
  25:12 27:15 29:9 48:8
  56:13 57:4 58:7 86:3
  97:17
authorize 36:10
authorizing 43:8
Avenue 2:8
aware 23:1 31:15 39:6
  39:13 61:7 97:4 98:2
  105:20 108:13

**B**

B-I-G 6:22
back 6:7 25:21 40:14
  45:9 61:15 67:8 94:8
  94:17 95:2 96:5,7
  107:22 108:4,7
background 15:6,16
  67:8
badge 34:13 35:10 48:9
  56:13 83:12
ball 103:19 105:1 112:9
based 69:3 72:12,13
  74:1 75:6 83:22 90:14
  95:4 96:6,8,16
basic 46:11,21 68:17
  79:9 81:3 89:1
basically 103:19
basing 15:11
battery 25:13

**beach** 33:10,22
**bear** 102:16 109:20
**began** 9:15
**beginning** 12:2
**behalf** 1:18 2:2,6
**behavior** 54:18
**belief** 75:21
**believe** 18:19 19:8
 34:10 36:6 37:7 40:7
 47:3 55:7 58:20 59:22
 75:17,22 76:6 77:6
 78:7 80:14 88:7,10
 108:5
**believed** 68:11
**bench** 33:10
**best** 44:3 69:13 70:8
 71:4 77:10 78:7 82:19
 83:4 84:1 86:21 87:14
 87:21 88:14 92:13
 95:18 96:19,22 97:11
 98:3 100:1,5 104:6
 109:5
**Best's** 14:2,7 70:18
 77:13 86:6 87:7
**better** 53:7 64:1 71:15
**beyond** 11:6 111:5,12
**bifurcate** 27:17 28:14
 28:19 32:22
**bifurcating** 112:16
**big** 6:22 33:14 50:14
**bit** 25:21 80:1 114:12
**block** 47:13 52:18
 62:18,19
**boards** 52:6,7
**bodies** 79:3
**bodily** 99:6
**body** 43:4
**bolts** 63:4
**bottom** 54:3
**Brady** 77:21
**break** 41:13,19 67:10
**bring** 27:5 36:8 60:12
**broad** 42:10
**broader** 106:16,17
 107:22
**bud** 79:8
**Buie** 1:5 68:6 69:7,13
 70:9 77:11 87:4,20
 88:14 89:17 95:19
 96:20 97:12 98:3,20
 99:6,22 100:16 101:3
 101:16 104:6,14
 105:7
**Buie's** 7:15 69:1 98:12
 100:18,21
**build-up** 109:16
**building** 83:8
**bulletin** 52:6,7

**bulletins** 52:5
**bunch** 81:7
**burden** 111:3
**business** 23:4

———————————
**C**

**C-A-N-O-E** 7:1
**C-H-U-L-A** 6:8
**call** 21:5 33:10 36:14
 39:1
**callbacks** 57:15
**called** 1:16 4:13 19:9
 29:14 34:10 64:21
**Canoe** 7:1
**car** 26:2 51:15 61:20
**card** 34:13 83:8
**care** 28:12
**Carolina** 64:15,15
**carrying** 58:6
**case** 1:7 7:14 8:1 10:3
 10:10 16:16 20:17
 23:17 28:11,20 29:2
 32:3,15,22 36:12,17
 38:2,5 39:9,17 59:22
 63:1 71:15 72:1,3
 75:18 83:18 85:7,16
 87:10 90:16 91:2 95:9
 98:8 100:14 101:18
 102:12,14 105:2,20
 109:3,4 111:19 112:6
 112:8,14 114:10,12
**cases** 12:1 27:1,17
 35:17 38:19 39:4
 40:20 76:22 85:10,14
 86:1 90:3,6,11 111:4
 112:3,4,16
**cashed** 6:2
**catastrophic** 51:2
**catch-all** 55:6
**categories** 92:20
**Cathy** 79:14
**causation** 90:10,16
 91:3 104:13,17
**cause** 50:15 51:4
**certain** 26:13 39:3,8
**certainly** 12:8 19:18
 84:9
**certifies** 27:4
**chagrin** 72:9
**chain** 81:8,18 82:7
**change** 59:9 86:22
**charge** 26:3 29:13,15
 30:2 36:7 55:4
**charged** 36:11 37:18
**charges** 27:5 33:20
 55:3
**chart** 93:17
**chastise** 63:20

**check** 5:5,6,9,10,13,14
 5:18,22 6:2,3,4,7,8,11
 7:4,7 47:4 114:19,22
**chief** 44:21 45:1,3,6,12
 45:13 53:12 79:14
 80:20 81:19,20 86:11
 95:12
**Chiefs** 8:19 49:3 53:10
 54:6
**child** 40:13,21 55:21
**children** 40:3
**Chinese** 28:16 36:14
**Chisley-** 86:11
**choice** 45:4 53:18 64:2
 81:1
**choose** 110:19
**chose** 28:8
**Chuck** 45:9
**Chula** 6:8
**church** 88:8,9 97:20
**Circuit** 85:12,12,13
**circumstances** 35:20
**citations** 101:18
**citizen** 22:18 56:12,15
 107:15
**citizen's** 21:6
**citizens** 44:8 50:22
 51:12,13 52:22 57:4
 58:14
**citizens'** 51:6
**civil** 2:3 21:12 73:20
**claim** 10:12,13 42:8
**claims** 7:15 19:3 90:7,7
 98:8
**clarify** 12:9,11 16:21
 25:6,7 101:12 106:6
**clear** 6:1 11:12,17 12:5
 37:21 98:1 113:18
**client** 63:10 65:14,18
**clients** 49:12 53:16
**close** 64:18
**closet** 34:22
**closets** 33:13
**code** 51:21 58:18
**codified** 57:1
**cog** 68:9
**colorful** 85:22
**Columbia** 1:1,8 5:21
 7:16 10:12,14 29:4
 32:14 37:22 42:16
 43:13 72:17 75:3,11
 113:11
**come** 21:2,4,5,6,6,8,11
 21:12,15 22:7 50:3
 57:16 59:20 67:7 88:4
 89:10
**comes** 15:3 76:22
**coming** 60:6 67:14

**command** 68:13 81:8
 81:19 82:7 83:10
**commit** 48:9
**committed** 48:6 70:1
**committee** 79:20
**common** 108:11
**communicate** 67:9
 76:13
**communication** 54:18
**community** 17:17 48:11
**companies** 65:9,11
**comparable** 60:3
**compel** 24:3 27:12
**compelled** 27:21 28:5
**complaining** 31:8
**complaint** 21:6
**complaints** 21:20 22:7
 22:18,22 23:7
**completed** 38:5 101:10
**comprehensive** 78:10
**concern** 22:4,5 23:19
**concerning** 24:6 42:19
 45:15
**concerns** 59:3
**concluded** 115:15
**concurrent** 37:5
**concurrently** 28:2,20
 33:6 112:17
**conduct** 47:11 48:21
 54:20 55:4,12 112:9
 112:12
**conducted** 16:11 21:10
 49:8
**conducting** 5:19
**conducts** 20:9
**confines** 70:6
**confuse** 30:4
**confused** 80:1 102:5
**conscious** 45:4 53:18
 81:1 110:3 111:6
 113:1
**consensual** 18:6 50:2,3
**consequences** 112:15
**consider** 83:15
**considered** 26:5 72:15
 73:7
**considering** 53:12
**consistent** 55:11 58:4
 62:11 85:9 112:21
**consoles** 50:6
**constitutes** 45:19
**constitutional** 10:11
 11:3 26:13 42:8 90:6
**constrict** 29:8
**construed** 54:19
**contained** 8:1
**CONTENTS** 3:1
**context** 18:12

continue 47:19
continuing 32:6
continuous 10:18
continuously 86:2
contrary 44:15
control 29:9 34:6 43:4
  86:3
convinced 7:3
copy 9:7
corners 111:12
correct 7:16,20 8:3
  11:10,16 12:14 13:15
  13:19,22 14:4,7,10,11
  14:15 15:16 22:3,8
  24:22 26:5,10,11,17
  27:1,10,13 32:18 38:6
  38:7 40:21 54:4,9
  55:5,13,21 56:2 58:8
  59:6 64:6 65:20 66:4
  66:5 72:12,18 74:4
  75:9 79:13 80:2 90:3
  90:7,11,15,16 91:3,7
  92:14 94:6,14 97:9,13
  98:3 104:15 106:4
  108:17 110:7
corrective 89:5
correctly 7:10 23:11
  48:18 110:8
counsel 1:16 9:5 18:8
country 27:17 111:8
couple 8:21 66:19
  67:16 105:14
course 14:21 15:17
  17:4 53:1 58:15 69:14
  106:19
court 1:1 4:7 31:5,9,11
  31:13 65:8 85:10 86:1
cover 61:17 62:1
covered 48:13,15
covering 43:19 52:6
covers 43:10 62:2 77:6
crates 49:19
create 36:14 53:19 70:3
  76:5 79:9
created 44:9 62:15
  75:18 88:20 89:2
creating 76:12
creation 104:21
crime 50:1
crimes 17:20 47:13
  48:16 50:11 57:10
criminal 21:9 24:13
  25:10,16 26:3,8,10,19
  27:5,8,17,22 28:2,10
  28:11,15 29:2,6,12,14
  29:21 30:2,5,6 32:22
  33:20 36:7 38:1 47:11
  51:21 110:5

criminally 36:11 37:18
criminals 26:12
crinkling 51:15
critical 63:18
CROSS 3:2
CROSS-EXAMINATI...
  105:15
cultural 111:13
culture 15:2 24:9 44:10
  48:7 49:20 68:10 70:3
  75:19 76:5,12 87:9,11
  88:20 104:22 111:22
  112:22
curriculum 46:12,21,21
  58:19
custom 71:9,10 72:16
  72:20 73:5,6,8 74:5
  75:2,11,15
customs 69:20

---

### D

D.C 19:19 27:14 58:18
DA 37:2
Dakota 64:16 65:3
dark 30:17
Darrell 86:21
dastardly 70:1
data 45:22
date 8:3,5 94:13
David 2:3 5:1 99:18
davida.jackson@dc....
  2:5
Davis 47:6
Davis's 47:9
day 13:3 115:13
days 23:4,4
DC 2:4,9 60:19,20
deal 33:2 51:12 52:15
  62:22,22 63:1
dealers 17:18
dealing 19:12 40:13
  46:12 48:4,20 49:11
  51:3,6,7,8
dealings 27:7
deals 11:15 19:2,15
  48:4
dealt 16:8 45:17 46:15
December 82:21 86:7
decision 11:5 37:6 97:1
  110:3
declaration 36:15
declination 24:2 110:2
  111:9 112:7,20
  113:13,15,22 114:10
declined 114:5
declines 111:17
Deerfield 1:17
defend 65:8

Defendant 9:5
Defendants 1:10,17
deficiencies 76:1,15,17
deficiency 94:21
deficient 46:7 76:21
  87:4 103:18 104:2,5
defined 88:21
definite 109:15
definition 18:15 45:18
  54:16
definitions 53:11
degree 104:12
deliberate 78:20 80:3
  80:14
deliberately 11:1 81:6
  81:12
demanding 17:14
demoted 93:20
department 10:5 15:3
  19:2,14,17,18 21:3,18
  22:5,6 23:20 24:2,9
  24:10,15 27:16 29:8
  34:3 38:6,18 39:1,7
  40:1,6,11,19 41:3
  44:10 48:19 51:20
  55:3,10,20 57:11
  59:11,12 60:6 62:5
  63:22 66:6 69:12
  75:15 77:20 78:20
  80:14 88:12 95:17
  97:10,19 104:22
  112:1 113:19
Department's 20:4
departments 19:16
  27:16 33:14 37:3,4,15
  37:19 62:10 63:2,11
  63:15 65:6 66:3 83:15
  86:2 112:2
depending 107:9
depends 19:17 37:4
deponent 2:6 31:15
  32:3
deposed 11:22 46:14
deposition 1:14,17 5:15
  5:19,20 8:14,15 31:2
  31:7 32:7 42:22 47:2
  47:9 86:12,16 89:21
  100:21 101:22 102:1
  102:3 106:7 115:15
depositions 32:9 44:3
  82:5 95:11
deprived 98:20 99:6
deputy 81:20
described 62:7,11 68:5
designated 46:18
desk 35:12
despite 106:12,18
destroy 6:4

details 34:15
detective 114:9
determine 33:3,19
  45:22 70:20
develop 81:1
developed 87:21
  112:22
developing 68:9
deviates 20:5,10,14
  28:11 32:17 41:3
dialogue 109:22
Diego 85:17
difference 84:3
different 16:16 19:19
  19:21,21 21:1,19 26:9
  38:9,18 42:7 44:2
  49:12 52:11,13,14
  56:12,22 57:18 62:9
  69:6 101:18 105:19
  107:20 109:2 111:3
  114:13
direct 3:2 4:21 50:22
directed 49:8
directly 22:22 51:12
  76:10
director 42:20 47:6
  81:20
dirt 63:4
disagree 55:14 94:22
disciplinary 10:21 14:3
  23:2,5 42:21 43:3,4
  55:2
discipline 15:5 28:19
  43:5
discover 72:9
discovery 71:14,17,19
  71:20 72:3,7 75:5
discrimination 107:14
displayed 71:20
displays 31:19
disposition 93:16
disruption 111:22
distinct 17:9 57:21
distinction 16:18 17:7
  30:6 106:8,11,13,18
distinctly 109:2
distinguished 106:14
distracting 32:8
district 1:1,1,8 5:10,11
  5:21 7:15 8:8 9:6
  10:12,13,21 21:9 28:8
  29:4 31:5 32:13 34:18
  35:17 36:19 37:21
  38:10 42:16 43:13
  46:19 53:18,20 71:18
  71:21 72:10,17 75:2
  75:11,18 76:8 77:4
  78:11 79:22 80:21

83:7 89:10,15 90:4,5
94:16 98:11,20 99:5
99:22 100:4 110:3,20
112:19,22 113:11,14
**District's** 76:1
**districts** 22:14
**disturbing** 67:15
**division** 2:3 42:21
**divorce** 21:13
**Dixon** 114:8
**document** 9:1,13 12:17
12:20 13:12 47:5 93:3
93:6
**documentation** 78:9
89:12
**documents** 9:21 75:7
101:20
**doing** 8:5 49:4,18 68:20
69:17,22 70:8 76:11
89:4,21
**domestic** 13:18 17:21
50:4 93:14
**doubt** 111:5
**drafted** 16:13
**Drive** 6:9
**driving** 83:6
**dropped** 103:19 105:1
112:9 114:6
**drove** 83:7
**drug** 17:17,18 50:19,22
51:10
**duly** 4:13
**duties** 34:14 58:15
**duty** 26:1 34:7 35:13
44:7 83:4,4,13,15,21
84:5,5 85:6,20 86:21
**DWI** 51:10

**E**

**earlier** 106:7 109:21
**early** 49:5 78:2
**East** 2:8
**eat** 108:9
**eBay** 85:19
**education** 10:18
**educational** 15:15
**EEO** 16:5,8,10,11,14
19:9,20 20:4,9,13
51:22 52:5,6,9,12
53:2 61:4
**EEOC** 61:10
**effect** 94:10
**effective** 24:14
**efficient** 81:5
**egregious** 44:15
**egregiously** 103:18
104:2,5
**either** 9:21 14:19 27:18

43:20 44:12 65:22
94:19 95:15
**elaborated** 14:22
**elected** 79:9
**elements** 79:7
**elevator** 83:9
**Eleventh** 85:12
**email** 5:12,16 61:22
**employee** 13:22 16:9
18:21,22 51:1 68:10
78:15 84:5 85:6 97:2
107:15 108:5
**employees** 24:10 44:2
52:21 53:2 60:20
76:13 86:3 107:12
**employer** 84:3 85:4
**employer's** 84:4
**employment** 18:17
37:11
**enact** 45:15 94:16 95:2
**encountered** 57:5
**enforcement** 8:21
15:12 30:3 33:7 34:14
34:15 36:17 49:5,14
50:9 51:8 52:12 54:11
61:12 65:19,19,21
69:17 70:22 73:21
**engage** 42:18 43:9 45:2
49:21,22 50:7 56:18
71:11 72:18 74:6 75:3
75:12,16 76:6 85:18
**engaged** 48:5 77:5,15
89:8 107:12
**engaging** 43:15 80:15
**ensure** 45:17,20 64:2
81:3
**enter** 51:5
**entire** 71:15
**entity** 27:19
**entrusted** 99:22
**enumerated** 23:17
**environment** 15:2
18:19
**equipment** 35:12 83:19
97:18
**erroneous** 51:4
**ESQ** 2:3,7
**essential** 79:7,7
**establish** 10:11 90:10
**established** 10:22
**ET** 1:9
**ethics** 46:17 49:4
**evaluate** 59:19 60:2
**evaluations** 14:3
**events** 17:12
**everybody** 30:17
**evidence** 37:8
**exactly** 101:19

**examination** 1:16 4:21
113:8
**examined** 4:14
**example** 26:1 36:22
38:3 54:10 112:7,13
**examples** 61:6,11
88:22
**exception** 78:4
**Excessive** 50:13
**Excuse** 23:8 31:14 41:6
**exhibits** 86:15 102:2
**expect** 52:21
**experience** 10:17 15:8
15:13 96:17
**expert** 5:13,14 9:12
14:14 15:10 16:1,4,10
23:12 69:20 90:3,13
91:4,10,10 96:17
**explain** 74:16
**Explorer** 51:11
**express** 1:17 42:17
**extent** 69:12

**F**

**fact** 28:7 31:16 42:20
45:21 46:13 55:1
80:22 110:19
**factors** 69:3
**fail** 46:9 78:12
**failure** 104:18
**failures** 14:7 28:6 80:21
**fall** 15:1 17:12 106:17
**fallacy** 94:16
**false** 111:22
**falsification** 50:14 51:4
**familiar** 12:3 29:7 60:18
**far** 11:5 65:7
**fashion** 74:19
**fault** 91:13
**favorite** 85:21
**February** 1:12 5:12
**Federal** 52:4
**FedEx** 6:3,7
**FedExing** 6:12
**fee** 5:5
**feel** 52:22 56:20
**felony** 37:18
**female** 61:15 75:20
**females** 76:9
**fender** 51:15
**field** 22:13 49:8
**fifth** 26:21 68:12 83:9
85:11 98:12
**figure** 30:17
**filed** 21:14
**files** 8:10 34:9 44:1
**filing** 13:21 33:4 72:5
77:2 89:2 114:5

**final** 43:3
**finally** 77:5
**find** 67:13
**fine** 32:2 84:10 99:16
107:6 115:7
**finger** 63:22
**finished** 98:6 115:1,2
**fired** 109:6
**first** 4:13 16:20 29:11
36:15 53:9 74:22
75:14 76:18 80:17
84:6 85:1 93:9 109:12
**fits** 11:3
**five** 14:6 60:1 67:19
**five-minute** 41:13,18
**flag** 78:14
**floor** 2:8 68:13 83:9,10
**focus** 23:2
**focused** 20:17
**focuses** 40:2
**folks** 6:12
**follow** 113:10
**followed** 105:21
**follows** 4:15
**fondling** 18:4
**force** 50:13 58:11
**forced** 18:5
**Forget** 73:22
**forgot** 64:22 95:12
**form** 106:20 107:5
110:11,13,21
**format** 44:12,12 61:16
61:22 88:21
**former** 77:9 79:14 84:1
86:6,11 87:21 88:13
98:2
**found** 77:19
**foundation** 19:21
**four** 14:2 42:7 93:8
109:17 111:12
**Fourth** 2:4
**frat** 89:14
**fraud** 93:10
**fraudulent** 77:18,18
**frequency** 45:22
**fresh** 95:3
**front** 18:4
**fronted** 5:22
**full** 32:5
**further** 78:21 105:10

**G**

**G-I-G-I-L-I-O** 77:22
**garbled** 74:8
**garnered** 78:13
**Garrity** 28:4
**geared** 32:12
**gender** 18:20 107:14

**general** 5:2 23:14 35:6
  39:17 40:15 44:20
  55:10
**generally** 16:5 23:21
  28:13 33:6 36:6 44:15
**generic** 39:20 48:15
  63:3
**gentlemen** 67:15
**genuinely** 102:5
**geographic** 22:14
**Georgia** 1:13,18 6:9 7:1
  64:22,22 65:1
**getting** 89:5
**Gigilio** 77:21,21
**GIRMA** 65:1
**give** 6:6 24:4 27:12,21
  28:4 34:20 42:10
  59:22 82:14 87:16
  92:21 95:21 99:13
**given** 10:10 11:9 24:7
  27:15 35:1
**gives** 54:17 61:6
**glad** 52:17
**Government** 2:2 52:4
**governmental** 65:1,12
**grooms** 50:6
**ground** 12:3
**group** 64:20,20
**guessing** 40:10
**guidance** 64:1
**guide** 49:18
**gun** 58:7 83:12

**H**
**half** 30:15,16 31:20
**half-hour** 98:6
**hand** 4:10 61:14 79:2
**handled** 27:18
**handling** 76:22
**hands** 61:15
**hang** 68:13 93:4
**happen** 113:5
**happened** 42:3 78:12
  104:10
**happens** 34:21 59:15
  83:16 113:11
**harassed** 18:20
**harassment** 16:9,19
  17:8 18:15,16 19:3,13
  19:15 20:19 52:10
  61:5 93:20 106:9,17
  107:10,12,17
**harm** 69:1
**he'll** 5:8
**head** 63:15 64:17 81:21
**headquarters** 83:7
**healthy** 84:20
**hear** 13:11 32:1,2 46:4

91:12,12,13,16,19
  110:7
**heard** 73:2
**held** 75:22 76:7 81:17
  83:16 84:1 85:5
**hell's** 89:13
**help** 25:7 49:18
**Hey** 76:8
**high** 25:15
**hiring** 60:4
**hold** 24:10 41:10 66:21
  102:4 115:3
**holding** 7:4 67:17
**Holiday** 1:17
**home** 34:22 40:14 51:5
**honest** 58:12
**hope** 61:16,18,22
**horrendous** 57:10
**hostile** 18:19
**hours** 8:21 58:10,10,10
  59:21
**house** 33:1 89:14
**housekeeping** 5:4,7
  30:12,13 115:4
**human** 60:19,21
**hundred** 93:17,21

**I**
**I-T-E-R** 4:19
**IA** 93:13
**IACP** 9:1,16 54:16
  55:15 62:13 63:17
**ID** 34:13
**idea** 38:8 77:14 84:11
  89:20 104:9
**identification** 78:3
**identified** 11:7 54:12
  72:14 74:2 75:7 78:10
  79:5,14 81:11 87:3
**identifies** 79:21
**identify** 38:14 82:6
**III** 2:3
**illegal** 59:6
**Illinois** 64:14
**image** 30:14,16 31:19
  57:11
**images** 61:21
**impact** 50:22 51:1
**implement** 53:19
**implemented** 22:13
**implements** 29:8
**implications** 110:18
  111:13,14
**Implicit** 70:11
**important** 90:10
**importantly** 63:14
  83:18 107:11
**in-service** 68:17 79:10

81:3 89:1
**inadequacies** 14:10
  71:20
**inadequate** 47:17,21
  48:3 72:5
**inappropriate** 54:20
**inch** 30:15,16 31:19,20
**inches** 31:18
**incidences** 20:17
**incident** 68:6 69:7
  82:21 83:5 86:22 88:6
  93:14,19 94:4,14
  95:18 96:19 97:11
  104:6,14 108:21
  111:4
**incidents** 17:12
**include** 51:22
**included** 46:17 94:5
**includes** 54:17
**including** 14:7 44:2
  95:11
**incorporated** 54:8
**incorrectly** 70:11 90:18
**indicated** 42:22 47:10
  92:12
**indication** 89:6
**indicative** 107:13
**indices** 18:1 48:9 56:17
  68:11 83:19 97:18
**indifference** 80:3 113:1
**indifferent** 11:1 78:21
  80:15 81:6,12
**industry** 49:14 69:17
  70:22
**inept** 72:5 77:2
**information** 22:12
  34:20 71:13 74:22
  95:21
**informed** 5:17
**initial** 9:19,22 11:8
  102:21
**inmates** 56:14
**Inn** 1:17
**Innovation** 1:18
**inquiry** 110:5 112:21
**inspection** 61:13
**instances** 63:21 89:9
  109:17
**instant** 115:15
**Institute** 49:11
**insurance** 49:9 53:16
  62:16 63:8 65:4,9,10
**intake** 22:22 23:7
**integrity** 99:7
**intercourse** 18:5,6
**intergovernmental**
  65:2,12
**internal** 19:10 20:1

28:18 62:19 68:14
  81:22 83:10
**International** 8:18 49:2
  53:10 54:5 55:11
**interpretation** 92:15
**intervention** 78:3
**intimate** 97:2
**investigate** 38:19 39:3
  39:8 57:16
**investigated** 114:12
**investigates** 40:20
**investigating** 10:5
  22:18,20 40:15 48:16
  112:17
**investigation** 8:10 15:4
  19:20,22 21:9 23:22
  24:5 26:20 28:3,9
  37:9 47:14 101:9,15
  103:2,12,16,20
  104:19 105:5,21,22
  108:3,20 110:4
  111:11,21 112:10
  113:21 114:6
**investigations** 19:8,20
  20:10 24:17 37:5
  39:18 44:14 50:10
  68:19 76:21 81:4
  87:11 89:2 93:8 96:11
  96:14
**investigative** 10:20
  14:10 19:6,9 34:9
  44:1,13 76:2 107:19
  112:19
**investigator** 27:11
**investigators** 27:9
**involve** 28:8 53:19
  85:10
**involved** 25:16 106:2
  111:18 112:13
**involvement** 50:19
**involving** 38:20 44:2,6
  44:8 50:17 51:7 68:6
  76:22 82:5 96:20
  104:6,14
**issue** 10:16 11:16 18:17
  23:13 25:16 32:13
  33:16 44:11 45:4
  46:15 60:7 63:18
  77:21 89:3 91:2 110:1
**issued** 34:10
**issues** 7:14 13:12 16:8
  16:8 19:12 39:20
  71:14 107:14 113:12
  113:22 115:4

**J**
**J-A-S-P-E-R** 6:9
**Jackson** 2:3 4:3,7,22

5:2 6:10 7:6 11:20
23:10 25:4 29:17
30:10,21 31:9,13,22
35:22 41:8,12,18,21
57:19 58:3 66:15
67:11,12,18 68:2,3
70:13 72:22 73:3,9,16
74:11,20 80:8 81:14
82:17 84:13,18 87:18
88:2 90:1,21 91:18,20
92:6,10,11 97:22
98:16 99:3,13,19
101:4,5,14 102:9,19
103:6,9 105:9 106:7
106:20 107:4 109:7
110:1,11,13,21 113:9
114:16,17,21 115:8,9
115:12
**Janice** 105:22 108:1,3
108:10,13,17,21
109:4
**JAQUIA** 1:5
**Jasper** 6:9 7:1
**job** 58:9 77:20 86:4
90:13,13 97:7
**Jones** 103:3,21 105:18
105:21 108:16,20
109:3 112:6 114:5
**judge** 11:4
**jurisdiction** 36:18 59:9
59:10 66:11,17
**jurisdictions** 36:13,21
38:9,12 63:5,6 64:4,9
64:11 66:2 97:5
**Justice** 85:15,21
**juvenile** 51:11

**K**
**Kansas** 64:15
**keep** 37:14,20 76:16
**keeps** 30:14 31:21
**Kentucky** 64:14
**kept** 77:20
**key** 69:1 83:8
**killing** 58:14
**Kimberly** 86:11
**kinds** 17:11 50:11
**knew** 64:1,3 88:5,10
**knowing** 38:11
**knowledge** 10:17 15:13
46:14 60:5 82:4 88:3
97:2
**knowledgeable** 52:19
**known** 43:11 44:5
60:11 111:15
**knows** 95:15 104:10

**L**

**L-O-U** 4:5,18
**lack** 11:13 13:13,17
68:5 76:2,3,4 103:16
**laid** 35:5 69:4,5 103:22
**language** 73:2
**languishing** 29:3
**Lanier** 45:12,14 79:15
79:18 80:20
**large** 33:12 50:14
**lascivious** 54:19
**law** 5:21 8:21 15:12
30:2 33:7 36:17 49:5
49:13 50:8 51:7 52:11
54:11 61:12 63:1
65:19,21 69:16 70:22
73:21 85:7
**lawsuits** 65:6
**lawyer** 10:15 42:10
**lawyers** 11:4
**lays** 13:13
**lead** 111:22
**leads** 104:20
**leave** 77:3
**led** 105:6
**Lee** 47:3 93:20 105:22
108:1,3,10,14,17,21
109:4
**left** 45:10
**legal** 10:16 49:10 73:3
**lesson** 46:15 58:20
61:8 62:2,10
**let's** 11:21 12:2,21 15:6
32:14 54:1 111:19
**letter** 13:12,22
**level** 25:10 26:8 28:10
57:4 71:11 79:9 80:22
**lewd** 54:19
**liability** 49:10 73:21
84:4
**liable** 85:5
**liberty** 98:20
**lied** 77:19
**Lieutenant** 47:6,9
102:13 103:14 104:13
105:3 112:8,11,12
**light** 51:16
**likelihood** 25:15
**limited** 71:19 96:8
**list** 101:20
**listed** 9:21 14:19
**litigation** 2:3 17:5
**little** 25:21 80:1 114:12
**LLC** 2:8
**local** 34:17 36:15 38:3
**located** 83:11
**lodged** 33:20
**long** 29:1
**Long-winded** 113:4

**look** 10:4,16 53:16 54:1
84:19 85:9 86:5,15
89:3 102:1 111:11,13
**looked** 10:20 18:9 19:7
22:19 23:17 35:2
44:14 46:11 93:15
100:13 112:4 114:3
**looking** 12:15 13:1,4,7
23:20 24:12 31:17
43:22 44:3,20 45:8
46:20 71:13 91:17
102:14
**loses** 35:10
**lot** 29:22 33:14 36:20
37:3 49:22 58:13
63:14 71:14 90:10
111:16
**Lou** 1:15 3:3 4:5,12,18
**loud** 67:14
**ludicrous** 43:2
**lying** 93:10 96:10,13

**M**
**M** 95:12
**Madam** 4:7 31:13
**mail** 6:13,18 114:19,22
**main** 23:2
**maintains** 20:13
**making** 89:5 108:6
**malignant** 69:15 70:1
**man** 77:14 84:20
**management** 43:2
49:10 65:2,3,14
**manager** 49:16 67:4
89:12
**mandate** 63:19
**manner** 59:6 81:5
**MARK** 2:7
**masmith@smithmus...**
2:10
**masturbating** 18:4
85:19
**material** 9:18
**materials** 8:16 16:22
35:2 39:16 72:13 74:2
75:17 87:10 88:19
114:3
**mathematics** 15:9
**matter** 1:4 5:4,8 25:10
25:17 26:9 27:22 28:1
30:13,13 55:1 95:8
108:16,17,20
**matters** 16:5 28:19 38:1
38:2
**mean** 8:4 11:4 12:19
13:6 25:3,6 43:1 49:7
49:22 50:7 51:14
52:21 53:8 59:11,19

61:10 73:1,11 77:20
80:5 85:8,20 89:9
94:16,21 96:8,9 105:1
105:5 112:2,11
**means** 18:11 34:12
**meant** 109:17
**measures** 23:5 76:12
**memo** 65:13
**menial** 35:1
**mentioned** 9:2 14:13,14
78:6 102:16
**mere** 31:17
**met** 77:14
**metes** 43:4
**methods** 19:21
**Metro** 59:22 63:16
**Metropolitan** 19:2 20:4
20:22 21:3 22:4,6
29:7 34:3 38:17 39:7
40:6,19 41:3 48:19
51:20 55:2,9,19 62:5
78:19 80:13 88:12
95:17 97:10 113:19
**Michigan** 64:14
**micro** 30:17
**mind** 16:18 22:21 66:17
67:16 70:18,19 77:13
84:9 87:8
**minute** 66:21 93:4
102:4
**minutes** 67:16,19
**misconduct/harassm...**
16:17 17:1
**misconducts** 93:1
**Missouri's** 86:12
**mistaken** 35:5 47:5
**misunderstanding**
27:20
**misunderstood** 32:19
**model** 54:4 62:15 63:6
64:6,20 66:4,7
**moment** 106:6
**monitor** 57:14
**monitored** 89:1
**monitoring** 68:20 76:5
89:7
**months** 28:22 33:8 60:1
**mother** 100:19 101:1,6
**move** 59:11
**movements** 34:7
**moves** 89:6
**movies** 61:19
**MPD** 27:4 34:6 60:17
68:12 69:15 70:8,21
71:9 74:6 79:8 87:2
112:3
**multiple** 88:16
**municipality** 37:22 42:9

**music** 66:22 67:14
**Mustille** 2:8 5:22
**mute** 91:11,22,22 92:3
**myriad** 21:15

**N**

**name** 4:4,17 5:1 7:10
95:13
**named** 32:13
**names** 81:16
**national** 20:5,10,14
23:20 28:12 79:3
**nationally** 41:4
**nature** 56:18 107:10
**Neal** 49:3
**nearly** 44:1
**Nebraska** 64:15
**necessarily** 107:16
**necessary** 60:17 65:8
95:14
**need** 63:18 67:2 69:19
78:21 85:7 95:4 115:5
**needs** 59:16
**negligence** 10:13 11:6
**negligent** 90:7 100:5
**negligently** 99:22
**neither** 102:7
**never** 15:19 57:3,3,5
59:1,2 76:8 77:14
84:9 105:2,5 109:9
**new** 7:1 60:3
**Newcomb** 45:11
**Newsham** 45:11
**nice** 99:18
**Nicole** 101:10,22
**Ninth** 85:13
**nip** 79:8
**non-law** 65:19
**normal** 56:12,15 68:20
**normally** 18:17 20:1
48:10 68:13 111:6
**North** 64:15
**note** 47:12
**noted** 9:11
**notes** 93:4 108:4
**Notice** 1:17
**notified** 23:4
**number** 12:1,13 13:17
45:21 78:5 89:9 95:13
**numbers** 38:13
**numerous** 87:6
**nuts** 63:3
**NW** 2:4

**O**

**object** 84:7,11 88:16
**objecting** 107:3
**objection** 11:17 25:1

29:11 35:19 70:10
72:19 74:8 80:5,18
87:22 90:17 97:14
98:13,21 99:9,14,18
101:11 106:20 107:2
107:4 109:7 110:11
110:13,21
**observing** 21:7
**occasions** 88:17
**occur** 49:17
**occurred** 63:2 68:7
71:2,6 82:21 83:12
87:13 89:19 95:5
97:12,17,19 104:7
105:7 108:21 111:4
111:12
**occurring** 88:6
**off-duty** 34:14 85:13
**offenses** 8:20 51:22
**offer** 65:16
**offered** 64:19
**offers** 60:20
**office** 5:22 6:21 18:1
20:1,5,9,13 21:10
24:3,12 27:2,10 29:3
32:16 33:19 34:5
35:18 36:12,16 48:9
56:17 60:19,21 68:11
68:14 83:19 97:21
110:6 113:12,21
**officer** 14:2 17:16,22
18:1 23:3,6 24:4 26:9
27:5,8,12,20 28:22
29:5,10 33:9,17,21
34:4,12,15,16,21 35:9
36:8,10,18 37:10,16
37:19,20 44:3 48:8
50:5 52:21 54:18,21
55:13 57:3,6 58:6
59:16 60:12 61:11,12
61:13,15 69:11,13
70:1,4,8,17 75:20
77:9,13 78:7 83:15
84:1 86:6,6 87:7,21
88:13,14 92:12 96:10
96:19,22 97:11,18
98:2,3 100:1,5 103:2
104:6 111:18 114:8
**officer's** 29:9 30:5 34:6
34:10
**officer-involved** 39:19
**officers** 10:7 11:2 18:10
21:7,15 26:1 38:20
42:17 43:15 44:8 45:2
45:16,20 46:2,10
47:22 48:14 49:18,20
49:22 50:12,18 51:20
52:1 53:6,20 55:20

