## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JAQUIA BUIE, | |
|     Plaintiff, | |
|       v. | Civil Action No. 16-1920 (CKK) |
| DISTRICT OF COLUMBIA, *et al.*, | |
|     Defendants. | |

### MEMORANDUM OPINION
(September 7, 2021)

Darrell Best formerly served as a police officer for the Metropolitan Police Department ("MPD"). Separately, Mr. Best also served as the pastor for a small church located in Washington, D.C. Jaquia Buie was a member of Mr. Best's congregation. On the evening of December 3, 2014, Mr. Best took Jaquia Buie out to dinner at a local restaurant. During their meal, Mr. Best raised explicit sexual topics with Jaquia Buie. Jaquia Buie attempted to leave the restaurant and separate herself from Mr. Best, but eventually allowed Mr. Best to drive her home in his police vehicle. Instead of driving Jaquia Buie home, however, Mr. Best drove her to MPD headquarters, escorted her to an empty office space inside the building, and violently attempted to rape her. At the time, Mr. Best was 45 years old and Jaquia Buie was 17. Mr. Best is now serving an 18-year prison sentence, in part, for his sexual assault of Jaquia Buie on December 3, 2014.

In response to Mr. Best's heinous assault, Jaquia Buie filed a ten-count civil action in September 2016 against Mr. Best, Mayor Muriel Bowser, and the District of Columbia. Plaintiff's complaint asserts both federal claims under 42 U.S.C. § 1983, as well as common law tort claims against the defendants. Now pending before the Court is the District of Columbia's [90] Motion for Summary Judgment, which seeks the dismissal of Plaintiff's § 1983 claims for municipal liability in Counts I and II, as well as Plaintiff's common law claims against the District of

Columbia in Counts III, IV, V, VI, VII, and VIII.  Upon consideration of the pleadings, the relevant

legal authorities, and the record as a whole,[1] the Court will **GRANT** the District of Columbia's

motion for summary judgment on Plaintiff's § 1983 municipal liability claims in Counts I and II.

The Court, however, will **DENY WITHOUT PREJUDICE** the District of Columbia's motion for

summary judgment as to Plaintiff's remaining common law claims, because unaddressed questions

persist regarding the Court's continuing jurisdiction over those non-federal causes of action.

## I.   BACKGROUND

### A.  Factual Background

#### 1.  Mr. Best's History as an MPD Officer

The Metropolitan Police Department ("MPD") hired Darrell Best as a police officer in

February 1987.  Def.'s Stmt. at ¶ 43.  In November 1998, MPD promoted Mr. Best from patrol

officer to master patrol officer within the Department's Fifth District.  *Id.*  Only several months

later, MPD promoted Mr. Best once again, this time to the rank of Sergeant, and assigned him to

the Department's Seventh District.  *Id.*

In the 2000s, MPD began to receive complaints about Mr. Best and to discipline him for

certain conduct.  In November 2006, MPD issued Mr. Best an official reprimand when he failed

to notify MPD's internal affairs division that he had served a fellow MPD officer with a temporary

protective order, arising from a domestic dispute.  *See* IAD Rep., ECF No. 90-22, at 2.  Then, in

---

[1] This Memorandum Opinion focuses on the following documents:
- Compl., ECF No. 1;
- Def.'s Stmt. of Mat. Facts ("Def.'s Stmt."), ECF No. 90;
- Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 90;
- Pl.'s Issues of Mat. Fact ("Pl.'s Stmt."), ECF No. 94-1;
- Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, ECF No. 94-1;
- Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 94-1; and,
- Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply"), ECF No. 97.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

May 2007, MPD suspended Mr. Best for 30-days for providing falsified time and attendance records to MPD, which overstated his compensated work hours.  *See* Pl.'s Opp'n, ECF No. 94-1, at Ex. 4 at 3–5; Not. of Adverse Action, ECF No. 90-23, at 1; Pl.'s Stmt. at ¶ 22.  Also in 2007, MPD received an incident report alleging that Mr. Best had assaulted his wife and that she had obtained a temporary protective order against him.  *See* Pl.'s Opp'n, ECF No. 94-1, at Ex. 20 at 1. The current record does not indicate that MPD took any disciplinary action against Mr. Best, as a result of his 2007 domestic violence incident report.  *See* Pl.'s Stmt. at ¶ 22.

In April 2008, Mr. Best was the subject of a formal sexual assault complaint lodged by a female MPD police cadet named Raynette Jones.  *See* MPD Rep., ECF No. 90-12, at 1–2.  In her complaint, Ms. Jones alleged that Mr. Best had repeatedly requested oral and vaginal sex, humped her in his office, and fondled her breasts and buttocks on numerous occasions.  *Id.* at 2–4.  MPD referred Ms. Jones's sexual assault allegation to the Sex Offense and Domestic Violence Section of the United States Attorney's Office for the District of Columbia.  *See* Aug. 1, 2008 Letter, ECF No. 90-13, at 1.  On August 1, 2008, the United States Attorney's Office declined criminal prosecution on a charge of sexual abuse against Mr. Best.  *Id.*  Thereafter, MPD conducted its own internal investigation of the Jones matter and ultimately issued no formal disciplinary action against Mr. Best after reaching a finding of "insufficient facts."  MPD Rep., ECF No. 90-12, at 8; *see also* Def.'s Stmt. at ¶ 45.  After the Raynette Jones matter, MPD detailed Mr. Best to work in the Department's Fifth District.  *See* MPD Rep., ECF No. 90-14, at 7.

In October 2008, Mr. Best was the subject of another formal sexual assault complaint, this time lodged by a civilian MPD employee named Janice Lee.  *See* MPD Rep., ECF No. 90-14, at 1.  Ms. Lee alleged that on October 22, 2008 Mr. Best propositioned her at work, offering to take her to a hotel and give her a "massage" for $35.  *Id.* at 3.  Mr. Best then allegedly grabbed Ms.

Lee's buttocks without her consent, while the two were alone together in an MPD community room. *Id.* As with the Raynette Jones complaint, MPD referred Ms. Lee's complaint to the Sex Offense and Domestic Violence Section of the United States Attorney's Office for the District of Columbia. *See* Jan. 23, 2009 Letter, ECF No. 90-17, at 1. On January 23, 2009, the United States Attorney's Office declined criminal prosecution on a charge of sexual abuse against Mr. Best. *Id.* MPD, however, conducted an internal investigation of Ms. Lee's complaint and found that Mr. Best had used his position of authority to intimidate female MPD employees and had engaged in behavior that could "leave the Department open to serious legal action." MPD Rep., ECF No. 90-14, at 6. MPD ultimately determined that Mr. Best's actions towards Ms. Lee constituted conduct unbecoming of an officer and demoted Mr. Best from the rank of a sergeant to an officer. Def.'s Stmt. at ¶ 48. MPD also required that Mr. Best report to MPD's police academy for "training and recertification." *Id.*; *see also* Not. of Direction, ECF No. 90-16, at 1. MPD then reassigned Mr. Best to the Patrol Service and School Security Bureau, in the Department's Fourth District. Def.'s Stmt. at ¶ 48.

Mr. Best remained with the Fourth District until November 21, 2014, at which point MPD Police Chief Cathy Lanier temporarily detailed Mr. Best to the Corporate Support Bureau ("CSB"). *Id.* at ¶ 49. Within the CSB, Mr. Best served as an "administrative officer," working at a desk in the CSB suite on the Fifth Floor of MPD headquarters. *Id.*; *see also* Chisley-Missouri Dep., ECF No. 90-4, at Tr. 61. As a CSB administrative officer, Mr. Best worked Monday through Friday, from 9:00 AM to 5:00 PM, and could only work overtime hours with supervisor approval. Def.'s Stmt. at ¶ 50. MPD assigned the CSB an unmarked police vehicle for its officers to use for official MPD business. *Id.* at ¶ 52. While detailed with the CSB, Mr. Best continued to carry an MPD service weapon. *See* Def.'s Stmt. at ¶ 11; Pl.'s Stmt. at ¶ 4.

### 2.   God of Second Chance Ministries

In addition to his role as an MPD officer, Mr. Best was also an ordained minister.  *See* Best Decl., ECF No. 90-1, at ¶ 7.  In December 2012, Mr. Best founded a church called "God of Second Chance Ministries" (the "Church"), located at 4410 Southern Ave., SE, Washington, D.C.  Def.'s Stmt. at ¶ 1.  The Church's congregation was comprised of approximately 60-80 individuals, *see* Best Decl., ECF No. 90-1, at ¶ 7, and its services included bible studies, counseling, a dance ministry, and a choir, *see* Pl.'s Dep., ECF No. 90-2, at Tr. 119:19–21; Shenita Buie Dep., ECF No. 90-20, at Tr. 70:14–20, 73:8–17.  As pastor, Mr. Best had personal involvement in these church activities, including through his service as choir director, *see* A.T. Dep., ECF No. 90-21, at Tr. 102–03, and by hosting Bible study groups in his house, *see* Pl.'s Dep., ECF No. 90-2, at Tr. 119:19–21.  Mr. Best was viewed as a role model for the congregation, as he appeared to carry himself professionally within the community.  *See* Shenita Buie Dep., ECF No. 90-20, at Tr. 71:14–16; 75:8–76:2; 77:10–18.

Mr. Best's duties as a police officer were completely unrelated to his association and work with God of Second Chance Ministries.  Def.'s Stmt. at ¶ 56 (citing Best Decl., ECF No. 90-1, at ¶ 8).  For example, Mr. Best did not seek approval or authorization from MPD to establish the Church in 2012 or to preach at the Church thereafter.  *Id.* at ¶ 57 (citing Best Decl., ECF No. 90-1, at ¶ 9).  Moreover, MPD refrained from assigning Mr. Best any police-related duties at or for the Church, *see id.* at ¶ 58 (citing Best Decl., ECF No. 90-1, at ¶ 10), and overall, there was no official or unofficial association or connection between MPD and the Church, *id.* at ¶ 59 (citing Best Decl., ECF No. 90-1, at ¶ 11).  Nonetheless, Mr. Best consistently wore his police uniform at the Church, and "every member" of the Church knew that he was an MPD officer.  Pl.'s Opp'n, ECF No. 94-1, at Ex. 22 at 3; *see also* Pl.'s Resp. to Def.'s Stmt. at ¶ 59 (referencing news broadcast

showing Mr. Best leading a church service while in police uniform).  Mr. Best would also carry his service weapon at the Church, including while presiding over the congregation from the pulpit. *See* Pl.'s Opp'n, ECF No. 94-1, at Ex. 1 at Tr. 100:18–21; *id.*, at Ex. 22 at 6.

