**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JAQUIA BUIE,<br>        Plaintiff<br>        v.<br>DISTRICT OF COLUMBIA, *et al.*,<br>        Defendants. | Civil Action No. 16-1920 (CKK) |

**MEMORANDUM OPINION**
(September 20, 2023)

In December 2014, Plaintiff Jaquia Buie was sexually assaulted by former Metropolitan Police Department officer Darrell Best.  She filed a civil action in September 2016 against Best, Mayor Muriel Bowser, and the District of Columbia ("District").

The Court has already dismissed Mayor Bowser from this lawsuit, *see* Mem. Op. & Order, ECF No. 19, and granted the District's motion for summary judgment on Plaintiff's federal law claims under 42 U.S.C. § 1983 in Counts I and II, *see* Mem. Op., ECF No. 99.  Now remaining against the District are claims of injunctive relief (Count III), negligent supervision (Count IV), negligent entrustment (Count V), negligent retention (Count VI), negligent infliction of emotional distress (Count VII), and intentional infliction of emotional distress (Count VIII). Pending before the Court is the District of Columbia's [101] Renewed Motion for Summary Judgment, in which they seek summary judgment on such remaining claims.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a

---

[1] The Court's consideration has focused on the following documents:
- Pl.'s Compl ("Compl."), ECF No. 1;
- Def.'s Renewed Mot. for Summ. J., ECF No 101 (Def.'s Mot.");
- Def.'s Statement of Undisputed Material Facts, ECF No. 101 at 3–11 ("Def.'s Stmt.")
- Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 102 ("Pl.'s Opp'n");
- Pl.'s Statement of Genuine Issues, ECF No. 102-1 and -2 ("Pl.'s Stmt."); and

whole, the Court will **GRANT** Defendant District of Columbia's Motion for Summary Judgment

in its entirety.

## I. BACKGROUND

### A. Factual Background

This Statement of Facts includes undisputed and unrebutted facts.

### 1. Best's History as an MPD Officer

The Metropolitan Police Department ("MPD") hired Darrell Best as a police officer in

February 1987.  Def.'s Stmt. ¶ 43.  In November 1998, MPD promoted Best from patrol officer

to master patrol officer within the MPD's Fifth District.  *Id.*  Several months later, MPD

promoted Best once again, this time to the rank of sergeant, and assigned him to the Seventh

District.  *Id.*

In the 2000s, MPD began to receive complaints about Best and to discipline him for

certain conduct.  In November 2006, MPD issued Best an official reprimand for neglect of duty

when he failed to notify MPD's Internal Affairs Bureau ("IAB") that he had served a fellow

MPD officer with a temporary protective order in a domestic violence case.  Def.'s Mot. at 11–

12; *id.* Ex. 22.  Then, in May 2007, MPD suspended Best for thirty days for providing falsified

time and attendance records to MPD that overstated his compensated work hours.  *See* Def.'s

Mot. at 12; *id.* Exs. 23, 24.  Also in 2007, MPD received an incident report alleging that Best had

assaulted his wife and that she had obtained a temporary protective order against him.  *See* Pl.'s

Opp'n at 3 (citing ECF No. 94-1 Ex. 20 at 1).  The current record does not indicate that MPD

took any disciplinary action against Best as a result of this domestic violence incident report.

---

- Def.'s Reply to Pl.'s Opp'n, ECF No. 103 ("Def.'s Reply").

In an exercise of its discretion, the Court finds that holding oral argument in this action would
not be of assistance in rendering a decision.  *See* LCvR 7(f).

*See id.*

In April 2008, Best was the subject of a formal sexual assault complaint lodged by a female MPD police cadet named Raynette Jones.  *See id.* (citing ECF No. 94-1 Ex. 3).  In her complaint, Ms. Jones alleged that Best had repeatedly requested oral and vaginal sex, humped her in his office, and fondled her breasts and buttocks on numerous occasions.  ECF No. 94-1 Ex. 3 at 2–4.  Best disputed the allegations.  *Id.* at 6–7.  The United States Attorney's Office for the District of Columbia declined to prosecute Best for sexual abuse related to these allegations.  Def.'s Stmt. ¶ 45; *see also* ECF No. 94-1 Ex. 3 at 7.  MPD launched an investigation into Ms. Jones' allegations, which was completed in January 2009.  Def.'s Stmt. ¶ 44; *see generally* ECF No. 94-1 Ex. 3.  The IAB Memorandum that served as the final report concerning these allegations stated that "[t]he investigation did not disclose sufficient evidence to sustain Cadet Jones' allegation that Sergeant Best inappropriately touched her or made inappropriate comments toward her," and, therefore, "it is recommended that no further action be taken on this matter."  ECF No. 94-1, at Ex. 3 at 7.  Best was detailed to the Fifth District afterwards.  ECF No. 90-14 at 7.

In October 2008, Best was the subject of another formal sexual assault complaint, this time lodged by a civilian MPD employee named Janice Lee.  *See* Def.'s Stmt. ¶ 46; Pl.'s Stmt. at 12.  Ms. Lee alleged that Best propositioned her at work while they were having breakfast alone in the Fifth District community room.  Pl.'s Opp'n at 4 (citing ECF No. 90-14 at 3).  Ms. Lee alleged that Best suggested they get a hotel room and that he would give her a massage for thirty-five dollars.  ECF No. 90-14 at 3.  Best then allegedly commented on Ms. Lee's appearance and grabbed her buttocks without her consent.  *Id.*  Best disputed the allegations.  *Id.* at 5.  As with Ms. Jones' complaint, Ms. Lee's complaint was referred to the United States Attorney's Office

for the District of Columbia, which declined to prosecute Best. *Id.* at 6.  MPD placed Best on administrative leave beginning in November 2008 pending the outcome of an investigation into Ms. Lee's allegations. *See id.* at 8.  Upon the conclusion of their investigation, the IAB found that "[d]ue to the nature of this allegation and the disturbing similarity of Sergeant Best's most recent complaint… it appears that Sergeant Best continues to engage in behavior that may leave the Department open for serious legal action." *Id.* at 7.  The report stated that both Ms. Jones and Ms. Lee were new employees and Best served as their supervisor; it continued that "it can be suggested that he used his position of authority to try to intimidate the women." *Id.*  MPD ultimately cited Best for adverse action of "conduct unbecoming an officer," which prohibits sexual harassment. *Id.* at 7–8.  Best appealed the charge, which was denied by MPD Chief of Police Cathy Lanier in September 2009. Def.'s Stmt. ¶ 47.  Following the IAB report and recommendation, MPD demoted Best from sergeant to officer. *Id.* ¶ 48.  They also required that Best report to MPD's police training academy for training and recertification and reassigned him to the Patrol Service and School Security Bureau at the Fourth District. *Id.*

Best remained with the Fourth District until November 21, 2014, at which point Chief Lanier temporarily detailed Best to the Corporate Support Bureau ("CSB") as an administrative officer. *Id.* ¶ 49.  As a CSB administrative officer, Best worked Monday through Friday, from 9:00 AM to 5:00 PM, and could only work overtime hours with supervisor approval. *Id.* ¶ 50.  MPD assigned the CSB an unmarked police vehicle for its officers to use for official MPD business. *Id.* ¶ 52.  While detailed with the CSB, Best continued to carry an MPD service weapon. *See* Def.'s Stmt. ¶ 11.

### 2.  God of Second Chance Ministries

In addition to his role as an MPD officer, Best was also an ordained minister. *See* Def.'s

Mot. at 1.  In December 2012, Best founded a church called "God of Second Chance Ministries" (the "Church"), located at 4410 Southern Ave. SE, Washington, D.C.  Def.'s Stmt. ¶ 1.  The Church's congregation was comprised of approximately sixty to eighty individuals and its services included Bible studies, counseling, a dance ministry, and a choir. Def.'s Mot. at 1–2.  As pastor, Best had personal involvement in these church activities, including through his service as choir director.  *Id.* at 2.