56:1,4,11 58:14 59:1
59:1,9 61:21 62:6
64:3 68:20,21 69:15
71:10 72:17 74:6 75:3
75:12,16 76:6 77:5
79:22 80:15 85:18
89:4,8 97:5 111:14
**officers'** 48:21
**official** 17:15
**Ohio** 64:14
**once** 15:17 42:12
113:12,21
**ones** 23:15 50:14,21
63:12 64:5,16
**ongoing** 54:12 61:13
89:7
**operating** 94:12
**operational** 43:18 44:5
**opine** 7:14 10:3 69:20
72:15 91:2
**opined** 106:10
**opinion** 10:19,22 11:5
15:20 20:3,7,8,11,12
20:15 21:17 28:7
34:20 41:1,5 42:15
43:12,22 44:4,9,22
47:16 48:18 49:1,2,3
49:7 50:2 55:19 58:5
59:16 62:4 68:4,8
69:5 71:8 72:2 74:1,5
75:10 77:9 78:18 80:2
80:3,20 83:20,22 84:4
86:22 87:2 88:11,19
90:15 91:6,8,9 95:16
95:21 96:3,17,18 97:3
97:13 98:11,18,19
99:2,4,8,12,21 100:4
100:8 101:8 103:13
103:15,17 104:3,8
105:8 107:17 109:5
109:15 110:18 112:21
**opinions** 7:22 10:9 11:9
11:13,15 12:18 14:18
15:11 20:16 41:10
75:9 85:22
**opportunity** 86:5
**opposed** 20:18
**order** 21:14 39:17 40:15
55:10 78:1,4 92:19
93:15 94:9
**ordered** 8:8 28:4
**orders** 23:14 35:6 44:20
**organization** 33:13
54:11
**orientation** 18:21
**original** 7:19 9:11 11:8
14:19 82:11 102:7,21
**outside** 27:19 60:13

**overlook** 111:20
**oversight** 14:6 68:21
**overview** 89:4

**P**

**P-R-O-C-E-E-D-I-N-G-S**
4:1
**p.m** 115:14
**page** 12:15,17,19 53:14
82:9
**paid** 34:14
**paper** 7:5 96:2
**parade** 61:16
**paragraph** 12:13,19,20
13:8 53:13,14 54:1
102:20 103:11,22
**parenthetical** 107:22
**part** 27:20 48:8 71:17
73:3 80:21 108:10
112:7
**particular** 27:5 34:4
35:9 59:16 60:11
**particularly** 37:7 43:2
50:1
**parties** 1:18
**parts** 56:5
**party** 31:3
**passed** 15:17
**patience** 42:2,5
**Patrice** 101:22
**patrol** 26:2 51:15
**pattern** 10:22 44:11
**patterns** 43:19
**pause** 23:9 41:7 67:2
67:10 82:16 87:17
102:18 115:6
**paying** 37:14,20
**payouts** 65:7
**PD** 59:22 63:16
**penalties** 13:2
**penis** 61:14
**Pennsylvania** 2:8
**people** 28:15,18 48:11
51:9 56:14 58:7,8
60:4 67:9 81:8,16
82:1 95:4
**percent** 22:13
**performance** 14:3 28:5
51:2
**period** 78:7 93:7 94:18
109:18
**perjury** 13:2
**person** 5:3 18:4 33:14
36:10 37:15 46:13,18
46:19 47:1 56:2,6,19
57:2,7 79:13,22 96:1
**person's** 50:4
**personnel** 16:8 97:1

**persons** 17:17 18:19
  52:18 82:2,6
**Perusing** 12:17,19 47:5
  93:3,6
**Philadelphia** 37:1
**philosophical** 110:18
**phone** 61:19
**phonetic** 103:3 114:8
**phrase** 55:6
**phraseology** 63:3
**pick** 103:20
**picked** 94:13
**piece** 7:5
**place** 16:20 34:6 69:8
  69:10 72:11 75:14
**Plaintiff** 1:6 72:6
**plaintiff's** 9:5 90:12
**plan** 46:15 58:21 61:8
  62:2
**plans** 62:10
**playing** 66:22
**please** 4:3,8,9,16 12:6
  41:16 58:1 74:10
  82:15 87:16 102:17
**plodding** 29:2
**PO77** 34:11
**point** 24:13 63:22 75:10
  80:13 92:21 100:9
  105:10 114:4
**points** 78:8,14 92:13,17
  93:11,18,22 94:3
  95:14
**policies** 11:14 13:14
  16:14 49:7 53:8 55:2
**policy** 22:10,11,12,15
  23:3 42:17,19 43:8,10
  43:14,18,19,21 44:5
  45:1,15 53:5,5,12
  54:4,14 55:16 60:8
  62:15 63:7,10 64:6,20
  66:4,7,8 68:16 76:3
  76:19 77:9 81:2
**policymaker** 43:13,22
  44:19 79:17 80:4,20
**pool** 53:16
**pools** 49:9 62:17 63:9
  65:5,12
**pornographic** 61:19,21
**portion** 31:18 48:20
**position** 56:19,19 57:9
  59:2 81:16
**positive** 88:9
**possession** 5:5
**possible** 28:11 36:7
  69:22
**possibly** 46:17 89:19
  114:8
**post** 6:21

**potential** 23:5 25:11
**power** 56:15 59:3,4,5
**powers** 34:11 35:10
  51:14
**PPMS** 78:1 92:13 94:5
  94:12 95:14
**practice** 10:22 28:14
  32:17 33:7 35:9 43:19
  44:11 73:6,6 104:12
**practices** 10:4 15:10
  23:13,21 35:14 38:22
  40:1,19 44:13,16
  52:12 69:20,21 76:2
  91:10
**preacher** 88:8
**preceded** 108:17
**preliminary** 12:13,14
**preparation** 8:13
**prepare** 8:15
**preparing** 9:19
**present** 1:18 26:17
**prevalent** 50:12
**prevent** 88:13
**prevented** 70:8
**principal** 24:8
**printed** 9:16
**prior** 45:11 88:6 95:18
  96:19
**private** 56:5
**proactive** 76:11
**probable** 50:15 51:4
**probably** 26:2 50:16
  64:17 77:6 91:12 98:6
**problem** 22:10 32:6
  54:13,13
**problems** 71:14
**procedure** 29:7
**procedures** 10:21
  94:12
**proceed** 6:5 36:16
  88:17
**proceeding** 21:12
**process** 32:14 38:1,4
  72:7 112:19
**processes** 34:5
**produce** 8:9 9:5
**produced** 7:18
**production** 112:14
**professional** 20:2
  104:12
**professionalism** 57:11
**proficiently** 58:12
**program** 52:1 59:17
  94:10
**programs** 59:21 62:20
**pronounce** 7:10
**proof** 111:3
**proper** 29:21 45:18

64:2
**property** 68:12
**prosecute** 111:10,18
**prosecuted** 25:17
**prosecutor** 33:3 36:7
  36:11 37:6,13 38:3
  111:17 112:8,16
**prosecutor's** 29:3
  36:16
**prosecutors** 111:2,6
**prostitutes** 17:15,19
**protective** 21:14 93:15
**protocol** 24:19 114:1
  114:15
**provide** 5:10,13 8:11
  9:4 26:21 28:17 60:14
  60:15 63:9 65:14
**provided** 9:7 62:16
  79:21
**proving** 42:8
**provisions** 61:10
**public** 83:17
**purely** 26:19
**purposes** 39:2
**pursuant** 1:17
**pussy** 108:9
**put** 6:19 33:13 34:22
  53:8,13 77:17 114:19
  114:22
**puts** 61:14

─────────────────
          **Q**
─────────────────
**qualify** 15:22 16:1
**quality** 101:9
**quarter** 31:20
**question** 11:18 12:4,5
  12:11 16:6 25:2 29:19
  36:2 43:7 47:18,20
  53:22 70:12,15 71:16
  71:22 73:12,13,13,18
  74:9,10,13,19 75:1,1
  75:6 79:16 80:7,10
  84:2,8,8,10,12,14,17
  84:21,22 85:3,4 87:15
  90:19 91:1 96:16
  97:15 98:15 102:5,7
  102:11 103:4 104:17
  105:20 106:21 107:5
  107:22 109:1,10,12
  110:14,22 113:4
  114:15
**questioning** 5:3
**questions** 32:11 42:7
  42:12 77:4 82:3,19
  99:14 105:10,12,14
  113:7

─────────────────
          **R**
─────────────────

**R-E-** 4:18
**R-E-I-T-E-R** 4:6
**raise** 4:9
**Ramsey** 45:9 79:18
**ranged** 90:6
**ranging** 38:13
**rape** 56:2 98:3,4
**raped** 97:20
**rarely** 90:13
**rate** 111:7
**Rayna** 103:3 105:17,21
  108:16,20 109:2
  112:6 114:4
**reach** 111:5
**reaching** 75:8
**read** 8:17 9:2 22:17,17
  22:18 47:2 53:8,21
  82:5 85:7 86:11
  100:21 102:1 115:10
**reading** 86:13
**readings** 87:10
**real** 107:14
**realistic** 11:14 13:14
  62:14,17 88:22 89:8
**reason** 111:10
**reasonable** 49:16 61:10
  69:11 70:3,4 72:8,11
  81:5 89:12 95:1
  104:11 111:5
**recall** 35:4,5,7 64:17
  86:8,18 88:7 108:2,19
**receive** 5:6 6:3
**received** 5:9,15
**recess** 41:20 67:22
  92:8
**recognize** 106:15,18
**recollection** 82:22
**recommending** 87:12
**record** 4:17 14:3 18:8
  45:8 86:7,19 91:21
  92:6 99:16
**recordkeeping** 71:21
**records** 20:14 44:4
**RECROSS** 3:2
**recruit** 47:6 60:5 103:2
  104:20
**recruits** 60:14
**red** 78:14
**REDIRECT** 3:2 113:8
**refer** 28:15 102:15
**reference** 45:21
**referenced** 9:14
**referral** 33:18
**referred** 23:14,16 27:2
  34:4 38:1,3
**referring** 22:15 32:14
  45:7 64:12 102:13
  103:13

**reflects** 104:18
**refuse** 56:20,21
**regard** 55:16
**regarding** 28:5 40:2
    46:22 75:1 103:2,15
    103:21 104:21
**regularly** 108:7
**Reiter** 1:15 3:3 4:5,5,12
    4:18 5:1 7:11,13
    11:21 18:7 25:5 29:18
    32:1,12 35:16 36:1
    41:9,22 42:6 70:14
    73:10,17 74:12,21
    80:9 84:15,19,20
    87:19 90:2 92:12
    97:10 98:2,10,17 99:5
    99:20 100:11 102:10
    113:10
**reiterate** 68:18
**related** 109:1
**relates** 41:10 43:15
    48:21 58:17 77:11
    78:22 80:4 113:20
**relating** 7:14 8:1 22:22
    101:15
**relation** 39:16
**relationship** 87:20 88:1
**relevant** 60:16 100:14
**relied** 75:8
**reluctant** 56:21
**rely** 9:20 26:21
**remain** 97:7
**remember** 10:15 80:6
    84:17,20,22 85:15
    86:12,12
**remind** 64:19
**render** 72:2 99:21 100:3
**rendered** 10:10 15:20
    20:17
**repeated** 12:16
**repeating** 91:1
**rephrase** 113:17
**report** 7:19,20 8:6,12
    8:18 9:12,19,20,22,22
    11:8,8 12:13,14,21,22
    13:1,12 14:14,19,20
    47:4 53:9 54:8 72:4
    78:6 82:10,11 83:2
    101:9,15 102:15,21
    102:21 103:14 104:4
    104:14 111:15
**reporter** 4:7,9,16,20
    31:5 67:3,11,13,20
    68:1 92:9
**reporter's** 31:12
**reporting** 21:8 31:9
**reports** 7:19 8:2,17
    9:17 10:20 13:21

23:18 50:14 72:13,14
    74:3 75:8 77:2 79:4
    105:5
**represent** 86:20
**representation** 7:7
**represented** 87:9
**representing** 31:15
**requirement** 24:1
**requirements** 52:13
**research** 9:15
**resisting** 106:13
**respective** 1:18
**respond** 5:8
**response** 5:16 91:15
**responsibilities** 81:9
**responsibility** 31:16
    82:8
**responsible** 31:4 84:1
**rest** 61:16
**restate** 74:19 84:16
    102:6
**restates** 70:10
**Restating** 90:17
**restroom** 67:19
**resulted** 109:18
**retained** 7:14 72:1 90:2
**retaining** 100:5
**retaliation** 16:9
**retention** 14:7
**retroactive** 44:20
**reverse** 92:2
**review** 8:10 40:16 42:21
    75:17
**reviewed** 8:16,16 9:18
    39:16,17 74:3 88:20
    101:21
**revocation** 34:11
**ridiculous** 97:15
**rights** 26:13,15 51:6
    60:20,21 98:12
**rise** 25:9 26:3 28:10
    80:22
**risk** 49:9,10 62:16 63:8
    65:2,3,12,14
**robust** 71:17
**role** 78:20 91:9
**room** 1:17 30:18 66:22
**rules** 12:3
**run** 28:2,20 33:5
**runaway** 51:10
**runaways** 17:18
**running** 23:19 24:14
    51:15 99:14,18

———————
**S**
———————
**safety** 83:17
**San** 85:16
**sand** 63:15 79:2

**saw** 66:16,18 105:5
**saying** 23:12 32:16
    50:21 53:17 56:6,7,10
    69:10,16 70:20 72:20
    72:22 73:8 81:18
    85:15 89:18 94:8,9
    95:22 109:16
**says** 54:17 61:18 69:17
    78:11
**scale** 78:8 92:21
**Scalia** 85:15
**scope** 58:15
**Scout** 51:11
**scratched** 89:11
**screen** 30:13,16 31:17
    32:5
**search** 50:15
**second** 8:5 23:8 76:19
    82:14 87:16 92:7
    102:17
**section** 2:3 48:13 78:17
    78:18
**secure** 83:9,10
**seeing** 32:5 35:5
**seek** 36:15
**seen** 10:19 16:22 34:8
    39:15 43:21 58:20
    61:8 62:1 66:8 86:9
    89:11 96:8
**self-incrimination** 27:6
**selling** 85:19
**seminars** 85:8
**sends** 35:17
**sense** 29:6,13,14 55:9
**sent** 5:11 34:21
**separate** 19:6,9,14
    27:18 37:10
**serious** 22:20 23:22
    24:6 44:16 50:17,21
    51:17 55:3 79:5
    104:19
**served** 93:15
**service** 31:10 35:11,11
    65:17
**services** 17:15 65:14
**sessions** 60:19
**set** 9:18 12:2 31:7 54:3
    110:6,19
**set-up** 112:15
**settlement** 65:7
**severely** 44:15
**sex** 26:2 40:13 55:21
**sexually** 75:21 76:9
**shame** 60:14
**share** 61:21
**sheriff** 63:11 65:5
**sheriffs** 65:22 66:1
**shift** 61:13

**shoot** 58:8,11
**short** 41:20 67:22 92:8
**shows** 112:14
**shrinking** 30:14
**side** 30:6,7 33:5
**sign** 115:10
**signed** 13:1 44:21
**significant** 50:5
**silence** 5:21
**similar** 38:9
**simpler** 74:19
**simply** 78:15 111:11
**sir** 4:3,9 7:9,12 12:6,18
    23:11 41:6 61:1 82:12
**sit** 62:12 66:9,12
**sitting** 28:21
**situation** 33:17 73:2
    105:18 106:2
**six** 11:8,13 12:12 13:12
    14:9,12,13 15:1 60:1
    101:17
**size** 19:17,19 40:12
**skills** 10:17 15:13 60:5
**slightly** 105:19
**small** 7:6
**smart** 61:19
**Smith** 2:7,8 5:7,22 8:22
    11:17 25:1 29:11,20
    30:9,12 31:1,11,14
    35:19 56:9 57:22
    66:14,21 67:4,7 70:10
    72:19 73:1,5,12 74:8
    74:18 80:5,17 84:6,16
    87:22 88:15 90:17
    91:11,16,19,21 92:4
    97:14 98:13,21 99:9
    99:13,17 101:2,11
    102:4 103:4 105:11
    105:13,16 106:22
    107:3,6,7 109:9,13
    110:12,15,16 113:6
    114:20 115:3,7
**Smith's** 6:6
**somebody** 78:19 79:8
    80:12
**someone's** 51:5 75:21
**sorry** 13:10 24:19 54:7
    64:10 72:13 82:12,14
    110:12 114:20
**sort** 60:15 70:16 89:14
**source** 57:17
**sources** 21:16
**South** 64:15,16 65:3
**span** 94:19
**speaking** 12:12
**specialized** 15:12 39:2
    39:8 40:12
**specific** 13:18 16:7

29:16 39:19 46:15
49:15 50:8 52:12
55:16 60:9 62:14,17
62:21 71:17 76:3,3,4
76:20 80:7 81:2,2,9
82:3 86:18 88:22 98:8
112:13 114:1
**specifically** 5:12 16:12
43:8 58:16 62:6,20
63:12 81:10 83:14
104:1
**specificity** 35:3 55:15
57:2
**spell** 4:16
**spend** 62:19
**spent** 8:21
**spoken** 100:16,18
**SSP** 78:2 93:11 95:14
**staff** 68:13 83:10
**stalking** 21:13
**stance** 57:9
**stanchion** 51:16
**standard** 20:6,14 28:12
28:12,13 32:17 73:4
114:14
**standards** 20:2,10 41:4
**standpoint** 83:18
**Starbucks** 51:16
**start** 15:6 42:12 95:3
**started** 95:12
**state** 4:4,16 49:9 65:16
99:15
**stated** 16:21 29:21 70:7
**statement** 24:4 26:16
26:21 27:12,21 28:5
103:5,6
**states** 1:1 27:2,3 33:19
34:5 38:15 49:12 63:9
64:13 110:5
**states'** 62:16
**station** 61:20
**statistician** 15:14,16,20
16:2
**step** 67:18
**steps** 8:14 34:2 113:19
**stick** 22:21 63:15
**stopped** 51:10 89:17
**straightforward** 74:9
**Street** 2:4
**strictly** 24:12 48:20
**strike** 20:22
**structure** 19:13
**structured** 31:3 91:22
**structuring** 112:18
**stuck** 33:8 79:2
**stuff** 61:5
**subjects** 48:15
**subsection** 107:9

**Subsequently** 5:17
**success** 111:7
**suddenly** 67:1
**sufficient** 10:11 37:8
**Suite** 2:4
**Suites** 1:17
**supervisory** 14:6 68:21
76:4 78:20 111:14
**supplemental** 7:20 8:6
8:11 9:20,22 14:14,20
**support** 65:6
**Supreme** 85:10
**surface** 89:11
**surprise** 61:3
**surprised** 40:8 77:17
**suspect** 61:9
**suspects** 48:5
**suspend** 37:19 110:4
111:10
**suspended** 112:20
**suspension** 93:11
**sustained** 77:16 93:9
104:9 108:14 109:3,4
**swear** 4:8
**sworn** 4:13
**synonymous** 73:7
**system** 72:5 76:16 78:3
78:10,13,15 92:14
**systems** 72:11 76:1
77:22 78:1

---

**T**

**t** 65:13
**table** 73:14
**taken** 23:6 41:20 67:22
69:7,9 92:8
**takes** 61:14 113:20
**talk** 31:4 48:6 52:14
55:15 57:22 61:4
62:17 63:2 73:14,20
83:3 92:5 103:1
**talked** 75:4 110:1
**talking** 12:22 15:2
29:13 33:18 35:20
43:17,18 51:18 52:7
53:5 56:9 68:9 76:16
88:1 101:13,19
109:10
**talks** 55:16 61:4 62:14
72:4
**tasks** 35:1
**taught** 58:17
**teach** 47:10,22 58:5
**teaches** 51:20
**techniques** 107:19
**telephone** 32:9
**tell** 5:6 15:7 18:7 45:13
46:6 55:20 56:1,4,11

57:2 62:6,9,13,13,15
62:18 63:5,8,12 66:9
66:12 67:9 70:6 78:4
81:16 102:12
**temporary** 21:13 93:14
**temptations** 57:5
**tenaciously** 57:15
**Tennessee** 64:14
**term** 17:2,4 30:3 43:1,6
106:16,17
**terminate** 37:10
**terminated** 95:18 96:12
96:13,16,19 97:11
**termination** 96:1
109:19
**terms** 8:13 16:17 17:5
19:12 55:12
**testified** 4:14 16:4,7
74:21
**testify** 14:18
**testimony** 109:22
**text** 61:22
**thank** 4:20 7:9 32:11
42:2,4 58:4 67:17,21
68:2 92:10 99:4,17
105:10 114:17 115:1
115:8,9,12
**theft** 50:13
**things** 51:14 57:8 62:7
69:16,18 70:7,22
86:10 89:16,21
106:14 111:16
**third** 76:20
**thought** 25:22 42:22
46:16 104:1,1
**thread** 108:11
**three** 13:21 22:21 93:8
94:20
**three-year** 78:7 93:7
**threshold** 78:5,14
94:19 95:10
**Thursday** 1:11
**tier** 50:16
**times** 16:7,16 87:7
**timesheets** 77:19
**title** 52:14,15
**titled** 8:20
**today** 5:3 8:15 14:21
115:1
**today's** 8:14
**told** 52:4 72:7
**tools** 24:8
**top** 50:16 64:17
**topics** 48:12
**total** 107:18
**totally** 17:9
**touch** 56:5
**touched** 42:3

**touching** 18:3
**tour** 34:7
**traffic** 51:9
**train** 28:18 46:9 57:7
60:3 73:20 85:7
**trained** 57:2 88:22
**training** 10:18 13:17
15:13 16:11 28:16,17
44:4,12 45:17 46:3,7
47:7,11,16,22 48:14
48:20 49:4,8,18,19
50:10 52:1,5 53:2
54:15 57:13 58:11
59:17,20,21 60:1,2,10
60:13,15,16,19 61:4
61:10 62:14,17,20
68:5,15,16,17,18 76:4
76:20 78:21 79:6,10
79:19,21 81:2,21
**transcript** 100:22
101:22
**trend** 85:9
**trial** 14:18
**trigger** 95:14
**trouble** 89:5
**troublesome** 32:4
**Troutman** 49:4
**true** 107:16 113:2
**truthful** 93:21
**try** 30:19 79:7
**trying** 30:11 32:12
67:13
**turn** 105:19
**twice** 96:9
**twist** 90:20
**two** 6:22 7:19 8:1 10:13
13:17 17:9 26:1 28:22
33:8 53:8 72:14 74:3
75:7 94:19 95:5 96:13
106:14
**two-hour** 52:18 62:19
**type** 39:8
**types** 19:20 39:3

---

**U**

**U.S** 21:10 24:2,11 27:9
28:8 32:15 35:17
36:12 113:12,21
**ultimately** 80:22
**umbrella** 107:18,18
**unanswered** 77:3
**unaware** 29:15
**unbecoming** 54:20
55:4,12
**unclear** 5:9 25:2
**unconstitutional** 43:14
**uncovered** 111:21
**undercut** 24:9

**underlying** 25:16 60:7
  65:4 108:2
**underrode** 57:10
**understand** 17:7 18:11
  23:11 25:5 27:3 29:18
  32:12,16 36:1 42:9
  48:17,18 55:18 59:5
  70:14 73:10,17,19
  74:12,15,17 80:9
  96:15 98:9 102:10
**understanding** 8:8 10:2
  10:8,9 18:14,16 19:1
  19:5 20:21 21:1 34:12
  39:11,12 42:11 44:18
  48:13 49:6 65:13 74:1
  83:3 87:19 88:4,5
**understood** 102:8
**underwrite** 65:5
**unidentifiable** 30:17
**uniform** 83:6
**unit** 19:7,9,15 27:18
  33:2 39:2,13,21 40:1
  40:6,12,20 41:2 105:4
**United** 1:1 27:2,3 33:18
  34:4 38:15 110:5
**units** 38:18 39:8,14
**unknown** 93:16
**untruthful** 96:9
**unwelcome** 18:18
**updated** 60:15
**UPS** 6:21
**upwards** 28:22
**usage** 71:9,10 72:16,20
  72:21 73:1,8,19,19,22
**use** 6:20,21 24:9 30:3
  49:11 50:19,22 56:17
  58:11 59:5 67:19
  68:11 111:9
**user** 51:10
**users** 17:19
**uses** 48:8
**utterances** 108:6,8

**V**

**v** 1:7
**vague** 43:1,6
**Vaguely** 88:6
**variety** 21:4
**vehicle** 83:7
**Vermont** 64:13
**vernacular** 108:9
**victim** 40:21 50:3
**victims** 17:20,20 48:5
  50:2
**videos** 100:13
**videotapes** 63:1 85:19
**view** 24:13 106:15
**violated** 50:4 98:12

**violates** 50:6
**violators** 51:9
**violence** 17:21 50:4
**VOICE** 67:6
**voluminous** 86:17
**vulnerable** 17:16 48:10
  51:8 56:14,19

**W**

**wait** 37:6,13
**waiting** 33:8
**wake** 5:20
**wall** 28:16 36:14
**wanted** 75:20,20
**wanting** 108:8
**warrants** 50:15,16
**Washington** 2:4,9
**wasn't** 11:17
**watch** 61:19
**way** 1:18 6:14 9:8 20:5
  20:9,13 22:6 31:3,8
  38:11 45:5 46:6 77:21
  89:8 110:7,19 112:19
**ways** 21:1,4,19
**weapon** 35:11
**wearing** 116:14
**Webster** 101:10,22
  102:13 105:3 112:11
  112:12
**Webster's** 103:14
  104:13
**went** 7:6 83:9 114:11
**who've** 59:2
**wife** 93:14
**willing** 12:9 21:19
**Wilson** 112:9
**witness** 3:2 4:8,14,18
  5:14,14,17 6:6 11:19
  56:10 58:2 80:19
  88:18 92:2 97:16 99:1
  99:11 107:1 111:1
  115:8,11
**witness's** 90:18
**woman** 37:2
**word** 7:1 73:22
**words** 6:22 90:20 91:1
**work** 18:19 34:14,17
  63:4 73:15 78:15
**worked** 72:6
**working** 27:9
**works** 31:5
**worry** 95:4
**wouldn't** 58:5 69:9,18
  69:19 89:21 94:17
**written** 11:14 13:14
  16:13,22 22:10,11,12
  23:3 42:17,19 43:8,10
  43:17,21 44:12 49:7

  53:15 60:8 76:3,18
  77:8 78:1,3,10 79:5
  81:2 88:21
**wrong** 76:13 80:2 85:20
**wrote** 18:8,10

**X**

**Y**

**year** 9:13 95:5
**years** 15:12 28:22 33:9
  37:3 66:19 94:19,20
  95:5
**yesterday** 8:22

**Z**

**0**

**06-158** 93:9
**07** 93:13
**07-2351** 93:13

**1**

**1:16-cv-01920-CKK-...**
  1:8
**1:22** 115:14
**10:10** 4:2
**100** 22:13 93:12
**105** 3:3
**10603** 6:22
**11** 53:13,15 54:1
**113** 3:3
**12** 31:18 53:14
**12505** 1:18
**13** 44:2
**13,000** 38:14
**150** 65:16
**17** 12:16 49:9,12 62:16
  63:9 64:4,8,18 66:2
**18** 28:22 33:8
**18,000** 38:14
**1990s** 49:5

**2**

**2** 12:13,17,19,19,21
  13:9
**2,500** 5:14 7:7
**20** 65:15 82:9
**20001** 2:4
**20037** 2:9
**2004** 23:1,2
**2005** 9:15
**2006** 93:7 94:4,14
**2007** 94:13
**2008** 13:3 93:7,19
**2011** 8:18 9:16
**2014** 82:22
**2018** 13:6

**2019** 1:12
**202-724-6618** 2:5
**202-776-0022** 2:9
**22** 13:8,10,10
**2200** 2:8
**23** 55:7
**24/7** 83:15,17
**28** 1:12

**3**

**3** 82:21 86:7
**30-day** 93:11
**30(b)(6)** 46:19
**300** 78:8,13,13 92:13,16
  94:2
**30143** 6:9 7:2

**4**

**400** 59:21
**43** 102:20 103:22
**44** 104:1
**441** 2:4
**4th** 2:8 13:2

**5**

**5** 3:3
**50** 37:2 44:1
**58** 15:11

**6**

**6305** 2:4

**7**

**7** 52:14
**7th** 89:10,15

**8**

**8** 5:12
**87** 6:8

**9**

**90** 23:4

C E R T I F I C A T E

This is to certify that the foregoing transcript

Deposition of: Lou Reiter

In the matter of: Jaquia Buie v DC

Before: US District Court

Date: 02-28-19

Place: Alpharetta, GA


were duly recorded and accurately transcribed under

my direction; further, that said transcript is a

true and accurate record of the proceedings; and

that I am neither counsel for, related to, nor

employed by any of the parties to this action in

which this deposition was taken; and further that I

am not a relative nor an employee of any of the

parties nor counsel employed by the parties, and I

am not financially or otherwise interested in the

outcome of the action.


------------------------
Court Reporter

# EXHIBIT 15

Alphonso Lee

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF COLUMBIA

3                    Civil Division

4     -------------------------------x

5     JAQUIA BUIE,                    :

6                    Plaintiff,       :

7     vs.                             : Case No.

8     DISTRICT OF COLUMBIA, et al., : 1:16-CV-01920-CKK

9                    Defendants.      :

10    -------------------------------x

11                    Washington, D.C.

12                Wednesday, November 14, 2018

13

14    Deposition of:

15                    ALPHONSO LEE

16    the witness, called for examination by counsel for

17    the plaintiff at Smith Mustille LLC, 2200

18    Pennsylvania Avenue, Northwest, 4th Floor East,

19    Washington, D.C., commencing at 10:15 a.m. before

20    Suzanne M. Enderson, Court Reporter and Notary

21    Public in and for the District of Columbia, and

22    present on behalf of the respective parties:

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4            MARK A. SMITH, ESQUIRE