Jaquia Buie ("Plaintiff") began attending God of Second Chance Ministries in the Fall of 2013, along with her two sisters and her mother, Ms. Shenita Buie.  Def.'s Stmt. at ¶ 2.  Plaintiff did not know Mr. Best before attending the Church, and she had no previous contact with him in his capacity as a police officer.  *Id.* at ¶ 3.  Plaintiff spoke directly with Mr. Best for the first time on Thanksgiving Day 2014.  *Id.* at ¶ 5.  During that conversation, Mr. Best stated that Plaintiff's mother had told Mr. Best about Plaintiff's interest in becoming a police officer.  *Id.*  Mr. Best then indicated to Plaintiff that he might be able to offer her assistance in her efforts to become a police officer.  *Id.*  Mr. Best concluded the conversation by asking Plaintiff what she wanted for her high school graduation gift.  *Id.*  At that time, Plaintiff was seventeen years of age and had graduated high school just five months earlier.  *Id.*

Shortly after their initial conversation on Thanksgiving Day 2014, Mr. Best approached Plaintiff again at the Church and asked if she had given any additional thought to her graduation gift.  *Id.* at ¶ 6.  When Plaintiff responded that she had not, Mr. Best offered to take Plaintiff and her mother out to dinner to discuss Plaintiff's interest in becoming a police officer.  *Id.*  Plaintiff, however, replied that there was "nothing . . . really to talk about," because her interest in police work "was not that serious."  Pl.'s Dep., ECF No. 90-2, at Tr. 165:6–13.  Nonetheless, Plaintiff still "felt pressured to . . . ask for a gift from" Mr. Best and, therefore, suggested that she would "just take a gift card."  *Id.* at Tr. 165:13–16.  Plaintiff, however, eventually acceded to Mr. Best's dinner invitation.  Def.'s Stmt. at ¶ 7.  Mr. Best requested Plaintiff's cell phone number and told Plaintiff to select a restaurant where he could take Plaintiff and her mother out for dinner.  *See* Pl.'s

6

Dep., ECF No. 90-2, at Tr. 167:14–20.   Plaintiff selected a local restaurant called "Georgia Brown's" and made plans to meet Mr. Best, accompanied by her mother, for dinner on December 3, 2014.  *See id.* at Tr. 170; Def.'s Stmt. at ¶ 7.

### 3.  Mr. Best Sexually Harasses Plaintiff at Dinner

On the day of their planned dinner with Mr. Best, Plaintiff's mother decided not to attend, preferring that her daughter have an opportunity to speak independently with Mr. Best about a career in the police force.  *See* Pl.'s Dep., ECF No. 90-2, at Tr. 168:13–21.  Accordingly, Plaintiff proceeded by herself to meet Mr. Best for dinner on December 3, 2014.  *See* Def.'s Stmt. at ¶ 9. Plaintiff met Mr. Best at the Mount Vernon metro station, *see id.*, where Mr. Best picked Plaintiff up in an unmarked police vehicle, *see id.* at ¶ 10.  Mr. Best notified Plaintiff that he was driving an unmarked police vehicle, but did not explain why.  *See* Pl.'s Dep., ECF No. 90-2, at Tr. 176:1– 8.  At the time, Mr. Best was also dressed in his full police uniform and was carrying his service weapon.  Def.'s Stmt. at ¶ 11.  As Mr. Best drove Plaintiff to Georgia Brown's for dinner, he asked whether Plaintiff had any specific question about the police force.  *Id.* at ¶ 12.  Plaintiff indicated that she did not.  *Id.*

Mr. Best and Plaintiff arrived at Georgia Brown's around 6:00 PM on the night of December 3, 2014.  *Id.* at ¶ 13.  At the beginning of the meal, Plaintiff and Mr. Best spoke briefly about the police academy for approximately five minutes.  *Id.* at ¶ 14.  Thereafter, Mr. Best directed the dinner conversation towards more lurid topics, asking Plaintiff whether she had a boyfriend, whether she liked to receive oral sex, and which sexual positions she preferred.  *Id.* at ¶ 15; *see also* Pl.'s Dep., ECF No. 90-2, at Tr. 181–82.  Plaintiff was shocked to hear Mr. Best, her church pastor, ask these highly sexual questions.  *See* Pl.'s Dep., ECF No. 90-2, at Tr. 182:4–6.  At first, Plaintiff requested that Mr. Best stop discussing such inappropriate topics.  *See id.* at Tr. 183:1–3.

But after Mr. Best persisted, Plaintiff started to put her coat on. *See id.* at Tr. 201:11–12. At this point, Mr. Best became "aggressive" and demanded that Plaintiff take off her coat. Def.'s Stmt. at ¶ 16. Plaintiff had never before witnessed Mr. Best act aggressively and this behavior "confused" and "frightened" her. Pl.'s Dep., ECF No. 90-2, at Tr. 201:17–20.

After Mr. Best's suddenly aggressive behavior, Plaintiff informed him that she would pay for her own dinner and that she was leaving to take the metro back home. Def.'s Stmt. at ¶¶ 17–18. Nonetheless, Mr. Best paid for the meal over Plaintiff's objection, *id.* at ¶ 20, and followed Plaintiff outside as she departed from the restaurant, *id.* at ¶ 22. Mr. Best then started to speak to Plaintiff sternly "between his teeth," commanding that she come back to him. *Id.* This caused Plaintiff to "fear for [her] life," Pl.'s Dep., ECF No. 90-2, at Tr. 205:15, and, therefore, Plaintiff attempted to get "as far away" from Mr. Best as she "possibly could," *id.* at Tr. 206:1–2. Plaintiff, however, was also aware of Mr. Best's status as a police officer and believed that as an officer, Mr. Best was "capable of anything" and had "access to everything." *Id.* at Tr. 206:11–12. Mr. Best continued to call out to Plaintiff, while standing next to his police vehicle and directing Plaintiff to "come here now." *Id.* at Tr. 207:3–4. Plaintiff finally acquiesced and walked back to Mr. Best. Def.'s Stmt. at ¶ 23. Mr. Best then asked Plaintiff "what it would look like if [he] didn't take [her] home?" *Id.* Plaintiff got into Mr. Best's police vehicle, believing that Mr. Best would drive her back to her house. *Id.*; *see also* Pl.'s Dep., ECF No. 90-2, at Tr. 211:5–14.

### 4. Mr. Best Sexually Assaults Plaintiff at MPD Headquarters

Instead of driving Plaintiff back home, Mr. Best drove Plaintiff from Georgia Brown's to MPD headquarters. Def.'s Stmt. at ¶ 24; *see also* Pl.'s Dep., ECF No. 90-2, at Tr. 248. Mr. Best explained to Plaintiff that he had some work to finish and that it would not take long. *Id.* Mr. Best and Plaintiff arrived at MPD headquarters at approximately 7:15 PM. *See* Pl.'s Dep., ECF No. 90-

2, at Tr. 223.  When they arrived, Mr. Best used his badge to gain access to and enter the parking garage.  Def.'s Stmt. at ¶ 25.  As they entered into the garage, Mr. Best pointed out the car of then-Police Chief Cathy Lanier, which was also parked in the MPD garage.  *See* Pl.'s Dep., ECF No. 90-2, at Tr. 213:11–12.  At that moment, Plaintiff realized that something had "turned wrong," "[b]ecause now [she was] not even where civilians are supposed to go."  *Id.* at Tr. 213:13–14.  Plaintiff asked Mr. Best if she could wait in the car while he finished his work, but Mr. Best refused, explaining to Plaintiff that she could not remain in the parking garage alone because "Chief Lanier's in here."  Def.'s Stmt. at ¶ 26.

Consequently, Plaintiff accompanied Mr. Best into MPD headquarters and proceeded with him into the elevators.  *Id.* at ¶ 27.  Mr. Best used his badge to operate the elevators and brought Plaintiff up to the Corporate Support Bureau ("CSB") suite on the fifth floor, where he was detailed at the time.  *Id.* at ¶¶ 28–29.  On the fifth floor, Plaintiff did not see any other police officers present, although she noticed that the door to Chief Lanier's office was open and that lights were on inside.  *See id.* at ¶ 30; Pl.'s Dep., ECF No. 90-2, at Tr. 216:5–6.  Plaintiff then followed Mr. Best into the CSB working suite, which included a private office, an open workspace for CSB staff, a second small office, and a file room.  Def.'s Stmt. at ¶ 31.  Upon entering the CSB suite, Mr. Best sat at his desk, which was located within the CSB suite's open workspace, and Plaintiff sat on a couch situated away from Mr. Best's desk.  *Id.* at ¶ 32.

After sitting at his desk for some time, Mr. Best stood up and made his way over to Plaintiff.  *Id.*; *see also* Pl.'s Dep., ECF No. 90-2, at Tr. 227:19–20.  Mr. Best then attempted to unbutton Plaintiff's shirt around her cleavage area.  Pl.'s Dep., ECF No. 90-2, at Tr. 229:4–5.  Plaintiff resisted, but Mr. Best used his strength to "smash[] his head into [Plaintiff's] breasts."  *Id.* at Tr. 229:10–11.  Mr. Best pulled down Plaintiff's bra, causing her breasts to become exposed, and

continued to "st[i]ck his head inside [Plaintiff's] breasts." *Id.* at Tr. 230:3–14.  Plaintiff tried to push Mr. Best's head away and implored Mr. Best to stop. *Id.* at Tr. 230:14–22.  Mr. Best asked Plaintiff why she was "acting like a little girl?" *Id.* at Tr. 231:2.  In response, Plaintiff stated that she was "a little girl," *id.* at Tr. 231:7, and that she was "not grown," *id.* at Tr. 233:10.

Plaintiff tried to move away from Mr. Best by leaving the couch and moving herself to a nearby chair. *Id.* at Tr. 231:7–12.  Nonetheless, Mr. Best followed Plaintiff to the chair and turned off the lights in the CSB suite, causing Plaintiff to return to the couch. *Id.* at Tr. 232:1–7.  Mr. Best then sat down next to Plaintiff on the couch and exposed his penis, while also taking his service weapon out of its holster and placing it on a nearby table. *Id.* at Tr. 233:17–20.  Mr. Best then asked Plaintiff "to touch his penis." *Id.* at Tr. 237:11.  Plaintiff refused. *Id.* at Tr. 238:3. Mr. Best, however, declared that "he wanted some" and proceeded to get on top of Plaintiff and hump her "so hard," trying to force his penis into Plaintiff's pants. *Id.* at Tr. 238:6–11.  But Plaintiff was able to keep her pants on and, eventually, she made it out from underneath Mr. Best. *Id.* at Tr. 239–40.  Plaintiff then stood up and insisted that they leave and Mr. Best take her home. *Id.* at Tr. 240.  Mr. Best said "Okay," but warned Plaintiff "that no one better find out about this," while looking at his gun. *Id.* at Tr. 242–43. Thereafter, Plaintiff and Mr. Best left the CSB suite, during which time Plaintiff could hear voices coming from Chief Lanier's office.  Def.'s Stmt. at ¶ 34. Mr. Best then drove Plaintiff out of MPD headquarters and dropped her off two blocks away from her house. *Id.* at ¶ 35.