Best's duties as a police officer were unrelated to his association and work with God of Second Chance Ministries.  Def.'s Stmt. ¶ 56.  For example, Best did not seek approval or authorization from MPD to establish the Church in 2012 or to preach at the Church thereafter. *Id.* ¶ 57. Moreover, MPD refrained from assigning Best any police-related duties at or for the Church, and overall, there was no official or unofficial association or connection between MPD and the Church.  *Id.* ¶¶ 58–59. Nonetheless, Best consistently wore his police uniform and weapon at the Church.  Pl.'s Stmt. at 15–16.

Jaquia Buie ("Plaintiff") began attending God of Second Chance Ministries in the fall of 2013 along with her two sisters and her mother, Ms. Shenita Buie.  Def.'s Stmt. ¶ 2.  Plaintiff did not know Best before attending the Church and she had no previous contact with him in his capacity as a police officer.  *Id.* ¶ 3.  Plaintiff spoke directly with Best for the first time on Thanksgiving Day 2014.  *Id.* ¶ 5.  During that conversation, Best stated that Plaintiff's mother had told Best about Plaintiff's interest in becoming a police officer.  *Id.*  Best then indicated to Plaintiff that he might be able to offer her assistance in her efforts to become a police officer.  *Id.*

Shortly thereafter, Best had another conversation with Plaintiff; he asked for her cell phone number and asked what she wanted for her high school graduation gift as, at that time, Plaintiff was seventeen years old and had graduated high school just five months earlier.  *Id.* ¶ 6.

Best offered to take Plaintiff and her mother out to dinner to discuss Plaintiff's interest in becoming a police officer. *Id.*  Plaintiff replied that there was "nothing… really to talk about" because her interest in police work "was not that serious" and that she "would just take a gift card." *Id.*  However, Plaintiff eventually acceded to Best's dinner invitation and selected Georgia Brown's as the location. *Id.* ¶ 7.

### 3.  Best Sexually Harasses Plaintiff at Dinner

On December 3, 2014, the day of their planned dinner with Best, Plaintiff's mother decided not to attend. *Id.* ¶ 8; Pl.'s Stmt. at 3.  Accordingly, Plaintiff proceeded to meet Best by herself at the Mount Vernon metro station, where he picked her up in an unmarked police vehicle. Def.'s Stmt. ¶ 9–10.  Best was dressed in his full police uniform and was carrying his service weapon. *Id.* ¶ 11.  As Best drove Plaintiff to Georgia Brown's for dinner, he asked whether Plaintiff had any specific question about the police force, to which she replied that she did not. *Id.* ¶ 12.

Best and Plaintiff arrived at Georgia Brown's around 6:00 PM. *Id.* ¶ 13. At the beginning of the meal, Plaintiff and Best spoke, in a one-sided conversation, about the police academy for approximately five minutes; Plaintiff did not ask Best any questions. *Id.* ¶ 14.  Thereafter, Best directed the dinner conversation towards more lurid topics, asking Plaintiff whether she had a boyfriend, whether she liked to receive oral sex, and which sexual positions she preferred. *Id.* ¶ 15.  Plaintiff was shocked to hear Best, her church pastor, ask these highly sexual questions. *See* Def.'s Mot. Ex. 2 at 182:4–6.  At first, Plaintiff requested that Best stop discussing such inappropriate topics. *Id.* at 183:1–3.  But after Best persisted, Plaintiff started to put her coat on. *Id.* at 201:11–12.  Best became "aggressive" and demanded that Plaintiff take off her coat. *Id.* at 201:12–16.  Plaintiff had never before witnessed Best act aggressively and this behavior

"confused" and "frightened" her.  *Id.* 201:17–20.

After Best's suddenly aggressive behavior, Plaintiff informed him that she would pay for her own dinner and that she was leaving to take the metro back home.  Def.'s Stmt. ¶¶ 17–18.  Best paid for the meal over Plaintiff's objection, *id.* ¶ 20, and followed Plaintiff outside as she left the restaurant, *id.* ¶ 22.  They were at the restaurant for about one hour.  *See* Def.'s Mot. Ex. 2 at 203:2.  Best then started to speak to Plaintiff sternly "between his teeth," commanding that she "come here."  *Id.* at 205:13–14.  This caused Plaintiff to "fear for [her] life," *id.* at 205:15, and, therefore, she attempted to get "as far away" from Best as she "possibly could," *id.* at 206:1–2.  Plaintiff, however, believed that as a police officer, Best was "capable of anything" and had "access to everything."  *Id.* at 206:11–12.  Best continued to call out to Plaintiff while standing next to his police vehicle and directing Plaintiff to "come here now."  *Id.* at 207:3–4.  Best asked Plaintiff "what it would look like if [he] didn't take [her] home?"  Def.'s Stmt. ¶ 23.  Plaintiff finally acquiesced and walked back to Best.  *Id.*  Plaintiff got into Best's police vehicle, believing that Best would drive her back to her house. *Id.*; *see also* Def.'s Mot. Ex. 2 at 211:5–14.

### 4.  Best Sexually Assaults Plaintiff at MPD Headquarters

Instead of driving Plaintiff back home, Best drove Plaintiff from Georgia Brown's to MPD headquarters.  Def.'s Stmt. ¶ 24; *see also* Def.'s Mot. Ex. 2 at 248. Best explained to Plaintiff that he had some work to finish and that it would not take long.  Def.'s Stmt. ¶ 24.  Best and Plaintiff arrived at MPD headquarters at approximately 7:15 PM.  *See* Def.'s Mot. Ex. 2 at 223.  When they arrived, Best used his badge to gain access to and enter the MPD parking garage.  Def.'s Stmt. ¶ 25.  When they entered the MPD garage, Best pointed out the car of Chief Lanier, which was parked there.  *See* Def.'s Mot. Ex. 2 at 213:11–12.  At that moment, Plaintiff

realized that something had "turned wrong," "[b]ecause now [she was] not even where civilians are supposed to go." *Id.* at 213:13–14.  Plaintiff asked Best if she could wait in the car while he finished his work, but Best refused, explaining to Plaintiff that she could not remain in the parking garage alone because "Chief Lanier's in here." *Id.* at 16; Def.'s Stmt. ¶ 26. Consequently, Plaintiff accompanied Best into MPD headquarters and proceeded with him into the elevators.  *Id.* ¶ 27.  Best used his badge to operate the elevators and brought Plaintiff up to the CSB suite on the fifth floor, where he was detailed at the time.  *Id.* ¶¶ 28–29.  On the fifth floor, Plaintiff did not see any other police officers present, although she noticed that the door to Chief Lanier's office was open and that lights were on inside.  *See id.* ¶ 30; Def.'s Mot. Ex. 2 at 216:5–6.  Plaintiff then followed Best into the CSB working suite, which included a private office, an open workspace for CSB staff, a second small office, and a file room.  Def.'s Stmt. ¶ 31.  Upon entering the CSB suite, Best sat at his desk and worked on his computer, which was located within the CSB suite's open workspace, and Plaintiff sat on a couch situated away from Best's desk.  *Id.* ¶ 32; Pl.'s Stmt. at 7.