 5            JUDITH A. MUSTILLE, ESQUIRE

 6            Smith Mustille LLC

 7            2200 Pennsylvania Avenue, Northwest

 8            4th Floor East

 9            Washington, D.C.  20037

10            (202) 776-0022

11

12   ON BEHALF OF THE DEFENDANTS:

13            DAVID JACKSON, ESQUIRE

14            ALICIA CULLEN, ESQUIRE

15            Office of the Attorney General

16            For the District of Columbia

17            441 4th Street, Northwest

18            Suite 630 South

19            Washington, D.C.  20001

20            (202) 724-6618

21

22
```

Page 12

1    Metropolitan Police Department as it relates to EEO.

2        Q.    I'm sorry?

3        A.    As it relates to EEO.

4        Q.    You were clarifying -- "as it relates to

5    EEO," what are you clarifying?

6        A.    Yes.  I said it governs all things that

7    deal with EEO.

8        Q.    Okay.  And does this general order comment

9    on sexual misconduct anywhere?

10       A.    Yes, it does.

11       Q.    So you're equating sexual harassment with

12   sexual misconduct?

13            MR. JACKSON:  Objection as to the form of

14   the question.

15            BY MR. SMITH:

16       Q.    Are you equating sexual misconduct with

17   sexual harassment?

18       A.    No, I'm not.

19       Q.    So where in here does this policy mention

20   sexual misconduct?

21       A.    In the note section under 19, section 19,

22   page 5, there's a note that says, "Sexual harassment

Page 13

1   may include, but is not limited to, verbal

2   harassment or abuse, subtle pressure for sexual

3   activity, patting or pinching, brushing against

4   another person's body, and demands for sexual

5   favors."

6           My interpretation of that is to include

7   sexual misconduct.

8       Q.   You're talking about the note on 19?

9       A.   Yeah, number 19, the --

10      Q.   There is a note, right?

11      A.   Yes, sir.

12      Q.   And the language "sexual harassment may

13  include, but is not limited to, verbal harassment or

14  abuse, subtle pressure for sexual activity, patting

15  or pinching, brushing against another person's body,

16  and demands for sexual favors."  So this passage is

17  where this policy document of the Equal Employment

18  Opportunity Division of MPD comments on sexual

19  misconduct, according to your interpretation?

20      A.   Yes, sir.

21      Q.   Are there any other comments anywhere else

22  in here that comments on sexual misconduct according

Alphonso Lee

Page 14

1    to your interpretation?  Well, let me ask you a more

2    specific question.

3                MR. JACKSON:  Objection.  You asked him a

4    question.  He hasn't --

5                MR. SMITH:  I understand, but I'm the --

6                MR. JACKSON:  -- had a chance to answer.

7                MR. SMITH:  -- source of the questions.

8    And I'm shifting while he is doing this which is my

9    prerogative.

10               MR. JACKSON:  But I think you should

11   withdraw the question.  Otherwise you have to give

12   him a chance to answer.

13               MR. SMITH:  Okay.  I withdraw the question.

14   Good counseling there.  I withdraw the existing

15   question.

16               BY MR. SMITH:

17       Q.    Please turn to page 6.  And you see

18   regulation V -- Roman numeral V, correct?

19       A.    Yes, sir.

20       Q.    Now, it reads -- subsection A of Roman

21   numeral V entitled "Regulations" reads, "The

22   department prohibits and will not tolerate sexual

Page 15

1    and/or any other form of unlawful harassment."

2              Now, is it your interpretation that this

3    involves a reference to sexual misconduct?

4         A.   Yes.  It would be my interpretation, yes.

5         Q.   So when it reads "the department prohibits

6    and will not tolerate," will you please annunciate

7    for me, to the best of your ability, what are the

8    measures that the department has instituted to

9    manifest its lack of toleration for sexual

10   misconduct?

11        A.   I don't understand the question.

12        Q.   Okay.  "The department prohibits and will

13   not tolerate," because you've already agreed that it

14   is your interpretation that this language that

15   follows includes sexual misconduct, right?

16        A.   Uh-huh.

17        Q.   So I'm asking you, what are the measures

18   that the department has instituted to manifest its

19   intolerance -- it will not tolerate sexual

20   misconduct?  So what are the things the department

21   has put in place to express that intolerance?

22        A.   They express this through training --

Page 16

1      Q.    Training?

2      A.    -- investigations, EEO counseling.

3      Q.    You said EEO counseling?

4      A.    Yes.

5      Q.    Okay.

6      A.    Disciplinary action.

7      Q.    Disciplinary action is a subset of

8  investigation, though, right?

9      A.    I'm describing my interpretation of this.

10     Q.    And I'm clarifying -- I want to make sure

11 that I'm following you.  That flows from

12 investigations; is that right?

13     A.    Yes.  I agree.

14     Q.    Okay.  I just wanted to make sure.  So

15 we've got training, investigations, EEO counseling.

16 Anything else?

17     A.    Outreach.

18     Q.    Okay.  Anything else?

19     A.    Not at this time.

20     Q.    Let's take those one at a time.  You said

21 training.  What is the training that the department

22 has devised to manifest its intolerance of sexual

Page 29

1       A.    There is an annual training for

2   Metropolitan Police Department employees in relation

3   to EEO and sexual harassment.

4       **Q.    And it's an hour each year?**

5       A.    Yes, sir.

6       **Q.    And when you say "EEO and sexual**

7   **harassment," it's not an hour dedicated to the**

8   **broader topic of sexual misconduct/sexual**

9   **harassment?  Let's do it that way.  It's in that**

10  **hour they cover the range of EEO topics, racial**

11  **discrimination, age discrimination national origin**

12  **discrimination?  All those types of EEO-related**

13  **topics are covered in that hour?**

14      A.    That is correct.

15      **Q.    Okay.  In one of your answers you said**

16  **module and programs I heard you say.  What are these**

17  **programs?**

18      A.    Programs?  I described the EEO program.  I

19  don't necessarily meant program regarding the actual

20  training.  So if that was what was interpreted from

21  my statement, that's not what I meant.

22           I meant the EEO program is a program that

# EXHIBIT 16

# GENERAL ORDER



| | |
|---|---|
| **Title** | |
| **Equal Employment Opportunity** | |
| **Topic/Number** | |
| **GO-PER-201.09** | |
| **Effective Date** | **Distribution** |
| **February 17, 2005** | **B** |
| **Rescinds:** | |
| General Order 201.9 (Equal Employment Opportunity) | |

## DISTRICT OF COLUMBIA

| | | | | | | |
|---|---|---|---|---|---|---|
| I. | Background…….....………. | Page 1 | VI. | Procedural Guidelines...…… ………... | Page 7 |
| II. | Policy……………………..... | Page 1 | VII. | Affirmative Action Plan……………….. | Page 10 |
| III. | Definitions……………………. | Page 2 | VIII. | MPD Workplace Environment Plan….. | Page 11 |
| IV. | Rules……...…..……………… | Page 6 | IV. | Cross References……………………... | Page 13 |
| V. | Regulations………. ….……… | Page 6 | | | |

## I.    BACKGROUND

This order establishes the Metropolitan Police Department's Equal Employment Opportunity Program (EEO), and describes the policies, objectives, organizational relationships, procedures and responsibilities involved in promoting and executing an effective program. The EEO Program for the Department includes:

- Complaint Procedures

- Affirmative Action Program

- Workplace Environment Program (CALEA 31.2.3)

## II.    POLICY

The Metropolitan Police Department is committed to providing a workplace free of any demeaning, derogatory, or abusive language, actions, and/or gestures relating to a person's race, color, national origin, sex/gender, age, religion, disability, sexual orientation, language harassment, discrimination, or retaliation.  MPD senior command officials, managers, and supervisors shall ensure that **all** employees are treated according to these guidelines. Every employee of the Department, sworn and civilian, regardless of rank, title or position, shall be held responsible for the contents of this Directive.

Employment discrimination is prohibited by the D.C. Human Rights Act of 1977, as well as Title VII of the Civil Rights Act of 1964, and Title VI of The Omnibus Safe Streets Act, as amended. MPD employees are reminded that equal employment is the law. As an employer, MPD has the responsibility for preventing discrimination in the workplace. Conduct of this nature is prohibited, even if the conduct is not specifically intended to be offensive to anyone, and the member to whom it is directed is not personally offended by the conduct.

III.   **Definitions**

When used in this directive, the following terms shall have the meanings designated:

A.   Type Of Discrimination Or Complaint

1.   Age Discrimination – an unlawful employment practice that occurs when the compensation, terms, conditions, and privileges of employment differ because of the age of an individual.

2.   Disability – a physical or mental impairment that substantially limits one or more of the major life activities of an individual; where there is such a record of impairment; or where the individual is regarded as having such impairment.

3.   Discrimination – the failure to treat all persons equally where no reasonable distinction can be found between those favored and those not favored.

4.   Familial Status – an unlawful discrimination against persons under the age of 18 who reside with someone other than their natural parents. This protection also applies to any person who is pregnant or in the process of securing legal custody of any individual under 18 years of age.

5.   Family Responsibilities – are not job-related and shall be impermissible considerations for employment decisions. Therefore, it is unlawful to base an employment decision on whether an employee or applicant has children or other dependents.

6.   Gender Or Sex Discrimination – an unlawful employment practice that occurs when the compensation, terms, conditions, and privileges of employment differ on the basis of sex/gender.

7.   Harassment – occurs when slurs or jokes, offensive or derogatory comments, or other verbal or physical conduct are made based upon an individual's race/color, national origin or ethnicity, religion, sex/gender, sexual orientation, age, or disability, and if the conduct creates an intimidating, hostile, or offensive working environment or interferes with the individual's work performance.

a.   Racial or ethnic harassment is a form of race/color discrimination.

b.   National origin harassment is a form of national origin discrimination.

c.   Religious harassment is a form of religious discrimination.

d.   Sex/gender harassment is a form of sex discrimination.

DC 002571

e.    Sexual orientation harassment is a form of sexual orientation (or preference) discrimination.

f.    Age harassment is a form of age discrimination.

g.    Disability harassment is a form of disability discrimination.

8.    Hostile Work Environment – is established when employees are made to work in an atmosphere of sufficiently severe or pervasive harassment as defined in III, A., 7.

9.    Marital Status – the state of being married, single, divorced, separated, or widowed cannot be used as a basis for an employment decision.

10.   Matriculation – An employer shall not refuse to hire or discharge a person because he/she is a student, or use a different pay scale for students performing the same work as other employees.

11.   National Origin Discrimination – includes, but is not limited to, the denial of equal employment opportunity because of:

a.    An individual's, or his or her ancestor's, place of origin, or;

b.    An individual who has the physical, cultural or linguistic characteristics of a national origin group, or;

c.    An individual who has been denied equal employment opportunity for reasons grounded in national origin considerations such as:

(1)   Marriage to, or association with, persons of a national origin group;

(2)   Membership in, or affiliation with, an organization identified with, or seeking to promote, the interests of national origin groups;

(3)   Attendance or participation in schools, churches, temples or mosques, generally used by persons of a national origin group; or,

d.    An individual's name or spouse's name, which is associated with a national origin group.

12.   Personal Appearance – the outward appearance of any person, irrespective of sex, with regard to bodily condition or characteristics, manner or style of dress, and manner or style of personal grooming, including, but not limited to, hairstyle and beards. It shall not relate to the requirement for cleanliness, uniforms, or prescribed standards,

DC 002572

when uniformly applied to a class of employees, for a reasonable business purpose; or when such bodily conditions or characteristics, style, or manner of dress or personal grooming presents a danger to the health, welfare, or safety of any individual.

13. Place Of Residence Or Business – it is unlawful to deny employment, services or accommodations based on where an individual lives, or the location of a business licensed by the District of Columbia.

14. Political Affiliation – it is unlawful for an employer to use an individual's present or past political affiliation, or lack of political affiliation, as the basis for an employment decision.

15. Pregnancy Discrimination – an unlawful employment practice that occurs when the compensation, terms, conditions, and privileges of employment differ on the basis of pregnancy, childbirth, or related medical conditions, from the treatment of other medical conditions with similar abilities or limitations. Pregnancy discrimination is a form of sex discrimination.

16. Race/Color Discrimination – an unlawful employment practice that occurs when the compensation, terms, conditions, and privileges of employment differ on the basis of:

   a. Race or color;

   b. Immutable characteristics associated with race, such as skin color, hair texture, or certain facial features;

   c. A condition which predominately affects one race;

   d. Membership in, or association with, ethnic-based organizations or groups;

   e. Marriage to, or association with, an individual of a different race; or

   f. Attendance or participation in schools or places of worship generally associated with certain minority groups.

17. Religious Discrimination – when an employment rule or policy requires a person to violate a fundamental precept of his/her religion or lose an employment opportunity.

18. Retaliation – when an employer harasses or punishes an employee because that employee complained about discrimination, or cooperates with, or participates in, an investigation of an allegation of discrimination.

19.   Sexual Harassment – unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

   a.   Submission to such conduct is made either explicitly or implicitly as a term or condition of employment;

   b.   Submission to, or rejection of, such conduct by an individual is used as the basis for employment decisions affecting such individual; or,

   c.   Such conduct has the purpose or effect of unreasonably interfering with an employee's work performance, or creating an intimidating, hostile, or offensive working environment.

   Note: Sexual harassment may include, but is not limited to, verbal harassment or abuse, subtle pressure for sexual activity, patting or pinching, brushing against another person's body, and demands for sexual favors.

20.   Sexual Orientation Discrimination – an unlawful employment practice that occurs when the compensation, terms, conditions, and privileges of employment differ on the basis of actual sexual orientation or perceived sexual orientation. Sexual orientation means male or female homosexuality, bisexuality or heterosexuality by preference or practice.

B.   General Definitions

1.   Agency Complaint – a complaint filed with the District of Columbia Office of Human Rights, U.S. Equal Employment Opportunity Commission, or the U.S. Department of Justice, Office of Civil Rights.

2.   Complainant – the aggrieved party.

3.   Days – business days, unless otherwise specified.

4.   Employee – sworn or civilian member of the Department.

5.   Equal Employment Opportunity – exists when compensation, terms, conditions, and privileges of employment are provided on a non-discriminatory basis.

6.   Equal Employment Opportunity Counselors – consists of sworn and civilian employees who are authorized to provide advice and counsel to employees on how to use the EEO complaint process, as well as other avenues for addressing their complaint, both internally and externally.

7.   Equal Employment Opportunity Officer – the Manager of the Diversity and EEO Compliance Unit.

DC 002574

8. Internal Complaint – a complaint filed with the Metropolitan Police Department Diversity and EEO Compliance Unit.

9. Respondent – the employer or his/her agent.

## IV. Rules

A. No MPD employee shall knowingly discriminate nor harass another employee. (CALEA 26.1.1; 26.1.3; 31.2.3)

B. All MPD employees shall comply with the obligations prescribed under the Department's Workplace Environment plan and shall make themselves familiar with the Department's Affirmative Action Plan.

## V. Regulations

A. The Department prohibits, and will not tolerate, sexual and/or any other form of unlawful harassment or discrimination. Such conduct may result in disciplinary action as necessary, up to, and including, termination of employment. (CALEA 26.1.3)

B. Acts of retaliation are strictly prohibited against an employee who files a charge of sexual harassment.

C. Managers and supervisors shall be accountable for promptly reporting and/or correcting unlawful discriminatory practices within their knowledge and responsibility.

D. Command Staff shall ensure the Department's Equal Employment Policies are posted in a visible place in every unit within their commands.

E. All complainants shall be advised that they have a right to pursue a complaint with an outside agency. This right is not forfeited by using the MPD's internal procedure.

F. An external complaint can be filed with the U.S. Equal Employment Opportunity Commission, the U.S. Department of Justice, Office of Civil Rights, or the D.C. Office of Human Rights. Internal and external complaints (excluding sexual harassment complaints) must be filed within 180 calendar days from the date of the alleged incident. Sexual harassment complaints must be filed within one year of the alleged incident.

G. Complainants, and those employees engaged in carrying out the provisions of this order, shall be free from restraint, interference, coercion, discrimination, or reprisal in connection with the performance of their duties during, or following, the complaint procedure.

H. Any employee who knowingly interferes with, coerces, discriminates against, or practices any form of reprisal against a complainant, or attempts any of the

above, is in violation of this general order and may be subject to disciplinary action. Any evidence of such actions shall be immediately reported to the EEO Officer. (CALEA 26.1.3; 31.2.3)

I.      Participants in the investigative process, e.g., employees and management, are required to cooperate fully with all phases of the investigation. Failure to do so may result in discipline. (CALEA 26.1.3; 31.2.3)

## VI.    Procedural Guidelines

A.      It is the primary objective of the Department to resolve the complainant's allegations of discrimination promptly and appropriately.

1.      At any stage of the complaint process, the complainant shall have the right to be accompanied, represented, and advised by legal counsel of the complainant's own choosing. (CALEA 26.1.3; 31.2.3)

2.      The complainant and his/her legal or union representative shall have a reasonable amount of official time for the preparation and presentation of the complaint, as permitted by the applicable union contract and/or the District Personnel Manual. (CALEA 26.1.3; 31.2.3)

3.      The procedures for filing complaints under the Equal Employment Opportunity Programs are to be considered separate and apart from any of the other procedures for filing all other official complaints. (CALEA 26.1.3; 31.2.3)

B.      Internal EEO Complaints (CALEA 26.1.3; 31.2.3)

1.      An employee may first consult with his/her local EEO Counselor prior to filing an EEO complaint. If, after the initial consultation, the employee wishes to file an internal complaint, the EEO Counselor shall refer the complainant to the Diversity and EEO Compliance Unit.

2.      Employees are encouraged to contact the Diversity and EEO Compliance Unit to schedule an initial interview.

3.      Additionally, the employee may contact the Diversity and EEO Compliance Unit without consulting the local EEO Counselor.

4.      After the filing of a complaint, the EEO Officer shall make a prompt and comprehensive investigation of the allegations in the complaint, determine whether a violation has occurred, and recommend a finding.

a.      For all complaints involving command personnel (i.e., Inspectors and above), DS 15 and above, MSS 14 and above, and all Excepted Service personnel, the Chief of Police will conduct the final review and make the final determination.

       b.     For all other personnel, the Assistant Chief of the Office of Professional Responsibility will conduct the final review and make a final determination.

5.     If it is determined that the charge is without merit, the complaint shall be dismissed with notice to the complainant and the respondent. The notice shall state the reasons for the dismissal.

6.     If it is determined that reasonable cause exists, immediate action shall be taken to eliminate the alleged unlawful practice, and any appropriate sanctions shall be imposed.

7.     If a complainant is not satisfied with the written decision of the EEO Officer, they have a right to pursue a complaint with an outside agency.

C.     Sexual Harassment Complaints (CALEA 26.1.3; 31.2.3)

1.     The Diversity and EEO Compliance Unit in the Office of Professional Responsibility, has the authority to investigate sexual harassment complaints. Upon learning of sexual harassment allegations either from the victim or a third party, it is the responsibility of supervisors and EEO counselors to notify the Diversity and EEO Compliance Unit of said allegations. Additionally, it is imperative that supervisors and EEO counselors encourage the complainant to personally contact the Diversity and EEO Compliance Unit.

2.     After the filing of a complaint, the EEO Officer shall make a prompt and comprehensive investigation of the allegations in the complaint.

3.     The accused person, the accused person's supervisor, and the Assistant Chief, Office Professional Responsibility, are to be notified simultaneously.

4.     The EEO Officer, or an agent of the Office of Professional Responsibility, will caution all parties, including witnesses, against discussing allegations with persons not directly involved in the complaint.

5.     As applicable, the Assistant Chief, Office of Professional Responsibility, or the Chief of Police shall conduct the final review and make the final determination after the comprehensive investigation.

6.     If the complaint is found to be without merit, the complaint shall be dismissed with notice to the complainant, the accused person, the accused person's supervisor, and the element Commander/Director. The notice shall state the reasons for the dismissal.

7.     If it is determined that reasonable cause exists, immediate action shall be taken to eliminate the alleged unlawful practice and any appropriate sanctions shall be imposed.

8.      If a complainant is not satisfied with the written decision of the EEO Officer, he/she has a right to pursue a complaint with an outside agency.

D.      Agency EEO Complaints (CALEA 26.1.3; 31.2.3)

1.      The complainant is encouraged to make every effort to resolve his/her complaint through the Department's internal complaint process before initiating an external complaint.

2.      The complainant has the right to file an external complaint with the D.C. Office of Human Rights within fifteen (15) calendar days after receiving an unsatisfactory determination from the MPD Diversity and EEO Compliance Unit. The complainant may also file a complaint with the U.S. Equal Employment Opportunity Commission, or the U.S. Department of Justice Office of Civil Rights.

3.      MPD's EEO Officer shall cooperate with the relevant Agency in the processing of a formal complaint.

E.      Manager for Diversity and EEO Compliance

1.      The Diversity and EEO Compliance Manager shall:

a.      Provide day-to-day management of the EEO investigators;

b.      Be responsible for the prompt resolution of complaints; and

c.      Ensure expedient corrective action when appropriate.

2.      EEO Investigators report to the Manager for Diversity and EEO Compliance, and shall:

a.      Be responsible for the investigation of EEO complaints;

b.      Maintain the confidentiality of employees who come to them for assistance, except to the extent necessary to perform their duties, or if otherwise released by the employee in writing; and

c.      Perform investigative duties as prescribed in Title 4, DCMR § 100 et. seq.

F.      EEO Counselor Program (CALEA 22.2.5; 22.2.10-d&e; 31.2.3)

1.      The MPD Equal Employment Opportunity Officer, in consultation with the Assistant Chief, Office Professional Responsibility, and the appropriate officials, shall develop an EEO Counseling Program designed to train employees as EEO Counselors.

DC 002578

2.   EEO Counselors shall:

    a.   Provide advice and counsel to employees within their units who feel they have been subjected to discriminatory treatment.

    b.   Provide information on the complaint process and avenues the employee may use to have their complaint addressed, including the right to seek counseling services from any other counselor or outside the agency, if the employee chooses to do so. In addition, Counselors may provide information to the employee on the Employee Assistance Program.

    c.   Serve only in an advisory, non-investigative role and have no authority to investigate.

3.   The specific components of the EEO Counselors program shall be published as Standard Operating Procedures and are to be made available to all employees.

## VII.   Affirmative Action Program

The Department is committed to the implementation of specific programs and practices of affirmative action designed to promote equal employment opportunity in the workplace and will undertake steps to assure that minorities and women are fairly represented in all areas and at all levels of the agency. Affirmative action activities shall be conducted throughout the Department in such areas as:

A.   Recruitment, hiring, training, promotion, reassignment, upward mobility, and termination.

B.   Employee utilization.

C.   EEO training and evaluation of supervisors.

D.   Publishing statements of the Department's commitment to equal employment opportunity in posters, websites, vacancy announcements, and other appropriate agency issuances.

E.   Monitoring the complaint process, workplace environment, and employment statistics so as to recognize and correct possible inequities in employment opportunities within the Department.

## VIII.   MPD Workplace Environment Plan

The purpose of the Workplace Environment Plan is to provide employees of the Metropolitan Police Department with guidelines and procedures that will ensure an environment where all employees can perform their work free of improper and illegal racial, national origin, sex/gender, age, religion, disability, sexual orientation, language harassment, discrimination, or retaliation. (CALEA 26.1.3; 31.2.3) The MPD Workplace Environment Plan addresses the following major elements:

DC 002579

A.  Harassment (CALEA 26.1.3; 31.2.3)

1.  MPD Responsibility:

(a)  As an employer, MPD has the responsibility to maintain a working environment free of harassment. Slurs and other verbal or physical conduct relating to an individual's race, color, national origin, sex/gender, age, religion, disability or sexual orientation constitute harassment when this conduct:

(1)  Effects or creates an intimidating, hostile or offensive working environment;

(2)  Affects or unreasonably interferes with an individual's work performance; or

(3)  Otherwise adversely affects a person's employment opportunity.

(4)  Derogatory or offensive language of the nature described in II, 2., a., is prohibited in all verbal expressions, whether in face-to-face conversations or in telephone, radio, printed or e-mail communication.

(b)  The MPD is also responsible whenever its agents or supervisory employees condone, or otherwise enable, the discriminatory acts of non-employees against MPD employees in the workplace. The workplace environment extends to any place the employee, while in the performance of his/her official duties, has a lawful right to be.

2.  Senior Command Official, Manager and Supervisor Responsibilities:

(a)  Every official, manager and supervisor is held responsible for maintaining an environment free of harassment.

(b)  MPD employees shall immediately report to supervisory personnel any conduct that occurs in their presence, or is brought to their attention, that could be construed as harassment, regardless of whether there has been a complaint made by the affected member.

3.  Official Responses:

The following two Official Responses shall be adhered to whenever an official of this Department witnesses, or is notified of, conduct by an employee that would constitute offensive behavior as described in this directive:

DC 002580

(1)    **Official Response I:** In any instance where an official witnesses, or has brought to his/her attention, discriminatory or harassing conduct of a relatively minor nature that could be construed by a reasonable person as derogatory, disrespectful or offensive to the dignity of any person, **that official shall take immediate action to correct the offending party and initiate an investigation, if warranted, within one hour of occurrence.**

The official may choose to document the matter for future reference in lieu of initiating an investigation if the offending party is receptive to the admonition, and the official has no knowledge of any prior similar misconduct by the offending party.

**NOTE: The Diversity and EEO Compliance Unit must be notified each time an investigation is initiated by an official.  If an official chooses to document the matter, in each instance, a copy of the documentation must be provided to the Diversity and EEO Compliance Unit.**

(2)    **Official Response II:** In instances where an employee of the MPD makes a complaint to an official about workplace harassment based on race, color, national origin, sex/gender, age, religion, disability, or sexual orientation, **the official to whom the complaint is made shall be responsible for ensuring that an investigation is initiated by conducting the investigation, or reporting the matter to the Diversity and EEO Compliance Unit to conduct the investigation.**

**NOTE: If the official wishes to conduct the investigation, he/she shall first contact the Diversity and EEO Compliance Unit and comply with that unit's guidance.**

B.    Language

1.    Employees shall be courteous, civil and respectful to persons when on duty. Employees of the MPD shall not use terms or resort to name-calling that might be interpreted as derogatory, disrespectful, or offensive to the dignity of any person. Employees shall not engage in idle conversation, tell jokes, or make comments that relate to the race, color, national origin, sex, age, religion, disability or sexual orientation of any individual. A member can also be held accountable for this behavior while off duty. (CALEA 26.1.1)

DC 002581

2.    As an employer, the Department recognizes that employees engage in casual conversation, generally in a language common to each of the parties.

    (a)    <u>**Use of Languages Other than English:**</u> Employees who speak a language other than English can converse among themselves, or to the citizens of the District of Columbia in their common languages. When such conversations are conducted pursuant to official police business, upon the request of an official, employees are required to provide English-translated versions of interviews or conversations.

    (b)    <u>**English-Only Requirements:**</u> Officials requiring employees to speak only English must be able to demonstrate that such a requirement is necessary for official business.

    (c)    <u>**Radio Communications:**</u> Members shall continue to apply the provisions of GO-SPT-302.05 (Radio Communications), which prohibit radio transmissions in languages other than English without approval of the official in charge of the Unified Communications Center.

C.    Retaliation

    1.    Employees of the MPD shall not be subjected to any form of retaliation, disciplinary or corrective action, transfers, or changes in assignment <u>**solely**</u> because the employee opposed what he/she believed to be an unlawful employment practice or made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under Title VII and the D.C. Human Rights Act.

    2.    An employee is protected against retaliation for his/her opposition to discrimination, as long as the employee has a reasonable and "good faith" belief that the employer's conduct is illegal, even if it turns out that the employee was mistaken as to the legality of the employer's conduct.

## IV.    Cross References

A.    Federal Laws

    1.    Title VII of the Civil Rights Act of 1964, as amended, 42 USC § 2000e et seq.

    2.    Civil Rights Act of 1991.

    3.    Title I of the Americans with Disabilities Act of 1990, as amended, 42 USC § 12101 et seq.

4. The Age Discrimination in Employment Act of 1967, as amended, 29 USC § 621 et seq.

B. D.C. Laws and Regulations

1. D.C. Human Rights Act of 1977, as amended, D.C. Official Code § 3-201 et seq.

2. Title 4 DCMR § 100 et seq. (Complaints of Discrimination in the District of Columbia Government)

// SIGNED //
Charles H. Ramsey
Chief of Police

CHR:NMJ:SOA:DAH:jj:jah

DC 002583



# OFFICE OF PROFESSIONAL RESPONSIBILITY

## SEXUAL HARASSMENT POLICY STATEMENT

The policy of the Metropolitan Police Department (MPD) is to provide a work environment free of unlawful discrimination, which includes freedom from sexual harassment. The policy applies to all applicants for employment, all employees and citizens served by MPD.

Sexual harassment is an unlawful discriminatory employment practice and a violation of Title VII of the Civil Rights Act of 1964, as amended.

Sexual harassment has been defined by the EEOC as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" when:

- Submission to the conduct is either an explicit or implicit condition of employment; or,
- Submission to, or rejection of, such conduct is used as the basis for employment decisions such as compensation, promotions or assignments affecting the individual; or,
- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance, or creating an intimidating, hostile, or offensive work environment.

The key word is "unwelcome," i.e., the conduct must not be wanted or solicited. This policy is not intended to regulate social interactions in the work place. When a person makes it known that the sexual overture or conduct is <u>unwelcome</u>, then it must stop <u>immediately</u>.

It is the responsibility of each manager and supervisor to prevent sexual harassment in the work place and ensure that no employee is subjected to such conduct. This includes making it clear that behaviors such as flirtation, sexual comments or jokes, graphic descriptions of an individual's body, sexually degrading words used to describe an individual, and the display in the workplace of sexually suggestive objects or pictures are not allowed.

If any employee believes he or she has experienced sexual harassment, the situation should be discussed immediately with a supervisor, who in turn shall immediately notify the Diversity and EEO Compliance Unit, Office of Professional Responsibility. If such a discussion with a supervisor is not feasible, the situation should be reported directly to the Diversity and EEO Compliance Unit. Every complaint will be handled in a confidential manner to the extent permitted by law, and consistent with the needs of the investigation. No retaliation will be permitted against any employee alleging sexual harassment.

A complainant's right to file a complaint with an outside agency is not forfeited by using MPD's internal procedure. Therefore, an employee may file a complaint with the EEOC, the Office of Civil Rights, U.S. Department of Justice, or the D.C. Office of Human Rights. Sexual harassment complaints must be filed within one year from the date of the alleged incident.

MPD prohibits and will not tolerate sexual harassment. Such conduct may result in disciplinary action as necessary up to, and including, termination of employment.

MPD will take all appropriate steps to enforce this policy.


Date:   <u>February 11, 2005</u>                    _____

                                                     **Charles H. Ramsey**
                                                     **Chief of Police**

**Diversity and EEO Compliance Unit**

DC 002584



## OFFICE OF PROFESSIONAL RESPONSIBILITY

### EQUAL EMPLOYMENT OPPORTUNITY POLICY STATEMENT

The policy of the Metropolitan Police Department (MPD) is to provide an equal employment opportunity (EEO) to all individuals. It is our objective to recruit, select, train and promote qualified individuals without regard to race, color, religion, gender, age, national origin, alienage or citizenship status, marital status, sexual orientation, disability, familial status, family responsibilities, matriculation, political affiliation, source of income, place of residence or business, personal appearance, or status as a disabled veteran or Vietnam era veteran.

In support of this policy, we reaffirm MPD's commitment to comply voluntarily with the requirements and the spirit of federal and local anti-discrimination laws and regulations. The Metropolitan Police Department is committed to ensuring implementation of specific programs and practices of affirmative action and promotion of EEO in the workplace.