### 5.  Mr. Best Faces Criminal Investigation and Prosecution

In January 2015, the 16-year old niece of Mr. Best's fiancé, A.T., confided in Plaintiff that Mr. Best had raped her. *Id.* at ¶ 36.  Like Plaintiff, A.T. was a member of God of Second Chance Ministries. *Id.* at ¶ 37.  After a conversation with A.T., Plaintiff herself revealed what Mr. Best

had done to her at Georgia Brown's and at MPD headquarters on the night of December 3, 2014. *See* Shenita Buie Dep., ECF No. 90-20, at Tr. 100–01.   On March 14, 2015, A.T.'s older sister reported Mr. Best's sexual crimes to her cousin, another MPD officer.  Def.'s Stmt. at ¶ 38.  The ensuing police investigation revealed that Mr. Best had raped or otherwise sexually assaulted A.T. on three separate occasions, between December 23, 2014 and February 14, 2015. *Id.*  Each assault on A.T. occurred within Mr. Best's private office at the Church. *Id.*  During at least two of the assaults, Mr. Best was visibly wearing his service weapon. *See* A.T. Dep., ECF No. 90-21, at Tr. 45:22–46:1; 57:17–18.

On March 14, 2015, agents from the MPD's Internal Affairs Division served Mr. Best with a revocation of police powers form and placed him on administrative leave.  Def.'s Stmt. at ¶ 39. The next day, a warrant was issued for Mr. Best's arrest for raping and sexually assaulting A.T. *Id.* Mr. Best was then arrested on March 16, 2015 and charged with First Degree Sexual Abuse of a Minor. *Id.*  On August 4, 2015, Mr. Best resigned from the Metropolitan Police Department. *Id.* at ¶ 40.  On September 23, 2015, a three-count federal information was returned against Mr. Best for his abuse of both A.T. and Plaintiff. *See* Information, ECF No. 23, *United States v. Best*, Case No. 15-CR-122-RBW.    Specifically, the information charged Mr. Best with: (1) Production of Child Pornography, (2) First Degree Sexual Abuse of a Minor, and (3) Second Degree Sexual Abuse of a Minor. *Id.*  On October 22, 2015, Mr. Best pleaded guilty to each count, *see* Plea Agreement,  ECF No. 26, *United States v. Best*, Case No. 15-CR-122-RBW, and on March 10,

2016, Judge Reggie Walton sentenced Mr. Best to eighteen years in prison, *see* Def.'s Stmt. at ¶ 42.

## B. Procedural Background

On September 28, 2016, Plaintiff filed a civil complaint against Darrell Best, the District of Columbia, and Mayor Muriel Bowser, seeking relief for the injuries she sustained during Mr. Best's December 3, 2014 sexual assault.  The complaint includes ten counts: (1) a § 1983 claim for a "Deprivation of Liberty and Right to Bodily Integrity" in violation of the Fifth Amendment, (2) a § 1983 claim for "Unlawful Seizure by a Police Officer" in violation of the Fourth Amendment; (3) a claim for injunctive relief, (4) negligent supervision, (5) negligent entrustment, (6) negligent retention, (7) negligent infliction of emotional distress, (8) intentional infliction of emotional distress, (9) sexual abuse of a minor, and (10) breach of fiduciary duty.  *See* Compl., at ¶¶ 44–126.

On August 30, 2017, upon a partial Rule 12(b)(6) motion, the Court dismissed Mayor Muriel Bowser as a defendant from this case.  *See* Aug. 30, 2017 Mem. Op. & Order, ECF No. 19, at 2.  As such, only the District of Columbia and Mr. Best now remain as defendants.  Mr. Best, however, has not entered an appearance or filed any responsive pleadings.  *See, e.g.*, Mustille Decl., ECF No. 16-2, at ¶ 3.  On February 22, 2017, the Clerk of the Court entered default against Mr. Best.  *See* Entry of Default, ECF No. 18, at 1.  Nonetheless, Plaintiff has not yet filed a motion for default judgment against Mr. Best, pursuant to Rule 55(b).  *See* Pl.'s Mem., ECF No. 16-1, at 3 ("Once the Court grants an entry of default against Defendant Best, Plaintiff intends to seek default judgment pursuant to Fed. R. Civ. P. 55(b), with a calculation of damages supported by affidavits.").

With Mayor Bowser dismissed from the case and Mr. Best in default, Plaintiff and the District of Columbia began a protracted period of discovery starting in late 2017. *See* Scheduling & Procedures Order, ECF No. 23, at 5–6. Through the course of this discovery, Plaintiff proffered a police practices expert named Mr. Lou Reiter. *See* Not. of Expert, ECF No. 52, at 1. Mr. Reiter possesses 57 years of law enforcement experience, including as a former Deputy Chief of Police of the Los Angeles Police Department. Reiter Rep., ECF No. 90-25, at ¶ 4. After reviewing the available discovery in this case, Mr. Reiter proffered an original and a supplemental expert report, in which he provided his expert opinion regarding the adequacy of MPD's sexual misconduct training policies and the sufficiency of MPD's investigations into police sexual misconduct. *See, e.g.*, *id.* at ¶ 24; Reiter Suppl. Rep., ECF No. 90-26, at 1–14. The District of Columbia deposed Mr. Reiter twice about his proffered expert opinions. *See* Order, ECF No. 85, at 1–3.

In addition to Mr. Reiter's expert reports and depositions, discovery in this case included voluminous document production and deposition testimony. Document discovery in this case has included, for example, MPD's production of disciplinary records pertaining to Mr. Best, *see, e.g.*, Pl.'s Opp'n, ECF No. 94-1, at Exs. 3, 4, & 23, general MPD training and policy documents, *see id.* at Exs. 8, 12, & 13, and MPD investigatory and administrative records, *see id.* at Exs. 17 & 18. Moreover, discovery included depositions from: (1) Plaintiff Jaquia Buie, (2) Plaintiff's mother, Shenita Buie, (3) former MPD Assistant Chief, Kimberly Chisley-Missouri, (4) Alphonso Lee, the Director of MPD's EEO Investigations Division, (5) Lieutenant Nicole Webster, a former officer within MPD's Internal Affairs Bureau, and (6) Inspector Kimberly Dickerson, MPD's Rule 30(b)(6) designee to testify regarding MPD's administrative investigations and employee discipline. On July 21, 2020, after the close of discovery, the Court held a conference with the parties and set a schedule for summary judgment briefing. *See* Order, ECF No. 86, at 2. On

October 20, 2020, the District of Columbia filed its [90] Motion for Summary Judgment, which seeks the dismissal of Plaintiff's Counts I, II, III, IV, V, VI, VII, and VIII.  The parties have now completed briefing on the District of Columbia's Motion for Summary Judgment and, accordingly, that motion is now ripe for the Court's review.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The mere existence of *some* factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

A party attempting to place a fact beyond dispute, or to show that it is truly disputed, must (a) rely on specific parts of the record, such as documentary evidence or sworn statements, or (b) "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's

assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not assess credibility or weigh evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with "all justifiable inferences . . . drawn in his favor." *Anderson*, 477 U.S. at 255. "If material facts are at issue, or though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (quoting *Kuo-Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994)) (internal quotation marks omitted). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

## III.   DISCUSSION

For the reasons set forth below, the Court will **GRANT** the District of Columbia's Motion for Summary Judgment as to Plaintiff's municipal liability claims in Counts I and II. The Court, however, will **DENY WITHOUT PREJUDICE** the District's Motion, as it applies to Plaintiff's common law claims, because outstanding questions remain regarding the Court's continuing jurisdiction over those causes of action.

## A.  Counts I & II – Municipal Liability Under Section 1983

In Counts I and II, Plaintiff asserts two *Monell* claims against the District of Columbia,

respectively for violations of her constitutional rights under the Fifth and Fourth Amendments. *See* Compl., at ¶¶ 44–75; *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "Courts conduct a two-step inquiry to assess [*Monell* claims for] municipal liability under § 1983. First, they must determine whether the plaintiffs have established a predicate federal constitutional or statutory violation. If so, they must decide whether a custom or policy of the municipality caused the violation." *Garnett v. Zeilinger*, 485 F. Supp. 3d 206, 220 (D.D.C. 2020) (citing *Baker v. District Columbia*, 326 F.3d 1302, 1306–07 (D.C. Cir. 2003)). The Court addresses each step in turn below.

### 1.  Predicate Constitutional Violations

The Court's first task is to determine whether Plaintiff has established a predicate constitutional violation to support her *Monell* claims against the District of Columbia. Here, Plaintiff has alleged constitutional injuries under both the Fourth and Fifth Amendments, respectively. *See* Pl.'s Opp'n at 6. At the summary judgment stage, Plaintiff has demonstrated a viable constitutional violation under both Amendments.

Plaintiff first argues that Mr. Best violated her Fourth Amendment right against unreasonable seizures. *See* Pl.'s Opp'n at 6. The Fourth Amendment proscribes "unreasonable" seizures carried out by government actors, including the "seizure" of a person, which occurs where an officer uses "physical force or a show of authority that in some way restrains the liberty of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quotation omitted). Plaintiff claims that Mr. Best "seized" her when he took Plaintiff "to MPD headquarters against her will," Pl.'s Opp'n at 6, and by "unlawfully detaining her against her will and then sexually abusing her inside MPD headquarters," Compl., at ¶ 72.

At the summary judgment stage, genuine issues of material fact remain regarding this alleged Fourth Amendment violation.  On the night of December 3, 2014, Mr. Best drove Plaintiff to dinner in a police vehicle, while wearing his full police uniform and service weapon.  Def.'s Stmt. at ¶ 11.  After a disagreement during the meal, Plaintiff attempted to leave the restaurant on her own.  *Id.* at ¶¶ 16–18.  In response, Mr. Best became "aggressive" with Plaintiff, ultimately causing Plaintiff to "fear him."  *Id.* at ¶ 21.  Mr. Best followed Plaintiff out of the restaurant and demanded that she come over to him and his police vehicle.  *Id.* at ¶¶ 22–23.  At this point, Plaintiff became concerned about Mr. Best's authority as a police officer, *see* Pl.'s Dep. Tr., ECF No. 90-2, at 206:11–12, and eventually acquiesced to his request to get into the police vehicle, Def.'s Stmt. at ¶ 22.  Plaintiff asked that Mr. Best drive her straight home, but instead Mr. Best took Plaintiff to MPD headquarters without her consent.  *Id.* at ¶ 24.  When they arrived at MPD headquarters, Plaintiff asked to remain in the car while Mr. Best went inside of his office.  *Id.* at ¶ 26.  Mr. Best refused and directed Plaintiff inside of MPD headquarters, eventually leading her up into the CSB suite on the fifth floor, where Mr. Best intended to finish some work.  *Id.* at ¶¶ 26–31.  Mr. Best then attempted to rape Plaintiff within the CSB suite, physically forcing himself upon her while placing his service weapon on a nearby table.  *See* disc. *supra* at 10.  On these facts, a reasonable jury could find that Mr. Best used both his authority as an MPD officer and his physical force to unreasonably "seize" Plaintiff's person, within the meaning of the Fourth Amendment.  *See Parker v. District of Columbia*, 293 F. Supp. 3d 194, 202 (D.D.C. 2018) (finding genuine issues of material facts regarding whether officer committed sexual assault as a state actor).