Eventually, Best stood up and made his way over to Plaintiff.  Def.'s Stmt. ¶ 33; Def.'s Mot. Ex. 2 at 227:17–20.  Best then attempted to unbutton Plaintiff's shirt around her cleavage area.  *See* Def.'s Mot. Ex. 2 at 229:4–5.  Plaintiff resisted, but Best used his strength to "smash[] his head into [Plaintiff's] breasts."  *Id.* at 229:10–11. Best pulled down Plaintiff's bra, causing one of her breasts to become exposed, and continued to "st[i]ck his head inside [Plaintiff's] breasts."  *Id.* at 230:3–14.  Plaintiff tried to push Best's head away and implored Best to stop.  *Id.* at 230:14–22.  Best asked Plaintiff why she was "acting like a little girl?"  *Id.* at 231:2.  In response, Plaintiff stated that she was "a little girl," *id.* Tr. 231:7, and that she was "not grown," *id.* at 233:10.  Plaintiff tried to move away from Best by leaving the couch and moving herself to

a nearby chair. *Id.* at 231:7–12. Despite this, Best followed Plaintiff to the chair and turned off the lights in the CSB suite, causing Plaintiff to return to the couch. *Id.* at 232:1–7. Best then sat down next to Plaintiff on the couch and exposed his penis, while also taking his service weapon out of its holster and placing it on a nearby table. *Id.* at 233:17–20. Best then asked Plaintiff "to touch his penis." *Id.* at 237:11. Plaintiff refused. *Id.* at 238:3. Best, however, declared that "he wanted some" and proceeded to get on top of Plaintiff and hump her "so hard," trying to force his penis into Plaintiff's pants. *Id.* at 238:6–11. Best unbuttoned and unzippered her pants, but Plaintiff attempted to pull them up and eventually made it out from underneath Best. *Id.* at 238–40. Plaintiff then stood up and insisted that they leave and Best take her home. *Id.* at 240. Once Best could sense that she "was going to be loud," after he had told her to keep her voice down, Best said "Okay," but warned Plaintiff "that no one better find out about this," while looking at his gun. *Id.* at 242–43. Plaintiff and Best then left the CSB suite, during which time Plaintiff could hear voices coming from Chief Lanier's office. Def.'s Stmt. ¶ 34. Best then drove Plaintiff out of MPD headquarters and dropped her off two blocks away from her house. *Id.* ¶ 35.

### 5. Best Faces Criminal Investigation and Prosecution

In January 2015, A.T., the sixteen-year old niece of Best's fiancé, confided in Plaintiff that Best had raped her. *Id.* ¶ 36. Like Plaintiff, A.T. was a member of God of Second Chance Ministries. *Id.* ¶ 37. On March 14, 2015, A.T.'s older sister reported Best's sexual crimes to her cousin, another MPD officer. *Id.* ¶ 38. The ensuing police investigation revealed that Best had raped or otherwise sexually assaulted A.T. on three separate occasions, between December 23, 2014 and February 14, 2015. *Id.* Each assault on A.T. occurred within Best's private office at the Church. *Id.*

On March 14, 2015, agents from MPD's IAB served Best with a revocation of police powers form and placed him on administrative leave.  *Id.* ¶ 39.  The following day, a warrant was issued for Best's arrest for raping and sexually assaulting A.T.  *Id.*  Best was arrested on March 16, 2015 and charged with First Degree Sexual Abuse of a Minor.  *Id.*  On August 4, 2015, Best resigned from the Metropolitan Police Department.  *Id.* ¶ 40.

On September 23, 2015, a three-count federal information was returned against Best for his abuse of both A.T. and Plaintiff.  *See* Information, ECF No. 23, *United States v. Best*, No. 15-CR-122-RBW.  Specifically, the information charged Best with: (1) Production of Child Pornography, (2) First Degree Sexual Abuse of a Minor, and (3) Second Degree Sexual Abuse of a Minor.  *See id.*  On October 22, 2015, Best pleaded guilty to each count, *see* Plea Agreement, ECF No. 26, *United States v. Best*, No. 15-CR-122-RBW, and on March 10, 2016, Judge Reggie Walton sentenced Best to eighteen years in prison, *see* Def.'s Stmt. ¶ 42.

## B.  Procedural History

On September 28, 2016, Plaintiff filed a civil complaint against Darrell Best, the District of Columbia, and Mayor Muriel Bowser, seeking relief for the injuries she sustained during the December 3, 2014 sexual assault.  The complaint includes ten counts: (1) a § 1983 claim for a "Deprivation of Liberty and Right to Bodily Integrity" in violation of the Fifth Amendment, (2) a § 1983 claim for "Unlawful Seizure by a Police Officer" in violation of the Fourth Amendment; (3) a claim for injunctive relief, (4) negligent supervision, (5) negligent entrustment, (6) negligent retention, (7) negligent infliction of emotional distress, (8) intentional infliction of emotional distress, (9) sexual abuse of a minor, and (10) breach of fiduciary duty.  *See* Compl. ¶¶ 44–126.

On August 30, 2017, upon a partial Rule 12(b)(6) motion, the Court dismissed Mayor

Muriel Bowser as a defendant from this case.  *See* Mem. Op. & Order, ECF No. 19, at 2.  As

such, only the District of Columbia and Best now remain as defendants.  Best, however, has not

entered an appearance or filed any responsive pleadings, and Plaintiff accordingly filed a [16]

Motion for Order of Default.  On February 22, 2017, the Clerk of the Court entered default

against Best. *See* ECF No. 18.  Despite this, Plaintiff has not yet filed a motion for default

judgment against Best pursuant to Federal Rule of Civil Procedure 55(b).

With Mayor Bowser dismissed from the case and Best in default, Plaintiff and the District

of Columbia began a protracted period of discovery starting in late 2017.  *See* Scheduling &

Procedures Order, ECF No. 23, at 5–6.  Through the course of this discovery, Plaintiff proffered

a police practices expert named Mr. Lou Reiter.  *See* Not. of Expert, ECF No. 52, at 1.  In

addition to Mr. Reiter's expert reports and depositions, discovery in this case included

voluminous document production and deposition testimony.

The District of Columbia then filed a [90] Motion for Summary Judgment.  The Court

granted the District's motion on Plaintiff's § 1983 municipal liability claims in Counts I and II,

but denied without prejudice the motion as to Plaintiff's remaining common law claims, finding

that there were unaddressed questions regarding the Court's continuing jurisdiction over those

non-federal causes of action.  *See* Mem. Op. & Order, ECF No. 99.

The District then filed the pending [101] Motion for Summary Judgment as to Plaintiff's

remaining claims.  With that motion fully briefed, the Court now turns to its resolution.

## II. LEGAL STANDARDS

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar

summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

### III. DISCUSSION

To begin, the Court will continue to exercise jurisdiction over the remaining common law claims in this case. As for merits of Plaintiff's claims themselves, the Court finds that Defendant is entitled to summary judgment for each of the remaining claims: injunctive relief (Count III), negligence (Count IV), negligent entrustment (Count V), negligent retention (Count VI), negligent infliction of emotional distress (Count VII), and intentional infliction of emotional distress (Count VIII).

### A. Subject Matter Jurisdiction

In the Court's [99] Memorandum Opinion granting in part and denying in part Defendant's previous [90] Partial Motion for Summary Judgment, the Court asked that the parties "specifically address[] the question of this Court's jurisdiction over [] pendent common law claims under 28 U.S.C. § 1367" in any future motion for summary judgment as to Counts III through VIII. Mem. Op., ECF No. 99 at 46. The Court outlined two jurisdictional questions.

First, it was not entirely clear whether the Court's dismissal of Plaintiff's § 1983 claims against the District removed all federal claims from the case. In the District's previous [90] Motion for Summary Judgment, they asserted that Counts One and Two—the federal law claims—"appear to be asserted solely against the District." ECF No. 90, at 14. Plaintiff did not

argue otherwise in her response brief, *see generally* ECF No. 94-1, and the Court previously

stated that it "broadly agrees with this reading," Mem. Op., ECF No. 99 at 44.  As the Court went

on to explain in its previous opinion, under this reading of Plaintiff's complaint, the dismissal of

Counts I and II against the District would remove all the federal causes of action from this case,

leaving behind only Plaintiff's common law claims.  *Id.*  However, as the Court continued,

because Plaintiff's § 1983 claims in Counts One and Two at least reference Defendant Best's

conduct and its effect on Plaintiff's constitutional rights, there was "ambiguity in the present

record regarding whether Plaintiff has asserted § 1983 claims against Best, which still remain

pending before this Court."  *Id.*

       Second, if Plaintiff's § 1983 claims *were* asserted only against Defendant District of

Columbia, and, therefore, no federal causes of action now remain, there would be a question as

to whether the Court should, in its discretion, continue to exercise supplemental jurisdiction over

the pendent common law claims.  *See id.* at 44–45.  The parties addressed these questions in their

briefing on the pending [101] Motion for Summary Judgment.