Through its Affirmative Action Program, MPD will undertake steps to ensure that minorities and women are represented in all areas and at all levels of the agency. The individuals responsible for the day-to-day implementation and monitoring of the Affirmative Action Program are Assistant Chief, Office of Professional Responsibility, and Manager, Diversity and EEO Compliance Unit.

It is the responsibility of each senior command official, manager, and supervisor to ensure compliance with our EEO policies and affirmative action obligations; to disseminate and implement these policies; to prevent discrimination in the workplace; and, to ensure that no employee is subjected to such conduct.

Any employee of the Metropolitan Police Department who alleges that they have been discriminated against may consult the local EEO Counselor or file a complaint with the Diversity and EEO Compliance Unit, Office of Professional Responsibility. An external complaint can be filed with the U.S. Equal Employment Opportunity Commission, the Office of Civil Rights, U.S. Department of Justice, or D.C. Department Human Rights. Internal and external EEO complaints must be filed within 180 calendar days (excluding sexual harassment) from the date of the alleged incident. Sexual harassment complaints must be filed within one year from the date of the alleged incident.

Date:   **February 11, 2005**                  _____
                                                        **Charles H. Ramsey**
                                                        **Chief of Police**



# OFFICE OF PROFESSIONAL RESPONSIBILITY

## NONDISCRIMINATION FOR PERSONS WITH DISABILITIES

**The policy of the Metropolitan Police Department (MPD) is to provide equal employment opportunity to qualified persons with disabilities.  This policy is applicable to all personnel practices, including recruitment, hiring, promotion, training, and compensation and benefits.**

**A qualified person with a disability is one that:**

- **Has a physical or mental impairment that substantially limits one or more of the major life activities of such individual;**
- **Has a record of such impairment; or**
- **Is being regarded as having such impairment; and**
- **With or without reasonable accommodation, can perform the essential functions of the employment position that such person holds or desires.**

**In support of this policy, the Department has adopted a program of affirmative action to employ and promote qualified individuals with disabilities.  This program conforms to the guidelines for implementation of Section 504 of the Rehabilitation Act of 1973, and to the Americans with Disabilities Act of 1990.**

**To ensure their rights under this program, employees who claim physical or mental impairment are invited to identify themselves on a voluntary and confidential basis.  Reasonable accommodations will be made available where applicable.**

**It is the responsibility of each manager and supervisor to disseminate and implement this policy; to prevent discrimination against persons with disabilities in the work place; and to ensure that no employee is subjected to such conduct.**

**Any employee of the Metropolitan Police Department who alleges to have been discriminated against may consult their local EEO Counselor or file a complaint with the Office of Diversity and EEO Compliance, Office Professional Responsibility.  An employee may also file a formal complaint with the U.S. Equal Employment Opportunity Commission, the Office of Civil Rights, U.S. Department of Justice, or the D.C. Office of Human Rights. Complaints must be filed within 180 calendar days from the date of the alleged incident.**

**Date:   February 11, 2005**          _____

**Charles H. Ramsey**
**Chief of Police**

# EXHIBIT 17

| IS | IncidentDate | IncidentType | Allegations | AssignedTo |
|---|---|---|---|---|
| 06002639 | 03/14/2006 | Civil Action | Sexual Misconduct, Civil Action | IAB |
| 06005448 | 10/04/2006 | Citizen Complaint, Outside Jurisdiction | Sexual Misconduct | IAB |
| 06003809 | 08/03/2006 | Citizen Complaint | Officer Misconduct | IAB |
| 06003030 | 01/01/2005 | EEO | Sexual Harassment | EEOB |
| 06004018 | 08/07/2006 | EEO | Sexual Harassment | EEOB |
| 06003271 | 06/28/2006 | EEO | Retaliation | IAB |
| 06005910 | 11/22/2006 | EEO, Other | Conduct Unbecoming, Officer Misconduct, Sexual Harassment | IAB |
| 06001881 | 03/31/2006 | Other | Sexual Misconduct | IAB |
| 06001883 | 03/31/2006 | Other | Sexual Misconduct | IAB |
| 06000407 | 09/01/2005 | Other, Outside Jurisdiction, Member Arrested | Sexual Misconduct | IAB |
| 06004204 | 08/18/2006 | Other, Outside Jurisdiction | Harassment | ROC |
| 06005027 | 10/02/2006 | Domestic Violence | Domestic Violence | IAB |
| 06003956 | 08/12/2006 | Other | Officer Misconduct | IAB |
| 06004352 | 08/31/2006 | Other | Officer Misconduct | IAB |

DC 002641

| IS | IncidentType | Allegations |
| --- | --- | --- |
| 07000143 | EEO | Sexual Harassment |
| 07002276 | EEO | Sexual Harassment |
| 07005607 | EEO | Sexual Harassment |
| 07000736 | EEO | Sexual Harassment, Hostile Work Environment |
| 07002661 | EEO | Sexual Harassment, Retaliation |
| 07001323 | EEO | Sexual Harassment, Retaliation |
| 07003163 | Member Arrested | Sexual Misconduct |
| 07002874 | Other | Sexual Misconduct |
| 07004510 | Other | Sexual Misconduct |
| 07005559 | Other | Sexual Misconduct |
| 07001424 | Outside Jurisdiction | Sexual Misconduct |
| 07002170 | Citizen Complaint | Conduct Unbecoming |
| 07004156 | Citizen Complaint | Conduct Unbecoming |
| 07004793 | Citizen Complaint | Conduct Unbecoming |
| 07005629 | Other | Conduct Unbecoming |
| 07004679 | Other | Officer Misconduct |
| 07005732 | Domestic Violence | Domestic Violence |
| 07005985 | Citizen Complaint | Criminal Activity |
| 07006191 | Member Arrested | Conduct Unbecoming, Criminal Activity, Sexual Misconduct |

DC 002642

| IS | IncidentType | Allegations | AssignedTo | CaseStatus |
|---|---|---|---|---|
| 08002066 | EEO | Sexual Harassment | EEOB | Closed |
| 08003544 | EEO | Sexual Harassment | EEOB | Closed |
| 08003668 | EEO | Sexual Harassment | EEOB | Closed |
| 08004986 | EEO | Sexual Harassment | EEOB | Closed |
| 08005412 | EEO | Sexual Harassment | EEOB | Closed |
| 08003617 | Other | Sexual Misconduct | IAB | Closed |
| 08001092 | Citizen Complaint | Abuse of Authority, Improper Use of MPD Vehicle/Equipment, Officer Misconduct, Fail to Report Misconduct, Misuse of WALES | IAB | Closed |
| 08002313 | Other | Conduct Unbecoming | IAB | Closed |
| 08000552 | Other | Conduct Unbecoming, Criminal Activity, Officer Misconduct, Racial/Ethnic Slur, Bias/Discrimination, Hostile Work Environment, Sexual Orientation, Destruction of Property, Damage to MPD Property | IAD | Closed |
| 08004406 | Other | Corruption, Officer Misconduct | | Closed |
| 08001021 | Outside Jurisdiction | Criminal Activity | IAD | Closed |
| 08001582 | Other | Criminal Activity | IAD | Closed |
| 08003428 | Citizen Complaint | Criminal Activity, Drug Use/UCSA Violation | IAD | Closed |
| 08000700 | Citizen Complaint | Criminal Activity, Threats/Intimidation, Sexual Misconduct | IAB | Closed |
| 08004370 | Domestic Violence | Domestic Violence | IAB | Closed |
| 08003101 | Other | Officer Misconduct | CLD | Closed |
| 08003321 | Member Arrested | Officer Misconduct | IAD | Closed |
| 08004026 | Citizen Complaint | Officer Misconduct | 1D | Closed |
| 08002963 | Citizen Complaint | Officer Misconduct, False/Unlawful Arrest | IAD | Closed |
| 08002585 | Other | Conduct Unbecoming | | Closed |

DC 002643

| IS | IncidentAddress | IncidentDate | IncidentTime | Assigned | Case status | Disposition | | |
|---|---|---|---|---|---|---|---|---|
| 09000433 | External Citizen Complaint | Citizen Complaint | Sexual Misconduct | IAB | Closed | Insufficient Facts | | |
| 09002057 | External Citizen Complaint | Citizen Complaint | Sexual Misconduct | IAB | Closed | Sustained | | |
| 09003040 | External Citizen Complaint | Citizen Complaint | Sexual Misconduct | IAD | Closed | Insufficient Facts | | |
| 09001778 | External Citizen Complaint | Citizen Complaint | Sexual Misconduct, Assault | NSID | Closed | Unfounded | | |
| 09001224 | EEO | Sexual Harassment | Sexual Harassment | EEOB | Open | Pending | | |
| 09003827 | EEO | Sexual Harassment | Sexual Harassment | EEOB | Closed | Sustained | | |
| 09002260 | EEO | Sexual Harassment, Assault | Sexual Harassment | EEOB | Closed | Unfounded | | |
| 09001248 | EEO | Sexual Misconduct | Sexual Misconduct | EEOB | Inactive | Pending | | |
| 09003888 | EEO, Other | Sexual Harassment | Sexual Harassment | EEOB | Open | Pending | | |
| 09001539 | Internal Complaint | Other | Sexual Harassment | IAD | Closed | Sustained | | |
| 09004290 | Internal Complaint | EEO | Abusive Language, Conduct Unbecoming, Neglect of Duty, Sexual Harassment, Fail to Report Misconduct | EEOB | Closed | Sustained | | |
| 09001479 | Internal Complaint | Other | Conduct Unbecoming, Officer Misconduct | IAD | Closed | Sustained | | |
| 09003818 | Internal Complaint | Other | Conduct Unbecoming, Officer Misconduct, Sexual Misconduct | IAD | Closed | Insufficient Facts | | |
| 09004182 | External Citizen Complaint | Citizen Complaint | Conduct Unbecoming, Officer Misconduct | IAD | Closed | Sustained | | |

DC 002644

| IS | IncidentAddress | IncidentDate | IncidentTime | Assigned | Case status | Disposition | | |
|---|---|---|---|---|---|---|---|---|
| 10000394 | Internal Complaint | EEO | Sexual Harassment | IAD | Closed | Insufficient Facts | | |
| 10002192 | Internal Complaint | EEO | Sexual Harassment | EEOB | Closed | Insufficient Facts | | |
| 10002610 | Internal Complaint | EEO | Sexual Harassment | EEOB | Closed | Insufficient Facts | | |
| 10000555 | Internal Complaint | Other | Sexual Harassment | IAD | Open | Pending | | |
| 10001039 | External Citizen Complaint | Citizen Complaint | Sexual Harassment, Other | 7D | Closed | Insufficient Facts | | |
| 10002321 | External Citizen Complaint | Citizen Complaint | Sexual Misconduct | IAD | Closed | Unfounded | | |
| 10005014 | External Citizen Complaint | Citizen Complaint | Sexual Misconduct | IAD | Closed | Unfounded | | |
| 10002985 | Internal Complaint | EEO | Sexual Misconduct | EEOB | Closed | Insufficient Facts | | |
| 10001147 | Internal Complaint | Member Arrested | Officer Misconduct, Sexual Misconduct | IAB | Closed | Sustained | | |
| 10000934 | Internal Complaint | Other | Criminal Activity, Sexual Misconduct | IAD | Closed | Sustained | | |
| 10002908 | Internal Complaint | Domestic Violence | Domestic Violence | IAD | Closed | Sustained | | |
| 10003677 | Internal Complaint | Officer Misconduct | Illegal Search, Officer Misconduct | IAD | Closed | Unfounded | | |
| 10004472 | External Citizen Complaint | Citizen Complaint | Officer Misconduct | IAB | Open | Pending | | |
| 10001060 | Internal Complaint | Other | Officer Misconduct | IAB | Closed | Insufficient Facts | | |
| 10004135 | Internal Complaint | Other | Officer Misconduct | EEOB | Closed | Sustained | | |
| 10002713 | Internal Complaint | Other | Conduct Unbecoming | IAB | Closed | Sustained | | |

DC 002645

| IS | IncidentType | Allegations | Synopsis | AssignedTo | CaseStatus |
|---|---|---|---|---|---|
| 11000234 | Internal Complaint | EEO | Sexual Harassment | EEOB | Closed |
| 11001946 | Internal Complaint | EEO | Sexual Harassment | EEOB | Inactive |
| 11002529 | Internal Complaint | EEO | Sexual Harassment | EEOB | Closed |
| 11002530 | Internal Complaint | EEO | Sexual Harassment | EEOB | Closed |
| 11000064 | Internal Complaint | Other | Sexual Misconduct | 3D | Closed |
| 11001623 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed |
| 11002911 | External Citizen Complaint | Citizen Complaint | Sexual Misconduct, Abuse of Authority | IAD | Closed |
| 11002711 | Internal Complaint | Officer Misconduct | Sexual Misconduct, Criminal Activity | IAD | Closed |
| 11002044 | Internal Complaint | EEO | Conduct Unbecoming, Sexual Harassment | EEOB | Closed |
| 11000047 | External Citizen Complaint | Citizen Complaint | Harassment | 6D | Closed |
| 11002001 | Internal Complaint | Domestic Violence | Domestic Violence - TPO/CPO | IAD | Closed |
| 11000711 | Internal Complaint | EEO | Bias/Discrimination, Hostile Work Environment | OCIO | Closed |
| 11001293 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | IAD | Closed |
| 11000857 | Internal Complaint | Officer Misconduct | Criminal Activity | IAD | Closed |

DC 002646

| IS | IncidentAddress | IncidentDate | IncidentTime | Assigned | Case status | Disposition | |
|----|-----------------|--------------|--------------|----------|-------------|-------------|---|
| 12000778 | External Citizen Complaint | Citizen Complaint | Conduct Unbecoming, Criminal Activity, Sexual Misconduct | IAD | Closed | Unfounded | |
| 12002873 | Internal Complaint | Officer Misconduct | Conduct Unbecoming, Prejudicial Conduct | EEOB | Closed | Unfounded | |
| 12002134 | Internal Complaint | EEO | Sexual Harassment | EEOB | Closed | Pending | |
| 12001998 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Unfounded | |
| 12001719 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Sustained | |
| 12000254 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | IAD | Closed | Unfounded | |
| 12000732 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | IAD | Closed | Sustained | |
| 12000844 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | IAD | Closed | Sustained | |
| 12000166 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | IAD | Closed | Insufficient Facts | |
| 12002477 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | SOD | Closed | Sustained | |
| 12000778 | External Citizen Complaint | Citizen Complaint | Conduct Unbecoming, Criminal Activity, Sexual Misconduct | IAD | Closed | Unfounded | |
| 12002873 | Internal Complaint | Officer Misconduct | Conduct Unbecoming, Prejudicial Conduct | EEOB | Closed | Unfounded | |
| 12000476 | Internal Complaint | Officer Misconduct | Conduct Unbecoming, Sexual Misconduct | IAD | Closed | Insufficient Facts | |
| 12002267 | External Citizen Complaint | Citizen Complaint | Fail to Report Misconduct, Inefficiency, Orders/Directives Violation, Conduct Unbecoming | HSB | Closed | Unfounded | |
| 12002006 | External Citizen Complaint | Citizen Complaint | Racial/Ethnic Slur, Rude/Unprofessional | 1D | Closed | Sustained | |

DC 002647

| IS | IncidentAddress | IncidentDate | IncidentTime | Assigned | CaseStatus | Disposition | |
|---|---|---|---|---|---|---|---|
| 13002702 | Internal Complaint | Officer Misconduct | Assault/ADW, Sexual Misconduct | IAD | Closed | Sustained | |
| 13000545 | External Citizen Complaint | Citizen Complaint | Illegal Search, Sexual Misconduct | IAD | Closed | Insufficient Facts | |
| 13002583 | Internal Complaint | EEO | Sexual Harassment | EEOB | Closed | Unfounded | |
| 13000605 | External Citizen Complaint | Citizen Complaint | Sexual Misconduct | IAD | Closed | Unfounded | |
| 13002577 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | No Action Taken | |
| 13002298 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | No Action Taken | |
| 13002413 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | No Action Taken | |
| 13003026 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | No Action Taken | |
| 13000435 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Insufficient Facts | |
| 13002317 | Internal Complaint | EEO | Sexual Orientation, Hostile Work Environment | EEOB | Closed | Unfounded | |
| 13000391 | Internal Complaint | EEO | Bias/Discrimination | EEOB | Closed | Insufficient Facts | |
| 13000594 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | 1D | Closed | Insufficient Facts | |
| 13001317 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | IAD | Closed | Exonerated | |
| 13002000 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | IAD | Closed | No Action Taken | |
| 13002391 | Internal Complaint | Civil Action | Conduct Unbecoming, Criminal Activity, Civil Action | IAD | Closed | Adverse Action | |
| 13000157 | External Citizen Complaint | Citizen Complaint | Abuse of Authority, Rude/Unprofessional | IAD | Closed | Insufficient Facts | |

DC 002648

| IS | ComplaintType | IncidentType | Allegations | AssignedTo | CaseStatus | Disposition | |
|----|---------------|--------------|-------------|------------|------------|-------------|---|
| 14001600 | Internal Complaint | EEO | Sexual Harassment | HSB | Closed | IS # Cancelled | |
| 14002653 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Insufficient Facts | |
| 14001765 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Insufficient Facts | |
| 14000790 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Sustained | |
| 14000988 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Insufficient Facts | |
| 14001013 | Internal Complaint | Citizen Complaint | Sexual Misconduct | IAD | Closed | Sustained | |
| 14001593 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Insufficient Facts | |
| 14002077 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Exonerated | |
| 14002228 | Internal Complaint | Officer Misconduct | Sexual Misconduct | IAD | Closed | Sustained | |
| 14003452 | Internal Complaint | Officer Misconduct | Sexual Misconduct, Theft | IAD | Closed | Exonerated | |
| 14000177 | External Citizen Complaint | Citizen Complaint | Abuse of Authority | IAD | Closed | Unfounded | |
| 14003335 | External Citizen Complaint | Citizen Complaint | Abusive Language | 1D | Closed | Sustained | |
| 14002226 | Internal Complaint | Civil Action | Bias/Discrimination, Hostile Work Environment, Sexual Orientation, Civil Action | IAD | Closed | Sustained | |
| 14002416 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | 7D | Closed | Insufficient Facts | |
| 14003313 | Internal Complaint | Officer Misconduct | Conduct Unbecoming | IAD | Closed | Sustained | |
| 14002285 | Internal Complaint | Officer Misconduct | Conduct Unbecoming, Disorderly Conduct, Prejudicial Conduct | IAD | Closed | Sustained | |
| 14000051 | Internal Complaint | Officer Misconduct | Criminal Activity, Sexual Misconduct | IAD | Closed | Insufficient Facts | |
| 14002834 | Internal Complaint | Officer Misconduct | Criminal Activity, Sexual Misconduct | IAD | Closed | Unfounded | |
| 14000589 | Internal Complaint | Member Arrested | District of Columbia Arrest | IAD | Closed | Sustained | |
| 14002787 | Internal Complaint | Officer Misconduct | Neglect of Duty | IAD | Closed | Sustained | |
| 14001685 | Internal Complaint | Orders/Directives Violation | Orders/Directives Violation, Conduct Unbecoming | IAD | Closed | Sustained | |
| 14000374 | Internal Complaint | Officer Misconduct | Orders/Directives Violation, Sexual Misconduct | ISB | Closed | Sustained | |

DC 002649

| IS | ComplaintT | IncidentType | Allegations | AssignedTo | CaseStatus | Disposition | | |
|----|-----------|--------------|-------------|-----------|-----------|-------------|--|--|
| 15000494 | External Cit | Citizen Complaint | Racial Profiling | 4D | Closed | Unfounded | | |
| 15000662 | Internal Co | Officer Misconduct | Sexual Misconduct | IAD | Open | | | |
| 15000682 | Internal Co | Officer Misconduct | Sexual Misconduct | IAD | Open | | | |
| 15000683 | Internal Co | Officer Misconduct | Sexual Misconduct | IAD | Closed | Unfounded | | |
| 15000823 | Internal Co | Officer Misconduct | Sexual Misconduct | IAD | Closed | Insufficient Facts | | |
| 15002443 | Internal Co | Officer Misconduct | Sexual Misconduct | IAD | Closed | Insufficient Facts | | |
| 15002299 | Internal Co | Officer Misconduct | Sexual Misconduct | IAD | Inactive | | | |
| 15000624 | Internal Co | Officer Misconduct | Conduct Unbecoming | IAD | Closed | Insufficient Facts | | |
| 15002244 | Internal Co | Officer Misconduct | Conduct Unbecoming | IAD | Closed | No Action Taken | | |
| 15000577 | Internal Co | Civil Action | Criminal Activity, Civil Action | IAD | Closed | Referred DRD Discip | | |
| 15003067 | Internal Co | Orders/Directives Vio | Orders/Directives Violation, Unauthorized Outside Employment | IAD | Closed | No Discipline | | |

DC 002650

| IS | IncidentType | Allegations | AssignedTo | CaseStatus |
|---|---|---|---|---|
| 16000445 | Citizen Complaint | Sexual Misconduct | IAD | Closed |
| 16003582 | Citizen Complaint | Sexual Misconduct | IAD | Closed |
| 16000958 | Officer Misconduct | Sexual Misconduct | IAD | Closed |
| 16002494 | Officer Misconduct | Sexual Misconduct | IAD | Closed |
| 16000447 | Officer Misconduct | Sexual Misconduct | IAD | Closed |
| 16004161 | Officer Misconduct | Sexual Misconduct | IAD | Closed |
| 16004162 | Officer Misconduct | Sexual Misconduct | IAD | Inactive |
| 16002850 | Citizen Complaint | Sexual Misconduct, OPC - 90 Day Referrals | IAD | Closed |
| 16000685 | EEO | Hostile Work Environment | IAD | Closed |
| 16000599 | Orders/Directives Violation | Orders/Directives Violation | YID | Closed |
| 16000106 | Orders/Directives Violation | Orders/Directives Violation | 4D | Closed |
| 16001644 | Officer Misconduct | Alcohol/On Duty, Sexual Misconduct | IAD | Closed |
| 16002093 | Citizen Complaint | Abuse of Authority, Conduct Unbecoming | IAD | Closed |
| 16004010 | Officer Misconduct | Conduct Unbecoming | IAD | Open |

DC 002651

| IS | IncidentType | Allegations | AssignedTo | CaseStatus |
|---|---|---|---|---|
| 17000379 | EEO | Sexual Harassment | EEOB | Closed |
| 17000209 | Officer Misconduct | Sexual Misconduct | IAD | Closed |
| 17000316 | Officer Misconduct | Sexual Misconduct | IAD | Closed |
| 17000815 | Officer Misconduct | Sexual Misconduct | IAD | Closed |
| 17003815 | Officer Misconduct | Sexual Misconduct | IAD | Closed |
| 17001608 | Citizen Complaint | Abuse of Authority, Harassment, Rude/Unprofessional | 4D | Closed |
| 17000920 | Officer Misconduct | Abuse of Authority, Sexual Misconduct | IAD | Closed |
| 17001513 | Domestic Violence | Assault/ADW | IAD | Closed |
| 17002355 | Citizen Complaint | Conduct Unbecoming | 1D | Closed |
| 17001958 | Officer Misconduct | Conduct Unbecoming | IAD | Closed |
| 17002747 | Officer Misconduct | Conduct Unbecoming | IAD | Closed |
| 17001118 | Officer Misconduct | Conduct Unbecoming, Prejudicial Conduct | IAD | Closed |
| 17000089 | Citizen Complaint | Harassment | IAD | Closed |
| 17001420 | OPC | OPC -  Harassment | OPC | Closed |
| 17003923 | OPC | OPC -  Harassment, OPC - Conduct | OPC | Closed |
| 17000451 | EEO | Retaliation, Sexual Harassment | EEOB | Closed |

DC 002652

| IS | IncidentType | Allegations | AssignedTo | CaseStatus |
|---|---|---|---|---|
| 18000370 | EEO | Sexual Harassment | EEOB | Open |
| 18000668 | EEO | Sexual Harassment | EEOB | Closed |
| 18001076 | EEO | Sexual Harassment, R | EEOB | Open |
| 18001714 | EEO | Sexual Harassment | EEOB | Open |
| 18000573 | Officer Misconduct | Sexual Harassment, S | EEOB | Closed |
| 18001038 | Officer Misconduct | Sexual Misconduct | IAD | Open |
| 18001715 | Officer Misconduct | Sexual Harassment, S | EEOB | Open |
| 18001339 | Officer Misconduct | Sexual Misconduct | IAD | Open |
| 18001391 | Member Arrested | District of Columbia A | IAD | Open |
| 18000406 | OPC | Rude/Unprofessional, | OPC | Closed |
| 18001017 | Orders/Directives Violation | Orders/Directives Viol | EEOB | Closed |
| 18001355 | Civil Action | Civil Action | IAD | Open |
| 18000079 | Officer Misconduct | Sexual Misconduct | IAD | Closed |

DC 002653

# EXHIBIT 18

| DRD | CS | Rank | Violation | Specs | FINDINGS | PENALTY | DispDate | FinDispo |
|---|---|---|---|---|---|---|---|---|
| 159-10 | 09-004290 | Officer | Failure to Obey Orders/Directives | INAPPROPRIATE SEXUAL EXPLICIT COMMENTS THAT WERE HEARD BY A FEMALE OFFICER | SUSTAINED | PD 750 | 07-Apr-10 | PD 750 FOR 18 MONTHS |
| 461-13 | 13-001486 | Officer | Failure to Obey | FAIL TO NOTIFY YID REGARDING A CHILD SEX ABUSE CASE | SUSTAINED | 12 DAYS SWOP | 10/18/2013 | 7 DAYS SWOP & 5 DAYS HELD |
| 963-16 | 16-003199 | Senior Police Officer | Chapter 16 | NOD-FAILED TO PROPERLY HANDLE A SEXUAL ASSAULT CASE | | 10 DAYS SWOP | | |
| 531-11 | 10-004039 | Sergeant | Conduct Unbecoming | MADE DISRESPECTFUL AND SEXUAL COMMENTS TOWARDS A RECRUIT | | TERMINATION | 11/29/2011 | MEMBER TERMINATED ON DRB# 198-11 |
| 198-11 | 10-004832 | Sergeant | Failure to Obey Orders/Directives | USED RACIAL SLURS WHILE TEACHING A RECRUIT CLASS (SEXUAL IN NATURE) | NOT-SUSTAINED | TERMINATION | 11/29/2011 | TERMINATED |
| 277-16 | 15-003114 | Master Patrol Officer | Conduct Constitutes Crime | PROPOSITIONED A PROSTITUTE FOR SEX AND THREATED SUBJECT WITH HIS WEAPON | SUSTAINED | TERMINATION | 8/3/2016 | 45 DAYS SWOP & REMOVAL FROM MPO PROGRAM |
| 163-12 | 12-000489 | Detective | Neglect of Duty | FAIL TO UPDATE WACIIS AND FOLLOW-UP REGARDING A SEXUAL ASSAULT CASE | SUSTAINED | 10 DAYS SWOP | 5/21/2012 | OFFICIAL REPRIMAND MEMO ATTACHED FROM CID COMMANDER |
| 177-06 | 05-2321 | Officer | Conduct Constitutes Crime | SEXUAL ASSAULT SUSPECT | SUSTAINED | TERMINATION | 10/3/2006 | TERMINATION |
| 171-09 | 09-000144 | Officer | Conduct Constitutes Crime | CRIMINAL SUMMONS FOR DUI & ALLEGED SEXUAL ASSAULT IN VIRGINIA | SUSTAINED | TERMINATION | 3/5/2010 | TERMINATED |
| 506-15 | 14-001342 | Officer | Conduct Unbecoming | MADE SEVERAL LEWD & INAPPROPRIATE COMMENTS AND SEXUAL ADVANCES TOWARDS A DETAINEE | SUSTAINED | TERMINATION | 7/22/2016 | TERMINATED |
| 429-14 | 14-001586 | Sergeant | Conduct Unbecoming | FAIL NOTIFY SEXUAL ASSAULT UNIT OF A POSSIBLE SEXUAL ASSAULT WHILE WORKING CLUB OVERTIME | SUSTAINED | 20 DAYS SWOP & NO CLUB OVERTIME FOR 12 | 10/10/2014 | 20 DAYS SWOP & NO CLUB OVERTIME FOR 12 MONTHS |
| 433-12 | 12-001334 | Sergeant | Neglect of Duty | FAIL TO FOLLOW-UP ON 44 SEX CASES | SUSTAINED | 15 DAYS SWOP | 12/5/2012 | 15 DAYS SWOP |
| 528-07 | 05-001993 | Officer | Conduct Constitutes Crime | ARRESTED & INDICTED FOR 1 COUNT OF SEXUAL ABUSE | SUSTAINED | TERMINATION | 10/22/2008 | TERMINATION |
| 292-08 | 08-001021 | Officer | Conduct Unbecoming | FAILURE TO OBTAIN VALID PERMIT FROM SEXUAL ASSAULT SUSPECT | SUSTAINED | OFFICIAL REPRIMAND | 7/3/2008 | PD 750 |
| 279-11 | 11-000064 | Officer | Prejudicial Conduct | ACCUSED OF AN SEXUAL ASSAULT AGAINST A MINOR IN WEST VIRGINIA | SUSTAINED | TERMINATION | 10/7/2011 | TERMINATION |
| 462-13 | 13-001486 | Officer | Neglect of Duty | FAIL TO NOTIFY YID REGARDING A CHILD SEX ABUSE CASE | SUSTAINED | 1 DAY SWOP & 2 DAYS | 11/19/2013 | PD 62E |
| 439-09 | 09-001855 | Officer | Conduct Unbecoming | SOLICIT AN UNDER COVER OFFICER FOR SEXUAL ACTS FOR THE EXCHANGE FOR MONEY | SUSTAINED | 35 DAYS/15 HELD WITH TRAINING | 1/5/2010 | 15 DAYS HELD/20 SWOP |
| 055-10 | 09-004182 | Investigator | Conduct Unbecoming | IMPROPER CONTACT WITH SEXUAL ASSAULT VICTIM | SUSTAINED | TERMINATION | 10/18/2014 | 15 DAYS SWOP RECOMMENDED BY THE PANEL |
| 699-14 | 12-000732 | Officer | Conduct Constitutes Crime | CONVICTED & SENTENCED TO 18 YRS IN JAIL FOR LEWD & INDECENT ACTS OF A SEXUAL NATURE W/ MINOR | SUSTAINED | TERMINATION | 6/27/2015 | TERMINATED |
| 699-14 | 12-000732 | Officer | Conduct Constitutes Crime | FOUND GUILTY ON 7 COUNTS OF CHILD SEXUAL ABUSE | SUSTAINED | TERMINATION | 6/27/2015 | TERMINATED |
| 163-14 | 14-000589 | Officer | Conduct Constitutes Crime | ARRESTED FOR MISDEMEANOR SEXUAL ABUSE OF A CHILD & SIMPLE ASSAULT | SUSTAINED | TERMINATION | 3/10/2014 | MBR RESIGNED EFF. 3/5/14 PRIOR TO CASE GOING TO AA |
| 085-07 | 06-005263 | Lieutenant | Neglect of Duty | FAILURE TO REPORT MISCONDUCT | SUSTAINED | 15 DAYS | 6/21/2007 | OFFICIAL REPRIMAND & SEXUAL HARASSMENT |
| 432-08 | 07-005559 | Officer | Conduct Constitutes Crime | CONVICTION FOR MISD. SEXUAL ASSAULT | SUSTAINED | TERMINATION | 10/14/2009 | MEMBER TERMINATED EFFECTIVE 10/14/09 |
| 620-12 | 12-001719 | Detective | Conduct Constitutes Crime | ARRESTED FOR SEXUAL CONDUCT TOWARDS STEP-DAUGHTER | | TERMINATION | | |
| 764-14 | 14-002568 | Detective | Neglect of Duty | FAIL TO PROPERLY INVESTIGATE A SEXUAL ASSAULT | NOT-SUSTAINED | NO DISCIPLINE | 12/29/2014 | NO PREPONDERANCE OF EVIDENCE |
| 463-13 | 13-001486 | Officer | Failure to Obey | FAIL TO NOTIFY YID REGARDING A CHILD SEX ABUSE CASE | SUSTAINED | 12 DAYS SWOP | 10/21/2013 | 3 DAYS SWOP & 2 DAYS HELD |

DC 002640

# EXHIBIT 19

1   UNITED STATES DISTRICT COURT - DISTRICT OF COLUMBIA

2                   Civil Division

3   ----------------------------:

4   JAQUIA BUIE,                 :

5               Plaintiff,   : Case No.:

6       vs.                  : 1:16:CV-01920-CKK

7   DISTRICT OF COLUMBIA, et al.:

8               Defendants.  :

9   ----------------------------:

10                      Washington,D.C.

11                      Wednesday, May 9, 2018

12  Deposition of

13          NICOLE DETRESE WEBSTER

14  the witness, was called for examination

15  by counsel for the plaintiff, at the law

16  offices of Smith Mustille, LLC, 2200

17  Pennsylvania Avenue, Fourth Floor East,

18  Washington, D.C. commencing at 10:15 a.m.,

19  before Hedy D. Blau, Court Reporter and Notary

20  Public for the District of Columbia, and

21  present on behalf of the respective parties:

22

Nicole Webster

Page 2

1    APPEARANCES:

2

3           On Behalf of the Plaintiffs:

4           BY: MARK A. SMITH, ESQUIRE

5                JUDITH MUSTILLE, ESQUIRE

6                Smith, Mustille, LLC

7                51 Monroe Street

8                Suite 1600

9                Rockville, Maryland 20850

10               (202) 776-0022

11

12          On Behalf of the Defendants:

13          BY: DAVID JACKSON, ESQUIRE

14               PATRICIA DONKOR, ESQUIRE

15               Office of the Attorney General

16               One Judicary Square

17               441 4th Street, Northwest

18               Suite 630 South

19               Washington, D.C. 20001

20               (202) 724-6618

21

22

Page 23

1    were going to say.

2       A.    What's the question?  Let me make sure

3    I'm answering it correctly.

4       Q.    So, I lead with the words, there's

5    categories of investigation and then, you were

6    going to illuminate me by structuring the

7    response a certain way.  Go ahead and do that.

8       A.    Certainly.

9       Q.    Okay.

10      A.    We have misconduct, the use of force

11   and equal employment opportunity.

12      Q.    Misconduct?

13      A.    And police complaint board, the

14   citizen's police complaint board.

15      Q.    So misconduct, the use of force,

16   citizen's complaint board and what else?

17      A.    The equal employment opportunity.

18      Q.    Okay, let's address each one of them,

19   one at a time, okay?

20      A.    Okay.

21      Q.    Do you operate in all four of those

22   realms as an Internal Affairs agent?

1    it?

2         MR. JACKSON:  Objection as to the form

3    of the question.

4         BY MR. SMITH:

5    Q.    If they're held responsible, there's a

6    presumption that they need to know about it,

7    right?

8    A.    They should be familiar with it and

9    know where to look, if they need more

10   information.

11        So is there some type of iPad that

12   each police officer is issued with all the

13   general orders on it?

14   A.    No iPad, but they are given a CD and

15   it's on our internet page.

16   Q.    On the MPD on-line?

17   A.    Yes, sir.

18   Q.    And so in the area of misconduct, in

19   that category, is sexual misconduct included in

20   that category?

21   A.    I believe so.  Yes, sir.

22   Q.    Now, what is the Metropolitan Police

1    Department's position on sexual misconduct?

2            MR. JACKSON:  Objection.

3            THE WITNESS:  That we don't tolerate

4    it.

5            BY MR. SMITH:

6    Q.    When you say you don't tolerate it,

7    explain to me what you mean?

8    A.    We don't tolerate it, knowingly.  So

9    if the facts are provided and it's found to be

10   sustained, then the member is disciplined.

11   Q.    But you have a zero tolerance policy

12   towards sexual misconduct?

13   A.    Yes, sir.  When it's proven, it's zero

14   tolerance.

15   Q.    And when you say "proven," what's the

16   standard of proof that you understand it to be?

17   A.    Evidence.

18   Q.    No, no.  I understand that is the

19   material --

20   A.    You mean preponderance?

21   Q.    Yes.  What's the standard?

22   A.    Preponderance.

Nicole Webster

Page 96

1          BY MR. SMITH:

2     Q.    Do you know Darrell Best?

3     A.    Yes, sir.

4     Q.    How long have you known him?

5     A.    For 28 years.

6     Q.    So were you part of the same cadet

7   class?

8     A.    No, sir.

9     Q.    Were you close in your classes?

10    A.    Yes, sir.

11    Q.    And when did you meet him?

12    A.    When we were cadets.

13    Q.    Were you in the same district?

14    A.    No, sir.

15    Q.    So you met him at the academy?

16    A.    Yes, yes.

17    Q.    And over the years, did you guys

18  maintain a friendship?

19    A.    Yes.

20    Q.    So now, did you ever work together?

21    A.    No, sir.

22    Q.    Did you ever socialize outside the

# EXHIBIT 20

UN-938 Rev. 4/05

# METROPOLITAN POLICE DEPARTMENT

## *Incident Summary Sheet*

☐ Chain of Command
☐ EEO
☐ Force Investigation Team
☒ Misconduct Intake
☐ Office of Police Complaints

(Unit):
– Agent:

*---Shaded Areas for Operations Staff Use Only---*

☐ OPC - NUMBER:
IS NUMBER: 07002351
IAD CASE NUMBER: 07-140
INTEL NUMBER:

| Name: 5062 - Best, Darrell L | Rank: Sgt | Assignment: | Badge Number: S0682 | SSN: ■ | Race: Black/African American | Sex: Male | Revoked? Yes |
|---|---|---|---|---|---|---|---|

*Use additional IS Sheet(s) to add names, completing only relevant portions with additional information.  Be sure to enter relevant IS number on all supplemental IS sheets used.*

Location of Incident: ■

Date of Incident: 05/30/2007          Time of Incident: 12:00:00 AM

**MPD Member First Receiving Incident:** 4808 - Scott, Larry P

**Date Notified:** 05/30/2007

| Type of Incident: | Domestic Violence |
|---|---|

Name of Complainant(s)/Source(s): E■ Best

Complainant/Source Address: ■

Complainant/Source Arrested? No   Charge(s)

Complainant/Source: Race:Black/African American Sex: Female Ethnicity: Unknown

Complainant Phone Numbers: Work:          Home: ■          Other:

OPR Member Receiving Incident: 4843 - Robinson, Kimberly A          Date Rec'd: 05/30/2007          Time Rec'd: 05:30:00 PM

Unit Official Notifying OPR: 4808 - Scott, Larry P          Assignment: Special Operations          Phone Number: 202 439-1620

**Allegation(s):** Domestic Violence          **Member(s) Arrested?** No   **Charge(s):**

**SYNOPSIS:** On 5/30/2007, Mrs. E■ Best obtained a Temporary Protection Order against her husband, Sergeant Darrell Best. Mrs. Best alleged that Sgt. Best physically assaulted her. Sgt. Best was served the TPO on 5/30/2007 by P.G. County Sheriffs Dept.

| UFIR Completed? | Date UFIR Completed: | UFIR Declination Date: | Reverse-Garrity Issued? |
|---|---|---|---|

*INSTRUCTIONS:* On **ALL** Use of Force Incidents, ascertain whether a Use of Force Incident Report (UFIR) was completed. If so, indicate "Y" and enter the date completed, and direct the notifying official to **FAX** a copy to FIT **202-576-7514** prior to being relieved from duty. If not, direct the notifying official to immediately contact a FIT official, who will approve or deny the issuance of Reverse-Garrity. Whether approved or denied, the notifying official shall <u>then</u> call back and notify the OIA agent accordingly, and obtain the IS numbers. If FIT denies issuance of Reverse-Garrity, instruct the official to prepare and forward a preliminary report to OPR, recommending USAO review.

| **Forwarded to:** ☐ EEO ☐ OIU ☐ PMU1 ☐ PMU2 ☐ PMU3 | **Date:** | **IS Entry By:** 4843 - Robinson, Kimberly A | **Date:** 05/30/2007 |
|---|---|---|---|
| Referral Approved By:   4280 - Klein, Matthew | | | Date Assigned: |
| Intel Approved By: | | | Date Assigned:   05/31/2007 |
| Case Approved By: | | | Date Assigned: |
| Disposition:   Pending | | Signature: | Date: |

DC 001471

**METROPOLITAN POLICE DEPARTMENT**
Washington, DC
*OFFICE OF INTERNAL AFFAIRS*
ROUTING SLIP

| | TO: | | DATE: 6/01/07 |
|---|---|---|---|
| | **Captain** Marcus Westover **FIT I, FIT II** | | Approval / Approved |
| **Thru** | **Captain** Parks, Rodney **PCU1, PCU2, PCU3, SIU** | | Comment / Consideration |
| | **Lieutenant** Paul Charity **PCU1** | | Contact Writer / Expedite |
| | **Lieutenant** **PCU2** | | File / Handle |
| | **Lieutenant** Mark Lotz **PCU3** | **X** | Information / Investigate and Report |
| | **Lieutenant** **SIU** | | Noted / Note & File |
| | **Lieutenant** Pamela Hopkins **Operations** | | Prepare / Recommendation |
| | **Lieutenant** Lyons **FIT I, FIT II** | | Reply Direct / Return |
| | **Inspector** Porter **DDRO** | | See Me / Signature |
| | **OPC Liaison Unit** Sgt.  Harrington, D | | Return  **(Original)** **30D 6/28/07** **90D-10/04/07** |
| | Signature of Sender: **Officer Cloyd, F** | | **IAD Log#** **07-140** |
| | *New IAD Intake Case: (IS 07-002351)* | | |
| | *Please enter the investigating Agent's name and return to Admin Staff.* | | |
| | | | |
| | **Agent:** | | |
| | | | |
| | | | |
| | | | Nmb. |

DC 001472

# EXHIBIT 21

 

Page 1 of 2

## Tapp, Lisa (MPD)

| | |
|---|---|
| **From:** | Vaughan-Roach, Sharon R. (MPD) |
| **Sent:** | Thursday, August 05, 2010 11:01 AM |
| **To:** | Anzallo, Michael (MPD) |
| **Cc:** | Webster, Nicole (MPD); Tapp, Lisa (MPD) |
| **Subject:** | RE: Preliminary Report for Sergeant ████ |

Chief Anzallo:

In past cases of this nature, we have not immediately revoked police powers i.e. Daryl Best case. In fact, it was not until the second sexual assault case filed against him and when he was placed on Admin leave that his police powers were revoked. I mention this because, typically we just detail a person away from the complainant i.e. their place of work (for sexual harassment). We take this action to "immediately" minimize the probability of any future occurrences while the investigation is occurring and until a final determination. However, we may want to use this "████" case to set a precedent by not only detailing him away but also revoking his police powers for the these two alleged criminal acts: touching of the breast and him rubbing his genitals against her dernier.

Sharon

**From:** Anzallo, Michael (MPD}
**Sent:** Thursday, August 05, 2010 10:37 AM
**To:** Vaughan-Roach, Sharon R. (MPD)
**Cc:** Webster, Nicole (MPD); Tapp, Lisa (MPD)
**Subject:** RE: Preliminary Report for Sergeant ████

Sharon should his police powers be revoked until the USAO has weighed in on this?

Assistant Chief Michael Anzallo
Metropolitan Police Department
Internal Affairs Bureau

**From:** Vaughan-Roach, Sharon R. (MPD)
**Sent:** Thursday, August 05, 2010 10:22 AM
**To:** Anzallo, Michael (MPD)
**Cc:** Webster, Nicole (MPD); Tapp, Lisa (MPD)
**Subject:** FW: Preliminary Report for Sergeant ████

Chief Anzallo:

Please have Sgt ████ removed today.

Thanks

Sharon

**From:** Webster, Nicole (MPD)
**Sent:** Wednesday, August 04, 2010 9:19 PM
**To:** Vaughan-Roach, Sharon R. (MPD)
**Cc:** Tapp, Lisa (MPD)
**Subject:** Preliminary Report for Sergeant ████

*Greetings Sharon,*

10/5/2010



Page 2 of 2

Attached is an Incident Summary Sheet (10002985) and a Preliminary Report with a recommendation that Sergeant ▮ be detailed out of the Seventh District until this matter is concluded.

Commander Maupin confirmed that **Sergeant** ▮ **has not been notified** about the allegations and is currently still working at the Seventh District.

Thank you in advance.

Agent N. Webster
Metropolitan Police Department
Internal Affairs Division
3224 Pennsylvania Avenue, Southeast
Washington DC 20020
202-727-0056 Desk
202-727-4383 Office
202-727-4858 Fax
nicole.webster-rogers@dc.gov

10/5/2010

DC_012157

# EXHIBIT 22



# METROPOLITAN POLICE DEPARTMENT
## *Patrol Services and School Security Bureau*





801 Shepherd St. NW ♦ Washington, D.C. 20011 ♦ (202) 576-6600

## MEMORANDUM

**TO:**     Administrative Captain
            Fourth District

**FROM:**   Assistant Chief
            Patrol Services and School Security Bureau

**DATE:**

**SUBJECT:** Discrepancies Regarding **4D IS# 11-003275 Alleged Misconduct, Ofc. Darrell Best**

The following discrepancies were found:

➢ Please interview wife of complainant with whom Ofc. Best is alleged to being having the affair with, Ms. ████████ W███. Submit PD. 119 with investigative package.

➢ Ofc. Best's response to the allegation of wearing his gun and badge in the pulpit of his church, does not adequately answer the question. Please Q & A Ofc. Best and have him respond directly to the allegation.     *PLEASE SEE ATTACHED SUPPLEMENTAL STATEMENT*

Please ensure that the discrepancies are addressed and forward to PSSSB within (3) days of the date of this memorandum. <u>Return this memorandum with the corrected package.</u>

PSSSB Log #687 qew



DC 001614
BEST-7/25/2012



**Patrol Services and School Security Bureau**
**Fourth Police District**

**Commanding Officer Kimberly Chisley- Missouri**

6001 Georgia Avenue, N.W., Washington, D.C., 20011 Office: 202-715-7400 Fax: 202-715-7489

## MEMORANDUM

**TO:**      Assistant Chief of Police
            Internal Affairs Bureau

**THRU:**    Assistant Chief
            Patrol Services and School Security Bureau

**THRU:**    Commander
            Fourth District

**FROM:**    Captain
            Fourth District

**DATE:**    January16, 2012

**SUBJECT:** Investigative Report with Recommendations Concerning the Alleged
            Misconduct Involving Officer Darrell Best of the Fourth District **(IS# 11-
            003275)**

### CHRONOLOGICAL NARRATIVE SECTION

On December 12, 2011, Mr. ▇ W▇ called IAB and alleged that Officer Darrell
Best was having an intimate relationship with his wife. He also alleged that Officer Best
wears his gun and badge when he is in the pulpit of his church, which is located at 4410
Southern Avenue, SE.

Officer Best states that he does know the W▇s because they are members of the
church where he is the senior pastor. He has socialized with them on various occasions.
Officer Best denies having any sort of affair with Mrs. W▇ and also states that when
he is in the pulpit of his church he wears a clerical robe and or a suit jacket at all times.

The date listed on the IS sheet is September 3, 2011. According to Officer Best, this is
his birthday, and on this date Mr. and Mrs. W▇ and their family were at Officer Best's
house until 11 pm for his birthday barbeque.

1

DC 001615

## MEMBER INVOLVED

| | | |
|---|---|---|
| 1. | **Officer Darrell Best** | Badge # 5394 |
| | Duty & Uniform Status: | Off duty and not in uniform |
| | Personal: | Black Male |
| | Assignment: | Fourth District |
| | Appointed to MPD: | 2-2-87 |
| | Age | 42 years old |
| | Current Duty Status: | Full Duty |
| | Impairment: | N/A |

## COMPLAINANT INVOLVED

Mr. ▇▇ W▇

▇▇▇▇

Phone: ▇▇▇▇

## WITNESS CANVASS

This section is not applicable.

## INVOLVED OFFICERS' STATEMENTS

**Officer Best** provided a written statement wherein he indicated the following:

He is the senior pastor at God of a Second Chance Ministry which is located at 4410 Southern Avenue, SE. He knows ▇▇ and ▇▇ Wilson. They are members of his church. He has conducted marriage counseling with them. He was asked by Mr. W▇ to bless their new house in August, 2011. The W▇s and Officer Best and his wife double-dated for his birthday in September, 2011. He has never been involved with Mrs. W▇ in any affair and the only relationship he has with her is that he is her pastor and she is a church member.

On September 3, 2011 Mr. W▇ and his whole family were at Officer Best's house for his birthday cookout. He was there with his family until 11 pm.

Every member of Officer Best's church is aware that he is a DC police officer. He is the senior pastor and performs several functions at the church, from preaching to teaching to sweeping. He wears a clerical robe and or a suit jacket in the pulpit at all times. **(Attachment # 1)**

On January 24, 2012 Officer Best submitted a supplemental statement wherein he indicated the following:

As I stated before, I ALWAYS wear my gun and badge while I am at my church. My church is located in a high-crime area of the Sixth District, and I believe it is prudent for

2

me to wear my gun at my church. Every single member of my congregation knows I am a Metropolitan Police officer. I keep my weapon and badge concealed as required by the General Order when I am in my church.

As I stated earlier, when I am in the pulpit preaching, I wear a clerical robe.  My gun and badge are underneath the robe and therefore are not visible.  So therefore, I state that there has not ever been a time that a reasonable person could construe as me being in violation of MPD's rules and regulations with regard to me wearing my service weapon and badge while inside my church.

## POLICE WITNESS STATEMENTS

This section is not applicable.

## COMPLAINANT'S STATEMENT

Mr. W█████ has alleged that Officer Best is involved in an intimate relationship with his wife █████████████W███. They have exchanged inappropriate text messages. He also stated that Officer Best wears his gun and badge while in the pulpit of his church. .

## CIVILIAN WITNESS STATEMENT

This section is not applicable.

## PHYSICAL EVIDENCE SECTION

This section is not applicable.

## DISCREPANCIES AND CLARIFICATIONS

* The IS Sheet states that Mr. W████'s wife's name is ████████████. Her married name is ██████████W███. ██████████ is her maiden name.

## CONCLUSIONS

I conclude there is not a preponderance of evidence that Officer Best has violated any departmental rules or regulations. Specifically, I conclude that there is not a preponderance of evidence that Officer Best is involved in an inappropriate relationship with a woman named Keisa Henderson-Wilson.

Additionally, I conclude that there is not a preponderance of evidence that Officer Best has worn his service pistol or badge in an inappropriate manner while inside of the church that he is the pastor of, which is located at 4410 Southern Avenue, SE.

DC 001617

## FINDINGS

Based on the evidence, I find the following to be true:

- Mr. ▮▮▮▮ W▮▮ called IAB on December 12, 2011 and alleged that Officer Darrell Best was having an inappropriate relationship with his wife. He also alleged that Officer Best has worn his badge and pistol while in the pulpit and in the church where he is a minister.

- Officer Best knows ▮▮▮▮▮▮▮ W▮▮ because they are members of the church at which he is the senior pastor.

- The date of September 3, 2011 is Officer Best's birthday. On that date Mr. and Mrs. W▮▮ and their family were at Officer Best's house for his birthday cookout until 11 pm.

- It is not known why Mr. W▮▮ waited from September 3rd until December 12th to call IAB and make his allegations.

- Officer Best states that when he is in the pulpit of his church, he always has on a clerical robe and or a suit jacket.

## RECOMMENDATIONS

Based on the evidence, I recommend the following:

The allegation that Officer Darrell Best is involved in an inappropriate relationship with a woman named ▮▮▮▮▮▮ W▮▮ be classified as **Insufficient Facts.**

The allegation that Officer Best wore his service pistol in a manner that was in violation of departmental regulations while inside of his church located at blank address be classified as **Insufficient Facts.**

4

DC 001618

**METROPOLITAN POLICE DEPARTMENT**
**WASHINGTON, D.C.**

P.D. 119 Rev. 7/74

**COMPLAINANT / SUSPECT STATEMENT**

| | |
|---|---|
| 2. NATURE OF INVESTIGATION  *ADMINISTRATIVE* | 1. COMPLAINT NO. |
| 4. STATEMENT OF: (Last, First, Middle)  *BEST, DARRELL* | 3. UNIT FILE NO. |
| 7. HOME ADDRESS | 5. DOB  |  6. SEX  *M* |
| 9. EMPLOYMENT (Occupation and Location)  *4D  MPD* | 8. HOME PHONE  *on file* |
| 11. LOCATION STATEMENT TAKEN  *4-D* | 10. BUSINESS PHONE |
| 12. NAME OF OFFICER TAKING STATEMENT *(If other than block 18 include signature)*  *CPT- F. HILL* | 13. DATE /TIME STARTED  *1-24-12* |

**14. STATEMENT**

Mr. ████ W████ has alleged that you wear your weapon and badge while in the pulpit and while inside the church, God of a Second Chance Ministries, located at 4410 Southern Avenue, SE.

Has there ever been a time when you have worn your weapon and badge while in the pulpit or in any part of the church in a manner that a reasonable person could construe as being in violation of MPD's General Order with regard to wearing your service weapon and badge while off-duty?

Answer:  As I stated before, I ALWAYS wear my gun and badge while I am at my church. My church is located in a high-crime area of the Sixth District, and I believe it is prudent for me to wear my gun at my church. Every single member of my congregation knows I am a Metropolitan Police officer. I keep my weapon and badge concealed as required by the General Order when I am in my church.
As I stated earlier, when I am in the pulpit preaching, I wear a clerical robe.  My gun and badge are underneath the robe and therefore are not visible.  So therefore, I state that there has not ever been a time that a reasonable  person could construe as me being in violation of MPD's rules and regulations with regard to me wearing my service weapon and badge while inside my church.

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. ("I UNDERSTAND THAT MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES. D.C. CODE SECTION 22-2514)

SIGNATURE OF PERSON GIVING STATEMENT

| 16. DATE / TIME ENDED  *1/24/12 / 2020hrs* |
|---|
| 17.  PAGE _____ OF _____ PAGES |

| 18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:  *CPT- F. HILL*  (Name and Signature) | 19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:  (Name and Signature) |
|---|---|

DC 001619

## **ATTACHMENTS**

1. PD 119- Ofc Best
2. IS sheet
3. Letter to be sent to complainant
4. Supplemental statement of Officer Best

DC 001620



**Patrol Services and School Security Bureau**
**Fourth Police District**

**Commanding Officer Kimberly Chisley- Missouri**

6001 Georgia Avenue, N.W., Washington, D.C., 20011 Office: 202-715-7400 Fax: 202-715-7489

## MEMORANDUM

**TO:**     Assistant Chief of Police
            Internal Affairs Bureau

**THRU:**   Assistant Chief
            Patrol Services and School Security Bureau

**THRU:**   Commander
            Fourth District

**FROM:**   Captain
            Fourth District

**DATE:**   January16, 2012

**SUBJECT:** Investigative Report with Recommendations Concerning the Alleged
            Misconduct Involving Officer Darrell Best of the Fourth District **(IS# 11-003275)**

### CHRONOLOGICAL NARRATIVE SECTION

On December 12, 2011, Mr. ███ W███ called IAB and alleged that Officer Darrell Best was having an intimate relationship with his wife. He also alleged that Officer Best wears his gun and badge when he is in the pulpit of his church, which is located at 4410 Southern Avenue, SE.

Officer Best states that he does know the W███s because they are members of the church where he is the senior pastor. He has socialized with them on various occasions. Officer Best denies having any sort of affair with Mrs. W███ and also states that when he is in the pulpit of his church he wears a clerical robe and or a suit jacket at all times.

The date listed on the IS sheet is September 3, 2011. According to Officer Best, this is his birthday, and on this date Mr. and Mrs. W███ and their family were at Officer Best's house until 11 pm for his birthday barbeque.

1



DC 001621

## MEMBER INVOLVED

1. **Officer Darrell Best**                      Badge # 5394
   Duty & Uniform Status:              Off duty and not in uniform
   Personal:                                   Black Male
   Assignment:                              Fourth District
   Appointed to MPD:                    2-2-87
   Age                                           42 years old
   Current Duty Status:                  Full Duty
   Impairment:                              N/A

## COMPLAINANT INVOLVED

Mr. ███████ W████
████████████████████
Phone: ████████████

## WITNESS CANVASS

This section is not applicable.

## INVOLVED OFFICERS' STATEMENTS

**Officer Best** provided a written statement wherein he indicated the following:

He is the senior pastor at God of a Second Chance Ministry which is located at 4410 Southern Avenue, SE. He knows ████████████ W███. They are members of his church. He has conducted marriage counseling with them. He was asked by Mr. W███ to bless their new house in August, 2011. The W███s and Officer Best and his wife double-dated for his birthday in September, 2011. He has never been involved with Mrs. W███ in any affair and the only relationship he has with her is that he is her pastor and she is a church member.

On September 3, 2011 Mr. W███ and his whole family were at Officer Best's house for his birthday cookout. He was there with his family until 11 pm.

Every member of Officer Best's church is aware that he is a DC police officer. He is the senior pastor and performs several functions at the church, from preaching to teaching to sweeping. He wears a clerical robe and or a suit jacket in the pulpit at all times.
**(Attachment # 1)**

## POLICE WITNESS STATEMENTS

This section is not applicable. .

2

DC 001622

## COMPLAINANT'S STATEMENT

Mr. W█████ has alleged that Officer Best is involved in an intimate relationship with his wife ██████████ W████. They have exchanged inappropriate text messages. He also stated that Officer Best wears his gun and badge while in the pulpit of his church. .

## CIVILIAN WITNESS STATEMENT

This section is not applicable.

## PHYSICAL EVIDENCE SECTION

This section is not applicable.

## DISCREPANCIES AND CLARIFICATIONS

- The IS Sheet states that Mr. W████'s wife's name is ████████. Her married name is ████████ Wilson.  Henderson is her maiden name.

## CONCLUSIONS

I conclude there is not a preponderance of evidence that Officer Best has violated any departmental rules or regulations. Specifically, I conclude that there is not a preponderance of evidence that Officer Best is involved in an inappropriate relationship with a woman named ████████ Wilson.

Additionally, I conclude that there is not a preponderance of evidence that Officer Best has worn his service pistol or badge in an inappropriate manner while inside of the church that he is the pastor of, which is located at 4410 Southern Avenue, SE.

## FINDINGS

Based on the evidence, I find the following to be true:

- Mr. ███████ W████ called IAB on December 12, 2011 and alleged that Officer Darrell Best was having an inappropriate relationship with his wife. He also alleged that Officer Best has worn his badge and pistol while in the pulpit and in the church where he is a minister.

- Officer Best knows ████████████ W████ because they are members of the church at which he is the senior pastor.

- The date of September 3, 2011 is Officer Best's birthday. On that date Mr. and Mrs. W████ and their family were at Officer Best's house for his birthday cookout until 11 pm.

3

DC 001623

- It is not known why Mr. W█████ waited from September 3rd until December 12th to call IAB and make his allegations.

- Officer Best states that when he is in the pulpit of his church, he always has on a clerical robe and or a suit jacket.

## **RECOMMENDATIONS**

Based on the evidence, I recommend the following:

The allegation that Officer Darrell Best is involved in an inappropriate relationship with a woman named ███████████ W███ be classified as **Insufficient Facts.**

The allegation that Officer Best wore his service pistol in a manner that was in violation of departmental regulations while inside of his church located at blank address be classified as **Insufficient Facts**.

4

## ATTACHMENTS

1. PD 119- Ofc Best
2. IS sheet
3. Letter to be sent to complainant

DC 001625

## METROPOLITAN POLICE DEPARTMENT
### WASHINGTON, D.C.

P.D. 119 Rev. 7/74

## COMPLAINANT / SUSPECT STATEMENT

| | |
|---|---|
| **1. COMPLAINT NO.** | |

**2. NATURE OF INVESTIGATION**
Allegation of an Affair

**3. UNIT FILE NO.**

**4. STATEMENT OF: (Last, First, Middle)**
Best, Darrell L.

| **5. DOB** | **6. SEX** |
|---|---|
| Adult | Male |

**7. HOME ADDRESS**

**8. HOME PHONE**

**9. EMPLOYMENT (Occupation and Location)**   4D

**10. BUSINESS PHONE**
(202) 715-7503

**11. LOCATION STATEMENT TAKEN**
4th District

**12. NAME OF OFFICER TAKING STATEMENT** *(If other than block 18 include signature)*
CPT. E. Ifill

**13. DATE /TIME STARTED**
01-05-12  1600 HOURS

**14. STATEMENT**

I, the undersigned am the Senior Pastor of God of a Second Chance Ministry, which is located at 4410 Southern Avenue, S.E. Washington, DC 20019. I am fully aware of the parties involved in this complaint the husband is a former member and the wife is still a full time member who serves in the Ministry. I have conducted marriage counseling with both of these parties. The Wilson's became members of the Church in the early part of the year of 2011. I am shocked by this allegation because we have had dinners at my house and I was requested by the husband to bless their new house in August 2011. Mr. W███ and his wife along with my wife double dated for my birthday celebration in September 2011. I have never been involved with Mrs. W███ in any afffair and the only relationship we share is that I am her Pastor and she is my Church Member.

It amazes me that the date of the incident is on September 3, 2011, at 0900 hours. Mr. ██████ W███ was at my house with me at 0800 hours until about 1100 hours assisting with cutting my grass. Mr. W███ left my home and returned with his entire family sometime around 4:00 pm for my birthday cookout which was the same exact day. Mr. W███ was also the last person to leave my house on the day in question he departed along with entire family around 11:00pm.

With regards to the allegation of having a gun and badge in the pulpit. Every member of my church is fully aware that I am a sworn Police Officer in the District of Columbia, Metropolitan Police Department. I as Senior Pastor conduct several functions at the church from Preaching to teaching and even sweeping. I wear a Clergy Robe and/or a Suit Jacket in the Pulpit at all times.

**15.   I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. ("I UNDERSTAND THAT MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES. D.C. CODE SECTION 22-2514)**

SIGNATURE OF PERSON GIVING STATEMENT

**16. DATE / TIME ENDED**
01-05-12  1620 HRS

**17.**
PAGE  1  OF  1  PAGES

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:**

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:**

(Name and Signature)

(Name and Signature)

DC 001626

| UN-938 Rev. 5/07 | **METROPOLITAN POLICE DEPARTMENT** |  |
| --- | --- | --- |
| | **Incident Summary Sheet** | |

| **IS Number:** | 11003275 |
| --- | --- |

**Location of Incident:**  4410 Southern Ave. SE (God of a Second Chance Church) Washington  00000

| **Type of Incident:** | **Date of Incident:** | **Time of Incident:** |
| --- | --- | --- |
| Officer Misconduct. | 09/03/2011 | 09:00 |

| **OPR Member Notified of Incident:** | **Date Notified:** | **Time Notified:** |
| --- | --- | --- |
| Boone,Nisa-4927 | 12/12/2011 | 13:15 |

| **Unit Official Notifying OPR:** | **Incident Element:** | **Phone Number:** |
| --- | --- | --- |
| None,-104 | 7D | |

| **MPD Member First Receiving Incicent:** | **Date MPD was Made Aware of Incident:** | **Time MPD was Made Aware of Incident:** |
| --- | --- | --- |
| None -104 | | |

| **Allegation(s):** | **FIT Member Notified About Use of Force?If 'yes' Member name** |
| --- | --- |
| Orders/Directives Violation, Conduct Unbecoming. | |

| **Member(s) Arrested?**  No | **Anchor Date :**  12/12/2011 |
| --- | --- |

| **SYNOPSIS:** | C-1 called the Internal Affairs Division and reported that the listed member, who is also the Pastor of his church is involved in an intimate relationship with a ▅▅▅▅▅ who is C-1"s wife. C-1 alleges that the member has been exchanging inappropriate text messages with Mrs. ▅▅▅▅ via her Ipod. C-1 also states that the member wears his weapon and badge while in the pulpit and while inside of the church. C-1 further states that Mrs. ▅▅▅▅ and her husband reside in the same household and are not legally separated. C-1 states that the affair has caused problems within their home between he and his wife. |
| --- | --- |

| **Member:** | Best, Darrell-5062 |
| --- | --- |

| **Rank:** | Officer | **Element:** | Patrol Services and School Security Bureau / Patrol Districts / 4D-Fourth District / 4D-Admin / |
| --- | --- | --- | --- |

| **Badge Number:** | S0682 | **Race:** | Black/African American | **Ethnicity:** | | **Sex:**  Male |
| --- | --- | --- | --- | --- | --- | --- |

| **Assignment:** | Patrol Services and School Security Bureau / Patrol Districts / 4D-Fourth District / 4D-Admin / | **Supervisor:** Audra Smith-4466 |
| --- | --- | --- |

| **Partner at Time of Incident:** | | **Revoked?** |
| --- | --- | --- |

| **Allegation(s):**  Conduct Unbecoming |
| --- |

| **Member Arrested?** | No | **Charge(s):** | |
| --- | --- | --- | --- |

| **Complainant (s):** | Anonymous Caller/ |
| --- | --- |

| **UFIR Required:** | No | **Did Member Decline to Complete UFIR?**  No |
| --- | --- | --- |

| **Reverse-Garrity Issued?** | No |
| --- | --- |

DC 001627

| UN-938 Rev. 5/07 | **METROPOLITAN POLICE DEPARTMENT** | | | |
|---|---|---|---|---|
| | **Incident Summary Sheet** | | | |

| Complainant: Anonymous Caller | | | |
|---|---|---|---|
| **Address:** Unknown  Washington District of Columbia-20002 | | | |
| **Race:** | | **Ethnicity:** Unknown | |
| **Sex:** Male | | **Email Address:** | |
| **Work:** | | **Home:** | |
| **Other:** ▮▮▮▮▮▮▮ | | **Fax:** | |
| **Complainant Arrested?** | | No | |
| **Charge(s):** | | | |
| **Instructions:** | On ALL Use of Force Incidents, direct the member to complete a Use of Force Incident Report (UFIR). Have the member FAX a copy of the UFIR to FIT 202-576-7514 prior to being relieved from duty. If the member does not want to fill out a UFIR, direct the notifying official to immediately contact a FIT official, who will approve or deny the issuance of Reverse-Garrity. | | |
| **IS Created By:** Boone Nisa-4927 | **IS Created By Rank:** Officer | | **Date:** 12/12/2011 |

**DUE DATES**

Report Date :12/12/2011

| | |
|---|---|
| **IS# :** 11003275 | |
| **Location :** District : 7D | **Tour of Incident :** Daywork |
| PSA : | |
| **Investigation Type :** Chain of Command | **Unit Assigned :** 4D |
| **Assign Approved by :** Cummings,Christopher-3232 | **Agent :** |
| **Incident Date :** 09/03/2011 | **Unit Assigned Date :** 09/03/2011 |
| **Date fwd to Inv Unit :** 12/12/2011 | **IA Anchor Date :** 12/12/2011 |
| **IA Due Date :** 01/11/2012 | **90 Day Due Date :** 01/09/2012 |
| **Date Recd by IA :** | **Date Sent to USAO :** |
| **Date Returned from USAO :** | **OPC# :** |
| **Date Ref By OPC to MPD :** | **Disposition :** Pending |
| **Disposition Date:** | **Closeout Reviewer :** |
| **Closeout Date :** | |

**Notes :**

**Approver Signature :** _[signature]_          **Date Signed:** 12/13/11

DC 001629



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**METROPOLITAN POLICE DEPARTMENT**

Mr. ████ W████

████████████████████

January 18, 2012

Dear Mr. W████ :

This letter is to inform you of the results of the investigation of the complaint which you made against Officer Darrell Best on December 12, 2011, wherein you claimed that he is having an intimate relationship with your wife, and also that he wears his police badge and gun while in the pulpit of his church, the God of a Second Chance Ministry.

I investigated your complaint. After considering the evidence available to me, I have concluded that there are Insufficient Facts known to sustain your complaint that Officer Best is having an intimate relationship with your wife. Also, I have conclude that there is not a preponderance of evidence that Officer Best has worn his police badge and gun in a manner that is in violation of departmental rules and regulations.

Should you disagree with the findings of this investigation, you may exercise your right to appeal in the following manner.

Appeals should be mailed to:
Chief of Police
Room 5080
300 Indiana Avenue, N.W.
Washington, D.C. 20001

Both the envelope and the letter should be clearly marked "Citizen's Complaint Appeal." Should you have any questions, feel free to contact me at 202-715-7500.

Sincerely,

*Frank Hill*

Frank Hill
Captain
Fourth District

DC 001630

# EXHIBIT 23

## Training History Report
Metropolitan Police Academy (MPA)
Metropolitan Police Department, Washington, D.C.

Reported by Sandra A. Readmore Suite    01/16/2018

For: Best, Darrell L.

CAD 5062

**Best, Darrell L.**

| | | | | |
|---|---|---|---|---|
| Person Status | Inactive | DOB | | EEOC |
| SSN | | Gender | Male | |

### Employment

| Status | Organization | Title/Rank | Assignment Level | Rank | Dates |
|---|---|---|---|---|---|
| Inactive | PSN - 4D Fourth District (Primary) | Officer | District | Officer | 02/02/1987 - 08/04/2015 |
| Inactive | CSB - Corporate Support Bureau | Officer | Bureau | Officer | 11/23/2014 - 03/14/2015 |
| Inactive | RTD - Return to Duty | Officer | | | 02/02/1987 - 01/15/2014 |
| Inactive | Patrol Districts | Officer | | | 02/02/1987 - 01/15/2014 |
| Inactive | Patrol Services Bureau | Officer | | | 02/02/1987 - 01/15/2014 |
| Inactive | PSN - 4D - Admin | Officer | | | 02/02/1987 - 01/15/2014 |

### Certifications

| Name | Issued | Expiration | Status |
|---|---|---|---|
| Civil Disturbance Unit Training | 12/27/2012 | Never Expires | Active (Active) |
| ASP | 09/04/2014 | 12/31/2016 | Expired (Inactive) |
| CPR/AED | 09/04/2014 | 12/31/2016 | Expired (Inactive) |
| Tactical Emergency Casualty Care (TECC) | 09/04/2014 | 09/04/2016 | Expired (Inactive) |
| WALES II | 06/26/2014 | 06/26/2016 | Expired (Inactive) |

### Training

**Upcoming, Ongoing, & Unconfirmed**

| Course/Title (Course No.) | Training Dates | Grade | Status | Training Category | Hours |
|---|---|---|---|---|---|
| 2015 Online Training - Overview of Body Worn Camera Part I | 06/26/2015 | | Assigned | | 1h 0m |
| 2015 Online Training - Transport Vehicle Safety Bar | 06/24/2015 | | Assigned | | 1h 0m |
| 2015 Online Training - Overview of Body Worn Camera - Part II | 06/23/2015 | | Assigned | | 1h 0m |
| 2015 Online Training - Introduction-Criminal Interdiction Unit | 06/12/2015 | | Assigned | | 1h 0m |
| 2015 Online Training - Use of Force-Module I | 05/15/2015 | | Assigned | | 1h 0m |
| 2015 Online Training - Use of Force-Module II | 05/15/2015 | | Assigned | | 1h 0m |
| 2015 Online Training - Dinner to Dismissal-2015 | 04/24/2015 | | Assigned | | 0h 30m |
| 2015 Online Training - Part IV - LGBT Issues (V 2) | 04/03/2015 | | Assigned | | 2h 0m |
| 2015 Online Training - Responding to Metro Incidents Online Module | 03/26/2015 | | Assigned | | 1h 0m |

DC 000674

**Training History Report**
Metropolitan Police Academy (MPA)
Metropolitan Police Department, Washington, D.C.

Reported by Rankin e Residence Suite

For   Sgt. Darrell L.

CAD  5062

| Course | Date | Status | Hours |
|---|---|---|---|
| 2015 Online Training - Drive to Arrive Safety Video Module | 03/13/2015 | Assigned | 1h 0m |
| 2014 Online Training - Personal Protective Equipment for First Responders Module | 11/18/2014 | Assigned | 1h 0m |
| 2014 Online Training - Body Worn Camera Pilot Program | 10/08/2014 | Assigned | |
| 2014 Online Training - Certify and Affirm-2014 Investigators Selection Process Application | 09/18/2014 | Assigned | |
| 2014 Online Training - SO 14-03 MPD CCTV Digital Evidence Management System | 06/06/2014 | Assigned | |
| 2013 Online Training - Handling And Accounting for Seized and Forfeited Property | 09/12/2013 | Assigned | 1h 0m |
| 2013 Online Training - Updated Citation Release Form DCSC | 09/12/2013 | Assigned | 0h 30m |
| 2013 Online Training - Adult Sexual Assault Investigations | 06/11/2013 | Assigned | 0h 30m |
| 2013 Online Training - Enhanced Bicycle-Pedestrian Enforcement Training | 04/18/2013 | Assigned | 0h 30m |
| | | **Total Hours** | **(14h 0m)** |

**Current Period to Date (01/01/2018 - 01/05/2018)**

No current year training data exists.

**Previous Period (01/01/2017 - 12/31/2017)**

No previous year training data exists.

**Other Periods (through 12/31/2016)**

| Course/Title (Course No.) | Training Dates | | Grade | Status | Training Category | Hours |
|---|---|---|---|---|---|---|
| 2014 Online Training - Use and Connection of the Motorola 3.5mm Earpieces | 03/04/2015 | 03/04/2015 | | Completed | | |
| 2014 Online Training - 2014 Language Access Training | 03/04/2015 | 03/04/2015 | 100.00% | Completed - Passed | | 0h 30m |
| 2015 Online Training - Initiative 71 - Legalization of Possession of Minimal Amounts of Marijuana for Personal Use | 03/04/2015 | 03/04/2015 | | Completed | | 1h 0m |
| Professional Development Training - 2014/09/02 (Sgt and below) | 09/02/2014 | 09/04/2014 | 0.00% | Graduated - 09/04/2014 | | 24h 0m |
| Firearms Pistol Requalification - Phase II - 2014/07/28 (MPA) | 07/28/2014 | 07/28/2014 | 0.00% | Graduated - 07/28/2014 | | 8h 0m |
| 2014 Online Training - Marijuana Decriminalization Act of 2014 Online Module | 07/15/2014 | 07/15/2014 | | Completed | | 0h 30m |
| WALES II Re-certification - 2014/06/26 | 06/26/2014 | 06/26/2014 | 0.00% | Graduated - 06/26/2014 | | 8h 0m |
| Firearms Pistol Requalification - Phase I - 2014/05/06 (MPA) | 05/06/2014 | 05/06/2014 | 0.00% | Graduated - 05/06/2014 | | 8h 0m |
| 2013 Online Training - Medical Marijuana Program | 09/12/2013 | 03/04/2015 | 80.00% | Completed | | 2h 0m |
| Firearms Pistol Requalification - Phase II - 2013/09/06 (FLETC) | 09/06/2013 | 09/06/2013 | 0.00% | Graduated - 09/06/2013 | | 8h 0m |
| Firearms Pistol Requalification - Phase I - 2013/04/11 (FLETC) | 04/11/2013 | 04/11/2013 | 0.00% | Graduated - 04/11/2013 | | 8h 0m |

*For Official Use Only*

*Page 2 of 4*

# Training History Report
Metropolitan Police Academy (MPA)
Metropolitan Police Department, Washington, D.C.

Reported by: Jessika R Resolvent Suite    01/15/2015

For:   Best, Darrell L.

CAD   5062

| | | | | | |
|---|---|---|---|---|---|
| Professional Development Training - 2013/04/08 (Officer) | 04/08/2013 | 04/10/2013 | 0.00% | Graduated - 04/10/2013 | 40h 0m |
| 2013 Inauguration Training - Response to Civil Disturbance and First Amendment Assemblies | 01/19/2013 | 01/19/2013 | | Completed | 2h 0m |
| 2013 Inauguration Training - 57th Presidential Inauguration Video | 01/19/2013 | 01/19/2013 | | Completed - Passed | 0h 30m |
| 2013 Inauguration Training - First Amendment Assemblies | 01/09/2013 | 01/19/2013 | | Completed | 1h 0m |
| 2013 Inauguration Training - Managing Large Crowds and Civil Disturbance Incidents | 01/09/2013 | 01/19/2013 | 100.00% | Completed - Passed | 1h 0m |
| 2012 Professional Development Training - Wage Disputes | 01/09/2013 | 01/09/2013 | 100.00% | Completed | 0h 30m |
| 2012 CDU Re-Certification Training - 2012/12/27 0630 | 12/27/2012 | 12/27/2012 | 0.00% | Graduated - 12/27/2012 | 8h 0m |
| WALES II Re-certification - 2012/12/21 | 12/21/2012 | 12/21/2012 | 0.00% | Departed - 12/21/2012 | 0h 0m |
| 2015 Online Training - Dinner to Dismissal | 12/05/2012 | 12/05/2012 | | Completed - Passed | 0h 30m |
| 2012 Professional Development Training - Snow Emergency Operations | 12/05/2012 | 12/05/2012 | | Completed | 0h 30m |
| 2012 Firearms Pistol Requalification - Phase II - 2012/11/16 (FLETC) | 11/16/2012 | 11/16/2012 | 0.00% | Graduated - 11/16/2012 | 8h 0m |
| 2012 Professional Development Training - Introduction to the District of Columbia Alcohol Breath Testing Program | 11/05/2012 | 11/05/2012 | | Completed | 0h 30m |
| MPD Intergraph RMS Training | 06/05/2012 | 06/05/2012 | N/A | Complete | 0h 0m |
| Firearms - Pistol Requalification 2012-I | 05/21/2012 | 05/21/2012 | N/A | Complete | 0h 0m |
| 2012 Professional Development Training - ASP/CPR/AED | 03/16/2012 | 03/16/2012 | N/A | Complete | 0h 0m |
| 2011 Online Professional Development Training | 02/17/2012 | 02/17/2012 | N/A | Complete | 0h 0m |
| Professional Development Training 2011 - Sergeants, Detectives and Below | 12/16/2011 | 12/16/2011 | N/A | Complete | 0h 0m |
| Professional Development Training 2011 - Wednesday Symposium Elective | 11/23/2011 | 11/23/2011 | N/A | Complete | 0h 0m |
| Firearms - Pistol Requalification 2011-II | 09/01/2011 | 09/01/2011 | N/A | Complete | 0h 0m |
| Firearms - Pistol Requalification 2011-I | 05/31/2011 | 05/31/2011 | N/A | Complete | 0h 0m |
| Disorderly Conduct | 01/28/2011 | 01/28/2011 | N/A | Complete | 0h 0m |
| Packaging Evidence | 01/28/2011 | 01/28/2011 | N/A | Complete | 0h 0m |
| Circular 11-01 Disorderly Conduct Certification Module | 01/28/2011 | 01/28/2011 | N/A | Complete | 0h 0m |
| 2010 Professional Development Training Part II | 12/04/2010 | 12/04/2010 | N/A | Complete | 0h 0m |
| OSHA 10 Series Course Certification Module | 12/03/2010 | 12/03/2010 | N/A | Complete | 0h 0m |
| Court Related Functions | 12/03/2010 | 12/03/2010 | N/A | Complete | 0h 0m |
| Pretrial Release Video | 12/03/2010 | 12/03/2010 | N/A | Complete | 0h 0m |
| First Amendment Assemblies | 12/03/2010 | 12/03/2010 | N/A | Complete | 0h 0m |
| Overview of the New Automated Event/ Incident Reports | 12/03/2010 | 12/03/2010 | N/A | Complete | 0h 0m |
| Electronic Correspondence | 12/03/2010 | 12/03/2010 | N/A | Complete | 0h 0m |
| See It - SAR It | 12/02/2010 | 12/02/2010 | N/A | Complete | 0h 0m |

DC 000676

# Training History Report

Metropolitan Police Academy (MPA)
Metropolitan Police Department, Washington, D.C.

Reported In: *Joshia S. Renderis Suite*

For: Best, Darrell L.

CAD  5062

| Class | Date | Date | | Status | Hours |
|---|---|---|---|---|---|
| Suspicious Activity Reporting (SAR) | 12/02/2010 | 12/02/2010 | N/A | Complete | 0h 0m |
| Professional Development Training 2010 | 10/13/2010 | 10/13/2010 | N/A | Complete | 0h 0m |
| Wales II Certification Training | 10/12/2010 | 10/12/2010 | N/A | Complete | 0h 0m |
| Firearms - Pistol Requalification 2010-II | 07/26/2010 | 07/26/2010 | N/A | Complete | 0h 0m |
| Court Related Functions | 11/25/2009 | 11/25/2009 | N/A | Complete | 0h 0m |
| 2009 Distance Learning Program Modules | 11/25/2009 | 11/25/2009 | N/A | Complete | 0h 0m |
| Professional Development Training 2009 | 10/06/2009 | 10/06/2009 | N/A | Complete | 0h 0m |
| Second Firearms Control Emergency Amendment Act of 2008 | 10/21/2008 | 10/21/2008 | N/A | Complete | 0h 0m |

Total Hours  (130h 30m)

A grade of ## indicates that the weights for this class are not valid and grades cannot be calculated.

**Education**

No education data exists.

**Miscellaneous**

| TECC Issue Date | 11/12/2014 |
|---|---|
| TECC Kit Issued | TECC Kit |



DEPOSITION
EXHIBIT
Davis 1
1-14-16

# METROPOLITAN POLICE DEPARTMENT
## Washington, DC
### Metropolitan Police Academy Record of Training

DC Metropolitan Police Department Confidential

| Course Title and Level | Type of Training | Contact Hours | % Marks | Grade/ Disposition | Date | Honors/Awards |
|---|---|---|---|---|---|---|
| Organization of MPD/Code of Conduct/ | | | | | | |
| Diplomatic Immunity/Blstandard Person/ | | | | | | |
| Crowd Control/Illness Arrest/Bomb | | | | | | |
| Threat/Explosive Devices/Police Chain/ | | | | | | |
| Sick Lv/Tardiness and Suspension - 01 | ROTP | 40 | 82 Pass | 6/15/1997 | | |
| Casual Clothes/Fresh & Fresh Pursuit/ | | | | | | |
| Discretory Conduct/Inhibited Person/ | | | | | | |
| Diplomatic Immunity/Citation Released | | | | | | |
| Interception of Wire & Oral | | | | | | |
| Communication/Handling Juveniles - 02 | ROTP | 40 | 86 Pass | 6/22/1997 | | |
| Press Relations/Narcotic/Missing | | | | | | |
| Persons - 03 | ROTP | 40 | 94 Pass | 7/9/1997 | | |
| Affidavits and Warrants - 04 | ROTP | 26 | 100 Pass | 9/4/1997 | | |
| Metro Transit Police, Arrest of Armed | | | | | | |
| Forces, EEO, Criminal Procedure, | | | | | | |
| Testimonial Evidence, Use of Canine | | | | | | |
| Summons - 05 | ROTP | 40 | 90 Pass | 9/18/1997 | | |
| Traffic Regulations | ROTP | 25 | 82 Pass | 7/17/1997 | | |
| Laws of Arrest, Search & Seizure | ROTP | 40 | 74 Pass | 6/29/1997 | | |
| DC Code Part I (Crimes against Person) | ROTP | 17 | 88 Pass | 5/29/1997 | | |
| Dc Code Part II (Crimes against Property) | ROTP | 21 | 80 Pass | 8/01/1997 | | |
| Municipal Regulations | ROTP | 24 | 80 Pass | 8/24/1997 | | |
| Handling Property | ROTP | 10 | 88 Pass | 9/11/1997 | | |
| Report Writing | ROTP | 25 | 84 Pass | 7/11/1997 | | |
| Spelling | ROTP | 12 | 84 Pass | 9/11/1997 | | |
| ABC Regulations | ROTP | 12 | 94 Pass | 10/1/1997 | | |
| Use of the Service Revolver | ROTP | 40 | MNA Pass | N/A | | |
| Drivers Training/Vehicle Skills | ROTP | 40 | 88 Pass | N/A | | |
| First Responder | ROTP | 15 | 90 Pass | 7/31/1997 | | |
| Physical Training | ROTP | 72 | MNA Completed | N/A | | |

| Course Title | Type of Training | Contact Hours | % Marks | Grade/ Disposition | Date | Honors/Awards |
|---|---|---|---|---|---|---|
| Police Continuing Education | | | | | | This copy of the member's training record becomes |
| Psychological Approach to Detecting | | | | | | an official transcript when bearing an embossed |
| Danger | PD | N/A | MNA Completed | 5/9/1995 | | seal of the director of training, and the signature |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 10/29/1998 | | of the director of training. This record is released in |
| | PD | 8 | MNA Completed | 3/11/1999 | | compliance with the requirements of the Privacy |
| Computer - Introduction to PC | PD | N/A | MNA Completed | 6/18/1999 | | Act of 1974. |
| Computer - Intermediate WORD | PD | N/A | MNA Completed | 5/27/1999 | | |
| Defensive Statements | PD | N/A | MNA Completed | 6/10/1999 | | This information has been released in accordance |