Next, Plaintiff alleges that Mr. Best also violated her Fifth Amendment rights.  *See* Pl.'s Opp'n at 6.  The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law," U.S. Const. amend. V, and

the Supreme Court has held that the Due Process Clause protects "certain fundamental rights and liberty interests," including the right to an individual's "bodily integrity." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  Here, Plaintiff asserts that Mr. Best violated her Fifth Amendment right to "bodily integrity" when Mr. Best tried to rape her at MPD headquarters, while he was in uniform and in possession of his service weapon.  Pl.'s Opp'n at 6; *see also* Compl. at ¶¶ 44–65; *G'Sell v. Carven*, 724 F. Supp. 2d 101, 111 (D.D.C. 2010) (noting that off-duty officers may act under color of state law when purporting to exercise official authority and using a service weapon).  Without Plaintiff's consent and against her physical and verbal resistance, Mr. Best exposed Plaintiff's breasts, forced his head into her chest, exposed his penis, straddled and humped Plaintiff, and attempted to force his penis into Plaintiff's pants.  *See* disc. *supra* at 8–10.  At the summary judgment stage, Plaintiff has adduced sufficient evidence upon which reasonable jury could find that Mr. Best's conduct violated Plaintiff's Fifth Amendment right to bodily integrity. The District of Columbia does not dispute this conclusion in their summary judgment briefing.

### 2.  Whether a Municipal Policy Caused Plaintiff's Constitutional Injuries

To pursue a municipal liability claim against the District of Columbia, it is not enough for Plaintiff to establish that she suffered constitutional deprivations at the hands of Mr. Best.  Under *Monell*, "[a] municipality cannot be held liable for the unconstitutional conduct of its employees based on a theory of *respondeat superior*."  *Smith v. District of Columbia*, 306 F. Supp. 3d 223, 241 (D.D.C. 2018).  Instead, "'[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant to official municipal policy caused their injury.'"  *Id.* at 242 (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)).  Put otherwise, municipal liability under § 1983 adheres only where "a custom or policy of the municipality caused the violation" in question.  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  To survive

summary judgment, therefore, Plaintiff must adduce sufficient evidence through which a reasonable jury could find the existence of a District of Columbia policy that caused her Fourth and Fifth Amendment deprivations. *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021).

The D.C. Circuit has identified "a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983:" (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306 (D.C. Cir. 2003); *see also Hurd*, 997 F.3d at 337.

In her summary judgment brief, Plaintiff's attempt to establish a municipal "policy" is disorganized, and, at times, Plaintiff confuses the applicable legal standards under *Monell*.[2] Nonetheless, the Court has discerned four potential theories of a municipal "policy" presented in Plaintiff's pleadings, based on: (1) MPD's inadequate training and supervision on sexual misconduct, (2) MPD's decision not to terminate Mr. Best in 2009, (3) MPD's inadequate investigations and discipline for cases of police sexual misconduct, and (4) Chief Lanier's decision

---

[2] For example, Plaintiff attempts to show a municipal "policy" by pointing to the District of Columbia's "customs, patterns, and practices." Pl.'s Opp'n at 7–8. It is true, that a plaintiff may establish an overarching municipal policy by showing "that the municipality knowingly ignored a practice that was consistent enough to constitute *custom*." *Hurd*, 997 F.3d at 338 (quotation omitted and emphasis added). As made clear in her brief, however, Plaintiff's "custom, pattern, and practice" argument is actually an attempt to demonstrate a municipal policy through evidence of "*deliberate indifference*," which entails a distinct analysis under *Monell*. *See* Pl.'s Opp'n at 7–31; *see Hurd*, 997 F.3d at 337–40. Similarly, Plaintiff conflates the concept of deliberate indifference with the existence of a municipal policy created by the decision of a "final policy maker" for the District. *See* Pl.'s Opp'n at 31–34. The Court sorts through this methodological overlap throughout this Memorandum Opinion.

to detail Mr. Best to the Corporate Support Bureau in November 2014.  *See* Pl.'s Opp'n at 7–31. Plaintiff's first three theories rest on the doctrine of "deliberate indifference," while Plaintiff's final theory turns on the action of a "final policy maker" for the District of Columbia.  The Court will address each theory in turn below.

### a.  Failure to Train and Supervise

The Court first considers Plaintiff's failure to train and supervise theory of municipal liability.  "The Supreme Court has recognized that a municipality's failure to train its officers can form the basis of a Section 1983 claim against it, but 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'"  *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 34 (D.D.C. 2015) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  Similarly, "[a] municipality can be liable for failure to supervise where it was 'deliberately indifferent to an obvious need for greater supervision.'"  *Anderson v. District of Columbia*, 317 F. Supp. 3d 444, 449 (D.D.C. 2018), *aff'd*, 810 F. App'x 4 (D.C. Cir. 2020) (quoting *Kenley*, 83 F. Supp. 3d at 34).

"[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  "A pattern of similar constitutional violations" carried out by the untrained and unsupervised municipal employees is ordinarily necessary to establish a municipal policy of "deliberate indifference."  *Connick*, 563 U.S. at 62; *see also Kenley*, 83 F. Supp. 3d at 34–35.  And "to establish a pattern giving rise to deliberate indifference, the other asserted violations must have materially similar legal implications so as to put the municipality on notice of the probability of future constitutional violations."  *Hurd*, 997 F.3d at 337.

20

In this case, Plaintiff's failure to train and supervise theory turns on the alleged inadequacy of MPD's sexual misconduct policy, including the Department's alleged failure to have a written policy on police sexual misconduct. At the summary judgment stage, the parties first raise factual disputes pertaining to the *presence and scope* of MPD's policy for sexual misconduct training and supervision. On this point, Plaintiff argues that MPD does not have a written training and supervisory policy to address the full breadth of police sexual misconduct. *See* Pl.'s Opp'n at 12–13. In particular, Plaintiff emphasizes that MPD's General Order 120.21 for "Disciplinary Procedures and Processes" sets forth twenty-five prohibited forms of police misconduct, but contains no reference to sexual misconduct. *See* Pl.'s Opp'n, ECF No. 94-1, at Ex. 12. Plaintiff similarly observes that the MPD's General Order 120.23 for "Serious Misconduct Investigations," defines the term "serious misconduct" without any specific reference to *sexual* misconduct by an MPD officer. *See* Pl.'s Opp'n, ECF No. 94-1, at Ex. 13, at 2–3.

Additionally, Plaintiff has proffered a police practices expert, Mr. Lou Reiter, who opines in his expert report that MPD "has made a conscious choice to avoid enacting specific written policies and procedures [and] specific training. . . involving police employee involvement in sexual and domestic misconduct." Reiter Rep., ECF No. 90-25, at ¶ 24. Mr. Reiter also opines that MPD records on police sexual misconduct reflect a "failure of oversight" for MPD employees "displaying a documented record of misconduct involving females." *Id.* at ¶ 35. Mr. Reiter explains that MPD's lack of a clearly written sexual misconduct policy contravenes industry recommendations, such as those set forth by the International Association of Chiefs of Police. *Id.* at ¶ 11 ("It strongly suggested that police agencies not rely on vague administrative charges and should develop specific policies to address this act of misconduct."). Furthermore, Plaintiff directs the Court to record evidence suggesting that MPD's current EEO harassment training does not

cover the full scope of police sexual misconduct, that the Department's existing sexual misconduct policy is "not clearly defined," and that a more comprehensive sexual misconduct policy is "needed, absolutely."  Pl.'s Opp'n, ECF No. 94-1, at Ex. 5 at Tr. 180–82; *see also id.* at Ex. 14 at Tr. 42–43 (expert testimony that MPD has "no written policy concerning sexual misconduct at all"); Reiter Rep., ECF No. 90-25, at ¶ 11.

The District expressly disagrees with Plaintiff's assessment of MPD's sexual misconduct training and supervisory policy.  In its summary judgment filing, the District directs the Court to record evidence showing that "[a]ll MPD recruits are trained on sexual misconduct topics in the context of learning the offenses of the D.C. Criminal Code, as well as in the context of EEO training."  Def.'s Stmt. at ¶ 60.  Furthermore, the District proffers record evidence showing that all MPD "recruits are also trained to act ethically, act with morals, act with standards," *id.* at ¶ 61, and that "MPD officers receive ongoing, quarterly sexual harassment training throughout their time on the force." *id.* at ¶ 62.  Relatedly, Mr. Alphonso Lee, the Director of the EEO Investigations Division, gave deposition testimony explaining that MPD provides its officers with EEO training modules that encompass training on both sexual harassment and sexual misconduct.  *See* Lee Dep., ECF No. 90-19, at Tr. 23:1–16.  The deposition testimony of MPD Lieutenant Nicole Webster also indicates that MPD places posters around its office "explaining sexual misconduct and the process of filing a complaint."  Webster Dep., ECF No. 90-32, at Tr. 60:1–5.

Beyond these disputes over the *scope* of MPD's sexual misconduct policy, the parties also raise factual disputes about whether *a pattern of similar constitutional violations* by MPD officers has placed the District on notice that its sexual misconduct training and supervision policy is deficient.  *See Hurd*, 997 F.3d at 337.   Here, the District argues that "Plaintiff has not presented *any* evidence that the District  had actual or constructive knowledge that its policy or any omission

within caused city employees to violate citizens' constitutional rights *and* has not produced any

evidence that the District made a deliberate choice not to act." Def.'s Reply at 9. According to

the District, therefore, Plaintiff "cannot prove municipal liability under the stringent failure to train

or supervise theory." *Id.*

But the record is not entirely so clear. Plaintiff has, in fact, proffered evidence of repeated

sexual misconduct carried out by MPD officers in the time leading up to Plaintiff's sexual assault

in December 2014. To start, Plaintiff's police practices expert, submitted an expert report outlining

specific instances of sexual misconduct carried out by MPD officers. *See* Reiter Suppl. Rep., ECF

No. 90-26, at 6–13. These instances of sexual misconduct include:

- In 2010, MPD investigated an officer for operating an MPD van and soliciting prostitutes for sex. During the course of the investigation, three other victims came forward. The officer under investigation was arrested in July 2011, and MPD's Internal Affairs Division sustained charges against him for unbecoming conduct in 2014. *See id.* at 9–10.