       As for the first issue, Plaintiff claims that Counts One and Two—the federal law claims—

were also alleged against Defendant Best and therefore remain.  Pl.'s Opp'n at 1 n.1.  She

explains that "Plaintiff intended to exclude Best only from the counts in the Complaint that

clearly did not apply to him.… The two constitutional claims were not among them."  *Id.*

Plaintiff explains that Counts Three, Five, and Six, which all state "Against the District of

Columbia," were the only claims that she intended to bring solely against the District.  *Id.* (citing

Compl. at 18, 20–21.  If the Court were to accept Plaintiff's construction of her Complaint to

have included Defendant Best in Counts One and Two, then the Court would continue to have

subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

The Court acknowledges that only the three claims noted by Plaintiff state "Against the District of Columbia" and, therefore, it could be implied that the other claims are against *both* the District and Defendant Best.  However, at the same time, the Court reads Counts One and Two as primarily addressing the District of Columbia's liability, and not that of Defendant Best.  For example, Count One, a § 1983 claim for a Fifth Amendment due process violation, states that "[w]hen officer Best seized Ms. Buie, without constitutional basis to detain her, Defendant *District* deprived Ms. Buie of her liberty without due process of law."  Compl. ¶ 56 (emphasis added).  There continues to be ambiguity.  But the Court need not decide this issue, as even if there are no longer any federal causes of action, the Court will, in its discretion, continue to exercise jurisdiction over the pendent common law claims.

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  The question before the Court is whether to continue to exercise pendent jurisdiction over Plaintiff's remaining common law claims pursuant to 28 U.S.C. § 1367(a), which provides, in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  "Whether to retain jurisdiction over pendent… claims after the dismissal of the federal claims is a matter left to the sound discretion of the district court."  *Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1097 (D.C. Cir. 2011).  In deciding whether to retain or dismiss such claims, a court is to be guided by the factors enumerated in 28 U.S.C. § 1367(c) considered within the framework of judicial economy, convenience, fairness, and comity.  *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 n.4 (D.C. Cir. 2005); *Edmondson & Gallagher*, 48 F.3d at 1266.

Defendant District of Columbia argues that each factor weighs in favor of retaining jurisdiction.  The Court agrees.  To begin, "once [a court] has invested time and resources in a case, considerations of judicial economy, convenience and fairness to litigants… make it reasonable and proper for a federal court to proceed to final judgment upon the state-law claims." *Schuler v. Pricewaterhouse Coopers, LLP*, 595 F.3d 370, 378–79 (D.C. Cir. 2010) (citing *Osborn v. Haley*, 549 U.S. 225, 245 (2007)) (cleaned up).  Here, the parties have been litigating in federal court for just shy of seven years.  As Defendant summarizes, "[t]he Court has been heavily involved in the litigation of this case, as there were numerous discovery disputes to resolve," and "[a] magistrate judge held four telephonic hearings concerning discovery disputes and issued six memorandum opinions."  Def.'s Mot. at 17.  In addition, the parties have now twice briefed summary judgment for Plaintiff's common law claims, and the Court has already resolved issues related to those now pending.  *See id.* at 18.  As for comity, there are no novel or complex issues of state law that the Court must decide to reach a decision.

The Court also emphasizes that neither party has asked for this case to be remanded and, instead, both want the case to remain in federal court.  Accordingly, the Court will, in its discretion, continue to exercise jurisdiction over this case; the Court now turns to the merits of the remaining claims.

### B.  Merits of Plaintiff's Claims

Defendant argues that they are entitled to summary judgment for each of Plaintiff's remaining claims: negligence (Count IV), negligent entrustment (Count V), negligent retention (Count VI), negligent infliction of emotional distress (Count VII), intentional infliction of emotional distress (Count VIII), and injunctive relief (Count III).  Defendant also argues that Plaintiff had only pursued theories of direct liability against the District; they continue that even

16

if she had been asserting theories of vicarious liability as well, those claims still fail as a matter of law.  The Court will first address direct liability on each of the remaining claims before turning to the issue of vicarious liability.

### 1.  Negligent Supervision and Retention (Counts IV & VI)

Plaintiff's Complaint states that Count Four is a claim for negligence.  *See* Compl. at 19. Defendants argue that the allegations in the Complaint suggest that Plaintiff is asserting a count of negligent supervision.  Def.'s Mot. at 20.  Plaintiff affirms this characterization in her opposition brief by both failing to respond to Defendants' argument and also explicitly referencing her own claim as one of negligent supervision.  *See* Pl.'s Opp'n at 15–16.  In addition to this claim of negligent supervision, Plaintiff also brings a claim of negligent retention in Count Six.  *See* Compl. at 21–22.  The Court will address these two claims together, as District of Columbia case law does not distinguish between negligent supervision and negligent retention. *See Islar v. Whole Foods Market Grp., Inc.*, 217 F. Supp. 3d 261, 265 n.1 (D.D.C. 2016) (RDM) (citing *Phelan v. City of Mt. Rainier*, 805 A.2d 930, 937 (D.C. 2002)); *see also Blair v. District of Columbia*, 190 A.3d 212, 229 (D.C. 2018).

Plaintiff alleges that the District of Columbia breached its duty of care to protect citizens, including herself, from the sexual misconduct of MPD officers when Best sexually abused her. Compl. ¶ 85.  She continues that the District acted negligently for its failure to supervise Best, as it was foreseeable that absence of supervision would permit the reoccurrence of such misconduct.  *Id.* ¶¶ 85, 87.  As for negligent retention, Plaintiff alleges that the District's failure to terminate Best after he misused his position as sergeant and sexually coerced a female cadet for his own personal benefit in violation of MPD regulations was a breach of duty to protect females, including Plaintiff, from Best's sexual misconduct.  *Id.* ¶¶ 97, 99.

For claims of negligent supervision or retention, a plaintiff must show that the employer knew or should have known that the employee behaved in a dangerous or otherwise incompetent manner prior to the conduct giving rise to the claim and that, despite this actual or constructive knowledge, the employer failed to adequately supervise—or failed to terminate—the employee. *See Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).  A plaintiff making such a claim "bears the burden of presenting evidence which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of." *Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994) (quoting *Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C. 1979)).

A review of the record shows that Plaintiff failed to meet her burden of demonstrating that the District of Columbia breached an applicable standard of care.  A plaintiff must offer expert testimony as to the standard of care "where it concerns a subject so related to some profession or occupation as to be beyond the realm of knowledge of an average lay person." *Young v. District of Columbia*, 752 A.2d 138, 145 (D.C. 2000).  Defendant contends that the case at issue presents an area where such expert testimony is required, *see* Def.'s Mot. at 21–22, while Plaintiff argues that it is not required, *see* Pl.'s Opp'n at 20 n.11.  To resolve this disagreement, the Court must assess whether the standard of care owed by the District of Columbia, in the factual context presented, is "within the realm of common knowledge and everyday experience" of the jurors or requires the guidance of expert testimony. *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) (quotation omitted).

Generally speaking, "expert testimony is routinely required 'in negligence cases… which involve issues of safety, security and crime prevention.'" *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (quoting *Varner v. District of Columbia*, 891 A.2d 260,

267 (D.C. 2006)).  More specifically, courts regularly require expert testimony in cases involving

the supervision or retention of police officers.  *See Blair*, 190 A.3d at 230 ("the activities at issue

here—training, supervision, and retention of police officers—are not within the common,

everyday experiences of laypersons"); *see also Linares v. Jones*, 551 F. Supp. 2d 12, 19 (D.D.C.