| Law Enforcement - CCRB | PD | N/A | MNA Completed | 8/23/1999 | | with the consent of the member named on this |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 9/23/1999 | | transcript and cannot be further disclosed to any |
| Sex Offender First Responder | PD | N/A | MNA Completed | 8/25/1999 | | other party without his or her prior written approval. |
| Management - RISA Management Seminar | In-service | 40 | 100 Completed | 4/6/2000 | | |
| ADP Certification - UOF | PD | N/A | MNA Completed | 6/27/2000 | | |
| In-service Training FY 2001 | In-service | 40 | 80 Completed | 4/20/2001 | | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 5/17/2000 | | |
| ADP Certification - UOF | In-service | 8 | MNA Completed | 8/9/2001 | | |
| In-service Training FY 2002 | In-service | 40 | MNA Completed | 4/19/2001 | | |
| Continued F.O.R.C.E. | In-service | 40 | 94 Completed | 11/30/2001 | | |
| Use of Force: Weapons Qualification | PD | N/A | MNA Completed | 12/5/2001 | | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 2/9/2002 | | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 10/22/2002 | | |
| In-service Training FY 2003-AHH | In-service | 8 | MNA Completed | 5/31/2003 | | |
| In-service Training FY 2003 | In-service | MNA | MNA Completed | 7/28/2003 | | |
| In-service Training FY 2003 | In-service | 40 | 100 Completed | 9/1/2003 | | |

# METROPOLITAN POLICE DEPARTMENT
## Washington, DC
### Metropolitan Police Academy Record of Training

| Course Title and Level | Type of Training | Contact Hours | % Marks | Grade/ Disposition | Date | Course Title | Type of Training | Contact Hours | % Marks | Grade/ Disposition | Date | Honors/Awards |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Use of Force: Weapons Qualification | In-service | 8 | | N/A Completed | 12/4/2003 | | | | | | | |
| Use of Force: Weapons Qualification | In-service | 8 | | N/A Completed | 2/20/2004 | | | | | | | |
| Use of Force: Civil Disturbance Training | In-service | 8 | | N/A Completed | 2/20/2004 | | | | | | | |
| In-service Training FY 2004 | In-service | 40 | | 94 Completed | 2/27/2004 | | | | | | | |
| Use of Force: Weapons Qualification | In-service | 8 | | N/A Completed | 3/15/2004 | | | | | | | |
| Use of Force: Weapons Qualification | In-service | 8 | | N/A Completed | 8/16/2004 | | | | | | | |
| Use of Force: Weapons Qualification | In-service | 8 | | N/A Completed | 8/19/2004 | | | | | | | |
| Use of Force: Civil Disturbance Training | In-service | 8 | | N/A Completed | 9/10/2004 | | | | | | | |
| Use of Force: Weapons Qualification | In-service | 8 | | N/A Completed | 10/25/2004 | | | | | | | |
| In-service Training FY 2005 | In-service | 40 | | 100 Completed | 2/4/2005 | | | | | | | |
| Use of Force: Weapons Qualification | In-service | 8 | | N/A Completed | 8/11/2005 | This Page was Intentionally Left Blank | | | | | | |
| Use of Force: Weapons Qualification | In-service | 8 | | N/A Completed | 11/16/2005 | | | | | | | |
| Writing & Grammar Skills Workshop | In-service | 8 | | N/A Completed | 2/8/2006 | | | | | | | |
| Use of Force: Weapons Qualification | N/A | | | N/A Completed | 6/31/2006 | | | | | | | |
| In-service Training FY 2006 | In-service | 40 | | 100 Completed | 8/2/2006 | | | | | | | |
| End of PDT & In-service Transcript | In-service | 40 | | 100 Completed | 9/12/2006 | | | | | | | |

Additional PDT & in-service training on attached LMS records

This copy of the member's training record becomes an official transcript when bearing an embossed Metropolitan Police Department seal and the signature of the director of training. This record is released in compliance with the requirements of the Privacy Act of 1974.

This information has been released in accordance with the consent of the member named on his transcript and cannot be further disclosed to any other party without his or her prior written approval.

DC Metropolitan Police Academy
4665 Blue Plains Drive, SW, Ste. 100
Washington, DC 20032-0202

Director of Training
Commander Ralph Ennis

Peter Newsham, Chief of Police

Muriel Bowser, Mayor

DC 000672

# METROPOLITAN POLICE DEPARTMENT
## Washington, DC
### Metropolitan Police Academy Record of Training

| Name: Reed, Sherral L. | Date of Birth: | Appointment Date: 2/27/1987 | Reason Closed: 1987-81 |
| --- | --- | --- | --- |
| SSN: XXX-XX-0200 | CAD #: 0002 | Date of Closure: 6/10/2007 | Date of One/Uniform: 8/01/1987 |

| Course Title | Type of Training | Contact Hours | % Marks | Grade/Disposition | Date | Course Title | Type of Training | Contact Hours | % Marks | Grade/Disposition | Date | Honors/Awards |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

**Grading System:**

HPP = High Pass (85% >) ..........Superior
HP = High Pass (80% - 84%) ........Outstanding
P1 = Pass (85% - 89%) ..............Good
P2 = Pass (80% - 84%) ..............Average
P3 = Pass (80% - 79%) ..............Fair
LP = Low Pass (75% - 79%) ..........Satisfactory
R = Repeat/Fail (< 70%) ............Unsatisfactory
RP = Repeat Pass ..................Passing on 2nd Try

AFW = Affidavits and Warrants
ASP = Armament System Procedures
CAD = Computerized Assisted Dispatching
CC = Code of Conduct
CDU = Civil Disturbance Unit
CP = Court Procedures
LASS = Laws of Arrest, Search & Seizure
MMA = Mama Not Assigned
N/A = Not Available or Not Applicable
PDT = Professional Development Training
PPMS = Personnel Performance Management System
RE = Rules of Evidence
ROTP = Recruit Officer Training Program
SDT = Self Directed Training
TE = Testimonial Evidence
UOF = Use of Force

**Hours of Recruit Training:** 530
**Student Average:** 87.00%  N/A
**Student Rank In Class:** N/A
**Hours of In-service and PD Training:** N/A
**Current Status & Rank with Metropolitan Police Department:** Inactive  Officer

**Last Known Address:**

DC Metropolitan Police Academy
4065 Blue Plains Drive, SW, Ste. 100
Washington, DC 20032-5202

Director of Training: C. Johnson, Commander Education
Peter Newsham, Chief of Police
Muriel Bowser, Mayor

This copy of the member's training record becomes an official transcript when bearing an embossed Metropolitan Police Department seal and the signature of the director of training. This record is released in compliance with the requirements of the Privacy Act of 1974.

This information has been released in accordance with the consent of the member named on the transcript and cannot be further disclosed to any other party without his or her prior written approval.

1/5/2016

DC 000678

# METROPOLITAN POLICE DEPARTMENT
## Washington, DC
### Metropolitan Police Academy Record of Training

| Name: Bash, Darrell L. | | Appointment Date: 2/2/1987 | Recruit Class: 1987-? |
|---|---|---|---|
| SS#: [redacted] | Date of Birth: [redacted] | Issue Date: 4/11/2018 | Date of Graduation: 9/3/1987 |
| | CAD #: | | |

| Course Title and Level | Type of Training | Contact Hours | % Marks Grade/Disposition | Date |
|---|---|---|---|---|
| Organization of MPD-Code of Conduct/ | ROTP | 40 | 90 Pass | 9/18/1987 |
| Diplomatic Immunity/Barricaded Person/ | | | | |
| Crowd Control/Mass Arrest/Bomb | | | | |
| Threats/Explosive Devices/Police Clinic/ | | | | |
| Stick Lv./Tardiness and Suspension - 01 | ROTP | 40 | 82 Pass | 5/15/1987 |
| Casual Clothes/Fugitive & Fresh Pursuit/ | | | | |
| Disorderly Conduct/Intoxicated Personnel | | | | |
| Diplomatic Immunity/Citizen Release/ | | | | |
| Interception of Wire & Oral | | | | |
| Communication/Handling Juveniles - 02 | ROTP | 40 | 88 Pass | 6/22/1987 |
| Press Relations/Narcotics/Missing | | | | |
| Persons - 03 | ROTP | 40 | 94 Pass | 7/9/1987 |
| Affidavits and Warrants - 04 | ROTP | 28 | 100 Pass | 9/4/1987 |
| Metro Transit Police, Arrest of Armed | | | | |
| Forces, EEO, Criminal Procedure, | | | | |
| Testimonial Evidence, Use of Canine | | | | |
| Summons - 05 | ROTP | 40 | 90 Pass | 9/18/1987 |
| Traffic Regulations | ROTP | 25 | 92 Pass | 7/17/1987 |
| Laws of Arrest, Search & Seizure | ROTP | 40 | 74 Pass | 7/17/1987 |
| DC Code Part I (Crimes against Persons) | ROTP | 17 | 88 Pass | 8/29/1997 |
| Dc Code Part II (Crimes against Property) | ROTP | 21 | 88 Pass | 5/26/1987 |
| Municipal Regulations | ROTP | 24 | 80 Pass | 6/8/1987 |
| Report Writing | ROTP | 80 | 88 Pass | 6/29/1987 |
| Handling Property | ROTP | 88 | 88 Pass | 9/24/1987 |
| Spelling | ROTP | 10 | 84 Pass | 9/11/1987 |
| ABC Regulations | ROTP | 25 | 64 Pass | 7/1/1987 |
| Use of the Service Revolver | ROTP | 12 | 94 Pass | N/A |
| Drivers Training/Vehicle Skills | ROTP | 12 | MNA Pass | 10/1/1987 |
| First Responder | ROTP | 40 | 99 Pass | N/A |
| Physical Training | ROTP | 40 | 82 Pass | N/A |
| End of Recruit Training | ROTP | 15 | MNA Completed | 7/31/1987 |
| | ROTP | 72 | | N/A |

| Course Title | Type of Training | Contact Hours | % Marks Grade/Disposition | Date | Honors/Awards |
|---|---|---|---|---|---|
| Comprehensive Examination | ROTP | N/A | 89% Passed | 10/5/1987 | |
| Police Continuing Education | PD | N/A | MNA Completed | 5/8/1996 | |
| Psychological Approach to Detecting Danger | In-service | 8 | MNA Completed | 10/28/1998 | |
| Use of Force: Weapons Qualification | PD | N/A | MNA Completed | 3/11/1999 | |
| Computer - Introduction to PC | PD | N/A | MNA Completed | 3/18/1999 | |
| Computer - Intermediate WORD | PD | N/A | MNA Completed | 5/27/1999 | |
| Defendant's Statements | PD | N/A | MNA Completed | 9/10/1999 | |
| Law Enforcement - CCRB | PD | N/A | MNA Completed | 9/22/1999 | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 9/23/1999 | |
| Sex Offender First Responder | PD | N/A | MNA Completed | 9/25/1999 | |
| In-service Training FY 2000 | PD | 40 | 100 Completed | 4/6/2000 | |
| Management - Risk Management Seminar | PD | N/A | MNA Completed | 8/27/2000 | |
| ASP Certification - UOF | In-service | 8 | MNA Completed | 3/04/2001 | |
| In-service Training FY 2001 | In-service | 40 | 80 Completed | 4/20/2001 | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 5/17/2001 | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 8/6/2001 | |
| ASP Certification - UOF | In-service | 40 | 84 Completed | 11/20/2001 | |
| In-service Training FY 2002 | In-service | 40 | 100 Completed | 11/20/2001 | |
| Completed F.O.R.C.E | PD | 8 | MNA Completed | 12/9/2001 | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 2/8/2002 | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 10/22/2002 | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 5/30/2003 | |
| Use of Force: Weapons Qualification | In-service | 8 | MNA Completed | 7/29/2003 | |
| In-service Training FY 2003 | In-service | 40 | 100 Completed | 8/1/2003 | |

This copy of the member's training record becomes an official transcript when bearing an embossed Metropolitan Police Department seal and the signature of the director of training. This record is released in compliance with the requirements of the Privacy Act of 1974.

This information has been released in accordance with the consent of the member named on this transcript and cannot be further disclosed to any other party without his or her prior written approval.

Director of Training:  Commander Ralph G. Ennis
Peter J. Newsham, Chief of Police
Muriel Bowser, Mayor

DC Metropolitan Police Academy
4665 Blue Plains Drive, SW, Ste. 100
Washington, DC 20032-5202

DC 007827

**METROPOLITAN POLICE DEPARTMENT**
Washington, DC
**Metropolitan Police Academy Record of Training**

Name: Best, Darcell L.
SS#:
Date of Birth:
CAD #:
Appointment Date: 2/2/1987
Issue Date: 4/11/2018
Recruit Class: '98 7-1
Date of Graduation: 9/3/1987

| Course Title | Type of Training | Contact Hours | % Marks | Grade/ Disposition | Date |
|---|---|---|---|---|---|
| Use of Force: Weapons Qualification | In-service | 8 | | MNA Completed | 12/4/2003 |
| Use of Force: Civil Disturbance Training | In-service | 8 | | MNA Completed | 2/20/2004 |
| In-service Training FY 2004 | In-service | 8 | | MNA Completed | 2/20/2004 |
| Use of Force: Weapons Qualification | In-service | 8d | | 84 Completed | 2/27/2004 |
| Use of Force: Weapons Qualification | In-service | 40 | | MNA Completed | 3/15/2004 |
| Use of Force: Weapons Qualification | In-service | 8 | | MNA Completed | 9/10/2004 |
| Use of Force: Civil Disturbance Training | In-service | 8 | | MNA Completed | 9/10/2004 |
| Use of Force: Weapons Qualification | In-service | 8 | | MNA Completed | 10/25/2004 |
| In-service Training FY 2005 | In-service | 40 | | MNA Completed | 2/4/2005 |
| Use of Force: Weapons Qualification | In-service | 8 | 100 | Completed | 5/11/2005 |
| Use of Force: Weapons Qualification | In-service | 8 | | MNA Completed | 11/10/2005 |
| Use of Force: Weapons Qualification | In-service | 8 | | MNA Completed | 2/8/2006 |
| Writing & Grammar Skills Workshop | In-service | N/A | | MNA Completed | 5/31/2006 |
| Use of Force: Weapons Qualification | In-service | 8 | | MNA Completed | 8/3/2006 |
| In-service Training FY 2006 | In-service | 40 | 100 | Completed | 9/12/2006 |
| Second Firearms Control Emergency Amendment Act of 2008 | In-service | N/A | | MNA Completed | 10/21/2008 |
| Professional Development Trng 2009 | In-service | N/A | | MNA Completed | 10/8/2009 |
| Re-Installate Exam | PD | N/A | 38 | Completed | 10/9/2009 |
| 2009 Distance Lrng. Program Modules | In-service | N/A | | MNA Completed | 11/25/2009 |
| Court Related Functions | In-service | N/A | | MNA Completed | 11/25/2009 |
| Firearms: Pistol Requalification 2010-I | In-service | 8 | | MNA Completed | 7/28/2010 |
| WALES II Certification Training | In-service | 8 | | MNA Completed | 10/12/2010 |
| Professional Development Training 2010 | In-service | N/A | | MNA Completed | 6/21/2010 |
| Suspicious Activity Reporting (SAR) | PD | N/A | | MNA Completed | 12/27/2010 |
| See It - SAR II | In-service | N/A | | MNA Completed | 12/27/2010 |
| Electronic Correspondance | PD | Online | | MNA Completed | 12/28/2010 |
| Overview of the New Automated Event / Incident Reports | In-service | N/A | | MNA Completed | 12/29/2010 |
| Pretrial Release Video | PD | Online | | MNA Completed | 12/30/2010 |
| Court Related Functions | In-service | N/A | | MNA Completed | 12/30/2010 |

| Course Title | Type of Training | Contact Hours | % Marks | Grade/ Disposition | Date | Honors/Awards |
|---|---|---|---|---|---|---|
| OSHA 10 Series Course Certification | In-service | N/A | | MNA Completed | 12/28/2010 | |
| First Amendment Assemblies | In-service | N/A | | MNA Completed | 12/28/2010 | |
| 2010 PDT Part II | In-service | N/A | | MNA Completed | 12/24/2010 | |
| Disorderly Conduct | PD | N/A | | MNA Completed | 12/28/2011 | |
| Circular 11-01 Disorderly Conduct | PD | N/A | | MNA Completed | 1/28/2011 | |
| Certification Module | In-service | N/A | | MNA Completed | 1/28/2011 | |
| Packaging Evidence | In-service | N/A | | MNA Completed | 5/31/2011 | |
| Firearms Pistol Requalification 2011 | In-service | 8 | | MNA Completed | 9/30/2011 | |
| Firearms Pistol Requalification 2011-I | In-service | 8 | | MNA Completed | 11/23/2011 | |
| PDT 2011 Wednesday Symposium Elective | In-service | N/A | | MNA Completed | 11/23/2011 | |
| PDT 2011 Sergeants & Below | In-service | N/A | | MNA Completed | 12/6/2011 | |
| 2011 Online PDT | Online | N/A | | MNA Completed | 2/17/2012 | |
| 2012 PDT ASP/CPR/AED | In-service | N/A | | MNA Completed | 3/16/2012 | |
| Firearms: Pistol Requalification 2012-I | In-service | 8 | | MNA Completed | 5/12/2012 | |
| MPD Intergraph RMS Training | PD | N/A | | MNA Completed | 6/5/2012 | |
| 2012 PDT - Intro. To DC Alcohol | In-service | 0.5 | | MNA Completed | 11/6/2012 | |
| Breath Testing Program | In-service | 8 | | MNA Completed | 11/16/2012 | |
| Firearms-Pistol Requalification 2012-I | In-service | 0.5 | | MNA Completed | 12/5/2012 | |
| 2012 PDT Snow Emergency Operations | In-service | 0.5 | | MNA Completed | 12/5/2012 | |
| 2012 PDT Dinner To Dismissal | In-service | 0.5 | | MNA Completed | 12/5/2012 | |
| WALES II Recertification Training | In-service | 8 | | MNA Completed | 12/21/2012 | |
| GDL Recertification Training - 2012 | PD | N/A | | MNA Completed | 12/27/2012 | |
| Civil Disturbance Training | In-service | N/A | | MNA Completed | 12/27/2012 | |
| Never Express | N/A | N/A | | N/A Issued | 12/27/2012 | |
| 2012 PDT - Wage Disputes | PD | 0.5 | 100 | Completed | 1/9/2013 | |

This copy of the member's training record becomes an official transcript when bearing an embossed Metropolitan Police Department seal and the signature of the director of training. This record is released in compliance with the requirements of the Privacy Act of 1974.

This information has been released in accordance with the consent of the member named on the transcript and cannot be further disclosed to any other party without his or her prior written approval.

DC Metropolitan Police Academy
4665 Blue Plains Drive, SW, Ste. 100
Washington, DC 20032-5202

Director of Training: Commander Ralph G. Ennis
Peter J. Newsham, Chief of Police
Muriel Bowser, Mayor

# METROPOLITAN POLICE DEPARTMENT
## Washington, DC
## Metropolitan Police Academy Record of Training

**Name:** Best, Darrall L.
**SS#:**

**Date of Birth:**
**CAD #:**

**Appointment Date:** 2/21/1987
**Issue Date:** 4/11/2013

**Recruit Class:** 1987-1
**Date of Graduation:** 8/3/1987

| Course Title | Type of Training | Contact Hours | % Marks | Grade/ Disposition | Date |
|---|---|---|---|---|---|
| 2013- Managing Large Crowds & Civil Disturbances Incidents | In-service | 1 | 100 | Completed | 1/9/2013 |
| 2013-First Amendment Assemblies | In-service | 1 | | MNA Completed | 1/9/2013 |
| 2013 Inauguration Training-57th Presidential Inauguration Video | In-service | 0.5 | | MNA Completed | 1/9/2013 |
| 2013 Response to Civil Disturbance & First Amendment Assemblies | In-service | 2 | | MNA Completed | 1/9/2013 |
| 2013 PDT Training | In-service | 40 | | MNA Completed | 4/10/2013 |
| Firearms Pistol Requalification 2013-I | PD | 8 | | MNA Completed | 4/11/2013 |
| Firearms Pistol Requalification 2013- II | PD | 8 | | MNA Completed | 9/5/2013 |
| Firearms Pistol Requalification 2014-I | PD | 8 | | MNA Completed | 5/9/2014 |
| WALES II Recertification Training | In-service | 8 | | MNA Completed | 6/26/2014 |
| WALES II | N/A | N/A | | N/A Issued | 6/26/2014 |
| Expires: 6/26/2016 | | | | | |
| 2014 Marijuana Decriminalization Act | Online | 0.5 | | MNA Completed | 6/26/2014 |
| Firearms-Pistol Requalification 2014-I I | In-service | 8 | | MNA Completed | 7/16/2014 |
| 2012 PDT ASP/CPR/AED | In-service | 8 | | MNA Completed | 7/25/2014 |
| CPR/AED Certification : Exp. 12/31/16 | N/A | N/A | | N/A Completed | 8/4/2014 |
| ASP Certification : Exp. 12/31/16 | N/A | N/A | | N/A Issued | 8/4/2014 |
| End of PDT & In-service Transcript | N/A | N/A | | N/A Issued | 9/4/2014 |

### Legend
AFW = Affidavits and Warrants
ASP = Armament System Procedure
CAD = Computerized Assisted Dispatching
CC = Code of Conduct
CDU = Civil Disturbance Unit
CP = Court Procedures
CSB = Corporate Support Bureau
LASS = Laws of Arrest, Search & Seizure
MNA = Marks Not Assigned
N/A = Not Available or Not Applicable
PD = Professional Development
PDT = Professional Development Training
PPMS = Personnel Performance Mgmt. System
RE = Rules of Evidence
ROTP = Recruit Officer Training Program
SDT = Self Directed Training
TE - Testimonial Evidence
UOF = Use of Force

| Course Title | Type of Training | Contact Hours | % Marks | Grade/ Disposition | Date | Honors/Awards |
|---|---|---|---|---|---|---|

### Grading System
P = 70% >
F = < 69% (Repeat)..................................Pass
RP = Repeat Pass..................................Fail
RRP = Repeat Fail.........................On 2nd Try
..................................On 3rd Try

**Hours of Recruit Training:** 539

**Student Average:** 87.69%

**Student Rank in Class:** N/A

**Hours of In-service and PD Training:** N/A

**Current Status & Rank with Metropolitan Police Department:** Active / CSB Officer

**Last Known Address:**

DC Metropolitan Police Academy
4665 Blue Plains Drive, SW, Ste. 100
Washington, DC 20032-5202

**Director of Training:** Commander Ralph G. Ennis
Peter J Newsham, Chief of Police
Muriel Bowser, Mayor

This copy of the member's training record becomes an official transcript when bearing an embossed Metropolitan Police Department seal and the signature of the Director of Training. This record is released in compliance with the requirements of the Privacy Act of 1974.

This information has been released in accordance with the consent of the member named on this transcript and cannot be further disclosed to any other party without his or her prior written approval.

DC 007829
11/13/2018

# EXHIBIT 24

# GENERAL ORDER



**DISTRICT OF COLUMBIA**

| Subject | | |
|---|---|---|
| **Personnel Performance Management System (PPMS) and the Supervisory Support Program (SSP)** | | |
| Topic | Series | Number |
| **PER** | **120** | **28** |
| Effective Date | | |
| **February 1, 2019** | | |
| Replaces: | | |
| GO-PER-120.28 [Personnel Performance Management System (PPMS) and the Supervisory Support Program (SSP)], Effective Date April 11, 2007 | | |
| Rescinds: | | |
| SOP 07-01 [Personnel Performance Management System (PPMS) and Supervisory Support Program (SSP) Operations Manual], effective date April 11, 2007 | | |
| TT-03-096-12 [Supervisory Support Program (SSP)], Issued March 26, 2012 | | |
| TT-11-092-12 [Addendum to Supervisory Support Program (SSP) Message – Teletype No. 03-096-12], Issued November 27, 2012 | | |
| TT-08-007-13 [Supervisory Support Program (SSP)], Issued August 2, 2013 | | |

| I. | Background | | Page | 1 |
|---|---|---|---|---|
| II. | Policy | | Page | 1 |
| III. | Regulations | | Page | 2 |
| IV. | Procedures | | Page | 2 |
| IV.A | Incident Summary Numbers | | Page | 2 |
| IV.B | Supervisory Support Program (SSP) | | Page | 3 |
| IV.C | Member Access and Corrections to PPMS Data | | Page | 7 |
| V. | Roles and Responsibilities | | Page | 8 |
| VI. | Definitions | | Page | 8 |
| VII. | Attachment | | Page | 10 |

## I.    BACKGROUND

This general order establishes the policy governing the use of the Personnel Performance Management System (PPMS), the system used by the Metropolitan Police Department (MPD) to track internal, chain of command administrative investigations as well as investigations conducted by the Internal Affairs Bureau. PPMS is also designed to support the successful implementation of the Supervisory Support Program (SSP), the Department's early identification system for identifying and supporting sworn and civilian employees and Reserve Corps members who may be experiencing issues affecting their job performance. Based on the sensitive and confidential personnel data in PPMS, the system is protected by an electronic auditing system and by security rights that permit specific access by authorized personnel only.

## II.    POLICY

The policy of the MPD is to use PPMS to track and monitor chain of command administrative and internal affairs investigations and to support the fair and equitable use of SSP. PPMS shall be used to promote and maintain the highest professional

## SSP Indicator Chart

| SSP INDICATORS | POINTS | | | | |
|---|---|---|---|---|---|
| **Use of Force** | Pre-disposition | Justified, Within Department Policy | Justified, Policy Violation | Justified, Tactical Improvement Opportunity | Not Justified, Not Within Department Policy |
| Fatality | * | 0 | 10 | 10 | 100 |
| All firearm discharges (no range, training, animals) | 25 | 0 | 10 | 10 | 100 |
| Loss of consciousness, substantial risk of death | 25 | 0 | 10 | 10 | 100 |
| Broken bone or injury requiring hospitalization | 25 | 0 | 10 | 10 | 100 |
| Canine bite | 25 | 0 | 10 | 10 | 100 |
| All head strikes with an impact weapon | 25 | 0 | 10 | 10 | 100 |
| Any use of force not included above | 10 | 0 | 10 | 10 | 100 |
| **Misconduct Allegations** | Pre-disposition | Unfounded | Sustained | Insufficient Facts | Exonerated |
| All criminal arrests or filing of criminal charges to include domestic violence (CPO/TPO) | * | 0 | 100 | | 0 |
| Civil suits based on an existing investigation in which there is a judgement against a member indicating liability | 25 | 0 | 100 | 0 | 0 |
| Discrimination, retaliation | 25 | 0 | 100 | 0 | 0 |
| EEO complaints | 25 | 0 | 100 | 0 | 0 |
| Harassment | 25 | 0 | | | 0 |
| Demeaning, insulting, or humiliating language | 25 | 0 | 50 | 0 | 0 |
| Excessive force | 10 | 0 | 50 | 0 | 0 |
| Improper threat of force | 10 | 0 | 100 | 0 | 0 |
| Unlawful search/seizure | 10 | 0 | 100 | 0 | 0 |
| Unlawful stop | 10 | 0 | 100 | 0 | 0 |
| False arrest | 10 | 0 | 100 | 0 | 0 |
| All cases dismissed due to officer credibility | 25 | 0 | 100 | 0 | 0 |
| Suppression order granted due to officer misconduct/judicial finding of officer misconduct | 25 | 0 | 100 | 0 | 0 |
| Intentionally providing false information in investigation | 25 | 0 | 100 | 0 | 0 |
| Court no-show: witness conference | 5 | 0 | 5 | | 0 |
| Court no-show: grand jury | 5 | 0 | 5 | | 0 |
| Court no-show: testifying | 10 | 0 | 10 | | 0 |
| Court no-show: papering | 10 | 0 | 15 | | 0 |
| Clinic no-show: AWOL | 15 | 0 | 25 | | 0 |
| Clinic no-show: All other types | 10 | 0 | 15 | | 0 |
| Willfully disobeying orders/Insubordination | 25 | 0 | 100 | | 0 |
| Orders/Directives Violation | 15 | 0 | 25 | | 0 |
| Undependability/Tardiness | 15 | 0 | 25 | | 0 |
| AWOL | 15 | 0 | 25 | | 0 |
| All other misconduct allegations not listed above | 10 | 0 | 25 | 0 | 0 |
| **Vehicle-Related Incidents** | Pre-disposition | Justified | Not Justified | Preventable | Non-preventable |
| Vehicle crashes | 10 | | | 50 | 0 |
| Vehicle pursuits | 25 | 0 | 50 | | |
| Vehicle pursuit: fatality | * | 0 | 100 | | |
| **Performance Evaluation Indicators** | | | | | |
| Annual Performance Rating of: "Inadequate Performer" in e-Performance or "Does Not Meet Expectations" in PMS. | 100 | | | | |

Notes: * Indicates automatic intervention.
   Confidential cases will not accrue predisposition points.

# EXHIBIT 25

**Kimberly Chisley-Missouri**

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF COLUMBIA

3                    Civil Division

4    ------------------------------x

5    JAQUIA BUIE,                   :

6              Plaintiff,      :

7    vs.                        : Case No.

8    DISTRICT OF COLUMBIA, et al., : 1:16-CV-01920-CKK

9              Defendants.     :

10   ------------------------------x

11                    Washington, D.C.

12                    Friday, April 20, 2018

13

14   Deposition of:

15            KIMBERLY CHISLEY-MISSOURI

16   the witness, called for examination by counsel for

17   the plaintiff at Smith Mustille LLC, 2200

18   Pennsylvania Avenue, Northwest, 4th Floor East,

19   Washington, D.C., commencing at 12:52 p.m. before

20   Suzanne Marie Alona Enderson, Court Reporter and

21   Notary Public in and for the State of Maryland, and

22   present on behalf of the respective parties:

Kimberly Chisley-Missouri

Page 2

 1   APPEARANCES:

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4           MARK A. SMITH, ESQUIRE

 5           JUDITH A. MUSTILLE, ESQUIRE

 6           2200 Pennsylvania Avenue, Northwest

 7           4th Floor East

 8           Washington, D.C.  20037

 9           (202) 776-0022

10

11   ON BEHALF OF THE DEFENDANTS:

12           DAVID JACKSON, ESQUIRE

13           PATRICIA DONKOR, ESQUIRE

14           Office of the Attorney General

15           For the District of Columbia

16           441 4th Street, Northwest

17           Suite 630 South

18           Washington, D.C.  20001

19           (202) 724-6618

20

21

22

Kimberly Chisley-Missouri

Page 56

1   has been marked as Exhibit 4 for this deposition.

2   Now, take a look at it.  Then I will ask you some

3   questions.

4        A.   Okay.

5        Q.   You testified that in November 2014 you

6   were promoted to assistant chief of the Corporate

7   Support Bureau, right?

8        A.   Correct.

9        Q.   Okay.  So explain this document that I

10  presented to you.

11       A.   This is a teletype.  It is used to put

12  information out to the department.

13       Q.   And what is the -- and you see that it

14  indicates that you are the detail supervisor for the

15  Corporate Support Bureau, and it indicates that

16  Darrell Best was detailed to the Corporate Support

17  Bureau, correct?

18       A.   Correct.

19       Q.   Now, what does it mean by "detailed"?

20       A.   Detailed means it's not your permanent

21  assignment.

22       Q.   Okay.  But I -- thank you for that.  I had

Kimberly Chisley-Missouri

Page 57

1    that sense, but can you develop that more?  So it's

2    not their permanent assignment, but what motivates

3    detailing?  What's behind detailing?

4        A.   I can't explain for purposes of this.  A

5    detail is -- in some instances, if there is a need

6    to move personnel, they can be detailed to an

7    assignment.  They're still assigned to whatever they

8    were permanently, but for working purposes every day

9    they will respond to their detail assignment.

10       Q.   Okay.  Now, prior to being -- Best being

11   detailed to the Corporate Support Bureau, he had

12   been working for you before, right?

13       A.   At the Fourth District, yes.

14       Q.   How long?

15       A.   I don't know exactly.  He came while I was

16   there during my tenure.  He was assigned.

17       Q.   You supervised him, right?

18       A.   I was not his immediate supervisor, no.

19       Q.   Were you his immediate -- if you're not

20   his immediate supervisor, were you his supervisor

21   any way when he was in the Fourth District?

22       A.   I was in the chain of command.  I was a

Kimberly Chisley-Missouri

Page 58

1    district commander.  So everyone fell under my

2    command.  All 300 people.

3        Q.   So you were the commander of the Fourth

4    District.

5        A.   Yes.

6        Q.   Everybody fell under your supervision, I

7    mean, as a technical matter, right?

8        A.   Yes.

9        Q.   But you didn't supervise him day to day,

10   you're saying, right?

11       A.   Correct.

12       Q.   Okay.  At that time who did supervise him

13   day to day?

14       A.   When he was in the administrative office,

15   it would have been the administrative sergeant.

16       Q.   Which is who?

17       A.   When I left, it was Sergeant DiPasquale.

18       Q.   Now, when you say when you left --

19       A.   When I was promoted.

20       Q.   That was in November 2014, right?

21       A.   Correct.

22       Q.   Now, I take it that you requested that

Kimberly Chisley-Missouri

Page 59

1    **Darrell Best be detailed to the Corporate Support**

2    **Bureau, right?**

3         A.   Correct.

4         **Q.   Why did you make that request?**

5         A.   It's past practice that when you're

6    relocating to different command assignments, that

7    you can have personnel come with you, especially if

8    the location that you're going to has personnel that

9    has moved on as well, if that makes sense.

10             So for example, in Exhibit 4 Ms. Campbell

11   was in Corporate Support, but she left with the

12   person who I replaced.  So there were vacancies in

13   the office.  So I was allowed to bring personnel.

14        **Q.   How many people did you bring with you from**

15   **the Fourth District?**

16        A.   Two.

17        **Q.   So you had, as you earlier testified, 300**

18   **plus people under your supervision at the Fourth**

19   **District, and you brought two of them with you after**

20   **you were promoted to Corporate Support Bureau,**

21   **right?**

22        A.   Correct.

Kimberly Chisley-Missouri

Page 60

1      Q.    And Darrell Best was one of them?

2      A.    Correct.

3      Q.    So were you -- what knowledge of Darrell

4   Best did you have prior to bringing him with you

5   that motivated you to want him to be there with you?

6      A.    I had no issue with his work.  When I did

7   interact with him, he handled assignments that I

8   gave him, as did the sergeant.  So I had no problem

9   with requesting that the two of them come to fill

10  the void that was in the office that I was assuming.

11     Q.    You said this was -- this was an exercise

12  of your druthers, right?  I mean, it was a choice

13  that you had.  You could have chosen anybody to

14  come, right?

15     A.    I could have.

16     Q.    Yes.  And so you chose two specific people

17  because you had a preference for those people,

18  right?

19           MR. JACKSON:  Objection to the form of the

20  question.

21           THE WITNESS:  To be honest, it was after

22  someone else I wanted to bring, but I did not want

1           MR. SMITH:  Well, that's good to know.

2           Can you mark this as Exhibit 7.

3           (Deposition Exhibit Number 7 was marked for

4      identification.)

5           BY MR. SMITH:

6      **Q.   Okay.  I'm handing you a document now that**

7  **is marked as Exhibit 7 for purposes of this**

8  **deposition.  Take a look at it and I want to ask you**

9  **a few questions.**

10     A.   Okay.

11     **Q.   Okay.  So when you requested that Darrell**

12 **Best come to work for you in the Corporate Support**

13 **Bureau, you were aware that he had been demoted,**

14 **right?**

15     A.   Yes.

16     **Q.   Did you know the details behind that**

17 **demotion?**

18     A.   No.

19     **Q.   Did you care to know?**

20     A.   I was -- I never asked why he had been

21 demoted or did I know when he was demoted.

22     **Q.   Did you know why he was demoted?**

Kimberly Chisley-Missouri

Page 81

1        A.    No.

2        Q.    So is it a common occurrence at the

3   Metropolitan Police Department that a sergeant is

4   demoted to officer?

5              MR. JACKSON:  Objection as to what is a

6   common occurrence at the Metropolitan Police

7   Department.  She's not here as a 30(b)(6) witness.

8              THE WITNESS:  Demotions happen.  They don't

9   happen every day, but they do occur.

10             BY MR. SMITH:

11       Q.    I didn't ask about demotions generally.  I

12  said is it a common occurrence at the Metropolitan

13  Police Department for sergeants to be demoted back

14  to basically gumshoe police officers?

15             MR. JACKSON:  Objection as to the form of

16  the question.

17             THE WITNESS:  A what officer?

18             BY MR. SMITH:

19       Q.    Gumshoe.  It's like a standard.  A person

20  walking the beat who doesn't have authority like

21  Sergeant Best had before he was demoted.

22       A.    So an officer.  There have been demotions

Kimberly Chisley-Missouri

Page 82

1  from the rank of sergeant to officer, but it's not a
2  common occurrence.
3      Q.   Is it a big deal or a minor thing?
4
5           MR. JACKSON:  Objection as to the form of
6  the question.
7           THE WITNESS:  In my opinion?  Of course.
8           BY MR. SMITH:
9      Q.   You're the one I'm asking, ma'am.  And you
10 were the person who was an assistant chief at the
11 Metropolitan Police Department and worked there for,
12 you know, a couple of decades or more, right?
13     A.   Yes.
14     Q.   So even though you're not a 30(b)(6)
15 witness, I expect you to be very knowledgeable about
16 this subject.  And you supervised hundreds of people
17 in the time of your career there, and you've known
18 many sergeants.  You've been a sergeant yourself,
19 correct?
20     A.   Correct.
21     Q.   So I'm asking you, is it a minor thing or a
22 significant thing for a sergeant to be demoted?

Kimberly Chisley-Missouri

Page 83

1          MR. JACKSON:  Same objection.

2          THE WITNESS:  Between minor and

3     significant, definitely more significant, yes.

4          BY MR. SMITH:

5     Q.    But you had -- you didn't look in -- before

6     you brought him into police headquarters and gave

7     him the privileges of accessing the office of the

8     Corporate Support Bureau, you didn't investigate why

9     he had been demoted?

10    A.    No.

11    Q.    Okay.  Is today when I handed you this

12    document the first time you learned why he was

13    demoted?

14    A.    Yes.

15    Q.    I may come back to that, but I want to take

16    you to another one before I do.  So does the

17    Metropolitan Police Department track occurrences of

18    members who are accused of sexual misconduct?

19    A.    If you're talking about from a criminal

20    aspect, yes.  Internal Affairs would be involved.

21    Q.    No.  I mean if just an allegation is made

22    that, you know, this officer, you know, touched me

# EXHIBIT 26



DC 000235

# EXHIBIT 27



**Carole T. Giunta, Ph.D.**
*Licensed Psychologist*

*Clinical & Forensic Psychology*
*Neuropsychology*

Carole T. Giunta, Ph.D. & Associates, LLC

March 2, 2018

Mark A. Smith, Esq.
Judith A. Mustille, Esq.
Smith Mustille, LLC
200-A Monroe Street, Suite 305
Rockville, MD 20850-4442

Re:   **Jaquia Buie v. District of Columbia and Darrell L. Best**
       **Civil Action No.: 1:16-cv-01920**

Dear Mr. Smith and Ms. Mustille,

Pursuant to your referral, I have completed my evaluation of your client, Ms. Jaquia Buie, a 21-year-old African American woman. On  December 3, 2014, Ms. Buie was sexually assaulted by Officer Darrell Best of the Metropolitan Police Department. Officer Best pled guilty to Second Degree Child Sexual Abuse; he is currently incarcerated. Ms. Buie was evaluated with respect to the question of the impact of this event on her, in light of the above referenced civil action.

I personally evaluated Ms. Buie on February 16, 2018. The nature of the evaluation and the limits of confidentiality were explained to Ms. Buie. Her consent for participation was obtained. Additionally, I reviewed the following documents which you forwarded to me: Complaint, Government's Submission Relating to Guilty Plea Hearing Pursuant to General Order Governing Criminal Cases, Statement of Offense, Plea Agreement, Darrell Best Judgment in Criminal Case, Articles re Case, Metropolitan Police Department Memorandum (03/26/15) and Wendt Center for Loss and Healing Medical Records. To obtain collateral information, I interviewed her mother Shenita Buie (02/27/18) and her friend Jazzmine Hester (02/27/18).