- In May 2011, MPD received an anonymous complaint that an MPD officer was using his apartment for a prostitution ring, using young girls "procured" through Craig's List. *Id.* at 8. MPD identified this activity as "Conduct Unbecoming and Criminal Activity." *Id.* In 2014, this same MPD officer was arrested on "sex related charges" and "a missing 16-year old girl was found in his apartment." *Id.*

- In 2013, an MPD officer from the 7th District "was arrested for taking nude photographs of a juvenile female on his follow-up to her missing report. Her mother contacted the MPD. Later hundreds of similar photographs of other females, some minors, were found on his camera." *Id.* at 12.

In reviewing these cases of sexual misconduct, Plaintiff's police practices expert observed "a

persistent and widespread custom of MPD officers abusing the most vulnerable female victims in

the community . . . " *Id.* at 10.

Plaintiff also has proffered a report from MPD's Disciplinary Review Division ("DRD"),

enumerating additional sexual misconduct charges sustained against MPD officers. For example,

the DRD report indicates that: (1) in October 2006, an MPD officer was terminated for "sexual assault," (2) in October 2008, an MPD officer was terminated for "sexual abuse," (3) in October 2009, an MPD officer was terminated for a misdemeanor sexual assault conviction, (4) in March 2010, an MPD officer was terminated for "sexual assault," (5) in October 2010, an MPD investigator was terminated for "improper contact with a sexual assault victim," (6) in November 2011, an MPD sergeant was terminated for making "sexual comments toward a recruit," and (7) in October 2011, an MPD officer was terminated for "sexual assault against a minor." Pl.'s Opp'n, ECF No. 94-1, at Ex. 18 at 1.

Finally, Plaintiff has provided evidence of prior sexual misconduct carried out by Mr. Best himself, while he was an active duty MPD officer. In April 2008, for example, a female MPD cadet named Raynette Jones filed a complaint against Mr. Best, alleging that he had groped her buttocks, breasts, and genital area without consent. *See* MPD Rep., ECF No. 90-12, at 2–4. Then on October 27, 2008, a civilian MPD employee named Janice Lee filed another complaint against Mr. Best, alleging that he had sexually harassed and assaulted her. *See* MPD Rep., ECF No. 90-14, at 1. Specifically, Ms. Lee alleged that Officer Best touched her buttocks and requested that Ms. Lee allow him to give her a "massage" at a hotel in exchange for $35. *Id.* at 2. An April 2009 MPD investigative report recommended that MPD sustain Ms. Lee's sexual harassment charge against Mr. Best. *Id.* at 6. That report also observed that Mr. Best "continues to engage in behavior that may leave the Department open for serious legal action" and that Mr. Best appears to "use[] his position of authority to intimidate women." *Id.* As a result of Ms. Lee's complaint, MPD ultimately demoted Mr. Best and sustained a charge of "conduct unbecoming an officer" against him. *See* Def.'s Stmt. at ¶¶ 47–48. Lastly, the record contains Mr. Best's MPD training history, which does not clearly indicate that Mr. Best received any specific police sexual misconduct

24

training, even after his demotion for the sexual harassment of Ms. Lee in 2009.  Pl.'s Opp'n, ECF No. 94-1, Ex. 23, at 1–10.

Altogether, this record evidence on summary judgment, outlined above, presents thorny factual disputes about both the scope of MPD's sexual misconduct training and supervision and the potential need for improvements.  In particular, Plaintiff has proffered troubling evidence of multiple charges of sexual assault against MPD officers.  Whether this summary judgment evidence ultimately presents a triable question of fact regarding the District's deliberate indifference towards inadequate MPD training and supervision is a difficult question.  The Court, however, need not resolve that question to reach a disposition on Plaintiff's failure to train and supervise theory of liability in this case.  Even if Plaintiff established that the District was deliberately indifferent to a deficiency in MPD's sexual misconduct training and supervision, Plaintiff has not adduced sufficient evidence for a reasonable jury to find that any such deficiency *caused* her specific constitutional injuries.

To prevail on a theory of municipal liability, a plaintiff must establish causation.  Here, that means Plaintiff must demonstrate an "affirmative link" between a District of Columbia "policy" and her constitutional injuries—*i.e.*, Mr. Best's unreasonable seizure and sexual assault of Plaintiff on December 3, 2014.  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).  In *City of Canton v. Harris*, the Supreme Court provided the framework for determining when a municipality's inadequate training "causes" the constitutional injury in question.  There, the Supreme Court explained that "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury."  *City of Canton*, 489 U.S. at 391.  "In resolving the issue of a city's liability, the focus must be on adequacy of the training program

in relation to the tasks the particular officers must perform." *Id.* at 390.  Therefore, a plaintiff must show that "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Id.* at 391.  Conversely, it will not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct," because "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Id.*

Plaintiff's failure to train and supervise claim cannot survive under this standard.  There is no question that Mr. Best's attempt to rape the then-seventeen-year-old Plaintiff on December 3, 2014 was reprehensible.  Mr. Best is currently sitting in federal prison, in part, for this very conduct.  But the abhorrence of Mr. Best's criminal conduct does not resolve the operative causation inquiry for the purposes of *municipal liability*.  To the contrary, the factual record on summary judgment shows a wide disconnect between Mr. Best's sexual assault of Plaintiff on December 3, 2014 and the alleged deficiencies Plaintiff points to in MPD's training and supervision policies.

To begin, Mr. Best's relationship with Plaintiff did not arise from Mr. Best's official activities as a police officer, but instead through Plaintiff's participation at "God of Second Chance Ministries."  Def.'s Stmt. at ¶¶ 1–3.  Mr. Best founded this church himself in 2012 and served as its pastor, while Plaintiff joined the church with her mother in 2013.  *Id.* at ¶¶ 1–2.  Plaintiff had not previously known Mr. Best before joining the church, nor had she been in contact with Mr. Best in his capacity as an MPD officer.  *Id.* at ¶ 3.  It was only through church connections that Mr. Best initiated contact with Plaintiff and acquired her cell phone number as a means of establishing

communications with Plaintiff.  *Id.* at ¶¶ 1–6.  It was also through this church-based relationship that Mr. Best was able to convince Plaintiff to have dinner with him on December 3, 2014, and garner the permission of Plaintiff's mother to do so.  *Id.* at ¶¶ 6–7; Pl.'s Dep., ECF No. 90-2, at Tr. 165–67.

Moreover, the events surrounding Plaintiff's sexual assault on December 3, 2014 are directly attributable to Mr. Best's criminal conduct.  Mr. Best met Plaintiff at Georgia Brown's for dinner on December 3, 2014 around 6:00 PM.  *See* Def.'s Stmt. at ¶ 13.  While Mr. Best drove to dinner in an unmarked police vehicle and wore his police uniform and service weapon, the record evidence shows that Mr. Best was only commissioned to work until 5:00 PM and, therefore, was not on official duty at the time of his December 3, 2014 dinner with Plaintiff.  *See id.* at ¶ 50. Relatedly, the record evidence shows that Mr. Best was not authorized to take Plaintiff to dinner in a police vehicle.  *See id.* at ¶ 53.  During the dinner itself, Mr. Best briefly asked Plaintiff about her interest in becoming a police officer.  *See id.* at ¶ 14.  Shortly thereafter, however, Mr. Best began to ask the then-seventeen-year-old Plaintiff highly sexual questions, regarding her affinity for oral sex and her preferred sexual positions.  Def.'s Stmt. at ¶ 15.   In response, Plaintiff left the restaurant.  *Id.* at ¶¶ 17–18.  Mr. Best then followed Plaintiff outside and aggressively implored her to get inside of his police vehicle, so that Mr. Best could drive Plaintiff home.  *Id.* at ¶ 23. Plaintiff eventually acquiesced.

At around 7:00 PM in the evening, Mr. Best drove Plaintiff against her will to MPD headquarters and, over her protests, required that she enter the building with him while he finished some work.  *See* Def.'s Stmt. at ¶¶ 24–26; Pl.'s Dep., ECF No. 90-2, at Tr. 213, 223, 248.  Mr. Best then directed Plaintiff to the CSB suite on the fifth floor of MPD headquarters, using his police credentials to enter the MPD office space.  *See* Def.'s Stmt. at ¶¶ 26–29.  There, Mr. Best attempted

to rape Plaintiff.  In a display of truly loathsome conduct, Mr. Best removed Plaintiff's shirt and bra, smothered his face into her breasts, exposed his penis to Plaintiff, and forcefully humped Plaintiff while pinning her down and attempting to remove her pants.  *See* Pl.'s Dep., ECF No. 90-2, at Tr. 227–39.  Plaintiff was able to courageously fend off Mr. Best's attempted rape.  *See id.* at 239–40.  Thereafter, Mr. Best allegedly stared threateningly at his nearby service weapon and instructed Plaintiff not to speak of the attempted rape.  *See id.* at 242–43.  Plaintiff agreed and demanded that Mr. Best drive her home.  *See id.*; Def.'s Stmt. at ¶ 35.

This criminal conduct from Mr. Best is horrific.  But on the question of *municipal liability*, Plaintiff's attempt to connect Mr. Best's actions with MPD's alleged failure to train and supervise is muddled.  The alleged deficiency Plaintiff identifies in MPD's training and supervision program is the general absence of a more comprehensive sexual misconduct policy that is expressly codified in some written format.  *See* Pl.'s Opp'n at 15 (highlighting the District's "persistent and deliberate custom and practice of failing to institute a written police sexual misconduct policy").  While a more robust sexual misconduct for MPD may very well be advisable, Plaintiff has not proffered record evidence causally connecting the purported ambiguities in MPD's current sexual misconduct training and supervision to Mr. Best's attempt to rape Plaintiff on the night of December 3, 2014.  At best, Plaintiff's police practices expert proposed that MPD should revise its sexual misconduct policy to expressly "clarify" that officers should not commit rape and have sex with children.  *See* Reiter Dep., ECF No. 90-29, at Tr. 55–56.

Given this summary judgment record, no reasonable jury could find that Mr. Best's attempt to rape Plaintiff on December 3, 2014 could "have been avoided" through more robust MPD training and supervision.  *City of Canton*, 489 U.S. at 391.  Mr. Best's conduct entailed taking a teenage parishioner from his church to a private restaurant after work hours, broaching highly

sexual topics with her during dinner, and then driving her to MPD headquarters against her will to rape her.  In this way, Mr. Best's actions on December 3, 2014 were not clearly connected to the "tasks . . . particular [MPD] officers must perform" and for which they are trained and supervised. *City of Canton*, 489 U.S. at 390.  Even if MPD had adopted an express written policy specifying that MPD officers shall not rape teenage girls, there is nothing in the record to suggest that such training or supervision would have had any effect on Mr. Best's patently criminal conduct towards Plaintiff on December 3, 2014.  Indeed, the record evidence indicates that Mr. Best *already* received training on the wrongfulness of such obviously criminal behavior.  *See* Def.'s Stmt. at ¶ 60.  Furthermore, it is noteworthy that even Plaintiff's police practices expert could not testify with any certainty that his proposed improvements to MPD's sexual misconduct training would have prevented the terrible crime committed by Mr. Best.  *See* Reiter Dep., ECF No. 90-29, at Tr. 88–89.