2008) (GK); *Cotton v. District of Columbia*, 541 F. Supp. 2d 195 (D.D.C. 2008) (RMU) ("Expert

testimony generally is necessary on claims of negligent training and supervision of police

officers") (internal citation and quotation marks omitted); *Edwards v. Okie Dokie, Inc.*, 473 F.

Supp. 2d 31, 45 (D.D.C. 2007) (RMC) ("D.C. district and local courts have held that expert

testimony is required to establish the standard of care for a claim of negligent hiring, training,

and supervision of security personnel") (citing cases); *Parker v. Grand Hyatt Hotel*, 124 F. Supp.

2d 79, 90 (D.D.C. 2000) (concluding "that the standards of police and security training relate to

an occupation that is 'beyond the ken of the average layman'"); *Parker v. Grand Hyatt Hotel*,

124 F. Supp. 2d 79, 89–90 (D.D.C. 2000) (RMU) (quoting *Waggaman v. Forstmann*, 217 A.2d

310, 311 (D.C. 1966)); *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997).

There are two notable exceptions, neither of which is present here.  First, expert

testimony may not be required to establish a standard of care in negligent supervision cases

where "supervisory police officers were physically present on the scene and were negligent in

supervising the subordinate officer during that officer's altercation with the plaintiff."  *Flythe v.

District of Columbia*, 994 F. Supp. 2d 50, 69 (D.D.C. 2013) (RC); *see also Wesby v. District of

Columbia*, 765 F.3d 13, 31 (D.C. Cir. 2014), *rev'd on other grounds*, 583 U.S. 48 (2018);

*Godfrey v. Iverson*, 559 F. 3d 569, 571 (D.C. Cir. 2009).  That was not the case here, as Best was

alone with the Plaintiff during the course of their encounter.

Second, expert testimony may not be required where the conduct at issue is "persistent,

open and notorious." *Daskalea v. District of Columbia*, 227 F.3d 433, 445 (D.C. Cir. 2000).  In *Daskalea*, the United States Court of Appeals for the District of Columbia Circuit found "a continuing series of evening stripteases, accompanied by blaring music and guard-on-inmate violence" to have been so "persistent, open and notorious" that a lay person could "reasonably conclude that the District had been negligent (at best) when it failed to notice, let alone stop" the behavior.  *Id.*  Importantly, however, the Court also added that the jury did not need to "rely only upon its common sense" given that an internal investigation had also found negligence among the ranks.  *Id.*  In the present matter, Plaintiff has presented evidence of "a series of important events," which she argues establishes an "official record of dishonesty and sordid conduct."  Pl.'s Opp'n at 19–20.  This evidence includes IAB investigations for allegations of police sexual misconduct, *id.* at 19, one of which Plaintiff admits resulted in a finding of Insufficient Fact, *see id.* at 5.  This conduct does not rise to the level of such pervasive, obvious, and notorious misbehavior as was the case in *Dasklaea* so as to obviate the need for expert testimony.

The Court therefore finds that expert testimony is required in this case, as the activities are "beyond the ken of the average layman," *Parker*, 124 F. Supp. 2d at 89, and lay jurors could "reasonably disagree over the [standard of] care required," *Briggs*, 481 F.3d at 845.  For example, jurors could disagree as to the types and frequency of misconduct that should precipitate improved supervision or position removal, what privileges should be revoked based on which types of misconduct, what any improved sexual misconduct training should entail, what supervisory materials governing sexual misconduct should include, and other questions of police protocol.  The District *did* take action after Best was accused of previous sexual misconduct, namely, launching investigations into his behavior, *see* ECF No. 94-1, at Ex. 3 (investigation into Ms. Jones' allegations); ECF No. 90-14 (investigation into Ms. Lee's

allegations), but a layperson would not know whether these investigations were adequate.

Next, the Court finds that Plaintiff has not presented sufficient expert testimony to establish the standard of care for the supervision and retention of police officers and, therefore, Plaintiff is incapable, as a matter of law, of proving either her negligent supervision or retention claim against the District of Columbia.

> Case law is clear that expert testimony
>
> is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances. Nor is it enough for the expert simply to declare that the [defendant] violated the national standard of care. Rather, the expert must clearly articulate and reference a standard of care by which the defendant's actions can be measured. Thus the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable… facilities or to some standard nationally recognized by such units.

*Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C.1997) (internal quotation marks and citations omitted). The District of Columbia Court of Appeals has found "generalized references" to standards to be insufficient, *District of Columbia v. Moreno*, 647 A.2d 396, 400 (D.C. 1994); *District of Columbia v. Carmichae*l, 577 A.2d 312, 315–16 (D.C. 1990); instead, the expert must proffer "a specific, articulable (and articulated) standard of care," *id.* at 315; *see Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C.1998) ("[T]he expert must testify as to specific… standards and must relate them directly to the defendant's conduct." (internal citation omitted)). "Absent such testimony, the jury will be forced to engage in idle speculation which is prohibited." *Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C. 1981). Particularly relevant here, articulation of a specific standard is essential "[e]specially in circumstances in which… the defendant is alleged to have failed to protect the plaintiff from harm." *Varner*, 891 A.2d at 269.

Plaintiff references expert testimony only twice, both in footnotes—or, as Defendant puts

it, "Plaintiff only makes two brief and muddled references to her own police practices expert."

Def.'s Reply at 7.  First, Plaintiff argues that "the District focuses on the standard of care, even

though plaintiff's police practices expert has presented extensive record evidence of the District's

failure in that regard."  Pl.'s Opp'n at 18 n.8.  Plaintiff does not then go on to present any of the

referenced evidence.  In a later footnote, Plaintiff cites a report and supplemental report prepared

by a police practices expert, Mr. Reiter.  *Id.* at 19 n.10.  The quoted sections explain that the

report addresses a "lack of adequate and realistic written policies; lack of training specific to

sexual misconduct;… Officer Best's disciplinary record…; supervisory oversight failures,

including Best's retention; and administrative investigatory inadequacies."  *Id.* (quoting Pl.'s

Opp'n Ex. 31 ¶ 22).  Plaintiff continues that her expert "opined that 'the harm suffered by the

Plaintiff from the sexual misconduct by Officer Best was the result of the environment created by

MPD's customs, practices and policies that prevailed in the agency [regarding] sexual and

domestic misconduct by MPD employees.'"  *Id.* (quoting Pl.'s Opp'n Ex. 31 ¶ 22).  The report

continued that "'[t]hese systemic deficiencies by the MPD, in my opinion, created an

environment where a reasonable officer could believe that there would be little, if any,

employment sanctions for engaging in sexual and domestic misconduct.'"  *Id.* (quoting Pl.'s

Opp'n Ex. 31 ¶ 23).

        In light of Plaintiff's cursory treatment of Mr. Reiter's expert testimony, the Court

reviewed the report in its entirety.  The Court did not find therein a specifically articulated

standard of care against which the District's conduct was measured.  The expert acknowledges "a

large body of knowledge and literature about the practices and standards that modern, reasonably

managed and administered police agencies across the U.S. should follow and apply to its

operations."  Pl.'s Opp'n Ex. 31 ¶ 7.  However, he does not proceed to articulate what these

practices or standards are to satisfy the required standard.

Mr. Reiter briefly discusses the creation of police policies. His expert report references a 2011 International Association of Chiefs of Police guide that presented "model language that should be used or adopted in police department policies" such as, for example, defining what constitutes sexual misconduct by law enforcement, and stating that "all employees [should] regularly receive effective training." *Id.* ¶ 11. This guide—at least the portion that the expert presented—cannot be said to be a specific, articulated standard of care, as it merely offered broad and vague suggestions about the need for policies addressing sexual harassment. The expert also offers his own suggested definitions regarding sexual assault, suggested procedures, and suggested disciplinary actions to be included in police department written policies, *id.* ¶ 12, which, importantly, he does not say have been adopted by any police departments, let alone achieved national recognition and acceptance. Later, the expert report includes a 1973 U.S. Department of Justice statement that "[e]very police chief executive immediately should establish written policies in those areas of operations in which guidance is needed to direct agency employees toward the attainment of agency goals and objectives." *Id.* ¶ 21. Although Mr. Reiter later goes on to critique the District's "conscious choice to avoid enacting specific written policies and procedures… involving police employee involvement in sexual… misconduct," *id.* ¶ 24, he did not articulate a specific standard against which the District's failure to enact adequate policies can be measured.