**RELEVANT HISTORY:** Ms. Jaquia Buie was born in North Carolina and raised in Washington DC from the age of two. Her sisters who are four and 14 years younger than she. Ms. Buie was raised primarily by a single mother; her father was in and out of the family home. Her father became incarcerated when she was six or seven, leading her mother to take on a second job. At that time, Ms. Buie began to take the bus to school independently, pick up her sister after school and help with housework. Ms. Buie recalled that the family's finances became strained and at times there was insufficient food in the house. But she stated, "My mother always made a way out of no way." Ms. Buie offered the observation that her family background helped her develop independence and become a hard worker.

Ms. Buie recalled being close to both of her parents growing up, despite the fact that their relationship was conflictual. Ms. Buie reported that her parents' relationship was "marked by disrespect." There was considerable verbal fighting but no domestic violence. She recalled a string of broken promises from her father whom she described as very blunt and angry. Ms. Buie characterized her mother as hard-working and trustworthy. She described each of them as "my best friend."

Ms. Buie reports that she worked hard and did well in school. Her grades slipped a bit in high school but she graduated on time with a 2.89 GPA. Ms. Buie worked during high school to help contribute to the family. After a brief stint at Nationals Stadium, she was a server and line cook at a local country club. In high school, Ms. Buie identified law enforcement as her career goal and hoped to attend the Police Academy and become employed by the Metropolitan Police Department (MPD).

When she was young, Ms. Buie's family attended church on a regular basis. When Ms. Buie was 16, her mother began to attend God of a Second Chance Ministry on a weekly basis where Officer Darrell Best was the pastor. Ms. Buie described her mother as "a believer" who was very committed to the church. Her mother gave a tithe to the church on a regular basis despite the fact that it stressed the family's modest finances and created conflict at home. Ms. Buie's father knew Officer Best and his siblings from the streets. According to Ms. Buie, her father referred to Officer Best as "a crook" whom he believed pulled people over for no reason and "a whore" whom he believed messed with young girls. There was considerable disagreement at home about attending his church, but Ms. Buie's mother prevailed.

Ms. Buie's mother attended Bible study on a weekly basis at Officer Best's home and insisted that Ms. Buie join her there and at weekly services. Ms. Buie was somewhat uncertain about her spiritual beliefs; while certain sermons spoke to her, she did not see herself as a follower and was trying to clarify how her beliefs fit with the church. Initially, Ms. Buie's interactions with Officer Best were limited to greeting him at church services and Bible study. Over time, Ms. Buie interacted with him more, particularly after her mother shared with him that Ms. Buie was hoping to join the Metropolitan Police Department. Ms. Buie looked at Officer Best as a mentor."

When Ms. Buie's mother learned that Officer Best and his fiancée were planning their honeymoon, she suggested that her daughter share pictures with him of their recent trip to Jamaica. Ms. Buie selected certain photos to share, avoiding photos of herself in a bathing suit. Around Thanksgiving 2014, Officer Best asked Ms. Buie for her cell phone number. He subsequently offered to take her to dinner as a belated high school graduation gift. She was not interested in having dinner with him and indicated to him that a gift was not necessary. He persisted, suggesting that she could choose whatever restaurant she wanted and she could bring her mother. He indicated that they would discuss her interest in becoming a police officer. She felt awkward about meeting with him as she did not have a personal relationship with him. Ms. Buie wondered about his agenda, particularly as he was not including his fiancée in the arrangements. Her mother urged her to accept the invitation, because of her career interest. Her mother declined to attend the dinner as she felt that Ms. Buie would be less engaged in the career discussion if she were there.

On December 3, 2014 Officer Best took Ms. Buie to Georgia Brown's restaurant for dinner ostensibly to discuss her interest in a career in law enforcement. Officer Best picked her up a few blocks from the restaurant in an unmarked police car, dressed in full uniform, including his service weapon. At the restaurant, Officer Best initially asked innocuous questions such as "How was your day?" While they were waiting for the food to arrive, Officer Best asked Ms. Buie a few questions about her interest in law enforcement then steered the conversation to other topics beginning with her interest in boys. He asked whether she had a boyfriend and then transitioned into sexually explicit questions such as "Do you like getting your pussy ate?" Ms. Buie was shocked and disgusted and spit out her drink. When the food arrived she felt unable to eat. Officer Best admonished Ms. Buie for not eating the food. While he ate dinner, Officer Best continued to pepper Ms. Buie with questions such as "Do you want a boyfriend?" and "What positions do you like?" Ms. Buie noted that he kept bringing the conversation back to the latter question. Ms. Buie was offended and very uncomfortable. She signaled the server, with the intention of paying her own bill and leaving. Officer Best

2

indicated that he felt Ms. Buie was making too big a deal of his comments. He paid the bill but complained to her that she chose an expensive restaurant.

Ms. Buie put her coat on and walked out of the restaurant, intending to walk to the Metro and travel home independently. However, Officer Best insisted on taking her home stating, "How's that gonna look to your mother." She initially refused the ride but when Officer Best started "talking through his teeth," further insisting that she get in the car, Ms. Buie complied.

Instead of taking her home, Officer Best drove to MPD headquarters, claiming that he had to finish some work. He used his badge to access the underground parking garage. When she asked to stay in the car, Officer Best insisted that Ms. Buie accompany him inside headquarters. He used his badge to access an elevator and pointed out the police chief's office which was on the same floor as his own. Inside Officer Best's office, Ms. Buie sat on a sofa while he sat at the desk and used his computer. Officer Best then called his fiancée, telling her that he would be home later after he finished some work. Officer Best then moved to the sofa near where Ms. Buie was sitting. She moved away and he asked "Why are you acting like a little girl?" She replied, "I am a little girl." He stated, "You don't look like it." Officer Best persisted in his advances, stating, "You know I like you. Why are you acting like that? Don't you find me attractive?" Ms. Buie responded, "You're my pastor." He asked her to stop calling him that and suggested that she call him Darrell.

Next, Officer Best touched Ms. Buie's thigh. She moved his hand away stating "We're not doing that." He then proceeded to touch her inner thigh while continuing to profess his affection for her. Ms. Buie moved to another couch to evade his advances. Officer Best followed her. This occurred more than once. Officer Best then turned out the lights and requested that Ms. Buie kiss him. She refused. He then held her face, forcing a kiss on her and trying to put his tongue in her mouth. She asked him to stop. Officer Best took off his belt and placed his gun on the table. She was very aware that his service weapon was within reach and felt terrified. Officer Best proceeded to tell Ms. Buie that he was not going to hurt her and that he loved her. He put her feet up on the sofa, opened her pants but did not take them down. He took his penis out and asked her to touch it; she refused. He kissed her, got on top of her and humped her, saying "I want some." She refused to allow him to enter her. When he was finished, he told Ms. Buie that "Nobody should find out about this because I got more to lose than you." He admonished her to "fix your shirt" so that nobody who saw her in the hall would "think something was going on." He then proceeded to drive her home, dropping her a block from her house and asking if her father was home.

When Ms. Buie came in the house, her mother noticed that she looked distraught and asked what was wrong. Ms. Buie did not tell her parents about the assault at that time, because "I hate talking about it." She also worried about losing her father to incarceration if he tried to harm Officer Best; Ms. Buie felt that she would have carried enormous guilt about him being locked up and felt she could not risk these possible events. She did call and tell her best friend, Jazzmine Hester, immediately. About three months later, Ms. Buie's parents learned of the sexual assault after they were contacted by the parents of another minor who had also been sexually victimized by Officer Best. Ms. Buie indicated that she was "so relieved" when her parents became aware.

The day after the sexual assault, Ms. Buie sent a text message to Officer Best because she "wanted to tell Darrell something to keep that from happening again." She was very aware that she would continue to see him at church and did not want to think that he could repeat the prior night's conduct. With help from her friend Ms. Hester, Ms. Buie crafted a text message to communicate that: the sexual assault was wrong and should never have happened.

**IMPACT OF THE SEXUAL ASSAULT:** Since the sexual assault, Ms. Buie has withdrawn notably from her relationships with friends and family and from the world more generally. For about a year after the assault, she primarily isolated herself at home, pursuing neither work nor school. She has curtailed her social life sharply and only interacts with a limited group of peers. At present, when she is not at work or school, Ms. Buie generally stays in the house, overeats and distracts herself with TV. Most of the time when she is home, Ms. Buie stays in her room with the door locked. She stated, "I feel so at peace with the door locked, nobody's gonna hurt me." She sleeps with her bedroom door locked as well.

After isolating herself at home for a year, Ms. Buie got a job as a line cook at a country club where she had worked previously. She subsequently left that position to take a job at Dave and Busters. She was fired from that position in late 2016 after she engaged in a verbal and physical altercation with a coworker who wished to date her. Ms. Buie noted that she was not an angry person prior to the sexual assault. She stated, "Now, I don't let nothing past me." She experiences very high levels of anger when issues of trust emerge and when she feels someone is trying to get over on her. Ms. Buie also reports that her anger now gets out of control easily, "because I don't want to be taken advantage of again." When angry, Ms. Buie has damaged her own things at times, has put a few holes in the wall and has gotten into physical altercations. Ms. Buie was arrested a few months ago after an argument with her sister turned physical. The charges were dropped but this demonstrates that Ms. Buie now struggles to keep her anger within acceptable boundaries.

Since the sexual assault, Ms. Buie has re-experienced the event in a number of ways. Initially, she was having intrusive recollections of the event and would see an image of Officer Best's face which triggered a fear response. These thoughts plagued her throughout the day during the first year after the assault. They continue now on a less frequent basis. Visual or physical reminders of Officer Best, such as seeing a police car or seeing one of his family members, trigger memories of the assault. As described below, she also has nightmares stemming from the assault and finds that sexual activity reminds her of the assault.

Initially after the sexual assault, Ms. Buie worried that Officer Best would find her father in the streets and harm him. She also reports that she is very afraid for her own and her family's safety. She stated, "I'm scared he's gonna come out after 18 years and kill me." She ruminates about this and finds it hard to distract herself from this worry at times. Ms. Buie also worries about her sisters' and her mother's safety. In this way, the terrifying aspects of the assault continue to plague her.

Pursuant to the sexual assault, Ms. Buie feels less open, more concerned about her safety and finds it especially hard to trust men. She did not date again until 2016 at which time she became involved with a boyfriend who got two other girls pregnant while he was dating Ms. Buie. She also became pregnant and subsequently miscarried. Since this relationship ended, Ms. Buie has been reluctant to date again. She notes that she is argumentative with potential boyfriends and is keeping people away because she is unclear about their intentions. Referring to her trust issues, Ms. Buie stated, "Every man I have put on a pedestal has let me down." She further stated, "I want to be loved, but I can't trust."

Ms. Buie avoided sexual activity for nearly 2 years following the assault. When she has been sexually active since the assault, she finds it to be less pleasurable as her boyfriend's sexual advances trigger memories of the assault. Specifically, Ms. Buie does not want a boyfriend to kiss her, because it reminds her of Officer Best. Certain types of touching also feel reminiscent of the sexual assault, triggering a very strong negative reaction.

Ms. Buie has struggled with depressive symptoms on and off for the past three years since the sexual assault. This has included bouts of low mood, crying, poor concentration, isolating, sleep disturbance and negative feelings about herself. These feelings were heightened after she lost her job, had a miscarriage and broke up with her boyfriend. At present, Ms. Buie describes her mood as "calm" when she is alone and "triggered," meaning that she feels worried and stressed, when she is with others. Although she is aware that the assault is not her fault, Ms. Buie continues to blame herself at times. Since the assault, she has experienced low self-esteem, lack of belief in her own abilities and negative feelings about herself as a result of the assault.

Ms. Buie describes an "anniversary reaction" whereby in December of the years following the assault, she isolates herself more, experiences lower mood and finds herself thinking about the event more than usual, which interferes with her sleep.

At present, Ms. Buie copes with the aftermath of the sexual assault by trying to distract herself as opposed to dealing with it directly. Distractions include drinking alcohol, watching television and actively avoiding situations and thoughts connected with the assault. Since the event, Ms. Buie avoids: church, the neighborhood around Officer Best's church, the neighborhood where his family lives, the area near Georgia Brown's restaurant, police officers, dark skinned men and the gym. She also avoids being outgoing because she feels that she needs to limit her social contacts in order to keep herself safe.

Since the sexual assault, Ms. Buie has had difficulty sleeping. Initially, she used marijuana or NyQuil to help initiate sleep. Recently, her sleep schedule has been disrupted by working at night.  Ms. Buie also experiences nightmares on a weekly basis. Some nightmares include reliving the sexual assault. Others center on Officer Best breaking out of jail, finding Ms. Buie and killing her, her sisters and her mother. Ms. Buie also evidences an exaggerated startle reaction and is more cautious and vigilant about checking her surroundings.

Ms. Buie reports that Officer Best told her that he was attracted to small [i.e. thin] girls. As such, she has gained 80 pounds since the assault because, "I didn't want to be small anymore. I didn't want to be appealing to him." In an effort to move past the assault, Ms. Buie tried to take some of the weight off. When she went to the gym, she felt that there were "so many men looking at you" that she felt uncomfortable and canceled her membership. She is now exploring the idea of surgery because "I want to change my physical appearance. I don't want to be that same person who [Officer Best] assaulted."

Ms. Buie reported that the sexual assault has "literally torn my family apart." In the aftermath of the assault, there was considerable conflict as her father and grandmother blamed her mother for trusting Officer Best and for being so involved in his church. About a month after the disclosure, her mother got a stay away order and put her father out; they remain separated and he cannot see her siblings (who are minors) without a relative being present. Ms. Buie identified many changes in her family pursuant to the sexual assault. She noted that her two younger sisters are more rebellious. Ms. Buie believes that her mother blames herself for not attending the dinner. She perceives her mother as more focused now on her own needs and as spending less time with her children. Ms. Buie also described her mother as less spiritual, indicating that she no longer goes to church. Ms. Buie does not see her father nearly as much since he is no longer living in the family home. Ms. Buie isolates herself in her room, invests less in her family relationships and feels more distant from her family members.  Ms. Buie misses the prior sense of connection she had with all of her family members and laments the loss of family cohesion.

Similarly, Ms. Buie has allowed many friendships to die away, only keeping up with a few close friends. Although she still feels close to two friends, she reports greater difficulty trusting even these long time friends.

Ms. Buie first tasted alcohol at age 15. As a teenager, she drank occasionally at parties but her mother did not allow her to go out much. Ms. Buie tried both marijuana and K2 once at the age of 15. After graduating high school, she tried marijuana again, but did not feel drawn to its effects. After the sexual assault, she started smoking marijuana on a daily basis as much as three times a day. In the summer of 2015, she stopped smoking weed and started drinking several days a week to the point of being tipsy. Ms. Buie reports that she does not like being drunk, because she feels vulnerable. At present, she drinks one or two glasses of wine to help her go to sleep, particularly on the weekends.

Ms. Buie reported that pursuant to the assault, her feelings about men, police and clergy are markedly changed. The prior assumptions she carried about the integrity and trustworthiness of police and clergy have been violated. Ms. Buie no longer feels that she can automatically afford someone trust or respect. As she put it, "The idea that he was protecting the community is ridiculous." Ms. Buie also reports that her relationship with God is different following the sexual assault. She no longer attends church and feels that even God failed to protect her.

At present, Ms. Buie works two jobs as a security guard and is completing training to become a dental assistant at Fordis College. She is finishing her course work, is completing an externship at present and then will sit for her licensure exams. Throughout this training, Ms. Buie has struggled with fears that she is not capable and "not good enough." After the assault, her prior goal of becoming an MPD officer was "out of the question."

In 2015, Ms. Buie was seen for a short course of therapy at the Wendt Center for Loss and Healing, through their affiliation with the Crime Victims Compensation Fund. Within a short period of time, Ms. Buie was transferred to a new therapist twice which interfered with her ability to establish a trusting relationship which is the foundation of psychotherapy. Thereafter, Ms. Buie's attendance waned, leading to termination of the therapy. As she put it, "I was getting tossed around. I was not getting treatment with the proper care." Ms. Buie indicated that she has not had the financial resources to undertake further therapy.

**INFORMATION FROM COLLATERAL SOURCES:** Ms. Shenita Buie, the plaintiff's mother, stated that her daughter is "totally changed" following the sexual assault. She reports that her daughter is "almost like a hermit," indicating that she is much less social than she used to be. The plaintiff's mother described Ms. Buie as "very leery of people" and as having difficulty trusting. She also confirmed that her daughter is very angry now. She voiced concerns about Ms. Buie's functioning and expressed a wish for her daughter to get counseling to decrease the impact of this event. She indicated that the prior counseling was problematic because they kept changing her daughter's counselor and it was difficult for her to keep explaining these events to new providers.

Ms. Buie's close friend, Ms. Jazzmine Hester, also corroborated the plaintiff's report of the impact of the sexual assault. She too noted that Ms. Buie now shows considerable anger, feelings of insecurity about herself, weight gain, isolating and difficulty trusting police, church officials and men. Ms. Hester also observed that Ms. Buie has difficulty reassuring herself that she is okay . Ms. Hester feels that since the assault, Ms. Buie and her mother have been arguing more; she also observed that the plaintiff and her father seem closer despite the fact that he no longer lives in their home.

6

**CURRENT CLINICAL PRESENTATION:** Ms. Buie was fully cooperative with the evaluation. She presented as slightly nervous but became more comfortable as the evaluation progressed. Ms. Buie was open and forthcoming on interview.

Ms. Buie evidenced no unusual motor movements. She was fully oriented to person, place and time.  There is no history of auditory or visual hallucinations or delusional thinking. Her thought process was logical and goal-directed. As indicated, Ms. Buie is much more vigilant regarding her safety since the sexual assault, but this does not rise to a clinical level of paranoia.

Ms. Buie experienced some passive thoughts of death in the wake of the sexual assault; this consisted of wondering what would happen if she wasn't here anymore. She has not experienced active suicidal ideation and has not had a plan or intent to suicide. There is no history of self-mutilation or manic symptoms. When her anger is triggered she has thoughts of hurting other people at times, but has not had a plan to harm others.

As described above, Ms. Buie experiences a full complement of symptoms of Posttraumatic Stress Disorder (PTSD). She also describes a considerable amount of worry and anxious behavior tied in particular to safety and fears that but things that could "go wrong." These symptoms all have onset following the sexual assault.

**DIAGNOSIS (DSM-V):**

> Post Traumatic Stress Disorder

**FORENSIC OPINION:**  The following is my opinion within a reasonable degree of psychological certainty.

Ms. Jaquia Buie is a 21-year-old woman who was sexually assaulted at the age of 17 by a Metropolitan Police Department officer who was also the pastor at her church. Officer Best is currently in prison as a result of his conduct. Now, more than three years later, Ms. Buie continues to be greatly impacted by the assault. She evidences Post Traumatic Stress Disorder secondary to the sexual assault along with a host of other sequelae.

As amplified above, Ms. Buie is changed in a myriad of ways by this event. Her feelings about herself are much more negative. She has low self-esteem and struggles intermittently with feeling that she is to blame for the assault. Her emotional experience is entirely different. She is now an extremely angry person with a short fuse who fears that others are trying to get over on her. Events in the present easily trigger the great well of anger she carries about the sexual assault, leading to displays of anger and aggression which are disproportionate to the provocation. Ms. Buie's interactions with others, particularly men, are vastly different. She does not trust men, she fears further victimization and she tries to keep men away from her because she is unclear about their intentions.

Because she was victimized by someone she knew and trusted and whose stature in the community she respected, this violation has affected Ms. Buie's beliefs on very fundamental levels. The fact that she was sexually assaulted by someone who had been entrusted by the community to both protect and serve and guide and comfort spiritually has left her feeling utterly unprotected in the world and enormously alone. Because larger societal structures failed to protect her, Ms. Buie feels that she cannot trust others to keep her safe and that she alone must manufacture whatever modicum of security she can manage. Indeed, if she could be lured

7

and taken advantage of by a representative of both law and order and God then are there no benevolent protectors and are there no structures to ensure safety and protection? Indeed, this act has challenged Ms. Buie's spiritual beliefs and changed her relationship with God. It has also shattered her fundamental assumptions about right and wrong, about order and boundaries in the world, about the role of societal institutions in protecting individuals and about her sense of agency in the world. But most profoundly, it has shattered her feelings of security and has left her doubting whether she can reestablish a sense of safety in this world.

Now, the overriding imperative in Ms. Buie's life is protecting herself and staying safe from further victimization. In an effort to do so, she isolates, spending her free time alone in her room with the door locked. She limits her social contacts to a few select individuals. She works and attends school but has otherwise narrowed her world in her attempt to reestablish feelings of safety and security. However, because the sexual assault remains so raw and the fear, anxiety, indignation and fundamental questions associated with it continue to plague her, Ms. Buie feels markedly unsafe and triggered as she moves about the world and interacts with others. The fact that she feels less comfort and trust in relationships with those closest to her is one measure of the extent to which she still feels vulnerable, exposed and unsafe. Thus, she has been failed by society's larger structures and protectors and is feeling distant from her personal network of family and friends, reinforcing her profound sense of isolation in the wake of the sexual assault.

Because she continues to reexperience the sexual assault on a regular basis and has not yet been able to integrate this event into the larger narrative of her life, Ms. Buie copes with its aftermath in largely unhealthy ways. She keeps others at a distance, forgoing support in favor of isolation. She has relied on substances to distance herself from the experience and facilitate sleep. Her fuse is ignited quickly, resulting in displays of anger and aggression in an attempt to ward off the feared experience of further victimization. In short, Ms. Buie is relying on any and all strategies she can muster to cope with what continues to be an overwhelming array of feelings and experiences which tie back directly to the sexual assault or represent attempts to manage its fallout. However, these coping strategies create more problems for her and put her at risk for a negative life trajectory.

Ms. Buie is in dire need of psychotherapy with a clinician who specializes in the treatment of post traumatic conditions. I strongly recommend ongoing therapy with a specialist who will utilize best practices to sequence the trauma therapy appropriately. She must first work to establish a trusting relationship with a therapist who can remain available to her for the duration of her work. The goals of therapy include helping Ms. Buie metabolize the pain and meanings of this event while remaining stable and functional in the world. Treatment must also focus on strategies for managing triggers, learning more functional methods of coping including reducing anger and its negative consequences. Later stages of therapy will need to focus on integrating this event into the larger narrative of her life and renegotiating her fundamental beliefs and assumptions about the world. To achieve these aims, I anticipate Ms. Buie will require weekly therapy for three years.[1] If subsequent life events become triggering, she may need as many as 30 additional sessions at a future date to reinforce the gains made in therapy and to manage new symptoms.[2] After she has made

---

[1] Estimating $200/hour for individual therapy x 50 sessions per year x 3 years = $30,000.

[2] Additional possible therapy at $200/hour x 30 sessions = $6,000.

significant progress in therapy, she will benefit from an estimated one year course of group therapy on a twice monthly basis. [3]

It should be noted that the therapy Ms. Buie was afforded following the sexual assault was insufficient to meet her therapeutic needs. She was transitioned among therapists in the clinic which further taxed her issues with trust and safety. The notes do not memorialize any attempt to process these issues. This experience reinforced Ms. Buie's difficulties with trust and her feeling that she is alone. Ms. Buie has not pursued further therapy due to lack of financial resources.

If Ms. Buie is unable to access appropriate therapy, she is at risk for any number of negative outcomes. Her high levels of anger are a particular concern with respect to the potential for negative consequences. To date, she has lost a job, been arrested and created distance in her relationships as a result of intermittent dyscontrolled anger. Without sufficient appropriate treatment, Ms. Buie's anger could interfere with her ability to remain employed, perhaps indefinitely.

Finally, it is noteworthy that Ms. Buie was a relatively unsophisticated, under age black female from a low income background at the time that she was sexually assaulted. All of these factors made her more vulnerable to exploitation by an older, more savvy man whom society had accorded respect and stature due to his status as a member of the law enforcement and clerical communities. These imbalances in power and privilege constitute an additional level of meaning to the victimization and insult which Ms. Buie must unravel in her therapy.

Respectfully submitted,

Carole T. Giunta, Ph.D.

---

[3]Group therapy estimated at $120/hour x 2 sessions/month x 12 months = $1,200.

# EXHIBIT 28

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3   UNITED STATES OF AMERICA        .
                      Plaintiff,    .
4   vs.                             .   Docket No. CR 15-122
                                    .
5   DARRELL BEST                    .   Washington, D.C.
                                    .   February 26, 2016
6                     Defendant.    .
    . . . . . . . . . . . . . . . . .x   9:43 a.m.
7

8                   TRANSCRIPT OF SENTENCING

9       BEFORE THE HONORABLE SENIOR JUDGE REGGIE B. WALTON

10                 UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Government:   Sarah McClellan, AUSA
                          UNITED STATES ATTORNEY'S OFFICE
13                        555 Fourth Street, NW
                          Washington, DC 20530
14

15  For the Defendant:    Nikki Lotze, Attorney-at-Law
                          LOTZE MOSLEY LLP
16                        400 Seventh Street, NW - Suite 202
                          Washington, DC 20004
17

18
    Court Reporter:   Cathryn J. Jones, RPR
19                    Official Court Reporter
                      Room 6521, U.S. District Court
20                    333 Constitution Avenue, N.W.
                      Washington, D.C. 20001
21

22

23

24
    Proceedings recorded by machine shorthand, transcript
25  produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Your Honor, this is Criminal

3    Case 15-122, United States of America versus Darrell Best.

4    Will all parties please come forward to the lectern and

5    introduce yourselves for the record.

6              MS. McCLELLAN:  Good morning, your Honor, Sarah

7    McClellan on behalf of the United States.

8              THE COURT:  Good morning.

9              MS. LOTZE:  Good morning, your Honor, Nikki Lotze

10   on behalf of Darrell Best, who is also present.

11             THE COURT:  Good morning.

12             MS. WILLETT:  Good morning, your Honor, Kelli

13   Willett on behalf of the U.S. probation office.

14             THE COURT:  Good morning.  In preparation for the

15   sentencing, I did review the presentence investigation

16   report dated February 16th, 2016; also, the defendant's

17   sentencing memorandum along with a number of letters that

18   were submitted with it.  In addition, there were some

19   additional letters that came through the mail.  And

20   according to my count there are about fifty letters which I

21   reviewed last night.  Also, the government's memorandum in

22   aid of sentencing, and also a notice of filing pursuant to

23   Title U.S. Code Section 3509, and also a supplement by the

24   government in aid of sentencing.

25                  Is there anything else that I should have reviewed

 1    compassion, and in need of a savior.

 2             We as people should do everything we can to help

 3    lift those of us who have fallen and give us the opportunity

 4    to do what is right.  Your Honor, I thank you for allowing

 5    me this opportunity to speak, and I await your verdict and I

 6    thank you.

 7             THE COURT:  Sir, I'm still, you know, struggling

 8    with whether the 18 year agreed upon sentence is

 9    appropriate.  I understand it's a long time, with good time

10    it's probably about 15 years.  But you know, I consider what

11    you did as just extremely serious and reprehensible.  And

12    reading the presentence report one of the things that

13    troubled me is that when you were interviewed by the

14    probation officer, according to her, you said that you felt

15    that the prosecution was overkill.  I don't know what you

16    meant by that if you said that.

17             THE DEFENDANT:  The prosecution was overkill?

18             THE COURT:  Yes, that's what she has overkill, and

19    she has it in parenthesis, in quotation marks indicating

20    that that's what you said you thought this prosecution was

21    overkill.  Did you say that?

22             THE DEFENDANT:  I don't recall, your Honor.

23             THE COURT:  Do you think that?

24             THE DEFENDANT:  No, sir.

25             THE COURT:  What do you think about the

 1   prosecution, the fact that you've been charged with these

 2   offenses?  I mean I'm trying to get an appreciation as to

 3   whether you really are remorseful in reference to what you

 4   did and whether you really appreciate the magnitude of what

 5   you did.  I mean, I've read all these letters, and I don't

 6   doubt that based upon what they say there's some indication

 7   that you've done some good in your life.

 8          But I have a hard time as a father of a daughter

 9   and the brother of a sister, I have a hard time

10   understanding how a man especially a man who professes to be

11   a man of God can do what you did to these two little girls,

12   one of them who comes to you, brought to you by the parents

13   because she was having problems in her life which all too

14   many of our kids have.

15          And your response in addressing that problem is to

16   sexually molest her, to take vulgar photographs of her, of

17   her private parts, to have sex with her in the office of the

18   church.  I don't get it.  And I'm trying to understand why I

19   should have any sympathy for somebody who would stoop to the

20   level that you did to do what you did to these two girls.

21          I haven't been convinced yet that that's the

22   appropriate thing to do.  Because I have concerns that if

23   somebody will do this, you'll still be sixty.  I'm 67, so I

24   think you're still young when you get out.  How do I know

25   that you won't do this again?

1   maybe she can come to an appreciation that it wasn't her

2   fault and it wasn't God's fault, and that she will be able

3   to reunite herself with the church, but I don't know if

4   that's going to happen.  And I guess I just don't get it.

5          But as I say as much as I struggle with getting to

6   where I've been asked to go I do fully appreciate having at

7   one time myself had to work with victims of these type of

8   crimes.  I do appreciate that for children and somebody

9   who's a young person even for adult women who've been

10  sexually abused that it's been very difficult for them to

11  have to put themselves in a public setting where they have

12  to take a witness stand with an audience out there and tell

13  that these unthinkable things happened to them.

14         And I could understand how it would be

15  embarrassing for these two girls to have to come into a

16  public setting, with the media presence since there has been

17  media interest in this case and have to reveal who they are

18  in the public and what happened to them.  And that is the

19  principal reason that I will agree to go along with what

20  I've been asked to do.  Because my inclination is not to do

21  that because I really think that there are certain crimes

22  that people commit that they should be put away for the rest

23  of their life and this is one of them.

24         But because like I say I can appreciate that these

25  girls should not have to reveal what happened to them, and

 1    the fact that photographs were taken of their private parts

 2    and people have had the chance to look at them and people

 3    have heard about the things that happened to them, I

 4    wouldn't want to put them through the humiliation of having

 5    to come into court and have to subject themselves to what

 6    inevitably would occur if there were a trial.

 7              Because of that I will agree with the Rule

 8    11(C)(1)(c) agreement that has been reached by the parties.

 9    And therefore, on Count one, I will sentence you to 18 years

10    in prison.  On Count two, the maximum sentence on that

11    offense is 15 years, and you'll be sentenced to 15 years in

12    prison on that offense.  And on Count three, the maximum

13    sentence is seven and a half years, and you'll be sentenced

14    to seven and a half years on that offense.  Those sentences

15    are to run together, concurrently so the total sentence is

16    18 years in prison as agreed upon by the parties.

17              As far as your term of supervised release is

18    concerned I do think it is necessary considering what you

19    did that you be under the supervision of the court for the

20    rest of your life.  And accordingly, on all of these three

21    counts I will sentence you to a period of supervised release

22    of life.  Once you are released from prison those three

23    periods of supervised release are obviously to run

24    concurrent with each other.

25              As far as a fine is considered I will conclude you