Finally, the substantial weight of authority also supports the conclusion that Mr. Best's criminal conduct would not have been susceptible to improved MPD training or supervision. Considering comparable failure to train issues under *Monell*, "numerous courts have concluded that a governmental entity or its officials are not required to train a police officer not to commit sexual misconduct." *Williams v. City Of Detroit*, No. 07-14858, 2009 WL 3059150, at *4 (E.D. Mich. Sept. 24, 2009) ("Tidwell required no training to refrain from sexual misconduct. Nor was it necessary that the City enact a specific policy prohibiting its officers from engaging in such conduct. To the extent that Tidwell did not complete the required training for a sergeant, or to the extent that the City's officer-training program is deficient, there is no causal connection to the alleged constitutional deprivation."); *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) ("[W]e cannot conclude that there was a patently obvious need for the city to specifically train

officers not to rape young women."); *Doe v. City of New York*, 09 CIV. 9895, 2013 WL 796014, at *3 (S.D.N.Y. Mar. 4, 2013), *aff'd*, 558 F. App'x 75 (2d Cir. 2014) (finding an officer's decision to rape an intoxicated Jane Doe in responding to a 911 call did not constitute a difficult choice of the sort that training or supervision will make less difficult); *Lewis v. Pugh*, No. 6:06–CV–357, 2007 WL 1394145, at *6 (E.D. Tex. May 11, 2007), *aff'd*, 289 F. App'x. 767 (5th Cir. 2008) ("Indeed, it hardly seems necessary that an officer would require specific training to know that rape, sexual assault, and other blatantly criminal actions are inappropriate.").

For the reasons set forth above, the Court concludes that Plaintiff has not adduced sufficient evidence by which a reasonable jury could find that the alleged shortcomings in MPD's sexual misconduct training and supervision were the "moving force" behind Mr. Best's sexual assault of Plaintiff on December 3, 2014.  *City of Canton*, 489 U.S. at 389.  The Court, therefore, **GRANTS** summary judgment in favor of the District of Columbia on Plaintiff's failure to train and supervise theory of municipal liability.

### b.  Failure to Terminate

Plaintiff's next theory of municipal liability is that the District was "deliberately indifferent" by failing to terminate Mr. Best.  *See* Pl.'s Opp'n at 27–31.  Specifically, Plaintiff maintains that it was deliberately indifferent for MPD to retain Mr. Best in 2009, given Mr. Best's prior record of alleged sexual misconduct leading up to that time.  *See* Pl.'s Opp'n at 30 (quoting MPD Rep., ECF No. 90-14, at 6). This theory of municipal liability rests on the premise that a municipality assumes a policy of deliberate indifference where it "'has actual or constructive knowledge' that its agents would probably violate constitutional rights," but still "adopt[s] a policy of inaction."  *Singh v. District of Columbia*, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)).

To advance her failure to terminate claim, Plaintiff relies primarily on the reasoning in *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397 (1997).  In *Brown*, a plaintiff named Jill Brown raised § 1983 claims after a police officer from Bryan County, Oklahoma, placed her in an "arm bar" and caused her physical injuries on the side of a road.  *Id.* at 400–01.  Ms. Brown asserted a § 1983 claim directly against Bryan County for her injuries, arguing that the county was liable because of its decision to hire the offending police officer, despite that officer's pre-employment criminal history.  *Id.*  On review, the Supreme Court specifically addressed this "hiring theory" of municipal liability advanced by Ms. Brown.  The *Brown* Court held that "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"  *Id.* at 411.  Plaintiff's reliance on this holding in *Brown* is misplaced, as the reasoning in *Brown* applied to a municipality's hiring decisions.  *See id.* at 405.  And here, Plaintiff points to no summary judgment evidence demonstrating that MPD's decision to *hire* Plaintiff *in 1987* reflected the District's deliberate and conscious disregard for the constitutional rights of its citizens.  *See id.* at 411; Def.'s Stmt. at ¶ 43.  In fact, Plaintiff does not even attempt to advance such an argument in her briefing.

Instead, Plaintiff's failure to terminate theory rests on MPD's decision *to retain* Mr. Best in 2009.  *See* Pl.'s Opp'n at 29–31.  Plaintiff contends that MPD's decision not to fire Mr. Best in 2009 was deliberately indifferent because this decision disregarded Mr. Best's prior disciplinary record, which included: (1) Mr. Best's 2007 suspension for misrepresenting his work attendance, *see* Pl.'s Opp'n, ECF No. 94-1, at Ex. 4 at 1; (2) a 2007 incident report alleging that Mr. Best had assaulted his wife, *see id.*, at Ex. 20 at 1, (3) the 2008 complaint of sexual assault lodged against

Mr. Best by Ms. Raynette Jones, *see* MPD Rep., ECF No. 90-12, at 2–4, and (4) the 2008 complaint of sexual assault filed against Mr. Best by Ms. Janice Lee, *see* MPD Rep., ECF No. 90-14, at 1. In particular, Plaintiff emphasizes that, after investigating the 2008 Lee complaint, MPD's internal affairs bureau concluded that Mr. Best "continues to engage in behavior that may leave the Department open for serious legal action" and that Mr. Best appears to "use[] his position of authority to intimidate women." *Id.* at 6.  Plaintiff contends that this record of Mr. Best's sexual misconduct should have placed MPD on notice of the danger he posed to "vulnerable, young women," and that MPD's decision "to retain" Officer Best constituted deliberate indifference to this danger.  Pl.'s Opp'n at 30.

Plaintiff's failure to terminate theory of deliberate indifference falls short.  To be sure, Plaintiff has adduced colorable summary judgment evidence demonstrating that Mr. Best presented some risk of sexual misconduct.  Namely, Plaintiff proffers evidence of three different sexual assault allegations against Mr. Best in 2007 and 2008, raised by three different women.  And notably, after investigating Ms. Lee's October 2008 sexual assault complaint against Mr. Best, MPD itself recognized that Mr. Best's sexual misconduct reflected a pattern of abusive behavior that could leave the District open to "serious legal action."  MPD Rep., ECF No. 90-14, at 6.  From this evidence, a reasonable jury could conclude that the District was on notice of the risk of sexual misconduct posed by Mr. Best.

But to establish a municipal policy of deliberate indifference, as Plaintiff aims to do here, Plaintiff must also demonstrate that MPD consciously disregarded the risk presented by Mr. Best and responded with deliberate inaction.  *See Hurd v. District of Columbia*, 997 F.3d 332, 339 (D.C. Cir. 2021).  The undisputed summary judgment record in this case belies such a conclusion.  First, the record shows that after Ms. Jones lodged her sexual assault claim against Mr. Best in April

2008, MPD referred the matter to the United States Attorney's Office for review and possible criminal prosecution.  *See* Aug. 1, 2008 Letter, ECF No. 90-13, at 1.  The U.S. Attorney's Office, however, declined to pursue a case against Mr. Best regarding his conduct towards Ms. Jones.  *Id.* And with regards to Ms. Lee's October 2008 complaint, MPD affirmatively sustained a charge of "conduct unbecoming an officer" against Mr. Best, directed Mr. Best to take additional training, and demoted him.  *See* Def.'s Stmt. at ¶¶ 47–48.  Moreover, MPD also referred the 2008 Lee matter to the United States Attorney's Office for review and criminal prosecution.  *See* Jan. 23, 2009 Letter, ECF No. 90-17, at 1.  But again, the U.S. Attorney's Office declined prosecution.  *Id.* Given this record evidence, no reasonable juror could find that MPD adopted an intentional policy of *deliberate inaction* to the complaints lodged against Mr. Best.  To the contrary, MPD took direct action in response to Mr. Best's conduct by referring two complaints against Mr. Best to the United States Attorney's Office for potential prosecution, sustaining a disciplinary charge against Mr. Best, referring him to training, and demoting Mr. Best in 2009.  *See Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 73 (D.D.C. 2018) ("In Jackson's case, an investigation was in fact performed and a written report completed . . . . In one of the other instances Longo cites, the U.S. Attorney's Office reviewed the matter and declined to prosecute.  It is hard to see how the District could have been 'indifferent' to matters it in fact investigated in this manner.").

All that is left then to support Plaintiff's failure to terminate theory is the assertion that MPD should have fired Mr. Best in 2009, instead of demoting Mr. Best and otherwise sanctioning him.  *See* Pl.'s Opp'n at 30.  But this position is unavailing.  As a factual matter, even Plaintiff's own police practices expert was unable to testify that MPD should have terminated Mr. Best in 2009.  *See* Reiter Dep., ECF No. 90-29, at Tr. 95–96 ("My question is: Based on your expert opinion, on your experience, do you have an opinion as to whether that they should have terminated

Officer Best prior to the incident involving Ms. Buie? No. I can't answer that, because I don't know Officer Best."). And, as a legal matter, Plaintiff provides no authority to support the position that a municipality's decision to demote, rather than fire a single employee could constitute a municipal policy of deliberate indifference.

In fact, the case law addressing this question is to the contrary. In *Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997), for example, a Maryland woman attempted to sue Anne Arundel County after she was allegedly raped by one of the county's on-duty police officers. *Id.* at 622. Years prior, the same officer was subject to another complaint of sexual assault. *Id.* at 623. After investigating the incident, the county police department elected to suspend the officer, transfer him to desk duty, and require that he attend counseling. *Id.* The Maryland woman argued that this decision to discipline, but not terminate, the offending officer constituted a policy of deliberate indifference. The district court, however, rejected this theory as a matter of law on summary judgment, and the Fourth Circuit affirmed. *Id.* at 626. Specifically, the Fourth Circuit explained that the decision to retain the offending officer "could not be found to be the result of deliberate indifference. With the benefit of hindsight, [the decision was] clearly unfortunate, might perhaps be thought imprudent, or even be found legally negligent, but that does not suffice; only decisions taken with deliberate indifference to the potential consequences of known risks suffice[] to impose municipal liability on the basis that such decisions constituted official County 'policy.'" *Id.* at 627 (citing *City of Canton*, 489 U.S. at 388); *see also Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 762 (5th Cir. 1993) (holding that a municipality's decision to "transfer [a sexually abusive teacher] rather than impose a more severe sanction" did not independently show a policy of deliberate indifference).

The Court is persuaded by the Fourth Circuit reasoning in *Jones*.  Plaintiff identifies no countervailing authority in this jurisdiction, nor has the Court identified any upon its independent research.  Perhaps most importantly, the Court is persuaded that the reasoning in *Jones* is consistent with binding "deliberate indifference" precedent from both the D.C. Circuit and the Supreme Court, which makes clear that to establish a policy of deliberate indifference, a plaintiff must demonstrate intentional inaction by a municipality in response to a known risk.  *See*, *e.g.*, *Hurd v. District of Columbia*, 997 F.3d 332, 339 (D.C. Cir. 2021) ("Deliberate indifference exists when the municipality knew or should have known of the risk of constitutional violations, *but did not act*.") (quotations omitted and emphasis added).  Under the collective weight of this authority, Plaintiff's attempt to demonstrate MPD's deliberate indifference through its decision to discipline, but not terminate Mr. Best in 2009 cannot prevail.