The expert report also references certain factors a police department should keep in mind when reviewing a complaint of sexual misconduct. These factors come from "materials from [the expert's] own experience and training as well as materials that reflect generally accepted practices advocated by the [International Association of Chiefs of Police] and the FBI" that he

uses when leading police trainings.  *Id.* ¶ 14.  The factors are: "(1) credibility of the complainant should not be a concern when accepting these complaints; (2) consent is not an issue at this stage; (3) chemical dependency or intoxication of the complainant is not a factor at this stage of the complaint process; (4) background of the complainant is not a consideration at this stage; (5) a belief complainant won't cooperate should not factor into accepting the complaint; and (6) marital status, religion or sexual orientation are not relevant issues at this stage."  *Id.*  Even if accepted as an acceptable standard of care for present purposes, these factors are not entirely relevant to the investigations involving Best or the District's behavior more broadly.

Finally, Mr. Reiter also references a 1999 model policy adopted by the International Association of Chiefs of Police that "delineates a position by the department of absolute intolerance… of domestic violence.  An officer found guilty of domestic violence, either through criminal court or an administrative hearing, shall have his/her police powers revoked. Once implemented, the policy will apply to past convictions, and existing and future police officer domestic violence crimes."  *Id.* ¶ 17.  This policy is not relevant for two reasons: first, it is about domestic violence rather than sexual assault or misconduct, which the expert recognizes are different, *id.* ¶ 19, and second, Best had not yet been found guilty of any crimes when the alleged lack of supervision or position removal occurred.

The Court also notes that Plaintiff's expert repeatedly references his report as including his opinions, which is patently contrary to what is required here.  *See, e.g.*, Pl.'s Opp'n Ex. 31 ¶¶ 7 ("My opinions are based upon…"), 23 ("… in my opinion…"), 24 ("… in my opinion…"), 29 ("In my opinion,…").

All in all, Plaintiff's expert testimony does not provide a specific, articulable, and articulated standard of care, but rather the expert report is sprinkled with generalized references

to standards and personal opinions.  Without sufficient expert testimony to establish a standard of care, Plaintiff cannot legally succeed on her negligent supervision and negligent retention claims, and the Court need not address additional elements required to make out such claims.

The Court will **GRANT** summary judgment for Defendant District of Columbia on both Count IV (Negligent Supervision) and Count VI (Negligent Retention).

### 2.  Negligent Entrustment (Count V)

Next, the Court turns to Plaintiff's claims for negligent entrustment, as set forth in Count V of the Complaint.  Plaintiff alleges that the "District negligently entrusted Best with a police uniform, weapon, police car and security passes to MPD headquarters in violation of MPD's regulations."  Compl. ¶ 90; *see also* Pl.'s Opp'n at 22.  Plaintiff continues that the District breached a duty to protect Plaintiff Buie "by negligently entrusting MPD equipment to officer Best, which allowed him to use the indica [sic] of police authority to sexually abuse Ms. Buie."  Compl. ¶ 93.

The elements of a negligent entrustment claim are: "(1) [t]he making available to another a chattel which the supplier (2) knows or should have known the user is likely to use in a manner involving risk of physical harm to others (3) [whom] the supplier should expect to be endangered by its use."  *Phelan*, 805 A.2d at 941.  The Second Restatement of Torts clarifies that the second element refers to a person who is likely to use the chattel in an unsafe manner due to "youth, inexperience, or otherwise."  Restatement (Second) of Torts § 390.  A plaintiff must also establish direct and proximate cause.  *Bankers Standard Ins. Co. v. Anand*, No. 19-cv-1661-RCL, 2020 WL 4698363, at *5 n.9 (D.D.C. Aug. 13, 2020).

Defendant argues that the "most prominent problem with Plaintiff's claim is that Best did not use his uniform, his weapon, the CSB squad car, or his security pass to sexually assault

Plaintiff."  Def.'s Mot. at 28.  The Court agrees that there is a disconnect between the chattel and the assault.  While the items Plaintiff lists are among chattels most commonly associated with negligent entrustment, *see, e.g.*, Restatement (Second) of Torts § 390 (listing examples of negligent entrustment, including those that involve cars and guns), the chattels were not used to cause harm to Buie.  The District continues that "even if th[e] Court finds that Best 'used' MPD equipment to commit the assault, there is no evidence in the record showing that MPD had any reason to foresee that Best would use these items to commit such a crime."  Def.'s Mot. at 29.  The Court, again, agrees; the chattel was not used in such a manner in which it would have been readily apparent they would have been used to cause the harm that ensued.

For example, as for the police car, "[g]enerally, negligent entrustment of a vehicle… is imposed only where the owner entrusts the vehicle to one whose appearance or conduct is such as to indicate his incompetency or inability to operate the vehicle with care."  *Drummond v. Walker*, 643 F. Supp. 190, 191 (D.D.C. 1986).  Courts have found liability where the owner of the vehicle had knowledge that the driver, who caused a car collision, did not know how to drive, was physically or mentally incapable of operating a motor vehicle, or was intoxicated.  *Id.* (collecting cases).  This theory pertains when the vehicle is used to cause or is instrumental in causing the harm, for example, where an unlicensed individual struck and injured a pedestrian while driving a U-Haul, *Young v. U-Haul Co. of D.C.*, 11 A.3d 247, 248–50 (D.C. 2011) (nevertheless finding that negligent entrustment claim failed), or where a bus driver lacking training struck a motorcyclist, *Davis v. Wash. Metro. Area Transit Auth.*, No. 19-cv-660 (APM), 2019 WL 2343670, at *2 (D.D.C. June 3, 2019) (also finding that negligent entrustment claim failed), and where the owner was or should have been aware of the risk.  Here, Best did not use his vehicle to cause harm to the Plaintiff.  While the Court acknowledges that Best drove

Plaintiff to MPD headquarters in his police vehicle, the vehicle was not used to cause the harm, nor could the District have been expected to know of Best's propensity to use this particular chattel in this particular improper manner. *See Phelan*, 805 A.2d at 941–42. The same is true for Best's uniform, weapon, and security passes.

Plaintiff has not cited any case law nor presented any facts indicating otherwise. She argues that Best's "known, documented disciplinary record involving… lying and stealing, domestic violence, and… police sexual misconduct" should have put the District on notice. Pl.'s Opp'n at 22. However, this history of misconduct did not involve using the aforementioned chattels to cause the type of harm at issue here.[2] Plaintiff even admits as such, citing an IAB Memorandum regarding the investigation involving Ms. Lee, stating that Best "used *his position of authority* to try to intimidate the women." *Id.* at 23 (citing ECF No. 90-14 at 8) (emphasis added). The Court adds that in the incident discussed in that Memorandum, his police uniform, weapon, police car, or security passes were not referenced. *See generally* ECF No. 90-14. The same is true of the IAB Memorandum regarding the investigation involving Ms. Jones. *See generally* ECF No. 94 Ex. 3.

For the foregoing reasons, the Court finds that the District of Columbia is entitled to judgment as a matter of law on this claim. The Court will **GRANT** summary judgment for Defendant District of Columbia on Count V (Negligent Entrustment).

---

[2] The Court notes that Best's prior sexual assault allegations were different from the one at hand in some other key regards such that the District could not have been expected to know he would use the chattels in this way. For example, during the alleged sexual assaults of Ms. Jones and Ms. Lee, Best was in MPD buildings or otherwise on duty as an MPD officer, *see* ECF No. 94-1 Ex. 3; ECF No. 90-14. Furthermore, both Ms. Jones and Ms. Lee were MPD employees and Best was their supervisor. ECF No. 90-14 at 7.