```
 1   while you're on supervised release.  Also, I will authorize
 2   the release of this order, I'm sorry, of this presentence
 3   report to the appropriate entities who need it in order to
 4   carry out the orders of the court.
 5        You do have 14 days from today's date to appeal
 6   your sentence and your conviction to the Court of Appeals.
 7   And if you cannot afford to pay for a lawyer to represent
 8   you on appeal or if you cannot afford to pay for the papers
 9   to be filed with that court to note your appeal those
10   expenses will be paid free of charge by the government.
11        Any other conditions probation believes are
12   appropriate?
13        MS.WILLETT:  No, Your Honor.
14        THE COURT:  Anything else from the government as
15   far as the conditions are concerned?
16        MS. McCLELLAN:  Your Honor, just regarding the
17   initials of the second victim it's JB.
18        THE COURT:  I thought I said JB.  If I didn't it
19   would be JB then.
20        MS. McCLELLAN:  Okay.  Is your Honor inclined to
21   impose any restriction on the type of employment the
22   defendant may seek?
23        THE COURT:  Yes, I will.  Since these offenses
24   occurred in reference, at least one of the offenses related
25   to his involvement as a police officer since one of the
```

1    assaults took place right across the street in the police

2    department and the others took place in relationship to his

3    capacity as a minister, I would order that he not be

4    employed in a position where he has interaction with

5    children under the age of 18 unless he receives

6    authorization to do that work by the probation department.

7              Anything else?

8              MS. McCLELLAN:  No, your Honor.

9              THE COURT:  Ms. Lotze, anything?

10             MS. LOTZE:  Court's brief indulgence.

11             [Brief pause.]

12             MS. LOTZE:  Your Honor, I did hear the Court

13   recommend that the Bureau of Prisons consider placing

14   Mr. Best either in Butner or a facility in Massachusetts.

15   Would the Court consider making a specific recommendation to

16   just Butner?

17             THE COURT:  Very well.  I'll say Butner, but I

18   don't know what their capacity right now is, so I would

19   recommend that he be placed at Butner.  If Butner is

20   unavailable he be placed at the Massachusetts facility where

21   he can get intervention regarding the sex treatment, but the

22   preference would be Butner.

23             MS. LOTZE:  Thank you, your Honor.

24             THE COURT:  Anything else?

25             MS. LOTZE:  No, your Honor.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OFCOLUMBIA**
**Civil Division**

JAQUIA BUIE               )

                              )

        Plaintiff,         )

                              )

vs.                         )     Civil Action No. 1:16-cv-01920 (CKK)

                              )

DISTRICT OF COLUMBIA, *et. al.*  )

        Defendants      )

———————————————)

**PLAINTIFF'S RESPONSE TO DEFENDANT DISTRICT'S**
**STATEMENT OF MATERIAL FACTS**

       Under Fed. R. Civ. P. 56(c)(1) and (2) and LCvR 7(h)(1), Plaintiff hereby submits the following response to Defendant District of Columbia's Statement of Material Facts as to Which There Is No Genuine Issue.

       Defendant Statement commences with a narrative of facts, some undisputed that do not actually matter to the claims Plaintiff has alleged, and they will be marked as 'immaterial.'

    1.     In December 2012, Defendant Darrell Best (Best) founded the God of Second Chance Ministries ("the church"), located at 4410 Southern Avenue, SE, Washington, DC. Ex. 1, Best Decl. at ¶ 7.

       **RESPONSE:** Immaterial, but undisputed.

    2.     Plaintiff Jacquia Buie started attending the church in the fall of 2013. Ex. 2, Pl. Dep. Tr. at 84:17-19; Ex. 1, Best Decl. at ¶ 14.

**RESPONSE**:  Immaterial, but Plaintiff's name is spelled "Jaquia," without a "c,"

and Plaintiff attended the church with her mother at her mother's insistence.

Plaintiff's Ex. 1, Jaquia Buie ("J. Buie") Tr." at 89:12-13.

3.      Plaintiff did not know Best before attending the church, and she had no previous

contact with him in his capacity as a police officer. Ex. 2, Pl. Dep. Tr. at 90:19-91:2, 99:2-7.

**RESPONSE:**  Immaterial, but undisputed.

4.      From the moment she joined the church until November 2014, Plaintiff never

spoke to Best about her life, her career goals, or any other topic. *Id*. at 122:6-22.

**RESPONSE:**  Immaterial, but undisputed.

5.      On Thanksgiving Day 2014, Plaintiff had a one-on-one conversation with Best

for the first time since joining the church. *Id*. at 145:9-21, 149:11-17, 150:2-9. Best mentioned

that Plaintiff's mother, Shenita Buie (Ms. Buie), told him that Plaintiff was interested in being a

police officer. *Id*. at 145:9-21, 147:22-148:3.  Plaintiff responded that she was interested and that

her mother had arranged for her to attend a police cadet meeting in early 2015. *Id*. at 148:4-16.

**RESPONSE:**  Immaterial, except to the extent it evinces Jaquia's interest in

potentially becoming a police officer.  Ex. 1, J. Buie Tr. at 148:20-149:4.

6.      Shortly thereafter, Best had another conversation with Plaintiff at the church in

which he asked for her phone number and inquired whether she had come up with an idea for a

graduation gift. *Id*. at 163:7-19.  Plaintiff said no, and Best responded that he would take Plaintiff

and her mother out to dinner to discuss Plaintiff's interest in becoming a police officer. *Id*.

Plaintiff told Best that there was "nothing . . . really to talk about[,]" that "it was not that

serious[,]" and that she "would just take a gift card[.]" *Id.* at 165:6-16.

**RESPONSE:**  Immaterial, except as to the implication that Jaquia's response "nothing . . . really to talk about" referred to a graduation gift and not to becoming a police officer. Plaintiff's Ex. 1 at 165:6-166:4.

7.      Plaintiff eventually agreed to go to dinner with Best and chose Georgia Brown's as the location for the dinner. *Id*. at 171:9-22.

**RESPONSE:**  Immaterial, but undisputed.

8.      At approximately 4:00 p.m. on the day of the dinner (December 4, 2014), Ms. Buie decided not to attend. *Id*. at 170:8-17.

**RESPONSE:**  Immaterial, except the day of the dinner was actually December 3, 2014, not December 4, 2014.

9.      On the day of the dinner, Best sent a text message to Plaintiff confirming their plans to have dinner at Georgia Brown's. *Id*. at 170:18-171:8.  Plaintiff agreed to meet him at the Mount Vernon metro station. *Id*. at 172:1-15.

**RESPONSE:**  Immaterial, but undisputed.

10.      Best picked Plaintiff up from the metro in an unmarked police car. *Id*. at 173:16 - 174:4. Best did not tell Plaintiff why he was driving an unmarked police cruiser; nor did Plaintiff inquire. *See id*. at 176:5-10.

**RESPONSE**:  Undisputed that Best picked Plaintiff up from the metro in an unmarked police car.  Immaterial as to what Best and Jaquia did not say about it.

11.      Best was dressed in his full police uniform with his service weapon. *Id*. at 176:11-17.

**RESPONSE:**  Undisputed.

12. As Best drove Plaintiff to Georgia Brown's, he asked if she had any questions about the police force, and Plaintiff stated she did not. *Id*. at 177:3-9, 178:3-16.

**RESPONSE:** Immaterial, but undisputed.

13. Plaintiff and Best arrived at Georgia Brown's around 6:00 p.m. *Id.* at 223:2-4.

**RESPONSE:** Immaterial, but undisputed.

14. Upon arriving at the restaurant, Best briefly spoke about the police academy. *Id*. at 179:21-180:11. It was a one-sided conversation that lasted only five minutes, and Plaintiff did not ask Best any questions. *Id*. at 180:12-22.

**RESPONSE:** Undisputed.

15. Throughout dinner, Best asked Plaintiff a series of inappropriate and harassing questions, such as: if she had a boyfriend, *id*. at 181:8-13; if she liked having oral sex performed on her, *id*. at 181:8-13; and what "position" she liked, *id*. at 183:4-13.

**RESPONSE:** Undisputed.

16. Plaintiff started to put her coat on but Best, in an aggressive manner, demanded that she take it off. *Id*. at 201:7-202:6.

**RESPONSE:** Undisputed.

17. Plaintiff told Best that she would pay for her own dinner because she considered the dinner was "no longer a gift." *Id.*

**RESPONSE:** Immaterial, but undisputed.

18. Plaintiff told Best that she was leaving, and she planned to take the metro home. *Id*. at 204:3-20.

**RESPONSE:** Undisputed.

19. Plaintiff and Best were at the restaurant for about one hour. *Id*. at 202:22-203:6.

**RESPONSE:** Immaterial, but undisputed.

20.     Best paid for the meal over Plaintiff's objection. *Id.* at 205:4-15.

**RESPONSE:** Immaterial, but undisputed.

21.     After dinner, Best's demeanor changed—he became "aggressive," "stern," and was "talking as if he was [Plaintiff's] parent," *id.* at 201:7-202:6—ultimately causing Plaintiff to fear him, *id.* at 202:7-9.

**RESPONSE:** Immaterial, but undisputed.

22.     When Plaintiff left the restaurant, Best followed her and, as she crossed to the other side of the street, Best, "talking between his teeth[,]" said "come here." *Id.* at 205:12-206:22.

**RESPONSE:** Undisputed.

23.     Plaintiff walked back to Best who asked "what would it look like if I didn't take you home?" *Id.* Plaintiff got into the car. *Id.* at 211:2-20.

   **RESPONSE:** Disputed as misleading. Officer Best induced Jaquia to believe
   that he was taking her home. *Id.* Tr. at 247:18-19. Best brought her to police
   headquarters against her will instead. *Id.* at 248:2-7.

24.     Best drove Plaintiff to MPD headquarters, stating that he had work to finish but that he would not be long. *Id.* at 212:5-11.

   **RESPONSE**: Disputed. This was the execution of a "bait and switch." Jaquia
   got into the police car, believing that Officer Best was going to drive her home.
   After she was inside the car and it was moving, Best took her to police
   headquarters against her will. *Id.* at 248:2-7.

25.     Best then drove into the parking garage at MPD Headquarters and used his badge to gain access. *Id*. at 212:12-14, 213:2-17.

**RESPONSE:**  Undisputed.

26.     Plaintiff asked to wait in the car but Best told her that she could not because "Chief Lanier's in here." *Id*. at 213:2-17.

**RESPONSE:**  Undisputed.

27.     As Plaintiff and Best walked to the elevators, the only person Plaintiff saw was a cleaning person. *Id*. at 213:21-214:10.

**RESPONSE:**  Immaterial, but undisputed.

28.     Best used his badge to operate the elevators. *Id.* at 243:20-244:2.

**RESPONSE:**  Undisputed.

**29.**     The two proceeded to the Corporate Support Bureau (CSB)—where Best was detailed at the time, *see* Ex. 3, Teletype—which is located on the fifth floor. Ex. 2, Pl. Dep. Tr. at 214:11-17.

**RESPONSE:**  Undisputed.

30.     Once they arrived on the fifth floor, Plaintiff did not see any police officers. *Id*. at 214:21-215:11. Plaintiff saw that Chief Lanier's office door was open but she did not hear any voices. *Id*. at 215:21-216:9.

**RESPONSE:**  Undisputed.

31.     Plaintiff proceeded with Best to the CSB suite, which was comprised of Assistant Chief Kimberly Chisley-Missouri's private office, an open workspace for staff, a smaller office, and a file room. Ex. 4, Chisley-Missouri Dep. Tr. at 51:10-54:2. Best's desk was located in the open workspace. *Id*. at 62:4-8.

**RESPONSE:**  Disputed as misleading.  Plaintiff did not "proceed[ ] with Best to the CSB suite. . ."  Officer Best took her there against her will.  *Id*. at 212:5-14; 248:2-7.

32.      When Plaintiff and Best entered the CSB suite on the night of the incident, Best sat at his desk while Plaintiff sat on a couch away from the desk. Ex. 2, Pl. Dep. Tr. at 216:20-217:6. Eventually, Best "made his way to [Plaintiff]." *Id*. at 227:17-20.

**RESPONSE:**  Disputed as misleading, because Best sat at his desk and worked on his computer, consistent with the statement to her that he had "work to finish up."  *Id*. at 212:10-11.

33.      Best then sexually assaulted Plaintiff. *Id*. at 228:10-229:11, 230:2-17, 230:20-231:2, 231:6-232:12, 232:20-233:20, 237:3-12, 237:15-21, 238:5-15.

**RESPONSE:**  Disputed as misleading, because the District does not even cite the full record of sexual abuse, which was the actual crime that Officer Best was convicted of as a result of this incident.  *Id.* at 238:16-241:8, 242:14-243:10.

34.      After the assault, Plaintiff and Best left the CSB suite. Plaintiff could hear voices coming from Chief Lanier's office but she did not see anyone. *Id*. at 243:11-19.

**RESPONSE:**  Undisputed.

35.       Best drove Plaintiff away from MPD headquarters and dropped her off two blocks from her house. *Id*.

**RESPONSE:**  Undisputed.

36.      In January 2015, A.T.,[1] Best's fiancé's 16-year-old niece, confided in Plaintiff that Best raped her. *Id*. at 259:7-261:21.

---

[1]      A.T. was a minor (age 16) at the time Best raped her.  Thus, to protect her privacy, only her initials are used throughout this brief and her name is redacted from the exhibits.

**RESPONSE:** Undisputed.

37.    Plaintiff and A.T. were in the church choir together, and A.T. revealed Best's criminal conduct to Plaintiff after the choir had performed at another church. *Id.*

**RESPONSE:** Immaterial, but undisputed.

38.    On March 14, 2015, A.T.'s older sister reported Best's crimes to her cousin, Officer Zunobia Hakir. Ex. 5, Incident Summary Report. The ensuing investigation revealed that Best raped and otherwise sexually assaulted A.T. on three separate occasions. Ex. 6, Arrest Warrant.  The incidents occurred on December 23, 2014, January 15 or 17, 2015, and February 14, 2015 (Valentine's Day). *Id*. All three incidents occurred in Best's private office inside the church. *Id.*

**RESPONSE:** Undisputed.

39.    On March 14, 2015, agents from MPD's Internal Affairs Division served Best with a Form PD 77 (Revocation of Police Powers). Ex. 7, Internal Affairs Final Report.  MPD then placed Best on administrative leave. *Id.*  On March 15, 2015, a warrant was issued for Best's arrest for raping and sexual assaulting A.T. *Id.*  Best was arrested on March 16, 2015, and charged with First Degree Sexual Abuse of Minor. *Id.*

**RESPONSE:** Undisputed.

40.    On August 4, 2015, Best resigned from MPD. Ex. 1, Best Decl. at ¶ 3.

**RESPONSE:** Undisputed.

41.    On August 18, 2015, the Internal Affairs Division (IAD) sustained the allegations against Best. Ex. 7, Internal Affairs Final Report. However, MPD could not take any disciplinary action against Best because he had resigned from his position. Ex. 8, Gottert Dep. Tr. at 50:20-51:15.

**RESPONSE:** Disputed.  The only allegation of misconduct sustained against Officer Best was for violation of "Department policies and procedures when he was arrested for First Degree Sex Abuse of a Minor.  No allegation of misconduct was raised, much less sustained, for his attempted rape of Jaquia in police headquarters. Admission of Defendant:  Defendant Ex. 7, Internal Affairs Final Report, at 7.

42.      On or about March 10, 2016, Best pled guilty to Production of Child Pornography, First Degree Sexual Abuse of a Minor, and Second Degree Sexual Abuse of a Minor. Ex. 9, Judgment in a Criminal Case. Best was sentenced to 18 years in prison.  *Id*.

**RESPONSE:** Disputed.   Best pled guilty on October 22, 2015, not March 10, 2016.

43.      Best was originally hired as a police officer with the Metropolitan Police Department (MPD) on February 2, 1987. Ex. 1, Best Decl. at ¶ 3. In November 1998, he was promoted from patrol officer to master patrol officer with the Fifth District. Ex. 10, Personnel Action, Promotion to Master Patrol Officer. Several months later, he was promoted to sergeant and assigned to the Seventh District. Ex. 11, Personnel Action, Promotion to Sergeant.

**RESPONSE**:  Disputed as misleading. In 2007, he was assigned to assist as liaison between the Police Academy and the Seventh District Youth Investigations Branch to teach the Code of Ethics, Report-Writing and Property to the cadets in the police academy.  Defendant's Ex. 12 at 8.  He was reassigned to the Police Academy in March 2008. Ex. 2, Best Personnel History, (DC 000545). The chief of police then detailed Sgt. Best to the Fifth District in the summer of 2008 during the first investigation of police sexual misconduct against him at the

police academy.  While he was detailed for his pending investigation, a female in

the Fifth District filed a second investigation of police sexual misconduct against

him in October 2008, and he was placed on administrative leave with pay in

October 31, 2008. *Id*. at DC 000980.  He remained on administrative leave for

approximately 11 months and was then reassigned to the Fourth District on

October 4, 2009. Id. at DC 000561.

44.     In January 2009, MPD's Diversity and Equal Employment Opportunity

Compliance Unit (EEO) completed an investigation into allegations by a female police cadet

with the Youth Investigation Branch Cadet Program that Best had sexually harassed and sexually

assaulted her over a period.  Ex. 12, Investigation Report (Jones matter).

The complainant alleged that Best repeatedly requested oral and vaginal sex, fondled her

buttocks and breast, and kissed her neck.  *Id*.

> **RESPONSE:**  Disputed.  The sergeant who investigated the Cadet Raynette Jones
>
> matter was an agent of the Internal Affairs Bureau assigned to EEO cases.
>
> [Defendant Ex. 12].  The complainant—in addition to alleging that Sgt. Best
>
> repeatedly requested oral and vaginal sex, fondled her buttocks and breast, and
>
> kissed her neck, also alleged that Best would call her on her cell phone and tell
>
> her to come to his office, and once inside, lock the door, feel her buttocks and
>
> breast, and kiss her on the neck, while humping her.  She alleged this occurred on
>
> approximately ten (10) occasions and once when they were detailed to an old
>
> folks home.  He allegedly directed her to the coat room, shut the door, blocked it
>
> with his body, and grabbed her buttocks and began humping her while kissing her
>
> neck.  Sgt. Best knew the cadet had a female lover and he said, "She can't do the

things I can do!  What she doesn't know won't hurt her." And, "I will eat you out
better than your girlfriend can."

45.     The investigation of the Jones matter found that there were insufficient facts
to support the allegations, specifically noting that the people identified by the complainant
as having information supporting the allegations denied having any knowledge of Best's
alleged misconduct.  *Id*.  The United States Attorney for the District of Columbia declined to
prosecute Best for sexual abuse related to these allegations. Ex. 13, Declination Letter (Jones
matter).

> **RESPONSE:**  Disputed.  The persons interviewed by the Internal Affairs agent
> were *not* "identified by the complainant as having information supporting the
> allegations," but about another story of Best's inappropriate conduct with respect
> to cadets.  There was only one person that Cadet Jones identified by name as
> having information supporting the allegations; a male cadet who was *not*
> interviewed.[2] Ex. __, Jones, Investigation, Tr. of Cadet Jones interview by
> Internal Affairs Division, April 28, 2008, at 10-11.   Even though the investigator
> brought up the male cadet's name at the end of the interview, told Cadet Jones
> that she would "interview the witnesses you named," and put the name of the
> male cadet on her "Things to Do" list, there is no mention of him in the final
> report and no evidence in the file that he was ever interviewed. *Id*. at DC 001547,
> "Things to Do" list.  The charge that the United States Attorney Office (USAO)
> declined to prosecute was not "Sexual Abuse."  The charge was Second Degree

---

[2]     The persons interviewed were female cadets, who Cadet Jones identified as referring to Best as
a "pervert" and not as people having information supporting Cadet Jones' allegations against Best. Ex.
__ Tr. of Cadet Jones interview by Internal Affairs Division, April 28, 2008, at 12-13.

Sexual Abuse of a Ward, fulfillment of the elements of which there was never a possibility, as the situation did not involve "a ward," and all involved were aware of that fact in advance. *Id*. at DC 001484, DC 001508 and 001548.

46.      In the winter and spring of 2009, MPD's EEO investigated allegations made by a civilian employee that Best touched her buttocks and asked that she allow him to give her a message for $35 at a hotel. Ex. 14, Investigation Report (Lee matter).

> **RESPONSE**:  Disputed because the investigation into allegations made by a civilian employee that Best touched her buttocks began on October 21, 2008. Defendant's Ex. 14.

47.      The Lee matter investigation substantiated the allegations and recommended sustaining a charge of "conduct unbecoming an officer" against Best. *Id.* Best appealed the charge and, in September 2009, Chief of Police Cathy Lanier denied Best's appeal. Ex. 15, Lanier Letter (Lee matter).

> **RESPONSE:**  Undisputed.

48.      As punishment, Best was demoted from sergeant to officer. *Id*. A few weeks later, Best was issued a Notice of Direction (Notice), requiring him to report to the training academy for training and recertification. Ex. 16, Notice of Direction. The Notice also specified that Best was reassigned to the Patrol Service and School Security Bureau at the Fourth District. *Id*. The United States Attorney declined to prosecute Best in connection with the allegations. Ex. 17, Declination Letter (Lee matter).

> **RESPONSE:**  Disputed as misleading.  The demotion did nothing to protect the civilian population of vulnerable females from misuse of the sway of Officer Best's police authority.  Nothing, in terms of the citizenry changed: Best remained

a documented lying, undutiful, miscreant with a penchant for police sexual

misconduct and the badge to exercise it.

49.     Best was with the Fourth District until November 21, 2014, when Chief Lanier

issued a teletype detailing Best to the CSB for the period of November 23, 2014, to February 21,

2015. Ex. 3, Teletype. Best was an administrative officer with CSB. Ex. 4, Chisley-Missouri

Dep. Tr. at 61:12-17.

> **RESPONSE:**  Undisputed.

50.     At CSB, Best's work hours were Monday through Friday, 9:00 a.m. to 5:00

p.m., and Best could only work overtime if it was approved by Chief Chisley-Missouri. Ex. 1,

Best Decl. at ¶ 5.

> **RESPONSE:**   Disputed because Darrell Best's credibility is established as
> unreliable: he is documented liar.  Charges of fraud and time/attendance were
> sustained against him in 2007 (Ex. 4, Fraud/ Time Attendance); he denied under
> oath the allegations against him that were sustained in the second sexual harassment
> case against him in 2009 (Defendant's Ex. 14); and the District's Rule 30(b)(6)
> witness on Internal Affairs testified that if the first sexual harassment case against
> him in 2008 had been investigated properly, the charges would have been sustained.
> Ex. 5, Inspector Dickerson Tr., at 211:19-213:14.
>
> Further, Best has exclusive access to many of the purported facts he swears to in
> his Declaration, he is interested in the outcome of the case, and there has been no
> opportunity for cross-examination.

51.     On the night that Best assaulted Plaintiff, he was not authorized to work

overtime. *Id.* at ¶ 20.

**RESPONSE:**  Disputed for the same reasons set forth in response to Defendant's

No. 50 above, as the assertion is based solely on Best's utterly unreliable word.

52.     The unmarked police car that Best used to take Plaintiff to dinner in December

2014, was assigned to CSB for official MPD business and the keys to the vehicle were kept in the

CSB office. *Id.* at ¶ 6.

**RESPONSE:**  Disputed because Officer Best had signed a police car out of the

MPD motor pool on December 1, 2014. The record shows that the cruiser had not

been returned as of December 14, 2014. Ex. 6, Motor Pool records.

53.     Best was not authorized by any MPD official to use the vehicle to take Plaintiff

to dinner. *Id.* at ¶ 22.

**RESPONSE:**  Disputed because MPD authorized Best's use of a police car by

permitting him access to the Motorpool.  *Id.*  The CSB oversees the Motorpool.

Id.  Best was detailed to the CSB by the chief of police, effective November 24,

2014.  Defendant's Ex. 3.  During his first nine (9) days at CSB, Best signed out

police cars on three occasions: November 26, 27 and December 1, 2014.  He

returned the cars the same day on November 26 and 27, but there is no indication

in the record as of December 14th that he had returned the car he signed out on

December 1st.  *Id.*

54.     No one at MPD was aware of Best's dinner plans with Plaintiff. *Id.* at ¶¶ 22, 23.

**RESPONSE:**  Disputed.  Best cannot have personal knowledge that no one at

MPD was aware of his dinner plans with Jaquia.  It is an epistemic and

psychological impossibility.

55.     Best independently decided to use the CSB car to avoid rush hour and parking problems. *Id.* at ¶ 22.

> **RESPONSE:**  Disputed because the "CSB car" is not necessarily the car that Best
> used, as the car he signed out from the Motorpool on December 1, 2014 had not
> been returned by December 14th.

56.     Best's duties as a police officer were completely unrelated to his association and work with the God of Second Chance Ministries. *Id*. at ¶ 8.

> **RESPONSE:**  Disputed.  Best told Jaquia Buie's mother that he was working
> overtime as an MPD officer and receiving overtime payments for working in the
> church. Jaquia Tr. 100:19-21 Furthermore, that fact that he was a member of
> MPD who visibly wore his sidearm under his pastoral robe inexorably associated
> MPD with his ministry. Ex. 1, J. Buie Tr., at 100:19-21

57.     Best did not seek approval or authorization from MPD to establish or preach at the church. *Id*. at ¶ 9.

> **RESPONSE:**  Disputed.  In 2011, IAD opened a chain of command investigation
> after a male member of Best's church called the MPD alleging that Best was
> having an affair with his wife and wore his service weapon while preaching in the
> pulpit.  Id.  MPD explicitly required Best to explain why it was appropriate to
> wear his service weapon in church, and Best's sought authorization from the
> MPD to continue wearing his uniform in church and service weapon in the pulpit.

58.     MPD did not assign Best to perform any police-related duties at or for the church *Id*. at ¶ 10.

> **RESPONSE:**  Disputed.  Best told Jaquia Buie's mother that he was working overtime as a MPD officer and receiving overtime payments for working in the church. *Id.,* at 236:11-14, 245:11-17.

59.     There was no official or unofficial association or connection between MPD and the church. *Id*. at ¶ 11.

> **RESPONSE:**  Disputed.   ABC 7 News broadcast a story showing Best dressed in his MPD police uniform and preaching in church at part of its coverage of his arrest in March 2015. Moreover, that a uniformed MPD officer is in the pulpit of a church necessarily creates, at minimum, an "unofficial association [and] connection between MPD and the church."

https://www.youtube.com/watch?v=sMtRYs_HXoM

60.     All MPD recruits are trained on sexual misconduct topics in the context of learning the offenses of the D.C. Criminal Code, as well as in the context of EEO training. Ex. 18, Davis Dep. Tr. at 6:9-19, 32:22-33:7.

> **RESPONSE:**  Disputed.  This is false.  The only evidence of training is on sexual harassment, which is a single category (at minimum, 1 of 10) of sexual misconduct. See Ex.___,  *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide*, at 3-4. There is no evidence that MPD recruits, or MPD sworn members, have ever received training on the broader topic of police sexual misconduct, because they have not.  The "EEO/Sexual Harassment" training for MPD recruits consists of a segment of a 40-hour program divided into 20 topics, 19 of which are unrelated to sexual misconduct.  Def. Ex. 18, Dep, Lt. Arthur Davis, 34: 8-16; Def. Ex. 19, Dep. Alphonso, 29:4.  The training module speaks for itself.  Ex. __., EEO Training Module.

61.     MPD recruits are also trained "to act ethically, act with morals, act with standards[.]" *Id*. at 7:10-19.

>    **RESPONSE:**  Disputed.  The District mistakes taking a course in ethics for
>
>    actually being conditioned—trained—to conduct oneself ethically.  (One can take
>
>    a course multiple times and fail it for consecutive semesters: happens all the
>
>    time.)  Officer Best actually was the person who taught the Code of Ethics at the
>
>    Police Academy in 2007, the same year that the fraud/ time attendance charge was
>
>    sustained against him, as well as the year in which the incidents upon which
>
>    Internal Affair's first investigation of police sexual misconduct against him was
>
>    predicated (Defendant District Exhibit 12, at DC 001479), and which Inspector
>
>    Kimberly Dickerson (the District's 30(b)(6) witness regarding Internal Affairs has
>
>    effectively said he lied about not committing.  Ex__ Inspector Kimberly
>
>    Dickerson Tr. at 211-213..

62.     MPD officers receive ongoing, quarterly sexual harassment training throughout their time on the force. Ex. 19, Lee Dep. Tr. at 30:7-20.

> **RESPONSE:** Disputed because it is not accurate.  It refers to sexual harassment training begun in 2017 as a result of Mayor's Order 2017-313, which was promulgated three years after the night of December 3, 2014.

Respectfully submitted,

SMITH MUSTILLE, LLC

By:    /s/Mark A. Smith
Mark A. Smith              Bar # 439116
2200 Pennsylvania Avenue, NW
Fourth Floor East Washington, D.C. 20037
(202) 776-0022
877-854-1631 – fax
masmith@smithmustille.com

By:    /s/ Judith A. Mustille
Judith A. Mustille          Bar # 455076
2200 Pennsylvania Avenue, NW
Fourth Floor East Washington, D.C. 20037
(202) 776-0022
877-854-1631 – fax
jamustille@smithmustille.com

December 21, 2020

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 21, 2020.

/s/ Mark A. Smith
Mark A. Smith