**** 

For the reasons set forth above, Plaintiff has not presented a triable question of fact regarding whether MPD's decision to retain and demote Mr. Best, rather than terminate him, constituted a municipal policy of deliberate indifference.[3]  Accordingly, the Court **GRANTS**

---

[3] In some cases, litigants have presented a "failure to terminate" theory, not through the lens of "deliberate indifference," but as a matter of final "policy maker authority."  *See, e.g.*, *Blue v. District of Columbia*, 850 F. Supp. 2d 16, 27–28 (D.D.C. 2012), *aff'd*, 811 F.3d 14 (D.C. Cir. 2015) (Plaintiff "allege[s] that the decision not to terminate Weismiller after DCPS investigated his sexual relationship with Plaintiff was made by a final municipal decisionmaker and is properly attributable to the District.").  This distinction is legally significant.  Final policy maker liability under *Monell* is different from a deliberate indifference theory and uniquely predicated upon an express decision by a municipal official endowed by state law with the authority to establish municipal policy.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  In this case, however, Plaintiff presents her "failure to terminate" theory exclusively under the ambit of "deliberate indifference."  *See* Pl.'s Opp'n at 27–31.  In fact, Plaintiff wholly omits her "failure to terminate" theory from the independent section in her summary judgment brief addressing "final policy maker" liability.  *See id.* at 31–34.  Therefore, the Court need not consider Plaintiff's "failure to terminate" theory as a matter of "final policy maker" liability, as Plaintiff herself has not raised that argument to the Court.  *See Interstate Fire & Cas. Co. v. Washington Hosp. Ctr. Corp.*, 917 F. Supp. 2d 87, 92 (D.D.C. 2013), *aff'd*, 758 F.3d 378 (D.C. Cir. 2014) ("Since GFIL failed to raise this argument . . . during summary judgment briefing, the Court may treat the argument as waived.").

summary judgment in favor of the District of Columbia on Plaintiff's failure to terminate theory of municipal liability.

### c.  Inadequate Investigation and Discipline

Next, Plaintiff contends that the District of Columbia has a "pattern and custom" of conducting "shoddy investigations into allegations of police sexual misconduct" and of tolerating police sexual misconduct through insufficient monitoring and accountability.  Pl.'s Opp'n at 19.  "A municipality may be liable under § 1983 for its failure to investigate incidents of [misconduct], and by extension, its failure to discipline officers for [that misconduct], when such failure amounts to deliberate indifference to the constitutional rights of persons within its jurisdiction." *McKnight v. District of Columbia*, 412 F. Supp. 2d 127, 133 (D.D.C. 2006); *see also Cox v. District of Columbia*, 821 F. Supp. 1, 16 (D.D.C. 1993), *aff'd*, 40 F.3d 475 (D.C. Cir. 1994).  A "single incident" of improper investigation and discipline, however, is generally insufficient to demonstrate that a municipality has a "policy" of deliberate indifference.  *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 139 (D.D.C. 2003), *aff'd sub nom. Byrd v. Gainer*, No. 03-7196, 2004 WL 885228 (D.C. Cir. Apr. 26, 2004) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985)).  Instead, a plaintiff must show that the investigatory and disciplinary inadequacies "amounted to a pattern—a course of conduct deliberately pursued by the city," which carried a known risk of constitutional violations.  *McKnight*, 412 F. Supp. 2d at 133.[4]

---

[4] In limited circumstances, a plaintiff may show deliberate indifference, not through a pattern of similar misconduct, but through "a single constitutional violation." *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 72 (D.D.C. 2018).  Plaintiff, however, does not attempt to show the District's deliberate indifference to inadequate MPD investigations and discipline through any one, single event.  And, regardless, the record in this case would not support such a theory.  "In a case involving a single constitutional violation, the plaintiff must show that the municipality's oversight was so severely inadequate as to make it 'obvious' that similar violations would result." *Id.* (quoting *Connick*, 563 U.S. at 63).  "Only a rank abdication of a municipality's duty to investigate police misconduct can meet this test." *Id.*  Plaintiff has not identified any one investigation that is so egregious as to evince the District's "rank abdication" of its investigatory or disciplinary duties.

To establish such a "pattern," a plaintiff must present evidence of "concentrated, fully packed, precisely delineated scenarios" of inadequate investigation or discipline, within which a pattern or policy of indifference is "sharply etched." *Carter v. District of Columbia*, 795 F.2d 116, 125 (D.C. Cir. 1986).  In *Cox*, for example, this Court found that the plaintiff had adequately established a municipal policy of inadequate investigation and discipline by providing "extremely detailed statistical evidence" showing a policy of extensive delay in the resolution of excessive force complaints against MPD officers.  *Cox*, 821 F. Supp. at 15.  Specifically, the plaintiff in *Cox* presented a "finely honed" theory based on empirical, year-over-year data demonstrating a substantial backlog in excessive force complaints, the average resolution time for such complaints, and the clear and consistent effect that this delay had on police accountability.  *Id.* at 14–16.  To the contrary, a plaintiff who presents "scattered" and generalized examples of inadequate training or discipline will not succeed in showing a municipal policy of deliberate indifference.  *Carter*, 795 F.2d at 125.

In this case, Plaintiff's attempt to establish a pattern of inadequate investigation and discipline is considerably fragmented.  In her summary judgment brief, Plaintiff highlights a series of sexual misconduct cases and their corresponding investigations, drawn primarily from the expert report of Mr. Lou Reiter.  *See* Pl.'s Opp'n at 19–22; Reiter Suppl. Rep., ECF No. 90-26, at 6–13.  But the investigations Plaintiff presents are irregular and sporadic, and Plaintiff offers no discernable theory as to how this assortment of investigations collectively evinces a clear pattern of systemic deficiency in MPD's investigation or discipline policy.  *See* Pl.'s Opp'n at 19–22.  For example, Plaintiff identifies an MPD investigation into a 2011 complaint regarding an officer's use of prostitutes and marijuana, which was allegedly delayed and was too "cursory," *id.* at 20, and another 2015 investigation into complaints of officer sexual misconduct in Ward 8, which

allegedly consisted of "merely two interviews" and was "superficial," *id.* at 21 & n.24.  Plaintiff also directs the Court to evidence suggesting that MPD's 2008 investigation into Mr. Best for his alleged sexual assault of Ms. Raynette Jones was improperly biased.  *See id.* at 24.

Even when construing the totality of this evidence in Plaintiff's favor, the summary judgment record presents a disparate assortment of arguably insufficient MPD investigations that are not clearly related.  *See Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 73 (D.D.C. 2018) ("Longo tries to paint a dire picture of the District's practices based on a handful of investigations he believes were conducted improperly. But these instances are too scattered and lacking in detail to build a case of deliberate indifference.") (quotation omitted).  Such disjointed evidence fails to demonstrate "a persistent and widespread practice" of inadequate investigation and discipline "that characteristically was repeated under like circumstances."  *Cox*, 821 F. Supp. at 17 (quoting *Morgan v. District of Columbia*, 824 F.2d 1049, 1058 (D.C. Cir. 1987)).

Furthermore, it is noteworthy that many of the investigations Plaintiff raises in the record affirmatively resulted in some form of discipline.  For example, Plaintiff relies on one case in which a sexually abusive MPD officer was charged with second and fourth degree sexual abuse "based on MPD's investigation," Pl.'s Opp'n at 20, and another case where MPD sustained several charges against a 22-year veteran who coerced a prostitute, *see id.* at 22.  The record similarly reflects that MPD's investigations into Mr. Best resulted in disciplinary measures.  For example, MPD referred both the April 2008 Jones complaint and the October 2008 Lee complaint against Mr. Best for sexual assault to the United States Attorney's Office for potential criminal prosecution, although the U.S. Attorney's Office ultimately declined prosecution in both cases. *See* Aug. 1, 2008 Letter, ECF No. 90-13, at 1; Jan. 23, 2009 Letter, ECF No. 90-17, at 1; *Jackson*, 327 F. Supp. 3d at 73 ("In one of the other instances Longo cites, the U.S. Attorney's Office

reviewed the matter and declined to prosecute. It is hard to see how the District could have been 'indifferent' to matters it in fact investigated in this manner."). Additionally, MPD's 2009 investigation of Ms. Lee's sexual assault complaint directly resulted in Mr. Best's demotion. *See* Def.'s Stmt. at ¶ 48. Finally, Plaintiff has presented internal MPD documentation demonstrating that numerous other MPD officers were terminated by MPD for their sexual misconduct. *See* Pl.'s Opp'n, ECF No. 94-1, at Ex. 18 at 1. This record evidence of affirmative disciplinary measures taken by MPD in response to sexual misconduct further belies the existence of a discernable pattern of inadequate investigation or discipline, to which the District was deliberately indifferent. *See Carter*, 795 F.2d at 125.

Absent any discernable pattern of deliberately insufficient investigations and discipline, Plaintiff attempts to salvage her inadequate investigation and discipline theory by pointing to MPD's treatment of "he said/she said" sexual harassment complaints. Specifically, Plaintiff argues that MPD has a "custom/practice" of "treating all he said/she said internal investigations involving sexual harassment as having Insufficient Facts." Pl.'s Opp'n at 27. Plaintiff contends that this purported "he said/she said" practice discounts the credibility of victim-witnesses, contravenes recommended EEOC investigatory standards, and, thereby, "evinces MPD's deliberate difference towards the constitutional rights of citizens." *Id.*

Plaintiff's "he said/she said" argument does not carry the day. To begin, Plaintiff bases this theory exclusively on the following "admission" of MPD Inspector Kimberly Dickerson, rendered during her deposition as the District's designated Rule 30(b)(6) witness:

> Q. And you say it is the practice of MPD to treat those as insufficient facts when that's what the situation is, without some extraneous witness or recording or

corroborating data, right?

A. Correct.

Pl.'s Opp'n, EX. 5, ECF No. 94-1, at Tr. 90.  According to Plaintiff, this testimony independently

"confirms" MPD's custom of ignoring EEOC standards and treating all "he said/she said"

complaints" as categorically insufficient.  Pl.'s Opp'n at 27.  But this purported "admission" is not

so clear cut.  First, the District is not irreversibly bound by the testimony of its Rule 30(b)(6)

witness.  *See United States ex rel. Landis v. Tailwind Sports Corp.*, 292 F. Supp. 3d 211, 217

(D.D.C. 2017).   Moreover, Plaintiff's characterization of Inspector Dickerson's testimony

overreaches.  Plaintiff's counsel asked Inspector Dickerson whether MPD treated "he said/she

said" complaints as insufficient where there was no "*extraneous witness or recording or*

*corroborating data.*"   Inspector Dickerson's one-word, affirmative response to this question does

not clearly "confirm" that MPD categorically rejects all "he said/she said" complaints, as Plaintiff

suggests.  For example, Inspector Dickerson very well might have understood the term

"corroborating data" to include witness credibility assessments made in compliance with EEOC

standards.  In sum, Inspector Dickerson's deposition testimony is ambiguous at best and, contrary

to Plaintiff's extrapolation, it does not clearly show a categorical MPD policy regarding "he

said/she said" complaints.