### 3.   Negligent Infliction of Emotional Distress (Count VII)

The Court now turns to Plaintiff's claim for negligent infliction of emotional distress ("NIED"), Count VII of the Complaint.  Plaintiff alleges that "Defendant District knew, or should have known, that given officer Best's past misconduct in police facilities while in uniform, it was especially likely that he would improperly detain Ms. Buie and sexually assault her, which would result in serious emotional distress to Ms. Buie" and that "Defendant District breached its duty to protect Ms. Buie from officer Best."  Compl. ¶¶ 105–06.

To prevail on an NIED claim, Plaintiff "must prove (1) that [Defendant] acted negligently, (2) that [she] suffered either a physical impact or [was] within the 'zone of danger' of the [Defendant's] actions, and (3) that [she] suffered emotional distress that was 'serious and verifiable.'"  *Wright v. United States*, 963 F. Supp. 7, 18 (D.D.C. 1997) (LFO) (quoting *Jones v. Howard University, Inc.*, 589 A.2d 419, 424 (D.C. 1991)).

Plaintiff fails to meet the first element of this claim: that Defendant acted negligently.  In her opposition brief, Plaintiff states that she "incorporates her negligence arguments under 'Negligent Supervision and Retention, Counts IV and VI' herein, for they are applicable here."  Pl.'s Opp'n at 23 n.14.  She goes on to reference the District's retention of Best.  *Id.* at 24.  Plaintiff does not present any additional arguments to show that the District acted negligently.

The Court incorporates its analysis from above, *see* Section III.B.1 *supra*, concluding that Plaintiff cannot legally succeed on her claims of either negligent supervision or negligent retention.  Without establishing negligence on the part of the District, Plaintiff therefore cannot make out a claim for NIED, and the Court need not address other elements of this cause of action.

The Court will therefore **GRANT** summary judgment for Defendant District of Columbia

on Count VII (Negligent Infliction of Emotional Distress).

### 4. Intentional Infliction of Emotional Distress (Count VIII)

The Court now examines Plaintiff's claims for intentional infliction of emotional distress ("IIED"), as alleged in Count VIII. Plaintiff's IIED claim is premised on the District's alleged negligent retention and failure to supervise Best "in light of his known proclivity for the commission of police sexual misconduct." Pl.'s Opp'n at 26. In her Complaint, Plaintiff states that "Defendant District failed to supervise officer Best, who was known, or should have been known, by Defendant as a sexual predator." Compl. ¶ 111. She continues that "[a]s a direct consequence of Defendant District's failure to supervise officer Best, he was able to abuse his position as a police officer and the equipment provided to him by Defendant District, as well as his office in MPD headquarters, sexually [sic] to abuse Ms. Buie." *Id.* ¶ 112. Finally, Plaintiff claims that "Defendant District's failure to supervise Best was intentional and in deliberate disregard of a high degree of probability that emotional distress would result to Ms. Buie." *Id.* ¶ 113. In her opposition brief, Plaintiff references the District's retention of Best. Pl.'s Opp'n at 26.

To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Williams v. District of Columbia*, 9 A.3d 484, 493–94 (D.C. 2010) (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003)).

A claim for intentional infliction of emotional distress has a "very demanding standard" that is "only infrequently" satisfied, *Dale v. Thomason*, 962 F. Supp. 181, 184 (D.D.C. 1997) (HHG), and, in particular, the "requirement of outrageousness is not an easy one to meet," *Drejza*

*v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Williams*, 9 A.3d at 494 (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)).  "The question of whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery requires a demanding showing that is a threshold question for the court." *Salem Media Group, Inc. v. Awan*, -- A.3d --, 2023 WL 5761922 (D.C. 2023); *see also Ortberg v. Goldman Sachs Group*, 64 A.3d 158, 164 (D.C. 2013) ("the threshold finding of 'extreme and outrageous conduct' is a question of law") (citation omitted).  The court must consider the context of the conduct, including "the nature of the activity, the relationship between the parties, and the particular environment in which the conduct took place." *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993).  "Where reasonable [persons] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficient extreme and outrageous to result in liability."  Restatement (Second) of Torts § 46 cmt. h; *see also King*, 640 A.2d at 668 (stating, on appeal, that "[i]f reasonable people could differ on whether the conduct [was] extreme and outrageous, the trial court properly submitted the issue to the jury") (citation omitted).

Here, the District's conduct—their retention of and alleged failure to supervise Best—could not reasonably be considered "extreme and outrageous."  Courts in this jurisdiction have held that "generally, employer-employee conflicts do not rise to the level of outrageous conduct." *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 211 (D.C. 1997).  For example, in *King v. Kidd*, an employee sued an agency's supervisors for IIED regarding an alleged failure to handle her grievances concerning sexual harassment. *King*, 640 A.2d at 659–61. After being harassed,

the employee had submitted a handwritten grievance to the agency's director complaining about the harassment and the biased way in which another supervisor had handled her informal grievance. *Id.* at 660, 670. The director failed to respond to the plaintiff's grievance in any way, did not attend a department training session on detecting sexual harassment in the workplace, and did not sponsor any training seminars on sexual harassment other than those required by umbrella regulations. *Id.* at 670. The court found that even viewing the evidence in the light most favorable to the employee, there was no case for IIED, stating that "[a]lthough the evidence might show [the director] neglected a duty, it is a type of neglect attributable to 'employer-employee conflicts,' and thus as a matter of law was not 'so extreme and outrageous as to permit recovery.'" *Id.* (quoting *Howard University v. Best*, 484 A.2d 958, 985–86 (D.C. 1984)).

The Court finds the same is true here. Neither the District's failure to take additional steps to supervise Best nor their retention of him are so extreme and outrageous so as "to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Williams*, 9 A.3d at 494. Plaintiff points to no case law or facts suggesting that the District's behavior was outrageous. Rather, Plaintiff's facts suggest otherwise. After each of the allegations of sexual assault or otherwise improper behavior, an MPD IAB agent conducted an investigation. Pl.'s Opp'n at 3–5. During one such investigation, Best was placed on administrative leave for approximately eleven months. Pl.'s Stmt. at 10. At another point, Best was demoted from sergeant to officer. *Id.* at 12. While Plaintiff raises questions about the sufficiency of the investigations, *see, e.g.*, *id.* at 11–12, these inadequacies do not rise to the high threshold of outrageousness. Therefore, because Plaintiff fails to satisfy this first element, the Court need not address other elements of this cause of action.

The Court will therefore **GRANT** summary judgment for Defendant District of Columbia

on Count VII (Intentional Infliction of Emotional Distress).

### 5.  Injunctive Relief (Count III)

Plaintiff also asserts, as a separate cause of action, a claim for Injunctive Relief in Count

Three.  As Defendant correctly points out, *see* Def.'s Mot. at 40–41, a request injunctive relief is

not a freestanding cause of action but instead a remedy, *Kemp v. Eiland*, 139 F. Supp. 3d 329,

343 (D.D.C. 2015) (TSC); *see also Base One Techs., Inc. v. Ali*, 78 F. Supp. 3d 186, 199 (D.D.C.

2015) (JEB).  Plaintiff, legally, has no stand-alone claim, and because the Court has granted

summary judgment for the District of Columbia on all other counts, it shall **GRANT** summary

judgment for Defendant District of Columbia on Count III (Injunctive Relief).

### 6.  Vicarious Liability

Having decided that Plaintiff's claims pursuing direct liability fail, the Court now turns to

the issue of potential vicarious liability.