Furthermore, Plaintiff provides no legal authority to support her position that a

municipality's failure to adopt recommended EEOC practices establishes deliberate indifference.

To the contrary, "a city's mere failure to adopt 'best practices' in . . . investigations is not enough

to excuse plaintiffs from showing that the city recklessly ignored a pattern of constitutional

violations."  *Jackson*, 327 F. Supp. 3d at 73.  And here, Plaintiff has provided no summary

judgment evidence demonstrating a pattern of constitutional violations arising from MPD's alleged

treatment of "he said/she said" complaints, nor does Plaintiff attempt to argue in her brief that such a pattern exists. In fact, the record evidence regarding Janice Lee's October 2008 complaint against Mr. Best appears to *contradict* Plaintiff's broad assertion that MPD categorically rejects all "he said/she said" complaints. There, Ms. Lee reported that Mr. Best sexually harassed her while they were alone together, with no direct witnesses or video surveillance available. *See* MPD Rep., ECF No. 90-14, at 3. Despite Mr. Best's outright denial of Ms. Lee's allegation, *see id.* at 5, MPD ultimately *sustained* a charge of misconduct against Mr. Best. Given this record, Plaintiff cannot rely on MPD's supposed treatment of "he said/she said" complaints to demonstrate the District of Columbia's purported deliberate indifference to the need for improved systems of investigation and discipline. *See Hurd v. District of Columbia*, 997 F.3d 332, 339 (D.C. Cir. 2021).

****

For the reasons set forth above, the Court concludes that Plaintiff's theory of inadequate investigation and discipline cannot survive summary judgment. To be sure, Plaintiff has raised discrete instances of potentially inadequate MPD investigations, which the Court in no way endorses or approves. But to establish a viable municipal policy of "deliberate indifference," a plaintiff must demonstrate a "systemic" flaw that the municipality consciously ignored. *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988); *see also Hurd*, 997 F.3d at 339. At the summary judgment stage, Plaintiff has presented highly fragmented and scattered record evidence that evinces no clear pattern of misconduct or systemic flaw in MPD's investigatory or disciplinary practices. Based upon this summary judgment record, no reasonable jury could find that the District of Columbia adopted a municipal policy of deliberate indifference towards MPD's inadequate investigations or disciplinary practices for cases of police sexual misconduct.

### d. Decision to Detail Mr. Best to MPD Headquarters

Plaintiff's final theory of a municipal policy relies on Chief Lanier's explicit decision to detail Mr. Best to MPD headquarters. *See* Pl.'s Opp'n at 33. Here, the record reflects that on November 21, 2014, Chief Lanier approved the transfer of Mr. Best to MPD's Corporate Support Bureau, located on the fifth floor of MPD's headquarters. *See* Nov. 21, 2014 Personnel Rep., ECF No. 90-3, at 1; Def.'s Stmt. at ¶ 29. In certain circumstances, a plaintiff may establish a municipal "policy" by identifying a single act or decision made by a "final policy maker" for the municipality. *See Pembaur v. Cincinnati*, 475 U.S. 469, 482–83 (1986). Demonstrating a municipal policy through the decision of a "final policy maker" is distinct from establishing a municipal policy of "deliberate indifference." *See Hurd*, 997 F.3d at 337.

Plaintiff's attempt to establish a municipal policy through the act of a "final policy maker" is unavailing. Problematically, Plaintiff raises her "final policy maker" theory for the first time on summary judgment. *See* Compl., at ¶¶ 1–75. Before the current round of summary judgment briefing, Plaintiff had not previously argued that Chief Lanier's November 2014 detail assignment for Mr. Best constituted a municipal "policy" that supports *Monell* liability against the District in this case. Plaintiff may not amend her § 1983 claims through summary judgment briefing. *See Jo v. District of Columbia*, 582 F. Supp. 2d 51, 64 (D.D.C. 2008) ("It is well-established in this district that a plaintiff cannot amend [her] Complaint in an opposition to a defendant's motion for summary judgment."). And, in any event, it appears from Plaintiff's summary judgment brief that Plaintiff ultimately intended her argument regarding Chief Lanier's detail decision to support her larger theory of deliberate indifference, which this Court has already rejected. *See* Pl.'s Opp'n at 34 (casting Chief Lanier's decision as evidence of "a pattern of deliberate indifference toward police sexual misconduct").

Finally, even if Plaintiff could proceed on her "final policy maker" theory, she has not established causation. There is no evidence in the record to demonstrate that Chief Lanier's purely administrative decision to assign Mr. Best to a particular bureau within MPD was the "moving force" behind Mr. Best's attempt to rape Plaintiff on December 3, 2014. *See Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 406–07 (1997) ("Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof. That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably."). For these various reasons, the Court **GRANTS** summary judgment in favor of the District of Columbia on Plaintiff's "final policy maker" theory of municipal liability.

## B. Plaintiff's Common Law Claims

The remainder of the District of Columbia's summary judgment motion requests the dismissal of Plaintiff's common law claims against the District. *See* Def.'s Mot. at 28–45. Specifically, the District moves for summary judgment on Count III, wherein Plaintiff generically requests that this Court issue an injunction against the District of Columbia. The District also moves for summary judgment on Plaintiff's claims against it for negligent supervision (Count IV), negligent entrustment (Count V), negligent supervision (Count VI), negligent infliction of emotional distress (Count VII), and intentional infliction of emotional distress (Count VIII). The Court, however, will not yet proceed to the merits of these claims, because it is unclear on the present record whether the Court should exercise federal jurisdiction over these common law causes of action.

This Court has an "independent obligation" at all stages of litigation to evaluate the contours of its own subject matter jurisdiction. *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).  In this case, the Court's jurisdiction over Plaintiff's pendent common law claims is "supplemental," *see* 28 U.S.C. § 1367(a), to the Court's federal question jurisdiction over Plaintiff's § 1983 claims in Counts I and II, *see* 28 U.S.C. § 1331; Meet & Confer Stmt., ECF No. 23, at 2.  But, as explained above, the Court will now dismiss Plaintiff's § 1983 claims in Count I and II against the District of Columbia.  *See* disc. *supra* at 18–42.  The disposal of Plaintiff's § 1983 claims against the District presents two threshold questions regarding the Court's continuing jurisdiction in this case.

First, it is not entirely clear whether the dismissal of Plaintiff's § 1983 claims against the District removes *all* federal claims from this case.  As the District of Columbia states in its summary judgment brief, Counts I and II of Plaintiff's complaint "appear to be asserted solely against the District."  Def.'s Mot. at 14.  The Court broadly agrees with this reading of Plaintiff's complaint, *see* Compl., ECF No. 1, at ¶¶ 44–75, and Plaintiff does not argue otherwise in her summary judgment briefing.  Under this reading of Plaintiff's complaint, the dismissal of Counts I and II against the District would remove all the federal causes of action from this case, leaving behind only Plaintiff's common law claims in Counts III through X.  Nonetheless, Mr. Best is also an independent defendant in this case, and Plaintiff's § 1983 claims in Counts I and II reference Mr. Best's conduct and its effect on Plaintiff's constitutional rights.  *See* Compl., ECF No. 1, at ¶¶ 44–75.  Consequently, there is ambiguity in the present record regarding whether Plaintiff has asserted § 1983 claims against Mr. Best, which still remain pending before this Court.

Second, the record presents unaddressed questions about the Court's discretionary authority to retain supplemental jurisdiction over Plaintiff's common law claims.  If Plaintiff's § 1983 claims do, in fact, pertain solely to the District of Columbia, then no federal causes of

action remain in this case.  Under 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over pendent common law claims where "the district court has dismissed all claims over which it has original jurisdiction."  And "in the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Accordingly, courts in this jurisdiction routinely decline to exercise supplemental jurisdiction over pendent common law claims after dismissing the § 1983 claims over which they possess original jurisdiction.  *See, e.g.*, *Louis v. District of Columbia*, 59 F. Supp. 3d 135, 151 (D.D.C. 2014) (declining supplemental jurisdiction over common law claims after the dismissal of § 1983 claims on summary judgment).  Instead, courts may dismiss such pendent common law claims without prejudice, allowing plaintiffs to refile their remaining common law claims in state court.  *See Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 143 (D.D.C. 2003), *aff'd sub nom. Byrd v. Gainer*, No. 03-7196, 2004 WL 885228 (D.C. Cir. Apr. 26, 2004) ("[T]he Court declines to exercise its supplemental jurisdiction over the remaining common law claims, but instead will dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).  Plaintiff may file the remaining non-federal claims in Superior Court.").  To that end, 28 U.S.C. § 1367(d) tolls the limitations period for a plaintiff's pendent common law claims, allowing them to refile such claims in state court without running afoul of applicable limitations periods.  *See Cherry v. District of Columbia*, 170 F. Supp. 3d 46, 51 (D.D.C. 2016).  In this case, neither party has considered these

factors or addressed whether this Court should retain jurisdiction over Plaintiff's common law claims, even after the dismissal of Plaintiff's § 1983 claims.

Altogether, the issues outlined above are critical to the question of this Court's continuing jurisdiction. But neither the parties' summary judgment briefing, nor the record as a whole, provides an adequate foundation upon which the Court can resolve this crucial jurisdictional matter. The Court, therefore, will **DENY WITHOUT PREJUDICE** the District of Columbia's motion for summary judgment as to Plaintiff's common law claims in Counts III through VIII. *See* Def.'s Mot. at 28–45. The Court will permit the District to refile its summary judgment motion, as to Counts III through VIII, while specifically addressing the question of this Court's jurisdiction over those pendent common law claims under 28 U.S.C. § 1367.

## IV.   CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court will **GRANT** the District of Columbia's [90] Motion for Summary Judgment as to Plaintiff's § 1983 claims for municipal liability in Counts I and II. The Court, however, will **DENY WITHOUT PREJUDICE** the District's [90] Motion, as it applies to Plaintiff's common law claims in Counts III, IV, V, VI, VII, and VIII. The District of Columbia may refile its summary judgment motion, as to Counts III through VIII, but, in so doing, the District must specifically address this Court's continuing jurisdiction over those claims.

An appropriate Order accompanies this Memorandum Opinion.

**Dated**: September 7, 2021

                                                              /s/
                                     COLLEEN KOLLAR-KOTELLY
                                     United States District Judge