In Defendant's previous [10] Partial Motion to Dismiss, they argued that as for Plaintiff's

common law claims of negligence, negligent entrustment, negligent retention, negligent

infliction of emotional distress, and intentional infliction of emotional distress, "Plaintiff's claim

fails to state a claim of relief under a respondeat superior theory of liability" because Best was

not acting within the scope of his employment at the time of the alleged acts.  ECF No. 10 at 6–

7.  Plaintiff did not contest that Best was acting outside the scope of his employment in her [13]

Opposition, but instead suggested that the District should be held vicariously liable under §

219(2)(b) and (d) of the Restatement (Second) of Agency.  ECF No. 13 at 3–8.  Under §

219(2)(b), an employer is liable when the tort is attributable to the employer's own negligence,

while § 219(2)(d) concerns vicarious liability for intentional torts.  *See Burlington Indus., Inc. v.

Ellerth*, 524 U.S. 742, 758–59 (1998).  The Court ultimately ruled that Plaintiff plausibly alleged

vicarious liability under § 219(2)(d) to survive the motion to dismiss stage and, therefore, reserved judgment with respect to § 219(2)(b).  Mem. Op. & Order, ECF No. 19 at 3.

The issue of vicarious liability was raised again in the context of Defendant's first [90] Motion for Summary Judgment.  Defendant now argues that in Plaintiff's [94] Opposition to Defendant's first [90] Motion for Summary Judgment, she "made clear—both by focusing exclusively on direct liability and by failing to counter the District's affirmative arguments concerning vicarious liability—that she is only pursuing theories of direct liability against the district."  Def.'s Mot. at 32.  However, Plaintiff retorts that she *did* pursue vicarious liability theories in her opposition, citing a footnote in her original brief that referenced Sections 219(2)(b) and (d) of the Restatement (Second) of Agency.  Pl.'s Opp'n at 10 (citing ECF No. 94-1 at 36 n.42).  In reply, Defendant argues that "[t]here is no dispute that Plaintiff has superficially mentioned Sections 219(2)(b) and (d) in discussing liability, but the *substance* of Plaintiff's arguments reveals that she is only pursuing theories of direct liability."  Def.'s Reply at 4 (emphasis in original).  This distinction is without consequence, because even assuming Plaintiff was in fact pursuing theories of vicarious liability, they fail as a matter of law for the reasons that now follow.

### a.  Restatement (Second) of Agency Section 219(2)(b)

Under the Restatement (Second) of Agency, a master can be "subject to liability for the torts of his servants acting outside the scope of employment" if "the master was negligent or reckless."  Restatement (Second) of Agency § 219(2)(b).

In Plaintiff's Opposition brief, she affirms that her argument hinges on the District's negligent (or reckless) retention of Best after learning of "his penchant for police sexual misconduct" as well as the District's negligent (or reckless) supervision of Best, including

MPD's lack of training specific to police sexual misconduct.  Pl.'s Opp'n at 12–13.  Accordingly, because the Court has decided that Plaintiff's claims of negligent retention and supervision fail as a matter of law, *see* Section III.B.1 *supra*, any theory of vicarious liability under Section 219(2)(b) must likewise fail.

**b.  Restatement (Second) of Agency Section 219(2)(d)**

The District of Columbia has not expressly adopted Section 219(2)(d) of the Restatement, *see Doe v. Sipper*, 821 F. Supp. 2d 384, 391 (D.D.C. 2011) (JEB), but it has been relied upon by the United States Court of Appeals for the District of Columbia Circuit, *see, e.g.*, *Gary v. Long*, 59 F.3d 1391 (D.C. Cir. 1995).

Under the Restatement (Second) of Agency, there are two ways in which an employer can be subject to liability for the intentional tort of an employee acting outside the scope of employment: first, if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority," or second, if "he was aided in accomplishing the tort by the existence of the agency relation."  Restatement (Second) of Agency § 219(2)(d).  The second theory "holds the employer liable only if the tort was accomplished by an instrumentality, or through conduct associated with the agency status."  *Gary*, 59 F.3d at 1397 (quotation omitted).

Plaintiff does not argue that the first theory applies here, *i.e.*, that Best purported to act or to speak on behalf of the District and there was reliance upon apparent authority.  As Defendant explains, Plaintiff has never contended that Best purported to act on behalf of MPD when he sexually assaulted her.  Def.'s Mot. at 35.  Plaintiff impliedly agrees by focusing only on the instrumentalities provided and the underlying agency relationship.  *See* Pl.'s Opp'n at 11 (quoting *Gary*, 59 F.3d at 1397 for the proposition that § 219(2)(d) applies if "the tort was accomplished by an instrumentality, or through conduct associated with the agency status," and

then proceeding to argue that "the District chose to retain officer Best and provide him with a bevy of instrumentalities that attend the underlying agency relationship that serving as an MPD… officer… entails").

Under this second theory, the D.C. Circuit has explained, "[l]iability is based upon the fact that the agent's position facilitates the consummation of the [tort], in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." *Gary*, 59 F.3d at 1397 (citing Restatement § 261 cmt. a; *id.* § 219 cmt. e (citing § 261 in discussion of § 219(2)(d))).  "It is a general principle of agency law that '[i]f a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability.'" *Id.* at 1398 (quoting Restatement § 166 cmt. a).

In the Court's previous [19] Opinion, the Court found that Plaintiff had plausibly alleged vicarious liability under § 219(2)(d) to survive a motion to dismiss on that issue.  ECF No. 19 at 3.  However, now, with the benefit of extensive discovery, the Court finds that Plaintiff's vicarious liability theory under § 219(2)(d) fails.

Plaintiff cannot successfully claim the § 219(2)(d) exception because she could not have reasonably believed that Best was acting within the color of his authority or that his actions were somehow condoned by MPD.  *Cf. Gary*, 59 F.3d at 1397–98.  It is far from reasonable for someone to think that anyone, let alone a police officer, committing sexual assault would be in the ordinary course of their business or within the scope of their employer's orders.  Plaintiff's deposition testimony further underscores she knew Best was doing something not condoned by MPD before the assault even began.  After Best demanded that she get in his car and he drove

her to the station, Plaintiff testified that

> while we were driving down in the police garage, he pointed out Chief Lanier's car.  And I noticed now, this just has turned wrong.  Because now I'm not even where civilians are supposed to go.  When we get into the garage.  I asked him to sit in the car.  And he tells me, 'No. Chief Lanier's in here.  You can't sit down here.'

Def.'s Mot. Ex. 2 at 213:10–17.  Plaintiff's comments reveal that she knew Best was doing something wrong, and, in particular, that he was doing something of which Chief Lanier would not approve.  *See also* Def.'s Mot. at 40 ("Best's reference to Chief Lanier… is yet further information that would have signaled to any reasonable person that Best was violating MPD orders by bringing her there.").  Once inside, when they walked past Chief Lanier's office, Plaintiff stated that Best "told me to keep it down."  Def.'s Mot. Ex. 2 at 215: 2–4.

In addition to Plaintiff's statements indicating she understood something inappropriate to be taking place, the District has presented evidence of policies forbidding such behavior.  Defendant outlines a host of policies that prohibit Best's actions and also emphasizes that Best's conduct was in clear violation of local or criminal law, which Plaintiff knew or should have known.  Def.'s Mot. at 38–40.  Because an employer cannot be liable for such a tort "if the employer is able to establish that it had adopted policies and implemented measures such that the victimized [individual] either knew or should have known that the employer did not tolerate such conduct," *Gary*, 59 F.3d at 1398, the District cannot be vicariously liable here.

It is not reasonable that Plaintiff could have concluded that Best's conduct was within the authority conferred by MPD or otherwise condoned by MPD and, therefore, Plaintiff cannot establish vicarious liability under Section 219(2)(d).

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant District of Columbia's Motion

for Summary Judgment on all remaining claims levied against them: injunctive relief (Count III),
negligence (Count IV), negligent entrustment (Count V), negligent retention (Count VI),
negligent infliction of emotional distress (Count VII), and intentional infliction of emotional
distress (Count VIII).

An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge